# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> ROBERT F. KENNEDY, JR., et al., <br><br> *Defendants.* | No. 1:25-cv-_____ |

**DECLARATION OF TIMOTHY F. MURPHY**

I, Timothy F. Murphy, MD, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with the University at Buffalo staff, or from documents that have been provided to and reviewed by me.

2.      I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

3.      I am a senior associate dean for clinical and translational research, responsible for overseeing strategies that aim to transform the University at Buffalo's research programs into new or improved treatments for patients and for assisting faculty and trainees at all levels in their research activities.  I also direct the University's Clinical and Translational Science Institute, a facility that includes a nine-bed Clinical Research Center with support services for clinical

1

research.  A wide variety of clinical and translational research training programs are conducted and coordinated at the facility.

An internationally recognized expert in respiratory tract bacterial infections, I am a SUNY Distinguished Professor of medicine and microbiology and immunology. I specialize in research on pathogens responsible for ear infections (primarily in children) and on lower respiratory tract infections in adults with chronic obstructive pulmonary disease (COPD).

I hold more than a dozen patents related to vaccine development and conducted the longest-standing study of COPD at the Buffalo Veterans Affairs Medical Center from 1994 to 2014. My laboratory is based at the University's Clinical and Translational Science Institute, and my work has long been funded in part by grants from the National Institutes of Health.

A graduate of New York University, I received my medical degree from Tufts University School of Medicine, completed an internship and residency in internal medicine at the New York Hospital Cornell Medical Center, and completed a fellowship in infectious diseases at Tufts before coming to the University at Buffalo in 1981. I have published 230 articles in peer-reviewed journals and serve as a reviewer for 20 medical journals, including the New England Journal of Medicine.

4.    The University at Buffalo is a scholarly community dedicated to bringing the benefits of our research, scholarship, creative activities and educational excellence to local and global communities in ways that impact and positively change the world.

The University views the three traditional pillars of the public higher education mission—research, education and service—as interdependent endeavors that continually enrich and inform each other. Groundbreaking research, transformative educational experiences and

2

deeply engaged service to our communities define the University at Buffalo's mission as a premier, research-intensive public university.

5.    University at Buffalo has three campuses, over 32,000 students, almost 12,000 employees, and performs over $544,000,000.00 in vital research annually.

**Reliance on NIH Funding**

6.    In fiscal year 2024, University at Buffalo received funding through the National Institutes of Health ("NIH") to support 224 projects, totaling $60,654,347.

7.    University at Buffalo receives NIH grants across a variety of institutes encompassed within the NIH, including the National Institute on Minority Health and Health Disparities, the National Institute of Mental Health, and the National Institute for Alcohol Abuse & Alcoholism.

8.    Through those NIH grants, University at Buffalo funds 1003 researchers.

9.    The work done by University at Buffalo on NIH funded projects provides education and training in Biomedical Engineering, Biochemistry, Chemistry, Dentistry, Family Medicine; Internal Medicine; Microbiology and Immunology, Neurology, Nursing, Ophthalmology, Pathology, Pediatrics, Pharmacology, Psychology, Public Health and Health Professions, Radiology, and other programs.

10.    University at Buffalo provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the New York State economy.

**Terminations of NIH Grants**

11.    Since March 12, 2025 University at Buffalo has had three NIH grants terminated, not including terminated grants for which the University was a sub-awardee.

3

12.     The terminations received as of March 28, 2025 are attached hereto as <u>Exhibits A–C</u>.

13.     These terminations will result in the loss of at least $4,481,711 in research money to University at Buffalo.

14.     The termination notices for these grants have provided very little to explain the termination, instead noting that the research is no longer consistent with newly conceived agency priorities. Specifically, the termination notices state that: "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

15.     In my 44 years working at University at Buffalo, my research has been continuously funded by the NIH for 42 of those years. I have never had a grant canceled by the NIH and have never seen this language to cancel grants.

16.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, University at Buffalo had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was University at Buffalo provided with any updated "agency priorities" with which its research must align.

4

17.     The NIH grant, "Center of Excellence in Investigator Development and Community Engagement" (grant number 1P50MD019473-01) to the University at Buffalo that was canceled March 13, 2025 has research aims that align directly with the publicly stated NIH mission, which is "to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."

