# EXHIBIT 25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> ROBERT F. KENNEDY, JR., et al., <br><br> *Defendants.* | No. 1:25-cv-_____ |

## DECLARATION OF AMY HEQUEMBOURG

I, Amy Hequembourg, PhD, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.     I am an associate professor of the State University of New York University at Buffalo in the School of Nursing.

2.     I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with the University at Buffalo staff including my Co-Principal Investigator Jennifer Livingston, PhD, or from documents that have been provided to and reviewed by me.

3.     I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

4.     I am an associate professor at the University at Buffalo School of Nursing, dedicated to investigating health disparities among sexual and gender minoritized (SGM) populations. My research has identified risks associated with sexual victimization among sexual

1

minority women, offering insights into their unique post-assault disclosure and coping experiences. I have also contributed to understanding the distinct health challenges faced by bisexual women. Collaborating with interdisciplinary teams, my work explores the link between alcohol use and violence within SGM communities. My current funded research examines mechanisms linking peer victimization and alcohol use among lesbian, gay, bisexual queer and individuals who identify as something other than exclusively heterosexual (LGBQ+) adolescents.

5.      The University at Buffalo is a scholarly community dedicated to bringing the benefits of our research, scholarship, creative activities and educational excellence to local and global communities in ways that impact and positively change the world.

The University views the three traditional pillars of the public higher education mission—research, education and service—as interdependent endeavors that continually enrich and inform each other. Groundbreaking research, transformative educational experiences and deeply engaged service to our communities define the University at Buffalo's mission as a premier, research-intensive public university.

6.      University at Buffalo, a flagship of the State University of New York, has three campuses, over 32,000 students, almost 12,000 employees, and performs over $544,000,000.00 in vital research annually.

**Reliance on NIH Funding**

7.      In fiscal year 2024, University at Buffalo received funding through the National Institutes of Health ("NIH") to support 224 projects, totaling $60,654,347.

8.      University at Buffalo receives NIH grants across a variety of institutes encompassed within the NIH, including the National Institute on Minority Health and Health

2

Disparities, the National Institute of Mental Health, and the National Institute for Alcohol Abuse & Alcoholism.

9.    Through those NIH grants, University at Buffalo funds 1,003 researchers.

10.    The work done by University at Buffalo on NIH funded projects provides education and training in Biomedical Engineering, Biochemistry, Chemistry, Dentistry, Family Medicine; Internal Medicine; Microbiology and Immunology, Neurology, Nursing, Ophthalmology, Pathology, Pediatrics, Pharmacology, Psychology, Public Health and Health Professions, Radiology, and other programs.

11.    University at Buffalo provides considerable employment benefits in the Science, Technology, Engineering and Mathematics workforce to the New York State economy.

**Terminations of NIH Grants**

12.    Since March 12, 2025, University at Buffalo has had three NIH grants terminated, not including terminated grants for which the University was a sub-awardee.

13.    The terminations received as of March 28, 2025 are attached hereto as Exhibits A–C.

14.    These terminations will result in the loss of at least $4,481,711 in research funding to University at Buffalo.

15.    The termination notices for these grants have provided very little to explain the termination, instead noting that the research is no longer consistent with newly conceived agency priorities. Specifically, the termination notices state that: "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do

3

not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

16.     In my 19 years working in NIH funded research at University at Buffalo, I have not seen this language previously used to cancel grants.

17.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, University at Buffalo had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was University at Buffalo provided with any updated "agency priorities" with which its research must align.

18.     I am the Co-Principal Investigator (with Jennifer Livingston, PhD, Associate Professor, School of Nursing, University at Buffalo) on one of the terminated grants. This grant, Award No. 92615, is titled Peer Victimization and Risky Alcohol Use among Sexual Minority Youth: Understanding Mechanisms and Contexts. In this grant we investigate the impact of peer victimization (PV) on health outcomes among LGBQ+ youth. These youth experience significant health disparities, including higher risk for suicide, greater mental health symptoms, and riskier alcohol and other substance use behaviors compared to exclusively heterosexual youth. These disparities are due, in part, to the exposure to unique and chronic minority stressors targeting their sexual identities. The relationship between PV and adverse health outcomes has been well-established for heterosexual youth, but the role of PV on these outcomes when accounting for sexual minority stressors is understudied. In this grant, we seek a better understanding of the complex and unique factors that elevate and ameliorate harmful outcomes for LGBQ+ youth in

4

the presence of minority stress and PV. Our study is novel in that we are using a developmental lens to assess participants over an 18-month period during which data are collected using surveys administered every 6 months, daily reports collected over two 4-week bursts, and qualitative interviews with a targeted subsample. This research is vital to improving the public health of millions of American youth who identify as LGBQ+ thereby reducing economic burden related to healthcare costs for these youth as they mature into adulthood. We have recruited 325 participants, representing 81.3% of the target sample. To date, only 11.4% of these participants have progressed through all phases of study. Preliminary unpublished results from this study underscore the negative impact of PV on health outcomes among LGBQ+ youth and identify heterogeneity of risks among these youth based on their sexual identity. Interviews with these youth underscore the negative emotional and psychological impact of PV on LGBQ+ youth, while also identifying factors that protective against these poor outcomes. Results indicate that parental support, LGBQ+ friendly school climate, and receipt of care from educated and culturally competent health providers are critical factors to consider as targets for future interventions to improve the health and well-being of these youth.

