EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., |
| Plaintiffs, |
| v. |
| ROBERT F. KENNEDY, JR., et al., |
| Defendants. |

No. 1:25-cv-_____

**DECLARATION OF MARI OSTENDORF**

I, Mari Ostendorf, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.    I am the Vice Provost of Research of University of Washington. I have personal knowledge of the facts set forth in this declaration, and if required to testify, would and could competently do so.

2.    I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

3.    I am the Vice Provost for Research in the Office of Research at the University of Washington, a position I have held since 2021. As Vice Provost for Research, I have oversight over the pre-award process, reporting of institution-wide research statistics, and several research compliance offices. In addition, I oversee two major research units: the Applied Physics Laboratory and the Washington National Primate Research Center. Prior to holding this position, I served as Associate Vice Provost for Research in the Office of Research since 2017.

1

4.      The University of Washington is the flagship university of the state of Washington. Since its founding in 1861, it has been a hub for learning, innovation, problem solving, economic development and community building. Driven by a mission to serve the greater good, our students, faculty and staff tackle today's most pressing challenges with courage and creativity, making a difference across Washington state—and around the world. As part of its mission, the UW engages in research and direct service, which frequently rely in whole or in part on federal financial assistance.

5.      The University of Washington School of Medicine is dedicated to improving the general health and well-being of the public. In pursuit of its goals, the School is committed to excellence in biomedical education, research and healthcare. The School is also dedicated to ethical conduct in all its activities.

6.      As the pre-eminent academic medical center in our region and as a national leader in biomedical research, we place special emphasis on educating and training physicians, scientists and allied health professionals dedicated to two distinct goals: 1) Meeting the healthcare needs of our region, especially by recognizing the importance of primary care and providing service to underserved populations; and 2) Advancing knowledge and assuming leadership in the biomedical sciences and in academic medicine.

7.      The UW receives more federal research dollars than any other U.S. public university. In particular, funding from the National Institutes of Health is critical to UW's mission. In fiscal year 2024, UW received more than 1,220 NIH grants, totaling over $648 million. However, recent actions by NIH, including cancelling study sections, delaying grant renewals, and terminating grants, have severely impacted UW's ability to accomplish its mission. Because of NIH's actions in delaying and cancelling grant awards, UW is now facing funding disruptions

which are forcing it to furlough and potentially lay off research staff and faculty, cut admissions to graduate programs, including not taking any new undergraduate researchers in labs during the summer semester, and causing unprecedented budget uncertainty. These cuts have also led individual researchers to scale back their research or to limit their research to less complex experiments.

**UW Relies on NIH Funding**

8.      As noted, UW currently has over 1,200 NIH grants. These grants come from 23 different funding institutes within NIH.

9.      Through those NIH grants, UW funds over 3000 researchers (faculty, graduate students, and research staff).

10.     NIH grants support research, education, and training, into project areas spanning a dizzying array, from biomedical engineering, to suicide reduction, to health equity, to protein design using artificial intelligence, diabetes, cancer treatments, kidney disease, and countless other examples.

**Typical Timeline and Processes for NIH Grant Awards**

11.     The Office of Sponsored Programs at UW works with researchers to submit grant applications and tracks grant applications and awards.

12.     As detailed elsewhere, NIH grant applications are evaluated by study sections, who determine whether a project has scientific merit. Applications are scored, and if a grant application receives a "excellent priority score", it will likely be funded.

13.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to fund the grant is made. After the advisory council meets,

a Notice of Award is issued confirming whether or not the grant will be funded after all administrative review steps are completed.

14.     The process for competitive renewals is very similar.

15.     The budget process at UW relies upon the regular NIH grant application submission, review, and approval cycle. Typically, we rely in grants being reviewed and scored within three to six months of submission and funding is generally awarded within nine to twelve months for meritorious grants.

16.     Based upon those published NIH timelines, UW is able to make educated decisions around hiring research staff and graduate students. The regularity of the grant cycle is thus critical for UW in setting its budget.

**Delays and Irregularities in the Processing of NIH Grant Applications**

17.     Since the Inauguration, UW has experienced unprecedented delays in the processing of NIH grant applications. NIH study sections and advisory councils have been canceled, delayed or otherwise not scheduled, and grant application scoring has been significantly delayed.

