# EXHIBIT 34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | No. 1:25-cv-_____ |

### DECLARATION OF PETER G. BARR-GILLESPIE

I, Peter G. Barr-Gillespie, Ph.D, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Executive Vice President and Chief Research Officer of Oregon Health & Science University ("OHSU"). In addition, I am a Professor with the OHSU Oregon Hearing Research Center and an affiliated scientist with the Vollum Institute. I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with the OHSU staff, or from documents that have been provided to and reviewed by me.

2. I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

3. I am the Executive Vice President and Chief Research Officer at OHSU, having held that position or an equivalent one for seven and a half years. I am also a Professor in the Department of Otolaryngology, and I have been running a research lab at OHSU since 1999. Prior to that I was an Assistant, then Associate Professor in the Department of Physiology at

1

Johns Hopkins University, where I was from 1993-1999. I received my postdoctoral training in neuroscience from Dr. James Hudspeth at the University of California San Francisco from 1988-1989 and at the University of Texas Southwestern Medical Center from 1989-1993. I earned a BA in chemistry from Reed College in 1981 and a PhD in pharmacology from the University of Washington in 1988.

4. OHSU's statutory mission is to provide healthcare, education and conduct research that supports the people of the State of Oregon.

5. OHSU houses a robust research program with approximately 1,415 faculty investigators and 262 postdoctoral scholars.

6. I am providing this declaration to explain the impacts of NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby grant proposals due for funding have remained unfunded. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds. These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

7. The NIH meeting blockade severely impacts OHSU by cutting off funding to research faculty members, preventing their ability to continue to support their own salaries and those of the research staff in their labs. This funding shortfall will both lead to faculty layoffs and negatively impact OHSU's budget to support research.

**Reliance on NIH Funding**

2

8.  In fiscal year 2024, OHSU received funding through the National Institutes of Health ("NIH") to support 784 projects, totaling $353.33 million.

9.  OHSU receives NIH grants across a variety of institutes encompassed within the NIH, including National Institute of Allergy & Infectious Diseases, National Institute on Aging, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Child Health and Human Development, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Neurological Disorders and Stroke, National Eye Institute, National Institute of General Medical Science, National Human Genome Research Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Mental Health, National Institute on Deafness and Other Communication Disorders, and the National Institute of Dental and Craniofacial Research, amongst others.

10. Through those NIH grants, OHSU funds approximately 1,415 researchers.

11. The work done by OHSU on NIH funded projects provides education and training in PhD-granting graduate programs in Behavioral Neuroscience, Biomedical Engineering, Biomedical Sciences, Clinical Psychology, and Neuroscience.

12. OHSU provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the OREGON economy.

13. As an example of impact on OHSU infrastructure, we have submitted a C06 construction grant to the NIH to support construction of a Biosafety Level 3 (BSL-3) laboratory, but that project is on hold while the grant review has been postponed.

**Typical Timeline and Processes for NIH Grant Awards**

3

14. The Office of Proposal & Award Management at OHSU works with researchers to submit grant applications and tracks grant applications and awards.

15. Based on my work as Professor and Chief Research Officer, I have an understanding of the NIH grant process based on my 25 years in those roles.

16. NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO"). From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit. The grant application is then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

17. What constitutes a fundable score is dependent on several factors as every institute, sometimes referred to as an "IC," is different. Some publish paylines, meaning the percentiles of grants they will fund, and some do not. Paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal, but many others (special emphasis and non-CSR) will only result in an impact score, but not percentile. Program officers have latitude to recommend proposals with higher scores/percentiles in order to balance portfolios and meet specific directives. Generally, researchers would consider a percentile less than 10% as guaranteed to receive funding

18. After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to fund the grant is made. After the advisory council meets, a Notice of Award is issued confirming whether or not the grant will be funded.

19. The process for competitive renewals is very similar, but it is even more likely for a grant that has been funded in the past to be renewed.

4

20. The budget process at OHSU relies upon the NIH grant application, review, and approval cycle. Historically, we have relied on grants being reviewed and scored within six months of submission.

21. Once a grant receives a score, OHSU is able to consider whether to include the funding coming from that grant as part of its budget for the coming year.

