# EXHIBIT 45

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>　　　　Defendants. | Civil Action No. 1:25-cv-10814 |

## DECLARATION OF DENISE BARTON

I, Denise Barton, declare as follows:

1. I am a resident of the Commonwealth of Massachusetts. I am over the age of 18. I have been an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the University of Massachusetts, in its Office of the General Counsel, as its Chief Deputy General Counsel.

3. As Chief Deputy General Counsel for the University of Massachusetts, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by University of Massachusetts employees and believe that information to be true.

4. The University of Massachusetts includes its five campuses (the University of Massachusetts Amherst, the University of Massachusetts Boston, the University of Massachusetts Chan Medical School, the University of Massachusetts Dartmouth, and the University of Massachusetts Lowell), as well as the University of Massachusetts Office of the President.

1

*See* M.G.L. c. 75. The University of Massachusetts maintains business records in the ordinary course of University of Massachusetts business which include, *inter alia*, records concerning grant proposals submitted to and funding received from the National Institutes of Health ("NIH") by the University of Massachusetts.

5. I am providing this supplemental declaration in furtherance of my declaration (Dkt. 12-12, filed in this matter on April 4, 2025) to explain the mounting irreparable harmful impacts of NIH's abrupt and ill-supported cancellation of certain grants to the University of Massachusetts as well as the impacts of NIH's delay in evaluating applications for future grants, delay in funding projects that have passed peer review, and denial of grant applications without consideration of scientific merit.

6. The University of Massachusetts does not have available funds to replace the funds that NIH already committed to provide to it (as to the grants that were already awarded but which NIH abruptly terminated) nor does the University of Massachusetts have the funds necessary to proceed forward with paying for the costs (such as those for laboratory equipment and supplies, faculty salaries and fringe costs, and graduate student stipends and related funding) associated with the grants with fundable scores (see Dkt 12-12) for which NIH should already have finalized, or be close to finalizing, funding awards.

7. The University of Massachusetts cannot fund all of the costs associated with grants that NIH has terminated or delayed while this litigation proceeds and, as NIH continues to terminate and/or delay grant funding, the universe of the harm NIH is causing continues to expand, making it impossible to even calculate how much emergency funding would be required.

8. While the University of Massachusetts and its researchers are diligently endeavoring to identify alternative funding sources, given the nationwide impact of NIH's arbitrary and

abrupt action, all institutions and their researchers are seeking funds from the same finite potential replacement sources simultaneously and, as a result, it is a certainty that alternative external funding sources will be insufficient at best and wholly unavailable at worst.

9. Put plainly, the minimal emergency funding that the University of Massachusetts can provide to try to ameliorate a fraction of the harm caused by NIH's termination and delay of grant funding is at best, a glide path to different (but as yet unsecured) funding support for the same project, a switch to a different project or, in the worst case, a complete shutdown of the project. Cessation of work caused by NIH's conduct includes, but is not limited to, the termination of all of the work associated with the project, termination of the uniquely talented researchers who perform that work, and recission of students' admission to the programs of study that perform this work: in sum, NIH's conduct has caused and will continue to cause if left unchecked deep and irreparable harm to the students who have worked hard their entire academic careers to be admitted to these programs of study, the researchers who have completed those academic programs and are now devoted to the furtherance of not only the work but to the education of students in the work, and to the benefits the work will provide to the Commonwealth and, in many cases, all corners of the globe.

10. For example, because of NIH's arbitrary termination of some grants and its unexplained rolling blockade causing delay, at best, in the well-established approval process of other grants, as detailed in Dkt. 12-12, and because there are no other funds budgeted or available for expenses associated with these terminated and delayed grants, the University of Massachusetts Chan Medical School ("UMass Chan Medical School") has been forced to:

   a. Terminate and/or furlough 209 employees;

      b. Cut the Fall 2025 incoming graduate student class size from 70 students to just 10 students;

      c. Freeze all faculty and staff hiring; and

      d. Stop other discretionary funding.

11. With the limited emergency funds that UMass Chan Medical School has been able to re-allocate, it has made a decision that it will use those funds to pay the stipends of current graduate students and post-baccalaureate scholars for the remainder of FY25 (through June 30, 2025).

12. UMass Chan Medical School does not have emergency funds to pay the costs associated with the grants NIH abruptly terminated nor does UMass Chan have emergency funds to pay the costs associated with the grant awards that NIH has improperly and arbitrarily delayed.

13. The University of Massachusetts Amherst ("UMass Amherst") does not have the funds to replace the financial deficit caused solely by NIH's arbitrary termination of some grants and rolling blockade of other grants, as detailed in Dkt. 12-12.

