# EXHIBIT 64

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | No. 1:25-cv-10814-BEM |

### DECLARATION OF SHASHANK PRIYA

I, Shashank Priya, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Vice President for Research and Innovation at the University of Minnesota (the "University"). The University's flagship campus is located in Minneapolis/St. Paul and there are four other campus locations in Minnesota. I have held this position since September 2022. Prior to that time, I served as Associate Vice President for Research at The Pennsylvania State University.

2. As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by University of Minnesota personnel. I offer this declaration in support of the request of the States' Motion for a Preliminary Injunction.

3. On February 17, 2025, I executed a declaration in support of judicial relief in the matter of *Association of American Universities, et al. v. Department of Health & Human Services, et al.*, Case No. 1:25-cv-10346. That declaration is attached as Exhibit 1 to this

1

Declaration and details the substantial funding received by the University from NIH and provides examples of the critical and cutting-edge medical research performed due to this funding. The declaration also details the potential impacts of a reduction in funding, which apply as well to the termination, suspension, and other delays relating to individual NIH grants.

4. There is also impact from NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby significant numbers of grant proposals due for funding have remained unfunded for at least one grant cycle, and potentially indefinitely. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds. These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

**Terminations of NIH Grants**

5. Since March 10, 2025, the University has had 21 NIH grants and subawards terminated.

6. These terminations will result in the loss of approximately $8.5 million in research money to the University.

7. The termination notices for these grants have provided vague reasons for the terminations, including noting that the research no longer "effectuates agency priorities." In my time working at the University, I have not seen this language previously used to terminate grants.

8. For many of the grants, the termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. In those

2

cases, prior to receipt of the termination, the University had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was the University provided with any updated "agency priorities" with which its research must align.

**Irreparable Harm**

9. The delays have disrupted ongoing research, as well as setting back the University for research going forward. The University will soon have to make decisions about which of these valuable programs to continue.

10. Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients. For example, the University is a major partner in the NIH U01 Diabetes Prevention Outcomes Study (DPPOS), serving as the central biochemistry lab for twenty-five clinical sites and serving on the project's Steering Committee. This project addresses the National Alzheimer's Project Act goal to "prevent, halt or reverse Alzheimer's Disease" in the high-risk group of persons with pre-diabetes and type 2 diabetes, who represent over half of the population aged 60 years or older in the United States.

11. Delays have also disrupted community services, student opportunities, and public programs.

12. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Conclusion**

13. The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

/Shashank Priya

Shashank Priya

Date:  April 24, 2025

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, AMERICAN COUNCIL ON EDUCATION, ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, BRANDEIS UNIVERSITY, BROWN UNIVERSITY, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE CALIFORNIA INSTITUTE OF TECHNOLOGY, CARNEGIE MELLON UNIVERSITY, THE UNIVERSITY OF CHICAGO, CORNELL UNIVERSITY, THE GEORGE WASHINGTON UNIVERSITY, JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, and TRUSTEES OF TUFTS COLLEGE, <br><br>       Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF HEALTH & HUMAN SERVICES,<br><br>NATIONAL INSTITUTES OF HEALTH,<br><br>DOROTHY A. FINK, M.D. in her official capacity as Acting Secretary, Department of Health and Human Services, and<br><br>MATTHEW J. MEMOLI, M.D., M.S. in his official capacity as Acting Director, National Institutes of Health,<br><br>       Defendants. | Case No. 1:25-cv-10346<br><br>**DECLARATION OF SHASHANK PRIYA** |

I, Shashank Priya, declare as follows:

1. I am the Vice President for Research and Innovation at the University of Minnesota (the "University"). The University's flagship campus is located in Minneapolis/St. Paul and there are four other campus locations in Minnesota. I have held that position since

**Exhibit 1**

September 2022. Prior to that time, I served as Associate Vice President for Research at The Pennsylvania State University.

