UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants*. | No. 1:25-cv-_____ |

**DECLARATION OF JOSHUA FESSEL, M.D., PH.D.**

I, Joshua Fessel, declare as follows:

**Background**

1. I am the former chief medical officer and director of the Office of Translational Medicine at the National Center for Advancing Translational Sciences (NCATS), one of the twenty-seven institutes and centers that collectively comprise the National Institutes of Health (NIH). Since 2011, the purpose of NCATS has been to advance translational sciences including by coordinating and developing resources to translate basic research into health solutions to treat specific diseases and illnesses. This includes the development of infrastructure for clinical trials and grants supporting rare disease and general clinical research centers. These centers, often at a hospital or academic medical center, support clinical studies and career development in all settings. NCATS' investment in external researchers through programs like the Clinical and Translational Science Awards and the Rare Disease Clinical Research Network has resulted in support for hundreds of clinical trials, numerous new FDA-approved diagnostics and treatments for both common and rare diseases in adults and children, and support for training of investigators across the United States and U.S. territories.

2. While I was at NCATS, the leadership team included the Center's director, deputy director, and the leads of NCATS' eleven divisions and offices, including the Division of Extramural Activities, the Division of Clinical Innovation, the Division of Preclinical Innovation, the Division of Rare Disease Research Innovation, and the Office of Translational Medicine. Though the grant management and scientific review staff for grant applications, cooperative agreement applications, research and development contract proposals, and other similar applications are housed in Extramural Activities; nearly all of the divisions and offices have some engagement with funding of external research.

3. For example, in my role as the director of the Office of Translational Medicine, I oversaw the activities of the Office to administer grants studying evolving and emerging areas of translational bioethics, such as bioethics in artificial intelligence; to support innovative approaches to all aspects of clinical research; and generally to consult on how clinical research including clinical trials should be conducted and supported across the Center's programs consistent with statutes, regulations, and recognized best practices.

4. Since I joined the NIH in 2018, I have been involved in the various aspects of the institutes and centers directed towards supporting both internal and external research programs. Prior to serving as the chief medical officer at NCATS, I served as a senior clinical advisor. My role there was to lead a team developing more effective ways to turn discoveries into action to treat and prevent diseases of all types and to bring those discovery-driven actions to as many people as possible for the better health of all. That included direct involvement in NIH's efforts to address the SARS-CoV-2 (COVID-19) global pandemic and eventually efforts to address long COVID and other post-COVID conditions.

5. Prior to NCATS, I served as a member of the NIH's extramural scientific workforce as a Medical Officer/Program Director in the Division of Lung Diseases at the National Heart, Lung, and Blood Institute (NHLBI). The purpose of the NHLBI is to similarly support research, training, and health information dissemination with respect to heart, blood vessel, lung, and blood diseases. My focus was on helping researchers across the country advance knowledge about the diagnosis and treatment of lung diseases and to provide guidance on how to apply for, receive, and successfully execute grants for such research projects. In this role, I directly interacted with investigators across the country and with the leadership of NHLBI to accurately communicate NHLBI's scientific priorities and specific policies to the community of investigators, and to communicate opportunities for developing innovation to the Institute's leadership. I also worked directly with investigators and with NHLBI staff to ensure the supported research in the portfolio I oversaw was progressing appropriately and to identify and help mitigate impediments to progress as early as possible.

6. Finally, my career as a researcher started at Vanderbilt University as an Assistant Professor of Medicine, Pharmacology, and Cancer Biology in 2013. While at the University, my research and clinical practice focused on investigation of the mechanisms that control metabolism at the molecular level, and how abnormalities contribute to complex vascular and lung diseases such as pulmonary hypertension, heart failure, sepsis, critical illness delirium, cancer, and pulmonary fibrosis. Those research projects received NIH support from institutes and centers like the National Center for Advancing Translational Sciences; the National Heart, Lung, and Blood Institute; and the National Cancer Institute.

