# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND; STATE
OF NEW YORK; STATE OF HAWAIʻI;
STATE OF ARIZONA; STATE OF
CALIFORNIA; STATE OF
COLORADO; STATE OF
CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF
THE STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY;
STATE OF NEW MEXICO; STATE OF
OREGON; STATE OF VERMONT;
STATE OF WASHINGTON; STATE
OF WISCONSIN,

      Plaintiffs,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; INSTITUTE OF MUSEUM
AND LIBRARY SERVICES; KEITH E.
SONDERLING, in his official capacity
as Acting Director of the Institute of
Museum and Library Services;
MINORITY BUSINESS AND
DEVELOPMENT AGENCY; MADIHA
D. LATIF, in her official capacity as
Deputy Under Secretary of Commerce
for Minority Business Development;
HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;
FEDERAL MEDIATION AND
CONCILIATION SERVICE;
GREGORY GOLDSTEIN, in his official
capacity as Acting Director of the
Federal Mediation and Conciliation

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:25-cv-128-JJM-LDA

Service; OFFICE OF MANAGEMENT )
AND BUDGET; RUSSELL T. )
VOUGHT, in his official capacity as )
Director of the Office of Management )
and Budget, )
)
)
  Defendants. )

# MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Once again, this Court is confronted with a legal challenge by various states, against an Executive Order that attempts to dismantle congressionally sanctioned agencies and ignores congressionally appropriated funds.  Here, the targeted federal agencies support our libraries, museums, minority business enterprises, and the well-respected federal mediation services.  This Executive Order violates the Administrative Procedures Act ("APA") in the arbitrary and capricious way it was carried out.  It also disregards the fundamental constitutional role of each of the branches of our federal government; specifically, it ignores the unshakable principles that Congress makes the law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated.

Plaintiffs are twenty-one states (the "States") who move for a preliminary injunction,[1] seeking to restrain the Defendants from implementing the President's Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" ("*Reduction* EO"), as it applies to three federal agencies—the Institute of Museum

---

[1] The States initially moved for a temporary restraining order but, upon the parties' stipulation, that motion was converted to one for a preliminary injunction. *See* ECF No. 31; *see also* Text Order, Apr. 10, 2025 (entering the parties' stipulation).

and Library Services ("IMLS"), the Minority Business Development Agency ("MBDA"), and the Federal Mediation and Conciliation Service ("FMCS").  ECF No. 3.  The States assert that the Defendants' efforts to carry out the *Reduction* EO's mandates violate: (1) the APA; (2) Separation of Powers principles; and (3) the Take Care Clause of the United States Constitution.  *Id.* at 2.  The Defendants oppose the motion on various jurisdictional grounds and assert that the States have not satisfied the elements required for entitlement to preliminary relief.  ECF No. 41.  For the reasons stated below, the Court GRANTS the States' motion.

# I.   BACKGROUND

The Court will first provide some exposition on the three congressionally created agencies at the center of this dispute—IMLS, MBDA, and FMCS—before outlining the travel of the case.

## A.  The Agencies

### 1.  IMLS

In 1996, Congress established IMLS as an agency within the National Foundation on the Arts and Humanities.  20 U.S.C. § 9102.  The agency's mission is to "to advance, support, and empower America's museums, libraries, and related organizations through grantmaking, research, and policy development."  INST. OF MUSEUM AND LIBR. SERVICES, FY 2022-2026 STRATEGIC PLAN 3 (2022), https://www.imls.gov/sites/default/files/2022-02/imls-strategic-plan-2022-2026.pdf.  Per statute, ILMS must have an Office of Museum Services and an Office Library Services.   20 U.S.C. § 9102(b).  IMLS must also "regularly support and conduct, as

appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services." *Id.* § 9108(a). The agency is also tasked with disbursing and expending appropriated funds and other forms of assistance to support museums and libraries across U.S. states and territories. *Id.* §§ 9121-9165 (libraries), §§ 9171–9176 (museums). IMLS administers several competitive grant programs each year. *See, e.g., id.* § 9165 (Laura Bush 21st Century Librarian Program); *id.* § 9161 (Native American Library Services Grant Program); *id.* § 9162 (National Leadership Grants for Libraries Program).

### 2. MBDA

In 2021, Congress created MBDA as an agency within the Department of Commerce. 15 U.S.C. § 9502. The agency's purpose is to "promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs." U.S. DEP'T OF COMMERCE, MBDA, FISCAL YEAR 2025 CONGRESSIONAL JUSTIFICATION 16 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf. The Under Secretary of Commerce for Minority Business heads the MBDA. 15 U.S.C. § 9502(b)(1).

The MBDA Business Center Program is a program under the MBDA, *id.* § 9523(a)(1), that creates "a national network of public-private partnerships" to: (1) help minority business enterprises with "accessing capital, contracts, and grants" and "creating and maintaining jobs"; (2) "provide counseling and mentoring to minority

business enterprises"; and (3) "facilitate the growth of minority business enterprises by promoting trade." *Id.* § 9522.   Under the MBDA Business Center Program, the MBDA Under Secretary must "make Federal assistance awards to eligible entities to operate MBDA Business Centers"—which are tasked with providing "technical assistance and business development services, or specialty services, to minority business enterprises." *Id.* § 9523(3).   Tangentially related to the MBDA Business Centers is the MBDA's Office of Business, which is administered by a Director.   *Id.* § 9502(d)(2).

### 3. FMCS

FMCS is the oldest of the three agencies, established by Congress in the Taft-Hartley Act of 1947. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202, 61 Stat. 136.   Congress charged this agency with "assist[ing] parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a).   Thus, the statute instructs FMCS to perform a wide range of functions related to resolving labor disputes, including: (1) conducting grievance mediations as a "last resort and in exceptional cases" to resolve "disputes arising over the application or interpretation of an existing collective-bargaining agreement," *id.* § 173(d), and (2) providing labor mediation and conciliation services "to assist parties to labor disputes affecting commerce to settle such disputes," *see id.* § 173(a)-(c).   FMCS also provides other services to facilitate the resolution of labor such as "appoint[ing] arbitration panels and arbitrators; conduct[ing] skills development and conflict resolution training; and verif[ying] signed union

authorization cards when employers agree to use that method to recognize a union." ECF No. 1 ¶ 124.

## B.  Executive Order 14238

On March 14, 2025, the President issued the *Reduction* EO, which directs seven federal agencies—including IMLS, MBDA, and FMCS—to: (1) eliminate their "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and (2) "reduce the performance of their statutory function and associated personnel to the minimum presence and function required by law."  Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025).  The *Reduction* EO instructs the head of each of these agencies to submit, within seven days, a report to the Director of the Office of Management and Budget (OMB) "confirming full compliance with this order and explaining which components or functions of the government entity, if any, are statutorily required and to what extent."  *Id.* § 2(b). Further, the *Reduction* EO outlines that, upon review of budget requests these agencies submit, the OMB Director "shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order."  *Id.* § 2(c).

A day after issuing the *Reduction* EO, the President signed the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025)—in which Congress funded IMLS, MBDA, and FMCS through September 30, 2025 at the same level it funded these agencies in fiscal year 2024.  *See* Continuing Appropriations Act § 1101(a)(2), (8).  In 2024, Congress appropriated:

(1) $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act," Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. 4, 138 Stat. 460; (2) appropriated $53,705,000 to FMCS "to carry out the functions vested in it by the" Taft-Hartley Act, *id.*; and (3) $68,250,000 "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law." *Id.*, Pub. L. No. 118-42, div. C, tit. 1.

