UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| v. | ) | 25-10814-WGY |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

DEVELOPMENT; NATIONAL INSTITUTE          )
ON DEAFNESS AND OTHER                    )
COMMUNICATION DISORDERS;                 )
NATIONAL INSTITUTE OF DENTAL             )
AND CRANIOFACIAL RESEARCH;               )
NATIONAL INSTITUTE OF DIABETES           )
AND DIGESTIVE AND KIDNEY                 )
DISEASES; NATIONAL INSTITUTE             )
ON DRUG ABUSE; NATIONAL                  )
INSTITUTE OF ENVIRONMENTAL               )
HEALTH SCIENCES; NATIONAL                )
INSTITUTE OF GENERAL MEDICAL             )
SCIENCES; NATIONAL INSTITUTE OF          )
MENTAL HEALTH; NATIONAL INSTITUTE        )
ON MINORITY HEALTH AND HEALTH            )
DISPARITIES; NATIONAL INSTITUTE          )
OF NEUROLOGICAL DISORDERS AND            )
STROKE; NATIONAL INSTITUTE OF            )
NURSING RESEARCH; NATIONAL LIBRARY       )
OF MEDICINE; NATIONAL CENTER FOR         )
ADVANCING TRANSLATIONAL SCIENCES;        )
JOHN E. FOGARTY INTERNATIONAL            )
CENTER FOR ADVANCED STUDY                )
IN THE HEALTH SCIENCES; NATIONAL         )
CENTER FOR COMPLEMENTARY AND             )
INTEGRATIVE HEALTH; and CENTER           )
FOR SCIENTIFIC REVIEW,                   )
                                         )
                    Defendants.          )
_____)


YOUNG, D.J.                                        May 12, 2025


## MEMORANDUM AND ORDER
## ON SUBJECT MATTER JURISDICTION

For the reasons stated below, after a full hearing and
carefully considering the parties' submissions and arguments,
the Court rules that it has subject matter jurisdiction over
this action and, as is its duty, exercises that jurisdiction.

[2]

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

I.    **BACKGROUND**

    A.    **Factual Allegations and Relief Sought in the Amended Complaint**

In this civil action, the Commonwealth of Massachusetts along with 15 other States[1] (referred to collectively as "the States", sue the Secretary of Health & Human Services, the Director of the National Institutes of Health ("NIH"), and several of those federal institutes and centers[2] (referred to

---

[1] In addition to the Commonwealth of Massachusetts, the State of California, the State of Maryland, the State of Washington, the State of Arizona, the State of Colorado, the State of Delaware, the State of Hawai'i, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico; the State of New York, the State of Oregon, the State of Rhode Island; and the State of Wisconsin join as plaintiffs.

[2] Those institutes and centers are: the National Cancer Institute, the National Eye Institute, the National Heart, Lung, and Blood Institute, the National Human Genome Research Institute, the National Institute on Aging,  the National Institute on Alcohol Abuse and Alcoholism, the National Institute of Allergy and Infectious Diseases, the National Institute of Arthritis and Musculoskeletal and Skin Diseases, the National Institute of Biomedical Imaging and Bioengineering, the Eunice Kennedy Shriver National Institute of Child Health and Human Development, the National Institute on Deafness and Other Communication Disorders, the National Institute of Dental and Craniofacial Research, the National Institute of Diabetes and Digestive and Kidney Diseases, the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences, the National Institute of General Medical Sciences, the National Institute of Mental Health, the National Institute on Minority Health and Health Disparities, the National Institute of Neurological Disorders and Stroke, the National Institute of Nursing Research, the National Library of Medicine, the National Center for Advancing Translational Sciences, the

collectively as "the Public Officials") because all act through those persons in their official capacities.  Broadly, the States claim that "[s]ince his inauguration, . . . the President has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to certain subjects he opposes, such as 'DEI' and 'gender ideology'."  Am. Compl. ¶ 4, ECF No. 75.  The States allege that the Public Officials "have adopted a series of directives [("the Challenged Directives")] that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to these and other blacklisted topics." Id.

