UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10814-WGY

COMMONWEALTH OF MASSACHUSETTS, et al,
Plaintiffs

vs.

ROBERT F. KENNEDY, JR., et al,
Defendants

*********

For Hearing Before:
Judge William G. Young

Preliminary Injunction

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, May 8, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

GERARD J. CEDRONE, ESQ.
KATHERINE B. DIRKS, ESQ.
CHRIS PAPPAVASELIO, ESQ.
RACHEL M. BROWN, ESQ.
VANESSA AZNIV ARSLANIAN, ESQ.
Massachusetts Attorney General's Office
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
E-mail: Gerard.cedrone@mass.gov
and
SOPHIA TONNU, ESQ.
Office of the Attorney General
Healthcare Rights & Access
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3529
Email: Sophia.tonnu@doj.ca.gov
For Plaintiffs

THOMAS PORTS, JR., ESQ.
DOJ-Enrd
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
(202) 307-1105
Email: Thomas.ports@usdoj.gov
and
ANUJ K. KHETARPAL, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 823-6325
Email: Anuj.khetarpal@usdoj.gov
For Defendants

P R O C E E D I N G S

(Begins, 11:30 a.m.)

THE CLERK: The Court will hear Civil Action 25-10814, the Commonwealth of Massachusetts, et al versus Robert F. Kennedy, Jr., et al.

THE COURT: Good morning. The Court has authorized internet access to these proceedings, and so I should say, if anyone has accessed the proceedings via the internet, you must keep your microphone muted, the rules of court remain in full force and effect, and that is to say there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

With that stated, would counsel introduce themselves, starting with the plaintiffs.

MR. CEDRONE: Good morning, your Honor, Gerard Cedrone from the Massachusetts Attorney General's Office representing the Commonwealth, and I'll be arguing for the plaintiffs today, and I'll let my co-counsel introduce themselves as well.

MS. DIRKS: Good morning, your Honor, Katherine Dirks from the Massachusetts Attorney General's Office.

MS. TONNU: Good morning, your Honor, Sophia TonNu for the State of California.

THE COURT: Good morning to you.

MS. ARSLANIAN: Good morning, your Honor. Vanessa Arslanian also from the Massachusetts Attorney General's Office.

MR. PAPPAVASELIO: Good morning, your Honor, Chris Pappavaselio from the Massachusetts Attorney General's Office.

MS. BROWN: Good morning, your Honor, Rachel Brown from the Massachusetts Attorney General's Office.

THE COURT: Good morning to you all.

MR. PORTS: Good morning, your Honor, Tom Ports from the U.S. Department of Justice representing all the United States defendants.

MR. KHETARPAL: Good morning, your Honor, Anuj Khetarpal for the United States.

THE COURT: And good morning to you.

Um, something off the record first. Would counsel come up to the sidebar.

(Off the record.)

THE COURT: And I thank counsel.

So at the sidebar I mentioned, and everyone recognizes, that in this case there is a significant issue of subject matter jurisdiction, and, um, every court has the inherent power to take the time to determine, in a thoughtful way, whether it has subject matter jurisdiction.

It's the plaintiffs who claim that this is the appropriate court and I think we'll start with the plaintiffs, 10 minutes a side. You'll understand I've read all of the papers that are, I think, germane to this issue. And again, as I mentioned at the sidebar, once this issue is argued, 10 minutes on this jurisdictional issue per side, I -- we will talk about whether we take another break.

Mr. Cedrone.

MR. CEDRONE: Good morning, your Honor, and thank you.

This Court clearly has jurisdiction to decide the claims in this case. The plaintiffs are bringing APA claims challenging the government policy and bringing constitutional and ultra vires claims challenging that policy. Those claims are squarely within this Court's jurisdiction under ordinary jurisdictional principles.

THE COURT: All right. Real world, what about the order of the Supreme Court to my colleague in another perhaps dissimilar case, but related to this?

Go ahead.

MR. CEDRONE: And the ***Nken*** matter, that is, um, an emergency docket order, it has limited precedential value, but we recognize it's an order of the Supreme Court that this Court has to take seriously. Our case

is different from that case.

