UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10814-WGY

COMMONWEALTH OF MASSACHUSETTS, et al,
Plaintiffs

vs.

ROBERT F. KENNEDY, JR., et al,
Defendants

*********

For Hearing Before:
Judge William G. Young

Case Management Conference

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, May 13, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


KATHERINE B. DIRKS, ESQ.
RACHEL M. BROWN, ESQ.
Massachusetts Attorney General's Office
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
E-mail: Katherine.dirks@mass.gov
and
DANIEL AMBAR, ESQ.
Office of the Attorney General
Healthcare Rights & Access
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 453-3598
Email: Daniel.ambar@doj.ca.gov
For Plaintiffs

THOMAS PORTS, JR., ESQ.
DOJ-Enrd
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
(202) 307-1105
Email: Thomas.ports@usdoj.gov
and
ANUJ K. KHETARPAL, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 823-6325
Email: Anuj.khetarpal@usdoj.gov
For Defendants

P R O C E E D I N G S

(Begins, 2:00 p.m.)

THE CLERK: The Court will hear Civil Action 25-10814, the Commonwealth of Massachusetts, et al versus Robert F. Kennedy, Jr., et al.

THE COURT: Good afternoon. I have permitted internet access for this hearing, though it's appropriate that I say that if you are attending this hearing via the internet, you must observe all the rules of court, that is to say you must keep your microphone muted, there is to be no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Well, good afternoon, counsel. You've seen the Court's order, um, and the first order of business is to -- now that I am satisfied that this court has, um, jurisdiction, to entertain the motion for a preliminary injunction. I do, after some consideration, pursuant to Federal Rule of Civil Procedure 65(a), collapse further hearing on the motion for a preliminary injunction with trial on the merits, and I am going to use this hearing as a, um, really a case management conference.

I acknowledge the -- and I appreciate the plaintiff states' listing of the specific grants which are at issue, though this does not preclude them from

coming up with additional data. I more carefully reviewed your complaint, and in fact at Paragraph 152 you say, "perhaps more than 100" actually.

What's the count here? It's 500 and something, isn't it?

MS. DIRKS: Yes, your Honor. Katherine Dirks for Massachusetts. I don't know the final tally, it might have been 563 or so. But I don't have it in front of me.

THE COURT: Well the exact amount is not important, but our count is roughly the same.

Let me take just a moment and try to explain what I'm doing.

It has been this Court's practice, when injunctive relief is sought, um, in most cases, to make use of Rule 65(a) and, um, move promptly to the merits. It has been the Court's considered opinion that a trial, with evidence, with all the safeguards of a trial, is to be preferred to affidavits where -- which I have called in other circumstances, "The Potemkin villages of modern American litigation, all lawyer-created flash and no interior architecture." I am a person who believes in cross-examination. And, um, because federal court proceedings are unfortunately too slow and too expensive, I think it makes sense to deal with the

actual reality. So I followed my usual procedure. And now -- and I say this candidly, I don't know what to do.

I had another of these cases, spawned by the actions of the current administration -- and I don't compare them in any way, and they're completely separate, but I have a case involving alleged free speech rights, and I did the same thing. And to me the case is a knotty case, but the prima facie proof seems pretty obvious. That's not obvious here. Or rather I'm not sure how to grab hold of this case.

This case primarily is an Administrative Procedure Act case. Such cases proceed usually, though I'm authorized to make modifications, on a record, and, um, the record, um, supplemented by argument, is as close as we get.

Here the case is a rather sprawling case, um, I don't mean that critically, that's just the nature of the claims here, that it is this Court's obligation now promptly to address. So I'm groping for a way to do just that, to address the claims promptly, and I am very much open to advice from counsel. This is not the only case on the Court's docket. And I recognize that many other cases have dealt with similar situations by denying or granting preliminary injunctions. We'll see if I can't get to the merits and, um, work through some

of this very promptly.

So without committing ourselves in any way, I did want to quote you something really beautiful, that we, um, held the investiture for Magistrate Judge Jessica Hedges last week and she spoke and spoke brilliantly. But there was one phrase that she used that has stuck with me, and I'm sure I will refer to it frequently. She says, "Judges must be brave, meticulous, thoughtful. They are invited to these virtues by lawyers who are brave, meticulous, and thoughtful." And that, in all candor, is what I invite now.

So here's what I'm thinking as a way to start, and I -- this does not deal will all the issues, but it promptly, or as promptly as I can conceive, deals with some. Now -- and I'll sketch it out. But don't think I'm wedded to this. I think I'm being candid.

