**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | No. 1:25-cv-10814<br><br>Leave to file excess pages granted June 3, 2025 (Doc No. 119) |

**DEFENDANTS' OPENING BRIEF**

**Table of Contents**

Introduction ..... 1

Background ..... 2

Procedural History ..... 5

Legal Standard ..... 7

Argument ..... 8

I. Multiple Jurisdictional Defects Pervade Plaintiffs' Claims ..... 8

A. This is a case about grant terminations and the guidance documents issued by NIH's Chief Grants Management Officer are not independently challengeable actions. ..... 9

B. NIH's decisions to withdraw Notices of Funding Opportunity are not reviewable. ..... 12

C. The remaining three Challenged Directives never harmed Plaintiffs or are no longer causing harm that the Court can remedy. ..... 15

D. Claims about many specific grants identified by Plaintiffs fail for various other jurisdictional reasons. ..... 17

II. Plaintiffs' Grant Termination Claims Fail on the Merits ..... 19

A. All terminated agreements gave the agency the right to terminate a grant that no longer effectuated agency priorities and exercising that right did not violate regulations. ..... 19

B. Plaintiffs lack standing to challenge grant terminations for research in China or for Covid-19 because NIH did not terminate any of Plaintiffs' grants for that reason. ..... 23

C. The terminations and non-renewals of grants related to Diversity, Equity, and Inclusion initiatives were lawful and reasoned. ..... 23

D. The termination and non-renewal of grants funding research on gender identity were lawful and reasoned. ..... 26

E. The termination and non-renewal of grants funding research on vaccine hesitancy were lawful and reasoned. ..... 27

F. Terminating grants does not violate the Constitution. ..... 28

III. The Remedy in an APA Case Is Remand, Not an Injunction. ..... 30

Conclusion ..... 31

## Table of Authorities

Page(s)

**Cases**

*Aetna Life Ins. Co. of Hartford, Conn., v. Haworth*,
300 U.S. 227 (1937) .......... 14

*Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*,
705 F.3d 44 (1st Cir. 2013) .......... 16

*Am. Petro. Inst. v. U.S. Dep't of Interior*,
81 F.4th 1048 (10th Cir. 2023) .......... 24

*Am. Tel. and Tel. Co. v. United States*,
124 F.3d 1471 (Fed. Cir. 1997) .......... 30

*Amer. Pub. Health Assoc. v. NIH*,
25-10787, 2025 WL 1548611 (D. Mass. May 30, 2025) .......... 28, 29

*Bellsouth Corp. v. F.C.C.*,
17 F.3d 1487 (D.C. Cir. 1994) .......... 18

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 9, 12

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 11

*Bluestone Env't Grp., Inc. v. Zapisek*,
No. 3:21-cv-30056-MGM, 2022 WL 16857173 (D. Mass. Nov. 10, 2022) .......... 7

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
419 U.S. 281 (1975) .......... 8

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
339 F. Supp. 2d 52 (D.D.C. 2004) .......... 30

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 7

*Carlson v. United States*,
837 F.3d 753 (7th Cir. 2016) .......... 20

*City of Taunton, Mass. v. U.S. Env't Prot. Agency*,
895 F.3d 120 (1st Cir. 2018) .......... 7

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 16, 17, 23

*Delta Data Sys. Corp. v. Webster*,
744 F.2d 197 (D.C. Cir. 1984) .......... 12

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 23

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 .......... 7, 31

*FTC v. Standard Oil Co. of California*,
449 U.S. 232 (1980) .......... 10

*Global Tower Assets, LLC v. Town of Rome*,
810 F.3d 77 (D. Mass. 2016) .......... 18

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) .......... 9

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 13

*Henke v. U.S. Dep't of,
Comm.*, 83 F.3d 1445 (D.C. Cir. 1996) .......... 19

*Holbrook v. Tenn. Valley Auth.*,
48 F.4th 282 (4th Cir. 2022) .......... 13

*Karst Env't Educ. and Prot., Inc. v. U.S. Env't Prot. Agency*,
403 F. Supp. 2d 74 (D.D.C. 2005) .......... 12, 15

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 13, 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 14

*Marcum v. Salazar*,
694 F.3d 123 (D.C. Cir. 2012) .......... 18

*Me. People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
471 F.3d 277 (1st Cir. 2006) .......... 14

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ........ 13

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........ 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 7, 8, 23, 24

*Nat'l Lab. Rels. Bd. v. Beverly Enters-Mass.*,
174 F.3d 13 (1st Cir. 1999) ........ 7, 8, 28

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans, Affs.*, 927 F.3d 1263 (Fed. Cir. 2019) ........ 24

*New Mexico v. Musk*,
-- F. Supp. 3d --, 2025 WL 1502747 (D.D.C. May 27, 2025) ........ 30

*Planned Parenthood of Wisc., Inc. v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018) ........ 12

*Rattlesnake Coal. v. EPA*,
509 F.3d 1095 (9th Cir. 2007) ........ 12

*Rhode Island Hosp. v. Leavitt*,
548 F.3d 29 (1st Cir. 2008) ........ 7

*Sackett v. EPA*,
566 U.S. 120 (2012) ........ 10

*Sibley v. Ball*,
924 F.2d 25 (1st Cir. 1991) ........ 19

*Sierra Club v. Env't Prot. Agency*,
353 F.3d 976 (D.C. Cir. 2004) ........ 23

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 24

*United States v. Rodgers*,
461 U.S. 677 (1983) ........ 20

*Univ. of Med. & Dentistry of N.J. v. Corrigan*,
347 F.3d 57 (3d Cir. 2003) ........ 9

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) ....................11

*Webster v. Doe*,
486 U.S. 592 (1988) .................... 13

*Whitewater Draw Natural Resources Conservation District v. Mayorkas*,
5 F.4th 997 (9th Cir. 2021) ....................11, 12

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .................... 29

**Statutes**

5 U.S.C. § 701 .................... 13

5 U.S.C. § 704 .................... 9

5 U.S.C. § 706 .................... 7, 23

5 U.S.C. § 1009 .................... 3

42 U.S.C. § 241 .................... 2, 25,26, 29

42 U.S.C. § 282 .................... 29

42 U.S.C. § 284 .................... 14

**Regulations**

2 C.F.R. § 200.340 .................... 3, 20, 21, 22

42 C.F.R. § 52.6 .................... 3

45 C.F.R. § 75.210 .................... 22

45 C.F.R. § 75.372 .................... 21

85 Fed. Reg. 49506-01 (Aug. 13, 2020) .................... 21

90 Fed. Reg. 11175-01 (Mar. 4, 2025) .................... 4

90 Fed. Reg. 11323-02 (Mar. 5, 2025) .................... 4

90 Fed. Reg. 11324-01 (Mar. 5, 2025) .................... 4

90 Fed. Reg. 11422-01 (Mar. 6, 2025) .................... 4

90 Fed. Reg. 12325 (Mar. 17, 2025) .......... 4

90 Fed. Reg. 12333 (Mar. 17, 2025) .......... 4

90 Fed. Reg. 13182 (Mar. 20, 2025) .......... 4

90 Fed. Reg. 13187 (Mar. 20, 2025) .......... 4

**Other Authorities**

H.R. 2882, 118th Cong., 138 Stat. 460 (2024) .......... 29

**INTRODUCTION**

Plaintiffs' focus on so-called "Challenged Directives" related to grant terminations fails because these Challenged Directives are a part of the agency's program management and are not final agency actions subject to judicial review apart from the grant terminations themselves. Any challenge to the terminations, however, also fail because the terminations were sufficiently reasoned, not arbitrary and capricious. Courts may not substitute their judgment for that of the agency, even if a court strongly disagrees with the agency's priorities and its decision to not spend on things that do not effectuate the agency's priorities.

