**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

<em>Plaintiffs,</em>

v.

ROBERT F. KENNEDY, JR., *et al.*,

<em>Defendants.</em>

No. 1:25-cv-10814-WGY

**PLAINTIFFS' MEMORANDUM OF LAW ON FIRST-PHASE ISSUES**

# TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 2

    I.   NIH's Extramural Research .................................................................................. 2

        A.  Congressional Authorization and Funding ............................................... 3

        B.  The Application Review Process ............................................................... 4

        C.  The Impact of NIH's Extramural Research ............................................... 5

    II.  The Challenged Directives .................................................................................. 5

        A.  Adoption of the Challenged Directives .................................................... 5

            1.  The Secretarial Directive ................................................................... 6

            2.  The Lauer Memoranda ....................................................................... 7

            3.  The Memoli Directive ........................................................................ 8

            4.  Subsequent Directives ....................................................................... 9

        B.  Implementation of the Challenged Directives ........................................ 12

            1.  Defendants' Mass Termination of Already-Awarded Grants ............ 12

            2.  Impact of the Terminations............................................................... 15

    III.  Procedural History ............................................................................................ 17

Argument ..................................................................................................................... 18

    I.   The Challenged Directives are unlawful. .......................................................... 18

        A.  The Challenged Directives violate the Administrative Procedure Act. .................... 18

            1.  The Challenged Directives are arbitrary and capricious. .................... 18

                a.   The Challenged Directives' policy choices are unexplained. ..................... 19

                b.   Defendants fail to acknowledge or provide good reasons for changing NIH's prior positions on public-health questions......................... 20

                c.   Defendants have not grappled with NIH's strategic plan, a statutorily mandated document that remains in force. ................................................. 21

                d.   Defendants gave no thought to plaintiffs' reliance interests. ........................ 23

            2.  The Challenged Directives conflict with duly enacted statutes. ......................... 24

            3.  The Challenged Directives flout governing regulations. .................... 27

                a.   Section 200.340 does not govern NIH grant terminations......................... 27

                b.   Section 200.340 does not authorize defendants to terminate grants based on unilateral changes in "priorities." ................................................. 29

        B.  The Challenged Directives violate the Spending Clause and separation-of-

i

powers principles and constitute *ultra vires* action. ................................................. 30

II.    The terminations based on the Challenged Directives are unlawful. ............................. 31

III.   Plaintiffs are entitled to the full panoply of APA, injunctive, and declaratory
       relief. .................................................................................................................... 33

       A. The Court should vacate and set aside the Challenged Directives and
          resulting terminations under the APA. ...................................................... 33

       B. The Court should award injunctive relief that bars defendants from enforcing
          the Challenged Directives and reinstates plaintiffs' awards. .................................. 33

       C. The Court should declare that 2 C.F.R. §200.340 does not authorize NIH to
          terminate grants based on new agency priorities identified after the award. ........... 34

Conclusion .................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases:**

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
   No. 25-cv-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025)............................ 2, 31

*Amerijet Int'l, Inc. v. Pistole,*
   753 F.3d 1343 (D.C. Cir. 2014)...................................................................... 18, 19, 20

*Brown & Williamson Tobacco Corp. v. FDA,*
   153 F.3d 155 (4th Cir. 1998) .............................................................................. 26

*Citizens Awareness Network, Inc. v. Nuclear Regulatory Comm'n,*
   59 F.3d 284 (1st Cir. 1995) ............................................................................ 21, 24

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ......................................................................... 30, 31

*Colorado v. HHS,*
   No. 25-cv-121, 2025 WL 1426226 (D.R.I. May 16, 2025) .................................. 34

*Dep't of Homeland Security v. Regents of the Univ. of California,*
   140 S. Ct. 1891 (2020).......................................................................... 20, 23, 24

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006)........................................................................................ 2, 33

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016)............................................................................................ 23

*Env't Def. Fund v. FERC,*
   2 F.4th 953 (D.C. Cir. 2021) .............................................................................. 33

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009).................................................................................... 20, 23

*FDA v. Wages & White Lion Invs., LLC,*
   145 S. Ct. 898 (2025)................................................................................. 20, 23

*Health Ins. Ass'n of Am. v. Shalala,*
   23 F.3d 412 (D.C. Cir. 1994).............................................................................. 26

*In re Aiken County,*
   725 F.3d 255 (D.C. Cir. 2013)............................................................................ 31

*Kisor v. Wilkie,*
   588 U.S. 558 (2019).......................................................................................... 30

*Massachusetts v. Kennedy,*
   No. 25-cv-10814-WGY, 2025 WL 1371785, at *9 (D. Mass. May 12, 2025)....................... 17

*Massachusetts v. NIH,*
   No. 25-cv-10338-AK, 2025 WL 702163 (D. Mass. March 5, 2025)....................................... 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................... 18, 19, 22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) ............................................................................................ 28

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) .......................................................................... 29

*Ohio v. EPA*,
603 U.S. 279 (2024) ........................................................................................... 18

*Planned Parenthood of N.Y.C., Inc. v. HHS*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018) .............................................................. 34

*Pol'y & Rsch., LLC v. HHS*,
313 F. Supp. 3d 62 (D.D.C. 2018) .................................................................... 29

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007) ........................................................................... 24

*Roe v. Mayorkas*,
No. 22-cv-10808-ADB, 2024 WL 5198705 (D. Mass. Oct. 2, 2024) ............ 7, 8, 22

*Util. Air Reg. Grp. v. EPA*,
573 U.S. 302 (2014) ........................................................................................... 30

**Statutes:**

Administrative Procedure Act,
5 U.S.C.:

§706(2)(A) ........................................................................... 18, 19, 22, 24, 26, 27

§706(2)(C) .................................................................................. 18, 24, 26, 27

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459,
4861–65 ............................................................................................................... 3

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A,
§1101(a)(8), 139 Stat. 9, 11 ................................................................................ 4

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460,
656–58 .................................................................................................................. 4

Public Health Service Act (PHSA), Pub. L. No. 78-410, 58 Stat. 682 (1944),
42 U.S.C.:

§241(a)(3) ............................................................................................................ 3

§282(b) ................................................................................................................. 3

§282(h) ............................................................................................................... 25

§282(m)(1) ...................................................................................................... 3, 21

§282(m)(2)(A) .................................................................................................... 21

§282(m)(3) ........................................................................................................... 3

§282(m)(4) ........................................................................................ 21

§283o(b)(2). ..................................................................................... 25

§283d .............................................................................................. 26

§283p ...................................................................................... 3, 26, 33

§284(b) ............................................................................................. 3

§284(b)(2) .......................................................................................... 4

§284(b)(2)(B) ...................................................................................... 4

§284(b)(3) .......................................................................................... 4

§284a(a)(3)(A)(ii) ................................................................................ 4

§285a-6 ............................................................................................ 25

§285b-7a(c)(1) ................................................................................... 25

§285f-5(a) ........................................................................................ 26

§285t(a) ........................................................................................... 25

§285t(c)(2)–(3) .................................................................................. 25

§287d(e). ......................................................................................... 25

§289a(a) ............................................................................................ 4

§300u-6(g)(1)–(2) .............................................................................. 25

**Rules:**

Fed. R. Civ. P. 65(a)(2) ...................................................................... 17

**Regulations:**

2 C.F.R.:

§1.105(b) .................................................................................... 27, 29

§200.340 ............................................................... 27, 28, 29, 30 34, 35

45 C.F.R. §75.372 ............................................................................. 28

78 Fed. Reg. 78,590 (Dec. 26, 2013) .................................................... 28

79 Fed. Reg. 75,871 (Dec. 19, 2014) .................................................... 28

81 Fed. Reg. 3004 (Jan. 20, 2016) ....................................................... 28

85 Fed. Reg. 49,506 (Aug. 13, 2020) .............................................. 28, 30

85 Fed. Reg. 72,899 (Nov. 16, 2020) .................................................... 28

89 Fed. Reg. 80,055 (Oct. 2, 2024) ................................................. 27, 28

**Constitutional Provisions:**

U.S. Const. art. I, §1 ........................................................................ 30

U.S. Const. art. I, §8, cl. 1 ................................................................. 30

U.S. Const. art. I, §9, cl. 7 ................................................................................... 30

U.S. Const. art. II, §3 ........................................................................................... 30

**Agency Documents:**

NIH, *NIH-Wide Strategic Plan, Fiscal Years 2020–2025* (2020), https://bit.ly/NIHSP2021
(Strategic Plan) ............................................................................................ 3, 21, 22

**Online Sources:**

Cong. Rsch. Serv., *National Institutes of Health Funding: FY1996-FY2025*
(June 25, 2024), https://www.congress.gov/crs-product/R43341 ............................................ 4

NIH Data Book, *Research Project Grants: Competing Applications, Awards, and Success Rates*
(last updated Jan. 2025), https://report.nih.gov/nihdatabook/report/20 ................................... 5

United for Med. Rsch., *NIH's Role in Sustaining the U.S. Economy*
(March 2025), https://bit.ly/3Xz6Wry ........................................................................ 5

Univ. of Cal., *National Institutes of Health and University of California Research
Partnership* (Sept. 2024), https://bit.ly/NIH-UC ............................................................ 5