18.     One aim of the Center of Excellence grant is to train and mentor a new generation of scientists from a broad range of disciplines to perform innovative research to improve public health with an emphasis in our region, more specifically in Erie County, located in Western New York. To accomplish this aim, the grant provides pilot study funds to early-stage investigators (using the NIH definition of early-stage investigators) to perform innovative research designed to improve health in our region in ways that are sustainable. The grant also includes effort for training experiences and mentoring tailored to the early-stage investigators to advance their careers. This aim directly addresses one of the publicly stated goals of the NIH: "to develop, maintain, and renew scientific human and physical resources that will ensure the Nation's capability to prevent disease" by expanding the nation's health research workforce and improving health through training the next generation of research leaders in public health.

19.     The grant has met and exceeded all milestones in the first seven months of funding with outstanding progress. To attract the most accomplished early-state investigators to apply for pilot studies, a Request for Applications was circulated to faculty in all 12 UB schools in an effort to engage researchers in many disciplines. The rationale is that improving public health will require expertise in both health-related and nonhealthy related disciplines, including for example urban planning (built environment and neighborhoods), education (improving health

5

literacy, which is directly related to health), economics (addressing poverty), and more. We received 18 Letters of Intent (LOIs) from early-stage investigators across seven UB schools, including the Jacobs School of Medicine and Biomedical Sciences, School of Public Health and Health Professions, School of Nursing, School of Management, School of Engineering and Applied Sciences, and College of Arts Sciences, and Graduate School of Education. This was an excellent outcome in that we reached a substantial number of early career researchers with interest in health-related research. Importantly, these applicants were from a broad range of disciplines, which was one our goals.

20.     Based on review by the pilot studies review committee, 11 applicants were invited to submit full proposals. Using a rigorous review process that involved a study section-like review and discussion of each proposal, pilot study grants were awarded to four early-stage faculty. Briefly, the four projects address public health issues that are especially important in our region:

    a.  Promoting health in elementary schools in Buffalo Public Schools by researchers from the UB School of Public Health and Health Professions and the Graduate School of Education.

    b.  Development of cell phone app to increase health literacy and improve access to healthcare for obstetric patients to improve maternal and neonatal outcomes from an expert in human-computer interaction from the School of Engineering and Applied Sciences.

    c.  Placing community health workers in pediatric practices to increase access to healthcare for families and children from a pediatrician in the Jacobs School of Medicine and Biomedical Sciences.

    d.  Promoting and teaching bystander cardiopulmonary resuscitation in schools and communities by a team from the Jacobs School of Medicine and Biomedical Sciences.

21.    All four of these projects support a publicly stated goal of the NIH: "to foster fundamental creative discoveries, innovative research strategies, and their applications as a basis for ultimately protecting and improving health."

22.    Of the 62 counties in New York State, Erie County (population 950,683) is ranked 47th based on data from the New York State Department of Health and county health departments. The long-term goal of this grant is to support innovative research that will improve health outcomes in Erie County while training the generation of the nation's public health research leaders. The pilot studies supported by the Center of Excellence grant and larger projects that will result from the pilot studies will improve health in our region.

23.    Leadership of the Investigator Development Core of the Center of Excellence grant met with each pilot study awardee and their departmental research administrator in a training session to review requirements, conditions of funding and to address any questions. The Core is assisting pilot study awardees to ensure compliance with federal policies, rules, and guidelines for research involving human subjects.

**Comparisons Across Administrations**

24.    In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

25.    Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

26.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations**

27.     The termination of the Center of Excellence grant at this time is particularly devastating for early-stage faculty whose research is supported by the grant. The highest risk period in the career of a health sciences and public health researcher is the transition from training to their first faculty position. This time period is frequently the turning point in one's career, determining whether they will become a successful, established researcher with their own independent federal funding or not. The early-stage faculty funded by this grant were all in the initial phase of initiating their study, including receiving Institutional Review Board (IRB) approval for human studies, hiring personnel and graduate students to work on their projects, training the new personnel and establishing protocols and partnerships. All of this successful activity has been stopped abruptly by termination of the Center of Excellence Grant (1P50MD019473-01) putting their research and their careers in jeopardy.

28.     We have paused seed funding for early career faculty related to this award as their projects depend on timely NIH awards. This funding was considered in the hire of new faculty related to the award intent and whom we had provided offer letters to and for whom the University at Buffalo had taken steps to prepare for their arrival. Termination of this award has a compounding affect on not only the faculty, but a strategic growth investment for the university.

29.     Several shared research cores have seen decreased usage due to grant uncertainty, and one facility temporarily reduced staff hours due to budget delays.