**Comparisons Across Administrations**

19.    In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

20.    Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

21.    Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

5

**Impact on Research-Related Operations**

22.    Termination of this grant has halted recruitment of new participants and ongoing longitudinal data collection, thereby jeopardizing our ability to achieve the stated aims. We are currently in the fourth year of the grant award, and anticipated an additional year of direct costs funding, which would have allowed us to complete participant recruitment and the follow-up assessments necessary to achieve the stated aims. Our grant supports the salaries of three highly trained research staff, all of whom were to be terminated without any warning and without cause. This termination renders them immediately unemployed, resulting in their loss of benefits accrued over years of service in the State University of New York (SUNY) system. Furthermore, loss of these three staff members impedes our ability to conduct activities in coordination with our staff to close out the grant as per NIH requirements, as instructed in the termination notice (i.e., closing records, notifying participants, paying final bills, reconciling expenses, preparing data for analysis and archiving). Loss of the project data analyst would also disrupt dissemination and scholarship, thereby hindering our team's contributions to the research and scholarship central to the University at Buffalo's mission. Overall, our inability to complete the study represents a significant loss of investment already made by the NIH and the American taxpayers.

23.    These terminations have forced the dean of our school to implement bridge funding to support our staff and compensate participants who have recently completed their assessments but were not compensated prior to receipt of the termination notice. Our school's capacity is limited to providing two weeks of bridge funds, after which our three staff members will be unemployed, preventing the completion of the project close-out. These staff were long-term SUNY Research Foundation employees and have been supported by our grant funding for

6

nearly four years. The sudden loss of employment with no due cause is economically and psychologically damaging to them.

## Admissions, Training and Workforce Disruptions

24.     The instability resulting from unanticipated grant terminations will affect the recruitment and retention of quality Ph.D. students in the School of Nursing and the University at Buffalo. Nursing Ph.D. students are required to participate in research as part of their program and a loss of the grant and the data that it would generate would adversely impact training opportunities. The inability to retain quality Ph.D. student research trainees will have continuing effects on the research capabilities of the University at Buffalo and will undermine the advancement of nursing science and public health.

## Irreparable Harm

25.     These termination notices have forced us and other researchers at the University at Buffalo and across the nation to abandon studies, miss deadlines, and/or lose key personnel. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

26.     The termination of our grant and thousands of other NIH-funded grants across the nation will undermine and stagnate scientific progress to understand the nature of health disparities among LGBQ+ populations. Recent estimates indicate that 9.3% of the U.S. adult population is LGBQ+, and the numbers of adolescents identifying as LGBQ+ is higher now than any time in prior history. The terminations have broad implications for the future of LGBQ+ research and the health of significant numbers of Americans. The impact is unmeasurable and has implications that will be seen far into the future for today's LGBQ+ youth. The health and well-being of a sizeable and vulnerable segment of our population is in jeopardy.

7

27.     Given the longitudinal and developmental nature of the current research, the study had the potential to contribute to prevention and intervention efforts to improve the health and well-being of millions who identify as LGBQ+ in our nation. Such breakthroughs would have advanced public health and will now not occur.

**Conclusion**

28.     The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships.  Terminations and delays with no explanation or remedy are undermining confidence in the system.  These harms are ongoing and, in many instances, irreparable.

29.     The termination of the NIH R01 grant has halted critical research investigating the impact of peer victimization on health outcomes among LGBQ+ youth, disrupting participant recruitment and data collection in the study's final year. The abrupt loss of funding has left three highly trained research staff unemployed without warning, preventing the completion of required closeout activities such as data reconciliation and analysis. The resulting instability has also jeopardized Ph.D. student research opportunities in the School of Nursing, undermining both immediate and long-term contributions to nursing science and public health.

30.     Beyond institutional disruptions, this termination undermines scientific progress in understanding health disparities among LGBQ+ populations. With growing numbers of adolescents identifying as LGBQ+, this research had the potential to inform vital prevention and intervention strategies. The premature termination not only wastes prior NIH investments but also has long-term consequences for public health, leaving a vulnerable population without the

8

benefits of evidence-based policy and healthcare improvements. Many of these harms—

particularly the loss of data continuity, personnel, and research momentum—are irreparable.

_____
Amy Hequembourg, PhD

Date:    4-1-25

# EXHIBIT A

 

March 12, 2025

Amy Lagowski
Research Foundation for the State University of New York
Amy.Lagowski@buffalo.edu

Dear Amy Lagowski:

Funding for Project Number 1P50MD019473-01 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on July 19, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G.
                        Bulls -S
                        Date: 2025.03.12 22:17:03 -04'00'

Michelle G. Bulls, on behalf Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

# EXHIBIT B

Wshen7@buffalo.edu

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:31 PM
**To:** Wei Shen <wshen7@buffalo.edu>
**Subject:** Grant Termination Notification

3/21/2025

Wei Shen
State University Of New York At Buffalo
wshen7@buffalo.edu

Dear Wei Shen:

Effective with the date of this letter, funding for Project Number 5K01MH130270-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents [12]

supporting your claim.

Sincerely,

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

_____

_____

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT C

3/21/2025

Mical, Alison
State University Of New York At Buffalo
alodojew@buffalo.edu

Dear Mical, Alison:

Effective with the date of this letter, funding for Project Number 5R01AA028810-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, NIAAA
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)