18.     As of April 1, 2025, UW has more than 500 proposals awaiting NIH study section review.

19.     As of April 1, 2025, UW has 54 proposals for $138 million in total funding requested that received fundable scores, awaiting NIH advisory council and Notice of Award.

20.     As of April 1, 2025, UW has 76 proposals for $260 million in total funding requested with fundable scores that for which the NIH advisory council has met or voted electronically to approve a grant for funding, but the NOA has not yet been issued.

21.    On top of that, UW is also experiencing significant delays in so-called non-competing or Type 5 renewals. These are grant awards for which NIH has issued an award for a given year (called the "award year"), with a commitment to fund further years (called "out years"), so long as the grantee demonstrates adequate progress. The out years typically require a new notice of award (NOA) after submission of a progress report (RPPR). This is generally pro forma, and unless the grantee gets nothing done or does not submit the progress report, the next year of funding is awarded. This decision is made by the NIH program officer without peer review. Type 5 NOAs are generally received at least one week (often more) before the start of the new budget period. There can be delays with a new administration or while on continuing resolution, however, the more common practice is to award them at 90% of the budgeted amount and then to increase to full budget once the FY budget is passed (assuming no major cuts to NIH).

22.    As of April 1, 2025, UW has 73 overdue non-competing renewals totaling over $61 million that have yet to receive NOAs.

23.    I want to highlight four important research centers that are at risk because of delays in the grants review and award processes at NIH. They are the Alzheimer's Disease Research Center (ADRC), the Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging, the joint UW/Allen Center "*A multimodal brain cell atlas and community resource of Alzheimer's disease and comorbid dementias," and* the Institute for Translational Health Science (ITHS), Three of these Centers are funded by the National Institute on Aging (NIA) and received excellent scores during their reviews in study section in the fall. Because the NIA Council did not meet as scheduled in the January, these large grants were not approved for award. They all end in March, April or May and would leave large research teams without support. The work being done by these

centers is longitudinal and lapse in funding will mean loss of critical cohorts that have been studied in some cases up to 40 years.

### UW Alzheimer's Disease Research Center (ADRC)

24.    The    NIH-funded    University    of    Washington    Alzheimer's Disease Research Center ("ADRC"; P30 AG066509 ) is the main platform for Alzheimer's disease research in Washington state. Alzheimer's disease processes start 15 years before symptoms occur and run their course across decades. Serious study of Alzheimer's disease biology and treatment requires following research participants for years, characterizing their trajectories with genetic, cognitive, imaging, and biomarker tests, and doing detailed biological studies on brain tissue after death. The cycle of recruitment, long term evaluation and brain donation is the cornerstone of research that leads to effective new drugs. The Alzheimer's Disease Centers program maintains a stable network of 35 ADRC Centers and supporting programs that cooperate to study Alzheimer's disease and related disorders in a standard, long term way. The resulting data is pooled for widespread scientific analysis. The University of Washington ADRC has been continuously funded for 40 years and is one of the leading centers. We contributed key research identifying genetic causes of Alzheimer's disease and continue to study tissue and data from our families with ever more powerful techniques. We focus on the biology of degenerative dementia and the factors that counter degeneration and dementia. Many other studies depend on our UW ADRC and its sister ADRCs for participants and biospecimens like blood, spinal fluid, and brain tissue, to advance their work more powerfully and less expensively. In addition, the ADRC is part of the UW Medicine Memory and Brain Wellness Center that ensures state of the art care for patients with memory loss and dementia. As disease-modifying treatments,

like lecanemab and donanemab are now available, the ADRCs are becoming more tightly connected to their clinics.

25.    Currently, the UW ADRC is in its renewal cycle, with a fundable score, but unable to move forward into the next five years of funding without NIA Advisory Council action. Lapse of funding for the ADRC, which appears likely, will mean serious interruption of the longitudinal research, loss of key personnel who have developed expertise over years of devoted service, and loss of availability of key resources, like appropriately curated brain tissue, that are essential for the affiliated studies. For example, we have a major project with the Allen Institute for Brain Science (U19 AG060909) that depends on our brain tissue. NIH funding means stability and longevity of resource centers like ours and is irreplaceable.

**Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging**

26.    I would like to highlight our NIA P30 Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging and its companion training grant (T32) the Biological Mechanisms of Healthy Aging (BMHA) Training grant. We submitted the renewals last year and the NSC received an impact score of 15 and the BMHA received an impact score of 13. These scores reflect the outstanding impact the NSC and BMHA continue to have on aging research in both scientific discovery and training the next generation. Both grants have been "recommended for funding" but, like the ADRC, are awaiting final decision at the January NIA Advisory Council that has been postponed. Funding for the NSC and BMHA ends in May and April 2025, respectively.