**Delays and Irregularities in the Processing of NIH Grant Applications**

22. Since late January 2025, OHSU has seen an unusual number of delays in the processing of NIH grant applications. Researchers have had their grant application study sections and advisory councils be canceled or otherwise not scheduled, and grant application scoring has been significantly delayed.

23. OHSU has not received formal notice of changes for many of these grants. For others, OHSU has gotten only a notification that proposals are "paused" or "under review."

24. As of March 31, 2025, OHSU has approximately 280 proposals totaling $731.6 million awaiting NIH study section review.

25. As of March 31, 2025, OHSU has 70 proposals totaling $172.4 million that received fundable scores, awaiting NIH advisory council and Notice of Award.

26. As of March 31, 2025, OHSU has 90 proposals totaling $194.9 million that received possibly fundable scores, awaiting NIH advisory council and Notice of Award.

**Terminations of NIH Grants**

27. Since March 24, 2025, OHSU has received a notice of termination of one NIH grant awarded directly to OHSU, as well as seven subawards issued from other institutions which had their NIH award terminated. We have received multiple notifications from NIH that additional terminations are imminent.

5

28. The notice of termination received as of March 24, 2025 is attached hereto as Exhibit A. The overall goal of this project is to utilize the nonhuman primate model to identify the mechanisms responsible for the metabolic disorders associated with long COVID. The termination states, "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

29. The notice of termination for one of the subawards involved an antiviral drug discovery project.

30. These terminations will result in the loss of $2.4 million in research money to OHSU.

31. The termination notices for these grants have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities." In my 25 years working at OHSU, I have not seen this language previously used to cancel grants.

32. The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, OHSU had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was OHSU provided with any updated "agency priorities" with which its research must align.

**Comparisons Across Administrations**

33. In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

34. Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo and renewals have been delayed.

6

35. Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations.**

36. These delays have forced us to implement bridge funding for dozens of faculty, drawing from limited discretionary resources. As of April 1, 2025, OHSU has implemented bridge funding of approximately $1 million during the FY25 fiscal year. This prevents the use of these funds for any other purpose, including other planned improvements to our programs and research.

37. We have paused start-up funding for new hires whose research programs depend on timely NIH awards. This includes several new hires we had provided offer letters to and for whom OHSU had taken steps to prepare for their arrival.

**Admissions, Training and Workforce Disruptions**

38. OHSU uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level.

39. NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays. These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants).

40. We have international postdocs whose visa status is now at risk due to pending NIH awards that were expected to renew this spring.

41. This instability is affecting the recruitment and retention of quality research trainees. The inability to retain quality research trainees will have continuing effects on the

7

research capabilities of OHSU, including by limiting the individuals qualified to conduct certain research.

**Concerns About FY25 Funds Being Obligated**

42. We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

43. Several proposals from our institution remain stuck at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time.

44. Our research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

**Irreparable Harm**

45. The delays have disrupted ongoing research, as well as setting back OHSU for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel. This is in spite of the interim funding measures being taken by OHSU to keep certain research going. OHSU has had to consider which of these valuable programs to continue with these limited funds.

46. Some of these studies involve the use of animal test subjects, all of which would need to be euthanized due to loss of funding.

47. Some of these studies had the potential to achieve breakthroughs in many different disciplines, which would have advanced public health, and which will now not occur.

48. Delays have also disrupted community services, student opportunities, and public programs.

49. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Conclusion**

50. The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

*Signed by:*
*Peter Barr-Gillespie*
Peter G. Barr-Gillespie, Ph.D,

Date: 4/3/2025

# EXHIBIT A

**Kellie Guentert**

**Subject:** FW: Grant Termination Notification
**Attachments:** 1015566-002_Roberts_3R01DK122843-05S1-APRC01318_50224 (2).pdf

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Monday, March 24, 2025 12:52 PM
**To:** Jason Jaworski <jaworski@ohsu.edu>
**Subject:** [EXTERNAL] Grant Termination Notification

 

3/24/2025

Jaworski, Jason N
Oregon Health & Science University
jaworski@ohsu.edu

Dear Jaworski, Jason N:

Effective with the date of this letter, funding for Project Number 3R01DK122843-05S1 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 7/1/2023, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S  *Digitally signed by Michelle G. Bulls -S*

Michelle G. Bulls, on behalf of Dee Doherty, Chief Grants Management Officer, NIDDK
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)