14. As circumstances currently stand, UMass Amherst will use its available emergency funds, currently projected to last through August 31, 2025, to support students, staff, and research faculty (whose salary is derived entirely from grants) so that they do not immediately have to be terminated. UMass Amherst also currently intends to use available emergency funding to support certain critical costs to preserve valuable research materials and/or pay for supplies to complete in-progress experiments through August 31, 2025.

15. To do this, UMass Amherst has been forced to reduce graduate admissions via rescission of funding offers to the human beings who had been accepted into various graduate programs. UMass Amherst has reduced graduate offers of admission to doctoral programs by 27%

for Fall 2025, and has rescinded funding offers from 100 accepted applicants. The reductions in offers of admission are largest in programs that rely significantly on NIH support, as set forth in the below table:

| School/College & Program | Fall 2025 PhD Offers of Admission | Fall 2024 PhD Offers of Admission | Percentage Change |
|---|---|---|---|
| College of Engineering | 112 | 160 | -30% |
| College of Natural Sciences | 283 | 405 | -30% |
| Manning College of Information and Computer Sciences | 84 | 147 | -43% |
| School of Public Health & Health Sciences | 31 | 62 | -50% |
| Campus wide PhD Offers of Admission | 805 | 1099 | -27% |

16. In sum, UMass Amherst will use the emergency funding it has available to give those impacted by NIH's abrupt actions time to either finish up a degree, find a new project, or secure a new (or delayed) source of funding but, to do so, it has had to significantly reduce the number of incoming students.

17. NIH continues to worsen the depth and breadth of irreparable harm to the University of Massachusetts, its researchers, its faculty, its students, the Commonwealth, and the forward progress of scientific knowledge.

18. For example, in addition to the exemplars set forth in Dkt. 12-12, NIH cancelled NIH AG077672-04S1 on April 7, 2025, a diversity supplemental award to UMass Amherst entitled "Deciphering the Molecular Features Underlying LRP1-Mediated Tau Spread (Parent Grant)" stating, "The Diversity Supplement program is no longer supported by NIH/HHS priorities."

5

19. Also by way of example, since submission of the original declaration (Dkt. 12-12), NIH has sent "program cancellation notifications" to UMass Chan Medical School on the following:

   a. 1F31GM157877-01: "Engineering bacterial group I introns for efficient production of safe and durable nucleoside-modified circular mRNA therapeutics."

   b. 2T32GM135751-06: "IMSD at the University of Massachusetts Chan Medical School."

   c. 5R25GM121220-08: "Pathway to graduate study post-baccalaureate training program."

20. Since submission of the original declaration (Dkt. 12-12) UMass Chan Medical School has received information that NIH will be cancelling the following grants:

   a. Subaward from Harvard School of Public Health: IMPAcTB 75N93019C00071: On April 5, 2025, UMass Chan Medical School was notified by Harvard School of Public Health that the award was under review and likely to be cancelled by NIH.

   b. On April 10, 2025, UMass Chan Medical School received a notification from the University of Alabama that their program, on which UMass Chan Medical School is a subawardee, is being cancelled by NIH.

   c. 5R01MD019235-02 "TANGO Program" cancellation notice received on April 3, 2025 at 4:04 p.m. by the University of Alabama at Birmingham from NIH which stated: "I am writing to inform you of an important update regarding funding for the TANGO project. As of April 1, 2025, the National Institutes of Health (NIH) will no longer be providing funding

for this initiative. Consequently, enrollment activities at the University of Massachusetts (UMass) and Brigham and Women's Hospital (BWH) will need to cease effective immediately. Given this update, we will be cancelling the TANGO Investigators meeting tomorrow."

21. In addition, a UMass Chan Medical School senior faculty member and administrator was scheduled to chair an ad hoc study section for the National Heart Lung and Blood Institute ("NHLBI") of NIH on April 23, 2025 for the National Gene Vector Biorepository ("NGVB"), which is an NHLBI funded core supporting the NHLBI's gene therapy portfolio. Like any other NIH grant, this matter is subject to the process of peer review, study section, and advisory council as described in the original declaration (Dkt. 12-12). On April 9, 2025, NIH held the "pre-review orientation" and there was no mention of any delay. Then, on April 10, 2025, NIH sent an email stating, "I have received information that we may need to pause the NGVB review. Please pause your reviewing activities until I receive further guidance." As of April 14, 2025, NIH has sent no follow-up communication regarding this study section.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 14, 2025, at Westborough, Massachusetts.

/s/ *Denise Barton*
Denise Barton
Chief Deputy General Counsel
University of Massachusetts, Office of the General Counsel
50 Washington Street
Westborough, MA 01581