2.  As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by University of Minnesota personnel. I offer this declaration in support of the request of the Association of American Universities (AAU) for judicial relief from the directive issued by the National Institutes of Health (NIH) on February 7, 2024: Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (NOT-OD-25-068).

3.  The University of Minnesota receives substantial annual funding from the NIH. In the University's fiscal year 2024 alone, the University received 808 awards directly from NIH which obligated funding to the University of approximately $355.6 million. In addition, the University received NIH subawards from other entities. Awards received are distinct from expenditures incurred.

4.  In any given fiscal year, the University of Minnesota is reimbursed for its expenditures on grants that were awarded in that year as well as in preceding years. In fiscal year 2024, the University of Minnesota was reimbursed by NIH for a total of $497.8 million from NIH direct awards and pass-through awards from other entities on which NIH was the prime funder (subawards). Of that, $135.9 million covered allowable indirect costs.

5.  Recovery of the University's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government. The University receives indirect costs calculated on a portion of its total direct costs referred to as "Modified Total Direct Costs" (MTDC).

2

**Exhibit 1**

6. Through fiscal year 2028, the University's negotiated indirect cost rate is 54% MDTC for on-campus research activities, 37% MTDC for other sponsored activities, 59% MTDC for the Hormel Institute, and 26% MTDC for all off-campus activities.

7. The impact of any significant reduction in the indirect cost rate would be devastating. For example, for fiscal year 2024, instead of $135.9 million in NIH reimbursement for indirect costs, a 15% MTDC cap on indirect costs would have resulted in the University receiving only $38.4 million in indirect costs. This would have been a loss of $97.5 million in one fiscal year.

8. Over the next five years, the University of Minnesota anticipates approximately $157.7 million in annual indirect costs based on the University's negotiated indirect cost rate. If—contrary to what the University of Minnesota has negotiated with the federal government—the indirect cost rate is reduced to a cap of 15% MTDC, the University's anticipated annual indirect cost recovery for NIH awards would be reduced by 71.8%, an average loss of $113.2 million per year over five years. This could result in a loss to the University of more than $565.7 million from fiscal year 2025 through fiscal year 2029.

9. The funding the University of Minnesota receives from NIH supports critical and cutting-edge medical research, which millions of Americans benefit from and depend on. For example:

    a. **Cancer Research**: The University's cancer research includes the Cancer Center Support Grant (P30CA077598), which funds the Masonic Cancer Center to advance cancer prevention, detection, and treatment. This grant enables the development of innovative approaches to suppress the disease at its earliest

3

**Exhibit 1**

stages and fosters collaboration through shared resources and administrative support.

b. **Immunotherapy Research**: The University's immunotherapy research includes the Off-the-Shelf Immune Effector Cells for Hematological Malignancies (P01CA065493), which focuses on developing accessible and effective natural killer (NK) cell therapies for treating blood cancers. These therapies aim to improve patient outcomes by leveraging the immune system's ability to target cancer cells.

c. **Cancer Immunology Research**: The University's cancer immunology research includes NK Cells, Their Receptors, and Cancer Therapy (P01CA111412), which explores the biology of NK cells and their receptors to develop effective cancer therapies. This research seeks to harness NK cells' natural ability to detect and destroy cancer cells, offering new hope for treatment.

d. **Healthy Aging Research**: The University's healthy aging research includes the Minnesota Tissue Mapping Center for Senescent Cells (U54AG076041), which investigates the role of senescent cells in aging-related disorders. This research aims to develop interventions that promote healthier aging by identifying and targeting key mechanisms of cellular aging.

e. **Neurological Research and Imaging**: The University's neurological research (UM1NS132207 and P41EB027061)) leverages state-of-the-art ultra-high-field MRI instrumentation to study brain structure, function, and connectivity in unprecedented detail. This enables early detection of neurodegenerative

diseases (Alzheimer's, Parkinson's, ALS), mapping of brain function in psychiatric disorders (schizophrenia, depression, PTSD), and insights into brain plasticity and development (aging, traumatic brain injury, autism).