7. On March 31, 2025, I voluntarily resigned from my position as chief medical officer from NCATS. In the three months prior to my departure, I experienced unprecedented

disruptions to the work of advancing biomedical research, particularly through the funding of external clinical and translational research. Typically, programmatic and grant management staff work together with the leadership at institutes and centers like NCATS to advance the purpose of each institute and center. As further described below, NCATS advances its mission by periodically setting and articulating its priorities in a strategic plan and by working with various stakeholder groups to fine-tune the scientific mission and to assess progress. That process includes consulting with the public and other stakeholders to set NCATS' priorities for its external research portfolio. Leadership and staff then work together with the scientific community and the advisory council to assess and ultimately fund external research projects consistent with NCATS' statutory and regulatory responsibilities. Grant terminations are exceedingly rare.

8. Since January 2025 that process has been turned on its head. Staff and leadership have received information about terminations of grants based not on lack of performance or any other irregularities, but claims that the aims of these grants no longer aligned with NIH's priorities. Staff and leadership at NCATS have had no input into and minimal ability to identify which grants are subject to greater scrutiny or termination. As described below, leadership and staff, including NCATS staff directly responsible for managing specific grants, have learned of grant terminations *after* grants have already been terminated.

### NIH Funding Priorities & Grantmaking

9. Congress created the National Center for Advancing Translational Sciences on December 23, 2011 "to support the creation of innovative methods and technologies to speed the development, testing and implementation of diagnostics and therapeutics across a wide range of

human diseases and conditions."[1] By statute, responsibility for the Cures Acceleration Network rests for NCATS. The Network is required to award grants and contracts to eligible entities like universities to accelerate the development of high-need cures, including through the development of medical products and behavioral therapies. Similarly by statute, NCATS (along with the other Institutes/Centers at NIH) on a triannual basis report to Congress on the enrollment of women and racial/ethnic minorities in clinical research supported by the NIH. By statute, NCATS also participates in the scientific strategic planning process at NIH. Every planning cycle, NIH considers disease burden in the United States and the potential for return on investment to the United States; rare diseases and conditions; and the biological, social, and other determinants of health contribution to health disparities in identifying research priorities. These priorities are then reported to Congress and publicized on its website via the NIH strategic plan.

10. At NCATS, the institute also engages in scientifically based strategic planning on a five-year basis. While I was at NCATS, we finalized the NCATS strategic plan for the 2025 to 2030 time period. NCATS Strategic Plan for 2025-2030.[2] While the process was led by the NCATS director and strategic planning staff, the plan was developed through extensive interactions with stakeholders from different research communities around the country, the general public, and staff across NCATS and NIH. Staff provided input into four translational sciences areas specifically Research; Training and Education; Patient and Community Engagement; and DEIA (Diversity, Equity, Inclusion, and Accessibility).

---

[1] Nat'l Ctr. Advancing Translational Scis., *NCATS History*, https://ncats.nih.gov/about/history (updated on Nov. 4, 2024).

[2] NAT'L CTR. ADVANCING TRANSLATIONAL SCIS., STRATEGIC PLAN FOR 2025-2030 (2024), https://web.archive.org/web/20241230113140/https://ncats.nih.gov/sites/default/files/2024-09/NCATS-Strategic-Plan-2025-2030_508.pdf.

11. At the time DEIA efforts specifically included NCATS' efforts to ensure that all Americans have the opportunity to contribute to and benefit from translational science. Without research and a research workforce that reflected the many communities, identities, backgrounds, races, ethnicities, abilities, cultures, and beliefs of the United States—NCATS could not meet its goal of reducing disease burden. Having research participants who do not adequately reflect the population of the disease or condition under study creates barriers to successful translation. Lack of inclusion in research can lead to new treatments that do not work for the people who need them most. This meant that NCATS would plan to prioritize health disparities research and research that included individuals of all backgrounds and from all settings.

12. Once agency priorities have been identified, NCATS issued notices of funding opportunities (NOFOs) for specific funding mechanisms. Depending on the grant, contract, cooperative agreement, or other transaction authority, some of these funding opportunities were targeted to specific areas and some are open-ended invitations to investigators to propose problems of interest and specific approaches that fall within NCATS's mission. These NOFOs are typically drafted by programmatic or scientific staff at NCATS with input from grants management staff and approved by NCATS leadership.