### C. Impact of Executive Order 14238

Since the issuance of the *Reduction* EO, leadership of IMLS, MBDA, and FMCS have taken several actions in furtherance of the EO's mandates. At IMLS, the agency's leadership held an agency-wide town hall in which they informed employees that: (1) they anticipated the agency would be stripped "down to the studs"; (2) employees should anticipate dismissal soon; and (3) a reduction in force ("RIF") plan would likely be implemented soon thereafter. ECF No. 3-40 ¶ 6. A few weeks later, IMLS's Director of Human Resources told staff that the "entirety of IMLS" would be placed on administrative leave and all IMLS grants would be terminated, "with the potential exception of the Grants to States Program." *Id.* ¶ 11.

Additionally, the Director of Human Resources indicated that all but a handful of staff members should expect a RIF in 30 days or less. *Id.* That same day, IMLS emailed state librarians notifying them that "IMLS received word that all staff are going to be placed on administrative leave," and staff accordingly would "not be able

to work or respond to your emails." ECF No. 1-2. IMLS later recalled twelve staff members from administrative leave. ECF No. 3-40 ¶ 15. Prior to the significant reduction in personnel, thirty-five employees were charged with administering IMLS's grant programs. *Id.* ¶ 17. Only four of the twelve employees recalled from administrative leave have grant administering experience, of whom only one administered the Grants to States Program. *Id.* ¶ 20. Further, none of the twelve employees works in IMLS's Office of Research and Evaluation, rendering it essentially defunct. *Id.* ¶ 22. And as of now, IMLS has terminated well over 1,000 grants—with the same boilerplate notice letter stating that the grant was "'no longer consistent with the [agency's] priorities' and that the President's March 14, 2025, executive order 'mandates that the IMLS eliminate all non-statutorily required activities and functions.'" ECF No. 35-3 ¶ 5; *see also* ECF Nos. 35-5 at 10-11, 35-6 at 6-7, 35-8 at 5-20, 35-9 at 4-5 (IMLS grant termination letters that grantees received).

As to MBDA, the agency placed all but five of its employees[2] on paid administrative leave shortly after the *Reduction* EO's issuance. ECF No. 3-41 ¶ 5. And now, those five employees have since been reassigned to positions outside the MBDA. ECF No. 35-4 ¶ 5. MBDA also announced that it was implementing a RIF. ECF No. 1-3. And the agency appears to have since terminated all preexisting MBDA

---

[2] Those remaining employees are the Deputy Under Secretary of Commerce for Minority Business Development, the Chief Operating Officer, the Chief of the Office of Legislative, Education, and Intergovernmental Affairs, a senior advisor, and a budget analyst. *See* ECF No. 3-41 ¶ 5.

grant awards in furtherance of the *Reduction* EO.  *See* ECF No. 45-1 ¶ 4; *see also* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-6 at 2.  The staff terminated include employees responsible for maintaining MBDA's informational clearinghouse, which is central to the agency's statutorily mandated responsibility to collect and share data related to minority enterprise.  ECF No. 3-41 ¶ 13.  Further, the agency has ceased several programs and services, including its Minority Business Advisory Council.  *Id.*

Lastly, FMCS placed almost all of its over 200 employees on administrative leave in the aftermath of the *Reduction* EO's issuance.  ECF No. 3-42 ¶ 4-7.  Now, only about ten to fifteen FMCS employees—all of whom are based in the agency's D.C. headquarters—remain on the job.  *See* ECF No. 3-26 ¶ 17.  And FMCS has started a RIF plan to terminate all but those ten to fifteen remaining employees. ECF No. 3-42 ¶ 7; *see also* Jory Heckman *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), FED. NEWS NETWORK, https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton.  Additionally, because the agency has only a fraction of its personnel remaining, it appears that "[n]early all of services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided."  Heckman, *supra.*

It is these series of actions the Defendants have taken to implement the *Reduction* EO as to IMLS, MBDA, and FMCS, that has prompted the States to seek a preliminary injunction enjoining the Defendants from giving effect to that EO.

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022).   "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).   In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)).   "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## III.   DISCUSSION

### A. Jurisdiction

#### 1.    Standing

The Defendants argue that the States lack standing to seek relief that would prohibit OMB from implementing the *Reduction* EO with respect to the four other agencies that are included in that Order but are not the subject to this lawsuit.  ECF No. 41 at 9.  But the States do not dispute that they cannot seek relief as to those four agencies not included in their Complaint.  ECF No. 44 at 4.  Instead, the States affirm that the claims outlined in their Complaint and preliminary injunction motion encompass the "Defendants' actions as to the IMLS, MBDA, and FMCS."  *Id.*  Thus, while the States' request that the Court enjoin the Defendants from "implementing the Closure Order and the Closure Decisions" can admittedly be read as all encompassing, *see* ECF No. 1 at 53, the States have made it clear that the specific relief they seek is for the Court to enjoin the Defendants from implementing the *Reduction* EO *as to* the IMLS, MBDA, and FMCS.  *See* ECF No. 3 at 2 ("Plaintiff States move for issuance of an order . . . restraining Defendants from implementing actions in accordance with [the *Reduction* EO] *as they relate to the Institute of Museum and Library Services (IMLS), the Minority Business Development Agency (MBDA), and the Federal Mediation and Conciliation Service (FMCS) . . .*") (emphasis added); *see also* Tr. of Prelim. Inj. H'rg. 43, ECF No. 48 (States explaining that "the relief that we're seeking is to enjoin the closure decisions and to enjoin these three

agencies' application and implementation of the Executive Order."). Accordingly, equitable relief against non-parties is not at issue here.

### 2. Ripeness

Next, the Defendants contend that nearly all the States' claims of potential injury from "future delays or failure to receive IMLS, MBDA, and FMCS funds and services" are speculative and thus are not ripe for the Court's review. ECF No. 41 at 11. But the unrefuted record before the Court reveals that the States are relying on more than mere speculation when asserting harms—current or imminent— stemming from the Defendants' efforts to significantly reduce agency services and personnel under the *Reduction* EO. For example, on April 9, 2025, an MBDA employee received a RIF notice from the Office of the Deputy Secretary of Commerce that plainly stated that "[t]he Department is abolishing all positions within MBDA." ECF No. 35-4 at 4. According to that MBDA employee, only five MBDA employees were not placed on administrative leave and have since been reassigned to positions *outside* the MBDA. *See id.* at ¶ 5. It is unclear how it is speculative for the States to precipitate delays in funds and services from the MBDA—and harms flowing therefrom—when the unrebutted record reveals that MBDA's workforce has been reduced to zero. States receiving MBDA funding have stated any pause to such funding will prompt cuts to essential programming. *See, e.g.*, ECF No. 3-11 ¶¶ 13, 20; ECF No. 3-12 ¶¶ 9, 16. Despite many opportunities to do so, the Defendants have presented no evidence suggesting that these MBDA funds and services can still be administered, in a timely fashion or at all, in the absence of MBDA's workforce. And

12

now, recent developments show that all existing MBDA grants were terminated based, in part, on the *Reduction* EO's mandate for the agency to eliminate all non-statutorily required activities and functions. *See* ECF No. 45-1 ¶ 4; *see also* ECF Nos. 45-2, 45-3, 45-4, 45-5, 45-6, 45-7 (Notice of grant terminations to MBDA grantees in Arizona, Hawaiʻi, Wisconsin, and Rhode Island).