The States claim that the Public Officials Challenged Directives and actions, including grant terminations ("Terminated Grants"), violate various sections of the Administrative Procedure Act (Counts 1 – 3, 7), violate the separation of powers of the three co-equal branches of government under the Constitution (Count 4), violate the Constitution's Spending Clause (Count 5), and constitute ultra vires Executive Branch action in excess of Constitutional and statutory authority (Count 6).

---

John E. Fogarty International Center for Advanced Study in the Health Sciences, the National Center for Complementary and Integrative Health, and the Center for Scientific Review.

[4]

The States seek the following relief:[3]

1. an order under the APA "holding unlawful and setting aside the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, on the ground that they are (a) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or otherwise not in accordance with governing statutes; (b) not in accordance with governing regulations; and (c) arbitrary and capricious;"

2. a declaration "that the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, are unconstitutional because they violate (a) the separation of powers and (b) the Spending Clause;"

3. issuance of "a preliminary and permanent injunction barring defendants from carrying out the Challenged Directives and any actions to enforce or implement the Challenged Directives, including, without limitation, by directing defendants to: (a) reissue Notices of Funding Opportunities (NOFOs) withdrawn based on the Challenged Directives and to refrain from withdrawing NOFOs based on the Challenged Directives; (b) refrain from denying grant applications or renewal applications based on the Challenged Directives; (c) release reimbursements and other funding for awards that defendants have refused to pay based on the Challenged Directives; (d) rescind the termination of the Terminated Grants and refrain from eliminating funding for awards based on the Challenged Directives; and (e) promptly reschedule and conduct all necessary steps in the review and disposition of plaintiffs' grant applications, including the Delayed Applications and Delayed Renewals;"

4. "an order pursuant to under the APA compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals;" and

5.   a declaration "that 2 C.F.R. §200.340(a)(2) (2020) and

------

[3] As a sixth request for relief the States seek catch-all, unspecified "additional relief as interests of justice may require"

[5]

C.F.R. §200.340(a)(4) (2024) do not independently permit or authorize termination of awarded grants based on agency priorities identified after the time of the Federal award."

Am. Compl. 88-89.

## B.   Procedural History

On April 14, 2025, the States filed their Amended Complaint, Am. Compl., and Motion for Preliminary Injunction, supported by a memorandum of law. Pls.' Mot. Prelim. Inj., ECF No. 76; Mem. Law. Supp. Pls' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 78. The motion is fully briefed. Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Opp'n"), ECF No. 95; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Reply"), ECF No. 101.[4]

This action was randomly reassigned to this Session of the Court on May 1, 2025. Elec. Notice Reassignment, ECF No. 99. The Court rescheduled the hearing on the preliminary injunction from May 9, 2025 to May 8, 2025. Elec. Notice Hrg., ECF No. 100.

At the hearing, the Public Officials claimed that most of the case must properly be brought before the Court of Federal

---

[4] The Court also received a submission, ECF No. 86, from amici: the Association of American Medical Colleges, the American Association of State Colleges And Universities, the American Council on Education, the Association of American Universities, The Association Of Governing Boards of Universities And Colleges, the Association of Public and Land-Grant Universities, COGR, and the National Association of Independent Colleges and Universities. The Court is grateful for this helpful submission.

[6]

Claims and the remainder was no longer amenable to adjudication. The Court heard argument on the matter and took it under advisement.   This opinion sets forth this Court's reasoning.

## II.   ANALYSIS

### A. Standard of Review

"Federal courts . . . are courts of limited jurisdiction." Royal Canin U. S. A., Inc. v. Wullschleger, 604 U.S. 22, 26 (2025) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)).  This Court's jurisdiction is "[l]imited first by the Constitution," and also "by statute." Id.   Through statute, "Congress determines, through its grants of jurisdiction, which suits those courts can resolve."  Id. This Court must therefore satisfy itself as to its subject matter jurisdiction over an action.  Calamar Constr. Services, Inc. v. Mashpee Wampanoag Village LP, 749 F. Supp. 3d 241, 242–43 (D. Mass. 2024) (citing McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction.")); see Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Of course, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v.