As the Supreme Court understood the claims in that case, the claimants were seeking, among other things, a payout of the past-due amounts on contract. We're not seeking anything of the sort here.

Our argument is --

THE COURT: But you are as a practical matter. I mean this is quite a breathtaking complaint, and I say that with respect. One of the questions that I'm going to be asking, if I was to ask it, if I determine that I have jurisdiction, is whether there's an issue of impoundment here, and, um, there's a factual dispute about that. But, um -- well you go ahead. I --

Don't you agree that that's an issue here?

MR. CEDRONE: I agree that there's a question of whether the actions the defendants have taken, from the policies that we're challenging, are lawful, but we are challenging the policies themselves, and that's what sets this case apart from the Supreme Court's decision. And I would return to the --

THE COURT: When you say they're dragging their feet in doing the things they're supposed to do and going before the appropriate counsel with functionally the fact that they will get by -- I mean these are aggressive allegations, get by subterfuge the result

even if their declared purposes are held to be unlawful. I mean officers of the United States, if I declare their declared purposes to be unlawful, they drag their feet, the money isn't spent, October 1 then comes, and it lapses.

You're concerned about that, right? Money?

MR. CEDRONE: That's correct. And the Supreme Court has long made clear, going back to the decision in ***Bowen***, which is still good law, and which the Supreme Court recognized and reaffirmed in that minute order, that just because a case involves money or just because a decision will implicate the payout of money down the line does not transform it into a contract claim.

And just to -- I want to be incredibly clear, your Honor mentioned the claims about the federal government dragging its feet. Those claims are not subject to the Tucker Act argument, there is no argument that --

THE COURT: And that's a problem, I think, for the government officials here. But we'll deal with that in their argument. I'm going to say, "Well then where do those things get resolved?" If those things were true, um, what court is going to hear you?

Go ahead.

MR. CEDRONE: I think that's exactly right. And I think the fact that our undue delay claims and our

constitutional claims are "other piece" with our APA claims, and when I say "APA," I mean not the undue delay, but the more traditional arbitrary and capricious Section 706(2) claims. The fact that they're all "other piece" demonstrates that the heart of our suit is not a suit for contractual damages.

And just to give your Honor some comfort about the Supreme Court's order, we cite, at Footnote 4 of our reply brief, a number of decisions since the Supreme Court's order that have recognized the government is reading that emergency decision, it's giving that decision far more weight than it can bear. And so we acknowledge it's a Supreme Court order, it deserves due weight, but the government's placing far too much weight on it.

And I would return the Court to the test that the First Circuit recognized, that hasn't been overturned, it originates from a D.C. Circuit case called ***Megapulse***, which says the Tucker Act applies -- to determine whether the Tucker Act applies, you look to the source of the rights and you look to the relief being requested.

The source of our rights here, for the APA claims -- again I'm putting aside the constitutional claims because there's no argument the Tucker Act applies to

those. For the APA claims, the source of our rights is the APA and its demand for reasoned decision-making. The essence of our claims is not that the federal government made a promise to us in contract that it then broke. Your Honor can decide this case and our claims without reading any agreement, without construing the terms of any contract. So that's the source of our rights.

And then in terms of the relief that we're seeking, we are not seeking money damages. We're not asking the Court to say "The federal defendants had an agreement with the plaintiffs, they should have paid out $500 million, they did not, therefore I'm awarding damages, a judgment in the amount of $500." We're not seeking that. We're asking the Court to hold that the policy the agency has adopted of blacklisting certain topics and defunding programs related to those topics is arbitrary and capricious, unlawful, and contrary to statute. That may have implications for the grants that have been terminated, but we're not seeking a money judgment in damages.

THE COURT: All right, I follow. About 4 more minutes.

And again, looking ahead, were it to remain here, I have to say I -- I would be interested. I'm going to

have to know what grants, presently extant, it has implications for, if you're right.

And you agree with that at least?

MR. CEDRONE: That's correct, that's absolutely correct. But ***Bowen*** makes clear that that fact doesn't turn this into a contract claim.