I'm very grateful to the, um, document provided me by the plaintiffs. Let me say -- this activity in Congress about nationwide injunctions, I'm not one who believed in nationwide injunctions. I had always thought that you dealt with the parties before you, that you could bind the parties before you, give them relief and enjoin them, if necessary, but nonparties, the government could always -- they can always appeal, the right is to appeal, but the government could, as I

learned it in law school, say they don't accede to the decision of the District Court and therefore the decision of the District Court would have effect only to the parties who came before the Court and have their matters adjudicated. So I approach this case believing that that is the appropriate approach.

So this spreadsheet and these 500-and-however-many grants there are pretty much defines -- well, no, it doesn't, because you were asking for relief more prospectively as to what you're thinking comes down the Pike, and I'm not dismissing things. I guess I do want to say I was told, in one of these hearings, that there were like 800 grants. Well grants to institutions in states other than the plaintiffs' states, this Court doesn't speak to, doesn't purport to adjudicate, and I -- and any injunction, if ever an injunction were to issue, wouldn't apply, um, save as to specific grants or specific institutions, specific states that are called out. So here's what I'm thinking, but it's only a first shot.

I'm struck by the fact that the letters of termination here are -- they're not all identical, but they're virtually identical, and they were issued in March on or about just a few days. I mean they all came out in a great blast. And they set forth, as much as I

can understand, the government's position here. So let me just quote from an exemplar letter and tell you both my concerns and where I think we might fill it.

So I'm picking out one issued on March 21st to Ayain Denson, the University of Massachusetts at Amherst, and I'm just picking it out. After some citations, it, um -- and there's this paragraph, and I'll just go sentence by sentence.

"This award no longer affects agency priorities." Well one imagines that that's so, um, and I have some concern for statutory mandates. But I understand it does not. I'll accept that it does not. And then there comes this sentence.

"Research programs based on gender identity are often unscientific." I don't know that. And there's a comma. And then it says, "have little identifiable return on investment." I don't know that. Maybe that's so. And then another comma. "And do nothing to enhance the health of many Americans." I don't know that.

Then the next sentence says, "Many such studies" -- no reference to the particular study at hand here. "Many such standards ignore rather than seriously examine biological realities." I don't know that. "It is the policy of NIH not to prioritize these research programs." Again that's a policy statement. I don't

take issue with it for the moment.

The next paragraph. "Although," and then they're quoting, "NIH generally will suspend rather than immediately terminate a grant and allow a recipient an opportunity to take appropriate correction action before NIH makes a termination decision," closed quote. "No correction" -- "No corrective action is possible here." I don't see why that's so? But we could examine that.

And then on the next page, and I'm not going to quote this, but there is a reference to an "administrative appeal." That's one exemplar.

Another exemplar, um, has an added sentence, um, to what I've read -- and this one comes from a letter of the same date to a Chake Camara, the University of Massachusetts Medical School in Worcester, and after a couple of the sentences I've read, comes this sentence. "Worse, so-called Diversity, Equity, and Inclusion, DEI studies, are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans." I didn't know that. And I don't know it.

Now because these letters are common -- and you see where I'm going here, I'm, um, channeling, if you will, Justice Kagan's dissent. If there's basis for this, maybe so, but if there's no basis for these

factual statements -- put aside the ones I term "policy statements," if there's no factual basis for these statements, grant by grant, then it's arguable that they are -- the terminations are arbitrary and capricious, and the Court, on the statements alone, could, um, order an injunction that reinstates the grant, with all its terms and conditions, as though the letter never was issued.

Now that doesn't get the plaintiffs entirely where they want to go, but it gets them a significant way there, it seems to me, if that were true. Congress of course can change the laws, Congress can do that, and maybe they will. And we're talking only now about a way to start in as to these specific regs.

If in fact there are studies that support any of these factual statements, or any internal analysis that support those statements, certainly the NIH, the defendants here, they have to have the full and fair opportunity to lay that analysis out before this Court. The fact they didn't state it doesn't mean that it doesn't exist.

Likewise, perhaps it doesn't exist in writing. Perhaps some official looked -- actually looked at a grant or looked at a group of grants and came to this conclusion with some sort of analysis, and, um, the

record on which this Court could act should include affidavits from those individuals. I have to say, given the framework here, that while I would accept such affidavits, I would expect that they be produced to testify and be cross-examined.