Plaintiffs' claims seeking to challenge decisions by the National Institutes of Health (NIH) not to *offer* new grants likewise fail for three independent reasons. First, a decision whether to make a grant available is not a final agency action subject to judicial review. Second, those decisions are committed to agency discretion by law, and thus not subject to judicial review. Third, Plaintiffs, as mere potential or actual grant applicants, lack standing to challenge the agency's decision to not offer a grant. For all the above reasons, Plaintiffs' claims about four of the seven Challenged Directives must fail.[1]

Plaintiffs' claims about the three remaining Challenged Directives are not justiciable because the Court can offer Plaintiffs no relief. The first is moot because it implemented a pause that ended before Plaintiffs sued.[2] The second never harmed Plaintiffs because it said to *resume*

---

[1] Those four directives are (1) the February 10, 2025 Secretarial Directive on DEI-Related Funding, NIH_GRANTS_000004-05, (2) the March 4, 2025 guidance titled Award Assessments for Alignment with Agency Priorities—Mach 2025, NIH_GRANTS_003454-61, (3) the March 13, 2025 guidance titled Award Revision Guidance and List of Terminated Grants, NIH_GRANTS_001957-68, and (4) the March 25, 2025 guidance titled NIH Grants Management Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025, NIH_GRANTS_003216-30.

[2] *See* January 21, 2025 Secretarial Memorandum. NIH_GRANTS_000001-02.

issuing grants without restriction.[3] And the third is also moot because NIH rescinded the memorandum before Plaintiffs sued.[4] With that, Plaintiffs' APA claims against all seven of the Challenged Directives fail.

Finally, Plaintiffs' allegations purporting to assert non-APA claims should be dismissed for the same reasons that the Court has already dismissed the same claims asserted by the *AHPA* plaintiffs.

Accordingly, all of Plaintiffs' claims in phase one of this case should be dismissed or denied.

**BACKGROUND**

NIH's mission is to "seek fundamental knowledge about the nature and behavior of living systems" in order to enhance health, lengthen life, and reduce illness and disability.[5] To further this mission, NIH spent more than $35 billion in Fiscal Year 2023 on almost 50,000 competitive grants to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions across all 50 states and the District of Columbia. *See* Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates, NOT-OD-25-068 (Feb. 7, 2025).

Congress gave NIH broad discretion in awarding grants. 42 U.S.C. § 241(a)(3); 42 U.S.C. § 282(b)(3), (12). The Health and Human Services ("HHS") Secretary awards grants "to those

---

[3] *See* February 12, 2025, memorandum titled NIH Review of Agency Priorities Based on the New Administration's Goals. NIH_GRANTS_000009.

[4] *See* February 13, 2025 memorandum also titled NIH Review of Agency Priorities Based on the New Administration's Goals. NIH_GRANTS_000016. This document would also suffer from the jurisdictional defects outlined above, and discussed in Argument Parts I.A. and I.B.

[5] NIH, Mission and Goals, available at https://www.nih.gov/about-nih/what-we-do/mission-goals (last visited Feb. 14, 2025).

applicants whose approved projects will *in the Secretary's judgment* best promote the purposes of the statute authorizing the grant and the regulations of this part." 42 C.F.R. § 52.6(a) (emphasis added). NIH also maintains broad discretion when administering grants. *See, e.g.*, 42 C.F.R. § 52.6(f).

When NIH awards a grant, it enters an agreement with the grantee through the issuance of a Notice of Award (NOA), and the terms of that NOA govern the relationship between the grantee and NIH. The terms of the grant agreements include terms identified in NIH's Grant Policy Statement (Policy Statement), including 2 C.F.R. § 200.340, which expressly permits NIH to terminate a grant agreement if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *See* 2024 NIH Policy Statement, NIH_GRANTS_003924. Although a grant agreement permits the grantee to draw funds, it does not "commit[] or obligate[] the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application." 42 CFR § 52.6(c)(3).

Following the 2024 Presidential election, NIH's priorities shifted. Consistent with past practice when NIH comes under new management, on January 21, 2025, the Administration issued a temporary freeze on the publication of any documents in the Federal Register until they had been reviewed by a presidential appointee. NIH_GRANTS_000001. Because NIH must post a notice to the Federal Register when it schedules a peer review meeting to review grant applications, it scheduled no meetings for the duration of the temporary pause. 5 U.S.C. § 1009(a)(2). NIH also cancelled all peer review meetings for that brief period. By March, these

pauses had ended, and NIH resumed holding meetings and making decisions about whether to award grants.[6]

In the meantime, NIH began exercising its broad discretion to make and administer grants in alignment with its priorities, including by terminating grants or portions of grants that did not effectuate NIH priorities. On February 10, 2025, the Acting Secretary of Health and Human Services directed agency personnel to "briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs" to allow time for an internal review, including "to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities." Feb. 10, 2025 Secretarial Directive, NIH_GRANTS_000004.[7] As the record shows, NIH worked with HHS to compile lists of grants, which NIH then reviewed for consistency with agency priorities. First, the final reviews and decisions to terminate grants here was made by the head of NIH, exercising the delegated authority of the Secretary. *See, e.g.*, NIH_GRANTS_003752–3. For these grants terminated by the head of NIH, NIH's Chief Grants Management Officer sent letters to grantees explaining that their grants had been terminated, and why. *See, e.g.*, NIH_GRANTS_003607. The NIH Chief Grants Management Officer also sent, or directed ICs to send, amended Notices of Award to those grantees that effected the termination. *See, e.g.*, NIH_GRANTS_002699.

---

[6] *See, e.g.*, 90 Fed. Reg. 11175-01 (Mar. 4, 2025); 90 Fed. Reg. 11324-01 (Mar. 5, 2025); 90 Fed. Reg. 11323-02 (Mar. 5, 2025); 90 Fed. Reg. 11422-01 (Mar. 6, 2025); 90 Fed. Reg. 12333 (Mar. 17, 2025); 90 Fed. Reg. 12325 (Mar. 17, 2025); 90 Fed. Reg. 13187 (Mar. 20, 2025); 90 Fed. Reg. 13182 (Mar. 20, 2025).