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| Award Revision Guidance | Email from M. Bulls to Chief GMOs re: Award Revision Guidance etc. (March 13, 2025) [AR 1957–1968] |
| Challenged Directives | Award Revision Guidance, Secretarial Directive, Lauer Memorandum, Supplemental Lauer Memorandum, Memoli Directive, Priorities Directive, and Revised Priorities Directives, collectively |
| DEI | diversity, equity, and inclusion |
| DEIA | diversity, equity, inclusion, and accessibility |
| DOGE | Department of Government Efficiency |
| GPS | NIH Grants Policy Statement |
| HHS | Department of Health and Human Services |
| ICs | institutes and centers of NIH |
| Lauer Memorandum | Mem. from M. Lauer to IC CGMOs re: NIH Review of Agency Priorities Based on the New Administration's Goals (Feb. 12, 2025) [AR 9] |
| Memoli Directive | Directive on NIH Priorities re: Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards (Feb. 21, 2025) [AR 1702–1703, 2930–2931, 3821–3822] |
| NIH | National Institutes of Health |
| NOFO | notice of funding opportunity |
| PHSA | Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944) (codified, as amended, at 42 U.S.C. §201 *et seq.*) |
| Priorities Directive | Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025 [AR 2135–2172, 3453–3461] |
| Revised Priorities Directives | Revised versions of the Priorities Directive dated March 25 [AR 3216–3230, 3351–3379, 3685–3700], May 7 [AR 3547–3581], May 15 [AR 3516–3546], and undated [AR 3231–3350] |
| Secretarial Directive | Secretarial Directive on DEI-Related Funding (Feb. 10, 2025) [AR 4–5] |
| Strategic Plan | NIH-Wide Strategic Plan, Fiscal Years 2021–2025 (2021), https://bit.ly/NIHSP2021 |

Supplemental Lauer Memorandum.....Mem. from M. Lauer to IC CGMOs re: Supplemental
Guidance to Memo (Feb. 13, 2025) [AR 16]

## INTRODUCTION

Plaintiffs brought this lawsuit to secure prompt relief for the unprecedented disruption of NIH's support for lifesaving research. Two categories of defendants' actions—their adoption of directives banning certain research topics and the resulting mass termination of already-awarded grants—are now ripe for decision. For the reasons that follow, those actions are unreasoned, unreasonable, and unlawful; they cannot withstand judicial scrutiny. The Court should vacate the Challenged Directives, set aside the terminations, and enjoin defendants' unlawful conduct.

The Challenged Directives do not come close to satisfying the APA. As plaintiffs explained at the preliminary-injunction stage, the directives conflict with governing statutes and regulations and are fundamentally arbitrary and capricious. The administrative record now confirms as much: the directives lack any hallmarks of reasoned decisionmaking. What is the basis for NIH's new "priorities"? The record does not say. How do defendants define the now-banned subject of "DEI"? The record provides no answer. What weight did defendants give to plaintiffs' reliance interests? Again, silence. In failing to grapple with these and other essential questions, the record shows that the Challenged Directives are not the product of thoughtful consideration or agency expertise—they are unreasoned decrees. The APA demands more.

The Challenged Directives also violate defendants' constitutional obligations and constitute *ultra vires* executive action. The authority to allocate Treasury dollars and to fix the statutory metes and bounds of an agency's powers lies with Congress; the Executive Branch, by contrast, is confined to faithfully executing Congress's legislative and appropriations decisions. Defendants have exceeded that circumscribed role. Their adoption and implementation of the Challenged Directives flouts Congress's clear instructions and arrogates the power of the purse by redirecting appropriated funds. For these reasons, too, the Challenged Directives cannot stand.

Because the Challenged Directives are unlawful, so are the terminations they prompted.

Since January, defendants have canceled hundreds of grants to plaintiffs' research institutions—exponentially more than NIH typically cancels in a *decade*. The sole basis for these terminations is each project's perceived connection with a now-blacklisted topic: as the Court has previously recounted, "[e]ach [termination] notice includes one of a few slightly different scripts stating that the grant 'no longer effectuates agency priorities.'" *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-cv-10787-WGY, 2025 WL 1548611, at *4 (D. Mass. May 30, 2025) (*APHA*). Defendants pulled this scripted language directly from the Challenged Directives, and the termination notices contain no additional substance. Just as the Court should vacate the Challenged Directives, so should it set aside the termination notices that flowed from them and restore plaintiffs' projects.

Plaintiffs are also entitled to prospective injunctive relief. A permanent injunction is warranted where, among other things, a plaintiff has suffered irreparable harm that money cannot redress. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). That is the case here. Plaintiffs have shown that defendants' conduct will cause an irretrievable loss of data and knowledge and irremediable programmatic harms—not to mention grave harm to patients and the American public. *See generally* ECF No. 77. Defendants have disputed none of that evidence as a factual matter. Accordingly, defendants have failed to rebut plaintiffs' right to equitable relief.

For all these reasons, plaintiffs should prevail on the first-phase issues.

## BACKGROUND

### I.    NIH's Extramural Research

As previously described,[1] NIH comprises 27 institutes and centers (ICs) that specialize in discrete diseases or body systems. NIH carries out much of its work by supporting extramural

---

[1] Plaintiffs appreciate the Court's "familiarity with the history of the [NIH], the types of grants it awards, and the grant process," *APHA*, 2025 WL 1548611, at *1, and so will not reiterate the overview of the agency provided in previous filings, *e.g.*, ECF No. 75, ¶¶33–73; ECF No. 78, at 2–7. Instead, this section focuses on a subset of background facts that are pertinent to the phase-one issues currently before the Court.

research—that is, research conducted at non-federal institutions like state and private universities.

## A.    Congressional Authorization and Funding

Congress authorized NIH to support extramural research in the Public Health Service Act (PHSA), Pub. L. No. 78-410, 58 Stat. 682 (1944) (codified, as amended, at 42 U.S.C. §201 *et seq.*). The PHSA instructs the Secretary of Health and Human Services—who oversees NIH—to promote research "relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments," including by offering "grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals."    42 U.S.C. §241(a)(3). The statute imposes similar mandates, and confers similar powers, on the NIH director and the directors of NIH's constituent ICs. *See id.* §§282(b), 284(b).

Congress has played a key role in shaping NIH's research priorities. In some instances, Congress has written a specific research priority directly into the PHSA. Under 42 U.S.C. §283p, for example, the NIH director is required to "encourage efforts to improve research related to the health of sexual and gender minority populations." In other instances, Congress has established a process by which NIH identifies its research priorities. For example, the PHSA requires that, every six years, NIH "develop and submit to the appropriate committees of Congress and post on [NIH's website] a coordinated strategy"—called the "National Institutes of Health Strategic Plan"—"to provide direction to [NIH's] biomedical research investments." *Id.* §282(m)(1). Each of NIH's ICs must similarly develop, with public input, such a strategic plan. *Id.* §282(m)(3). NIH formulated its most recent plan in 2019–2020 and adopted it in 2021. *See* NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021–2025* (2021), https://bit.ly/NIHSP2021 (Strategic Plan).

NIH derives the funds for its extramural grants from annual congressional appropriations. *E.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459, 4861–4865; *see also* ECF No. 75, ¶45 n. 15 (collecting prior acts). Congress has made this funding

a priority: from Fiscal Years 2017 to 2023, it consistently increased the budget for NIH and its ICs each successive year.  *See* Cong. Rsch. Serv., *National Institutes of Health Funding: FY1996–FY2025* (June 25, 2024), https://www.congress.gov/crs-product/R43341 (reflecting more than 20 years of stable, and generally increasing, NIH funding).  The agency's current funding is governed by a "continuing resolution" that maintains and carries forward the same funding levels established in the appropriations bill for Fiscal Year 2024.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, §1101(a)(8), 139 Stat. 9, 11; Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 656–659.

### B.    The Application Review Process

To secure a grant from NIH, extramural researchers submit to a rigorous application process.  The process begins with a public "notice of funding opportunity" (NOFO), in which NIH invites proposals for specific grants.  *See* ECF No. 77-11, §2.3.5, at I-51.  The resulting applications then undergo two layers of evaluation.  A "scientific review group" (or "study section") composed of experts in the relevant field reviews proposals for their scientific merit and likely impact on the field of research.  *See id.* §§2.4.1 to 2.4.2, at I-71–75; 42 U.S.C. §§284(b)(2)(B), 289a(a) (study-section recommendation required for final award).  Projects recommended by a study section then proceed to an "advisory council" that weighs programmatic issues, including how a proposed project aligns with an IC's strategic priorities.  *See* ECF No. 77-11, §2.4.3, at I-75–76; 42 U.S.C. §§284(b)(2), §284a(a)(3)(A)(ii) (advisory-council recommendation required for final award over $50,000).  From there, the advisory council's recommendations proceed to the IC's director, who makes the ultimate funding decision and issues a final "Notice of Award" to successful applicants. *See* ECF No. 77-11, §5, at IIA-59; 42 U.S.C. §284(b)(3).

As this multi-tiered process suggests, securing extramural research funding is a highly competitive endeavor.  According to NIH data, over the past 20 years, the "success rate" for

research projects—*i.e.*, the percentage of reviewed applications that receive some funding—has hovered around 20%.  *See* NIH Data Book, *Research Project Grants: Competing Applications, Awards, and Success Rates* (last updated Jan. 2025), https://report.nih.gov/nihdatabook/report/20.