**Admissions, Training and Workforce Disruptions**

30.     University at Buffalo uses that information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level.

31.     NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays. These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants).

32.     Physician scientists are an especially critical part of the health sciences workforce supported by NIH training grants. There is an alarming national decline in physician-scientists in the last three decades. Physician-scientists are a vital component of the biomedical research workforce. Combining both clinical and research expertise, physician-scientists play an irreplaceable role in biomedical discovery by bringing unique perspectives through caring for patients. Physician-scientists have been awarded 41% of basic and 65% of clinical Lasker Awards; 37% of all Nobel Prizes in Physiology or Medicine have gone to physician-scientists. Physician-scientists are also important leaders in scientific organizations, representing ~70% of NIH Directors and~ 70% of scientific officers in the largest pharmaceutical companies. Taken together, physician-scientists are a critical asset in the US and the world.

33.     In the 1980s, physicians engaged in research reached a peak of 4.7% of the physician workforce. Today, only 1.5% of physicians in the US report research as their major professional activity. The number of physician scientists receiving postdoctoral research training and career development awards is at an all-time low. Early career physicians currently make up a smaller share of funded investigators than ever, and the training pipeline for future physician scientists is shrinking. The report by the NIH Physician Scientist Working Group made a series

9

of recommendations aimed toward increasing the number of physician scientists in the biomedical research workforce, emphasizing the national priority placed on training more physician scientists. The report concludes that in order to maintain a steady state, 1,000 physician scientists per year will need to enter the workforce.

34.     Four physician scientists are principal investigators or co-investigators on the pilot studies awarded as part of the Center of Excellence grant. The abrupt termination of this grant will clearly adversely impact career development for these faculty at the most vulnerable time in their scientific careers.

**Irreparable Harm**

35.     The terminations have disrupted ongoing research, as well as setting back the University at Buffalo for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel.  This is in spite of the interim funding measures being taken by University at Buffalo to keep certain research going. University at Buffalo has had to make decisions about which of these valuable programs to continue with these limited funds.

36.     Delays have also disrupted community services, student opportunities, and public programs.

37.     In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Conclusion**

38.     The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are

10

undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

39.     The termination of the NIH P50 grant has caused significant disruptions to research, faculty development, and institutional operations at the University at Buffalo. Early-stage faculty, who were relying on this funding to establish their independent research careers, now face major setbacks, including stalled projects, lost personnel, and diminished prospects for securing future funding. Several pilot studies aimed at improving public health in Western New York have also been halted, delaying critical advancements in community health initiatives. The sudden loss of funding has forced the University to reallocate limited discretionary resources for emergency bridge funding, diverting support from other research priorities and planned institutional improvements.

40.     Beyond the immediate research impact, these terminations have destabilized faculty recruitment, reduced access to shared research facilities, and weakened the training pipeline for future scientists, including physician-scientists. The unpredictability of NIH funding has created institutional uncertainty, delaying new faculty start-ups and diminishing confidence in the reliability of federal research support. With loss of key personnel related to the efforts, substantial previous investments made both by the U.S. Department of Health and Human Services and the University will be a complete loss as disruption of an established team does not permit others to step in and complete the work proposed. Many of these harms—particularly lost time, disrupted research continuity, and career setbacks—are irreparable..

_____
Timothy F. Murphy MD

Date:  4-1-25

11

# EXHIBIT A



March 12, 2025

Amy Lagowski
Research Foundation for the State University of New York
Amy.Lagowski@buffalo.edu

Dear Amy Lagowski:

Funding for Project Number 1P50MD019473-01 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on July 19, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S
Date: 2025.03.12 22:17:03 -04'00'

Michelle G. Bulls, on behalf Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

2

# EXHIBIT B

Wshen7@buffalo.edu

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:31 PM
**To:** Wei Shen <wshen7@buffalo.edu>
**Subject:** Grant Termination Notification



3/21/2025

Wei Shen
State University Of New York At Buffalo
wshen7@buffalo.edu

Dear Wei Shen:

Effective with the date of this letter, funding for Project Number 5K01MH130270-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents[12]

supporting your claim.

Sincerely,

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT C

3/21/2025

Mical, Alison
State University Of New York At Buffalo
alodojew@buffalo.edu

Dear Mical, Alison:

Effective with the date of this letter, funding for Project Number 5R01AA028810-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, NIAAA
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

―――――――――――――――――

―――――――――――――――――

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)