27.    The UW NSC is one of eight NSCs and is the longest running one in the country (over 30 years). It provides critical funding for pilot programs for junior investigators and collaborative projects with other centers from around the country to provide access to state-of-the-art expertise in protein phenotypes, metabolite phenotypes, invertebrate models and artificial

intelligence to understand the basic mechanisms of human aging. Three of these four cores have been part of the NSC for 15 years and the newer AI core is a world leader in state-of-the-art AI tools for health and medicine. They have ongoing collaborations both within the UW and across the country working to establish new biomarkers, identify new biological mechanisms, and testing new interventions to improve health in the aging population. Without timely renewal of the NSC these ongoing studies will be jeopardized, and our core laboratories face the risk of losing staff with critical expertise. The BMHA is a rigorous training program closely affiliated with the NSC that currently supports 6 predoctoral and 6 postdoctoral fellows. The training program not only includes laboratory-based research in aging biology, but career development programs, mentoring, and networking opportunities to help prepare the next generation of scientists to become independent scientists in basic and translational aging biology. A delay in renewal of the BMHA runs the risk of not only losing this current cohort of trainees but also risks dismantling the training program and staff. These are both critical centers to the UW infrastructure and educational programs and, with the ADRC, are key drivers of the international recognition of the UW as a leader in driving new treatments for improved health with age. We are extremely anxious about the impact of the ongoing delays at the NIH on their futures.

### U19 UW/Allen Institute "*A multimodal brain cell atlas and community resource of Alzheimer's disease and comorbid dementias*"

28.    The goal of this U19 Center Collaboration with UW and Allen Institute for Brain Science is to build a national brain tissue and data resource to stimulate cutting edge research in Alzheimer's Disease (AD). A unique aspect of this project is the tight integration with the NIH BRAIN Initiative's flagship Cell Census projects, which has allowed us to rapidly build on cutting edge advances in the BRAIN Initiative and use them to understand Alzheimer's disease in unprecedented detail, and also to disseminate these advances to the larger AD research and medical

communities. Over the first five years of this center, we developed techniques and tools to optimally preserve and characterize human brain tissue from the UW ADRC and affiliated studies. The Center has produced advances in our ability to manage, process, and analyze brain tissue for AD/ADRD that have led to substantial progress in our understanding of the cell type basis of these diseases. This has led to an openly accessible highly multimodal data resource that serves as a reference for the entire field of human AD research. The goal of this center is to identify early vulnerable cells in AD using cutting edge genomics tools and to identify potential therapeutic strategies to protect those cells. The renewal extends this study to build a national network of ADRCs to adopt these cutting-edge techniques across multiple cohorts to build this resource around Alzheimer's Disease related dementias (ADRD) including Lewy body dementia, Parkinson's disease, vascular dementia, etc. The renewal integrates new technology, including multimodal spatial genomics applications, to continue to understand AD and AD/ADRD mechanisms. The renewal proposes to develop a neuropathology consensus panel to improve existing or develop new ways to diagnose and differentiate AD and AD/ADRD. A critical aspect of this work is that all of the data is openly accessible, and has already served as a resource for many highly impactful studies across the US and internationally (https://portal.brain-map.org/explore/seattle-alzheimers-disease) with more than 29,000 users. The platform paper for SEA-AD was published last year (https://www.nature.com/articles/s41593-024-01774-5) and this work has been featured in local and national media (reaching over 70M people). But all of this work is now jeopardized by NIH's funding delays.

**Institute of Translational Health Sciences (ITHS)**

29.    A partnership between the University of Washington, Fred Hutchinson Cancer Center, Seattle Children's, and regional institutions ITHS promotes the translation of scientific

discovery to clinical practice by fostering innovative research, cultivating multi-disciplinary research partnerships, and ensuring a pipeline of next generation researchers through robust educational and career development programs throughout the Washington, Wyoming, Alaska, Montana, and Idaho (WWAMI) region.