10. Indirect costs are essential for supporting this research. The NIH's proposal to cut indirect cost rates to 15% would seriously jeopardize the research projects described in Paragraph 9.

11. Indirect costs include constructing and maintaining state-of-the-art facilities, such as laboratories, cleanrooms, and data centers, that meet the technical requirements of advanced research. They also cover the procurement and upkeep of essential equipment, such as ultra-high-field MRI machines, electron microscopes, advanced computing clusters, and specialized instrumentation for imaging, data analysis, and experimental setups. These investments ensure a safe and compliant environment for researchers to innovate, collaborate, and push the boundaries of discovery. Without these critical facilities and equipment, the research simply cannot be conducted, jeopardizing advancements that benefit society.

12. For example, with respect to the areas of research including those described in Paragraph 9:

    a. **Cancer and Immunotherapy Research:** The University's advanced immunotherapy research, including cell-based therapies, relies on highly controlled manufacturing environments (GMP facilities) to ensure compliance with FDA Current Good Manufacturing Practices (cGMP). These facilities are essential for producing safe and effective immune-based treatments. A reduction in the F&A rate to 15% would severely underfund GMP operations, limiting production capacity, delaying patient access to novel treatments, and

jeopardizing quality control. This could increase costs, strain clinical trial infrastructure, slow development of next-generation therapies, and undermine the training of future scientists, ultimately reducing the University's ability to deliver cutting-edge therapies to patients and maintain global leadership in biomedical innovation.

b. **Healthy Aging Research:** Reduced funding due to a lower indirect cost rate could hinder data management, participant tracking, and multi-site diversity, leading to slower progress and diminished impact of these critical age-related interventions.

c. **Neurological Research and Imaging**: A 15% cap on indirect costs would severely impact the maintenance of MRI infrastructure, upgrades to advanced technology, and support for technical staff, leading to delays, data bottlenecks, and limited access to cutting-edge instruments. The massive datasets generated by high-field MRI research, often requiring petabyte-scale, HIPAA-compliant storage, would face funding shortfalls for secure and scalable solutions, increasing risks of data loss. Additionally, AI-powered MRI analysis, which relies on GPU clusters and cloud computing for early disease prediction, would be hampered by insufficient computing resources. These reductions would significantly impede progress in understanding and treating neurological disorders, undermining the University's leadership in MRI-based research and diagnostics.

13. Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research

that can be done at the University of Minnesota. The University's planned construction for the Minnesota Bioimaging Center, the BioTechnology and Biomanufacturing Innovation Center, and the Translational Research and Innovation Facility are critical to advancing life-saving research and clinical innovation. However, if a 15% cap on indirect costs were implemented, these projects would face significant delays or very likely cancellation of these projects, causing immediate and long-term harm not only to the University's research capabilities on life-saving technologies but also to the public health outcomes.

14. A critical component of this challenge lies in the facilities reimbursement structure. Facilities costs, which are based on depreciation and interest for investments already made to support research, are not variable costs that can be adjusted based on the volume of research. Over the past several decades, the University has made multi-decade investments totaling hundreds of millions of dollars in research infrastructure, including laboratories, imaging facilities, and advanced capabilities. These are sunk costs, not discretionary expenditures, and they represent essential commitments to supporting the research mission.

15. Changing the reimbursement structure after institutions have made these substantial investments is untenable. Good facilities planning hinges upon reliable and consistent funding sources; sudden and disruptive disturbances to prior funding commitments jeopardizes the financial sustainability of research facilities already in operation.