13. After grant applications were received, they are evaluated for their scientific and technical merit by subject matter area specific study sections. The leadership team at NCATS' including myself would also typically meet before advisory councils to discuss whether grant applications aligned with NCATS' funding priorities. Institute or center specific advisory councils also provided input on whether the scored applications aligned with NCATS' mission and research priorities. The NCATS director and grants management staff would then ultimately issue notices of awards for funded projects.

14. During my time at NHBLI and NCATS, these funded research projects included women; individuals across the life span, especially children and people over 65; and other underrepresented groups, such as racial and ethnic groups, rural residents, sexual and gender minorities, and individuals with disabilities in their study populations.

15. As an example, I was a part of the NCATS' team managing clinical trials that were a part of the Accelerating COVID-19 Therapeutic Interventions and Vaccines public-private partnership, created in response to the COVID-19 pandemic. In particular, the ACTIV-6 clinical trial was managed by NCATS's Office of Translational Medicine staff. The clinical trial platform enrolled participants from all 50 states and territories, ultimately enrolling over 10,000 participants and testing seven treatments for acute COVID-19 against a common placebo group. Enrollment of underrepresented groups, such as Black or African-American and Hispanic participants, increased steadily over time. As part of the urgency to evaluate potential treatments for COVID-19, each arm of the trial completed enrollment in less than 10 months, and results were posted within 15 months from day one of a given treatment. Due to the enrollment of a diverse set of participants, the results (i.e. whether or not a treatment worked) were applicable to adults with acute COVID-19 across the entire United States and in other countries around the world.

16. Prior to 2025, I have never been involved with a termination of a grant that purportedly no longer aligns with NCATS' or NHLBI's priorities. To administer grants, programmatic staff at both NCATS and NHLBI are in regular communication with grant recipients and receive annual progress reports tailored to the specific research project. The initial review of a project for funding specifically involves a scientific review concerning whether or not the project is scientifically sound and feasible. Most research projects, hence, do not

encounter significant issues at the annual progress report stage. To the extent there is a concern with how the scientific study is proceeding, the general approach is to engage extensively with the research team and institution to discuss and implement a corrective action plan.

17. Termination of even a *component* of a grant is exceedingly rare. For instance, if part of the science supported by a funded grant includes a clinical trial, and the clinical trial cannot be completed successfully as planned for any of a variety of reasons (e.g., inability to enroll, or an adverse event necessitating that the trial be stopped), only the clinical trial itself would be halted, and even that would be preceded by extensive discussions with the investigators and others involved in the study (e.g., the trial's Data and Safety Monitoring Board) to ensure that all measures had been taken to allow the study to be completed successfully if possible, and to ensure a safe and orderly closeout if not. The grant itself would not necessarily be terminated, but rather the grant funds may be used for the closeout process and for any remaining analyses to support the scientific goals of the grant.

**NIH Grant Terminations Since January 2025**

18. As part of running NCATS, the leadership team historically has met weekly to discuss how to advance the Center's mission and priorities. Similarly, to share information and encourage a consistent approach across the individual institutes and centers, each institute and center's leadership team also typically meets on a frequent basis. This includes coordination meetings between institute or center's directors, executive officers, scientific directors, and each institute's leads on extramural or external funding. Information from these meetings is shared with NCATS' leadership meetings and then typically translated down to programmatic and grant management staff.

19. In late January 2025, the above processes experienced extreme disruptions. On January 21, the Acting Secretary of Health and Human Services informed NIH that all notices in the Federal Register would need to be approved by a Presidential appointee. This meant that study sections and advisory councils that were not noticed before January 21, could not meet without the approval of the notice by a Presidential appointee. Similarly, all grant making related actions were paused to assess their alignment with the Administration's priorities.

20. As a result, the leadership team at NCATS including myself opted to meet daily from late January into February in an attempt to respond to these shifting directives. However with respect to external research, these meetings were frustrated in the sense that NCATS leadership was unable to provide guidance to staff on how to proceed with the NIH's external funding responsibilities. While typically NCATS's leadership would set and broadcast its funding priorities as described above, we were unable to identify the basis for grant terminations and other delays starting in late February.