As to FMCS, the agency announced the cessation of public sector conciliation services as of April 18, 2025, ECF No. 1-4, which are services the States have attested to regularly using and benefiting from. *See, e.g.*, ECF No. 3-39 ¶¶ 7-8; ECF No. 3-26 ¶¶ 13(a), 22-23; ECF No. 3-30 ¶ 10. And as to the IMLS, the agency's headcount was reduced from seventy-seven to twelve employees[3] in the aftermath of the *Reduction* EO's issuance. ECF No. 3-40 ¶¶ 4, 13. An IMLS employee attested, based on their experience, that the twelve remaining employees "will not be able to administer the volume of existing grants and incoming grant applications for the upcoming year [and] [a]s a result . . . no new grants will be awarded, and most existing grants will be terminated." *Id.* ¶ 21. Now, many of the States have attested to being compelled to cut staff and shut down programs due to the grant terminations and missed grant payments in the wake of the agency's apparent implementation of the *Reduction* EO. *See, e.g.*, ECF No. 3-33 ¶¶ 4-10, 20, 22 (Washington); ECF No. 3-3 ¶¶ 16, 22, 23, 31–32 (California); ECF No. 3-4 ¶¶ 17–19, 31 (Connecticut); ECF No. 35-5 ¶¶ 10-12 (Maryland). The States have presented compelling evidence illustrating that the

---

[3] All but twelve IMLS employees were placed on administrative leave. ECF No. 40 ¶ 14.

harms stemming from the dismantling of IMLS, MBDA, and FMCS are already unfolding or are certain to occur, in light the significant reduction in personnel available and competent to administer these agencies' funds and services and the elimination of certain programs that served the States. Accordingly, the States' claims are sufficiently ripe for the Court's review.

### 3. Subject Matter Jurisdiction

#### a. The Tucker Act

Next, the Defendants argue that the Court lacks jurisdiction over the States' APA claims related to the Defendants grant terminations because, under the Tucker Act, Congress vested the Court of Claims with exclusive jurisdiction over such claims. ECF No. 41 at 14. The Court disagrees. The Tucker Act "provides jurisdiction and waiver of immunity in the Claims Court so long as the action: 1) is against the United States; 2) seeks relief over $10,000; and 3) is founded upon the Constitution, federal statute, executive regulation or governmental contract." *Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009) (citing 28 U.S.C. § 1491(a)). To support the contention that the States' challenges to the grant terminations are claims sounding in contract, the Defendants rely primarily on the Supreme Court's ruling on an emergency stay application in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam).

In *California,* the Supreme Court stayed a district court's temporary restraining order that enjoined the Government from terminating education-related grants after finding that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.*

14

at 968.  The Supreme Court highlighted that the APA's sovereign immunity waiver
does not apply to claims seeking "money damages," *id.* (citing 5 U.S.C. § 702), then
explained that the APA's immunity waiver "does not extend to orders 'to enforce a
contractual obligation to pay money' along the lines of what the District Court ordered
. . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212
(2002)).  The Supreme Court highlighted that the "Tucker Act grants the Court of
Federal Claims jurisdiction over suits based on 'any express or implied contract with
the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

But *California* does not render this Court an improper forum for the States'
claims under the APA.  To start, *California*'s precedential value is limited,
considering that the Supreme Court issued the decision on its emergency docket, in
the context of an application for a stay pending appeal, and based on "barebones
briefing, no argument, and scarce time for reflection."  145 S. Ct. at 969 (Kagan, J.,
dissenting); *see also Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J.,
concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow
docket' is similarly off target.  The stay will allow this Court to decide the merits in
an orderly fashion—after full briefing, oral argument, and our usual extensive
internal deliberations—and ensure that we do not have to decide the merits on the
emergency docket.  To reiterate: The Court's stay order is not a decision on the
merits.").

Further, the *California* stay order does not displace governing law that guides
the Court's approach to discerning whether the States' claims are essentially contract

claims in order to direct jurisdiction to the Court of Claims. "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). The Court first addresses the States' source of rights; here the States bring claims under the APA and the United States Constitution. *See* ECF No. 1 at 44-52. As the Defendants recognize, the States are not "challeng[ing] specific grant terminations [or] specific payments they claim to be entitled to." ECF No. 41 at 21. Rather, the States' suit challenges each agency's actions implementing a categorical policy to eliminate their "non-statutory components and functions" and "reduce the performance of their statutory function and associated personnel" under the *Reduction* EO. *See* Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). True, some of the harms the States allege because of these decisions include the termination of certain grant agreements. But nowhere are the parties quibbling over whether the States subject to those grant terminations breached the terms or conditions of the underlying agreements as to transform this action into one sounding in contract. Rather, the States' challenges are grounded on whether the Defendants' actions exceeded the bounds of their *statutory* or *constitutional* authorities.

The Court now turns to the relief the States seek. The Court of Claims' exclusive jurisdiction under the Tucker Act does not arise "merely because [a plaintiff] hints at some interest in a monetary reward from the federal government

16

or because success on the merits may obligate the United States to pay the complainant." *Crowley Gov't Servs., Inc.*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)).  Indeed, the Supreme Court reaffirmed, in *California*, that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 145 S. Ct. at 968 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).  The States seek equitable relief to enjoin the Defendants' actions implementing the *Reduction* EO—not specific performance of any grant agreements. True, the scope of the relief the States seek implicates enjoining the unlawful terminations of their grants.  But such relief "is not a claim for money damages," precluded under the APA—even though "it is a claim that would require the payment of money by the federal government." *Bowen*, 487 U.S. at 894.  That is because money damages are a remedy at law that "provide relief that substitutes for that which ought to have been done." *Id.* at 910.  Whereas specific relief does not constitute a "substitute remed[y] at all, but attempt[s] to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (citations omitted).  Here, the States "seek access to funds they are presently entitled to, 'rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer or ha[ve] suffered by virtue of the withholding of those funds.'" *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412, at *10 (D.D.C. Apr. 16, 2025) (quoting *Bowen*, 487 U.S. at 895).

Accordingly, because the States' challenges are based on alleged statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act. *Crowley*, 38 F.4th at 1106.

### b. The Civil Service Reform Act

Next, the Defendants assert that the Court lacks jurisdiction to consider the States' challenges to the placement of IMLS, MBDA, and FMCS personnel on administrative leave because, under the Civil Service Reform Act ("CSRA"), "Congress made the Office of Special Counsel [OSC], the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees . . . and other interested parties to raise challenges to final, non-discrimination-related employment actions, even when those disputes involve constitutional claims." ECF No. 41 at 19-20 (citations omitted). The Defendants urge that "the APA does not permit litigants to forestall properly applicable channeling regimes that Congress established." *Id.* at 20.

There is no dispute that the CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). But to determine whether the CSRA's statutory review scheme precludes district court jurisdiction, the Court must consider whether: (1) "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction," and (2) "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207,

212 (1994)).  As to the second prong, the Court must presume that Congress does not intend to limit jurisdiction "if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'"  *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-213).

The Court does not observe any jurisdiction bar within the CSRA's statutory scheme that would apply to the States; the scheme, at most, contemplates the availability of judicial review of *federal employees'* disputes over employment decisions.  Specifically, the CSRA's "comprehensive and exclusive" statutory scheme "protects covered *federal employees* against a broad range of personnel practices, and ... supplies a variety of causes of action and remedies to employees when their rights under the statute are violated."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (emphasis added).  Thus, "[a] *federal employee* generally may not pursue alternative routes of judicial review, such as by filing a civil action in district court under the APA."  *Rodriguez v. United States*, 852 F.3d 67, 82 (1st Cir. 2017) (emphasis added).  Here, none of the plaintiffs are federal employees so the Court need not review whether their claims fall under the ambit of the CSRA.