[7]

Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)).  Once
jurisdiction is established, however, this Court has a
"'virtually unflagging obligation' to exercise federal
jurisdiction." AUI Partners LLC v. State Energy Partners LLC,
742 F. Supp. 3d 28, 41 (D. Mass. 2024) (quoting Colorado River
Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976)).

   **B. This Court Has Subject Matter Jurisdiction**

      **1. The Tucker Act**

   Speaking of the Supreme Court, Justice Robert Jackson
famously said, "We are not final because we are infallible, but
we are infallible only because we are final." Brown v. Allen,
344 U.S. 443, 540 (1953) (Jackson, J., concurring).  As always,
the determinations of the Supreme Court matter, only here the
most relevant Supreme Court determination is **not** final (at least
not yet) -- and therein lies the problem.  Because the Supreme
Court, on a 5-4 vote, has seen fit to enter an emergency
interlocutory order in a somewhat similar case, its language
provides guidance in other cases but without full precedential
force.

   So it is that this Court, after careful reflection, finds
itself in the somewhat awkward position of agreeing with the
Supreme Court dissenters and considering itself bound by the
still authoritative decision of the Court of Appeals of the

First Circuit (which decision the Supreme Court modified but did not vacate). Here is this Court's analysis:

"The Court of Claims was established, and the Tucker Act enacted, to open a judicial avenue for certain monetary claims against the United States." United States v. Bormes, 568 U.S. 6, 11 (2012). Prior to its enactment, "it was not uncommon for statutes to impose monetary obligations on the United States without specifying a means of judicial enforcement." Id. Thus, "Congress enacted the Tucker Act to 'suppl[y] the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable.'" Maine Community Health Options v. United States, 590 U.S. 296, 323 (2020) (citing Bormes, 568 U.S. at 12).

Under the Tucker Act, "the United States Court of Federal Claims . . . [has] . . . jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1); Department of Education v. California, 145 S. Ct. 966, 968 (2025) (per curiam) (California II). "In suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the federal district courts."

[9]

Massachusetts v. Natl. Institutes of Health, --- F. Supp. 3d ---
-, No. 25-CV-10338, 2025 WL 702163, at *4 (D. Mass. Mar. 5,
2025) (Kelley, J.) (citing Burgos v. Milton, 709 F.2d 1, 3 (1st
Cir. 1983)).

"The Supreme Court has made clear that 'not every claim
invoking the Constitution, a federal statute, or a regulation is
cognizable under the Tucker Act.'" Massachusetts 2025 WL
702163, at *5 (quoting United States v. Mitchell, 463 U.S. 206,
216) (cleaned up). "The fact that a judicial remedy may require
one party to pay money to another is not a sufficient reason to
characterize the relief as 'money damages.'" Bowen v.
Massachusetts, 487 U.S. 879, 893, (1988). Also, "the mere fact
that a court may have to rule on a contract issue does not, by
triggering some mystical metamorphosis, automatically transform
an action ... into one on the contract and deprive the court of
jurisdiction it might otherwise have." California v. United
States Dept. of Educ., 132 F.4th 92, 96 (1st Cir. 2025)
("California I") (quoting Megapulse, Inc. v. Lewis, 672 F.2d
959, 968 (D.C. Cir. 1982)). "The Claims Court does not have the
general equitable powers of a district court to grant
prospective relief." Bowen, 487 U.S. at 905.

Whether a claim is contractual in nature under the Tucker
Act is based upon a determination of the essence of the action.
"While the First Circuit has not formally adopted the 'rights

and remedies' test that is used by several other circuits,[]
courts in this Circuit have adopted the test to determine if the
'essence' of an action is truly contractual in nature,"
Massachusetts, 2025 WL 702163, at *6 (D. Mass. Mar. 5, 2025)
(collecting cases); however, it appears the First Circuit is
open to such analysis, see California II, 132 F.4th at 96-97.
"The 'essence' of an action encompasses two distinct aspects —-
the source of the rights upon which the plaintiff bases its
claim and the type of relief sought (or appropriate)."
Massachusetts, 2025 WL 702163, at *5. (citations and quotations
omitted).  This Court adopts this test to determine whether the
Tucker Act applies here and concludes that it does not.