So in ***Bowen*** itself, the agency action at issue was that -- and it's in this case, I noted that ***Bowen*** was in ***Massachusetts vs. HHS***. In that case itself, HHS denied payments of certain Medicaid claims, they "disallowed them" in the language of that statutory regime, Massachusetts brought an Administrative Procedure Act claim, and the Supreme Court held that was not within the scope of the Tucker Act, even though, quite straightforwardly, a decision in that case would result in the payout of money.

So the California -- the decision of the ***Department of Education vs. California*** case doesn't change any of that. As multiple courts have recognized, right up to earlier this week, in the District of Rhode Island, which is supplemental authority we submitted yesterday.

THE COURT: Those -- not all those courts go your way, though if I were counting courts, the ones who have spoken to it, most do.

What's the status of the decision of the First Circuit after the, um, order of the Supreme Court?

MR. CEDRONE: I think again because the, um -- because the Supreme Court's order is an emergency decision which the Supreme Court -- the Supreme Court justices themselves have said has limited precedential value, my argument would be the First Circuit's decision stands except insofar as it, um, directly conflicts with the limited reasoning in that 2-page Supreme Court order. And even then, I think the Court needs to recognize that that was a request for a stay from the Supreme Court. So, um, I think the area of direct conflict might be pretty limited because the standard for a stay in the Supreme Court is different from the standard that the First Circuit was applying.

THE COURT: Thank you.

All right, I'll hear the United States.

MR. PORTS: Thank you, your Honor.

THE COURT: And maybe -- I really am interested in what is the status of the First Circuit decision after the order of the Supreme Court. I mean I work for the First Circuit. I of course work for the Supreme Court. But it's a -- it's a vertical system. I try to be transparent.

I had a case where I read a Supreme Court

decision, and I thought the decision required probable cause before you could get a pole camera, and I fit it right into the -- into the Supreme Court decision. There's a First Circuit decision which had considered that matter, predating the Supreme Court decision, and expressly excluded it. I was pretty snappily reversed with language which said "It's a vertical system. Unless we tell you we changed First Circuit law, pay more attention to First Circuit law." I live and learn.

Isn't that the case here?

MR. PORTS: Um, so, your Honor, in that case was it -- I guess was it a reversal by the Supreme Court of a First Circuit ruling?

THE COURT: No, it was I -- I was weaker than that, in that sense. I'm not so sure I agree that they reversed the First Circuit, they entered an order that is supreme in the circumstances. No, I built on dicta in a Supreme Court case.

MR. PORTS: Okay, your Honor.

THE COURT: But my decision was weaker and the decision of the First Circuit was more plain. I'm just saying I learned from it.

MR. PORTS: Understood, your Honor.

Here this is a very different situation. The First Circuit looked at the District Court's ruling,

which was assessing the likelihood of success on the merits regarding the Tucker Act argument, and I will say, for starters, that the facts in California and the facts here in what we're looking at really couldn't get much more similar.

THE COURT: Really?

MR. PORTS: But so I'll talk about that a little bit more.

THE COURT: But he says it's a different case.

MR. PORTS: I would respectfully disagree, your Honor.

In that case the Department of Education undertook a review, it terminated DEI-related grants, and the plaintiffs filed -- if the Court holds the docket and looks at their brief, um, Docket Number 7 on the docket from the District Court, the Court will see that the brief looks a lot like the brief that is filed here.

Now after amending their complaint and refiling the PI, they took out some of the more explicit references to the contract. They avoid bringing it up in the first motion and they don't have to talk about the contract until it comes up in their reply. But the only time they talk about the contract in that brief -- it focuses on the APA, um, is in the same way that this brief seeks to do. The only time they talk about it is

to say that the contracts or the agreements do not allow for termination for these reasons. That same issue exists here. And we talk about it, we talk about it in the reply, we talk about it in our opposition. It doesn't get much more similar than these two claims. So I'll start there.

The First Circuit said, looking at that, "We think it is likely that the plaintiffs will succeed on the merits." Looking at the same question, the Supreme Court said "We do not think -- we think it is unlikely -- that they haven't shown that it's likely they're going to succeed on the merits in the Tucker Act claim. It is likely that the Court did not have jurisdiction and that the jurisdiction is in the Court of Federal Claims."