Now that's a -- another part of the record here. If an appeal has been taken by any of these grant recipients, the appeal, the results of the appeal, and any documents that reflect the discussion, um, in the appeal, should be before the Court, and I'm entitled to look at them and see whether any of these grants -- and the grant has to be evaluated on the specifics of the grant.

At least my understanding of medical research, but I stand to be corrected, is that it -- it should take account of race and gender. Sickle-cell anemia is more prevalent in a particular race. A certain type of cancer is, um, affects Ashkenazi Jews more than other people. I believe that it is the received medical wisdom that, um, gender differences are significant in providing the best possible medical care. So it can't be that we're just going to ignore those.

And, um, when I look at -- and I've -- you filed it timely, but I've spent the time since it was filed looking at this, it really does seem that, um, many of

these grants go to study, anyway, vulnerable populations. That's how I understand the medicine to work. That doesn't seem illogical to this Court, to, um -- well these are my concerns.

So if we started there -- and in terms of procedure, if we started there, we created a record for these, the Court ruled on that record that the actions were or were not arbitrary and capricious, and then under Rule 54(d), (1) I'm required to write an opinion, and I expect to, as to each variation that, um, I may have to deal with, but I can immediately -- once I'm satisfied that I've thoroughly reviewed the record, I can immediately enter a partial judgment under Rule 54(d) because the interests of justice require it. If the states lose or a state loses or some states lose as to some grant, I'd enter judgment. An appeal from an actual record with a decision can take place.

And contrary-wise, if I entered any such injunction that a grant, the termination of the grant was arbitrary and capricious, again I'm not going to sit on it, I'm going to enter in a -- in an area where one expects that Congress -- and indeed will expect that the agency may alter its or put out different guidance, this may, um -- it would be permanent only until the legal framework changes.

And I recognize that I'm groping, but let me start with the plaintiffs.

Can you think of any way to get at this better?

MS. DIRKS: Um, your Honor, again Katherine Dirks from Massachusetts, I'll just preface by saying your comment about Judge Hedge's statement about lawyers inviting the bench, the Court to think of things a different way, that really spoke to me. I really see that as my role, and I want to thank you for that, and I think maybe I can apply some of that principle here today.

THE COURT: Thank her.

MS. DIRKS: I will.

THE COURT: There's much other wisdom in what she had to say, but that was the part I was able to quote. And you're right to pick up on it, because it inspired me.

Please.

MS. DIRKS: My invitation is as follows, and it calls for hearkening back to how we frame these allegations in our amended complaint. Which is that we are not alleging that the terminations themselves are the final agency action and we are not asking the Court to conduct an individualized review of termination decisions, or other grant-based decisions, the final

agency actions that we are challenging are the directives, the challenged directives. And we're seeking ultimately, at the end of the day, for those directives to be vacated, and for the implementation of those directives to be enjoined.

Now we realize that the implementation comes in the form of the grants we've listed here and we believe that list will grow as we confirm further details with our clients, and crafting the relief might require some individualized identification of grants, but as to liability and as to the vacatur of the agency action, it is the challenged directives and the decision-making as to those directives that we're seeking to present to the Court.

THE COURT: How do we put together the record on which the Court is going to make its decision?

MS. DIRKS: So we have initiated a conference with the Department of Justice and federal defendants on that question. As to the administrative record for the challenged directives, that will be a more finite universe because it's a discrete list of directives, and that could be somewhat contained.

Now should there -- might there be some need for discovery? Potentially, yes, your Honor, because of the fact that some of these directives have not been made

publicly available, um, and we already have seen some deposition testimony in other cases regarding some of the murkiness behind the development of those directives that might require putting someone in a chair for a 30(b)(6) deposition, for instance, and there might be some redesignation of 30(b)(6) witnesses. But we still think that the universe of discovery there is quite contained, and we could move on a very expedited schedule or a resolution of the challenged directives, both the administrative record and a very very narrowly-tailored set of discovery for those issues that might be encompassed in the administrative record.

THE COURT: How long?

MS. DIRKS: We think that 14 days for the administrative record would be sufficient. Now we have had conversations with federal defendants there, we think that is not quite what they could live with, and we understand that and will obviously let them have their turn.

THE COURT: Well let me hear from --

MS. DIRKS: But we think 14 days for that, and an additional 14 days for resolving any other fact issues that might not be encompassed in the administrative record. But that does leave the question of the implementation question, and we can visit that, your

Honor. Um -- and if I could just tag on one piece of it that might not be in the administrative record.