[7] NIH stopped and re-started its processes to comply with court orders. See Feb. 12, 2025 NIH Review of Agency Priorities Based on the New Administration's Goals, NIH_GRANTS_000009 (directing agencies to resume issuing grants without restriction); Feb. 13, 2025 Supplemental Guidance, NIH_GRANTS_00016 (providing guidance about NIH priorities review).

Additionally, various Institutes and Centers did not award renewals of certain grants following their investigation and review of individual grants. When an IC decided to not award the renewal of a grant, it issued an amended Notice of Award that provided NIH's reason. *See, e.g.*, NIH_GRANTS_001444-50. NIH provided grantees the right to appeal any termination. *See, e.g.*, *id.* Many terminated grantees did appeal, and some appeals remain pending. *See, e.g.*, NIH_GRANTS_002221-24 (R34MH129279).

The NIH Chief Grants Management Officer shared a series of draft documents that provided guidance to ICs about reviewing grants for consistency with agency priorities, and about what to do if all or a portion of a grant no longer effectuated agency priorities. *See* Mar. 4, 2025 Award Assessment for Alignment with Agency Priorities, NIH_GRANTS_003454-61; Mar. 13, 2025 Award Revision Guidance, NIH_GRANTS_001957-68; March 25, 2025 NIH Grants Management Staff Guidance, NIH_GRANTS_003216-30.

**PROCEDURAL HISTORY**

Plaintiffs filed this suit on April 4, 2025, over a month after grant terminations started. *See* Compl., Doc No. 1. That same day, a subset of Plaintiffs—states whose instrumentalities had grant agreements terminated—moved for a Temporary Restraining Order (TRO). *See* Temporary Restraining Order Motion, ("TRO Mot."), Doc No. 4. After the Court promptly set a briefing schedule and a hearing, Doc Nos. 15, 19, Plaintiffs withdrew their TRO motion in favor of an agreed briefing schedule on a motion for Preliminary Injunction (PI). The Court approved the schedule, and Plaintiffs filed an Amended Complaint on April 14, 2025, along with a PI Motion. Am. Compl., Doc. No. 75; PI Motion, Doc. No. 78. Defendants opposed on numerous grounds, including a contention that the Court of Federal Claims has exclusive jurisdiction over Plaintiffs' claims seeking to vacate the "Challenged Directives" and to reinstate their terminated grants. Doc. No. 95.

On May 12, 2025, following a hearing, the Court entered a Memorandum and Order ruling that jurisdiction existed to hear Plaintiffs' grant termination claims, not the Court of Federal Claims. Doc. No. 105. It discussed but did not decide Defendants' other arguments. *See id.*

The next day, on May 13, 2025, the Court held a case management conference. *See* Doc. No. 109. The Court decided that it would consider Plaintiffs' allegations in two phases, with the first portion considering the grant terminations. It directed Defendants to file administrative records by June 2, 2025. *Id.* It set a merits hearing for June 16, 2025, at 10:00 am and directed the parties to inform the Court about whether the hearing would be on the record submitted or if there is a dispute about whether evidence should be entered at the hearing. *Id.* In this APA case, Defendants respectfully oppose use of any evidence outside the administrative record except for taking notice of public records to assess mootness.

Thereafter, on May 29, 2025, the parties submitted a joint statement proposing deadlines for simultaneous merits briefing and responses. Doc No. 113. If Plaintiffs wish to present extra-record evidence, the parties also proposed a deadline for them to move to complete or supplement the record and to file a list of witnesses and exhibits they desire to present. *Id.* It proposed deadlines for Defendants to oppose extra-record evidence, and for Plaintiffs to reply. *Id.*

On June 3, 2025, the Court held a status conference in which it consolidated the proceedings in *American Public Health Association v. National Institutes of Health*, 1:25-cv-10787 (D. Mass.), with this case. *See* Doc No. 119. At the request of Plaintiffs in that case, the parties agreed to extend certain deadlines about Plaintiffs' requests to submit extra-record evidence. Doc No. 123.

## LEGAL STANDARD

The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Rels. Bd. v. Beverly Enters-Mass.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and capricious' standard is narrow[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "'[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *City of Taunton, Mass. v. U.S. Env't Prot. Agency*, 895 F.3d 120, 127 (1st Cir. 2018) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973) and citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.")).

"The task of a court reviewing agency action under the APA's 'arbitrary or capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Beverly Enters-Mass.*, 174 F.3d at 23 (quoting *State Farm*, 463 U.S. at 43).

"The burden is on the party challenging the agency decision to show that the arbitrary and capricious standard has been met." *Bluestone Env't Grp., Inc. v. Zapisek*, No. 3:21-cv-30056-MGM, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022). Although the highly deferential standard of review is not a rubber stamp, *Beverly Enters-Mass.*, 174 F.3d at 24, "'agency action is presumptively valid,' and the standard 'precludes a reviewing court from substituting its own judgment for that of the agency,'" *Bluestone Env't Grp., Inc.*, 2022 WL 16857173, at *4 (quoting *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008)).

An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]'" *Beverly Enters-Mass.*, 174 F.3d at 24. A court must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1975)).

**ARGUMENT**

**I. Multiple Jurisdictional Defects Pervade Plaintiffs' Claims**

At bottom, Plaintiffs claim three harms from the "Challenged Directives." First, NIH terminated certain existing grants, or did not renew existing grants on a non-competitive basis. Second, NIH decided not to offer certain grants and therefore withdrew prior Notices of Funding Opportunity. Third, NIH paused meetings and grant decisions for less-than three months and did not held meetings or award competitive grants as quickly as Plaintiffs wanted.

The Court lacks jurisdiction to remedy Plaintiffs first alleged harm based on review of the "Challenged Directives" —termination of grants—because none of the Challenged Directives are final agency actions that terminated the grants. At most, they are part of the process of making the decision to terminate grants and to communicate the agency's reasoning.

The Court also lacks jurisdiction to remedy another harm allegedly caused by the Challenged Directives: withdrawing Notices of Funding Opportunity—because the decision to withdraw a notice of funding opportunity is not a challengeable final agency action, the decision whether to offer funding for a certain grant is not a reviewable agency action, and in any event Plaintiffs lack standing to challenge the decision to not issue grants they never received.

The Court lacks jurisdiction to remedy Plaintiffs' alleged harm from the Challenged Directives relating to a temporary pause on meeting and deciding grants, because the pause

ended before Plaintiffs sued. And, of course, Plaintiffs cannot seek review of agency actions that did not harm them.

Additionally, the Court lacks jurisdiction to review many of the alleged actions to terminate grants that Plaintiffs identify because the grants were not terminated, the terminations are under appeal and thus are not final actions, or other problems preclude review.

### A. This is a case about grant terminations and the guidance documents issued by NIH's Chief Grants Management Officer are not independently challengeable actions.