### C.    The Impact of NIH's Extramural Research

Through its support for extramural research, NIH is the primary source of federal funding for biomedical research in the United States.  In Fiscal Year 2024 alone, NIH spent over $36 billion on extramural grants.  *See* United for Med. Rsch., *NIH's Role in Sustaining the U.S. Economy*, at 5 (March 2025), https://bit.ly/3Xz6Wry.  It is difficult to overstate the importance of these investments.  NIH's activities have spurred some of the marquee medical breakthroughs of the modern era, including the development of the rubella vaccine and the discovery of life-sustaining treatments for people living with HIV/AIDS.  *See generally* ECF No. 75, ¶2 & nn. 2–6.  These investments have also laid the groundwork for the future of biomedical research by funding the training of tomorrow's scientists.  ECF No. 77-37, ¶4; *see, e.g.*, ECF No. 77-12, ¶22.

Plaintiffs' research institutions have been crucial partners to NIH in these important endeavors.  *See* ECF Nos. 77-12 to 77-36, 77-45 to 77-60, 77-62 to 77-65.  Indeed, one of the plaintiff states' universities—the University of California—"is the largest single recipient" of NIH funding.  Univ. of Cal., *National Institutes of Health and University of California Research Partnership* (Sept. 2024), https://bit.ly/NIH-UC.

## II.    The Challenged Directives

### A.    Adoption of the Challenged Directives

In recent months, defendants have adopted a series of policies—the Challenged Directives—that blacklist certain categories of scientific inquiry at NIH.  These directives have their origins, at least in part, in several inauguration-day executive orders that declared the current Administration's opposition to "'diversity, equity, and inclusion' (DEI)"—a term the orders do not

define—and instructed federal agencies to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." ECF No. 77-1, §2(b)(i); *see also* ECF No. 77-3 (similarly disparaging so-called "illegal DEI and DEIA policies"); ECF No. 77-2, §3(e), (g) (directing federal agencies to "end the Federal funding of gender ideology"). Since January, the defendants have used the Challenged Directives to carry out and expand upon these executive orders, resulting in a list of now-prohibited research topics that NIH refuses to support.

### 1. The Secretarial Directive

The Acting Secretary of Health and Human Services issued the first pertinent Challenged Directive[2] on February 10. Entitled "Secretarial Directive on DEI-Related Funding" (Secretarial Directive), the memorandum contains several *ipse dixit* statements about DEI—a term that, like the executive orders, the directive does not define. *See* AR 4–5.[3] For example, the directive states, without elaboration, that "grants that support DEI" are "inconsistent with the [Department of Health and Human Services' (HHS's)] policy of improving the health and well-being of all Americans." AR 4. The directive also states—again without any support or explanation—that "grants [that support DEI] can cause serious programmatic failures." *Id.* Based on these statements, the Secretarial Directive instructed NIH personnel to "briefly pause" all payments for grants "related to DEI and similar programs" and advised that "grants may be terminated in accordance with federal law." *Id.*

The entire administrative record for the Secretarial Directive consists solely of the directive

---

[2] As defined in the complaint and preliminary-injunction papers, the "Challenged Directives" include a January 21 memorandum entitled "Immediate Pause on Issuing Documents and Public Communications." *See* ECF No. 75, ¶¶103, 118–122; ECF No. 78, at 8. Because that directive relates most directly to plaintiffs' unreasonable-delay claims, plaintiffs will address it in the second phase of the litigation. *See infra*, pp. 17–18 (discussing the bifurcation). As used in this memorandum, the term "Challenged Directives" refers to those directives discussed in this Part II-A.

[3] This brief cites the administrative record by Bates number, omitting, for readability, the "NIH_GRANTS_" tag and any leading zeroes. For example, the citation above corresponds to NIH_GRANTS_000004 through 000005.

itself.  ECF No. 118-1, ¶7 (certifying, under penalty of perjury, that the "complete administrative record" for the Secretarial Directive appears at AR 1–3).  In other words, defendants admit that they considered no other documents or materials in promulgating the Secretarial Directive or in reaching the conclusions therein.  *See Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2024 WL 5198705, at *7 (D. Mass. Oct. 2, 2024) (explaining that "[a]n administrative record must consist of all documents and materials directly or indirectly considered by the agency decision-makers," including "evidence contrary to the agency's position" (brackets and quotation marks omitted)).

## 2.    The Lauer Memoranda

NIH's Deputy Director for Extramural Research, Michael Lauer, followed the Secretarial Directive with a pair of back-to-back memoranda regarding research priorities on February 12 and 13.  The first, entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" (Lauer Memorandum), informed the agency's grants-management officers that "NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration." AR 9.  The second, styled "Supplemental Guidance" (Supplemental Lauer Memorandum), instructed grants-management officers at NIH's ICs to "to issue hard funding restrictions . . . on awards where the program promotes or takes part in diversity, equity, and inclusion ('DEI') initiatives." AR 16.  Lauer's memoranda did not supply a definition of "DEI."  *See* AR 9, 16.

The certified administrative record for the Lauer memoranda consists only of (1) the memoranda themselves, (2) the Secretarial Directive, and (3) scattered documents relating to the entry of a TRO in litigation regarding a January memorandum from the Office of Management and Budget imposing a governmentwide funding freeze.  AR 6–31.[4]  In other words, the only

---

[4] The certificate accompanying the administrative record states that the complete record for the Lauer Memoranda can be found at AR 32–3824. *See* ECF No. 118-1, ¶7.  However, defendants' counsel acknowledged in a June 6 email that the certificate identifies the wrong page range, and that defendants will be filing a corrected certificate.  The record for the Lauer Memoranda in fact consists of AR 6–32.

documents or evidence that Lauer considered in issuing his memoranda were the Secretarial Directive and the TRO documents. *Cf. Roe*, 2024 WL 5198705, at *7.

### 3.    The Memoli Directive

Defendants next issued a "Directive on NIH Priorities" signed by Acting NIH Director Matthew Memoli on February 21 (Memoli Directive).[5] AR 1702–1703; *see also* AR 2930–2931, 3821–3822 (duplicates).  Captioned "Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards," the Memoli Directive begins by declaring that "studies based on diversity, equity, and inclusion (DEI) and gender identity" are "low-value and off-mission." AR 1702.  From that unsupported statement—which, once again, fails to define the key terms ("DEI" and "gender identity")—the memorandum relies on the rote language that defendants have regurgitated in countless subsequent documents:

> Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

> Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs either.

*Id.*  The memorandum offers no support for these paragraphs or their conclusory assertions, apart from a bare assertion that Memoli "issue[d] th[e] directive based on [his] expertise and

---

[5] Plaintiffs' prior filings did not call out the Memoli Directive by name, because defendants did not make it public until they produced the administrative record.  Plaintiffs' filings make clear, however, that this once-secret directive is within the scope of the "Challenged Directives."  *See* ECF No. 75, ¶116–117 (explaining that "defendants have issued other directives, including nonpublic and undisclosed directives, that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to the blacklisted topics," and explaining that such "nonpublic and undisclosed directives" are included among the "Challenged Directives"); ECF No. 78, at 11 (similar).

experience." *Id.* And even this bare assertion is belied by the administrative record, which makes clear that this "[l]anguage [was] provided to NIH by HHS," AR 2164, and so did not derive from Memoli's expertise or experience. The administrative record also reveals that defendants did not consider any other documents or evidence—aside from the directives already discussed above— in promulgating the Memoli Directive. *See generally* AR 32–3824.

The second half of the Memoli Directive puts the memorandum's conclusory assertions into action, "direct[ing]" that NIH offices "conduct an internal review of all . . . existing awards" to "ensur[e]" that they "do not fund or support low-value and off-mission research activities or projects—including DEI and gender identity research activities and programs." AR 1703.[6] The directive goes on to instruct that grants "deemed inconsistent with NIH's mission" may be "subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements." *Id.*

### 4.    Subsequent Directives

Since March, several follow-on directives have operationalized the policies described above. These additional directives have instructed NIH officials to terminate awards, going so far as to provide the specific language and regulatory authorities they must use in doing so. The directives have also continued to expand the list of blacklisted research subjects.

NIH issued the first of these follow-on directives, entitled "Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025" (Priorities Directive) on or about March 4. *See* AR 2135–2172 (original version); AR 3453–3461 (corrected version of even date). The directive announces that "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)"—again, undefined—and instructs

---

[6] The version of the Memoli Directive produced at AR 1702–1703 contains unexplained digital highlighting. The metadata indicates that the markup was added on March 4 by a "Tanya Xu."

ICs to "completely excise all DEI activities." AR 3454. The directive also added a new topic—
"China"—to the blacklist. AR 3459. The directive provided NIH staff with specific language "to
use when terminating awards" related to those topics, including requiring NIH staff to inform grant
recipients that "NIH is taking this enforcement action in accordance with 2 C.F.R. §200.340 as
implemented in NIH GPS Section 8.5.2." AR 3458.

Next, on March 13, the director of NIH's Office of Policy for Extramural Research
Administration issued a directive entitled, in relevant part, "Award Revision Guidance." AR 1957–
1968. The Award Revision Guidance expanded the list of blacklisted topics yet again—now to
include "Vaccine Hesitancy"—and instructed the ICs on how to terminate grants related to the
blacklisted topics. AR 1957–1958, 1968. According to those instructions, termination letters were
to include the following language: "It is the policy of NIH not to prioritize [insert termination
category language]. Therefore, this project is terminated." AR 1957 (brackets in original).