30.     One example of the innovative work performed at ITHS' is the Gene & Cell Therapy Lab's (GCTL) acceleration of medical discoveries to clinical environments through partnerships. One such partnership involved a biopharmaceutical company that developed a therapy to treat advanced ovarian cancer, called UltraCAR-T Cell therapy. Scientists in the GCTL worked with the company to transfer the technology so that the product could be made quickly and effectively. A separate unit of ITHS, the Translational Research Unit, conducted the rigorous clinical trials necessary to advance the technology towards a clinical use.

31.     ITHS supports collaboration between primary care practices and academic researchers that improves the health and well-being of patients in their communities and enhances primary care clinical practice through its WWAMI Practice and Research Network. This practice-based research network, known as the WPRN, spans 34 organizations and over 90 clinics in the five-state WWAMI region.

32.     ITHS is supported by a $10.5 million annual grant from NIH. UW did not receive an expected NOA generated by a non-competing renewal for ITHS on March 1, 2025. Without funding for over thirty days, UW was forced to institute staff reductions, furloughs, and elimination of positions at ITHS.

**Terminations of NIH Grants**

33.     Since February 28, UW has had at least seven NIH grants terminated on which a UW researcher was the prime grantee.[1] UW has also had multiple grants terminated in which a UW researcher is a subgrantee.

34.     The prime grantee terminations received as of April 1 are attached hereto as Exhibits A-G.

35.     These terminations will result in the loss of over $2.9 million in research money to UW.

36.     The termination notices do not explain why the grants are being terminated, instead claiming that the research no longer "effectuates agency priorities." Of course, these grants were initially approved through NIH's rigorous process—some as recently as last year, while others have been continually funded for multiple years—and NIH failed to explain what changed. In my experience, I have never before seen NIH cancel a grant because it supposedly no longer comports with agency priorities.

37.     The termination notices claim that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to the terminations, UW was not given any opportunity to submit revised grant materials to align with agency priorities, nor were grantees even given an opportunity to explain what their work was and how it might align with agency priorities. Nor was UW provided with any updated definition of "agency priorities" with which its research must align.

38.     These grants all funded amazing work by UW researchers. For example, NIH terminated Grant No. 5R01MD017573-03 to UW Professor Emily Dworkin. That grant funded a groundbreaking study on the impact of anti-LGBTQ policies on sexual minority health across the

---

[1] This does exclude one grant that NIH terminated and then subsequently reinstated.

nation. Dr. Dworkin's study sought to understand the causes of disproportionately high rates PTSD and other mental health issues among sexual minority women who have experienced sexual assault with an eye toward understanding how the political and social environment affects people, and, consequently, how changing people's environments can improve mental health. This was year three of the project, meaning that significant work had already been done—which will now be wasted if funding is not restored.

39.    In its cancellation letter, NIH wrote: "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs." Given that Dr. Dworkin's research sought to understand, and hopefully address, significant mental health issues among sexual minority women, it is hard to see how NIH could possibly have concluded that her research was unlikely to contributed to public health.

40.    As another example, NIH terminated Grant No. 1F31 AI181431-01A1. That grant, to UW graduate student Gregory Zane, funded research into prophylactic antibiotic treatment for Chlamydia trachomatis, a bacterium that "causes roughly 128 million sexually transmitted infections globally each year." And, in light of "concerns of antibiotic resistance," Zane's research also sought to assess whether "CT vaccination a cost-effective prevention strategy compared to current screen-and-treat practices in the United States[.]" "To answer these questions," the NIH

grant funded research into "the frequency and factors associated with antibiotic use among" men who have sex with men to "predict the 50-year impact of national rollout of a theoretical vaccine."

41.    But yet again, the termination letter declared that this research—which was approved just eight months ago—"no longer effectuates agency priorities." According to the letter, "[i]t is the policy of NIH not to prioritize research activities that focuses [on] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment." NIH otherwise offered no explanation for this about-face.

42.    In addition to these outright terminations, I am also aware of at least two instances (so far) in which a UW researcher lost funding because of NIH's new decision to no longer fund Diversity Supplements. Diversity Supplements are workforce development grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations.[2]

43.    However, my understanding is that NIH has recently decided to cancel NOFOs for Diversity Supplements, meaning that researchers who have applied for, and in many cases, already received funding under a Diversity Supplement are now getting their funding pulled.

44.    In one case, a research scientist at Seattle Children's Hospital was awarded a $177,553 diversity supplement grant to support a study on lupus aimed at developing new targeted therapies for the treatment of lupus. However, on January 28, NIH sent an email cancelling the researcher's grant with no explanation.