16. For instance, the Minnesota Bioimaging Center is designed to provide advanced imaging tools essential for understanding diseases such as cancer and chronic and infectious diseases at the molecular and cellular levels. Delays in the construction of this facility would impede researchers' ability to develop new diagnostics and therapies, slowing progress in precision oncology and other fields. The BioTechnology and Biomanufacturing Innovation Center is

designed to address key challenges in therapeutic development, biologics manufacturing, and scalable biomanufacturing processes by fostering collaborations between academic researchers, industry, and government stakeholders. Delaying the construction of this center would impede efforts to develop cutting-edge biologics and therapeutics, slowing the translation of research into scalable treatments and disrupting Minnesota's leadership in biotechnology and biomanufacturing innovation. Similarly, the Translational Research and Innovation Facility is essential for testing new therapeutics and advancing clinical trials. Delays in its completion would reduce the University's capacity to conduct early-phase trials and biomarker validation studies. This would directly impact the development pipeline for life-saving treatments, leading to longer timelines for FDA approval and reduced availability of new therapies for patients.

17. In addition to delaying new construction, the 15% cap would force institutions to reallocate funds to maintain existing facilities at the expense of research productivity and innovation. The depreciation and financing costs associated with decades-long infrastructure investments cannot simply be "turned off" or scaled down without jeopardizing research capacity. This structural shift in reimbursement undermines the foundational investments that make cutting-edge research possible.

18. The combined effect of these delays will hinder the University's ability to maintain its leadership in biomedical research and will negatively impact public health outcomes, patient care, and economic growth driven by biotech innovation. Without sufficient recovery of indirect costs, these crucial facilities and their potential contributions to medical science will remain unrealized.

19. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with the regulatory mandates from agencies such as NIH. These mandates

serve many important functions, including protecting human and animal subjects involved in research; ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

20. A reduction in the indirect cost rate will have deeply damaging effects on the University's ability to conduct research from day one of an implemented change to existing and new awards. Most critically, it will necessarily and immediately result in staffing reductions across the board. For example:

> The University's clinical trials program relies heavily on indirect cost recovery to support specialized infrastructure, regulatory oversight, and patient engagement activities. Without appropriate funding, the institution would be forced to implement immediate reductions in essential staffing and resources, causing significant harm to research and patient care outcomes. For example, the University's Institutional Review Board (IRB) oversees the ethical review and compliance of all clinical trials, ensuring patient safety and adherence to federal regulations. A 15% cap on indirect costs would necessitate a reduction of staff members from the IRB. This reduction would delay the review of clinical trial protocols, hindering the timely initiation of critical studies, including early-phase trials for cancer therapies and precision medicine. These delays would also extend FDA approval timelines, slowing the availability of life-saving treatments. Similarly, patient recruitment and retention efforts

would be severely impacted. The University's patient navigator program, which supports rural and underserved populations in accessing clinical trials, would lose funding for navigators and outreach staff. This would result in a decline in recruitment from these populations, reducing trial diversity and generalizability of results. In rare disease and pediatric trials, which require long-term follow-ups and multisite collaborations, indirect cost reductions would force the University to cut back on the coordination staff and specialized research nurses critical to these efforts. This would make participation in multisite trials less viable, jeopardizing advancements in these highly vulnerable patient populations. Finally, the University's ability to ensure data security and deploy AI-driven trial monitoring systems—essential for real-time analysis and adverse event detection—would be impaired by reductions in cloud computing resources. This would increase risks to patient safety and trial reliability, further compromising research integrity.

21. The University has for decades relied on the payment of indirect costs. Until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. In some cases, University of Minnesota has long-term obligations for which it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

**Exhibit 1**

22. In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.

23. The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. A massive reduction in the University of Minnesota's research budget would immediately and seriously jeopardize these contributions to the local region.

24. Finally, slowdowns or halts in research by the University of Minnesota and other U.S. universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

25. If required to absorb the cost of a reduced indirect cost rate, the University of Minnesota would be forced to immediately reduce key investments supporting the University of Minnesota's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025, at Minneapolis, Minnesota.

                                                        ___/s/ Shashank Priya_____
                                                                Shashank Priya

**Exhibit 1**