21. For example, I am unaware of any input from NCATS leadership or staff into how grants were identified for termination starting in late February. We would receive lists of grants funded or supported by NCATS for termination. But to the best of my knowledge, nobody at NCATS identified grants for termination on the basis of "DEI" or "gender identity" or other concepts or keywords. Similarly, NCATS leadership never received any instructions defining "DEI" or "gender identity" or instructions on how to identify a grant as associated with "DEI" or "gender identity." We also never received any instructions on what basis grants could be reinstated; and therefore could not respond to inquiries from grant recipients about how to appeal grant terminations.

22.     For example, an Accelerating COVID-19 Therapeutic Interventions and Vaccines clinical trial – the ACTIV-6 trial, managed by staff that directly reported to me – was terminated without the kind of advance notice described above in late March. The ACTIV-6 clinical trial at that point had enrolled approximately 10,000 participants over 4 years to assess repurposed drugs for their ability to treat acute COVID-19 and, later, for their ability to reduce the likelihood of developing symptoms of long COVID. Long COVID, based on our current knowledge, is a chronic illness impacting many Americans that were infected with COVID-19. Effects of the illness include fatigue, cognitive disturbances ("brain fog"), sleep disturbances, dysautonomias, and breathing difficulties. No one on my team including myself had input into the decision to terminate the funding for ACTIV-6.

23.     Similarly, NCATS had awarded a Clinical & Translational Science Award to the University of Utah for $38 million over seven years. That award included support for clinical research across a slew of interventions ranging from diabetes diagnosis tools to studies of children with severe mental illness.[3] The award description also specifically included efforts to spark the translation of research discoveries from the research bench to populations to improve the health of individuals and communities, reducing health disparities and improving health equity. That included training scientists and engaging with populations that experience health disparities, including underserved racial/ethnic populations, senior citizens, members of LGBTQ+ communities, and rural/frontier residents across Mountain West region.[4] This CTSA

---

[3] University of Utah, *Federal Funding and the Utah Clinical and Translational Science Institute* (Mar. 24, 2025), https://healthcare.utah.edu/newsroom/news/2025/03/federal-funding-and-utah-clinical-and-translational-science-institute

[4] Nat'l Inst. of Health, *CTSA UM1 Program at University of Utah*, NIH RePORTER, https://reporter.nih.gov/search/p4C2KMNslUaLWgpOFnalSQ/project-details/10810815 (last accessed May 5, 2025).

award was terminated in the middle of the night, without any advance warning to anyone at NCATS. NCATS leadership and staff learned of the grant termination at the same time the University of Utah learned of it. While I was at NCATS, we were unable to ascertain with certainty why that grant was terminated, whether the termination was on "DEI" grounds, or why the grant was subsequently reinstated without any explanation.

24. I am similarly aware of other NIH grants that were terminated on apparent "DEI" grounds; but as far as staff could tell only mentioned "diversity" in the grant description. On this basis, I can only infer that grants were at risk if they mentioned diversity or health equity in the grant description.

25. Definitive guidance on how to identify grants at risk of termination was of deep concern to the NCATS leadership and staff. Both grant recipients and grant applicants were seeking guidance on whether their grant and applications were at risk for termination. Once grants were terminated, we received inquiries on how to safely and ethically close out projects with a clinical trial or study component. This was of deep personal concern to me as the director of the NCATS office charged with providing guidance on the safe and ethical conduct of clinical trials supported by NCATS. There are many interventions or other medical treatments where participants in trials should not suddenly stop treatment. For example, a number of drugs in common use – systemic corticosteroids, selective serotonin reuptake inhibitors, certain blood pressure medications, and a number of others – cannot safely be stopped abruptly. Some interventions require significant follow-up intervals to continue to assess safety, efficacy, and side effects. Many gene-targeted therapies fall under this description. The follow-up required cannot be completed if the grant supporting the study is terminated suddenly.

26.    But as of the date of my separation from NIH on March 31, 2025, both staff and leadership continued to be unable to provide definitive guidance to grant recipients and applicants on what grants were at risk of termination; or what grant applications were at risk of being removed from review by the study section and advisory council process.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of May 2025, in Rockville, Maryland.

_____
Joshua Fessel, M.D., Ph.D.
Former Director
Office of Translational Medicine
National Center for Advancing Translational Sciences
National Institutes of Health