As to the second prong, a finding of CSRA preclusion would foreclose all meaningful judicial review over the States' claims because they cannot bring their claims under CSRA's statutory scheme.  Further, the States' challenges to the Defendants actions to implement the *Reduction* EO are plainly outside the MSPB's expertise.  While the States' challenges implicate the Defendants' decisions to

terminate or place employees on leave, such challenges are not the run of the mill challenges to adverse employment actions with which the MSPB may be familiar. Instead, the States' claims raise constitutional and statutory challenges to various agencies' decisions effectuating "the termination of agency functions, the failure to carry out statutory duties, [and] the refusal to expend appropriations." ECF No. 44 at 11. The MSPB and OSC do not have the jurisdiction to review the congressional appropriation issues raised here. *See Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at \*11 n.22 (D.D.C. Apr. 22, 2025)[4] ("*Widakuswara II*") ("the MSPB and OSC have no jurisdiction to review the cancellation of congressional appropriations."). And the States' remaining APA and constitutional claims—under separation of powers principles and the Take Care Clause—"raise[s] standard questions of administrative and constitutional law, detached from any issues related to federal employment." *Id.* (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 194 (2023)) (internal quotation marks omitted). Thus, the States' claims fall outside the "competence and expertise" of the administrative bodies that handle employee grievance arising under the CSRA.

Lastly, for similar reasons, the States' claims are "wholly collateral" to CSRA's review provisions because they invoke constitutional and administrative questions

---

[4] The D.C. Circuit administratively stayed the preliminary injunction issued in *Widakuswara II* as to only the part of the order to restore grants but specified that "[t]he purpose of this administrative stay is to give the court sufficient opportunity to consider the emergency motions for stay pending appeal and should not be construed in any way as a ruling on the merits of those motions." *Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. May 1, 2024).

about the propriety of the agencies' actions to curtail their respective statutory and discretionary functions—i.e., claims that do not necessarily relate to CSRA's focus on the review of federal employee grievances.  Accordingly, the CSRA statutory scheme does not reflect Congress's intent to preclude the Court's jurisdiction to review the States' claims here.

### B.  Likelihood of Success on the Merits

#### 1.  APA Claims

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The States assert that the Defendants' implementation of the *Reduction* EO violates the APA because such actions are arbitrary and capricious and contrary to law.  Before reaching the merits, the Court must first address the Defendants' contentions that the States' claims cannot be subject to judicial review under the APA because the agency actions at issue are neither discrete nor final.

#### a.  "Programmatic" Challenges

The Defendants contend that the States do not challenge "discrete agency action," "but rather a collection of grant terminations, personnel actions, and programmatic activities."  ECF No. 41 at 20-21.  In making such arguments, the Defendants analogize the States' challenges as the type of "programmatic challenge" that the Supreme Court dispelled in *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990).  *See* ECF No. 41 at 20-22.  In *Lujan*, the "programmatic challenge" that the Supreme Court dispelled "was an attempt to seek 'wholesale' 'programmatic

improvements' 'by court decree' by 'couch[ing]' '[the Bureau of Land Management's]
land withdrawal review program' as an 'unlawful agency action.'" *New York v.
Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Norton v. S. Utah Wilderness All.*,
542 U.S. 55, 64 (2004)).   But the Supreme Court recognized in *Lujan* that "if there is
in fact some specific order or regulation, applying some particular measure across the
board to all individual classification terminations and withdrawal revocations . . . it
can of course be challenged under the APA."  497 U.S. at 890 n.2.   Here, the States'
claims are closer to the latter type of APA challenge; the States have underscored
that they are challenging the Agency Defendant's adoption of a discrete, categorical
policy that applies the measure "of eliminating all functions and components not
mandated by statute, and of dramatically reducing their remaining functions" across
the board.  *See* ECF No. 44 at 14-15.  Accordingly, the States' APA challenges are of
the type deemed proper under *Lujan*.

### b.  Final Agency Action

Now, the Court must address whether there was "final agency action" to permit
judicial review under the APA.  5 U.S.C. § 704.  "[A]gency action includes the whole
or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial
thereof, or failure to act."  *Id.* § 551(13).  "Agency action" is not an "all-encompassing"
term that authorizes the Court to "exercise 'judicial review [over] everything done by
an administrative agency.'"  *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427
(D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir.
1948)).  Still, the term has a broad sweep—covering "comprehensively every manner

in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)). Relevantly, "[t]he term 'action' encompasses an agency's 'policy or routine practice.'" *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 895326, at *13 (D. Md. Mar. 24, 2025) (quoting *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018)). An agency action is final if: (1) it marks the "'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)). The Court is to apply the "finality" requirement in a "flexible" and "pragmatic" fashion. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-151 (1967). For the purposes of this analysis, it is crucial to lay out the actions that occurred at IMLS, MBDA, and FMCS close to the *Reduction* EO's issuance.

At IMLS, an employee described that the agency's leadership held a town hall during which they informed staff that IMLS "would look 'very different' following the President's [*Reduction*] executive order and that it might be stripped 'down to the studs.'" ECF No. 3-40 ¶ 6. Then on March 31, each office head within IMLS "met separately with their staff to inform them that the entirety of IMLS would be placed on admin[istrative] leave and that all grants would be terminated, with a potential exception of the Grants to States Program." *Id.* ¶ 11. That same day all but twelve of IMLS's staff of seventy-seven were placed on administrative leave. *Id.* ¶¶ 4, 13. Over a week later, IMLS terminated over 1,000 grants—and each termination notice

stated that the grant was "'no longer consistent with the agencies' priorities' and that the President's March 14, 2025, executive order 'mandates that the IMLS eliminate all non-statutorily required activities and functions.'" ECF No. 35-3 ¶ 5; *see also* ECF Nos. 35-5 at 10-11, 35-6 at 6-7, 35-8 at 5-20, 35-9 at 4-5 (notices of grant termination from IMLS to grantees in Maryland, New Jersey, Washington, and Wisconsin citing the *Reduction* EO and stating that the grant terminations were based, in part, on "the President's March 14, 2025 executive order [that] mandates that the IMLS eliminate all non-statutorily required activities and functions.").

At MBDA, a RIF notice to one of its employees revealed the plan to "eliminate the non-statutory components and functions of MBDA"—that appeared to include "abolishing all positions within MBDA." ECF No. 35-4 at 4. And that appears to have occurred, because all MBDA employees have either been placed on administrative leave with a slated termination date of May 9, 2025, or have been reassigned to positions outside the MBDA. *Id.* ¶¶ 5–6. A declaration from an MBDA employee also reveals that Nate Cavanaugh—an individual purporting to act under the authority of Acting MBDA Undersecretary Keith Sonderling—sent out notices informing MBDA grant recipients that their grants were being terminated effective April 17, 2025. ECF No. 45-1 ¶ 4. That employee has conveyed that "all preexisting MBDA grants were terminated pursuant to such notices." *Id.* The States have provided copies of such notice of grant terminations from the MBDA, all which include boilerplate language explaining that the grants were being terminated, in part based on the "the President's March 14, 2025 executive order [that] mandates

24

that the MBDA eliminate all non-statutorily required activities and functions.". *See* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2.

Lastly, at the FMCS, staff has been cut from 207 to fifteen. ECF No. 3-42 ¶¶ 4-7. A letter from the Director of Human Resources indicates that the RIF implemented was "taken in accordance with President Donald Trump's . . . Executive Order 14238 [*Reduction* EO] of March 14, 2025." *Id.* at 5. Further, FMCS circulated an internal memorandum citing the *Reduction* EO as among the "updated guidance" the agency received to implement a plan to perform "only statutory mandated functions." ECF No. 1-4 at 2. And that memorandum also outlined "operational adjustments" to take effect immediately, stating that the agency: (1) will not accept new public sector and grievance mediation, and (2) should not schedule new in-person education, advocacy, and outreach meetings. *Id.* at 2-3.