    The States argue that the essence of the claims here do not
sound in contract because the claims attack the broad policies
and actions of the Public Officials. Pls.' Mem. 18; Reply 2-4.
The Public Officials counter that the Public Officials merely
"disguise their claims as APA claims.  Opp'n. 9.

    The Public Officials rely on the recent Supreme Court
determination in California II, which granted an emergency stay
of a district court injunction.  In that case, Judge Joun, of
this District, issued a temporary restraining order, enjoining
the Department of Education from terminating certain grants, and
further ordered "the Government to pay out past-due grant
obligations and to continue paying obligations as they

[11]

accrue[d]." _Id._; _see_ _California_ v. _U.S. Dept. of Educ._, No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) (Joun, J.).

The government appealed to the First Circuit to stay the injunction pending appeal. _California I_. The First Circuit ruled the Tucker Act did not apply, that the actions were reviewable under the APA, and that on the merits the Department of Education had not met its burden to overturn the grant of the injunction, and therefore a stay pending appeal was not warranted. _Id._ at 96.

The Supreme Court accepted the government's application for an immediate administrative stay of the injunction, which was allowed _per curiam_. _California II_, 145 S.Ct. at 969. Construing the ruling as an "appealable preliminary injunction," the Court reasoned that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the" Administrative Procedure Act, because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" there. _Id._ at 968 (quoting _Great-West Life & Annuity Ins. Co._ v. _Knudson_, 534 U.S. 204, 212 (2002). Further, according to the Supreme Court, the Tucker Act likely applied. _Id._ The Court granted the stay

[12]

pending resolution of the appeal by the First Circuit.  Id. at

969.

Justice Kagan dissented, asserting that it was a "mistake"

to grant the emergency relief, noting among other things that:

> The remaining issue is whether this suit, brought
> under the Administrative Procedure Act (APA), belongs
> in an ordinary district court or the Court of Federal
> Claims.  As the Court acknowledges, the general rule
> is that APA actions go to district courts, even when a
> remedial order "may result in the disbursement of
> funds." Ante, at 968 (citing Bowen v. Massachusetts,
> 487 U.S. 879, 910 (1988)).  To support a different
> result here, the Court relies exclusively on Great-
> West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204,
> 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).  But Great-West
> was not brought under the APA, as the Court took care
> to note. See id., at 212, 122 S.Ct. 708
> (distinguishing Bowen for that reason).  So the
> Court's reasoning is at the least under-developed, and
> very possibly wrong.

California II, 145 S. Ct. at 969 (Kagan, J. dissenting).

Justice Jackson (with whom Justice Sotomayor joined), also

dissented asserting, among other things, that presuming the

Court could reach the merits, Judge Joun's assessment that "the

Department's mass grant terminations were probably unlawful is

not unreasonable." Id. 145 S. Ct. 975 (Jackson, J.,

dissenting).  Indeed, the Department of Education's conduct

could be viewed as arbitrary and capricious under the APA where:

> [A] mere two days after the Acting Secretary
> instructed agency officials to review the TQP and SEED
> grants, the Department started issuing summary grant-
> termination letters that provide a general and
> disjunctive list of potential grounds for

[13]

cancellation, without specifying which ground led to
the termination of any particular grant. Nor did the
letters detail the Department's decisionmaking with
respect to any individual termination decision. It
also appears that the grant recipients did not receive
any pretermination notice or any opportunity to be
heard, much less a chance to cure, which the
regulations seem to require. See, e.g., 2 C.F.R. §§
200.339, 200.208(c) (permitting grant termination only
after an agency "determines that noncompliance cannot
be remedied by imposing additional conditions," such
as by "[r]equiring additional project monitoring," by
requiring that the recipient obtain technical or
management assistance, or by "[e]stablishing
additional prior approvals").

     The Department's robotic rollout of its new mass
grant-termination policy means that grant recipients
and reviewing courts are "compelled to guess at the
theory underlying the agency's action." SEC v. Chenery
Corp., 332 U.S. 194, 196-197 (1947). Moreover, the
agency's abruptness leaves one wondering whether any
reasoned decisionmaking has occurred with respect to
these terminations at all. These are precisely the
kinds of concerns that the APA's bar on arbitrary-and-
capricious agency decisionmaking was meant to address.
See Prometheus Radio Project, 592 U.S. at 423, 141
S.Ct. 1150 (explaining that the APA requires a
reviewing court to ensure that "the agency ... has
reasonably considered the relevant issues and
reasonably explained the decision").