THE COURT: But all the Supreme Court did was stay the order. You're reading it that broadly, what the Supreme Court said?

MR. PORTS: It looked at -- yes, your Honor, it stayed the order and it said, as its reasoning, that it was unlikely, um, looking at the Tucker Act, and said that the jurisdiction is likely in the Court of Federal Claims.

THE COURT: Where then -- where then are the, um, equitable claims going to be adjudicated?

MR. PORTS: Um -- okay, your Honor. So to discuss all of the claims overarching I will say one correction for what opposing counsel has said. The Tucker Act argument applies to all of the claims for -- under the APA, the constitutional claims, and the ultravirus claims. So these are all based, um, if you look at the relief.

So first, plaintiffs want the Court to compel NIH to keep paying on now-terminated grant agreements by setting aside the termination of those agreements. So on that claim involving existing grants, the Court does not have jurisdiction to issue that because the Tucker Act is the exclusive waiver of sovereign immunity to bring claims on an express or an implied contract. So that these claims are based on a contract, that's the first part of the ***Megapulse*** decision, they don't get any money under these grant agreements but for the grant agreements.

There's, um -- this is very different from ***Bowen***, there was no grant agreements there, that was just focusing on whether a statutory payment was damages or not damages. That's a different part of the Tucker Act. It's not looking at contracts, it's just saying not all money is money damages. This part that we're talking about today is about whether this is based on a

contract.

Here the relevant case is ***Ingersoll Rand.*** So there the plaintiff came into the District of D.C. and said, "You arbitrarily and capriciously terminated my contract, I want review of that under the APA." And the D.C. Circuit said, in ***Ingersoll Rand***, "We can't do that, the Tucker Act is the exclusive waiver of sovereign immunity for claims to review a contract termination and it does not allow for specific performance of the contract."

Specific performance of the contract -- there is no waiver of sovereign immunity for the specific performance of the contract. The First Circuit has acknowledged that it is aware of no decision or no waiver of sovereign immunity for the specific performance of the contract. So any relief that plaintiffs can receive to get performance, or to try and get performance, um, or to get money under their contract, must be decided in the Court of Federal Claims. So that's one group.

Plaintiffs are correct in saying that the Tucker Act is not the reason that we asserted that this Court lacks jurisdiction to consider their 7061 unreasonable delay claim. So if that's what you're referring to in asking about the equitable claims, the claims for

unreasonable delay, we do believe that there is no jurisdiction to consider those claims, but for different reasons.

THE COURT: And?

MR. PORTS: For those claims we would say this Court does not have jurisdiction because it's an improper programmatic challenge, they are not seeking to compel a discrete or mandatory action, and for jurisdictional purposes, it's moot. They didn't sue until after these meetings that they're seeking to compel and these decisions that they're seeking to have made have resumed. It was -- there was a roughly a 2-month pause in communications and --

THE COURT: No, I've read your papers, but they say the clock is ticking now and it's so slow that the money's going to lapse here?

MR. PORTS: Understood, your Honor, that they do say that, um, but if the Court looks at --

THE COURT: Suppose they prove that?

MR. PORTS: Respectfully, your Honor, these documents that they have already submitted in this case disprove that. But they do prove that a pause occurred and that there is -- they're roughly 2 months behind. But that's --

THE COURT: Are you going to make that up?

MR. PORTS: Sorry, your Honor?

THE COURT: Actually I'm not so sure I can ask the question because we're talking -- but I'll ask it anyway.

Are you going to make that up? Is it all going to be determined in this fiscal year so that if they are right, the monies can be expended in accordance with the, um, appropriations that Congress made? I mean could you tell me that?

MR. PORTS: I can make a couple of points and sort of explain broadly where things stand, your Honor, if that would be helpful.

I will say, um, as far as can I guarantee that 100 percent of the appropriated money available will be appropriated by the end of the fiscal year? I cannot make that representation. But I will also say that NIH essentially never appropriates all of the money or allocates all of the money appropriated by Congress by the end of the fiscal year. That's just not what happens in any given year and it's not an impoundment problem, it is just a practical reality of NIH managing its programs and making decisions about which grants it wants to fund and which ones it doesn't want to fund. But that is very normal, it doesn't create any kind of bigger problems to not get through -- you know, um, that

whereas here, they're moving forward, they're making stuff, they are approving grants, but the fact that they may not appropriate all of the money is not an issue.