Our understanding -- and this is to some extent in the PI papers, is that the ultimate decision as to what grants would be terminated was not granular, it was not on a program-officer basis, rather a blast e-mail went out saying, "Here are the hundreds of grants being terminated today, program officers get your notices out." And so it really should be a finite list of e-mails.

It might not be what, um, will be defined as the "administrative record," because that might post-date the directive itself, but there is a discrete period of time in which the directives were implemented. And it does not require individual deposition testimony from every program officer, it really is, um, a request for a production of documents that would be very specifically defined and could be produced with a few e-mails, is our understanding.

So we would look to a bench trial. You know we've often discussed summary judgment versus trial and the Court has, um, indicated, at the last hearing, that there might be disputes of fact, and that we're hearing today from the Court that the Court is anticipating some sort of dispute -- some disputes of fact that would

require in-court resolution and testimony. And so our inclination would be to not do summary judgment and instead put this on for trial, trial to resolve as much as we can through proposed findings of fact, so that we identify the short list, hopefully a short list of disputed facts, we can have a condensed bench trial, um, and can move this to a final resolution as quickly as possible.

THE COURT: Thank you. And that is very helpful.

Mr. Ports, what do you think of all this? You can go back to my meandering as well and, um, give me your thoughts. I much appreciate it.

MR. PORTS: Yes, your Honor.

I'll say the United States' thinking about the case is more aligned with what your Honor seems was describing than what Mr. Dirks described with her -- involving discovery and trial and things along those lines.

As your Honor stated at the beginning, this is an APA case at core, that the Court has ruled it would be decided as an APA case. Such cases need to be decided based on the agency's stated reason at the time it took an action and the documents that it considered in taking that action.

So there is -- there's a final agency action that

plaintiffs fall back in their brief was -- it's the grant terminations, that's what we end up with as the final agency action. Which although we said can't be challenged, I'll put that aside and not revisit our argument previously on this point. But, you know, we would agree that that's final, it has a legal consequence.

Your Honor mentioned appeals. Where an appeal is ongoing, there it is not final any longer, although there was a legal consequence with the termination that has reopened the agency's decision-making and the agency has not stated its final position on the matter, it is currently considering it.

But so putting aside the appeals that are ongoing, because they've been reopened, whether terminated and have been appealed, looking just at the terminated grants where there is no appeal, as your Honor described, there are a variety of reasons that grants would no longer effectuate agency priorities.

It -- we believe that the agency could compile an administrative record for those grant terminations. As long as the record from each individual grant file could, um, with agreement, include the termination letter itself and the notice of award and the agency could avoid going through the hundreds of additional

pages that are in individualized grant files that may contain sensitive information that can't be disclosed, if we included the grant termination and the notice of award to provide those stated reasons of the agency in terminating a grant, and the background on the grant, what is the award that was terminated, then we believe we could compile an administrative record of what the agency -- the decision-maker considered in terminating those grants, in 30 days.

I will say, your Honor, that's a good deal longer than what plaintiffs had asked for here, but it is after substantial back and forth and consideration within the agency about how fast it could proceed, and it is shorter than the agency would prefer. And in asking for 30 days we are seeking to move quickly and offer the fastest possible time that we could.

After, um, you know plaintiffs identify 7 challenged directives that they say are the things that they are challenging, um, that the agency would presumably be looking at to compile administrative records for each of those purportedly-filed agency actions -- and that will require looking at what a decision-maker considered, and some of the decision-makers are no longer with the agency, and this will take time and review, and we believe that 30 days

is reasonable for that.

After that, we believe that the Court is correct, this case could be decided based on cross-motions -- well I won't say "correct." What I understood the Court was insinuating was that the case could likely be decided on cross-motions for summary judgment after that unless -- unless we were to provide a declaration or some additional justification that is not apparent in a document or on the face of the termination, in which case we understand the Court would want to allow for cross-examination. But if we did not do that, the Court would be able to review based on the record, and the termination and their justifications would rise and fall based on what is in the administrative record. And if the Court finds that it is insufficient, then, yes, we believe the Court could make its ruling based on that record.

But there is no need or justification for discovery, certainly not before an administrative record has been filed, certainly not before plaintiffs have demonstrated that the administrative record is incomplete, which we would say is a requirement.

In order to order discovery, there must first be a finding that the administrative record isn't complete and that one of the very limited circumstances that

allows for extra-record discovery exists, um, and that mostly -- that typically happens in the case of pretext. And I don't think there's any allegation that there's pretext for why these grants were terminated, it is clear on the face of the grants why the agency has said to terminate the grants.