Four of the "Challenged Directives," a Secretarial Directive and certain guidance issued by NIH's Chief Grants Management Officer, are not final agency actions subject to judicial review and are instead parts of the interlocutory processes to review grants. The APA only permits review of "final agency action." 5 U.S.C. § 704. To be final, the agency action must satisfy two conditions. First, the action "must mark the consummation of the agency's decision making process." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). "Second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 178). The Directives fail both conditions.

The First Circuit recently explained in *Harper* that "investigatory measures are not final agency action," because such measures are "tentative or interlocutory in nature." *Id.* (collecting cases). The opening of a review or investigation is a preliminary step, "leading toward the possibility of a final action in the form of an enforcement or other action." *Id.* (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003)). The consummation of the decision-making process here occurs only when the agency decides to act on an existing grant.

By contrast, the Directives merely ordered a review of the grants to determine whether they were consistent with the agency's priorities. The Directives make this plain. For example,

the February 10, 2025 Secretarial Directive directs "a review of the overall contracts and grants to determine whether those contracts or grants are . . . consistent with current policy priorities" and notes that, "after review," "such contracts may be terminated." NIH_GRANTS_000005. Likewise, the March 4, 2025 Award Assessments for Alignment with Agency Priorities document directs NIH institutes and centers to "review the specific aims [and] assess whether the proposed project contains any DEI research activities" before issuing any awards or approving requests for carryover. NIH_GRANTS_003454-61. The March 25, 2025 document titled, "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities—March 2025," directs NIH institutes and centers to "review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority." NIH_GRANTS_003216-30. But *initiating* a review is not the consummation of the agency's decision making process. *Cf. Sackett v. EPA*, 566 U.S. 120, 127 (2012) (finding final agency action where a compliance order was "not subject to further Agency review").

Initiating an agency review also does not determine the grantees' rights and obligations. In *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), the Supreme Court held that issuing a complaint and initiating enforcement proceedings did not have "definitive" legal consequences for the respondent such that it was a final agency action. *Id.* at 241. The Court emphasized that the complaint was still subject to challenge and review. *Id.* Here, too, the Directives did not definitively affect any of Plaintiffs' or their institutions' rights and obligations, because the status of their grants remained subject to review.

Moreover, the Challenged Directives' guidance does not qualify as agency action. The Challenged Directives provide the language to use when sending a draft termination and outline

the process for staff to follow when renegotiating or terminating awards *if* NIH decides to terminate a grant based on the review. *See* "Staff Guidance – Award Assessments for Alignment with Agency Priorities—March 2025," NIH_GRANTS_003459-60 (detailing the steps to follow when issuing a revised NOA for terminated grants and language to use in renegotiated awards); "Award Revision Guidance and List of Terminated Grants via letter on 03/12," NIH_GRANTS_001957-68; "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities—March 2025," NIH_GRANTS_003216-30. The agency's decision and action, however, are separate from the guidance: directing staff on the process to follow and the language to use when implementing a decision is not itself agency action. *See Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (noting that "operating a program" does not qualify as agency action). This guidance remained subject to the decision to be made for each grant following the review.

The Challenged Directives' guidance was also interlocutory, not final. The procedural guidance in the initial "Staff Guidance" Directive NIH_GRANTS_003454-61, was revised in the Award Revision Guidance, NIH_GRANTS_001957-68, which was again updated in the revised Staff Guidance, NIH_GRANTS_003216-30. Reinforcing that the staff guidance was tentative, the Award Revision Guidance directed staff to "save this guidance until we can clear the updated staff guidance." NIH_GRANTS_001957-68. This is not the stuff of final agency action.

This case is nothing like *Biden v. Texas*, where the agency directed personnel to take all necessary actions to shut down an entire program. 597 U.S. 785, 808–09 (2022). At most, the guidance here resembles the manual in *Whitewater Draw Natural Resources Conservation District v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021). There, the Ninth Circuit held a Department of Homeland Security manual was not challengeable final agency action because it

did "not prescribe any particular option in any particular way" and "[a]ny guidance that could be attributed to the Manual would be subsumed" in the subsequent action. *Mayorkas*, 5 F.4th at 1008. Here, the relevant final agency action is the decision to terminate grants, not the guidance documents that initiate reviews and provide justification language to include in documents implementing any termination decision. The Court lacks jurisdiction to review the Challenged Directives as final agency actions separate from the grant terminations.

**B. NIH's decisions to withdraw Notices of Funding Opportunity are not reviewable.**

**1. Withdrawing a Notice of Funding Opportunity is not a final agency action.**

Withdrawing a Notice of Funding Opportunity (or NOFO) is not a final agency action subject to judicial review because it neither (1) "marks the consummation of the agency's decision-making process," nor (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). In the context of agency grant-making in particular, no final agency action exists "until the [agency] has reviewed a grant application and decided to disburse the funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007); *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 300-01 (D.D.C. 2018), *rev'd on other grounds*, 942 F.3d 512, 519 (D.C. Cir. 2019) (emphasizing that, in the grant application context, "courts usually recognize final agency action only after grant awards issue."). Indeed, before the agency makes an award, 'the federal money is but an expectancy that has not yet materialized.'" *Karst Env't Educ. and Prot., Inc. v. U.S. Env't Prot. Agency*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005); *see Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 206 (D.C. Cir. 1984) ("award procedures are not designed to establish private entitlements to public contracts but to produce the best possible contracts for the government."). The agency is always free to re-issue a NOFO for the same or a similar grant. The retraction of a

NOFO neither denies nor establishes any rights, obligations, or legal consequences because, prior to actual award of a grant, prospective awardees have no right to the specific funding opportunity.

**2. NIH's decisions about what grants to offer, about what topics, and on what terms, are committed to the agency's discretion by law.**

Plaintiffs' claims are also unreviewable because they challenge funding decisions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Id.* at 193. These principles are not limited to lump-sum appropriations, and § 701(a)(2) bars review where an appropriation confers discretion on the agency. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002). NIH's decisions about whether to offer a grant and on what terms are unreviewable.

Plaintiffs cannot overcome the discretion conferred by Congress. Where a decision is presumptively non-reviewable, as with funding allocation, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)). This is a question of statutory interpretation. *Id.* (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988) ("[Section] 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based")). So too with express conferrals of discretion. *See Milk Train, Inc.,* 310 F.3d at 751-52 (holding plain language

of statute conferred discretion on Secretary where statute directed distribution of funds "as soon as practicable").