Finally, NIH has updated the Priorities Directive on several occasions. *See* AR 3216–3230,
3351–3379, 3685–3700 (March 25); AR 3231–3350 (undated); AR 3547–3581 (May 7);
AR 3516–3546 (May 15). Among other things, these Revised Priorities Directives have (1) added
"COVID," "Climate Change," and "Influencing Public Opinion" as prohibited topics, (2) renamed
the "Transgender issues" category "Gender-Affirming Care," (3) developed responses to
"Frequently Asked Questions" for officials terminating grants, and (4) provided sample
termination letters. *See* AR 3536, 3541–3544, 3546. As of May 15, the full list of prohibited
topics—and the language to be used in terminating grants related to those topics—is as follows:

- China: "Bolstering Chinese universities does not enhance the American
people's quality of life or improve America's position in the world. On the
contrary, funding research in China contravenes American national-security
interests and hinders America's foreign-policy objectives."

- DEI: "Research programs based primarily on artificial and non-scientific

categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's [*sic*], which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs." . . .

- Vaccine Hesitancy: "It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria."

- COVID (to be used for HHS/NIH OD directed terminations only): "The end of the pandemic provides cause to terminate COVID-related grant funds.  These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary." . . .

- Climate Change: "Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change."

- Influencing Public Opinion: "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."

AR 3536.

The administrative record for the foregoing directives leaves several important questions unanswered.  For example, there is no explanation of the genesis of any new topics that were banned along the way, like "climate change" or "influencing public opinion."  The record is also silent on the basis for the directives' various conclusory assertions, such as the bald claim that research related to gender-affirming care "[is] often unscientific, ha[s] little identifiable return on

investment, and do[es] nothing to enhance the health of many Americans." AR 3536. And, as with the administrative record for the earlier directives, the record for the Priorities Directive, Revised Priorities Directives, and Award Revision Guidance reveals that defendants did not consider any documents or materials other than the preceding directives. *See* AR 32–3824.

**B.    Implementation of the Challenged Directives**

**1.    Defendants' Mass Termination of Already-Awarded Grants**

Defendants have implemented the Challenged Directives by terminating thousands of grants to researchers around the country in the middle of the academic year—including hundreds of grants to plaintiffs' public universities and other instrumentalities.

To effectuate this mass cancellation, defendants dispatched a tsunami of boilerplate termination letters to plaintiffs' institutions. Each letter follows the same template: it substitutes the appropriate addressee and grant number and plugs in the scripted basis for termination (selected from the bulleted list above), but otherwise copies the same rote text. For example, a March 21 letter to the University of Massachusetts (UMass) provides, in relevant part:

> Effective with the date of this letter, funding for Project Number 3R01MH134176-02S1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement, and 2 C.F.R. §200.340(a)(2). This letter constitutes a notice of termination.
>
> The 2024 Policy Statement applies to your project because NIH approved your grant on 8/16/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."
>
> The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards." According to the Policy Statement, "NIH may . . . terminate the grant in whole or in part as outlined in 2 CFR Part 200.340." At the time your grant was issued, 2 C.F.R. §200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."
>
> This award no longer effectuates agency priorities. Research programs based on

gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

AR 2426 (footnotes omitted). In some instances, NIH conveyed this text in standalone letters or emails, *see, e.g.*, AR 2426–2468, 2932–2933; in others, NIH folded the text into a "revised" notice of award, *see, e.g.*, AR 1781–1786, 1793–1798, 1884–1890. Either way, the text follows the same, predictable script, with no individualized discussion of the relevant project.[7]

The administrative record for these terminations reveals the haste with which defendants acted to cancel as many grants as quickly as possible. On February 28, just a week after the Memoli Directive, Acting Director Memoli sent a list of 16 grants to an NIH official—copying representatives of the so-called "Department of Government Efficiency" initiative (DOGE)— instructing the NIH official to "[p]lease terminate the grants on the attached spreadsheet by [close of business] today." AR 2469; *see* AR 2470–2478;[8] *see also* AR 2296 (listing five more grants). Later, on March 10, Memoli circulated another spreadsheet listing 43 more grants that "need to be terminated/taken down, preferably by [close of business] today if possible." AR 2352; *see*

---

[7] Defendants have excluded from the administrative record documents pertaining to "over 100" projects that plaintiffs previously identified as terminated. ECF No. 118-1, ¶4. Defendants have failed to produce an index identifying *which* projects these even are. Plaintiffs are filing a motion to complete the record contemporaneously with this memorandum. Defendants' omissions do not affect plaintiffs' right to relief: as described below, plaintiffs seek relief with respect to *all* terminations that rely on the Challenged Directives.

[8] Certain pages of the administrative record (*i.e.*, AR 1959–1967, 2046–2085, 2296–2302, 2311–2319, 2353–2397, 2470–2478, 2489–2561, 2564–2590, 3123–3191, 3463–3502, 3512–3515, 3588–3591, 3632–3635, 3807–3809) consist of spreadsheets and tables that, in the PDF version of the record produced on June 2, are difficult or impossible to read because their text is truncated or their rows and columns do not line up across pages. Defendants have provided native Microsoft Excel versions of these spreadsheets to plaintiffs, and plaintiffs will coordinate with defendants to ensure those legible, native versions are also provided to the Court.

AR 2353–2397.  Memoli's email predicted that it was "going to be a busy week," with "many actions this week similar to this." AR 2352.  He was right: just a few days later, Memoli circulated a spreadsheet with a whopping 530 grants "for termination," asking NIH officials to "complete these by [close of business] next Friday" and to provide a "daily evening update on how many were terminated." AR 3122; *see* AR 3123–3191; *see also* AR 3820 (identifying six more projects).  Memoli sent around a list of 120 more grants on March 24, stating that "[w]e have been asked to terminate the list." AR 2562; *see* AR 2564–2590; *see also* AR 2563 (adding four more on March 26).  And on March 28, Memoli closed out the month by circulating a color-coded spreadsheet identifying a few dozen other grants on the chopping block.  AR 2488; *see* AR 2489–2496.  Memoli explained that "the ones in red we should terminate," but "[t]he ones in yellow I would like to negotiate"—including one grant where, in Memoli's view, "it would be great if they just changed the name." AR 2488; *see* AR 2489–2496.

This opaque process was, unsurprisingly, susceptible to error.  One NIH program officer wrote to a University of California researcher to express her surprise that, although the program officer had "complete[d] a form . . . *confirming* that your project is aligned with FY 2025 goals and is not research focused on gender identity," defendants had nevertheless "erroneously" cancelled it.  AR 125; *see also id.* ("Had the people involved in this decision consulted my expert assessment as the scientist managing this award, they would have known it was aligned with FY2025 goals.").  The program officer went on to explain that "scientific program staff at [her IC] ha[d] no information about how awards [were] being identified for potential termination, what criteria [were] being used, or who [was] involved in making these decisions." *Id.*

The administrative record for the mass terminations likewise fails to shed any light on these important questions—*i.e.*, how awards were identified for termination, what criteria were used,

and who was involved in making the decisions. *See* ECF No. 118-1, ¶3 (certifying that defendants produced the complete record "for the grant terminations and non-renewals that plaintiffs challenge in this case"). For example, the record does not reveal how defendants selected specific grants for termination—including who compiled the spreadsheets that Acting Director Memoli circulated or what reasoning or criteria they used to populate the spreadsheets. Nor, given the boilerplate nature of the termination letters, does the record reveal how or why any specific program was deemed to relate to one of the blacklisted research topics.

### 2.    Impact of the Terminations

The projects that defendants have terminated supported a wide range of scientific inquiry for some of our nation's most underserved individuals. For example, in Massachusetts, terminated studies sought to understand and reduce the spread of HIV among certain at-risk populations. *See* AR 2605–2612, 2987–2993, 3025–3030. In California, defendants cancelled studies that sought to prevent suicide among children. *See, e.g.*, AR 2972–2979. In Maryland, cancelled projects included research combatting alcohol abuse among minors. *See, e.g.*, AR 1755–1760. And in Washington State, cancelled studies included a project aimed at preventing the spread of chlamydia. *See, e.g.*, AR 1924–1929. These are but a few examples: the areas of focus of the terminated studies run the gamut of health conditions, from Alzheimer's Disease (*e.g.*, AR 662–668) to cardiovascular conditions (*e.g.*, AR 2716–2722), and everything in between.

NIH has long recognized the value of these studies. Most obviously, NIH affirmed the projects' worth in approving the applications in the first place—after they had endured the crucible of rigorous study-section and advisory-council review. Even more remarkably, though, NIH officials extolled the value of certain projects *even as they were cancelling them*. For example, even as NIH terminated a grant for the "All of Us" research study—for which the University of California is a subawardee—NIH officials lauded participating researchers for their "extraordinary

achievements" and their "invaluable" and "indispensable" contributions to "one of the most ambitious biomedical research efforts in history." AR 293. Similarly, in terminating a program at the Oregon Health and Science University focused on bringing students into data science careers, NIH highlighted the "vital role" played by the program in "advancing [the agency's] goal of advancing . . . biomedical informatics and data science training." AR 3749.