---

[2] NIH has defined diversity broadly, to include not only "[i]ndividuals from racial and ethnic groups that have been shown by the NSF to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas. https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.

45.     In another case, a UW postdoctoral fellow lost their funding because a diversity NOFO was cancelled.  This postdoctoral fellow had received funding under a K99 grant, which help post-docs transition to faculty roles. The K99 phase funds 1-2 years of postdoc, and then, if the researcher gets a faculty job, they receive 3 years of R00 funding at the institution where their faculty job is located (often a different institution). This researcher had received a $132,381 K99, funded in response to a Diversity NOFO, to study the impact of air pollution on Alzheimer's disease and related dementias. However, when UW submitted the researcher's R00 transition application, it was rejected by NIH within a few hours. The email rejecting the application said, merely: "Because your application was in response to a Diversity NOFO that has been expired and is no longer a priority to the NIH, we will not be able to award the R00 phase of this grant."

46.     In other words, this researcher had her funding cut off mid-stream not because of anything she had done or failed to do but because she had applied for a grant through a previously approved funding mechanism designed to increase participation of diverse individuals in research careers.

**Impact on Institutional Operations**

47.     The failure of NIH to communicate deviation from the normal funding application cycle for reviews and approval of funding means that research team which often plan grant applications years in advance to maintain necessary funding to support their research teams are left without consistent funding and in some cases are needing to furlough or layoff research team members.

48.     We have paused some new hires whose research programs depend on timely NIH awards to conserve funding to allow us to support research staff that would normally be funded on NIH grants. This includes several faculty searches that were underway for the 2024–2025

academic year, which had already been advertised and in some cases multiple candidates had already been interviewed on campus.

49.    UW has also been forced to cut admissions to graduate programs across the University. Depending on the department, the cutbacks in admissions have ranged between 25 and 50%.

50.    Moreover, the terminations, delays, and unprecedented disruptions in funding have had a profoundly negative effect on morale University wide. Faculty and staff don't know if their funding will be cut, if their research will be terminated, whether they will be able to attend conference, or even whether they will continue to have jobs. The stress of these funding disruptions is palpable, and even if I cannot measure it, I am certain it has negatively affected our mission as a University. Research staff that are stressed about losing their jobs on a daily basis are not able to focus their full creative energy on innovation and discovery.

**Irreparable Harm**

51.    The delays have disrupted ongoing research, as well as setting back UW for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel. This is in spite of the interim measures being taken by UW to keep certain research going. UW has had to make decisions about which of these valuable programs to continue with these limited funds.

52.    Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients. The Department of Neurology has had to provide interim funding to ensure patient safety in a clinical trial of sleep apnea treatment for stroke patients. Department of Medicine was not able to enroll any patients in a clinical trial for HIV patients.

53.     At bottom, NIH's actions have fundamentally undermined UW's mission to pursue scientific research. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 1st day of April 2025, in Seattle, Washington.

_____
MARI OSTENDORF
Vice Provost of Research
University of Washington

# Exhibit A

**Outlook**

## FW: Grant Termination Notification | A160406 [5UG4LM013725-04]

**From** Office Of Sponsored Programs <osp@uw.edu>
**Date** Fri 3/21/2025 3:22 PM
**To** Carol Rhodes <carhodes@uw.edu>
**Cc** Jenny Muilenburg <jmuil@uw.edu>

Hi Carol,

MOD47947 was created for this, assigned to you and is in "OSP Setup" status.

Best,

Dianna

---

**From:** Michael Snow <mikesnow@uw.edu>
**Sent:** Friday, March 21, 2025 10:41 AM
**To:** Office Of Sponsored Programs <osp@uw.edu>
**Cc:** Ariadna A. Santander <filimus@uw.edu>; Amanda C Snyder <acs229@uw.edu>; Josy S Combs <combsj3@uw.edu>
**Subject:** FW: Grant Termination Notification | A160406 [5UG4LM013725-04]

Hi Dianna,

Another NIH termination letter, please set this up as a MOD to AWD-005078. I believe there are subawards.

Thanks,
Mike

MICHAEL SNOW / Manager, Proposals and Awards (Team Gold), Office of Sponsored Programs / 206.221.0553

---

**From:** Jonathan N. Geraghty <geraghti@uw.edu>
**Sent:** Friday, March 21, 2025 10:30 AM
**To:** Ariadna A. Santander <filimus@uw.edu>; Michael Snow <mikesnow@uw.edu>
**Subject:** FW: Grant Termination Notification | A160406 [5UG4LM013725-04]

Hi Ari / Mike:

I must have received this because I was listed as AOR at some point.