What the unrefuted evidence reveals is that, to comply with the *Reduction* EO, IMLS, MBDA, and FMCS each adopted a policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum—thereby taking an "agency action." *Bessent*, 2025 WL 895326, at *13. And each of those agencies "consummat[ed] [their] decisionmaking process" upon adopting such policies as there is no evidence that these decisions to eliminate non-statutorily required activities and functions are "tentative or interlocutory." *Bennett*, 520 U.S. at 178. Rather, as surmised above, the IMLS, MBDA, and FMCS made it explicitly clear in various memoranda, grant termination letters, and other documents that they were terminating grants, staff, and programs pursuant to their

effort to "eliminate all non-statutorily required activities." Further, "legal consequences" flow from these decisions, as: (1) the States and other grant recipients no longer have access to previously award funds because of grant terminations and withheld or delayed disbursements; (2) the personnel necessary for these agencies to feasibly administer grant awards and payments to the States have been removed, en masse, and (3) FMCS, in particular, has stopped providing public sector services to the States. Accordingly, the Court finds that IMLS, MBDA, and FMCS have taken final agency actions subject to the Court's review.

### c. Arbitrary and Capricious

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious . . ." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if it is not reasonable and reasonably explained." *Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024) (citing *FCC v. Prometheus Radio Project*, 556 U.S. 502, 513 (2021)). While the scope of review under this standard is "narrow" and the Court may not "substitute its judgment for that of the agency," the agency must still articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281

286 (1974)).   But "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

Here, there is an absence of *any* reasonable explanation from IMLS, MBDA, and FMCS.  The *Reduction* EO—with which these agencies sought to comply through their challenged policies—stated that the "non-statutory components and functions" of IMLS, MBDA, and FMCS shall be "eliminated to the maximum extent consistent with applicable law."  90 Fed. Reg. 13043 (Mar. 14, 2025).  But the Defendants have not shown that any analysis was conducted to determine which "components and functions" of IMLS, MBDA, and FMCS are statutorily required, and which are not.

For instance, in its letter apprising employees of their placement on administrative leave, IMLS merely indicated that "this action . . . is taken to facilitate the work and operations of the agency."  ECF No. 1-1 at 2; *see also* ECF No. 3-40 at 4.  And both MBDA and FMCS explained that the implementation of a RIF was being done in accordance with the *Reduction* EO—shortly before most of their employees were placed on administrative leave.  *See* ECF No. 3-42 at 4-5; ECF No. 1-3 at 2.  Further, in its memorandum announcing the cessation of its core programs, FMCS stated it was "required to perform only statutorily mandated functions" because of the mandates in the *Reduction* EO and other executive orders and guidance.  *See* ECF No. 1-4 at 2.  And, as the States point out, MBDA has not publicly acknowledged or even explained the removal of *all* its staff and the abrupt dismantling of its core programs.  *See* ECF No. 3-41 ¶ 13 (indicating that MBDA has: (1) taken down grant

27

solicitations for its Rural Business Center Program and Women Entrepreneurship Program, (2) eliminated its Minority Business Center Advisory Council, and (3) placed all staff responsible for its informational clearinghouse—"a statutorily mandated activity to collect and share data on minority business enterprises"—on administrative leave.).

IMLS has also offered no further explanation for the termination of thousands of its grants other than stating that the grants are "no longer consistent with the agency's priorities" and citing the *Reduction* EO's mandate to "eliminate all non-statutorily required activities and functions." *See* ECF Nos. 35-5 at 11; 35-6 at 7; 35-8 at 5-20; 35-9 at 5. And grant termination letters from MBDA provided the same anemic explanations, using nearly the same language that was used in the boilerplate IMLS grant termination letters. *See* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2 ("MBDA has determined that your grant is unfortunately no longer consistent with the agency's priorities . . . [and] the President's [*Reduction* EO] mandates that the MBDA eliminate all non-statutorily required activities and functions . . . Therefore, the MBDA hereby terminates your grant in its entirety . . .").

Recall that "[t]he APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). Thus, conclusory statements do not "reasonably" explain agency action. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)) ("[T]o this end, conclusory statements

will not do; an 'agency's statement must be one of *reasoning*.'").  Here, the "rational connections" are absent, as IMLS's, MBDA's, and FMCS's justifications for eliminating programs, terminating grants, and implementing large-scale employee RIFs have been couched in mere conclusory statements—most of which merely defer to the *Reduction* EO.  There is no explanation about why the targeted programs or grants fell within the ambit of "non-statutory" functions or components.  Such conclusory explanations, "devoid of data or any independent explanation, [are] grossly insufficient and fall[] far short of reasoned analysis." *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025) (*"Widakuswara I"*).

Additionally, ILMS, MBDA, and FMCS have failed to indicate that they considered any of the significant reliance interests of their program beneficiaries or grantees such as libraries, museums, business centers, contractors, labor unions, states, and local governments. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citations omitted) ("When an agency changes course, as [IMLS, MBDA, FMCS] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.").  The States have presented compelling evidence that they rely on timely and continuous disbursements to continue operating several important programs and services.  *See, e.g.*, ECF No. 3-24 ¶¶ 18, 22 (New Mexico explaining that delay in disbursement of IMLS grant funds will prompt the delay, suspension, or reduction of interlibrary loan services); ECF

No. 3-3 ¶ 27 (California State Librarian noting that "If we do not receive such disbursements/reimbursements [from IMLS], it will stop statewide and local public library programs immediately and before they can be completed, contracted services will be denied payment. Much-needed library services to Californians will cease. Money for the salary and benefits for a significant portion of the California State Library's staff (34 positions) would be unavailable, and layoffs would ensue."); ECF No. 3-10 ¶ 16  ("Any pause in funding would delay completion of client projects, resulting in clients losing access to capital and contracting opportunities, prevent new clients from accessing these services and resources, and may lead to loss of jobs. Delay would also eliminate our ability to fill key staff positions currently open, and would therefore terminate the ability to restore vital business activity by the Hawai'i MBDA Business Center.").

Further, the States have supplied evidence underscoring how much they have depended on FMCS to provide mediation and conciliation services to solve non-federal public sector disputes and to prevent "prolonged labor disputes that could disrupt the provision of essential state services."  ECF No. 3-30 ¶¶11-13 (noting prolonged labor disputes pose risks to state services such as child welfare); *see also* ECF No. 3-32 ¶ 13 ("If FMCS ceased to function in a meaningful way . . . Rhode Island would suffer from prolonged labor disputes that could disrupt transportation, healthcare, and other critical services throughout the State.");  ECF No. 3-26 ¶ 8.b n.1 (School District in Illinois required to seek emergency mediation services "after the Parties had spent five (5) months working with an FMCS mediator whose services suddenly ceased to

be available" after the issuance of the *Reduction* EO); *id.* ¶¶ 18, 22 (explaining that FMCS mediators are "exceedingly competent and well-trained"; New Mexico will "not be able to replace those services in the near or medium term"). These examples show the significant reliance interests that IMLS, MBDA, and FMCS appeared not to consider when hastily adopting the mandates in the *Reduction* EO. "In light of the serious reliance interests at stake, [IMLS, MBDA, and FMCS'] conclusory statements do not suffice to explain [their] decision[s]." *Encino Motorcars*, 579 U.S. at 224.

Accordingly, because IMLS, MBDA, and FMCS have not provided a rational connection between the sweeping actions they have taken and the vague, conclusory justifications they have provided, the Court finds that the States have established a strong likelihood of success on their arbitrary and capricious claims. *Ohio*, 603 U.S. at 292. Further, the Court finds that the States have illustrated a strong likelihood of success on their claims that IMLS, MBDA, and FMCS acted arbitrarily and capriciously in failing to consider reliance interests. *Regents*, 591 U.S. at 30; *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations omitted) ("Sudden and unexplained change, . . . or change that does not take account of legitimate reliance . . . may be 'arbitrary, capricious [or] an abuse of discretion.'"