     It also seems clear that at least one of the
items included on the Department's undifferentiated
laundry list of possible reasons for terminating these
grants -- that the entity may have participated in
unspecified DEI practices -- would not suffice as a
basis for termination under the law as it currently
exists. That is because termination is only
permissible for recipient conduct that is inconsistent
with the terms of the grants and the statutes that
authorize them. But the TQP and SEED statutes
expressly contemplate that grant recipients will train
educators on teaching "diverse populations" in
"traditionally underserved" schools, and on improving
students' "social, emotional, and physical
development." 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1),

1022a(d)(1)(ii).[] It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

Id. 975-76. That appeal has since been dismissed, the underlying motion for preliminary injunction has been withdrawn, and the action is now proceeding in the ordinary course with a motion to dismiss anticipated in the near future. See Status Report, California, Civ No. 25-10548-MJJ, ECF No. 93. At a status conference on April 9, 2025, Judge Joun indicated that "the Supreme Court stay was of the TRO. . . [and] . . . the Court preliminarily weighed in on a couple of issues, but there [was] no ruling on anything other than granting a stay of the TRO." April 9, 2025 Hrg. Tr. 5-6, ECF No. 97.

The Public Officials argue that this Court ought follow the Supreme Court's analysis in California II. In fact, at oral argument they argued California II is virtually indistinguishable from the instant case.

Not so. California is somewhat different than the claims presented here. In that case, "[t]heir only claim was to sums awarded to them in previously awarded discretionary grants."

[15]

<u>Widakuswara</u> v. <u>Lake</u>, No. 25-5144, 2025 WL 1288817, at *13 (D.C. Cir. May 3, 2025) (Pillard, J. dissenting).

While the Supreme Court's determination in <u>California II</u> may be an indicator of how the Supreme Court **might** someday view the merits, it is not binding on this Court. As Chief Judge McConnell of the District of Rhode Island explained mere days ago facing a similar Tucker Act challenge by the government:

> To start, <u>California</u>'s precedential value is limited . . . [and] . . . does not displace governing law that guides the Court's approach to discerning whether the States' claims are essentially contract claims in order to direct jurisdiction to the Court of Claims.")see also <u>Merrill</u> v. <u>Milligan</u>, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target. The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do not have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits.").

<u>Rhode Island</u> v. <u>Trump</u>, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *5 (D.R.I. May 6, 2025).

In <u>State of New York</u> v. <u>Trump</u>, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), Chief Judge McConnell has earlier done an extensive analaysis:

> On a surface level, the facts in the <u>California</u> case may appear to be generally analogous to the facts here, as both cases involve states challenging federal agencies' decision-making regarding appropriated federal funds, but the similarities end there. When the Court delves deeper, however, it finds several significant and relevant differences that underscore

California's inapplicability to this case. In
California, the First Circuit Court of Appeals
determined that "the terms and conditions of each
individual grant award" were "at issue." California,
132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the
Supreme Court then granted the Department's
application for a stay because it concluded that the
district court issued an order "to enforce a
contractual obligation to pay money" and "the
Government is likely to succeed in showing the
District Court lacked jurisdiction to order the
payment of money under the APA." California, 2025 WL
1008354, at *1. That is not the case here.
In this case, the terms and conditions of each
individual grant that the States receive from the
Agency Defendants are not at issue. Rather, this case
deals with the Agency Defendants' implementation of a
broad, categorical freeze on obligated funds pending
determinations on whether it is lawful to end
disbursements of such funds. The categorical funding
freeze was not based on individualized assessments of
any particular grant terms and conditions or
agreements between the Agency Defendants and the
States; it was based on the OMB Directive and the
various Executive Orders that the President issued in
the early days of the administration. Therefore, the
Court's orders addressing the categorical funding
freeze were not enforcing a contractual obligation to
pay money.