So looking at it --

THE COURT: Well it's an issue, isn't it, if the -- if this so-called "pause" was illegal, isn't that an issue?

MR. PORTS: Is it an issue?

THE COURT: You just told me, you said there's been a pause, now it's resumed. Everything's fine. But in the ordinary course, not all of the appropriated funds are going to be "committed," if that's the right word. But you say, "Well that happens every year." I mean I see and I've looked and there's a 5-year plan that's in effect on paper. But my question to you is suppose this pause was completely unlawful -- suppose, just suppose that, you're saying to me, um, that's without remedy?

MR. PORTS: I would say it is -- it is certainly without remedy where plaintiffs waited until after that pause to even bring a lawsuit, and NIH had resumed its consideration and its holding of meetings and taking all of the actions that the plaintiffs seek to compel. It's unclear what this Court would do, as far as offering a remedy, where what they're asking for is already

happening?

THE COURT: It's on them. I understand the argument. All right, this has been very helpful.

Now, I propose to take a brief recess. Let me put to you this issue. I'm going to take a recess briefly, um, in any event.

Should I -- to encourage the parties to talk, should I just simply take this matter under advisement, stay my hand in expressing any view, um, or should I get deciding it and decide it and we'll see where it comes up?

Mr. Cedrone?

MR. CEDRONE: I think a short recess would be useful. I also know that your Honor typically does not allow reply arguments --

THE COURT: I do not.

MR. CEDRONE: Is there any way I can respond to the --

THE COURT: No.

MR. CEDRONE: Okay. Thank you, your Honor.

THE COURT: You know I've read your brief. So the answer is "No."

Counsel?

MR. PORTS: Yes, your Honor, we --

THE COURT: The same -- so here's what we're going

to do. I don't mind -- I need the recess. I appreciate the argument.

We'll stake a 10-minute recess. I'm coming back on the bench. My first question is the one I just posed.

Do you want to know -- if I were able, and I'm not saying I am, but do you want to know what I think? Or even if I don't yet know what I think, do you want me to get busy on resolving this? Or, because talking is a good thing, I urge you to talk, do you want to agree to a longer wait? And I'm not talking about a great deal of time, like over the weekend, something like that. Or tell me something else? I expect an answer as to that and then we'll see what I do.

Does that make sense?

We'll take a 10-minute recess. We'll recess.

THE CLERK: All rise.

(Recess, 12:00 p.m.)

(Resumed, 12:15 p.m.)

THE COURT: What's the answer to the question?

MR. CEDRONE: Our view is that we would like a decision and we'd like to move forward, and that that does not preclude us from talking with the government and hoping to work things out so that --

THE COURT: Of course it does not. Of course it

does not. Well it would take two. And so here's where we are.

I'm going to take the matter under advisement. I'm going to commence work on it at once. To be completely transparent, my impression is that the states have the better of it and that this Court does have subject matter jurisdiction. That's not a ruling. The matter is sufficiently complex that, as the saying goes, "I've got to see how it writes." And I will. I have the right to take the time to determine this Court's subject matter jurisdiction.

If I determine that I am without jurisdiction as to one or both aspects of the case, without further meeting, I will so declare, in a very short order. If I determine that this Court has subject matter jurisdiction, um, we will meet at 2:00 p.m. on Tuesday of next week for a case-management conference. Because I will tell you now -- and don't -- please don't think that my mind is made up and therefore that's where we're going, because my mind is not made up. I thank the, um, all the attorneys, and I thank the government attorneys, the United States government attorneys for their careful presentation. But this is a motion for a preliminary injunction and expedition, if the Court has subject matter jurisdiction, um, is required.

But I don't -- I prefer to deal with matters on the merits. And so if at that -- if I think I have subject matter jurisdiction, at 2:00, Tuesday, my present intention, if I do, is to collapse further proceedings on the preliminary injunction with trial on the merits, and to discuss at that conference the most expeditious manner of trial proceedings. My feeling is that a large portion of this can be handled by summary judgment or a case-stated, but significantly not all, and, um, a trial is definitely required.