And so we would propose that we could file the administrative record in 30 days and then the parties could file cross-motions for summary judgment thereafter, and then proceed to a prompt end and proper resolution of this matter in that way.

THE COURT: Well both of you are talking sensibly and I -- we're not going to, um -- neither one of you is going to prevail in their entirety, but that's not surprising.

This Court operates on an intentionally-practical and programmatic basis. I'm starting a significant MS-13 trial on the 2nd of June. I really think that case is going to go. I expect that it will go a couple weeks. That takes us up to the 14th of June, "Flag Day."

Whenever that case finishes, um, I'm prepared to address this case, or at least part of this case. I know the plaintiffs' allegations go further than what either one of us -- what anyone who has spoken is

talking about, and I'm not dismissing anything, though change could settle or throw it by the boards.

So if I'm going to look for you around the 16th of June, that's not for filing papers, that's for being ready to go. Clearly the NIH was prepared by March to send out these notices following these directives. So it does seem to me that I ought to have a -- now this is the 13th. I ought to have -- if we're going to have the appropriate administrative record, by Monday the 2nd of June, and briefs may be filed simultaneously with reply briefs thereafter.

And I'm getting ahead of myself, actually I work for Ms. Belmont. Let me ask her.

Assuming that the case on the 2nd of June runs two weeks, what do we have on the 16th?

THE CLERK: We're free.

THE COURT: Well we're not free now, we're --

I propose a hearing on the 16th. And I'm not one to micromanage. What the government says, um, makes sense to the Court. I want to encourage you to work out disputes, and all I can say is I'm not going anywhere. If I set this down for a hearing on the 16th of June, if that hearing is just on the record, because you've worked things out, so be it. If there's a dispute as to whether I should take evidence starting on the 16th of

June, you'll let me know. And, um, my effort will be -- though whatever order happens will happen, and then to follow it up with a written opinion just as rapidly as I can.

Now, um, if I left things like that, recognizing that there may be more to this case than we have discussed today, do the plaintiffs have any questions?

MS. DIRKS: Um, yes, your Honor. Um, not a long list. I promise.

One thing we haven't mentioned or focused on today is our unreasonable delay claim, and that does seem to be the one area that, um, would benefit most from, um, live testimony or where there was the most room for --

THE COURT: I couldn't agree more.

MS. DIRKS: -- and the most room for factual disputes.

THE COURT: But that's going to take some time. So I was positing, um -- you know this idea of cross -- I know what the -- how these cases are handled. If we get an agreed-upon record, I don't know that we -- it's not strictly cross-motions for summary judgment where as to each side I have to lean against their position, if we had an agreed-upon record, then I draw the natural and probable inferences from that record. I give both sides an equal chance to argue the disputed -- it's a

mixed question of law and fact, the arbitrary and capricious issue. I'm not answering your question, I'm going back.

So the reason -- while I agree with you, that's going to take evidence, um, and we've got to start somewhere.

Do you want to start that this week or this month?

MS. DIRKS: I guess, your Honor, I -- I stand corrected, with gratitude, that maybe I should ask the more basic question.

When you say "briefs," your Honor, are you referring to specifically Rule 56 motions for summary judgment or a legal brief in support of --

THE COURT: A legal -- in support of a final decision on the issue, as you frame it, of whether these directives are unsupportable under the Administrative Procedure Act. And they will say, "Here is the record. Here are our reasons. They're all satisfactory reasons, under the Constitution, as the legal framework." And it's not for me, the Court, to make policy determinations, if policy determinations are permissible.

There are some statutory -- at least prior Congresses have instructed the NIH, for example, to be sure that they include women in their research studies,

to be sure that they include children in their research studies, and I take it to encompass the science that, um, you want to capture the data on which proper health decisions can be made. But I don't mean to talk over you.

When do you want to go on the unreasonable delay?

MS. DIRKS: Um, so if I -- I just want to make sure I understand the proposal that I'm reacting to, your Honor.

So with June 16th, it would be, um, briefing on the, um, the grant terminations piece of the case as to the challenged directives, and without the need to get into individualized, um, grants. Right?

THE COURT: Don't you characterize what I said. We'll see.

MS. DIRKS: All right, that's why I wanted to make sure I'm clarifying it, so I can understand what we're briefing.