Congress granted NIH broad discretion when awarding grants. 42 U.S.C. §§ 284(b)(2) ("Support for an activity or program under this subsection ***may*** be provided through grants, contracts, and cooperative agreements.") (emphasis added); 284(b)(2)(A)–(B) (providing that the agency "***may*** enter into a contract for research" and "***may*** make grants and cooperative agreements") (emphasis added). Indeed, NIH is not statutorily required to enter into *any* grant agreements. Furthermore, the Secretary of HHS, acting through the Director of NIH, is authorized to "conduct[] priority-setting reviews to ensure that the research portfolio of the National Institutes of Health is balanced and free of unnecessary duplication." As in *Lincoln*, Congress gave the agency "the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way," 508 U.S. at 192. NIH's decisions about whether to offer a grant are unreviewable.[8]

**3. Plaintiffs fail to establish they have standing to sue NIH for its retraction of NOFOs.**

"The Constitution limits the exercise of judicial power to 'cases' and 'controversies.'" *Aetna Life Ins. Co. of Hartford, Conn., v. Haworth*, 300 U.S. 227, 239 (1937) (citing U.S. Const. art. III, § 2). For a "case or controversy" to exist, a litigant must have standing to bring the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, Plaintiffs must offer more than a "bald assertion" of injury. *Me. People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 284 (1st Cir. 2006). Plaintiffs fail to meet that burden here. As

[8] In their opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants argued that NIH's decisions to award or to terminate a particular grant are also unreviewable. Doc No. 95 at 19-21. To the extent the Court has not already denied that argument, Defendants maintain it and incorporate the argument into this brief by reference.

to the NOFO retractions specifically, Plaintiffs offer only that "[a]t least some of these NOFOs were withdrawn after grant applications had been submitted in response to them." Am. Compl. 142. But this is just the type of bald assertion that is insufficient to support a finding of standing. Plaintiffs do not name any specific NOFOs to which they had already applied. They do not explain whether they intended to apply to any other specific NOFOs. And they do not identify any specific harms from the cancellation of the NOFOs.

Further, application to any one NOFO does not guarantee success. As discussed above, before the federal agency makes the award "the federal money is but an expectancy that has not yet materialized." *Karst Env't Educ. and Prot.*, 403 F. Supp. 2d at 81. So, even if, counterfactually, Plaintiffs had specifically identified NOFO retractions that caused them harm, a frustrated expectation in receiving federal funds cannot sustain standing.

**C. The remaining three Challenged Directives never harmed Plaintiffs or are no longer causing harm that the Court can remedy.**

Plaintiffs' challenges to three of the Challenged Directives are not justiciable because the Court can offer plaintiffs no relief. For the January 21, 2025 Secretarial Memorandum, NIH_GRANTS_000001-02, Plaintiffs' challenge is moot because the pause ended before Plaintiffs sued. For the February 12, 2025, memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals," Plaintiffs were never harmed because that memorandum said to *resume* issuing grants without restriction. NIH_GRANTS_000009. And for the February 13 memorandum titled "Supplemental Guidance to Memo Entitled – NIH Review of Agency Priorities Based on the New Administration's Goals," NIH_GRANTS_000016, that claim is also moot because NIH rescinded the memorandum before Plaintiffs sued.

Plaintiffs challenge to the January 21, 2025 Secretary's Memorandum directing an immediate pause on issuing documents and public communications, NIH_GRANTS_000001-02,

is moot because that directive expired by the time Plaintiffs sued and NIH was holding meetings and awarding grants, *see supra* n.6. As the First Circuit has explained, challenges "to government regulatory schemes which have expired or been effectively repealed" are moot. *Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). Indeed, Plaintiffs acknowledge that NIH has resumed rescheduling meetings and awarding grants.[9] The Court can offer Plaintiffs no relief from the directive since any harm to Plaintiffs from that directive ceased before Plaintiffs sued and Plaintiffs' claims against this Challenged Directive should be denied.

Plaintiffs challenge to February 12, 2025, memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" fails because the memorandum did not cause Plaintiffs' alleged injuries. To establish standing, Plaintiffs must demonstrate that their alleged injury is "fairly traceable to the challenged action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The February 12, 2025 memorandum authorized grant managers "to proceed with issuing awards" in response to recent court orders. NIH_GRANTS_000009. Plaintiffs' alleged harms are plainly not traceable to this memorandum.

Plaintiffs challenge to the February 13 memorandum entitled "Supplemental Guidance to Memo Entitled – NIH Review of Agency Priorities Based on the New Administration's Goals," NIH_GRANTS_000016, is moot because that guidance was expressly rescinded before Plaintiffs sued (twice). *See* March 4, 2025 Award Assessment for Alignment with Agency Priorities, NIH_GRANTS_003455 ("This staff guidance rescinds the guidance provided in the February 13, 2025, memo"); *see also* March 25, 2025 NIH Grants Management Staff Guidance,

[9] Defendants understand that Phase 1 of this case does not address Plaintiffs' claim that NIH is not holding meetings and deciding grants fast enough. It is, however, relevant that the Challenged Directives are no longer pausing meetings or decisions.

NIH_GRANTS_003217 (same). APHA Plaintiffs admit as much in their Complaint. *See Amer. Pub. Health Assoc. v. NIH*, No. 25-10787 (D. Mass. May 30, 2025) (*APHA v. NIH*), Doc No. 1 ¶ 92. The Court can offer Plaintiffs no relief from the directive since any harm to Plaintiffs from that directive ceased before Plaintiffs sued.

**D. Claims about many specific grants identified by Plaintiffs fail for various other jurisdictional reasons.**

As a preliminary matter, the Court must confine its consideration of Plaintiffs' claims to actual grants awarded by NIH that have since been terminated. For purposes of the merits hearing, Defendants acknowledge this Court's initial determination that it has APA jurisdiction over the matter, but that jurisdiction depends on the existence of final agency action resulting in the termination of a grant. Many of Plaintiff's cited grants, however, have *not* been terminated or are not grants at all. These parts of Plaintiffs case thus present no case or controversy for the Court to resolve and must be dismissed from the action.

**1. Ninety identified grants were not terminated or not non-competitively renewed.**

Of Plaintiffs' identified grants, 90 grants were *active* when Plaintiffs sued, not terminated, or else they had expired by their own terms after a project period ended, so Plaintiffs cannot show standing and no "termination" exists for the Court to review. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper*, 568 U.S. at 409. Here, no actual injury exists: NIH has not terminated the grants. Cert. Ex. A. Nor can Plaintiffs show an imminent threat of termination. An injury is imminent only when it is "certainly impending." *Id.* at 410. Plaintiffs can point to nothing in the record that satisfies this high standard. As such, they have no standing to assert a claim related to these 90 grants. Cert. Ex. A. Absent any termination, moreover, no case or controversy exists to support the Court's review.

**2. Forty-four terminations and non-renewals are currently under appeal and thus are not final agency actions.**

"Ongoing agency review renders an agency order non-final and judicial review premature," *Marcum v. Salazar*, 694 F.3d 123, 128 (D.C. Cir. 2012), because "simultaneous judicial review and agency reconsideration … is an invitation to waste judicial resources." *Bellsouth Corp. v. F.C.C.*, 17 F.3d 1487, 1489 (D.C. Cir. 1994) (internal quotations omitted); *Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 79 (D. Mass. 2016) (emphasizing that "in keeping with basic principles of administrative law" an appeal opportunity prevents federal judicial review of agency action). Here, each termination letter and updated Notice of Award afforded the grantee a right to appeal by submitting a request for review to Dr. Matt Memoli. *See, e.g.*, NIH_GRANTS_003760, NIH_GRANTS_003806. Indeed, numerous entities represented by Plaintiffs wasted no time in exercising their appeal rights. Research organizations and universities have appealed 44 of the terminations at issue here. By electing to pursue administrative appeal, Plaintiffs may not impose on this Court's jurisdiction unless and until those appeals have run their course without restoration of the grants at issue. To entertain appealed agency decisions is precisely the "invitation to waste judicial resources" decried in *Bellsouth Corp.*, 17 F.3d at 1489. The Court should not indulge in any premature review of a grant termination that is under appeal.