The unprecedented spate of grant terminations has caused irreparable harm to plaintiffs and the public. First, defendants' conduct has resulted in the unrecoverable loss of scientific knowledge, *e.g.*, ECF No. 77-17, ¶51; ECF No. 77-20, ¶45; ECF No. 77-36, ¶20, including the termination of longitudinal studies whose data will be irretrievably invalidated, *e.g.*, ECF No. 77-25, ¶22; ECF No. 77-33, ¶18; ECF No. 77-65, ¶9, and animal studies whose subjects will need to be euthanized, *e.g.*, ECF No. 77-34, ¶46; ECF No. 77-59, ¶38. Second, the terminations have imposed severe operational burdens on plaintiffs' institutions. Because planning at research centers occurs years in advance, plaintiffs have been forced to lay off highly specialized personnel, *e.g.*, ECF No. 77-15, ¶41; ECF No. 77-31, ¶18; ECF No. 77-45, ¶10, cut student enrollment and rescind offers of admission, *e.g.*, ECF No. 77-45, ¶10; ECF No. 77-59, ¶31, and withdraw offers for accepted applicants, *e.g.*, ECF No. 77-45, ¶15. Third, the terminations have put patient health at risk by eliminating treatment programs mid-course. For example, defendants terminated a clinical trial at San Diego State University involving over 85 active participants with a history of suicide attempts and current suicidal ideation who, through the trial, were promised six months of clinical care and regular risk assessments. AR 2977; ECF No. 77-14, ¶¶78–80. The termination of the grant ceased the provision of essential care, with no leeway for SDSU to safely transition participants to alternative resources (if any exist). ECF No. 77-14, ¶¶80–81.

As a result of the terminations, NIH has also failed to award billions of dollars appropriated

by Congress.  The terminations have eliminated millions of dollars of obligated funding to plaintiffs' institutions alone (*i.e.*, not counting grants awarded to private universities or public institutions in states not part of this suit) with less than four months left in the fiscal year.

## III.  Procedural History

Plaintiffs brought this suit on April 4.  ECF No. 1.  The operative complaint asserts eight claims: Counts 1–3 seek review under the APA of the legality of the Challenged Directives and associated terminations; Counts 4–5 seek relief for defendants' constitutional violations; Count 6 challenges defendants' conduct as *ultra vires*; Count 7 seeks relief under the APA for defendants' delay in reviewing grant applications; and Count 8 seeks a declaration as to the meaning of a pertinent regulation.  ECF No. 75.  Plaintiffs[9] also sought a preliminary injunction.  ECF No. 76.

The Court rejected several threshold arguments that defendants raised in opposition to the motion for a preliminary injunction, including defendants' argument that the Court lacks subject-matter jurisdiction.  As the Court explained, "the 'essence' of this action is not one of contract," so "[t]he Tucker Act does not divest this Court of jurisdiction."  *Massachusetts v. Kennedy*, No. 25-cv-10814-WGY, 2025 WL 1371785, at *9 (D. Mass. May 12, 2025) (ECF No. 105).  The Court also held, on the preliminary record, that "[t]he APA claim here is not a prohibited programmatic challenge," that the Challenged Directives constitute final agency actions, and that plaintiffs are not seeking review of matters committed to agency discretion.  *Id.* at *10–11.

The Court then consolidated plaintiffs' motion for a preliminary injunction with a trial on the merits, *see* ECF No. 110, at 3:18–21; Fed. R. Civ. P. 65(a)(2), and bifurcated the proceedings. The first portion—the current phase—concerns the legality of the Challenged Directives and associated terminations, while the second phase will address plaintiffs' unreasonable-delay claims

---

[9] Plaintiff Colorado was not a party to the motion for a preliminary injunction but is a plaintiff in this action and joins in the request for resolution of these issues on the merits.

(*i.e.*, Count 7 and the portion of Counts 4–6 regarding unreasonable delay). *See* ECF No. 109; ECF No. 110, at 26:12–18. Defendants produced the administrative record for the phase-one issues on June 2, certifying that it was true, accurate, and complete. ECF No. 118-1. A hearing is set for June 16 in conjunction with a merits hearing in the related *APHA* case brought by private parties.

## ARGUMENT

### I.    The Challenged Directives are unlawful.

The Challenged Directives violate the APA and the Constitution and constitute *ultra vires* executive action. The Court should set them aside.

### A.    The Challenged Directives violate the Administrative Procedure Act.

Under the APA, a Court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "otherwise not in accordance with law." 5 U.S.C. §706(2)(A), (C). The Challenged Directives violate these blackletter rules of administrative law several times over.

#### 1.    The Challenged Directives are arbitrary and capricious.

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). "In reviewing an agency's action under that standard," courts ask whether the agency "has offered 'a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency obviously fails that test if it does not state the basis for its decision at all—*i.e.*, if it does not "explain why it chose to do what it did." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation marks omitted). An agency also violates the APA if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  Applying these principles, the Challenged Directives are unlawful in several distinct ways.

### a.    The Challenged Directives' policy choices are unexplained.

The Challenged Directives do not offer any meaningful explanation for defendants' policy choices—instead, they boil down to pure *ipse dixit*.  Take the directives' repeated assertion that studies that implicate DEI "provide low returns on investment" and "do not enhance health, lengthen life, or reduce illness." *E.g.*, AR 1702, 3536.  As an initial matter, defendants have never explained what DEI even *means* in this context.  *See supra*, pp. 6–9.  And even if defendants had supplied a definition, the directives do not back up their conclusory claims about DEI with any reasoning or evidence.  *See* AR 1702 (offering the unadorned statement that Memoli "issue[d] th[e] directive based on [his] expertise and experience"); *but see* AR 2148 (noting that the language of the Memoli Directive regarding DEI was "provided to NIH by HHS").  The same is true for the other blacklisted topics: the directives never explain why, for example, NIH considers research on gender to be "unscientific" or why it is now "the policy of NIH not to prioritize research activities that . . . explore ways to improve vaccine interest." AR 3536.  Instead, the directives simply insisting—without explanation—that those subjects are no longer "priorities" for the agency.  The law is clear: such "conclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet*, 753 F.3d at 1350 (quotation marks omitted).  In *Amerijet*, for example, the court deemed a TSA determination "arbitrary because it sa[id] nothing about 'why' TSA made the determination." *Id.* at 1351.  That essential question—why—is equally unanswered here.

The surrounding administrative record fails to supply the reasoned explanation that the directives themselves lack.  Indeed, it is hard to imagine how an administrative record could

provide *less* of a window into "why [the agency] chose to do what it did" than the record here.  *Id.* at 1350.  Although the issuance of the Challenged Directives is, without exaggeration, the single biggest NIH policy shift in generations, the administrative record consists of little more than the directives themselves (and orders issued *after* the directives).  In other words, the record concedes that defendants failed to consider *any* other materials or evidence when formulating the directives.  *See supra*, pp. 5–12.  That cavalier decisionmaking is arbitrary on its face.

   **b.** **Defendants fail to acknowledge or provide good reasons for changing NIH's prior positions on public-health questions.**

   Although defendants clearly broke from longstanding NIH policies in adopting the Challenged Directives, the directives themselves never grapple at all with the fact that the agency has changed its positions.  That fact matters: the APA "ordinarily demand[s] that [an agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).  Defendants have done neither.  The Challenged Directives do not acknowledge that the agency is departing from past precedent or provide any good reasons for the new policies.  All they offer is silence.

   Defendants argued at the preliminary-injunction stage that "a change in administration" is a "reasonable basis" for changed agency priorities.  ECF No. 95, at 24–26.  But a court cannot uphold an agency decision based on "*post hoc* rationalizations" from counsel.  *Dep't of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (*DHS*).  Even if a presidential transition can, in some circumstances, provide grounds for changed priorities, an agency must still acknowledge that it is changing positions, identify the transition as the reason for the change, and grapple with the implications of its new stance.  *Fox*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* . . . .");  *accord Citizens Awareness Network,*

*Inc. v. Nuclear Regulatory Comm'n*, 59 F.3d 284, 292 (1st Cir. 1995) (holding that an agency's "failure to provide any explanation for its seemingly irrational change in policy renders its new policy arbitrary and capricious"). The Challenged Directives fail to do so.

> **c.    Defendants have not grappled with NIH's strategic plan, a statutorily mandated document that remains in force.**

The Challenged Directives are also arbitrary and capricious because, in blacklisting certain topics, defendants failed to consider whether prohibiting those topics was consistent with NIH's operative strategic plan. As discussed above (at p. 3), Congress has commanded NIH to develop such a plan every six years. 42 U.S.C. §282(m)(1). In doing so, agency officials must consult with stakeholders and then promulgate a document announcing the agency's "strategic research priorities and objectives" and "near-, mid-, and long-term scientific needs. *Id.* §282(m)(2)(A), (m)(4). All of this must also be public: the agency must submit the final plan to Congress and post it on its website. *Id.* §282(m)(1).