A160406 [5UG4LM013725-04]

Let me know how I should proceed.

Jon

**OSP contacts:** https://www.washington.edu/research/contact-us/
Jonathan Geraghty | Compliance Analyst | UW Office of Sponsored Programs |206-685-4842 | geraghti@uw.edu

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:30 AM
**To:** Jonathan N. Geraghty <geraghti@uw.edu>
**Subject:** Grant Termination Notification

 

3/21/2025

Jonathan Nicklen Geraghty
University Of Washington
geraghti@uw.edu

Dear Jonathan Nicklen Geraghty:

Effective with the date of this letter, funding for Project Number 5UG4LM013725-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 5/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to USAspending.gov.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Andrea Culhane, Chief Grants Management Officer, NLM
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

_____

_____

_____

_____

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# Exhibit B

**Emily R Dworkin**

| | |
|---|---|
| **From:** | Office Of Sponsored Programs <osp@uw.edu> |
| **Sent:** | Friday, March 21, 2025 3:01 PM |
| **To:** | Carol Rhodes |
| **Cc:** | Emily R Dworkin |
| **Subject:** | FW: Grant Termination Notification |
| | |
| **Categories:** | Blue |

Hello Carol,

MOD47944 has been created for this, assigned to you and is in "OSP Setup".

Best,

Dianna

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:30 AM
**To:** Office Of Sponsored Programs <osp@uw.edu>
**Subject:** Grant Termination Notification



3/21/2025

Rhodes, Carol
University Of Washington
osp@uw.edu

Dear Rhodes, Carol:

Effective with the date of this letter, funding for Project Number 5R01MD017573-03 is hereby terminated pursuant to the Fiscal Year 2025 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2025 Policy Statement applies to your project because NIH approved your grant on 12/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2025 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the

1

time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# Exhibit C



March 18, 2025

Carol Rhodes
University of Washington
osp@uw.edu

Dear Carol Rhodes:

Effective with the date of this letter, funding for Project Number 1F31 AI181431-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/16/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

# Michelle
# G. Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.18
09:26:19 -04'00'

Michelle G. Bulls, on behalf Emily Linde, Chief Grants Management Officer, National Institute of Allergy and Infectious Diseases
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# Exhibit D



03/20/2025

Lester Warnac Villaflor
UNIVERSITY OF WASHINGTON
gcsfund@uw.edu


Dear Lester Warnac Villaflor:

Effective with the date of this letter, funding for Project Number 5R01LM013301-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/01/2023, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle
G. Bulls -S
Date: 2025.03.20 16:19:56
-04'00'

Michelle G. Bulls, on behalf of Andrea Culhane, Chief Grants Management Officer,
National Library of Medicine
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# Exhibit E



March 12, 2025

Carole Rhodes
University of Washington
carhodes@uw.edu

Dear Carol Rhodes :

Funding for Project Number 1G13LM014426-01  is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on August 15, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G.
Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.12 23:15:18
-04'00'

Michelle G. Bulls, on behalf Andrea Culhane, Chief Grants Management Officer, NLM
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# Exhibit F

| | |
|---|---|
| **From:** | UW-AOR on behalf of Tracking Grants.gov AOR emails via UW-AOR |
| **To:** | uw-aor@u.washington.edu |
| **Subject:** | [UW-AOR] Grant Termination Notification |
| **Date:** | Friday, March 21, 2025 9:38:52 AM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | ATT00001.txt |

3/21/2025

Rhodes, Carol
University Of Washington
uw-aor@u.washington.edu

Dear Rhodes, Carol:

Effective with the date of this letter, funding for Project Number 1R21AI183907-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 6/10/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Emily Linde, Chief Grants Management Officer, NIAID Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9]

*See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

Exhibit G



March 20, 2025

Carol Rhodes
University of Washington
uw-aor@u.washington.edu

Dear Carol Rhodes:

Effective with the date of this letter, funding for Project Number 1R01 TW012904-01 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on August 9, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S
Date: 2025.03.20 17:04:13 -04'00'

Michelle G. Bulls, on behalf of Bruce Butrum, Chief Grants Management Officer, Fogarty International Center
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)