### d. Contrary to Law

IMLS, MBDA, and FMCS also likely violated the APA, as their actions were "not in accordance with law." 5 U.S.C. 706(2)(A).

### i.  Actions Inconsistent with the Agencies' Mandatory Statutory Duties

"Under Article II of the Constitution and relevant Supreme Court precedents the President [and subordinate executive agencies] must follow statutory *mandates*." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). The Executive may *not* "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* Thus, "absent a lack of funds or a claim of unconstitutionality that has not been rejected by final Court order, the Executive must abide by statutory mandates and prohibitions." *Id.* Here, the States have presented compelling evidence illustrating that IMLS, MBDA, and FMCS are flouting their statutory mandates in implementing the directives outlined in the *Reduction* EO.

Starting with IMLS, Congress directed the agency to conduct regular research and data collection to "extend and improve the Nation's museum, library, and information services." 20 U.S.C. § 9108(a). Congress also tasked the agency with administering the Grants to States Program, *see id.* § 9141, which involves: (1) reviewing state plans from fifty-nine states and territories, *id.* §§ 9122(3), (5), 9134(e)(1); (2) notifying jurisdictions of noncompliant plans and providing "technical assistance" to help bring such plans into compliance, *id.* § 9134(e)(3)(A), (C); (3) paying the "Federal share of the activities" described in approved state plans, *id.* § 9133(a), and monitoring state expenditures, *id.* § 9133(c). Further, Congress charged IMLS with administering grant programs relating to the National Museum of African American History and Culture, 20 U.S.C. § 80r-5(b), and the National Museum of the American Latino, *id.* § 80u(f)(2). Congress also instructed IMLS to administer several competitive grant programs each year. *Id.* § 9165(a)(1)-(3) (Laura

Bush 21st Century Librarian Program); *id.* § 9161 (Native American Library Services Grant Program); *id.* § 9162 (National leadership grants for libraries program).

Before the large-scale RIF at the agency, IMLS carried out its responsibilities with seventy-seven employees—with thirty-five employees assigned mainly to administer the agency's grants programs. ECF No. 3-40 ¶¶ 17-18. Nothing suggests that the twelve employees expected to be brought back from administrative leave will be able to fulfill IMLS's wide-ranging statutory responsibilities. *Id.* ¶ 21. First, none of the returning twelve employees work in the IMLS's Office of Research and Evaluation—which is the office primarily responsible for conducting the regular research and data collection that the statute requires IMLS to perform. *Id.* ¶ 22. Thus, with that office essentially defunct, there is no evidence that the agency will be able to perform its statutorily required regular research and data collection. *See* 20 U.S.C. § 9108. Nor is there any indication that the twelve employees will be able to consider the large volume of new grant applications and administer any existing grants—especially because most of those twelve employees do not have experience with administering grants. ECF No. 3-40 ¶¶ 20-21.

Regarding MBDA, Congress directed that the agency "shall" provide federal assistance awards and technical assistance to MBDA Business Centers, 15 U.S.C. § 9523(a)(3), and outlined the criteria the agency must use when awarding grants, *id.* § 9524. Congress also required MBDA to (1) "collect and analyze data" relating to minority business enterprises, *id.* § 9513(a)(1)(A); (2) conduct economic "research, studies, and surveys," *id.* § 9513(a)(1)(B)(i); and (3) "provide outreach, educational

services, and technical assistance" in at least five languages, *id.* § 9513(A)(1)(C). Congress also instructed MBDA to establish a "regional office . . . for each of the regions of the United States," *id.* § 9502(e)(2)(A) and provided a list of duties those offices must perform, including outreach, cooperation with relevant private and government entities, and information-gathering, *id.* § 9502(e)(2)(B).

But as of now, no employees appear to be currently working at MBDA. *See* ECF No. 35-3 ¶¶ 4-5. Thus, there is no one who can: (1) staff the "regional office for each of regions of the country" that MBDA is statutory required to have, *see* 15 U.S.C. § 9502(e)(2)(A); (2) monitor MBDA's existing grants for compliance—if any still exist; or (3) timely award new grants, all of which used to be facilitated by a team of forty employees. *See* ECF No. 3-41 ¶¶ 10-12. MBDA has ceased performing many of its statutory duties, including: (1) posting new grant solicitations; (2) performing data collecting and sharing on minority business enterprises, and (3) undertaking required communications with MBDA centers. *Id.* ¶ 13; ECF No. 3-12 ¶ 17.

Lastly, as to FMCS, Congress outlined that it is "the duty of the Service, in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). Further, Congress directed FMCS to "make its conciliation and mediation services available in the settlement of" grievance disputes arising "arising over the application or interpretation of an existing collective-bargaining agreement." *Id.* § 173(d). Yet FMCS has ceased its grievance mediation services as of March 14, 2025. *See* ECF

No. 1-4 at 2 ("No new [Grievance Mediation ("GM")] cases will be accepted.  As of March 14, all GM cases should be complete.").  Further, with its substantial reduction of personnel from about 200 to fifteen, *see* ECF No. 3-42 ¶¶ 4-7, nothing suggests that FMCS' remaining employees can continue to perform its statutory duties, *see* ECF No. 3-14 ¶ 11.

### ii.    Violations of Each Agency's Appropriations Statute

The Constitution's Appropriation Clause, U.S. Const. art. I, § 9, cl. 7, grants "Congress 'exclusive power' over federal spending."  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)).  Without such exclusive power, "the [E]xecutive would possess an unbounded power over the public purse of the nation[ ] and might apply all its monied resources at his pleasure."  *U.S. Dep't of the Navy*, 665 F.3d at 1347 (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)).

By making laws, Congress has expressly restricted the Executive Branch from taking control of its appropriation powers.  One such body of law is the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 et seq., ("ICA") which details the procedures the Executive must follow if it wishes to impound appropriated funds.  For the permanent rescission of appropriated funds, Congress outlined that if the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or . . .

should be rescinded for fiscal policy of other reasons," the President must "transmit to both Houses of Congress a special message" that specifies the amount, effect, reasons, and other information relating to the proposed rescission. 2 U.S.C. § 683(a). The act also requires the funds proposed for rescission "be made available for obligation" unless, within forty-five days, Congress rescinds the appropriation. *Id.* § 683(b). And if the President wishes to defer appropriated funds, the ICA also outlines that process, which also involves sending a special message to Congress. *Id.* §§ 684(a), 682(1). Accordingly, while "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty*, 725 F.3d at 261 n.1; *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Congress appropriated funds to IMLS, MBDA, and FMCS at the same levels as the previous fiscal years. But the records show that these agencies are rescinding or deferring appropriated funds and do not plan to spend them. For instance, it appears that all—or nearly all—preexisting grants that IMLS and MBDA administer have been terminated, *see* ECF Nos. 45-1 ¶ 4; 35-3 ¶ 5, to carry out the *Reduction* EO and other of the President's undefined policy goals. *See* ECF Nos. 45-2 at 4; 45-3 at 6,

7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2 ("MBDA has determined that your grant is unfortunately no longer consistent with the agency's priorities . . . MBDA is repurposing its funding allocations . . . in furtherance of the President's agenda. Independently and secondly, the President's [*Reduction* EO] mandates that the MBDA eliminate all non-statutorily required activities and functions . . . Therefore, the MBDA hereby terminates your grant in its entirety . . ."); *see also* ECF Nos. 35-5 at 10-11; 35-6 at 6-7; 35-8 at 5-20; 35-9 at 4-5 (same). As explained above, nothing suggests that the "skeleton" crew remaining at IMLS—which has only a small portion of personnel experienced with grant administration—will be able to administer disbursements of the millions of dollars in grant funds they are budgeted to award. *See* IMLS, FISCAL YEAR 2024 APPROPRIATIONS REQUEST TO THE UNITED STATES CONGRESS 4-6, (Mar. 2023), https://www.imls.gov/sites/default/files/2023-03/fy24cj.pdf (allocating over $250 million for grants and $20 million for administrative expenses). Nor is it clear how a crew of *zero* will be able to administer any of the grant funds MBDA is budgeted to award. *See* MBDA, FISCAL YEAR 2024 CONGRESSIONAL JUSTIFICATION (Mar. 2023), https://www.commerce.gov/sites/default/files/2023-04/MBDA-FY2024-Congressional-Budget-Submission.pdf.