Id. That Court also observed that the Court of Claims could not

provide the relief requested.  Id. at n.2.

Similarly, Judge Woodcock of the District of Maine recently

wrote,

The Supreme Court's [California] decision to vacate
and stay a district court's TRO enjoining the U.S.
Department of Education from terminating various
education-related grants on the ground that the Tucker
Act provided exclusive jurisdiction to the United
States Court of Federal Claims does not change the
Court's determination that it is a proper forum for
this dispute under the APA  . . . .  While bearing
some similarities to the instant suit, the Supreme

[17]

Court issued this decision on its emergency docket, without full briefing or hearing, id. at ----, 145 S.Ct. at 969 (Kagan, J., diss.); id. at ----, 145 S.Ct. at 969-978 (Jackson, J., joined by Sotomayor, J., diss.), and its precedential value is thus limited. See Merrill v. Milligan, --- U.S. ----, 142 S. Ct. 879, 879, --- L.Ed.2d ---- (2022) (Kavanaugh, J., concurring).

Maine v. U.S. Dept. of Agric., No. 1:25-CV-00131-JAW, 2025

WL 1088946, at *19 (D. Me. Apr. 11, 2025).[5]  The district courts'

---

[5] But see Massachusetts Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev., No. CV 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025)) (Stearns, J.):

> The court begins, and ends, its analysis with plaintiffs' second argument (because, if the court likely lacks jurisdiction, there is no longer any likelihood of success on the merits -- at least, not for the purposes of this specific action in this specific forum -- which moots any inquiry into irreparable harm). Plaintiffs correctly note that, unlike the operative complaint here, the Complaint in California references "the terms of the grant agreements at issue." Id. What plaintiffs ignore, however, is that these references occur only in the context of buttressing the larger APA-based argument that the Department of Education did not terminate the grants in accordance with any statutory or regulatory authorization (the Department of Education simply cited to 2 C.F.R. § 200.340(a)(4) as authorizing the termination of the grants); the Complaint itself does not assert any independent claim based on the language of the grant agreement. The Supreme Court nonetheless found that the government was likely to succeed in showing that the plaintiffs in California sought to enforce a contractual obligation to pay money. Because plaintiffs assert essentially the same claim here -- that the agency did not terminate the grant in accordance with statutory or regulatory authority -- it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money.

divergent views within the First Circuit of <u>California</u>'s
precedential value is not surprising given the unusual
interventional posture taken by the Supreme Court.  Indeed,
Justice Jackson's dissent observed that the Supreme Court's
"attempt to inject itself into the ongoing litigation by
suggesting new, substantive principles for the District Court to
consider in this case is unorthodox and, in [her] view,
inappropriate."  <u>California II</u>, 145 S. Ct. at 978.  Whatever the
Supreme Court's motivations or intentions, the <u>California II</u>
decision is of little assistance to the district courts in
charting the intersection of the APA and the Tucker Act.

The views of the dissenters in <u>California II</u>, as well as
the fully developed reasoning of the decisions quoted above are
persuasive authority for the course this Court adopts.

Even more compelling is the guidance of the First Circuit
in <u>California</u> I.

---

This decision should not be read as an endorsement of
the brusque and seemingly insensitive way in which the
terminations were announced nor as casting doubt on
the First Circuit's assessment that the plaintiffs in
the <u>California</u> case may well likely succeed on the
merits of at least some of their claims. The court is
merely deferring (as it must) to the Supreme Court's
unmistakable directive that, for jurisdictional
purposes, the proper forum for this case is the Court
of Federal Claims.

<u>Id.</u>  That decision is currently on appeal.

[19]

First, the Department claims that the district court itself lacked jurisdiction to entertain this lawsuit, which the Department argues belongs in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1) (granting jurisdiction to the Court of Federal Claims for any action against the government "upon any express or implied contract with the United States"). The Department points to the fact that each grant award takes the form of a contract between the recipient and the government.  "But the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action ... into one on the contract and deprive the court of jurisdiction it might otherwise have." Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, although the terms and conditions of each individual grant award are at issue, the "essence," id., of the claims is not contractual. Rather, the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law -- arguments derived from the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). The States' claims are, at their core, assertions that the Department acted in violation of federal law -- not its contracts. Simply put, if the Department breached any contract, it did so by violating the APA.  And if the Department did not violate the APA, then it breached no contract.  In the words of the Tenth Circuit, "when a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction." Normandy Apts., Ltd. v. HUD, 554 F.3d 1290, 1300 (10th Cir. 2009); see also Megapulse, 672 F.2d at 968, 970 (upholding a district court's jurisdiction where "[a]ppellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act").