To that end, I make three requests. The first will be helpful to whatever court hears it and I want it -- and this is a request to the states. I at least would find this very helpful, and by Tuesday at 2:00 p.m. I want it. And I have every reason to believe the Court of Federal Claims will find it helpful too.

I want a list -- and I understand there's hundreds of them, but I want a list of the grants actually affected -- really on a spreadsheet, a list of the grants actually affected, not process that may affect other grants. And then across the top I want -- and you people can encapsulate the grounds why conduct with respect to that -- those grants is wrong. It's not just arbitrary and capricious, some of them you say flat out violate the governing statutes. I want to know that.

The other two requests are previous and really are not my business unless I have subject matter jurisdiction. But only in the effort to save time, I make two additional requests, one of the states and one of the federal authorities.

The next question to the states -- and I know why you stayed away from the grants, the whole argument, this isn't about contracts, but your proposed preliminary injunction is -- and I say this respectfully, is too great -- it's too general, significantly too general. I'd like -- although I suggested that my preferred course of conduct is to collapse the hearing for a preliminary injunction with trial on the merits, maybe that trial has some injunctive relief. So I want something much more specific.

I speak with some diffidence. Look, I'm a transparent person, this subject matter jurisdiction is a big issue. I'm not past it. Don't anyone think I am. But I think beyond it. Maybe it's not for me. So I ask that. I'm not looking for that at Tuesday. But if I keep the case, um, asking for a preliminary injunction when you collapse it with trial on the merits doesn't mean it doesn't go away, it means I much prefer to proceed based on evidence.

And the same -- and I ask this with the same diffidence of the federal authorities. In your presentation -- and it has been very helpful, you mentioned DEI. I understand the Administration is against DEI. This is an area, um -- the substantive area here is health care for all Americans. And so when you use that term, counsel, respectfully I just don't know what you mean? And this isn't a -- a teasing question.

I understand the words mean "Diversity Equity Inclusion." I think I know what "diversity" means. I know it's a word with a positive connotation to me. "Equity" is fairness. There can be many disputes over fairness, cases deal with those all the time. "Inclusion," I -- well I shouldn't characterize the Administration, but I understand that the federal administration has problems with inclusion. But I just don't know what it means.

There has to be some working definition. And so I'm looking for one. If I keep the case, I need a working definition. It's not "The length of the Chancellor's foot." So what does that mean?

What does that mean -- um, you know in the Education cases, that's usually coupled now with a broad reading of ***Students for Fair Admissions***, the case about

the Harvard admissions process. I can understand that. I mean I understand what the decision of the Supreme Court means. But this is health care, this is research to advance health care for all our citizens. So I don't know what it means in this circumstance. And I say that with complete honesty. I need to know what it means. And as one who may be tasked with fair and full adjudication, it's my responsibility to know what it means.

All right, I'm taking the matter under advisement. We'll stand in recess. There may or may not be a hearing on Tuesday. And just as soon as I am confident in my reasoning, I will advise you.

MR. CEDRONE: Just to confirm on your Honor's request, the spreadsheet that you requested we will prepare by?

THE COURT: I want that by Tuesday.

MR. CEDRONE: And the further requests are --

THE COURT: Even if it's a matter of only curiosity to me, I am satisfied that the Court of Federal Claims would like to see something like that. And, um, I'm not looking for a "Thank you" from them, but I want it. And you're right, I want that 2:00 Tuesday. You're in possession of this data, it's your pleading, I'm asking you to talk about your pleading in

some more detail.

The other two, um, I do make those requests with diffidence because we may not be meeting on Tuesday. If we meet on Tuesday, I want them.

MR. CEDRONE: I understand.

THE COURT: I do express my thanks to you all. We'll stand in recess.

MR. CEDRONE: Thank you, your Honor.

MR. PORTS: Thank you, your Honor.

(Ends, 12:30 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, May 8, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 05-12-25
________________________
RICHARD H. ROMANOW Date