THE COURT: I'm -- really, I'm trying to force you into -- both of you, into an agreed-upon record. There's advantages to having an agreed-upon record. If you can't, I'll settle it. I'm not hesitant to settle it. But I'm always transparent about what I'm thinking.

So you've corrected me on my idea, my approach, and focused me more on the directives quite right. NIH

counsel properly says, "But really let's look at these directives." Work that out and, I expect on the 16th, if things work -- if things work on the 16th, I will have an agreed-upon record, I will have, um, briefs, I will hear argument, um, and if I can see my way clear to action -- but I don't promise anything on that day, but then I will take it under advisement. If I can't get my arms around it, I'll be saying, "But I want this witness" or "You can't really get there from here without something." I can't see now. But I respect you both -- I respect you all, and that's what I'm thinking.

You then say -- well let's focus on that piece. Without you characterizing it, the -- the terminations and the grant terminations piece, I hope to deal with on the 16th, to be followed by a decision, which is immediately appealable once I get the decision out, and it's based upon an agreed-upon record. That's where I'm hoping to go.

So still sticking with the plaintiffs. We haven't dealt with unreasonable delay, but are you -- do you understand that and can you work with that at least for today?

MS. DIRKS: Yes, your Honor, with one additional question. And we welcome this, your Honor, and I want to thank you for the June 16th date, because that

reflects our need for urgency.

One question. When the Court said that, um, briefs would be filed simultaneously, was that simultaneously with the administrative record, which would be due June 2nd, or simultaneous with each other?

THE COURT: No, no, no, not simultaneous with the administrative record. But it's not like you people don't know the other side. The lawyering has been, and I'm grateful, exemplary.

MS. DIRKS: Thank you, your Honor.

THE COURT: One thing that can be said about the NIH, whether it's the way they express it, I don't know the basis for that, but it's not like they're secretive about what they're doing. Okay?

MS. DIRKS: Um, that works very well, your Honor. But there's still the question pending about unreasonable delay? I'm happy to take that up now or later.

THE COURT: No, let's go now to the NIH.

My discussion with her is, um, can you work with her in that schedule?

MR. PORTS: Um, yes, your Honor, we will do our absolute best to have a record prepared by the 2nd.

THE COURT: All right. If you don't, I'm likely to, um, conclude that nothing exists. But that's

neither here nor there. But that's what I expect, on the 2nd.

Now unreasonable delay. How do you want to handle that?

MS. DIRKS: Um, your Honor, we think it makes sense to -- we could schedule it now or schedule it at another time, a second hearing on that case, your Honor. The reason why I hesitate from committing to doing -- to tackling that on the June 16th date is because there might be more need for fact-gathering there and more disputed facts that would not be contained within an administrative record because --

THE COURT: I have another hearing at 3:00.

MS. DIRKS: I'm sorry, your Honor.

THE COURT: Again, it's always the practicalities of each day. Are you suggesting I hold another status conference or are you suggesting that we go forward on the order I've entered now, and as you -- and you are working together, zealous advocates for their own position can work together, and I urge you -- I'm going to depend on it.

So what are you suggesting?

MS. DIRKS: Um, either we schedule a hearing now, your Honor, on unreasonable delay and the parties work backwards from there, the alternative would be for the

parties to propose a schedule, um, and an earliest date.

THE COURT: Why don't you -- why don't you do that and you don't have to agree on it. Your schedule may not be their schedule.

All I can say is I'm not insensitive to what I've done when I've collapsed further hearing on a preliminary injunction with trial on the merits. It's imperative that we all step up and give a reasoned, I hope to say, "brave, meticulous, and thoughtful opinion," that resolves what I am responsible for resolving at the earliest possible date. This wasn't "Okay, I collapse it with trial on the merits, when in the next year are we going to have the trial?"

So I'm going to leave you. I'm not going anywhere. Get Ms. Belmont, she's wonderful, and, um -- and it will be a status conference. It's not suddenly you come in here and I'm going to say "Well where are the witnesses?" We'll have a status conference when you know the issues that you think I need to address. But that can be as early as next week or at such other reasonable time.

MS. DIRKS: That works well, your Honor. Thank you.

THE COURT: The government?

MR. PORTS: Thank you, your Honor.

THE COURT: Good. It's good to see you. I look forward to working with you.

And again, any case can be settled. If this case is settled, a simple phone call to Ms. Belmont is all that's required. We'll stand in recess. Thank you very much.

(Ends, 2:50 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, May 13, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 05-16-25
________________________
RICHARD H. ROMANOW Date