**3. Thirty-five entries in Plaintiffs' spreadsheet are errors.**

Another 35 of the entries on Plaintiffs' spreadsheet have turned out to be references to non-grant contracts or other documents, which are not the subject of the Amended Complaint nor subject to APA review. During the May 8 status hearing, the Court requested "a list of the grants actually affected -- really on a spreadsheet, a list of the grants actually affected, not process that may affect other grants." May 8 Tr. at 23 ¶ 18–21. On May 13, Plaintiffs provided a spreadsheet

to both the Court and the United States. Doc No. 109. Defendant's subsequent check of Plaintiffs' list, however, reveals 34 entries on Plaintiffs' spreadsheet that are not grants *at all*. Cert. Ex. B., Ex. C. For example, 75N93024D00018 is a non-grant contract. Cert. Ex. C. But Plaintiffs have at no point alleged that they were challenging any action other than grant terminations. Doc No. 75 ¶¶ 215, 217, 223, 230. 231. Furthermore, the statutory and regulatory regimes they allege the United States violated relate specifically to actions on grants. Doc No. 75 ¶¶ 217, 223, 230, 231. Plaintiffs cannot bootstrap every NIH decision they disagree with into this litigation. Indeed, for any contracts subject to the Contracts Disputes Act, that Act provides an additional reason that this Court lacks jurisdiction to review any action.[10] *Sibley v. Ball*, 924 F.2d 25, 27 (1st Cir. 1991).

## II. Plaintiffs' Grant Termination Claims Fail on the Merits

### A. All terminated agreements gave the agency the right to terminate a grant that no longer effectuated agency priorities and exercising that right did not violate regulations.

A grant award is a contract between the NIH and the grant recipient. *Henke v. U.S. Dep't of Comm.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) ("An NSF grant agreement includes the essential elements of a contract and establishes what would commonly be regarded as a contractual relationship between the government and the grantee."). As the record shows, all grant awards include the same essential terms. The contract terms give NIH the right to terminate a grant if the agency concludes that the grant no longer effectuates agency priorities. NIH exercised that right here. The grant recipients agreed to these terms, and the regulations do not prevent NIH from including these terms in its contracts or from exercising this right.

[10] Defendants noted these discrepancies in a May 28 email to Plaintiffs but received no response. Another entry in Plaintiffs' spreadsheet, 5R01HS028024-03, is a grant issued by Agency for Healthcare and Research Quality, an entirely separate agency from NIH governed by different statutes and regulations.

The Notice of Award explains the grant "is subject to the terms and conditions incorporated either directly or by reference in the" agreement. NIH_GRANTS_000088. As one of the terms and conditions of the grant, the Notice of Award expressly incorporates the NIH Grants Policy Statement. *Id*. The NIH Grants Policy Statement covers the grounds for terminating grants in Section 8.5.2, which explicitly states that "NIH may also terminate the grant in whole or in part as outlined in 2 CFR Part 200.340." NIH_GRANTS_004078. In turn, part 200.340(a)(4) provides that the agency may terminate an award in whole or in part "if an award no longer effectuates the program goals or agency priorities." The award terms thus permit NIH to terminate a grant for no longer effectuating agency priorities.

Plaintiffs contend that this contractual term "does not govern NIH grants." Doc. 101 at 17. That is obviously untrue. As contracts, the NIH grants are governed by the contract terms. Plaintiffs' theory seems to be that the regulations somehow preclude NIH from agreeing to incorporate § 200.340 into the contract. But the regulations do nothing of the sort. Section 75.372(a) lists four grounds upon which an award "may" be terminated. 45 C.F.R. § 75.372(a). The wording is neither exhaustive nor restrictive. It does not say that an award may be terminated "only" or "exclusively" on those grounds. *See id.*; *see also Carlson v. United States*, 837 F.3d 753, 765 (7th Cir. 2016) (holding that an enumerated list of exceptions in the rules was not exclusive because the rule "uses the word 'may,' which 'usually implies some degree of discretion.'") (quoting *United States v. Rodgers*, 461 U.S. 677, 706 (1983)). Here, the agency and the grantee agreed in the contract terms to another, widely recognized ground on which the agency may terminate awards: "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The regulations do not bar the parties from contracting to additional grounds for termination.

Plaintiffs question why NIH has subsequently adopted § 200.340 into its own regulations starting in October if NIH already has the right to rely on this provision. Doc. 101 at 17 n.10. OMB promulgated § 200.340 in 2020. 85 Fed. Reg. 49506-01, 49507 (Aug. 13, 2020). Subsequently, two professional university associations—representing many of the colleges and universities on whose behalf Plaintiffs bring this suit—asked NIH to adopt OMB's 2020 revisions to align the terms with other research grants. *APHA v. NIH*, 1:25-cv-10787, Doc No. 66-1, Lorsch Declaration ¶¶ 8-10. NIH obliged by incorporating part 200, including § 200.340 specifically, into its Grant Policy Statement. *Id.* Now, HHS is formalizing that term and incorporating § 200.340 into its regulations as well. There is nothing unusual or inappropriate about an agency updating its rules so that a provision is expressly included in its regulations, rather than merely in its contracts.

Plaintiffs have also argued that § 200.340(a)(4) permits terminating a grant "only if it no longer effectuates agency priorities for reasons external to the agency." Doc. 101 at 16. This argument finds no support in the text. The provision authorizes the agency to terminate "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The text says nothing about what may cause the award to no longer effectuate agency priorities. The cause could be an external change with the facts or the recipient, or it could be an internal change in agency priorities. Plaintiffs argue that this right to terminate is so broad that it would render superfluous the other termination grounds. Doc. 101 at 17. Not so. For example, terminating for no longer effectuating agency priorities is distinct from terminating for failure to comply with the award terms. *See* 45 C.F.R. § 75.372(a)(1).

Next, Plaintiffs argue that NIH failed to "clearly and unambiguously specify" that § 200.340(a)(4) applies to NIH grants. Doc. 101 at 18. As explained above, the award terms

expressly incorporate the NIH Grant Policy Statement, which explicitly cites the specific provision at issue in § 200.340(a) as one of the permitted grounds for termination. Plaintiffs suggest that it is not enough to incorporate termination provisions by reference. But the very regulations on which they rely specifically contemplate the incorporation of required terms and conditions by reference. 45 C.F.R. § 75.210(b)(1) ("HHS awarding agencies must incorporate the following general terms and conditions either in the Federal award or by reference[.]"); § 75.210(b)(2) ("The Federal award must include wording to incorporate, by reference, the applicable set of general terms and conditions."). The regulations do not require a talismanic recitation of the termination provisions in the agreement itself. Incorporating those terms by reference to the specific provisions is sufficient.