NIH's most recent strategic plan—which was developed in 2019–2020 during the first Trump Administration and adopted in 2021—is flatly inconsistent with the "priorities" reflected in the Challenged Directives. According to that plan, NIH's priorities include "improving minority health and reducing health disparities" and promoting "the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)." Strategic Plan, *supra*, at 3, 8. The 2021 plan also stresses that "[u]nderserved groups"—including "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons"—"have distinct health needs and often experience disparities in health outcomes," and that including such persons "in all relevant research" is critical. *Id.* at 32. Similarly, to promote "[g]round-breaking, impactful biomedical and behavioral research," the plan highlights the need for "a diverse workforce, composed of people trained in multiple disciplines and from different backgrounds,

who can provide a richness of perspectives necessary to inspire new ideas."  *Id.* at 17.

The conflict between the Challenged Directives and the strategic plan is particularly stark when it comes to workforce development grants meant to increase diversity in the research workforce, also known as "diversity supplements."  *See* ECF No. 12-17, ¶41.  Eliminating those grants undermines the strategic plan's goal to "facilitate[] the transition of promising postdoctoral researchers from diverse backgrounds, including those from underrepresented groups, to academic faculty positions at institutions throughout the country."  Strategic Plan, *supra*, at 17.  Indeed, because NIH makes diversity supplement NOFOs available in parallel with non-diversity-supplement NOFOs, the cancellation of diversity supplements effectively punishes applicants who chose to apply to self-identify as coming from underrepresented backgrounds.  *See* ECF No. 12-27, ¶¶42–46; AR 2332–2334.

There is no dispute that defendants failed to even consider the 2021 strategic plan in promulgating the Challenged Directives: the plan does not appear in the administrative record, which must contain all "documents and materials" that defendants "directly or indirectly considered."  *Roe*, 2024 WL 5198705, at *7.  That failure is fatal: an agency's decision violates §706(2)(A) if it "entirely fail[s] to consider an important aspect of the problem" before it.  *State Farm*, 463 U.S. at 43.  The goals embodied in the 2021 strategic plan—a congressionally mandated, formally developed, and publicly promulgated plan that is still on the books—certainly qualify as "important" factors the agency must at least *consider*.

In opposing plaintiffs' preliminary-injunction motion, defendants argued that the strategic plan is "aspirational."  ECF No. 95, at 27.  That argument sidesteps the issue.  Even if defendants have some discretion to depart from the plan from time to time, they cannot adopt policies that contradict entire portions of the plan without explaining why—or even admitting that—they are

doing so.  Such conduct is the very definition of capricious decisionmaking.

### d.    Defendants gave no thought to plaintiffs' reliance interests.

Finally, the Challenged Directives are arbitrary and capricious—and must be set aside—because they completely ignore plaintiffs' reliance interests.  As described above, the Challenged Directives pulled the rug out from the plaintiff states, compelling the termination of a range of projects in the middle of the academic year with no advance warning.  *Supra*, pp. 15–16.  Yet the record contains no consideration of plaintiffs' reliance interests—not a single word was spared on the subject.

That is a stunning omission given the scope of the reliance interests at stake.  When NIH awards a grant, plaintiffs' public research institutions organize their affairs around the expectation that they will receive continuous funding for at least the full award year, if not the full project term.  *See, e.g.*, ECF No. 77-12, ¶22; ECF No. 77-49, ¶9.  They hire staff, extend offers of admission to students, purchase equipment, recruit study participants, enter contracts with vendors, and more.  *See, e.g.*, ECF No. 77-18, ¶¶45–52; ECF No. 77-27, ¶¶47–53; ECF No. 77-36, ¶¶19–24.  So when a project is shuttered midstream, knowledge is lost, patients are harmed, researchers are put out of work, and students lose their training opportunities.  *See supra*, p. 16; *see also* ECF No. 77-37, ¶¶11–12 ("NIH grants are typically awarded for an average of four years because the advancement of biomedical research benefits significantly from stable funding across a number of years.").

Defendants' failure to consider these issues is not only callous—it is unlawful.  The Supreme Court has repeatedly emphasized that "[w]hen an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."   *DHS*, 140 S. Ct. at 1913 (quotation marks omitted) ("It would be arbitrary and capricious to ignore such matters."); *see also Wages & White Lion*, 145 S. Ct. at 918; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222 (2016); *Fox*, 556 U.S. at 515.  In *DHS*, for

example, the Court held that an agency memorandum that rescinded prior immigration protections on the basis of new agency priorities violated the APA because it "failed to address whether there was legitimate reliance on the [old policy]." 140 S. Ct. at 1913 (quotation marks omitted). Defendants have committed the same fundamental error here.

At the preliminary-injunction stage, defendants argued that "NIH necessarily understood that it was terminating funding on which the grantee relied" but decided those interests "were outweighed." ECF No. 95, at 25. Again, though, the Court must judge the Challenged Directives by the agency's "contemporaneous explanations," not its attorneys' "*post hoc* rationalizations." *DHS*, 140 S. Ct. at 1909. Nothing in the Challenged Directives or the administrative record supporting it gives even a hint that defendants thought about reliance interests before issuing the directives. *See Massachusetts v. NIH*, No. 25-cv-10338, 2025 WL 702163, at *21 (D. Mass. March 5, 2025) (identifying failure to consider reliance interests in capping NIH reimbursement rates).

For all these reasons, the Challenged Directives are arbitrary and capricious.

## 2.    The Challenged Directives conflict with duly enacted statutes.

An agency action is "not in accordance with law" within the meaning of §706(2)(A) if it conflicts with "substantive statutory commands." *Citizens Awareness Network*, 59 F.3d at 291 (agency's actions were "inconsistent with the plain terms of [the agency's] enabling statute"); *see also Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1037 (9th Cir. 2007) (agency actions that "conflict[ed] with [the agency's] governing statutes and regulations" were "not in accordance with law"); 5 U.S.C. §706(2)(C) (agency action must be set aside if "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). That problem exists here: the Challenged Directives purport to restrict research on subjects that Congress has expressly required NIH to *support*.

This square statutory conflict is perhaps clearest with respect to the Challenged Directives'

blacklisting of DEI.  Defendants' conduct reveals that defendants are applying the directives not only to research *on* DEI, but also to studies that aim to enroll a diverse population or to examine how different diseases affect people of different genetic or ethnic backgrounds.  For example, defendants applied the Challenged Directives to cancel a University of California Study entitled "Genetic and Social Determinants of Pharmacological Health Outcomes in Ancestrally Diverse Populations," AR 1364, which examines whether people of different genetic or social backgrounds respond to pharmaceutical products differently, *see* UCSF, *Project Summary/Abstract*, https://pharm.ucsf.edu/oni-orisan/research/gasp.

This new policy on DEI is impossible to reconcile with provisions of the PHSA that expressly instruct NIH to promote diversity—including through the enrollment of diverse patient populations.  For example, PHSA requires NIH to increase "the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research," 42 U.S.C. §282(h); to conduct research related to women's health and reproductive health, *id.* §285a-6; and to conduct certain research involving "African-American women and other women who are members of racial or ethnic minority groups," *id.* §285b-7a(c)(1).  The PHSA also establishes the National Institute on Minority Health and Health Disparities, which supports research and training "with respect to minority health conditions and other populations with health disparities," *id.* §285t(a),[10] and the Office of Research on Women's Health, which aims to increase women's representation among NIH grantees, *id.* §287d(e) ; *see also id.* §283o(b)(2)  (instructing the NIH director to "develop, modify, or prioritize policies" to "enhance workforce diversity").

---

[10] The statutory term "minority health conditions" means conditions that are unique to, or more prevalent among, or treated differently in, or understudied with respect to "individuals who are members of" "racial and ethnic minority group[s]"—*i.e.*, "American Indians (including Alaska Natives, Eskimos, and Aleuts); Asian Americans; Native Hawaiians and other Pacific Islanders; Blacks; and Hispanics." 42 U.S.C. §§285t(c)(2)–(3), 300u-6(g)(1)–(2).

Such stark statutory conflicts exist for other blacklisted subjects, too. For example, the aspects of the Challenged Directives prohibiting research related to gender identity runs headlong into a provision instructing the NIH Director to "encourage efforts to improve research related to the health of sexual and gender minority populations." 42 U.S.C. §283p. The aspects of the Challenged Directives blacklisting research related to COVID cannot be squared with a statute mandating the NIH director to "advance the discovery and preclinical development of medical products for priority virus families and other viral pathogens with a significant potential to cause a pandemic." *Id.* §285f-5(a). And the aspects of the Challenged Directives eschewing any research on vaccine hesitancy are in conflict with PHSA provisions *promoting* vaccination. *See id.* §283d (instructing various ICs to support efforts to "develop affordable new and improved vaccines").

Finally, as discussed above, the duty of NIH and its ICs to formulate and publish strategic plans comes directly from the PHSA. *See supra*, p. 3. Thus, the agency's failure to grapple with the stated goals in its strategic plan in promulgating the challenged directives, in addition to constituting arbitrary and capricious agency action, *see supra*, pp. 21–23, also constitutes agency action not in accordance with law in violation of §§706(2)(A) and (C).

At the preliminary-injunction stage, defendants did not explain—nor can they explain—how the Challenged Directives' stances are consistent with these clear mandates from Congress. In declaring research related to these blacklisted topics off-limits, and in ignoring the congressionally mandated strategic plan, defendants have improperly "substitute[d] their policy judgments for those of Congress." *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000); *see Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (explaining that a court may not accept "the agency's policy judgments . . . if they conflict they policy judgments that undergird the statutory scheme"). The APA does not

allow an agency to thumb its nose at Congress in this way. *See* 5 U.S.C. §706(2)(A), (C).