As for FMCS, only fifteen employees remain and they must perform the work that over 200 employees previously performed. Thus, such a small group of personnel will expend only a fraction of what it would have otherwise spent to perform to its conciliation, arbitration, and mediation services with its previous staffing level. *See*

FMCS, FISCAL YEAR 2024 CONGRESSIONAL BUDGET SUBMISSION, AT 23 (Mar. 13, 2023), https://www.fmcs.gov/wp-content/uploads/2023/03/2024-Congressional-Budget.pdf ($42.3 million out of $55 million budget request allocated to mediations, training, outreach, and workshops).

As the States point out, the *Reduction* EO orders OMB to "reject funding requests" for IMLS, MBDA, and FMCS "to the extent they are inconsistent" with the mandate for these agencies to "eliminate non-statutory components and functions" and "reduce the performance of their statutory functions and associated personnel." 90 Fed. Reg. 13043 (Mar. 14, 2025). Thus, the *Reduction* EO practically proscribes these agencies from increasing expenditures elsewhere to make up for these cuts in spending, considering its mandate to reduce these agencies' functions and activities to the bare minimum. But Congress made clear that it wanted to appropriate funds to IMLS, MBDA, and FMCS so they may operate at the same level as the previous fiscal year. And the Executive does not have the "unilateral authority to refuse to spend the funds." *In re Aiken Cnty*, 725 F.3d at 261 n.1. Thus, if the Executive does wish to rescind or defer funds appropriated to an agency, they are in luck, as the ICA sets forth clear procedures to facilitate that process under congressional oversight. 2 U.S.C. §§ 681–688. But that process was not facilitated here. Rather, IMLS, MBDA, and FMCS took actions that essentially directed the rescission of funds to fulfill the President's policy—with congressional authorization glaringly absent.

The Court therefore finds that the States are likely to succeed in establishing that IMLS, MBDA, and FMCS violated the APA by acting "not in accordance" with

their respective statutory mandates and congressional appropriations acts when effectively absconding their statutory mandates by terminating core services and grant programs.

### 2. Separation of Powers and Take Care Clause Claims

Under the Constitution, the President is required "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, "across the entire Executive Branch—including 'independent' agencies." *Eng. v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496–97 (2010)). "And because federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the authority that Congress has provided them.'" *Widakuswara II*, 2025 WL 1166400, at *15 (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024)).

Here, IMLS, MBDA, and FMCS were created by Congress via statutes that granted each a comprehensive set of statutory responsibilities. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (establishing IMLS); and Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (authorizing MBDA). And Congress, a mere day after the *Reduction* EO's issuance, passed a statute that appropriated funds to these three agencies. *See* Continuing Appropriations Act § 1101(a)(2), (8). But Defendants' acts "[w]ithholding congressionally appropriated

funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause]." *Widakuswara II*, 2025 WL 1166400, at *15.

Intertwined with the Take Care Clause claim, the States assert that the Defendants' actions "violate[] the constitutional separation of powers." ECF No. 3 at 33. Article I of the Constitution grants to the legislative branch, the exclusive power to make law, U.S. Const. art. I, § 1, and the power of the purse, *id.* § 8, cl. 1. As for the Executive, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). By issuing the *Reduction* EO—which effectively directs withholding the funds that Congress recently statutorily appropriated to IMLS, MBDA, and FMCS, resulting in the cessation of several of their programs, *see supra*—the Executive is usurping Congress's: (1) power of the purse, by disregarding congressional appropriations; and (2) vested legislative authority to create and abolish federal agencies. *See Widakuswara I*, 2025 WL 945869, at *7 (finding that the Executive usurped Congress's power of the purse and "legislative supremacy" in violation of the Constitution's implicit separation of powers principles when "withholding funds statutorily appropriated to full administer" a federal agency).

Thus, the States have established a likelihood of success on their claims that the Defendants violated the Take Care Clause and constitutional separation of powers.

## C.  Irreparable Harm

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)).  There are "relevant guideposts" to guide that discretion—"the plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (citations omitted).  The Court finds that the States have demonstrated irreparable and continuing harm from the Defendants' de facto dismantling of IMLS, MBDA, and FMCS.

The States have presented a plethora of declarations illustrating the myriad of harms arising from the undoing of IMLS.  The New Jersey Library "issued stop work orders" and will not be able to work on project developing tools to teach informational literacy to K-12 students due to terminated IMLS grant funding.  ECF No. 35-6 ¶¶ 7-8.  The New York State Library described that a delay in funding from IMLS will cause it to "immediately . . . halt services and implement a hiring freeze."  ECF No. 3-27 ¶ 29, 42.  And the loss of data from IMLS's Public Library Survey would "represent the loss of decades of information that is critical for community development and planning."  *Id.* ¶ 35.  The California State Library will have to "stop statewide and local public library programs immediately and before they can be completed," "deny payments for contracted services, and initiate layoffs if it does not receive IMLS

disbursements and reimbursements." ECF No. 3-3 ¶ 10, 32. Loss of IMLS funding will also diminish or halt the California State Library's programs "targeted to seniors, veterans and English learners" and services to the "blind and visually impaired." *Id.* ¶ 31. Maryland's state-operated Banneker-Douglass-Tubman Museum delayed portions of an archaeological project because of the uncertainty surrounding IMLS funding. ECF No. 3-13 ¶¶ 9, 14.

For Maryland's Entrepreneurial Development and Assistance Center, the delay or loss in MBDA funding will halt: (1) "essential programs" such as "entrepreneurship education" and "one-on-one business guidance," and (2) "access to resources like the content library for continued learning." ECF No. 3-16 ¶ 12. Baltimore MBDA Advance Manufacturing Center—which provides comprehensive technical assistance to help minority manufacturing businesses adopt innovative technologies and business methodologies—will suffer "immediate service impacts" related to such technical assistance if there is a pause in MBDS funding. ECF No. 3-12 ¶¶ 9, 16.

University of Wisconsin System Office of Business & Entrepreneurship will have to "cancel any upcoming training and accelerator services for participants already enrolled and expecting these services" due to termination of MBDA grant award. ECF Nos. 3-37 ¶ 23; 45-2 at 4. The University of Hawai'i Maui College— which receives MBDA funding to provide entrepreneurship training to students—will have to eliminate "training courses, coaching and mentoring support services, and curriculum development" and will lose "three grant program staff" due to the

termination of their MBDA grant.  ECF Nos. 3-11 ¶¶ 13, 20; 45-4 at 2.  Arizona's MBDA Business Center will close due to the termination of their MBDA grant and therefore will no longer provide pertinent services to Arizona businesses that aided in access to capital, access to markers, and market research.  ECF No. 45-3 ¶¶ 1, 4. Further, the Center will have to terminate ten employees and release twenty contractors without notice.  *Id.* ¶ 5.