Nor do the States seek damages owed on a contract or compensation for past wrongs. See Megapulse, 672 F.2d at 968-70 (considering, in a Tucker Act analysis, "the type of relief sought (or appropriate)"). Rather,

they want the Department to once again make available
already-appropriated federal funds for existing grant
recipients. And as the Supreme Court has made clear,
"[t]he fact that a judicial remedy may require one
party to pay money to another is not a sufficient
reason to characterize the relief as 'money damages.'
" Bowen v. Massachusetts, 487 U.S. 879, 893, 108 S.Ct.
2722, 101 L.Ed.2d 749 (1988). As a result, we see no
jurisdictional bar to the district court's TRO on this
basis. See id. at 900-01 (holding that a district
court could hear a claim for an injunction requiring
the government to pay certain Medicaid reimbursements
because it was "a suit seeking to enforce the
statutory mandate itself, which happens to be one for
the payment of money," and "not a suit seeking money
in compensation for the damage sustained by the
failure of the Federal Government to pay"); Megapulse,
672 F.2d at 970-71 (explaining, in a Tucker Act case,
that "the mere fact that an injunction would require
the same governmental restraint that specific
(non)performance might require in a contract setting
is an insufficient basis to deny a district court the
jurisdiction otherwise available").

California I, 132 F.4th at 96-97.

In the absence of a decision on the merits from the Supreme
Court, this Court takes to heart the First Circuit's admonition
that its pronouncements of law bind this Court. United States
v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) (holding "circuit
court decisions control federal district courts in their
circuits" and that the district court is "absolutely bound to
follow vertical precedents."), reh'g en banc granted, opinion
vacated, 982 F.3d 50 (1st Cir. 2020), and on reh'g en banc, 36
F.4th 320 (1st Cir. 2022).

[21]

This Court need not gild the lily: <u>California I</u> presented a closer question than the one before this Court, and the First Circuit did not hesitate to rule that the Tucker Act did not apply there.  The Court is not free to ignore the First Circuit's pronouncement of the law and chart new territory, even though it might not be the law for long -- either by action of the First Circuit itself or ultimately the Supreme Court.  This Court follows <u>California I</u>.

Applied here, the "essence" of this action is not one of contract.  This is not an action for monetary damages against the United States for which the Court of Claims was created.  Rather, at least as alleged, and taking all inferences in the States' favor, it is an action to stop the Public Officials from violating the statutory grant-making architecture created by Congress, replacing Congress' mandate with new policies that directly contradict that mandate, and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution.  See Am. Compl. ¶ 93 ("This lawsuit arises because [the Public Officials] are flouting the statutory and regulatory rules governing NIH grantmaking" by "adopting a series of directives that blacklist certain topics -- e.g., "DEI," "gender," or "vaccine hesitancy" -- that the Administration disfavors . . . [and by] . . . adopting, implementing, and enforcing those directives, defendants have

[22]

systematically disrupted the review of pending grant applications, delayed the annual renewal of already-approved multi-year awards, and terminated huge tranches of grants in the middle of the project year. Those disruptions have caused—and will continue to cause—significant harm to plaintiffs and their institutions."). The Tucker Act does not divest this Court of jurisdiction.

Similarly, the Public Officials' sovereign immunity claim falls flat. The Court need look no further than the First Circuit's binding guidance again, which, borrowing from the Tenth Circuit, explains "'when a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction." California I, 132 F.4th at 97 (quoting Normandy Apts., Ltd. v. HUD, 554 F.3d 1290, 1300 (10th Cir. 2009)). So it is here. Sovereign immunity is not a bar to the APA challenges.