Finally, Plaintiffs argue that the incorporation of § 200.340 into the award terms is contradicted by another document referenced in the NIH Grants Policy Statement. Doc. 101 at 18. In a section broadly discussing the attempt to standardize federal grant research requirements, the Grants Policy Statement refers to several documents, including "Agency-Specific Requirements." NIH_GRANTS_003925. This document mentions that "NIH does not adopt 2 CFR § 200.240(a)(2) [sic]. . . . NIH derives and exercises discretionary decision-making related to program goals and priorities, separate and distinct from non-compliance[.]" NAT'L INSTS. OF HEALTH, RESEARCH GENERAL TERMS AND CONDITIONS, AGENCY SPECIFIC REQUIREMENTS FOR THE NIH (April 8, 2021).[11] The "Agency-Specific Requirements" document is dated April 2021. The version of the Grant Policy Statement that incorporates § 200.340 is dated April 2024. The document refers to NIH's decision in 2021 not to adopt § 200.340 then in

[11] https://nsf-gov-resources.nsf.gov/files/NIH-research-terms-conditions-20210408-r.pdf?VersionId=mU6QrWZhasHMz7_PXyHHoXLr9OsVbfuX.

its regulations. NIH later decided to incorporate the provision into the contract terms. The 2024 terms supersede the statement from the 2021 document.

**B. Plaintiffs lack standing to challenge grant terminations for research in China or for Covid-19 because NIH did not terminate any of Plaintiffs' grants for that reason.**

Plaintiffs lack standing to challenge grant terminations for research grants in China or for Covid-19 research because Plaintiffs' grants at issue were not terminated for those reasons. *See* Doc. No. 104. Accordingly, Plaintiffs have no harm traceable to the Challenged Directives' guidance about terminations for those reasons. *Clapper*, 568 U.S. at 409.

**C. The terminations and non-renewals of grants related to Diversity, Equity, and Inclusion initiatives were lawful and reasoned.**

**1. The agency's termination was reasoned.**

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. Env't Prot. Agency*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted). As a result, a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quotation omitted). The terminations readily clear this low bar.

The agency provided a rational explanation for the termination of grants related to DEI:

> Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

AR_000035. Plaintiffs may disagree with NIH's basis, but that does not make the basis arbitrary and capricious. It is a policy dispute, and policy changes are entirely appropriate and to be expected with a new administration. "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 59 (Rehnquist, C.J., concurring in part and dissenting in part). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.*

Plaintiffs argue that the terminations are arbitrary and capricious because the agency failed to consider the grant recipients' reliance interests. As an initial matter, for withdrawn NOFOs and Notices of Awards, Plaintiffs can have no legally protectible reliance interest in grants that have not yet been awarded. *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 927 F.3d 1263, 1269 (Fed. Cir. 2019) (holding that an amendment to a regulation did "not defeat veterans' reliance interests" because the amendment "applied only prospectively"). For the termination of already-awarded grants, Plaintiffs' invocation of reliance interests is unavailing because NIH necessarily understood that it was terminating funding on which the grantee relied to conduct research when it terminated the grant for that research. Plaintiffs may not like the agency's conclusion that Plaintiff's interests were outweighed by the agency's responsibilities and priorities, but Plaintiffs cannot substitute their judgment for the agency's. *See Am. Petro. Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1066 (10th Cir. 2023) ("[A]n agency may conclude . . . that reliance interests were 'entitled to no or diminished weight' or outweighed by 'other interests and policy concerns'") (quoting *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020). Where NIH decided to terminate a grant that

was funding research, Plaintiffs' reliance on that research funding cannot compel NIH to maintain the grant.

**2. Termination did not violate a statute.**

Statutes do not prevent HHS from exercising its discretion to identify agency priorities and terminate grants that do not effectuate those priorities. Plaintiffs argue that the termination of grants is contrary to various statutes that direct HHS or NIH to support research into certain minority-related topics. Doc No. 78 at 33. Plaintiffs also argue that deciding DEI projects are not an agency priority is contrary to a statute providing for the establishment of a strategic plan every six years. *Id.* at 34. Both arguments are misplaced.

First, Plaintiffs wrongly presume that their terminated grants are the only research grants on these topics. On the contrary, entirely consistent with the statutes directing HHS and NIH to support research into certain minority-related topics, *see* 42 U.S.C. §§ 282(h), 283p, 285a-6, 285b-7a(c)(1), 285t(a), HHS is continuing at least 26 research grants on these topics. Those grants are publicly available, and Defendants attached a table of them as Exhibit A to their opposition to Plaintiffs' Motion for a Preliminary Injunction. Doc No. 95-1. For example, HHS has an ongoing research grant to "reduce cervical cancer disparities in African American Women"; to understand the "risk of gestational diabetes among Asian Americans"; to prevent "anxiety and depression" in "older Latinos"; and to understand "cancer and comorbidities among American Indian and Alaska Native people." *Id.* HHS exercised its discretion to terminate DEI grants that it determined did not enhance health, while preserving grants into health disparities. This action is not only consistent with the statutes that Plaintiffs cite–which do not require HHS to approve and preserve every grant or proposal that in any way relates to minorities–but furthers the statutes' aims. HHS is supporting research on minority-related projects and did not adopt a policy to no longer support such projects. The statutes afford HHS discretion to decide which

grants among this category are worthy of approving and renewing; neither Plaintiffs nor the Court should displace this role that Congress has conferred on NIH.

Second, NIH has fully complied with the statutory directive to develop a Strategic Plan. Section 282(m)(1) directs NIH to develop a "National Institutes of Health Strategic Plan" every six years. 42 U.S.C. § 282(m)(1). NIH has done precisely that, and most recently published a Strategic Plan in compliance with the statute in 2021. NAT'L INSTS. OF HEALTH, NIH-WIDE STRATEGIC PLAN (2021). The Strategic Plan provides guidance. But nothing in the statute suggests that Congress intended the Strategic Plan to be a six-year straight jacket that prevents NIH from shifting priorities in the interim. Even Plaintiffs acknowledge that "new administrations are certainly permitted to shift priorities in NIH research." Doc No. 78 at 34. Contrary to Plaintiffs' suggestion, NIH has not "toss[ed] entire portions of the plan." Doc. 101 at 16. The issue, rather, is whether § 282(m)(1) forbids NIH from changing its priorities except during the six-year intervals when NIH develops a Strategic Plan. For good reason, the statute does not impose such a rigid and inflexible process on NIH. Nor should the Court.

**D. The termination and non-renewal of grants funding research on gender identity were lawful and reasoned.**

**1. The agency's termination was reasoned.**

The agency also provided a rational explanation that meets the arbitrary and capricious standard when it terminated grants related to gender identity:

> Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

AR_000110. As with the termination of DEI grants, Plaintiffs' policy disagreement with NIH's basis for termination does not render the basis arbitrary and capricious.