### 3.    The Challenged Directives flout governing regulations.

Finally, the Challenged Directives are contrary to law—and therefore violate the APA, 5 U.S.C. §706(2)(A)—because conflict with controlling regulations. The directives instruct NIH officials to terminate grants under 2 C.F.R. §200.340, which contemplates termination of federal grants in certain circumstances if "an award no longer effectuates the program goals or agency priorities."[11] The Challenged Directives' invocation of that provision is misplaced for two reasons.

### a.    Section 200.340 does not govern NIH grant terminations.

As an initial matter, the Challenged Directives err in invoking 2 C.F.R. §200.340 because that regulation does not apply to (much less control) NIH grant terminations. Section 200.340 appears in subtitle A of 2 C.F.R.—a set of OMB regulations that, by its own terms, consists of nonbinding "guidance" designed to streamline procedures across agencies. *See* 2 C.F.R. §1.105(b) ("Publication of the OMB guidance in the CFR does not change its nature—it is guidance, not regulation."). The NIH grant-award process is instead governed by HHS's own implementing regulations in 45 C.F.R. *See* 89 Fed. Reg. 80,055, 80,055 (Oct. 2, 2024) ("[H]istorically, [HHS] has had its own set of implementing regulations . . . ."). HHS adopted these HHS-specific regulations "prior to OMB's initial streamlining efforts," *id.*, and has maintained them ever since.

Crucially, the HHS-specific regulations in title 45 have *never* allowed termination based on "agency priorities." In 2013, when OMB initially promulgated the predecessor to §200.340 (then codified at §200.339), the regulation contemplated only three grounds for an agency to terminate an award: (1) if the award recipient "fail[ed] to comply with the [award's] terms and

---

[11] In the 2020 version of §200.340, that clause appears in subsection (a)(2). In the 2024 version, it appears, as amended, in subsection (a)(4). The record refers at times to both versions, depending on when the relevant grant was awarded. The arguments in this section apply to both versions. For readability, this section refers to the version currently in force—*i.e.*, the 2024 version.

conditions," (2) "for cause," or (3) "with the consent" of the award recipient.  78 Fed. Reg. 78,590, 78,638 (Dec. 26, 2013).  In 2014, HHS codified a version of this nonbinding OMB provision in 45 C.F.R. §75.372.  *See* 79 Fed. Reg. 75,871, 75,919 (Dec. 19, 2014).  In doing so, HHS maintained the same three reasons for termination—*i.e.*, it did not adopt an additional ground for failure to effectuate "agency priorities."  *See id.*; 81 Fed. Reg. 3004, 3017 (Jan. 20, 2016) (subsequent revision to §75.372 maintaining these same basic grounds).

Indeed, when later presented with an opportunity to modify §75.372 to include a failure to effectuate "agency priorities" as a possible basis for terminating grants, HHS declined to do so.  In 2020, OMB amended §200.340 to remove the clause allowing termination "for cause," replacing it with the language on which defendants now rely, which permits termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 85 Fed. Reg. 49,506, 49,507, 49,559 (Aug. 13, 2020).  Importantly, however, when HHS amended §75.372 in November 2020, it did *not* codify these OMB changes into its own termination provision.  Instead, §75.372 continued to allow—and to this day still allows—termination only under the three limited circumstances for noncompliance or for cause or with consent.  85 Fed. Reg. 72,899, 72,911, 72,903 (Nov. 16, 2020).  Defendants' current position—that §200.340 allows them to enforce the Challenged Directives by terminating existing grants—directly conflicts with the above regulatory text and historical backdrop.  If defendants could terminate an award directly under §200.340, then §75.372 would be superfluous—despite the canon against surplusage.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 668–69 (2007).[12]

Defendants have previously argued that §200.340 applies here because NIH incorporated

---

[12] HHS has since published an interim final rule that will "fully adopt 2 C.F.R. part 200" effective October 1, 2025, 89 Fed. Reg. 80,055, 80,056 (Oct. 2, 2024), thereby incorporating "agency priorities" as a ground for termination in HHS's own regulations.  But that just further proves the point: if §200.340 already provided HHS all the authority it needed to terminate based on "agency priorities," these amendments would be superfluous.

that provision into its agreements with award recipients by way of a document called the Grants Policy Statement (GPS). *See* ECF No. 95, at 22. But the GPS "does not, and cannot, trump the agency's formal regulations." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 82 (D.D.C. 2018). And the question here is whether the Challenged Directives comply with the agency's controlling regulation. Defendants cannot show that they do. *See Nat'l Env't Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1003 (D.C. Cir. 2014) (setting aside an EPA "directive" that was "plainly contrary to EPA's own regulations").

### b. Section 200.340 does not authorize defendants to terminate grants based on unilateral changes in "priorities."

Even if §200.340 did apply to NIH grants, it does not independently authorize the agency to terminate grants based on its own unilateral, post-award changes to its "priorities." By its plain terms, §200.340 says only that termination is possible "if an award *no longer effectuates* the program goals or agency priorities." 2 C.F.R. §200.340(a)(4) (emphasis added). The most natural reading of that language, in context, is that it only covers situations where a project can no longer effectuate agency priorities in place at the time of the grant—*e.g.*, if new evidence shows that the project is ineffective. *See* ECF No. 86, at 12–13; ECF No. 101-1, ¶¶16-17. Defendants' contrary interpretation—that "agency priorities" includes priorities newly identified *after* the notice of award—would produce an absurd result: allowing NIH to terminate an award at any time by simply changing its mind. It would also render superfluous a whole host of OMB and HHS regulations dealing with grant terminations. That is not a realistic construction: there is no reason to think that OMB buried absolute authority to cancel a project at any time for any reason in a minor subclause of a nonbinding provision that OMB itself considers to be "guidance, not regulation," 2 C.F.R. §1.105(b). *See Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019) ("[Agencies], no less than Congress, do not hide elephants in mouseholes." (quotation marks omitted)).

Even if the text and structure of OMB's guidance permitted defendants' interpretation, moreover, history forecloses it. When OMB first proposed the language on which defendants now rely, commenters objected the language "w[ould] provide Federal agencies too much leverage to arbitrarily terminate awards." 85 Fed. Reg. at 49,509. OMB disagreed: "as written," the agency explained, the language did not allow agencies "to terminate grants arbitrarily" and was designed to ensure that agencies "prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49,507, 49,509. Defendants' current interpretation of §200.340(a)(4) is impossible to square with those responses. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (courts should not defer to an agency's new interpretation of a regulation if it creates unfair surprise or upsets reliance interests).

In sum, the Court should also set the Challenged Directives aside to the extent they invoke §200.340 to call for the termination of already-awarded grants.

**B.    The Challenged Directives violate the Spending Clause and separation-of-powers principles and constitute *ultra vires* action.**

The Constitution assigns to Congress the power to legislate, including the exclusive power of the purse. *See generally* U.S. Const. art. I, §1 (Vesting Clause); *id.* art. I, §8, cl. 1 (Spending Clause); *id.* art. I, §9, cl. 7 (Appropriations Clause). The Executive Branch, by contrast, must "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (explaining that the Constitution "grants the power of the purse to Congress, not the President").

In adopting and implementing the Challenged Directives, defendants unconstitutionally arrogated Congress's spending power. Congress has allocated certain sums of money to NIH so that the agency could use those sums during the fiscal year. *See supra*, pp. 3–4. In adopting the

Challenged Directives, defendants have interrupted the flow of funding to existing projects and precluded the prompt awarding of new grants—with a dwindling opportunity to reallocate funds before they are no longer available at the end of the fiscal year.  The upshot: a substantial portion of Congress's appropriation will remain unspent, contrary to the purpose for which the funds were appropriated and Congress's longstanding and well-established framework of NIH funding.

That is unlawful.  If the President and his appointees "want[] to spend less than the full amount appropriated by Congress," they "must propose the rescission of funds [under the Impoundment Control Act (ICA)], and Congress then may decide whether to approve a rescission bill"; the Executive Branch, in other words, "does not have unilateral authority to refuse to spend the funds."  *In re Aiken County*, 725 F.3d 255, 261 n. 1 (D.C. Cir. 2013); *see San Francisco*, 897 F.3d at 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").  Defendants have not invoked the ICA's procedures; as a result, they have overstepped the Executive's discretionary authority to set priorities and usurped congressional spending power.

For largely the same reasons, as well as reasons discussed above, the Challenged Directives also violate the Constitution's separation of powers and constitute *ultra vires* executive action.  Defendants lacked statutory or constitutional authority to issue or implement the Challenged Directives and because defendants' actions are contrary to statutory requirements and congressional appropriations.  For all these reasons, the directives cannot stand.

## II.    The terminations based on the Challenged Directives are unlawful.

Because the Challenged Directives are unlawful, so too are the resulting grant terminations.  As this Court has noted, defendants deployed "nearly identical" termination letters that adhere to "one of a few slightly different scripts."  *APHA*, 2025 WL 1548611, at *4.  Those scripts come directly from the Challenged Directives, with no additional explanation for why plaintiffs' grants

were terminated.  *Compare* AR 1702 (stock language in the Memoli Directive about "[r]esearch programs based primarily on artificial and non-scientific categories"), *with, e.g.*, AR 1785 (termination copying that language).  Indeed, various directives expressly instructed NIH officials to use that exact language in terminating awards.  *See supra*, pp. 9–12.  And the administrative record, which defendants have certified as complete, reveals no basis for the terminations other than the policies in the Challenged Directives.  *See generally* AR 32–3824.