As to the FMCS, the Defendants do not dispute that the agency has completely stopped their public sector services.   And it is undisputed that the States often rely on FMCS for their conciliation and mediation services to resolve public sector labor disputes.  Such services are not easily replicable.  To start, the use of FMCS's services is embedded in some states' laws, *see*, *e.g.*, ECF No. 3-26 ¶ 6 (New Mexico), and forty-two states have collective bargaining agreements with specific provisions that either allow or mandate the use of FMCS's services "in labor-management relations."  *See* ECF No. 3-39 ¶¶ 7-8.  And States opt to request FMCS's assistance because it is a well reputed, trustworthy, experienced neutral entity that is fluent in providing services that are "critical for resolving labor disputes" and "promot[ing] confidence in the decision-makers and the dispute resolution process."  ECF No. 3-14 ¶ 10; *see* ECF No. 3-26 ¶¶ 18, 22 (describing FMCS mediators as "exceedingly competent and well-trained" and noting that New Mexico will not be able to replace FMCS's services "in the near or medium term").  FMCS's mediation services have been critical in averting prolonged labor disputes which posed significant disruption to essential services such as transportation, healthcare, and child welfare.  *See* ECF Nos. 3-30 ¶¶ 11-13; 3-32

¶ 13.   And the record shows that circumscribing FMCS significantly reducing personnel and ceasing their core public sector and grievance programs has set the stage for ongoing and imminent harms.

For example, the New Mexico Public Employee Labor Relations Board had eight pending cases at the time the *Reduction* EO was issued in which the parties "hoped to obtain FMCS mediation services" due to the lack of other services that not only could provide mediation for free or a reduced fee but also supply the specialized substantive knowledge on labor relations that FMCS mediators possessed.   ECF No. 3-26 ¶¶ 21-22.   Additionally, the Associated Federation of State County and Municipal Employees, AFL-CIO ("AFSCME")—a private and public sector union that uses FMCS for handling grievances concerning the States' public employees—attested to having multiple pending mediations in which the parties were using FMCS services.   *See* ECF No. 3-39 ¶¶ 9, 20-22.   But the abrupt layoff of FMCS personnel due to the *Reduction* EO, prompted "the immediate cessation of all FMCS assistance in the mediation of labor management dispute in the public and private sector." *Id.* ¶ 23.   Now, AFSCME unions representing public sector employees in the States must "find and utilize other more costly and time expansive method to resolve disputes," and labor disputes that are "more likely to result in work disruptions" with this discernable path to mediation now gone. *Id.*

In Illinois, a school district spent five months working with an FMCS mediator for a negotiation impasse in a labor dispute until those mediation services abruptly stopped after the issuance of the *Reduction* EO.   ECF No. 3-26 ¶ 8.b n.1.   Now, the

affected union has issued an intent to strike if the labor dispute is not resolved by early April, *id.*, and it is unclear whether such disputes have been resolved. In Rhode Island, the United Nurses & Allied Professionals (UNAP) and Brown University Health was assigned a FMCS mediator after the parties reached a negotiation impasse relating to new collective bargaining agreements for about 2,5000 healthcare workers employed at the state's only Level One Trauma Center—Rhode Island Hospital. ECF No. 44-2 ¶¶ 8-10. That assigned mediator appeared at the first session, but before the session began the mediator informed the parties that he was no longer able to mediate the parties' negotiation because he was placed on administrative leave under the *Reduction* EO. *Id.* ¶ 11. The UNAP collective bargaining agreement with Brown University Health has now expired and the loss of FMCS's mediation services has "dramatically increased the risk of an imminent work stoppage—with life-and-death consequences—at the busiest medical center in the region." *Id.* ¶ 15.

These are just a few key examples of how the implementation of the *Reduction* EO at IMLS, MBDA, and FMCS has disrupted numerous critical state library and museum services and programs, impeded the resolution of time-sensitive labor disputes involving State entities, and curtailed broad-ranging training, consultation, and technical assistance services and programs that facilitate the growth of minority business enterprises. Accordingly, the Court finds that the States have established a likelihood of success on their claims of irreparable harm arising from the Defendants' actions here.

### D. Balance of the Equities and Public Interest

The final two preliminary injunction factors—balance of the equities and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). When weighing these factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief ... pay[ing] particular regard for the public consequences" that would result from granting the emergency relief sought. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks and citations omitted). Here, the two factors weigh strongly in favor of equitable relief.

The States have set forth a plethora of injuries that would arise if the Court does not grant injunctive relief. *See supra* Section III.C. On the flip side, the Defendants assert that granting the injunctive relief the States request would "effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities." ECF No. 41 at 37. They also assert harm from disbursing funds that "may not be retrievable afterwards." *Id.* As the Court explained, the Defendants' implementation of the *Reduction* EO has effectively usurped Congress's lawmaking and spending authority—without constitutional or statutory authority permitting them to do so. And there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Thus, the Court finds that "there is no competing harm to the government with the issuance

46

of preliminary relief that orders compliance with governing statutes and the Constitution." *Widakuswara II*, 2025 WL 1166400, at *17. In fact, the "substantial" public interest lies "'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Thus, the Court finds that these final two factors weigh in favor of granting a preliminary injunction.

### E. Bond

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But that rule "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *24 (D.R.I. Apr. 15, 2025) (citations omitted). Generally, "[a] bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, No. 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)).

Here, the Defendants request that the Court impose a bond against the States that is "commensurate with the scope of any such order." ECF No. 41 at 37. The

Defendants assert that the States are seeking "the disbursement of grant funds" and thus the Court should order them to post a bond equal to the size of "any payment that the Court orders on a preliminary basis" because without such a bond, "there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that the Defendants were 'wrongfully enjoined.'" *Id.* But requiring the States to pay a bond equal to the grant disbursements at issue would impose a significant financial barrier to their ability to raise these challenges to the Defendants unlawful decisions withholding these grant disbursements. The States have attested that they would need to cut or terminate critical services and lay off staff because of such a loss of federal funding. *See*, *supra* Section III.C. Thus, requiring them to pay a bond in an amount equal to that loss of federal funding—via withheld grant disbursements—would impose the same imminent harm that this preliminary injunction aims to avoid and thus, would deny the States' right to judicial review here. *Nat'l Council of Nonprofits*, No. 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).

Nor has the Government shown that it would be unable to recover any funds disbursed because of the injunctive relief entered here. Such a claim is dubious considering that "the Government has various legal mechanisms to recoup these kinds of funds." *California*, 145 S. Ct. at 974 (Jackson, J., dissenting); *see, e.g.*, 2 C.F.R. § 200.346; *see also* 2 C.F.R. § 3187.2 (indicating that "the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal

Awards set forth in 2 CFR part 200 shall apply to awards from funds appropriated to [IMLS].").  Accordingly, the Court declines to impose a bond against the States.

## IV.   PRELIMINARY INJUNCTION[5]

For all these reasons, the Court finds based on the record evidence before it that a preliminary injunction is appropriate and necessary.  The States shall prepare and submit to the Court a preliminary injunction form order, after consultation with the Defendants.

Additionally, because of the finding of likelihood of success by the States and the large-scale irreparable harm that would occur without the preliminary injunction, the Court DENIES the Defendants' request to stay this Order for seven days.  *See* ECF No. 41 at 38.

IT IS SO ORDERED.

/s/ John J. McConnell, Jr.
John J. McConnell, Jr.
Chief Judge
United States District Court

May 6, 2025

---

[5] This Order binds Defendants' officers, agents, employees, attorneys, and other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B). Fed. R. Civ. P. 65(d)(2).