### 2. Programmatic attack

Under the APA, a claim is limited to "discrete agency action that it is required to take," and that "limitation to discrete agency action precludes the kind of broad programmatic attack [the Supreme Court] rejected in Lujan v. National

[23]

Wildlife Federation, 497 U.S. 871 (1990)." Norton v. South Utah Wilderness All., 542 U.S. 55, 64 (2004).

The Public Officials argue that the States claims constitute a programmatic attack. Opp'n 13-14. The States persuasively counter that "[t]he fact that [the Public Officials] have enforced these directives against hundreds of projects does not make this lawsuit programmatic, even if it is large." Reply 11. The States cite the First Circuit's decision in New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.") and this Court's decision in American Association of University Professors v. Rubio, No. CV 25-10685-WGY, 2025 WL 1235084, at *21 (D. Mass. Apr. 29, 2025) (describing plaintiffs' claim as neither a "constellation of independent decisions or a general drift in agency priorities."). The States have the better of it. The APA claim here is not a prohibited programmatic challenge.

### 3. Jurisdiction Over Individual Actions

The Public Officials argue that two Challenged Directives are expired and two did not cause any injuries. Opp'n 15 - 16. The States concede that while "perhaps the administrative record will bear this claim out, . . . the current record shows is that [States] have experienced significant injury from a series of

overlapping and interlocking blacklisting directives that have caused unprecedented delays and disruptions. The secretive and slapdash nature of these directives, which makes it hard to know which are effective at any given time, is hardly a defense." Reply 8. At this stage, all inferences must be taken in favor of the States, and the States' argument prevails for now.

As for the remaining Challenged Directives, the Public Officials argue that they are not final agency actions and therefore not actionable under the APA. Opp'n 17. The Public Officials characterize their actions as "merely order[ing] a review of the grants to determine whether they were consistent with the agency's priorities." Id.

The States argue that this "misstates the directives' effects." Reply. 7. As the States persuasively argue, the Public Officials' "own [alleged] conduct confirms that the directives are not 'interlocutory': if they were, defendants would not be implementing them by terminating hundreds of grants around the country." Reply 7. Furthermore, the terminations themselves are final agency action. Id.

On balance, and at this stage, the States have the better of it.

C.    Agency Discretion

Finally, the Public Officials argue that the States APA "claims are unreviewable because they challenge funding

[25]

decisions that are 'committed to the agency discretion by law."
Opp. 19 (citing 5 U.S.C. § 701(a)(2). They argue that their
allocation of funds is committed to their sole discretion. Opp.
19-21 (citing Lincoln v. Vigil, 508 U.S. 182 (1993); Milk Train,
Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002).

The States counter that they are not seeking review of a
funding decision, but rather the Public Officials' "adoption of
enforcement of the overarching Challenged Directives." Reply 8.
The States point out that Lincoln stands for the unremarkable
proposition that review is precluded so "long as the agency
allocates funds from a lump-sum appropriation to meet
permissible statutory objectives." Id. (quoting Lincoln, 508
U.S. at 193). Thus, there is arguably review where the
Challenged Directives "conflict with authorizing statutes and
applicable regulations." Reply 9.

## III. CONCLUSION

As alleged, and at its core, the States' Amended Complaint
alleges conduct similar to what Justice Jackson describes in her
dissent in California II as the "robotic rollout of [a] new mass
grant-termination policy" that has left the States "and
reviewing courts . . . 'to guess at the theory underlying the
agency's action.'" California II, 145 S. Ct. at 975-76 (quoting
SEC v. Chenery Corp., 332 U.S. 194, 196-197 (1947)) (Jackson, J.
dissenting). Assuming the allegations of the Amended Complaint

[26]

as true for purposes of the jurisdictional inquiry, the Public Officials' alleged "abruptness leaves one wondering whether any reasoned decision making has occurred with respect to these terminations at all." Id. Indeed, this Court agrees in principle with Justice Jackson that "[t]hese are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decision making was meant to address." Id. Whether the States can prove their case -- at summary judgment or a bench trial -- is for another day and the Court expresses no opinion on the merits. For now, the Court rules that subject matter jurisdiction exists in the United States District Court.

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

SO ORDERED.

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[6]

_____

[6] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[27]