**2. Termination did not violate a statute.**

Plaintiffs have not identified any statute that directs NIH to support research into transgender issues. As such, no argument before the Court suggests that the termination of grants related to gender identity is contrary to a statute.

**E. The termination and non-renewal of grants funding research on vaccine hesitancy were lawful and reasoned.**

**1. The agency's termination was reasoned.**

NIH's decision to terminate grants researching why individuals are hesitant to be vaccinated and to terminate grants to explore ways to explore vaccine interest and commitment was sufficiently reasoned. In each termination for this reason, NIH stated:

> This award no longer effectuates agency priorities. It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.
> (NIH_GRANTS_001394)

In so stating, the agency made clear that it examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *See Beverly Enters-Mass.*, 174 F.3d at 23. The agency considered the evidence: the grant award. It considered the relevant factors: what that grant award sought to research versus the research that the agency wanted to prioritize. It found that the research funded by the grant award did not effectuate the agency's priorities. It therefore chose to terminate the grant award. And NIH articulated the connection between these things, explaining that NIH terminated the award to ensure taxpayer dollars were spent on research that NIH wanted to prioritize to benefit the American people. Plaintiffs wish for even more explanation and, ideally, to substitute their judgment for that of the agency. But this is

neither required nor allowed. The decision was sufficiently reasoned, not arbitrary and capricious.

### 2. Termination did not violate a statute.

Plaintiffs do not assert that any statute requires NIH to fund research on vaccine hesitancy nor that terminating research into vaccine hesitancy violates a statute.

## F. Terminating grants does not violate the Constitution.

### 1. No separation of powers concern exists here.

As an initial matter, the Court has already dismissed the separation-of-powers argument made in the related case, *APHA v. NIH*, -- F. Supp. 3d --, 1:25-cv-10787, 2025 WL 1548611 (D. Mass. May 30, 2025), which challenged identical agency action, *see APHA v. NIH*, 1:25-cv-10787, Doc No. 41 at 11, 12 17- 21. It should reject the separation of powers argument here for the same reasons. Although Defendants maintain that this case may only be properly brought in the Court of Federal Claims, now that this Court has asserted jurisdiction under the APA, "plaintiffs' concerns are better addressed by other counts of their complaint, that is, their APA claims." *APHU v. NIH*, 2025 WL 1548611 at *15 (internal citations omitted). As this Court already noted, it "must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim." *Id.* So, because the APA "appears to provide an avenue for complete relief," *id.*, the Court need not (and should not) entertain Plaintiffs' extraneous separation of powers argument. That view applies equally well here.

But if the Court chooses to consider separation-of-powers, Plaintiffs' argument fails for two additional independent reasons. First, the Executive has both express and implied authority to terminate individual grants. Second, Plaintiffs' separation-of-powers argument fundamentally misrepresents the impact of the grant terminations.

Congress has explicitly authorized NIH to take the challenged actions. "[W]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). Congress specifically charges the Secretary of HHS, and by extension the Director of NIH, with responsibility "for the overall direction of the National Institutes of Health and for the establishment and implementation of general polices respecting the management and operation of programs and activities within the National Institutes of Health." 42 U.S.C. § 282(b)(1); *see also* 42 U.S.C. § 282(b)(3). This broad grant of discretion permits the Director of NIH to set NIH's priorities and terminate grants unaligned with these priorities.

The Executive also has implicit authority to terminate grants because Congress authorized NIH to make grant awards and left the design, implementation, and administration of those grants to NIH's discretion, *see* 42 U.S.C. § 241(a)(3). Indeed, the appropriation for each institute of NIH is breathtakingly capacious. *See, e.g.*, H.R. 2882, 118th Cong., 138 Stat. 460, 656 (2024) (appropriating funds to the National Cancer Institute "[f]or carrying out section 301 and title IV of the PHS Act."). Congress knows how to write laws that constrain Executive Branch discretion, including laws that mandate inclusion of terms in agency contracts. *Am. Tel. and Tel. Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997), aff'd, 307 F.3d 1374 (Fed. Cir. 2002). Congress did not do so here. *See Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) (Congress' "silence is controlling"). Because Congress empowered the NIH to administer grants and did not cabin its discretion to terminate grants, no separation of powers concern exists.

***2. Ultra vires***

Plaintiffs *ultra vires* claims fail because the APA provides an alternative procedure for review, in addition to the claims' failure on the merits. To establish an *ultra vires* claim, Plaintiffs

must show that: "(1) equitable review is not expressly precluded, (2) there is no alternative procedure for review, and (3) the Executive plainly acts in excess of its delegated powers and contrary to law." *New Mexico v. Musk*, -- F. Supp. 3d --, 2025 WL 1502747, at *17 (D.D.C. May 27, 2025); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."). This Court has ruled that it can review Plaintiffs' claims under the APA. Doc. 105. As such, because there is an alternative procedure for review, the court should dismiss Plaintiffs' *ultra vires* claim.

The *ultra vires* claim should also be dismissed because Plaintiffs failed to show that NIH's actions were contrary to law. As explained above, terminating DEI grants does not violate any statutes because NIH preserved other minority-related grants; NIH complied with the requirement to enact a Strategic Plan, which does not preclude NIH from adjusting priorities in the interim; and repurposing appropriated funds to projects that are consistent with the new administration's priorities is not impoundment. For all these reasons, the court should dismiss the *ultra vires* claim.

**III. The Remedy in an APA Case Is Remand, Not an Injunction.**

Even if the Court were to rule for Plaintiffs on the merits, the proper remedy here is vacatur and remand, not an injunction. Upon determination that an agency has violated the APA, "the proper course, except in rare circumstances, is to remand to the agency." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). In contrast, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). As such, a permanent injunction in the APA context should not issue unless it would "have [a] meaningful practical effect independent of [the policy's] vacatur." *Id.* An injunction has that effect when the remedy of vacatur is insufficient to redress respondents' injury.

*Id.* at 165-66. Here, Plaintiffs can make no such showing. All the harms at issue in this part of Plaintiffs' case flow from termination of certain grants. *See, e.g.*, Am. Compl. ¶¶ 165, 168, 172, 188, 194, 196-207. If the Court vacates those terminations, all of Plaintiffs' harms dissipate. Each institution will have access to grant funds, resolving the financial harms Plaintiffs allege in their Amended Complaint. Thus, if the Court rules in Plaintiffs' favor, all they would be entitled to is remand for further consideration by the agency.

**CONCLUSION**

Defendants respectfully request the Court deny Plaintiffs' requested relief.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 9, 2025

*/s/ Thomas W. Ports, Jr.*

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1105
Email: thomas.ports@usdoj.gov

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658

Anuj.Khetarpal@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 9, 2025

*/s/ Thomas W. Ports, Jr.*
Thomas W. Ports, Jr.