A review of individual termination decisions confirms that the terminations embody all the errors found in the Challenged Directives—and so must be set aside.  For example, defendants terminated a grant that funded the University of California's Building Interdisciplinary Research Careers in Women's Health Program, which supports pathbreaking research on women's health issues, including cancers, metabolism and bone health, mental health and cognition, and reproductive health across the lifespan.  AR 190–224.  The letter terminating the grant lifted verbatim the termination language for "gender identity" directly from a Challenged Directive.  *See* AR 188 (adopting the language found at AR 3696).  As discussed above, however, defendants did not explain how the project got on the list of grants to be terminated (*see* AR 3122, 3143) or what criteria were used to put it there.  They did not explain the basis for their assertion that the project is a "[r]esearch program[] based on gender identity," or that such programs "are often unscientific," "have little identifiable return on investment," "do nothing to enhance the health of many Americans," or "ignore, rather than seriously examine, biological realities."  AR 188.  Nor did they explain how their termination was consistent with NIH's prior positions or its strategic plan, or grapple with the University's reliance interests.  Moreover, even if defendants' assertions and characterizations were valid, as discussed above, the termination is still impossible to square with the portions of the PHSA that "encourage efforts to improve research related to the health of sexual

and gender minority populations." 42 U.S.C. §283p. Finally, the termination letter's invocation of §200.340 rests on the erroneous understanding discussed above.

This example—reflective of countless examples in the record—confirms that vacating the Challenged Directives necessarily requires vacating terminations that flowed from them.

### III.    Plaintiffs are entitled to the full panoply of APA, injunctive, and declaratory relief.

#### A.    The Court should vacate and set aside the Challenged Directives and resulting terminations under the APA.

Under §706(2), a court must "hold unlawful and set aside agency action" an agency action that is arbitrary and capricious, contrary to law, or in excess of statutory jurisdiction. Because the Challenged Directives and resulting terminations violate those standards, for the reasons discussed above, it follows that they should be vacated. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 960–961 (D.C. Cir. 2021) (explaining that "vacatur is the normal remedy" under the APA, and vacating approval of a pipeline that had since entered operation (brackets and quotation marks omitted)).

#### B.    The Court should award injunctive relief that bars defendants from enforcing the Challenged Directives and reinstates plaintiffs' awards.

Plaintiffs are also entitled to equitable relief. To obtain a permanent injunction, a plaintiff must demonstrate that it has suffered irreparable harm for which money damages cannot compensate, and that the equities and public interest favor an injunction. *See eBay Inc.*, 547 U.S. at 391. Those standards are satisfied here.

First, plaintiffs have demonstrated that defendants' adoption and enforcement of the Challenged Directives have caused—and will continue to cause—several forms of irremediable harm. The directives are causing irreparable programmatic harms, including the discontinuation of longitudinal studies, *e.g.*, ECF No. 77-25, ¶22, and the euthanization of animal subjects used in testing, *e.g.*, ECF No. 77-34, ¶46. They are causing irreversible harm to the public health and patients living in plaintiffs' states, including patients predisposed to aggressive cancers, *e.g.*, ECF

No. 77-17, ¶44, patients suffering from long-term effects of COVID-19, *e.g.*, *id.* ¶52, and patients with a history of suicide attempts or suicidal ideation, *e.g.*, ECF No. 77-14, ¶79.  And they are inflicting irremediable harm on a pipeline of highly specialized and trained personnel, including researchers and students who are the victims of layoffs, *e.g.*, ECF No. 77-15, ¶41, reduced graduate enrollment, *e.g.*, ECF No. 77-45, ¶10, rescinded offers of admission, *e.g.*, ECF No. 77-59, ¶31, and withdrawn funding offers, *e.g.*, ECF No. 77-45, ¶15.  Defendants have disputed none of these irreparable harms as a factual matter.  And, crucially, these sweeping harms are not remediable by an award of money damages.  *See Massachusetts*, 2025 WL 702163, at *28–31 (finding harms along these lines, from a mere *reduction* in NIH funding, to be irreparable).

Second, the equities and public interest favor permanent injunctive relief.  "States have a substantial interest in the effective operation of their public health systems."  *Colorado v. HHS*, No. 25-cv-121, 2025 WL 1426226, at *23–24 (D.R.I. May 16, 2025).  And "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (citation omitted); *see supra*, pp. 18–32 (demonstrating that Challenged Directives and resultant terminations violate the APA and Constitution).  There is thus a strong public interest in permanently restraining defendants' actions.

Accordingly, and as set forth more fully in the accompanying proposed order, the Court should enjoin defendants from explicitly or implicitly implementing the Challenged Directives.

### C.    The Court should declare that 2 C.F.R. §200.340 does not authorize NIH to terminate grants based on new agency priorities identified after the award.

Finally, the Court should award the declaratory relief that plaintiffs seek in Count 8 of their complaint during this first phase of the litigation.  In adopting the Challenged Directives and terminating plaintiffs' grants, defendants invoked 2 C.F.R. §200.340, which contemplates termination of federal grants in certain circumstances if "an award no longer effectuates the

program goals or agency priorities."  Plaintiffs seek a declaration that §200.340(a)(2) (2020) and §200.340(a)(4) (2024) do not, of their own force, authorize NIH to terminate grants on the grounds of newly identified "agency priorities" that post-date the award of the grant.  *See supra*, note 11 (discussing the relation between the 2020 and 2024 versions).

For the reasons explained above, defendants are misinterpreting §200.340 in two significant respects.  First, that nonbinding guidance provision does not apply to NIH grant terminations at all; instead, NIH grant terminations are currently governed by HHS-specific regulations—a fact only underscored by HHS's recent decision to adopt §200.340 *prospectively*, starting in October of this year.  *See supra*, pp. 27–29.  Second, and in any event, §200.340 does not allow terminations based on newfound agency priorities: the most natural reading of this provision, in context, is that it covers a failure to effectuate priorities that existed at the time of the grant.  *See supra*, pp. 29–30.  Defendants' apparent interpretation—that "agency priorities" somehow encompass priorities identified after the grant is awarded—conflicts with usual interpretive principles and the regulation's history.  *See id.*

Because defendants invoked §200.340 in terminating grants from plaintiffs' institutions, an actual and substantial controversy exists between plaintiffs and defendants as to whether this provision permits NIH to terminate grants based on "agency priorities" identified post-award.  Accordingly, plaintiffs respectfully seek a declaration from the Court as to the meaning of §200.340(a)(2) (2020) and §200.340(a)(4) (2024).

## CONCLUSION

The Court should vacate the Challenged Directives and resulting project terminations, enter a declaration as to the meaning of §200.340, and permanently enjoin defendants' unlawful conduct.

June 9, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

 /s/ Gerard J. Cedrone
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Allyson Slater (BBO No. 704545)
  *Director, Reproductive Justice Unit*
Rachel M. Brown (BBO No. 667369)
Vanessa A. Arslanian (BBO No. 688099)
Phoebe M. Lockhart (BBO No. 709411)
Chris Pappavaselio (BBO No. 713519)
  *Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
  *Commonwealth of Massachusetts*

**ROB BONTA**
  *Attorney General of California*

 /s/ Emilio Varanini
Neli Palma
  *Senior Assistant Attorney General*
Emilio Varanini*
Kathleen Boergers*
  *Supervising Deputy Attorneys General*
Nimrod Pitsker Elias*
Daniel D. Ambar*
Ketakee R. Kane*
Sophia TonNu*
Hilary Chan*
  *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for the State of California*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

 /s/ James C. Luh
Michael Drezner*
James C. Luh*
  *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

 /s/ Andrew Hughes
Andrew Hughes*
Tyler Roberts*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for the State of Washington*

**KRISTIN K. MAYES**
 *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*


**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**KEITH ELLISON**
 *Attorney General of Minnesota*

 /s/ *Pete Farrell*
Peter J. Farrell*
  *Deputy Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
peter.farrell@ag.state.mn.us

*Counsel for the State of Minnesota*

**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ *Lauren Peach*
Shannon Stevenson*
  *Solicitor General*
Lauren Peach*
  *First Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
lauren.peach@coag.gov

*Counsel for the State of Colorado*


**ANNE E. LOPEZ**
 *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON D. FORD**
 *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

37

**MATTHEW J. PLATKIN**
  *Attorney General of New Jersey*

 /s/ *Nancy Trasande*
Nancy Trasande*
Bryce Hurst*
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 954-2368
nancy.trasande@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
  *Attorney General of New York*

 /s/ *Rabia Muqaddam*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

**RAÚL TORREZ**
  *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete*
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
  *Attorney General of Oregon*

 /s/ *Christina L. Beatty-Walters*
Christina L. Beatty-Walters*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
tina.beattywalters@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
  *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl*
  *Assistant Attorney General*
17 West Main Street
P.O. Box 7857
Madison, WI 53707
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

* admitted *pro hac vice*