Multiple responses to the notice will not be accepted. If an applicant fails to identify proprietary information at the time of submission as instructed in the application guide, a significant substantive justification will be required to withhold the information if requested under FOIA. The PD/PI will be given five (5) working days to identify potentially patentable or commercially valuable information that the PD/PI believes should not be disclosed. Any such submission must be specific as to the nature and type of commercial harm that will result if the requested information is released. Submissions that merely state in general terms that the grant application or portions should not be released will not be honored. If the PD/PI does not respond within that time period, the grant will be prepared for release in accordance with applicable FOIA policies and released to the requester. If the PD/PI does identify commercial or proprietary information an NIH official will review that response. After NIH consideration of the response, the PD/PI and recipient will be informed if NIH does not agree with the PD/PI's position. If a document contains both disclosable and non-disclosable information, the non-disclosable information will be redacted and the balance of the document will be disclosed.

The HHS regulations implementing FOIA provide that only the NIH FOI Officer may deny requests for information. Requests for information, the release of which is believed to be exempt under FOIA, are referred to the NIH FOI Officer along with written documentation of the rationale for nondisclosure. If the NIH FOI Officer determines that the requested information is exempt from release under FOIA, the requester may appeal that determination to the Deputy Assistant Secretary for Public Affairs (Media), HHS. Additional information on the FOIA process is available at the NIH FOI Office Web site.

### 2.3.11.2.3 Release of Research Data

NIH handles requests for the release of research data by certain types of recipients as FOIA requests. The term "research data" is defined as the recorded factual material commonly accepted in the scientific community as necessary to validate research findings. It does not include preliminary analyses; drafts of scientific papers; plans for future research; peer reviews; communications with colleagues; physical objects (e.g., laboratory samples, audio or video tapes); trade secrets; commercial information; materials necessary to be held confidential by a researcher until publication in a peer-reviewed journal; information that is protected under the law (e.g., intellectual property); personnel and medical files and similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy; or information that could be used to identify a particular person in a research study.

As required by 2 CFR Part 200.315, recipients that are institutions of higher education, hospitals, or non-profit organizations must release research data first produced in a project supported in whole or in part with Federal funds that are cited publicly and officially by a Federal agency in support of an action that has the force and effect of law (i.e., regulations and administrative orders). If the data are publicly available, NIH directs the requester to the public source. Otherwise, the IC FOI coordinator handles the request, consulting with the affected recipient and the PD/PI. This requirement also provides for assessment of a reasonable fee to cover recipient costs and (separately) the NIH costs of responding.

This requirement to release research data does not apply to for-profit organizations or to research data produced by State or local governments. However, if a State or local governmental recipient contracts with an IHE, hospital, or non-profit organization, and the contract results in covered research data, those data are subject to the disclosure requirement.

Additional information is available on the NIH scientific data sharing website. Additional information is available on the Data Management & Sharing Policy Overview web page. (Also see Administrative Requirements—Availability of Research Results: Publications, Intellectual Property Rights, and Sharing Research Resources.)

## 2.3.12 Protecting Sensitive Data and Information Used in Research

Recipients of NIH funds have a vital responsibility to protect sensitive and confidential data as part of proper stewardship of federally funded research, and take all reasonable and appropriate actions to prevent the inadvertent disclosure, release or loss of sensitive personal information. NIH advises that personally identifiable, sensitive, and confidential information about NIH-supported research or research participants not be housed on portable electronic devices. If portable electronic devices must be used, they should be encrypted to safeguard data and information. These devices include laptops, tablets, mobile devices, CDs, disc drives, flash drives, etc. Researchers and institutions also should limit access to personally identifiable information through proper access controls such as password protection and other means. Research data should be transmitted only when the security of the recipient's systems is known and is satisfactory to the transmitter. See also Public Policy Requirements and Objectives—Federal Information Security Management Act.

# 2.4 THE PEER REVIEW PROCESS

NIH policy is intended to ensure that applications for funding submitted to NIH are evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias. Competing applications for NIH grants and cooperative agreements, including renewals and revisions, are subject to peer review as required by sections 406 and 492 of the PHS Act, as amended by the NIH Reform Act of 2006 and 21st Century Cures Act. The peer review system used by NIH, often referred to as the "dual review system," is based on two sequential levels of review for each application—initial review by an IRG or SRG, and a second level of review for scientific merit by the IC National Advisory Council/Board.

The NIH peer review process has evolved over the years to accommodate increasingly collaborative and multi-disciplinary research, changes in workload, resource constraints, and recommendations of various scientific and professional groups. However, the underlying basis for the system—to provide a fair and objective review process in the overall interest of science—has not changed. Information concerning NIH's peer review process may be found at NIH's web site or Peer Review Policies and Practices on the NIH Grants & Funding web site.

## 2.4.1 Initial Review

### 2.4.1.1 Responsibilities

The DRR in the CSR receives all competing grant applications submitted to NIH, whether the peer review will be conducted by CSR or by an IC. The primary determining factors in whether CSR or an IC will be responsible for the peer review are the announcement type, the support mechanism, and/or the program. In general, CSR is responsible for the initial review of research project grant applications (including NIH Research Enhancement Award applications), Kirschstein-NRSA individual fellowship applications, and SBIR/STTR applications, while the ICs handle the initial review of applications that have Institute-specific features such as conference grant applications, applications resulting from RFAs, and program project and center grant applications. CSR also may review other types of applications at an IC's request.

When the IC is responsible for the initial review, CSR reviews the application for completeness and staff in the soliciting IC review the application for responsiveness to the RFA/PAR/PAS, if applicable. The scientific review office in that IC coordinates the initial technical review for scientific merit and prepares the summary statements.

CSR Referral Officers, who are senior health scientist administrators with both research and scientific review experience, assign each application to one or more ICs for potential funding and to an IRG or SRG for initial review of the scientific merit of the application. These assignments are made on the basis of the application's contents, the referral guidelines, and any written request by the applicant organization (accompanying the application) for a specific study section or IC assignment.

SRGs, including CSR study sections, are organized by scientific discipline or current research areas and are managed by health scientist administrators functioning as SROs. Generally, study sections are chartered groups composed of formally appointed members serving multiyear terms, to which the SRO often adds temporary members or other additional reviewers. Ad hoc SEPs are formed to review applications that cannot be reviewed by a standing review group or study section because they require special expertise or involve other special circumstances.

SRGs, whether study sections or SEPs, are primarily composed of non-federal scientists who have expertise in relevant scientific disciplines and are actively engaged in research. NIH's conflict-of-interest and confidentiality of information requirements for reviewers are intended to promote an unbiased review process by minimizing even the appearance of a conflict of interest and by restricting the use of privileged application information.

Applicants are notified by e-mail that their application has been received and that they can find information about the application's SRO, SRG, and IC assignments in eRA Commons. At this time, applicants may request reconsideration of the SRG and IC assignment. Applicants also are notified by e-mail to check eRA Commons for any change in the application's SRG or IC assignment, as well as a change in Council date. Once the assignment process is completed, the SRO, not the PO, is the primary contact for communication with the applicant until the summary statement is released. An applicant organization may withdraw an application from consideration at any time during the review process. A request to withdraw an application must be signed by the PD/PI and an AOR, and submitted to the SRO.

In preparation for the initial review, SROs review applications to determine whether they are complete and conform to administrative requirements. For each reviewable application, they then assign (from among the standing and temporary members) at least three reviewers to write a critique of the application, provide initial scores, and to be prepared to discuss the application in detail.

Following the initial review, the SRO prepares a summary statement for most applications reviewed. The summary statement includes the reviewers' written comments, and, for scored applications, a summary of the discussion, and an impact score. Summary statements are then simultaneously provided to the IC's program staff, Advisory Councils, the PD(s)/PI(s), and applicant institution's Authorized Organization Representative.

## 2.4.1.2 Overall Impact

The SRG assesses overall impact in the determination of scientific and technical merit; overall impact is defined based on the different types of applications. When considering applications for research grants and cooperative agreements, reviewers will provide an overall impact score to reflect their assessment of the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, in consideration of the five scored review criteria, and additional review criteria (as applicable for the project proposed). All the criteria, weighted as appropriate for each application or as described in the NOFO, will be considered when assigning the overall impact score.

## 2.4.1.3 Scored Review Criteria

The goals of NIH-supported research are to advance the understanding of biological systems, improve the control of disease, enhance health, and reduce illness and disability. For research grant applications, and most other types of applications, reviewers evaluate the overall impact to reflect their assessment of

the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, taking into account, among other pertinent factors: Significance, Investigator(s), Innovation, Approach, and Environment. These scored review criteria may not be applicable for some types of applications. When these criteria are not applicable, the NOFO will include the specific review criteria.

Reviewers will consider each of the five criteria below in the determination of scientific and technical merit, and determine a separate score for each. An application does not need to be strong in all categories to be evluated likely to have a major scientific impact. For example, a project that by its nature is not innovative may be essential to advance a field.

- Significance
- Investigator(s)
- Innovation
- Approach
- Environment

The NOFO should be consulted for additional information describing each of the scored review criteria.

## 2.4.1.4 Additional Review Criteria

As applicable for the project proposed, reviewers will consider the following additional items in the determination of scientific and technical merit, but will not give separate scores for these items.

- Diversity Plan (for Conference Grant Applications)
- Protections for Human Subjects
- Inclusion of Women, Minorities, and Individuals Across the Lifespan.
- Vertebrate Animals
- Biohazards
- Resubmission Applications
- Renewal Applications
- Revision Applications

The NOFO should be consulted for additional information describing each of the relevant additional review criteria.

## 2.4.1.5 Additional Review Considerations

As applicable for the project proposed, reviewers will address each of the following items, but will not give scores for these items and Reviewers should not consider these items in providing an overall impact score.

- Provision of Family Care Facilities (for Conference Grant Applications)
- Applications from Foreign Organizations
- Select Agent Research
- Resource Sharing Plans
- Authentication of Key Biological and/or Chemical Resources
- Budget and Period of Support

The NOFO should be consulted for additional information describing each of the relevant additional review considerations.

Although the review criteria are intended for use primarily with investigator-initiated research project grant applications (e.g., R01 and P01), including those in response to PAs, to the extent reasonable, the criteria also will form the basis of the review of solicited applications and research related activities. However, for some activities (e.g., construction grants), the use of these criteria may not be feasible. Applications also may be reviewed against other pertinent factors as stated in NOFOs.

## 2.4.2 Appeals of Initial Scientific Review

To preserve and underscore the fairness of the NIH peer review process, NIH has established a peer review appeal system to provide applicants the opportunity to seek reconsideration of the initial review results if, after consideration of the summary statement, they believe the review process was procedurally flawed. The NIH policy for appeals of initial peer review does not apply to appeals of the technical evaluation of Research and Development contract projects through the NIH peer review process, appeals of NIH funding decisions, or appeals of decisions concerning extensions of MERIT awards. In addition, NIH will not review a resubmission application when an appeal of initial peer review is pending on the original application. As stated in the Notice of Funding Opportunity, appeals of initial peer review outcome will not be accepted for applications in response to an RFA.

An appeal is a written communication from a Program Director/Principal Investigator (PD/PI) and/or applicant institution that meets the following four criteria: 1) is received after issuance of the summary statement and up to 30 calendar days after the second level of peer review, 2) describes a flaw or perceived flaw in the review process for a particular application, 3) is based on one or more of four allowable issues (described below), and 4) displays concurrence from the Authorized Organization Representative (AOR).

An applicant who is concerned about procedural aspects related to the completed initial peer review of their application first should consider the comments in the summary statement, and then should contact the appropriate NIH Program Official (PO). Following discussion of concerns with the PO, if the PD/PI and/or an official of the applicant organization wishes to appeal the outcome of the initial peer review process, an appeal letter must be submitted, either in hard copy or electronically, to the PO. The appeal letter must display concurrence from the AOR of the applicant organization for the application. Although the content of the appeal letter may originate from the PD/PI, Contact PD/PI for multiple PD/PI applications, or an organizational official(s) (not necessarily the AOR), the AOR must send the letter directly to the PO, or must send their concurrence to the PD/PI who will forward the materials and AOR concurrence to the PO. A communication from the PD/PI or official of the applicant organization (other than the AOR) only or with a "cc" to the AOR will not be accepted. The PO will send the PD/PI and/or institutional official, and AOR, an acknowledgement letter within 10 days of receipt of the appeal letter.

An appeal letter will be accepted only if the letter 1) describes the flaws in the review process for the application in question, 2) explains the reasons for the appeal, and 3) is based on one or more of the following issues related to the process of the initial peer review:

- Evidence of bias on the part of one or more peer reviewers.
- Conflict of interest, as specified in regulation at 42 CFR Part 52h.5 "Scientific Peer Review of Research Grant Applications and Research and Development Contract Projects", on the part of one or more non-Federal peer reviewers.
- Lack of appropriate expertise within the SRG.

- Factual error(s) made by one or more reviewers that could have altered the outcome of review substantially.

Appeal letters based solely on differences of scientific opinion will not be accepted. A letter that does not meet these criteria and/or does not include the concurrence of the AOR will not be considered an appeal letter, but rather a grievance. The IC will handle grievances according to IC-specific procedures.

If review staff and program staff do not support the appeal, or do not agree on its merit, the PD/PI and/or an institutional official (not necessarily the AOR) may elect to withdraw the appeal letter. The request to withdraw an appeal letter must be submitted either in hard copy or electronically to the PO, and must display concurrence from the AOR of the applicant organization for the application. Although the content of the request may originate from the PD/PI, Contact PD/PI for multiple PD/PI applications, or an organizational official(s) (not necessarily the AOR), the AOR must send the request directly to the PO, or must send their concurrence to the PD/PI who will forward the materials and their concurrence to the PO. A communication from the PD/PI or institutional official (other than the AOR) only or with a "cc" to the AOR will not be accepted.

If review staff and program staff do not support the appeal, or do not agree on its merit, and the appeal letter is not withdrawn, the appeal letter will be made available to Council. The IC may not deny the PD/PI or applicant organization the opportunity to have an appeal letter made available to Council. Only two outcomes are possible following consideration of an appeal letter by Council:

- The Council may concur with the appeal, and recommend that the application be re-reviewed.

- The Council may concur with the SRG's recommendation and deny the appeal. Although factual errors or other issues may be evident, the Council may determine that these factors were unlikely to alter the final outcome of the SRG and deny the appeal. No action by the Council is equivalent to concurrence with the SRG's recommendation and denial of the appeal.

The recommendation of Council concerning resolution of an appeal is final and will not be considered again by the NIH through this or another process.

The Executive Secretary for the Council will communicate the Council recommendation concerning an appeal to the PD/PI, AOR, and NIH staff with a need to know. If the appeal letter was received by the IC deadline, the PD/PI and AOR will receive a written explanation of the resolution no later than 30 calendar days after the Council meeting. If the appeal letter was received after the IC deadline, the Executive Secretary will provide, no more than 30 calendar days after the date when the appeal letter was received, a written explanation of the IC's plan for making the appeal available to Council.

If the Council recommended that the application be re-reviewed, the original application will be re-reviewed without additional materials or modifications. The application may be re-reviewed by the same or a different SRG, depending on the flaws in the original review process that led to the appeal. In most cases, the re-review will entail re-assignment to a subsequent review round and delay in the final funding decision. The outcome of the re-review is final and cannot be appealed again.

On occasion, and for specific circumstances, the NIH may suspend temporarily the policy and process for handling appeals of NIH initial peer review. Such decisions will be announced in NIH Guide Notices and/or the relevant Notice of Funding Opportunity when they are issued in the NIH Guide for Grants and Contracts.

## 2.4.3 National Advisory Council or Board Review

Summary statements for those applications recommended for further consideration are presented to the assigned IC National Advisory Council or Board (hereafter "Council") for use in the second level of

review. Council members include senior scientists with broad experience and members of the public with general knowledge of, and interest in, the IC's mission. The Council reviews applications not only for scientific and technical merit, as judged by the SRG, but also for relevance to the IC's programs and priorities. The Council may concur with the SRG's recommendation, may decide not to recommend an application on the basis of program or policy considerations, or may recommend deferral of an application and refer it back to the SRG for re-review.

In addition, Council members will receive a list of competing applications that will be considered for funding from PD/PIs that meet the threshold for Special Council Review. These are investigators who currently receive $2 million or more in total costs (inclusive of direct and indirect) per year of NIH funding to support Research Project Grants. Council members will be asked to recommend consideration of funding for applications that afford a unique opportunity to advance research which is both highly promising and distinct from the other funded projects from the PD/PI. This does not represent a cap to NIH funding.

With very limited exception, an application may not be considered for funding unless it has received a favorable recommendation by both the SRG and the Council. For some applications (e.g., Kirschstein NRSA Fellowship applications) the second level of review is conducted by senior level IC staff.

## 2.4.4 Disposition of Applications

All incomplete applications, non-compliant applications, and applications determined to be non-responsive to NOFO requirements will not be reviewed. If the NOFO remains open with subsequent submission dates, the applicant may resubmit a corrected or complete version of an investigator-initiated application for consideration in the next review cycle. An application may resubmit one application may be submitted for an appropriate due date up to 37 months after the application due date of the initial application, provided the NOFO allows resubmission applications. Any application on the same topic proposed as a resubmission more than 37 months from the initial receipt date will not be accepted; it must be formatted and submitted as a new application.

For complete, compliant and responsive applications, following the initial scientific peer review, the summary statement will be available to the PD/PI and AORs of the applicant organization with the Signing Official (SO) user role in the eRA Commons. Applicants just receiving their summary statements should consult the NIH Next Steps page for detailed guidance. If an application does not result in funding, there may be an opportunity to respond to the reviewers' comments and resubmit the application, provided the NOFO allows resubmission applications. Applicants seeking advice beyond that available online may want to contact the NIH Program Officer listed at the top of the summary statement.

The IC Director or designee is the official who has the authority to make final award decisions from among those applications receiving a favorable initial review and Council recommendation. If an application has been recommended for further consideration but is not expected to be funded in the current cycle, the application may be held by NIH for one or more additional cycles and will compete with other applications submitted for that cycle. If an application is unsuccessful, the applicant may subsequently submit one revised version of the application (referred to as a resubmission) for review in a future cycle.

Some of the ICs publish paylines as part of their funding strategies to guide applicants on their likelihood of receiving funding. Application scores can only be compared against the payline for the fiscal year when the application will be considered for funding, which is not necessarily the year when it was submitted. At the beginning of fiscal years when the agency awaits an actual budget, there may be a delay of several months to determine paylines. If the application is assigned to an IC that does not announce a payline, the Program Officer listed at the top of the summary statement may be able to provide guidance on the likelihood of funding.

Successful applicants will be notified of additional information that may be required or other actions lead-
ing to an award. The process leading to an award, including the business management review performed
by the GMO, is described in Completing the Pre-Award Process below.

For unsuccessful applicants, the NIH will send a centralized, automated correspondence to the applicant
organizations to notify them of NIH's intent not to fund the indicated applications.

The decision not to award a grant, or to award a grant at a particular funding level, is discretionary and is
not subject to appeal to any NIH or HHS official or board.

# 2.5 COMPLETING THE PRE-AWARD PROCESS

Following the peer review process, applications that an IC may fund are reviewed for a number of other
considerations. These include, as applicable, alignment with NIH's funding principles, review of the pro-
ject budget, assessment of the applicant's management systems, determination of applicant eligibility,
and compliance with public policy requirements. The applicant may be asked to submit additional
information (such as other support or verification of IACUC approval) or to undertake certain activities
(such as negotiation of an F&A cost rate) in anticipation of an award. However, such requests by NIH do
not guarantee that an award will be made. Following review of all applicable information, the IC will
determine whether an award can be made, if specific award conditions are required, and what level of
funding is appropriate.

Although these reviews and determinations occur before NIH makes a new award, recipients must con-
tinue to comply with eligibility and public policy requirements and maintain adequate management sys-
tems throughout the period of support. The pre-award process for non-competing continuation awards is
a streamlined version of this process, including an assessment of progress (see Administrative Require-
ments—Monitoring—Reporting—Non-Competing Continuation Progress Reports).

## 2.5.1 Just-in-Time Procedures

NIH uses Just-in-Time procedures for certain programs and award mechanisms (each NOFO will include
specific guidance on the use). These procedures allow certain elements of an application to be submitted
later in the application process, after review when the application is under consideration for funding. The
standard application elements include other support information (both active and pending) for senior/key
personnel; certification of IRB approval of the project's proposed use of human subjects; verification of
IACUC approval of the project's proposed use of live vertebrate animals; and evidence of compliance
with the education in the protection of human research participants requirement. Other program-specific
information may also be requested using this procedure. (Applications in response to RFAs also may be
subject to these procedures. The RFA will specify the timing and nature of required submissions.)

Applicants will be notified (primarily by e-mail) when Just-in-Time information is needed. This noti-
fication is not a Notice of Award nor should it be construed to be an indicator of possible funding.
Applicants should only submit this information when requested. Information must be submitted elec-
tronically using the Just-in-Time feature in the eRA Commons. In some circumstances the GMO may
ask for information in addition to the descriptions below, e.g., if the application involves hESCs and the
applicant did not identify a hESC from the NIH Registry in the application.

The requirement for applicants to verify the accuracy and validity of all administrative, fiscal, and pro-
grammatic information extends to information submitted through the Just-in-Time process. Applicants
are responsible for promptly notifying NIH of any substantive changes to previously submitted Just-in-
Time information up to the time of award. This includes items such as Other Support changes that could
lead to budgetary overlap, scientific overlap, or commitment of effort greater than 12 person-months for
the PD/PI(s) or any Senior/Key Personnel; or any changes in the use or approval of vertebrate animals or

human subjects. Similar to the NIH public policy requirements, applicants are responsible for establishing and maintaining the necessary processes to monitor its compliance and informing NIH of any problems or concerns. Failure to address changes to Just-in-Time submissions prior to award does not diminish the applicant's responsibility to address changes post-award by submitting a prior approval request to NIH in accord with Administrative Requirements—Changes in Project and Budget—NIH Standard Terms of Award.

***Other Support.*** Information on other active and pending support will be requested as part of the Just-in-Time procedures. Other support includes all resources made available to a researcher in support of and/or related to all of their research endeavors, regardless of whether or not they have monetary value and regardless of whether they are based at the institution the researcher identifies for the current grant. This includes:

- Resources and/or financial support from all foreign and domestic entities that are available to the researcher. This includes but not limited to, financial support for laboratory personnel, and provision of high-value materials that are not freely available (e.g., biologics, chemical, model systems, technology, etc.). Institutional resources, such as core facilities or shared equipment that is made broadly available, should not be included in Other Support, but rather listed under Facilities and Other Resources.

- Consulting agreements, when the PD/PI or other senior/key personnel will be conducting research as part of the consulting activities and the activities fall outside of their appointment at the applicant or recipient institution.

- In-kind contributions, e.g., office/laboratory space, equipment, supplies, or employees or students supported by an outside source. If the time commitment or dollar value of the in-kind contribution is not readily ascertainable, the recipient must provide reasonable estimates.

Other support does not include training awards, prizes, or gifts. Gifts are resources provided where there is no expectation of anything (e.g., time, services, specific research activities, money, etc.) in return. An item or service given with the expectation of an associated time commitment is not a gift and is instead an in-kind contribution and must be reported as Other Support.

Reporting of other support is required for all individuals designated in an application as senior/key personnel—those devoting measurable effort to a project. Each PD/PI or other senior/key personnel must electronically sign their respective Other Support form prior to submission. This signature certifies that the statements are true, complete, and accurate. Information on Other Support is not specifically requested for Program Directors, training faculty, and other individuals involved in the oversight of training grants since applicable information is collected in other sections of a training grant application. It is also not requested for individuals categorized as Other Significant Contributors.

Recipients are expected to establish and maintain effective internal controls (e.g. policies and procedures) to ensure that individuals designated in applications as senior/key personnel fully disclose all Other Support information to their institution as soon as it becomes known. When a recipient organization discovers that a PI or other Senior/Key personnel on an active NIH grant failed to disclose Other Support information outside of Just-in-Time or the RPPR, as applicable, the recipient must submit updated Other Support to the Grants Management Specialist named in the Notice of Award as soon as it becomes known.

For Other Support submissions that include foreign activities and resources, recipients are required to submit copies of contracts, grants, or any other agreement specific to senior/key personnel foreign appointments and/or employment with a foreign institution as supporting documentation. If they are not in English, recipients must provide translated copies. This does not include personal service contracts, or employment contracts for fellows supported by foreign entities.

The supporting documentation must be provided as part of the Other Support PDF following the Other Support Format page. See NIH Other Support page for forms, instructions, and other resources.

IC scientific program and grants management staff will review this information before award to ensure the following:

- Sufficient levels of effort are committed to the project.
- There is no scientific, budgetary, or commitment overlap.
  - ◦ Scientific overlap occurs when (1) substantially the same research is proposed in more than one application or is submitted to two or more funding sources for review and funding consideration or (2) a specific research objective and the research design for accomplishing the objective are the same or closely related in two or more applications or awards, regardless of the funding source.
  - ◦ Budgetary overlap occurs when duplicate or equivalent budgetary items (e.g., equipment, salaries) are requested in an application but already are provided by another source.
  - ◦ Commitment overlap occurs when an individual's time commitment exceeds 100 percent (i.e., 12 person months), whether or not salary support is requested in the application.
  - ◦ Overlap, whether scientific, budgetary, or commitment of an individual's effort greater than 100 percent, is not permitted. Any overlap will be resolved by the IC with the applicant and the PD/PI at the time of award.
- Only funds necessary for the approved project are included in the award.
- Any foreign resources that meet the definition of a foreign component have received appropriate prior approval.

See NIH Other Support for format page, instructions and the NIH disclosure table.

***Certification of IRB Approval.*** If the proposed project involves human subjects research, a certification to NIH that all non-exempt research involving human subjects has been reviewed and approved by an appropriate IRB must be submitted. Pending or expired approvals are not acceptable. See Public Policy Requirements/Human Subjects for additional information.

***Verification of IACUC Approval.*** If the proposed project involves research with live vertebrate animals, verification of the date of IACUC approval of those sections of the application that involve use of vertebrate animals along with any IACUC-imposed changes must be submitted. Pending or out-of-date approvals are not acceptable. See Public Policy Requirements/Animal Welfare for additional information.

***Human Subjects Research Education Requirement.*** If the proposed project involves human subjects research, certification that any person identified as senior/key personnel involved in human subjects research has completed an education program in the protection of human subjects must be submitted. See Public Policy Requirements/Human Subjects/Education in the Protection of Human Research Participants for additional information.

***Human Embryonic Stem Cells (hESCs).*** If the proposed project involves hESCs and the applicant did not identify a hESC line from the NIH Human Embryonic Stem Cell Registry in the application, the line(s) should be included in the Just-in-Time submission.

***Genomic Data Sharing Institutional Certification***. If the proposed project involves research subject to the Genomic Data Sharing policy for the generation of human genomic data (including within the Data Management and Sharing Plan, as applicable), investigators must submit an Institutional Certification,

or, in some cases, a Provisional Institutional Certification. Institutional certification forms and directions for completing them are available on the NIH GDS Data Sharing website. This certification must be submitted as a "Genome Data Sharing Certification" filein the eRA Commons Just-in-Time module.

***SBIR Foreign Disclosure Form.*** For SBIR and STTR competing applications, applicants must submit the Required Disclosure of Foreign Affiliations or Relationships to Foreign Countries form. See NIH SBIR and STTR Foreign Disclosure requirements for more information. This form must be submitted as an "SBIR STTR Foreign Disclosure Form" file in the eRA Commons Just-in-Time module.

***SBIR Funding Agreement Certification.*** For SBIR applicants, provide only upon request the SBIR Funding Agreement Certification described in Section 2.18 of the Supplemental Grant Application Instructions. The certification is available in fillable formats at: https://-grants.nih.gov/grants/forms/manage_a_small_business_award.htm. This should be submitted as an "Other Upload" in the eRA Commons Just-in-Time module.

***STTR Funding Agreement Certification.*** For STTR applicants, provide only upon request the STTR Funding Agreement Certification described in Section 2.19 of the Supplemental Grant Application Instructions. The certification is available in fillable formats at: https://-grants.nih.gov/grants/forms/manage_a_small_business_award.htm. This should be submitted as an "Other Upload" in the eRA Commons Just-in-Time module.

***My Bibliography Report of Publications.*** For renewal applicants to research training programs, a My Bibliography Report of Publications arising from work conducted by trainees while supported by the training grant will be collected in the Interim/Final Research Performance Progress Report.

***Other Information Requested by the Awarding IC.*** NIH IC's may also request additional Just-in-Time information on a case-by-case basis, such as revised budgets or changes to the human subjects or vertebrate animals sections of the application. If required, these changes must be submitted as an "Other Upload" file in the eRA Commons Just-In-Time module.

## 2.5.2 Submitting Revised Project Summary/Abstracts, Specific Aims, and/or Public Health Relevance Statement

When requested by NIH as part of the pre-award process, PD/PIs and the AOR should discuss potential changes in scope with NIH PO and revise the Project Summary/Abstract, Specific Aims, and/or Public Health Relevance sections of their application as appropriate. Once all issues are resolved, applicants should e-mail a document with final versions of the revised sections to the IC-designated e-mail address (normally a Program Official, Grants Management Official, or centralized e-mail box) as a single Microsoft Word file only. Be reminded that all revised application information submitted to the NIH must be approved by an AOR. Applicants should use this template. The template includes specific headings that must be used for each section. All three headings must be included in the document that is submitted even if a particular section had no changes from the previous submission. If there are no changes for a section include the header but leave the text area blank to ensure appropriate processing of this information by NIH's electronic systems.

## 2.5.3 Determining Applicant Organization Eligibility

All applicant organizations must complete the one-time eRA Commons registration process (see NIHGPS 2.2.1 eRA Commons Registration) prior to submitting any application (paper or electronic) to the NIH. During the registration process, NIH may make a preliminary assessment of applicant organization eligibility. In an effort to streamline the registration requirements and reduce the administrative

burden (i.e., time between registration submission and NIH's final determination), NIH urges potential applicants to consider the following eligibility considerations:

- What is the nature of the research and business that your organization performs and how does that fit within the NIH mission?

- Is your organization professionally responsible for the research?

- How many people are in your organization?

- Are the researchers employed by your organization?

- Where will the proposed research physically be conducted?

- Can you identify a Notice of Funding Opportunity that you would apply for?

- Has your organization applied to and/or been directly funded by any other Federal agency?

Applicants should be prepared to establish their eligibility to receive and administer all awards (that are applied for), and NIH reserves the right to deny registration if an organization is determined not to be an appropriate applicant for a particular NOFO. NIH will not accept forms or other documentation bearing generic departmental signatures or their electronic equivalent (e.g., Department of Sponsored Research). All forms and documentation submitted to the NIH must reflect the name of the individual, electronic or otherwise, with the appropriate institutional authority to submit such information.

NIH awards may be made only to eligible applicants. Continued funding is dependent on the recipient's continued eligibility. In general, domestic or foreign, public or private, non-profit or for-profit organizations and individuals are eligible to receive NIH grants. However, on the basis of statutory, regulatory, or published policy limitations, under certain programs or types of awards, NIH may limit eligibility to, or exclude from, eligibility, classes or types of entities. Examples are limitations on the participation of foreign entities, and programs under which only small businesses are eligible applicants. The determination of eligibility includes verification of the applicant's status. The applicant may be required to provide proof of its status by submitting documentation; otherwise, the AOR's signature on the application certifies that the applicant is eligible to apply for and receive an award (e.g., a small business applying under the SBIR or STTR programs).

In addition to reviewing organizational eligibility, NIH may consider other factors relating to the applicant's ability to responsibly handle and account for Federal funds and to carry out the project. These factors include the applicant's intended role in the project, the location where the project will be performed, the role of the PD/PI in the project, and the PD/PI's employment and citizenship status. Although some of these same considerations are reviewed as part of the peer review, NIH's concern at this stage in the process is making an award to a legal entity that will be accountable for both the performance of the approved project or activity and the appropriate expenditure of funds. NIH will not make an award to an applicant that does not have a substantive role in the project and would simply serve as a conduit for another entity.

## 2.5.4 Determining Eligibility of Individuals

It is the responsibility of the applicant organization to select the individuals who have the appropriate expertise to manage the scientific and administrative aspects of the project. The eligibility of these individuals to complete the project will be evaluated during peer review and at the IC level by grants management and program staff.

The GMO will verify whether the proposed PD/PI or other senior/key personnel are debarred or suspended from participation in Federal assistance programs (see Public Policy Requirements and Objectives—Debarment and Suspension for certification requirements).

Generally, PD/PIs and other personnel supported by NIH research grants are not required to hold any particular educational degree, and are not required to be U.S. citizens. However, some NIH programs/mechanisms have a citizenship requirement. Any citizenship requirement will be stated in the NOFO. In these cases, individuals are required to have the appropriate citizenship status when the award is made rather than when the application is submitted. For example, under most career development awards or Kirschstein-NRSA individual fellowships, the individual to be trained must be a citizen or a non-citizen national of the United States or have been lawfully admitted for permanent residence at the time of award.

NIH requires the applicant to determine that individuals' visas will allow them to remain in this country long enough for them to be productive on the research project, but NIH does not provide guidance on or assess the different types of visas. NIH expects recipient organizations to have policies, consistently applied regardless of the source of funds, to address this area. If a grant is awarded and an individual's visa will not allow a long enough stay to be productive on the project, NIH may terminate the grant (see Administrative Requirements—Changes in Project and Budget and Administrative Requirements—Enforcement Actions—Suspension, Termination, and Withholding of Support).

The eligibility requirements for trainees and additional eligibility requirements for fellows are addressed in Ruth L. Kirschstein National Research Service Awards chapter in IIB.

In the post-award phase, NIH monitors changes in recipient and project status to ensure they meet legal and programmatic requirements and takes actions necessary to protect the Federal government's interests.

## 2.5.5 Cost Analysis and Assessment of Management Systems

The GMO will ensure that a cost analysis is performed on any application that requires a detailed budget. Cost analysis involves obtaining cost breakdowns, validating cost data, evaluating specific elements of cost, and examining data to determine the necessity for, and the reasonableness and allowability of, the costs included in the application budget. The extent of cost analysis will depend on the type of funding instrument and award mechanism, the complexity of the project, prior experience with the applicant, and other factors. Information on the applicable cost principles and on allowable and unallowable costs under NIH grants is provided in the Cost Considerations chapter.

The amount of NIH funding is based on reasonable and allowable costs consistent with the principles of sound cost management, considering IC priorities (e.g., program relevance), constraints on the growth of average grant costs, and available funds.

In addition to considering the specific information provided in the application, the GMO determines the adequacy of the applicant's financial and business management systems that will support the expenditure of and accountability for NIH funds. When an applicant has had no prior Federal grants or cost-reimbursement contracts, the GMO may review the applicant's financial management and other management systems before award, or within a reasonable time after award, to determine their adequacy and acceptability. For an applicant with prior NIH or other Federal cost-reimbursement awards, the GMO may review recent audit reports and other relevant available information to determine whether the applicant's management systems meet the standards established in 2 CFR Part 200. The GMO will advise the applicant if additional information is required. Based on the results of the review results, the GMO will determine the need for any corrective action and may impose specific award conditions on the award.

# PART II: TERMS AND CONDITIONS OF NIH GRANT AWARDS

## Subpart A: General

# 3 OVERVIEW OF TERMS AND CONDITIONS

Part II includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards. Subpart A (IIA) includes those terms and conditions that apply, in general, to NIH awards. Subpart B (IIB) either expands on IIA coverage or specifies additional or alternate terms and conditions for particular types of awards, recipients, or activities.

These terms and conditions are not intended to be all-inclusive. All awards or a specified subset of awards also may be subject to additional requirements, such as those included in executive orders and appropriations acts.

NIH recipients are responsible for complying with all requirements of the Federal award. NIH grants awards are based on the application submitted to, and approved by, the NIH and are subject to the terms and conditions incorporated either directly or by reference in the following:

- The grant program legislation and program regulation cited in the NoA.
- The NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
- Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts. This also includes any recent legislation.
- 2 CFR Part 200.
- The NoA including all terms and conditions cited on the document or attachments.

Notice of requirements not specified in the NIHGPS generally will be provided in the NoA, but such notice is not required for the award to be subject to the requirements of pertinent statutes and regulations. An individual award also may contain award-specific terms and conditions. For example, the GMO may include terms or conditions necessary to address concerns about an applicant's management systems.

Program and administrative policies and the terms and conditions of individual awards are intended to supplement, rather than substitute for, governing statutory and regulatory requirements. Thus, the requirements of the NIHGPS apply in addition to governing statutory and regulatory requirements not cited herein, and award-specific terms apply in addition to the requirements of the NIHGPS.

This NIHGPS is an aid to the interpretation of statutory and regulatory requirements. These terms and conditions are intended to be compliant with governing statutes and the requirements of 2 CFR Part 200, as modified by previously approved waivers and deviations. However, in the case of a conflict, the statutes and regulations govern.

If there is a perceived conflict between or among these three categories of requirements—statutory and regulatory requirements, the terms and conditions in the NIHGPS, and award-specific terms and conditions—or if the recipient has other questions concerning award terms and conditions, the recipient

should request written clarification from the GMO. This may be done at any time; however, if the inclusion of the term or condition would cause the recipient not to accept the award or to be unable to comply, the question should be raised before funds are requested from the HHS payment system. By drawing funds from the HHS payment system, the recipient agrees to the terms and conditions of the award.

# 3.1 FEDERALWIDE STANDARD TERMS AND CONDITIONS FOR RESEARCH GRANTS

In order to create greater consistency in the administration of Federal research awards, all Federal research agencies now utilize a standard core set of administrative terms and conditions on research and research-related awards that are subject to 2 CFR Part 200, to the extent practicable. The core set of administrative requirements for participating Federal research agencies and other pertinent documents are posted on the National Science Foundation's web site. Recipients are encouraged to review the companion documents which include a Prior Approval Matrix, National Policy Requirement Matrix, Subaward Requirement Matrix, and Agency-Specific Requirements. NIH implementation of these Federalwide research terms and conditions is also known as the "NIH Standard Terms of Award".

See Administrative Requirements—Changes in Project and Budget—NIH Standard Terms of Award for more details.

# 4 PUBLIC POLICY REQUIREMENTS, OBJECTIVES AND OTHER APPROPRIATION MANDATES

NIH grants are subject to requirements intended to ensure that recipient organizations handle their Federal awards responsibly. Recipients are required to adopt and enforce policies that minimize the opportunity for improper financial gain on the part of the organization, its employees, and organizations and individuals whom they may collaborate, and that limit the potential for research results to be tainted by possible financial or other gain. In addition, NIH recipients are expected to provide safe and healthful working conditions for their employees and foster work environments conducive to high-quality research.

This chapter addresses public policy requirements, objectives, and other appropriation mandates applicable to NIH awards. The term "public policy" indicates that the requirement is based on social, economic, or other objectives or considerations that may be attached to the expenditure of Federal funds by recipients, subrecipients, and contractors, in general, or may relate to the expenditure of Federal funds for research or other specified activities.

In addition to cross-cutting requirements that some or all Federal agencies must apply to their grant programs, NIH recipients and subrecipients are subject to requirements contained in the HHS annual appropriations act that apply to the use of NIH grant funds, applicable provisions in other Federal agencies' appropriations acts, including Treasury, and other Federal statutes. Some of those requirements are included here in a separate section titled Appropriation Mandates since they have been included in the appropriations acts for several years with little or no change. Those requirements may be changed or other requirements may be added in the future.

The public policy requirements, objectives, and appropriation mandates listed in Exhibit 4 apply to all NIH awards with exceptions as noted.

## 4.1 PUBLIC POLICY REQUIREMENTS AND OBJECTIVES

NIH intends to uphold high ethical, health, and safety standards in both the conduct of the research it funds and the expenditure of public funds by its recipients. The public policy requirements specified in this section set many of those standards. NIH will not accept forms or other documentation bearing generic departmental signatures or their electronic equivalent (e.g., Department of Sponsored Research). All forms and documentation submitted to NIH must reflect the name of the individual, electronic or otherwise, with the appropriate institutional authority to submit such information. The signature of the AOR on the application certifies that the organization complies, or intends to comply, with all applicable policies, certifications and assurances referenced (and, in some cases, included) in the application instructions. The policies, certifications and assurances listed in this section may or may not be applicable to the project, program, or type of applicant organization. Requirements / objectives are listed in alphabetical order.

As noted in this section, some requirements may necessitate the submission of a separate document (e.g., human subjects assurance, certification of IRB approval or institutional exemption, civil rights assurance). Applicants and recipients should take particular note of these requirements (for example, see specific sections on Human Subjects Protections and Civil Rights Protections), the absence or inadequacy of which may delay an award or render an applicant ineligible for award.

The recipient is responsible for: 1) establishing and maintaining the necessary processes to monitor its compliance and that of its employees, consortium participants, and contractors with these requirements; 2) taking appropriate action to meet the stated objectives; and, 3) informing NIH of any problems or concerns.

If a grant is awarded on the basis of false or misrepresented information, or if a recipient does not comply with these public policy requirements, NIH may take any necessary and appropriate action, including using any of the remedies described in Administrative Requirements—Enforcement Actions or other available legal remedies.

Exhibit 4 contains information to help the recipient determine what public policy requirements, objectives and appropriations mandates apply to its activities and whether a requirement should be included in a consortium agreement or a contract for routine goods or services under the grant (see Glossary in Part I for definitions). The exhibit distinguishes between these types of transactions under a grant and indicates (by "Y" for Yes or "NA" for Not Applicable) whether a given requirement normally would apply. However, even if the exhibit indicates that a requirement is not applicable that requirement potentially could be applicable in a specific situation, e.g., if a contract under a grant involves research activity. Therefore, this exhibit should be used as general guidance only. The recipient should consult the terms and conditions of its award and should contact the GMO if it has any question concerning the applicability of a particular public policy requirement or objective.

Exhibit 4 also indicates where, in the NIHGPS, the individual public policy requirements, objectives and appropriation mandates are covered in more detail. The recipient should also consult its attorney, as appropriate, regarding particular questions about the governing statute or regulation as applied to its specific circumstances. Other cited policies or documents may provide additional information.

In addition to the requirements addressed in this section, there are applicable NIH administrative requirements outlined in the Administrative Requirements chapter.

Some programs may have special requirements and are covered in IIB.

## Exhibit 4. Public Policy Requirements, Objectives and Appropriation Mandates *

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Military Recruiting and ROTC Program Access to Institutions of Higher Education 4.1.19 | Y | N | N |
| Seat Belt Use 4.1.28 | Y | NA | NA |
| Labor Standards under Federally Assisted Construction 10.5.3 | Y (Construction Grants and major A&R Contracts Exceeding $100,000) | NA | Y |
| Smoke-Free Workplace 4.1.29 | Y | NA | NA |
| Drug-Free Workplace 4.1.7 | Y | NA | NA |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Flood Disaster Protection Act of 1973 — Flood Insurance 10.10.1 | Y (Construction grants only) | NA | NA |
| National Environmental Policy Act of 1969 (including Public Disclosure) 4.1.20 and 10.10.1 | Y | NA | NA |
| Intergovernmental Review of Federal Programs under EO 12372 10.10.1 | Y (Construction grants only) | NA | NA |
| Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 10.10.1 | Y | NA | NA |
| Standards of Conduct 4.1.30 | Y | NA | NA |
| Federal Funding Accountability and Transparency Act (FFATA) 4.1.8 and 8.4.1.5.5 | Y | NA If under $30,000 | NA If under $30,000 |
| President's Emergency Plan for AIDS Relief (PEPFAR Program 4.1.22 | Y | Y | Y |
| Nondelinquency on Federal Debt 4.1.21 | Y | Y | NA |
| National Historic Preservation Act of 1966 — Archaeological and Historic Preservation Act of 1974 10.10.1 | Y (Construction Grants; any award involving major or minor A&R, or any work resulting in physical changes to real property) | Y | Y |
| Lead-Based Paint Poisoning Prevention Act 10.10.1 | Y (Construction grants only) | Y | Y |
| Investigational New Drug Applications/Investigational Device Exceptions 4.1.16 | Y | Y | Y |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Inclusion of Women/Minorities as Subjects in Clinical Research 4.1.15.8 | Y | Y | NA |
| Metric System 4.1.18 and 10.10 | Y | Y | Y |
| Lobbying (Appropriation Mandate) 4.2.6 | Y | Y | Y |
| Limited English Proficiency 4.1.2.5 | Y | Y | NA |
| Pro-Children Act of 1994 4.1.23 | Y | Y | Y |
| Safe Drinking Water Act 10.10.1 | Y (Construction grants only) | Y | Y |
| Salary Limitation/Cap (Appropriation Mandate) 4.2.10 | Y | Y | NA |
| Restriction on Distribution of Sterile Needles (Appropriation Mandate) 4.2.9 | Y | Y | Y |
| Select Agents (see Public Health Security & Bioterrorism Preparedness and Response Act) 4.1.24.1.1 | Y | Y | Y |
| USA Patriot Act 4.1.33 | Y | Y | Y |
| U.S. Flag Air Carriers 7.9.1 | Y | Y | Y |
| Text Messaging While Driving 4.1.31 | Y | Y | Y |
| Restriction on Abortions & Exceptions (Appropriation Mandates) 4.2.8 & 4.2.8.1 | Y | Y | Y |
| Wild and Scenic Rivers Act of 1968 10.10.1 | Y (Construction grants only) | Y | Y |
| Protection of Wetlands (EO 11990) 10.10.1 | Y (Construction grants only) | Y | Y |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Promotion or Legalization of Controlled Substances (Appropriation Mandate) 4.2.7 | Y | Y | Y |
| Public Health Security and Bioterrorism Preparedness and Response Act (Select Agents) 4.1.24.1.1 | Y | Y | Y |
| Research Misconduct 4.1.27 | Y | Y | NA |
| Research Involving Recombinant or Synthetic Nucleic Acid Molecules 4.1.26 | Y | Y | Y |
| Reporting and Assurance Requirements for Institutions Receiving Awards for Training of Graduate Students for Doctoral Degrees 4.1.25 | Y | Y | NA |
| Inclusion of Individuals Across the Lifespan as Participants in Research 4.1.15.7 | Y | Y | NA |
| Copeland Act, when required by statute 10.10.1 | Y (Construction grants only) | Y | Y |
| Controlled Substances 4.1.5 | Y | Y | Y |
| Conservation of Petroleum and Natural Gas (EO 12185) 10.10.1 | Y (Construction grants only) | Y | Y |
| Data and Safety Monitoring 4.1.15.6 | Y | Y | Y |
| Dual Use Research of Concern 4.1.24.2 | Y | Y | Y |
| Dissemination of False or Deliberately Misleading Information (Appropriation Mandate) 4.2.3 | Y | Y | Y |
| Davis-Bacon Act, when required by statute 10.10.1 | Y (Construction grants only) | Y | Y |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Confidentiality of Alcohol and Drug Abuse Patient/Client Records 4.1.4.2 | Y | Y | Y |
| Architectural Barriers Act of 1968 10.10 | Y (Construction grants and any grant involving major A&R) | Y | Y |
| Animal Welfare 4.1.1 | Y | Y | Y |
| Acknowledgment of Federal Funding (Appropriation Mandate) 4.2.1 | Y | Y | NA |
| Certificates of Confidentiality 4.1.4.1 | Y | Y | Y |
| Coastal Zone Management Act of 1972 10.10 | Y (Construction grants only) | Y | Y |
| Clinical Trials.gov 4.1.3 | Y | Y | NA |
| Clean Air and Clean Water Act 10.10.1 | Y (Construction grants only); for contracts exceeding $100,000 | Y | Y |
| Earthquake Hazards Reduction Act of 1977 and Seismic Safety of Federal and Federally Assisted or Regulated New Building Construction (EO 12699) 10.10 | Y (Construction grants only) | Y | NA |
| Human Subjects Protections 4.1.15 | Y | Y | Y |
| Gun Control 4.2.4 | Y | Y | Y |
| Fly America Act 4.1.11 | Y | Y | Y |
| Hotel and Motel Fire Safety Act of 1990 14.6.1 | Y (Conference Grants Only) | Y | Y |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Human Fetal Tissue Research (Including Transplantation Research) 4.1.14 | Y | Y | Y |
| Human Stem Cell Research 4.1.13 | Y | Y | Y |
| Human Embryo Research and Cloning Ban (Appropriation Mandate) 4.2.5 | Y | Y | Y |
| Health and Safety Regulations and Guidelines 4.1.12 | Y | Y | Y |
| Endangered Species Act of 1973 10.10.1 | Y (Construction grants only) | Y | Y |
| Equal Employment Opportunity 10.5 | Y (Construction grants and any grant involving major A&R) | Y | NA If under $10,000 |
| Financial Conflict of Interest 4.1.10 | Y (NA to Phase I of the SBIR/STTR programs and to Federal institutions) | Y | NA |
| Federal Information System Security Management Act 4.1.9 | Y | Y | Y |
| Age Discrimination Act of 1975 4.1.2.4 | Y (NA to foreign and international organizations) | Y (NA to foreign and international organizations) | Y (NA to foreign and international organizations) |
| Civil Rights Act of 1964 (Title VI) 4.1.2.1 | Y (NA to foreign and international organizations) | Y (NA to foreign and international organizations) | Y (NA to foreign and international organizations) |
| Health Insurance Portability and Accountability Act (HIPAA) 4.1.4.3 | Y (if a covered entity) | Y (if a covered entity) | Y (if a covered entity) |

| Requirement, Objective, or Appropriation Mandate | Recipient | Subaward/Subrecipient | Contractor under Grant (routine goods/services) |
|---|---|---|---|
| Debarment and Suspension 4.1.6 | Y (NA to certain for-eign organizations) | Y (NA to certain foreign organizations) | Y If contract equals or exceeds $25,000 (NA to certain for-eign organizations) |
| Education Amendments of 1972 (Title IX) 4.1.2.2 | Y (NA to foreign and international organ-izations) | Y (NA to foreign and inter-national organizations) | Y (NA to foreign and international organ-izations) |
| Rehabilitation Act of 1973 (sec-tion 504) 4.1.2.3 and 10.10.1 | Y (NA to foreign and international organ-izations) | Y (NA to foreign and inter-national organizations) | Y (NA to foreign and international organ-izations) |
| Lobbying (Federalwide Cer-tification) 4.1.17 | Y (Certification required if total costs expected to exceed $100,000) | Y (Certification required if greater than $100,000 only) | Y (Certification required on con-tracts greater than $100,000 only) |
| Trafficking in Persons 4.1.32 | Y (Private entities) | Y (Private entities) | NA |
| Never Contract with the Enemy 4.1.36 | Y | Y | Y |
| Prohibition on Certain Tele-communications and Video Sur-veillance Services or Equipment 4.1.37 | Y | Y | Y |

\* NA: A designation of NA in this table indicates that a particular requirement does not apply to an otherwise eligible recipient, consortium participant, or contractor or may not apply because the type of activity covered is one not normally performed by such an entity.

Please note that the core set of National Policy Requirements for participating Federal research agencies is maintained by the National Science Foundation and is posted on Research Terms and Conditions web-site.

## 4.1.1 Animal Welfare Requirements

The *Public Health Service (PHS) Policy on Humane Care and Use of Laboratory Animals* (PHS Policy) requires that an approved Animal Welfare Assurance be on file with the Office of Laboratory Animal Welfare (OLAW) at the time of award for all organizations involved in PHS-conducted or supported activities involving live vertebrate animals. This requirement includes organizations that are award

recipients and organizations that serve as performance sites where animal activities will be conducted. Recipient organizations must establish appropriate policies and procedures to ensure the humane care and use of animals and bear ultimate responsibility for compliance with the PHS Policy in all PHS supported activities.

The PHS Policy incorporates the *U.S. Government Principles for the Utilization and Care of Vertebrate Animals used in Testing, Research, and Training*, and requires the recipient to maintain an animal care and use program based on the Guide for the Care and Use of Laboratory Animals. An Institutional Animal Care and Use Committee (IACUC) appointed by the Chief Executive Officer or designee, is federally mandated to oversee the organization's animal program, facilities, and procedures (Public Law 99-158, Sec. 495). Organizations in foreign countries must also comply with the PHS Policy on Humane Care and Use of Laboratory Animals or may provide evidence to the PHS (i.e. NIH) that acceptable standards for the humane care and use of the animals in PHS-conducted or supported activities will be met per Section II of the PHS Policy.

The PHS Policy defines "animal" as any live, vertebrate animal used or intended for use in research, research training, experimentation, biological testing or related purposes.

Applications from organizations proposing the use of animals are incomplete if they do not thoroughly address the use of vertebrate animals required in the Research Plan of the application. If the involvement of animals isnot yet known and cannot be described in the application at the time of application, the applicant should provide an explanation and indicate when it is anticipated that animals will be used. If an award is made, prior to conducting any animal activities the recipient must submit to the NIH awarding IC for prior approval the detailed information about the use of animals as required in the Research Plan of the application and meet the Assurance and IACUC approval requirements of the PHS Policy.

Noncompeting and competing awards are prohibited from using NIH funds to procure cats from USDA Class B dealers. The procurement of cats may only be from USDA Class A dealers or other approved legal sources.

NIH funds may not be used to procure or support the use of dogs from Class B dealers. Dogs used in NIH-supported research may only be from USDA Class A dealers or other approved legal sources. Any costs incurred in violation of this policy are unallowable and will be subject to a cost disallowance.

No activities with live vertebrate animals may begin and no costs for activities with live vertebrate animals may be charged to NIH if there is not a valid Animal Welfare Assurance and IACUC approval of the activity.

The PHS Policy does not supersede applicable State or local laws or regulations that impose more stringent standards for the care and use of animals in research. All recipient organizations are required to comply, as applicable, with the regulations (9 CFR, Subpart A) issued by the U.S. Department of Agriculture under the Animal Welfare Act, as amended, 7 U.S.C. 2131 et seq., and other Federal statutes and regulations relating to animals.

## 4.1.1.1 Animal Welfare Assurance Requirements

An Animal Welfare Assurance is the document submitted by an institution assuring institutional compliance with the PHS Policy. OLAW is responsible for requesting, negotiating, approving or disapproving, and, as necessary, restricting or withdrawing approval of Assurances.

When an applicant institution does not have an Animal Welfare Assurance, the Authorized Organization Representative's signature on the application constitutes declaration that the institution will submit an Assurance when requested by OLAW. Upon such request, the institution shall prepare the Assurance as instructed by OLAW and in accordance with the PHS Policy, and the authorized IACUC shall review

those components of the application related to the care and use of animals. Except in certain circumstances, the Assurance must be submitted to and approved by OLAW in order for the IC to award the grant. No activities with live vertebrate animals may be conducted and no costs for activities with live vertebrate animals may be charged to NIH grants in the absence of a valid Assurance on file with OLAW.

Organizations where live, vertebrate animal work is performed onsite (i.e., serve as an animal performance site) must have an approved Domestic or Foreign Assurance. If the pass-through entity does not have an approved Domestic or Foreign Assurance and the animal activities will be conducted at an Assured institution named as a performance site, the recipient must obtain an Interinstitutional Assurance from OLAW. Under the Interinstitutional Assurance, the recipient and performance site agree that the research will be conducted under the auspices and program of animal care and use of the performance site's Assurance.

## 4.1.1.2 Verification of IACUC Approval

NIH will delay an award for research involving live vertebrate animals until the recipient organization and all performance sites are operating in accordance with approved Animal Welfare Assurances and the recipient has provided verification of IACUC approval of those sections of the application that involve use of vertebrate animals. IACUC approval must have been granted not more than three years prior to the budget period start date to be valid; however, IACUCs may determine that continuing review on a more frequent basis is appropriate.

Verification of IACUC approval may be filed at any time before award in accord with Just-in-Time procedures, unless required earlier by the IC. Therefore, following peer review and notification of impact score/percentile, applicant organizations with approved Assurances may wish to proceed with IACUC review for those applications that have not yet received IACUC approval and that appear to be in a fundable range.

It is an institutional responsibility to ensure that the research described in the application is congruent with any corresponding protocols approved by the IACUC. The applicant verifies that there is congruence between the application and the IACUC-approved protocol when it provides the IACUC approval date.

No costs for activities with live vertebrate animals may be charged to NIH grants if there is not a valid IACUC approval.

## 4.1.1.3 Consortiums

Under consortium (subaward) agreements in which the recipient collaborates with one or more other organizations, the recipient, as the direct and primary recipient of NIH grant funds, is accountable for the performance of the project, the appropriate expenditure of grant funds by all parties, and all other obligations of the recipient as specified in the NIHGPS (see Consortium Agreements chapter in IIB). The animal welfare requirements that apply to recipients also apply to consortium participants and subprojects.

The primary recipient is responsible for including these requirements in its agreements with collaborating organizations, and for ensuring that all sites engaged in research involving the use of live vertebrate animals have an approved Animal Welfare Assurance and that the activity has valid IACUC approval. The approval of more than one IACUC is not required if the recipient and performance site(s) have Assurances; the institutions may exercise discretion in determining which IACUC reviews research protocols and under which institutional program the research will be conducted.

The recipient is further responsible for complying with NIH prior approval requirements related to the addition of sites not included in the approved application (see Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements).

The list of domestic and foreign organizations with a PHS approved animal welfare assurance is available on OLAW's website. The list of organizations with approved assurances is available at The OLAW web site posts a list of domestic institutions and foreign institutions with approved assurances.

### 4.1.1.4 Foreign Recipients and Foreign Performance Sites

Foreign recipients that will perform live, vertebrate animal activity onsite must provide OLAW with an Animal Welfare Assurance for Foreign Institutions. This constitutes institutional assurance and certification of compliance with the applicable laws, regulations, and policies of the jurisdiction in which the research will be conducted, and a commitment to follow the International Guiding Principles for Biomedical Research Involving Animals. IACUC approval is not required of foreign recipients; however, OLAW encourages foreign recipients to use the standards in the *Guide for the Care and Use of Laboratory Animals*.

When the recipient is a domestic institution and animal performance sites are foreign (i.e., domestic grant with a foreign component), the IACUC approval requirement applies. Accordingly, the recipient remains responsible for animal activities conducted at the foreign site and must provide verification of IACUC approval (i.e., certification that the activities as conducted at the foreign performance site are acceptable to the recipient). The recipient IACUC may accept, as its own, the approval of a foreign organization's animal welfare committee or oversight body;; however, the recipient IACUC remains responsible for the review. Additionally, the foreign animal performance site must obtain an Animal Welfare Assurance for Foreign Institutions as described in the preceding paragraph.

### 4.1.1.5 Reporting to OLAW

Reporting requirements under the PHS Policy include an annual report to OLAW describing any change in the institution's program for animal care and use as described in the Assurance, changes in IACUC membership, and the dates the IACUC conducted its semiannual evaluations of the institution's program and facilities. The IACUC, through the institutional official signing the Assurance, must promptly report any serious or continuing noncompliance with the PHS Policy, serious deviations from the Guide for the Care and Use of Laboratory Animals, and any IACUC suspensions.

Charges to NIH grant awards for the conduct of live vertebrate animal activities during periods of time that the terms and conditions of the grant award are not upheld are not allowable. Specific situations under which charges are not allowable are:

1. The conduct of animal activities in the absence of a valid Animal Welfare Assurance on file with OLAW.

2. The conduct of animal activities in the absence of a valid IACUC approval of the activities. Absence of IACUC approval includes failure to obtain IACUC approval, expiration, or suspension of IACUC approval.

Instances of serious noncompliance with section IV.F.3. of the PHS Policy, such as those mentioned above, are to be reported to OLAW and the IC supporting the grant award. In cases where charges have been made for unauthorized animal activities, appropriate adjustments must be made to the grant to remove those charges. NIH requires that reports contain a certification that no unallowable costs were charged to NIH grant funds during a period of noncompliance. If such a certification cannot be made, a detailed accounting of unallowable charges made to each affected grant should be included with the

report. If a detailed accounting has not been completed at the time of reporting, a date when it will be provided should be included.

NIH expects recipients to continue to maintain and care for animals during periods when animal activities are conducted in the absence of a valid Animal Welfare Assurance and/or IACUC approval. ICs may allow expenditure of NIH grant funds for maintenance and care of animals on a case-by-case basis. Consultation with the IC is encouraged regarding questions concerning allowable costs.

Information about the PHS Policy, Animal Welfare Assurances, and other relevant topics is available on the OLAW website.

## 4.1.2 Civil Rights Protections

Recipients are required to administer NIH-funded projects in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy, and comply with applicable conscience protections.

Before NIH may make an award to a domestic organization, the AOR must certify, by means of the signature on the application, that the organization has on file with the HHS OCR a one-time Assurance of Compliance with the statutes described in this subsection. The Assurance, HHS Form 690, is filed for the organization and is not required for each application. If the application has been recommended for funding and the applicant organization does not have an Assurance of Compliance on file, it will receive the required form and instructions for completion and submission from the awarding IC. The HHS Form 690 also is available from GrantsInfo@nih.gov or by telephone at 301-435-0714.

Domestic organizations that receive funding from recipients (including consortium participants and contractors under grants) rather than directly from NIH, also are required to file an HHS 690. The applicant/recipient is responsible for determining whether those organizations have the required Assurance on file and, if not, ensuring that it is filed with OCR. This includes ensuring that entities take meaningful steps to provide meaningful access to persons with limited English proficiency; and ensuring effective communication with persons with disabilities. Where applicable, Title XI and Section 1557 prohibit discrimination on the basis of sexual orientation, and gender identity, The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS.

### 4.1.2.1 Civil Rights Act of 1964

Title VI of the Civil Rights Act of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. The HHS implementing regulations are codified at 45 CFR Part 80.

### 4.1.2.2 Educational Amendments of 1972

Title IX of the Education Amendments of 1972 provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance. The HHS implementing regulations are codified at 45 CFR Part 86.

### 4.1.2.3 Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act of 1973, as amended, provides that no otherwise qualified handicapped individual in the United States shall, solely by reason of the physical or mental impairment, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance. These requirements pertain to the provision of benefits or services as well as to employment. The HHS implementing regulations are codified at 45 CFR Parts 84 and 85.

### 4.1.2.4 Age Discrimination Act of 1975

The Age Discrimination Act of 1975 prohibits discrimination on the basis of age in any program or activity receiving Federal financial assistance. The HHS implementing regulations are codified at 45 CFR Part 91.

### 4.1.2.5 Limited English Proficiency

EO 13166, August 11, 2000, requires recipients receiving Federal financial assistance to take steps to ensure that people with limited English proficiency can meaningfully access health and social services. A program of language assistance should provide for effective communication between the service provider and the person with limited English proficiency to facilitate participation in, and meaningful access to, services. The obligations of recipients are explained on the Limited English Proficiency (LEP) page of the HHS website..

## 4.1.3 Clinical Trials Registration and Reporting in ClinicalTrials.gov Requirement

### 4.1.3.1 NIH Policy on Dissemination of NIH-Funded Clinical Trial Information

For grant applications that request support for the conduct of a clinical trial, the NIH Policy on Dissemination of NIH-funded Clinical Trial Information establishes the expectation that all NIH-funded recipients and investigators conducting clinical trials, funded in whole or in part by NIH, will ensure that their clinical trials are registered at, and that summary results information is submitted to, ClinicalTrials.gov for public posting. The purpose of the policy is to promote broad and responsible dissemination of information from NIH-funded clinical trials through ClinicalTrials.gov. Disseminating this information supports NIH mission to advance the translation of research results into knowledge, products, and procedures that improve human health. For basic experimental studies with humans (BESH) NIH continues to expect registration and results reporting, but with the additional flexibility to register and report results on alternative publicly available platforms. This flexibility is only applicable to BESH studies submitted to Notices of Funding Opportunities designated as "basic experimental studies with humans" in the title and is available until September 24. 2023.

This policy is complementary to requirements in the Clinical Trial Registration and Results Information Submission regulation at 42 CFR Part 11, hereinafter referred to as the regulation.

This policy applies to all NIH-funded clinical trials regardless of study phase, type of intervention, or whether they are subject to the regulation. For example, NIH-funded phase 1 clinical trials of an FDA-regulated product are covered by this policy as are clinical trials studying interventions not regulated by the FDA, such as behavioral interventions. As such, the policy encompasses all NIH-funded clinical trials, including applicable clinical trials subject to the regulation. All NIH-funded clinical trials will be expected to register and submit results information to ClinicalTrials.gov according to the timelines described in the regulation.

This policy does not apply to a clinical trial that uses NIH-supported infrastructure but does not receive NIH funds to support its conduct.

Applicants seeking NIH funding for clinical trials will be required to submit a plan that will address how the expectations of this policy will be met. Recipients and investigators conducting clinical trials funded

in whole or in part by NIH are required to comply with all terms and conditions of award, including following their plan for the dissemination of NIH-funded clinical trial information.

The signature of the AOR on the grant application or progress report form certifies that, for any clinical trials funded under the NIH award, the recipient and all investigators are in compliance with the recipient's clinical trial information dissemination plan.

Responsibilities of recipients and investigators will fall within one of the following three categories:

1. If the NIH-funded clinical trial is an applicable clinical trial under the regulation and the recipient is the responsible party, the recipient will ensure that all regulatory requirements are met.

2. If the NIH-funded clinical trial is an applicable clinical trial under the regulation but the recipient is not the responsible party, the recipient will coordinate with the responsible party to ensure that all regulatory requirements are met.

3. If the NIH-funded clinical trial is not an applicable clinical trial under the regulation, the recipient will be responsible for carrying out the tasks and meeting the timelines described in regulation. Such tasks include registering the clinical trial in ClinicalTrials.gov and submitting results information to ClinicalTrials.gov.

Recipients of NIH funding conducting non-exempt research involving human subjects research subject to the revised Common Rule and conducting a clinical trial as defined in 45 CFR Part 46.102(b) should be aware that for each funded trial, one IRB-approved consent form must be posted on a designated public federal website in accordance with 45 CFR Part 46.116(h). The forms must be posted on a designated public federal website after recruitment closes and no later than 60 days after the last study visit by any subject, as required by the protocol. More information about these requirements is available on Posting Clinical Trial Informed Consent Forms webpage..

- **NIH-funded recipients using an English-language informed consent form to enroll participants may either:**

Submit an IRB-approved English-language informed consent form to ClinicalTrials.gov. Documents that are uploaded to ClinicalTrials.gov should be uploaded in accordance with these instructions. ClinicalTrials.gov does not currently support upload of non-English documents. Or:

Submit an IRB-approved informed consent form to Regulations.gov following the instructions in the paragraph below. NIH recipients submitting informed consent forms to Regulations.gov must maintain a copy of their Regulations.gov receipt and tracking number and make it available to NIH upon request.

- **NIH-funded recipients using only non-English informed consent forms to enroll participants:**

Submit an IRB-approved informed consent form to Docket ID: HHS-OPHS-2018-0021 on the Regulations.gov website in accordance with guidance issued by the Office for Human Research Protections. NIH recipients submitting informed consent forms to Regulations.gov must maintain a copy of their Regulations.gov receipt and tracking number and make it available to NIH upon request.

Institutions submitting documents to either ClinicalTrials.gov or Regulations.gov must protect participant privacy in accordance with applicable federal, state, and local laws and regulations (e.g., the HIPAA Privacy Rule, Certificates of Confidentiality) and any applicable terms of their NIH award.

Each NIH-funded clinical trial should have only one entry in ClinicalTrials.gov that contains its registration and results information. Recipients need not and should not create a separate record of the applicable clinical trial to comply with this policy.

## 4.1.3.2 Food and Drug Administration Amendments Act (FDAAA)

Applicants and recipients should familiarize themselves with the requirements of 42 U.S.C. 282(j), also known as Sec. 801 of Public Law 110-85 (the FDA Amendments Act of 2007 or FDAAA), as implemented in regulation by 42 CFR Part 11, with respect to registration and results reporting requirements that apply to certain clinical trials. Of particular note is that, in general, results of applicable clinical trials are due not later than 12 months after the primary completion date. If this date occurs after the period of performance has ended, results reporting is still required in accordance with FDAAA and the terms and conditions of grant award.

The signature of the AOR on the grant or progress report form certifies that, for applicable clinical trials funded in whole or part by the award, the responsible party has made all registration and results submissions required by 42 CFR Part 11.

## 4.1.3.3 Good Cause Extension (GCE) Request Requirements

Section 402(j) of the Public Health Service Act (PHS Act) and the Final Rule for Clinical Trials Registration and Results Information establish requirements and deadlines for the submission of clinical trial results information for Applicable Clinical Trials (ACTs). In general, the standard submission deadline for clinical trials results information is no later than 1 year after the primary completion date. However, in rare instances, a good cause extension (GCE) request may be sought for the following categories of trials:

- ACTs that are subject to the Final Rule (42 CFR 11.42).
- NIH Clinical trials subject to the complementary policy in Section 4.1.3.1.

Therefore, GCE requests must be submitted through the ClinicalTrials.gov Protocol Registration and Results System (PRS) prior to (i.e., the day before) the standard submission deadline or granted extended deadline. Late submissions, or requests submitted outside of the PRS, will not be accepted. If NIH determines the request does not constitute "good cause," the GCE request will be denied. If the request is denied, the responsible party must either (1) submit clinical trial results information by the later of the date on which clinical trial results information would otherwise be due, or 30 calendar days after the date that the PRS GCE denial notification was issued by NIH; or (2) submit an appeal.

Special Considerations for NIH Recipients

For NIH-funded and supported clinical trials, recipients should be aware that any GCE request could impact other aspects of the grant award. Therefore, the submission of a "Request for an Extension for Good Cause" does not constitute a prior approval request submission (e.g., No Cost Extension and Carryover).

Each GCE request must include

1. a complete description of the reason(s) why clinical trial results information cannot be provided according to the deadline, with sufficient detail to justify good cause for the extension and to allow for the evaluation of the request; and

2. an estimated date on which the clinical trial results information will be submitted.

Extension requests will be evaluated on a case-by-case basis using the following general criteria to support a determination of "good cause." These include, but are not limited to:

General Criteria:

1. The circumstances and their leading to the GCE request, including steps the responsible party is taking to mitigate the impact of those circumstances.

2. The extent to which the factors underlying the GCE request are outside of the responsible party's control.

3. 3. What steps will be taken during the requested extension, why they are necessary to mitigate the circumstances leading to the GCE request, and whether the requested submission date is commensurate with the explanation provided in the request.

4. 4. Whether information is internally consistent with relevant data element definitions and is consistent with information provided in other sections of the study record.

5. 5. The number of, and explanations for, previous GCE request(s), and the proposed reporting deadline in previous requests.

General Formatting Criteria and Considerations:

1. The request must be in English.

2. Acronyms and abbreviations should be spelled out, with the acronym or abbreviation provided in parentheses immediately after, at least the first time they are used in the request.

3. The responsible party should not include specific personal health information in the request.

Sufficient detail should be provided, including the steps that will be taken to meet the estimated submission date, a description of mitigating steps to avoid future delay, and any other information needed to address the criteria listed above. Requests that do not provide sufficient information may be denied.

More than one GCE request may be submitted for the same ACT or NIH Clinical Trial after a previous GCE request was granted. When a GCE is granted, the results submission deadline is updated to align with the approved extension. Any subsequent GCE request must be submitted prior to the granted extended deadline.

Appeals

Responsible parties or Recipients, as appropriate, may appeal denied GCE requests or the NIH-identified earlier deadline specified in a granted extension request. An appeal must provide an explanation of the reason(s) why the initial decision to deny the GCE request or grant the GCE request with a shorter deadline than requested should be overturned or revised, with sufficient detail to allow for the evaluation of the appeal. Responsible parties or Recipients, as appropriate, should provide further elaboration of the grounds for the request or highlight factors that justify an extension. The appeal should only address why the initial decision was incorrect; new bases for an extension request should not be presented for the first time in an appeal and will not be considered.

Only one appeal may be submitted for a denied GCE request. The appeal must be submitted via the PRS not later than 30 calendar days after the date that the PRS notification was issued by NIH. NIH will provide an electronic notification to the responsible party or recipient, as appropriate, communicating the determination of whether the appeal is granted or denied.

If the appeal is granted, the responsible party or recipient, as appropriate, has until the extended date specified in the electronic notification to submit clinical trial results information. If NIH denies the appeal of a denied GCE request, the responsible party or recipient, as appropriate, must submit clinical trial results information by the later of the date on which clinical trial results information would otherwise be due, or 30 calendar days after the electronic notification denying the appeal was sent by NIH.

The GCE request review and decision notification process can be found on the NIH Good Cause Extension website.

# 4.1.4 Confidentiality

## 4.1.4.1 Certificates of Confidentiality

In keeping with Section 301(d) of the PHS Act, as amended by Section 2012 of the 21st Century Cures Act, P.L. 114-255, and as enacted December 13, 2016 Certificates of Confidentiality (Certificates) are issued automatically to any NIH funded investigators or institutions engaged in biomedical, behavioral, clinical, or other research activities in which identifiable, sensitive information is collected.

At the time of enactment, all NIH-funded and conducted research that was commenced or ongoing on or after December 13, 2016 was deemed to be issued a Certificate and was therefore required to protect the privacy of individuals who are subjects of such research in accordance with subsection 301(d) of the Public Health Service Act. Per the PHS Act, subsection 301(d)(1), the Certificates protect identifiable, sensitive information collected and all copies, in perpetuity.

Institutions and their investigators are responsible for determining whether research they conduct is subject to the requirement and therefore issued a Certificate. Certificates issued in this manner will not be issued as a separate document.

For the purposes of this Policy, NIH considers research in which identifiable, sensitive information is collected or used, to include:

- Human subjects research as defined in the Federal Policy for the Protection of Human Subjects (45 CFR Part 46), including exempt research except for human subjects research that is determined to be exempt from all or some of the requirements of 45 CFR Part 46 if the information obtained is recorded in such a manner that human subjects cannot be identified or the identity of the human subjects cannot readily be ascertained, directly or through identifiers linked to the subjects;
- Research involving the collection or use of biospecimens that are identifiable to an individual or for which there is at least a very small risk that some combination of the biospecimen, a request for the biospecimen, and other available data sources could be used to deduce the identity of an individual;
- Research that involves the generation of individual level, human genomic data from biospecimens, or the use of such data, regardless of whether the data is recorded in such a manner that human subjects can be identified or the identity of the human subjects can readily be ascertained as defined in the Federal Policy for the Protection of Human Subjects (45 CFR Part 46); or
- Any other research that involves information about an individual for which there is at least a very small risk, as determined by current scientific practices or statistical methods, that some combination of the information, a request for the information, and other available data sources could be used to deduce the identity of an individual, as defined in subsection 301(d) of the Public Health Service Act.

*Recipient Responsibilities*

To determine if the requirement applies to research conducted or supported by NIH, investigators will need to ask, and answer the following question:

- Is the activity biomedical, behavioral, clinical, or other research?

If the answer to this question is no, then the activity is not issued a Certificate. If the answer is yes, then investigators will need to answer the following questions:

- Does the research involve Human Subjects as defined by 45 CFR Part 46?

- Are you collecting or using biospecimens that are identifiable to an individual as part of the research?

- If collecting or using biospecimens as part of the research, is there a small risk that some combination of the biospecimen, a request for the biospecimen, and other available data sources could be used to deduce the identity of an individual?

- Does the research involve the generation of individual level, human genomic data?

If the answer to any one of these questions is yes, then the requirement will apply to the research and therefore, in accordance with subsection 301(d) of the Public Health Service Act, the recipient of the Certificate shall not:

- Disclose or provide, in any Federal, State, or local civil, criminal, administrative, legislative, or other proceeding, the name of such individual or any such information, document, or biospecimen that contains identifiable, sensitive information about the individual and that was created or compiled for purposes of the research, unless such disclosure or use is made with the consent of the individual to whom the information, document, or biospecimen pertains; or

- Disclose or provide to any other person not connected with the research the name of such an individual or any information, document, or biospecimen that contains identifiable, sensitive information about such an individual and that was created or compiled for purposes of the research.

Disclosure is permitted only when:

- Required by Federal, State, or local laws (e.g., as required by the Federal Food, Drug, and Cosmetic Act, or state laws requiring the reporting of communicable diseases to State and local health departments), excluding instances of disclosure in any Federal, State, or local civil, criminal, administrative, legislative, or other proceeding;

- Necessary for the medical treatment of the individual to whom the information, document, or biospecimen pertains and made with the consent of such individual;

- Made with the consent of the individual to whom the information, document, or biospecimen pertains; or

- Made for the purposes of other scientific research that is in compliance with applicable Federal regulations governing the protection of human subjects in research.

As set forth in NIHGPS Chapter 8.3, recipients conducting NIH supported research applicable to the Policy are required to establish and maintain effective internal controls (e.g., policies and procedures) that provide reasonable assurance that the award is managed in compliance with Federal statutes, regulations, and the terms and conditions of award.

Recipients of Certificates are required to ensure that any investigator or institution not funded by NIH who receives a copy of identifiable, sensitive information protected by a Certificate issued by the Policy, understand they are also subject to the requirements of subsection 301(d) of the Public Health Service Act. In accordance with NIHGPS Chapter 15.2.1, recipients are also responsible for ensuring that any subrecipient that receives funds to carry out part of the NIH award involving a copy of identifiable, sensitive information protected by a Certificate issued by the Policy understand they are also subject to subsection 301(d) of the Public Health Service Act.

For studies in which informed consent is sought, NIH expects investigators to inform research participants of the protections and the limits to protections provided by a Certificate issued by the Policy.

Information on CoCs is available on the NIH Web site at Grants and Funding's Certificates of Confidentiality (CoC) webpage.

### 4.1.4.2 Confidentiality of Alcohol and Substance Use Patient Records

Section 543 of the PHS Act, as implemented in 42 CFR Part 2, requires that records of substance abuse patients be kept confidential except under specific circumstances and purposes. These protections differ from those available to patients under HIPAA and are intended to ensure that a patient in a substance or alcohol use program is not made more vulnerable than a similar patient who does not seek treatment. The covered records are any information, written or not, of a patient who has applied for or been given diagnosis or treatment for substance or drug use at a federally assisted program and includes any individual who, after arrest on a criminal charge, is identified as a substance or drug user in order to determine that individual's eligibility to participate in a program. This includes records of the identity, diagnosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, training, treatment, rehabilitation, or research, which is conducted under an NIH grant. Except as authorized under a court order, no patient record may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient. The regulations also describe procedures to allow for nonvoluntary disclosure of certain information by persons engaged in research on mental health, including research on the use and effect of alcohol and other psychoactive substances.

### 4.1.4.3 Confidentiality of Patient Records: Health Insurance Portability and Accountability Act

HHS issued the final version of the "Standards for Privacy of Individually Identifiable Health Information"—the Privacy Rule—on August 14, 2002. The Privacy Rule is a Federal regulation under the Health Insurance Portability and Accountability Act (HIPAA) of 1996 that governs the protection of individually identifiable health information. It is administered and enforced by OCR, HHS.

Decisions about applicability and implementation of the Privacy Rule reside with the researcher and the recipient organization. The OCR web site provides information on the Privacy Rule, including the complete text of the regulation and a set of decision tools for determining whether a particular entity is subject to the rule. An educational booklet, Protecting Heath Information in Research: Understanding the HIPAA Privacy Rule, is available through OCR's web site. That web site also includes other educational materials including information specific to grants.

## 4.1.5 Controlled Substances

If controlled substances are proposed to be administered as part of a research protocol or if research is to be conducted on the substances themselves, applicants/recipient must ensure that the DEA requirements, including registration, inspection, and certification, as applicable, are met. Regional DEA offices can supply forms and information concerning the type of registration required for a particular substance for research use. The main registration office in Washington, DC may be reached at 800-882-9539. Information also is available from the National Institute on Drug Abuse at 301-443-6441.

## 4.1.6 Debarment and Suspension

HHS regulations published in 2 CFR Part 376 implement the government-wide debarment and suspension system guidance (2 CFR Part 180) for HHS' non-procurement programs and activities. "Non-

procurement transactions" include, among other things, grants, cooperative agreements, scholarships, fellowships, and loans. NIH implements the HHS Debarment and Suspension regulations as a term and condition of award. Accordingly, recipients of NIH grants ("primary covered transactions"), including sponsoring institutions for Kirschstein-NRSA individual fellowships, are required to determine whether it or any of its principals (as defined in 2 CFR Part 180.995 and 2 CFR Part 376.995) is excluded or disqualified from participating in a covered transaction (i.e., grant or cooperative agreement) prior to entering into the covered transaction, i.e., prior to the drawdown of funds which signals acceptance of the grant award. Recipients may decide the method and frequency by which this determination is made and may check excluded parties in SAM, although checking SAM is not required.

Prior to the drawdown of funds for each grant award, recipients must report to the funding IC if the recipient or any of its principals:

- Are presently excluded or disqualified;
- Have been convicted within the preceding three years of any of the offenses listed in 2 CFR Part 180.800(a) or had a civil judgment for one of those offenses within that time period;
- Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses listed in 2 CFR Part 180.800(a); or
- Have had one or more public transactions (Federal, State, or local) terminated within the preceding three years or default.

Disclosure of unfavorable information by recipients under this requirement will not necessarily cause NIH to deny participation in the grant. NIH will consider the information when determining whether to enter into the covered transaction. NIH will also consider any additional information or explanation that recipients elect to submit with the disclosed information. However, if it is later determined that a recipient failed to disclose information that it knew at the time it accepted the NIH grant award, NIH may (a) terminate the transaction for material failure to comply with the terms and conditions of the award or (b) pursue any other available remedies, including suspension and debarment.

Recipients must immediately report to the NIH funding IC if at any time during the project period, including periods of no-cost extension, they discover that they (a) failed to disclose information prior to the drawdown of funds or (b) due to changed circumstances the recipient or any of its principals for the grant now meet the reporting criteria.

"Lower tier" transactions (e.g., consortiums, subcontracts, consultants, collaborators, and contractors that require the provision of goods or services that will equal or exceed $25,000) also are subject to the HHS regulations. Prior to entering into a lower tier covered transaction with a participant (as defined in 2 CFR Part 180.980), recipients must verify that the person (as defined in 2 CFR Part 180.985) is not excluded or disqualified. Recipients may not enter into any transaction with a person who is disqualified from that transaction unless an exception under the disqualifying statue, Executive Order, or regulation has been obtained from HHS.

Recipients must require participants at the next lower tier to (a) comply with the HHS Debarment and Suspension regulations as a condition of participation in the transaction and (b) pass the requirement to comply with the HHS Debarment and Suspension regulations to each person involved in the covered transaction at the next lower tier. Likewise, before entering into such a transaction lower tier participants and contractors under grants (where the contract requires the provision of goods or services that will equal or exceed $25,000) must report to the recipient if it or any participants are presently excluded or disqualified.

Recipients also are required to assure compliance for each trainee under a Kirschstein-NRSA institutional research training grant, or other similar NIH-supported institutional training grant, before their appointment.

Organizations or individuals that are suspended, debarred, or voluntarily excluded from eligibility cannot receive NIH grants, be paid from NIH grant funds, whether under a primary or lower-tier transaction (including trainees on NIH-supported training grants), or otherwise participate during the period of suspension, debarment, or exclusion. Because individuals who have been debarred, suspended, declared ineligible, or voluntarily excluded from covered transactions may not receive Federal funds for a specified period, charges made to NIH grants for such individuals (e.g., salary) are unallowable.

## 4.1.7 Drug-Free Workplace

The Drug-Free Workplace Act of 1988 (41 U.S.C. § 701 et seq.) requires that all organizations receiving grants from any Federal agency agree to maintain a drug-free workplace. By signing the application, the AOR agrees that the recipient will provide a drug-free workplace and will comply with the requirement to notify NIH if an employee is convicted of violating a criminal drug statute. Failure to comply with these requirements may be cause for debarment. Government wide requirements for Drug-Free Workplace for Financial Assistance are found in 2 CFR Part 182; HHS implementing regulations are set forth in 2 CFR Part 382.400. All recipients of NIH grant funds must comply with the requirements in Subpart B (or Subpart C if the recipient is an individual) of Part 382. Foreign applicants and recipients may be exempted from the drug-free workplace requirements of 2 CFR Part 182 based on a documented finding by the NIH awarding IC that application of those requirements is inconsistent with U.S. international obligations or the laws and regulations of a foreign government.

## 4.1.8 Federal Funding Accountability and Transparency Act (FFATA)

Public Law 109-282, the Federal Funding Accountability and Transparency Act of 2006 as amended (FFATA), requires full disclosure of all entities and organizations receiving Federal funds including grants, contracts, loans and other assistance and payments through a single publicly accessible web site, USASpending.gov. The Web site includes information on each Federal financial assistance award and contract over $30,000, including such information as:

1. The name of the entity receiving the award

2. The amount of the award

3. Information on the award including FAIN, transaction type, funding agency, etc.

4. The location of the entity receiving the award

5. A unique identifier of the entity receiving the award; and

6. Names and compensation of highly-compensated officers (as applicable)

Compliance with this law is primarily the responsibility of the Federal agency. However, two elements of the law require information to be collected and reported by recipients: 1) information on executive compensation when not already reported through the Central Contractor Registry; and 2) similar information on all subawards/subcontracts/consortiums over $30,000. Information on the recipient reporting requirement for this law can be found in Monitoring—Reporting—Financial Reports—Recipient Reporting of Subrecipient Data for FFATA.

Full text of the award term is available at 2 CFR Part 170.

# 4.1.9 Federal Information Security Management Act

All information systems, electronic or hard copy which contain Federal data need to be protected from unauthorized access. This also applies to information associated with NIH grants and contracts. Congress and the OMB have instituted laws, policies and directives that govern the creation and implementation of federal information security practices that pertain specifically to grants and contracts. The current regulations are pursuant to the Federal Information Security Management Act (FISMA), 44 U.S.C. 3541 et seq. The applicability of FISMA to NIH recipients applies only when recipients collect, store, process, transmit or use information on behalf of HHS or any of its component organizations. In all other cases, FISMA is not applicable to recipients of grants, including cooperative agreements. The recipient retains the original data and intellectual property, and is responsible for the security of this data, subject to all applicable laws protecting security, privacy, and research. If and when information collected by a recipient is provided to HHS, responsibility for the protection of the HHS copy of the information is transferred to HHS and it becomes the agency's responsibility to protect that information and any derivative copies as required by FISMA.

# 4.1.10 Financial Conflict of Interest

NIH requires recipient institutions (except Phase I SBIR/STTR applicants and recipients) to comply with the requirements of 42 CFR Part 50, Subpart F, "Responsibility of Applicants for Promoting Objectivity in Research for which PHS Funding is Sought." (FCOI Regulation), as implemented in the 2011 Final Rule for grants and cooperative agreements. FCOI requirements are aligned with 42 CFR Part 50--Subpart F and the overarching goal for reporting is to promote and encourage transparency in order to avoid distorting NIH funding decisions; NIH staff consider reports in light of other disclosures, e.g. other support, biographical sketch data, and foreign components, etc., and provide a holistic approach to award and risk management principles.

The requirements under the 2011 revised regulation promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct, or reporting of research funded under PHS grants or cooperative agreements will be free from bias by any conflicting financial interest of an Investigator, defined as the PD/PI and any other person, regardless of title or position, who is responsible for the design, conduct, or reporting of research funded by PHS, or proposed for such funding, which may include, for example, collaborators or consultants. These requirements do not apply to Federal employees or Federal agencies. Federal agencies have their own set of rules governing FCOI for employees. When submitting a grant application, the signature of the AOR certifies the applicant Institution's compliance with the requirements of the FCOI regulations, including that:

1. There is in effect at the Institution an up-to-date, written and enforced administrative process to identify and manage FCOI with respect to all research projects for which NIH funding is sought or received;

2. The Institution shall promote and enforce Investigator compliance with the regulation's requirements including those pertaining to disclosure of Significant Financial Interests (SFI);

3. The Institution shall identify and manage FCOIs and provide initial and ongoing FCOI reports to NIH;

4. When requested, the Institution will promptly make information available to the NIH/HHS relating to any Investigator disclosure of financial interests and the Institution's review of, and response to, such disclosure, whether or not the disclosure resulted in the Institution's determination of an FCOI;

5. The Institution must fully comply with the requirements of the regulation.

When the Institution determines that an FCOI exists (see #3 above), the Institution must report to the NIH awarding IC through the submission of an initial and annual FCOI report using the eRA Commons FCOI Module. The initial FCOI report will include the following information:

- Grant number and PD/PI or Contact PD/PI if the grant is awarded under the multiple PI model;

- Name of Investigator (if different from the PD/PI) with the FCOI;

- Name of the entity with which the Investigator has an FCOI;

- Nature of the FCOI (e.g., consulting fees, honoraria, paid authorship, equity interest, intellectual property rights and interests, and reimbursed or sponsored travel);

- Value of the financial interest $0-4,999; $5,000-9,999; $10,000-19,999; amounts between $20,000-100,000 by increments of $20,000; amounts above $100,000 by increments of $50,000 or a statement that a value cannot be readily determined;

- A description how the financial interest relates to NIH-funded research and the basis for the Institution's determination that the financial interest conflicts with such research; and

- Key elements of the Institution's management plan, including:
    1. Role and principal duties of the conflicted Investigator in the research project;

    2. Conditions of the management plan;

    3. How the management plan is designed to safeguard objectivity in the research project;

    4. Confirmation of the Investigator's agreement to the management plan;

    5. How the management plan will be monitored to ensure Investigator compliance; and

    6. Other information as needed.

The annual FCOI report must be submitted to NIH through the eRA Commons FCOI Module each year within a competitive segment or until the Institution reports that the FCOI no longer exists. The annual FCOI report will include the following information:

- Status of the FCOI

- Changes to the management plan, if applicable

The Institution must enter into a formal written agreement, signed and agreed to by the recipient and each consortium participant and/or subrecipient. The agreement must establish whether the FCOI policy of the recipient Institution or that of the subrecipient will apply to subrecipient Investigators and in either case, the agreement must include required significant financial interest disclosure, review, and FCOI reporting timelines to ensure compliance with the FCOI regulations. Subrecipient Institutions who rely on their FCOI policy must report identified FCOIs to the recipient Institution in sufficient time to allow the recipient Institution to report the FCOI to NIH to meet its reporting obligations. (See Consortium Agreements, 15.2.1 Written Agreement.)

NIH will not support any agreement that does not meet the minimum requirements. If a subrecipient is unwilling to accept the requirements of the written agreement by signing the agreement, then the agreement cannot be issued. NIH reserves the right to request copies of the written agreement and relevant supporting documentation as needed as part of its oversight responsibilities. Failure to provide requested documentation may lead to remedies for noncompliance and potential enforcement actions (See 8.5, Specific Award Conditions and remedies for noncompliance).

The Institution will make certain information available concerning identified FCOI held by senior/key personnel as defined in the regulation via a publicly accessible web site or by a written response to any

requestor within five business days of a request and update such information as specified in the regulation.

Each Institution shall maintain an up-to-date, written, enforced policy on FCOI that complies with the regulation, and make the policy available via a publicly accessible web site. NIH funded recipients are required to submit their publicly accessible FCOI policy to NIH via the eRA Commons Institution Profile (IPF) Module (IPF Module). The information is provided on an institutional level as part of an institution's IPF, rather than on a grant-specific level, so it is not necessary to submit the FCOI policy with each grant application.

The Institution must require each Investigator to disclose their (and their spouse and dependent children) domestic and foreign SFIs that are related to their Institutional responsibilities to the Institution's designated official(s).

Investigators must disclose all foreign financial interests (which includes income from seminars, lectures, or teaching engagements, income from service on advisory committees or review panels, and reimbursed or sponsored travel) received from any foreign entity, including foreign Institutions of higher education and foreign governments (which includes local, provincial, or equivalent governments of another country) when such income meets the threshold for disclosure (e.g., income in excess of $5,000). Institutions are strongly encouraged to review their FCOI policy and make any necessary changes to ensure Investigators fully understand their disclosure responsibilities.

The Institution must require each Investigator (including subrecipient Investigators) to complete training prior to engaging in NIH-supported research and at least every four years, and immediately under the designated circumstances:

- Institutional FCOI policies change in a manner that affects Investigator requirements
- An Investigator is new to an Institution
- An Institution finds an Investigator noncompliant with the Institution's FCOI policy or management plan.

As described in the regulation, examples of how FCOIs might be managed include but are not limited to, the following:

- Public disclosure of FCOI (e.g., when presenting or publishing the research);
- Disclosure of FCOI directly to human subjects research participants;
- Monitoring of research by independent reviewer(s);
- Modification of the research plan;
- Change of personnel or personnel responsibilities, or disqualification of personnel from participation in all or a portion of the research;
- Reduction or elimination of SFIs (e.g., sale of an equity interest)
- Severance of relationships that create FCOIs.

The information above is only a sample of the regulatory requirements found in 42 CFR Part 50--Subpart F. Applicants and recipients must review the regulation in its entirety to ensure compliance with all of the requirements. Resources applicable to FCOI, including Frequently Asked Questions, etc. can be found on the NIH Financial Conflict of Interest website.

## 4.1.11 Fly America Act

The Fly America Act (49 U.S.C. 40118) generally provides that foreign air travel funded by Federal government money may only be conducted on U.S. flag air carriers. A "U.S. flag air carrier" is an air carrier that holds a certificate under 49 U.S.C. 41102 but does not include a foreign air carrier operating under a permit. There are limited circumstances under which use of a foreign-flag air carrier is permissible. These circumstances are outlined below:

1. *__Airline "Open Skies" Agreement.__* A foreign flag air carrier may be used if the transportation is provided under an air transportation agreement between the United States and a foreign government, which the Department of Transportation has determined meets the requirements of the Fly America Act. For example, in 2008, the U.S. entered into an "Open Skies" Agreement with the European Union (EU). This Agreement gives European Community airlines (airlines of Member States) the right to transport passengers and cargo on flights funded by the U.S. government, when the transportation is between a point in the United States and any point in a Member State or between any two points outside the United States.

   The U.S.-EU Open Skies Agreement was amended effective June 24, 2010. GSA issued Guidance October 6, 2010. Pursuant to the amendment, federal contractors and recipients (not U.S. Government employees) need not be concerned about city-pair contract fares. However, contractors and recipients must check with the airline to ensure that the airline is covered by the U.S.-EU Open Skies agreement which may change periodically.

   Additionally, pursuant to the amendment, EU airlines are no longer limited to flying passengers between points in the United States and points in the EU. Instead, EU airlines are authorized to transport passengers between points in the United States and points outside the EU if the EU airline is authorized to serve the route under the U.S.-EU Open Skies Agreement. This includes flights that originate, arrive, or stop in the European Union. For additional information, please see GSA Bulletin FTR 11-02. For information on other "open skies" agreements in which the United States has entered, refer to the Fly America Act page on GSA's website

2. *__Involuntary Rerouting.__* Travel on a foreign-flag carrier is permitted if a U.S.-flag air carrier involuntarily reroutes the traveler via a foreign-flag air carrier, notwithstanding the availability of alternative U.S.-flag air carrier service.

3. *__Travel To and From the U.S.__* Use of a foreign-flag air carrier is permissible if the airport abroad is: (a) the traveler's origin or destination airport, and use of U.S.-flag air carrier service would extend the time in a travel status by at least 24 hours more than travel by a foreign-flag air carrier; or (b) an interchange point, and use of U.S.-flag air carrier service would increase the number of aircraft changes the traveler must make outside of the U.S. by two or more, would require the traveler to wait four hours or more to make connections at that point, or would extend the time in a travel status by at least six hours more than travel by a foreign-flag air carrier.

4. *__Travel Between Points Outside the U.S.__* Use of a foreign-flag air carrier is permissible if: (a) travel by a foreign-flag air carrier would eliminate two or more aircraft changes en route; (b) travel by a U.S.-flag air carrier would require a connecting time of four hours or more at an overseas interchange point; or (c) the travel is not part of the trip to or from the U.S., and use of a U.S.-flag air carrier would extend the time in a travel status by at least six hours more than travel by a foreign-flag air carrier.

5. ***Short Distance Travel.*** For all short distance travel, regardless of origin and destination, use of a foreign-flag air carrier is permissible if the elapsed travel time on a scheduled flight from origin to destination airport by a foreign-flag air carrier is three hours or less and service by a U.S.-flag air carrier would double the travel time.

## 4.1.12 Health and Safety Regulations and Guidelines

Recipients are responsible for meeting applicable Federal, State, and local health and safety standards and for establishing and implementing necessary measures to minimize their employees' risk of injury or illness in activities related to NIH grants. In addition to applicable Federal, State, and local laws and regulations, the following regulations must be followed when developing and implementing health and safety operating procedures and practices for both personnel and facilities:

- 29 CFR Part 1910.1030, Blood borne pathogens; 29 CFR Part 1910.1450, Occupational exposure to hazardous chemicals in laboratories; and other applicable occupational health and safety standards issued by the Occupational Health and Safety Administration (OSHA) and included in 29 CFR Part 1910.

- Nuclear Regulatory Commission Standards and Regulations, pursuant to the Energy Reorganization Act of 1974 (42 U.S.C. 5801 et seq.). Copies may be obtained from the U.S. Nuclear Regulatory Commission, Washington, DC 20555-0001.

The following guidelines are recommended for use in developing and implementing health and safety operating procedures and practices for both personnel and facilities:

- Biosafety in Microbiological and Biomedical Laboratories, CDC and NIH, HHS. This publication is available at on CDC's Strengthening Lab Safety webpage.

- Prudent Practices for Safety in Laboratories (2011), National Research Council, National Academies Press, 500 Fifth Street, NW, Lockbox 285, Washington, DC 20055 (ISBN 978-0-309-13864-2).

Recipient organizations are not required to submit documented assurance of their compliance with or implementation of these regulations and guidelines. However, if requested by the awarding IC, recipients should be able to provide evidence that applicable Federal, State, and local health and safety standards have been considered and have been put into practice.

## 4.1.13 Human Stem Cell Research

Under Executive Order 13505 NIH may support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell (hESC) research, to the extent permitted by law. NIH Guidelines on Human Stem Cell Research, implement the Executive Order. The Guidelines apply to the expenditure of NIH funds for research using hESCs and certain uses of induced pluripotent stem cells.

For the purpose of NIH Guidelines, "human embryonic stem cells (hESCs)" are cells that are derived from the inner cell mass of blastocyst stage human embryos, are capable of dividing without differentiating for a prolonged period in culture and are known to develop into cells and tissues of the three primary germ layers. Although hESCs are derived from embryos, such stem cells are not themselves human embryos.

NIH recipients may use hESCs that have been approved by NIH in accord with NIH Guidelines and are posted on the NIH Human Embryonic Stem Cell Registry, or may establish eligibility of specific cell lines for NIH funding by submitting a Request for Human Embryonic Stem Cell Line to be Approved

for Use in NIH Funded Research (NIH Form 2890). Prior to the use of NIH funds, applicants and recipients must provide assurances, when endorsing applications and progress reports submitted to NIH for projects using hESCs, that the hESCs to be used are listed on the NIH Registry and will be used in accordance with any restrictions associated with the line as cited on the Registry. If a specific line from the NIH Registry cannot be identified at the time of submission, the applicant/recipient must provide a strong justification why one cannot be identified at that time and a certification that one from the NIH Registry will be used.

DHHS regulations for Protection of Human Subjects, 45 CFR Part 46, Subpart A, establish safeguards for individuals who are the sources of many human tissues used in research, including non-embryonic human adult stem cells and human induced pluripotent stem cells. When research involving human adult stem cells or induced pluripotent stem cells constitutes human subject research, Institutional Review Board review may be required and informed consent may need to be obtained per the requirements detailed in 45 CFR Part 46, Subpart A.

In addition, 45 CFR Part 46, Subpart A, may apply to certain research using hESCs. This regulation applies, among other things, to research involving individually identifiable private information about a living individual, 45 CFR Part 46.102(f). The HHS Office for Human Research Protections (OHRP) considers biological material, such as cells derived from human embryos, to be individually identifiable when they can be linked to specific living individuals by the investigators either directly or indirectly through coding systems. Thus, in certain circumstances, IRB review may be required, in addition to compliance with these Guidelines. Applicant institutions are urged to consult OHRP guidance.

### 4.1.13.1 Human Pluripotent Stem Cell Research Prohibited with NIH Funding

The following uses of hESCs, even if derived from embryos donated in accordance with NIH Guidelines and listed on the NIH Registry, or human induced pluripotent stem cells, are prohibited:

- Research in which hESCs or human induced pluripotent stem cells are introduced into non-human primate blastocysts.

- Research involving the breeding of animals where the introduction of hESCs or human induced pluripotent stem cells may contribute to the germ line.

In addition, the derivation of stem cells from human embryos is prohibited in NIH funded research by the annual appropriations ban on funding of human embryo research known as the Dickey Wicker Amendment. NIH funding for research using hESCs derived from other sources, including somatic cell nuclear transfer, parthenogenesis, and/or IVF embryos created for research purposes, is also prohibited.

NIH will also not fund research in which human pluripotent cells are introduced into non-human vertebrate animal pre-gastrulation stage embryos.

## 4.1.14 Human Fetal Tissue Research

Human fetal tissue is defined as tissue or cells obtained from a dead human embryo or fetus after a spontaneous or induced abortion or stillbirth. This definition does not include established human fetal cell lines.

Sections 498A and 498B of the PHS Act (42 U.S.C. 289g-1 and 289g-2) set forth specific requirements and prohibitions on research involving human fetal tissue. Research involving human fetal tissue is also subject to the HHS Regulations for the Protection of Human Subjects. 45 C.F.R. 46.204 and 46.206 may be specifically relevant.

The scientific and ethical challenges associated with research utilizing human fetal tissue make it imperative that researchers and their organizations be fully aware of and in compliance with the Federal requirements. When an application involving human fetal tissue research is submitted to NIH, the AOR's signature certifies that researchers using these tissues are in compliance with the PHS Act. The statute specifically prohibits any person from knowingly acquiring, receiving, or transferring any human fetal tissue for valuable consideration. The term "valuable consideration" is a concept similar to profit and does not include reasonable payment for costs associated with the collection, processing, preservation, storage, quality control, or transportation of these tissues. Violation of this statute carries criminal penalties that apply to both those that supply and those that acquire human fetal tissue.

Current federal laws and regulations require informed consent for research involving the transplantation of human fetal tissue and for research with human fetal material associated with information that can identify a living individual. Most states require informed consent for the use of fetal tissue in research. Accordingly, NIH expects informed consent to have been obtained from the donor for any NIH-funded research using human fetal tissue.

When obtaining primary human fetal tissue for research purposes, NIH expects recipients to maintain appropriate documentation.

## 4.1.14.1 Research on Transplantation of Human Fetal Tissue

Sections 498A and 498B contain additional requirements for research on the transplantation of human fetal tissue for therapeutic purposes conducted or supported by NIH. Research involving the transplantation of human fetal tissue must be conducted in accordance with applicable Federal, State and local laws as well as the following NIH guidance.

Under section 498A, the official who signs the application is certifying that the research on transplantation of human fetal tissue will adhere to the following provisions:

- The woman who donates the fetal tissue must sign a statement declaring that the donation is being made:
    - for therapeutic transplantation research,
    - without any restriction regarding the identity of individuals who may receive the transplantation, and
    - without the donor knowing the identity of the recipient.

- The attending physician must sign a statement that they have:
    - obtained the tissue in accordance with the donor's signed statement and
    - fully disclosed to the donor their intent, if any, to use the tissue in research and any known medical risks to the donor or risks to her privacy associated with the donation that are in addition to risks associated with the woman's medical care.

- In the case of tissue obtained pursuant to an induced abortion, the physician's statement also must state that they:
    - obtained the woman's consent for the abortion before requesting or obtaining consent for the tissue to be used;
    - did not alter the timing, method, or procedures used to terminate the pregnancy solely for the purpose of obtaining the tissue for research; and
    - performed the abortion in accordance with applicable State and local laws.

- The PD/PI must sign a statement certifying that they are aware that the tissue is human fetal tissue obtained in a spontaneous or induced abortion, or pursuant to a stillbirth and that the tissue was donated for research purposes. The PD/PI also must certify that this information has been shared with others who have responsibilities regarding the research and, before eliciting informed consent from the transplantation recipient, will obtain written acknowledgment that the patient is aware of the aforementioned information.

- The PD/PI must certify in writing that they have had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy.

In submitting an application to NIH, the AOR that signs the application is certifying that, if research on the transplantation of human fetal tissue is conducted under the grant-supported project, the organization will make available for audit by the HHS Secretary or designee, the physician statements, the PD/PI's statements, and informed consents required by subsections 498A(b)(2) and (c) of the PHS Act or will ensure HHS access to those records, if maintained by an entity other than the recipient. This requirement is in addition to the requirements concerning human subjects in research.

In addition, FDA has jurisdiction over fetal cells and tissues intended for use in humans and requests that investigators contact them to determine whether any planned or ongoing clinical research would require submission of an IND application. Additional information and FDA contact information is available on FDA's Safety & Availability (Biologics) webpage.

### 4.1.14.2 Non-Transplantation Research on Human Fetal Tissue from Elective Abortions

For the purposes of this section, HFT from elective abortions is defined as research involving the study, analysis, or use of primary HFT, cells, and derivatives, and human fetal primary cell cultures obtained from elective abortions and includes the following:

• human fetal primary or secondary cell cultures, whether derived by the investigator or obtained from a vendor.

• animal models incorporating HFT from elective abortions, including obtaining such models from a vendor.

• derivative products from elective abortion tissues or cells such as protein or nucleic acid extracts.

• any human extra-embryonic cells and tissue, such as umbilical cord tissue, cord blood, placenta, amniotic fluid, and chorionic villi, if obtained from the process of elective abortion.

- The definition of research involving HFT from elective abortions does not include the following:

  - human fetal primary or secondary cell cultures, if cells were not derived from an elective abortion

  - already-established (as of June 5, 2019) human fetal cell lines (e.g., induced pluripotent stem cell lines from human fetal tissue, immortalized cell lines, differentiated cell lines).

  - derivative products from human fetal tissue or cells (e.g., DNA, RNA, protein) if not derived from elective abortion.

  - human extra-embryonic cells and tissue, including, but not limited to, umbilical cord tissue, cord blood, placenta, amniotic fluid, and chorionic villi if not derived from elective abortion.

  - human fetal cells present in maternal blood or other maternal sources

  - human embryonic stem cells or human embryonic cell lines.

  - research on transplantation of HFT for therapeutic purposes (because of the statutory provision(s) addressing such research)."

NIH requires additional documentation of the use of HFT from elective abortions in research, as NIH does with other research materials and models, to ensure that it is utilized for research only when scientifically justifiable, and in the least amount possible to achieve the scientific outcomes. NIH requires applicants to provide detailed information addressing the use of HFT in applications/proposals and reports. These requirements are designed to enable NIH to assess whether extramural research applicants and recipients are adequately assuring compliance with all applicable laws and HHS/NIH policies concerning the acquisition and use of HFT obtained from elective abortion.

NIH requires applicants to address HFT requirements by providing a justification of the use of HFT, details regarding procurement and costs, and information about how the applicant will use HFT. These additional requirements must be met within existing applicable page limits.

The addition of research involving HFT from elective abortions to a funded NIH grant project is considered an indicator of a change in scope and, due to the additional information required, such changes will require the submission of a competing revision application. Competing revision applications must include all required information, as described below. Administrative supplements to add HFT research will not be allowed. Complex grant mechanisms that include centers/cores with discretionary funds will not be allowed to expand existing HFT funding or to add HFT funded activities, including pilot projects.

Training awards and individual fellowships may not propose research using HFT. In addition, grant mechanisms that include centers with discretionary funds and Other Transaction Authority may not be used to support HFT research.

## 4.1.15 Human Subjects Protections

The HHS regulations for the protection of human subjects, in 45 CFR Part 46, implement Section 491(a) of the PHS Act and provide a framework, based on established, internationally recognized ethical principles, to safeguard the rights and welfare of individuals who participate as subjects in research activities supported or conducted by NIH or other HHS components.

The HHS regulations state that institutions (whether domestic or foreign)that are engaged in nonexempt research involving human subjects research and institutional boards (IRBs) reviewing research that is subject to the HHS regulations must comply with the regulations at 45 CFR 46 (Revised Common Rule §46.101(a) and Pre-2018 Common Rule §46.101(a)). Recipient institutions "engaged" in human subjects research must provide written assurance that it will comply with the regulatory requirements (Revised Common Rule §46.103(a) and Pre-2018 Common Rule §46.103(a)). The recipient institution provides written assurance by obtaining a Federalwide Assurance (FWA) with the HHS Office for Human Research Protections (OHRP) and establishing appropriate policies and procedures for the protection of human subjects (Revised Common Rule §46.108(a)(3) & (4) and Pre-2018 Common Rule §46.103(b) (4) & (5)). An institution is engaged in human subjects research if:

1. the institution's employees or agents intervene or interact with human subjects for research purposes;

2. the institution's employees or agents obtain individually identifiable private information or identifiable biospecimens about human subjects for research purposes; or

3. the institution receives a direct HHS award to conduct human subjects research, even where all activities involving human subjects are carried out by a subcontractor or collaborator.

The OHRP's document entitled Engagement of Institutions in Human Subjects Research provides additional guidance on "engagement".

The HHS regulations at Subparts B, C, and D include additional protections for specific populations as follows:

1. pregnant women, human fetuses and neonates (45 CFR Part 46, Subpart B);

2. prisoners (45 CFR Part 46, Subpart C); and

3. children (45 CFR Part 46, Subpart D).

Certain research activities are exempt from regulatory requirements for an FWA and IRB oversight (Revised Common Rule 46.104(d) and Pre-2018 Common Rule 46.101(b). OHRP guidance states that institutions must adopt clear procedures under which the IRB (or some authority other than the investigator) determines whether proposed research is exempt from the human subjects regulations. NIH will review the materials submitted by the institution, including the PHS Human Subjects Clinical Trails Information Form of the application, to determine if it can concur with the institution that the proposed activities are covered by the regulations or are in one or more exempt category. For research potentially subject to an exemption, this includes reviewing which category of exemption applies. NIH's review does not relieve the institution of any of its regulatory responsibility to accurately make and implement correct determinations about the research for the entirety of the project or otherwise speak for regulatory entities within HHS.

Unless all research activities meet the criteria for one or more exemptions from 45 CFR Part 46, research involving human subjects may only be conducted under an HHS award if the organization has a current OHRP approved FWA and provides certification that an Institutional Review Board (IRB) registered with OHRP has reviewed and approved the proposed activity in accordance with the HHS regulations.

In accepting an award that supports human subjects research, the recipient institution assumes responsibility for all research conducted under the award, including protection of human subjects at all participating and consortium sites. The recipient institution also assumes responsibility for ensuring that all institutions under the award engaged in nonexempt research involving human subjects have a current, approved FWA and must obtain certification of approval by an IRB registered with OHRP, of all nonexempt research involving human subjects before research may begin. When consultants are performing

research involving human subjects on NIH-funded projects, the consultant's institution must obtain an FWA.

The The Human Subjects page of the NIH Grants & Funding website contains additional information and Frequently Asked Questions that are available to help investigators understand how these Federal requirements apply to their research.

Applications will be considered incomplete if they do not address the involvement of human subjects in the PHS Human Subjects and Clinical Trials Information Form of the application. If human subjects research is anticipated within the period of the award but definite plans for involvement of human subjects cannot be described in the application (referred to as "delayed onset human subjects research" in the NIH grant application instructions), applicants must provide a detailed explanation of why it is not possible to develop definite plans. Prior to the involvement of human subjects the recipient must submit to the NIH awarding IC for prior approval either (1) detailed information as required in the PHS Human Subjects and Clinical Trials Information Form of the application, and meet the FWA and IRB certification requirements, or (2) if all of the research meets the criteria for one or more exemptions, identification of which exemptions(s) is/are applicable to the research, and a justification for the exemption with sufficient information about the involvement of human subjects to allow a determination that the claimed exemption is appropriate. Typically, recipients that are part of large clinical research networks or consortia that plan to add new protocols after the award must follow the awarding IC's procedures for approval of new protocols. Institutions with award mechanisms that allow them to select new projects, typically small future research projects (e.g., pilot projects), for support by their NIH award are responsible for ensuring that the selected projects follow all relevant regulations and policies including those governing the involvement of human subjects in research, including prior approval from the IRB if applicable. They must follow the awarding IC's procedures for prior approval of new protocols and updating the IC on the status of funded projects in annual progress reports which are typically described in the NOFO and/or NoA.

Recipients may not draw funds from the payment system, request funds from the paying office, or make obligations against Federal funds for research involving human subjects at any site engaged in nonexempt research for any period not covered by both an FWA and IRB approval consistent with 45 CFR Part 46. Costs associated with IRB review of human research protocols are not allowable as direct charges to NIH-funded research unless such costs are not covered by the organization's F&A rate.

The use of autopsy materials is governed by applicable State and local law and is not regulated by 45 CFR Part 46.

## 4.1.15.1 Federalwide Assurance Requirements

The Federalwide Assurance (FWA) commits the organization to compliance with the requirements set forth in 45 CFR Part 46, and the Terms of Assurance. Each institution that is engaged in HHS supported human subjects research must be covered by an FWA approved by OHRP.

When an applicant organization proposes nonexempt research involving human subjects and does not have an FWA, the AOR signature on the application constitutes declaration that the organization will comply with 45 CFR Part 46 and proceed to obtain an FWA. The NIH awarding component will place a restriction in the NoA so that no human subjects research may be conducted under the award until the FWA and certification of IRB review and approval (or certification of institutional determination of exemption, if applicable) have been obtained and accepted by NIH.

Each recipient institution must file its own FWA even if the organization does not operate its own IRB and designates another IRB for that purpose. IRBs must be registered with OHRP before the IRB may be designated on an FWA as reviewing proposed research for the FWA-holding institution.

Organizations that will serve as additional performance sites that are engaged in nonexempt research involving human subjects under the award must obtain an FWA, or, under specified circumstance, may be covered by the recipient's FWA in accordance with the OHRP's Guidance on Extension of an FWA to Cover Collaborating Individual Investigators and Introduction of the Individual Investigator Agreement.

It is the recipient organization's responsibility to ensure that all sites engaged in research involving human subjects are covered by an appropriate FWA and have IRB approval consistent with 45 CFR Part 46. It also is the recipient's responsibility to comply with NIH prior approval requirements related to the addition of sites not included in the approved application (see Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements). A list of organizations with approved assurances is available at the OHRP web site.

No individual may receive NIH grant funds for nonexempt research involving human subjects unless the individual is affiliated with or sponsored by an organization that assumes responsibility for the research under an FWA or the individual makes other arrangements with OHRP.

Detailed information concerning FWAs is available on the OHRP web site.

## 4.1.15.2 Certification of IRB Approval

Recipients must provide a certification to NIH that all nonexempt research involving human subjects has been reviewed and approved by an appropriate IRB, consistent with 45 CFR Part 46 and OHRP guidance. NIH-funded sites in the United States cannot rely on a non-US IRB; therefore, NIH will not accept an approval from a non-US IRB. The date of final IRB approval is the date that all protocols in the proposed research application received IRB review and approval (i.e., the date of the last protocol approval). When human subjects research is anticipated within the period of the award but definite plans for involvement of human subjects cannot be described in the application or proposal (referred to as "delayed onset human subjects research"), prior to the involvement of human subjects in nonexempt research, the recipient must submit to the NIH awarding IC for prior approval (1) detailed information as required in the Human Subjects and Clinical Trials Information Form of the application, as well as the certification and date of final IRB approval. Note that NIH requires the date of final IRB approval; conditional IRB approval is not sufficient. According to OHRP, in the case of IRB approval with conditions, IRB approval only becomes effective when the IRB has approved all information submitted in response to their conditions.

Certification of IRB approval may be filed at any time before award in accord with Just-in-Time procedures, unless required earlier by the IC. Therefore, following peer review and notification of impact score/percentile, applicant organizations with OHRP FWAs may wish to proceed with IRB review for those protocols that have not yet received IRB approval and that apply to applications in a fundable range.

Under no circumstances may NIH-supported nonexempt research involving human subjects be initiated prior to obtaining IRB approval and providing the final IRB approval date to NIH. NIH will not allow any funds to be used by recipients where a certification and an IRB approval date has not been provided to the funding IC.

Recipients are also reminded that any changes to study protocols that have been subject to peer review, as well as the addition of new study protocols, require the prior approval of the NIH awarding Institute or Center consistent with Section 8.1.2.5 of the NIHGPS. Such requirements are also generally described in the Notice of Funding Opportunity and/or the Notice of Award.

### 4.1.15.3 Reporting to Funding Agency and OHRP

Under the HHS regulations, recipient institutions must establish and follow written procedures for ensuring prompt reporting to the IRB, appropriate institutional officials, and NIH of any unanticipated problem involving risks to subjects or others or any serious or continuing noncompliance with 45 CFR Part 46 or IRB requirements or determinations; and any suspension or termination of IRB approval(revised Common Rule 45 CFR Part 46.108(a)(4) and pre-2018 Common Rule 45 CFR Part 46.103(b)(5)). Any IRB suspension or termination of approval must include a statement of the reasons for the IRB's action and must be reported promptly to the investigator, appropriate institutional officials, and NIH (45 CFR Part 46.113). Recipient institutions must also file incident reports promptly with OHRP of unanticipated problems involving risks to subjects or others, serious or continuing noncompliance with 45 CFR Part 46 or with the requirements or determinations of the IRB, and suspension or termination of IRB approval. See Guidance on Reporting Incidents to OHRP for more information.

### 4.1.15.4 OHRP Oversight

OHRP has regulatory responsibility for oversight of recipient compliance with the HHS human subjects regulations. In carrying out this responsibility, OHRP evaluates all written allegations or indications of non-compliance with the HHS regulations it receives from any source. All compliance oversight evaluations are predicated on the HHS regulations and the organization's assurance of compliance. Any corrective actions imposed as a result of a compliance oversight evaluation are intended to remedy identified non-compliance and prevent reoccurrence. Because each case is different, OHRP tailors corrective actions to foster the best interest of human research subjects and, to the extent possible, of the organization, research community, and HHS. Most compliance oversight evaluations and resultant corrective actions are resolved at the OHRP level. However, OHRP may recommend actions to be taken by other HHS officials.

Information about the FWA submission process and about OHRP activities related to oversight and compliance, as well as copies of the human subjects regulations, may be obtained from OHRP at the address shown in Part III or from the OHRP home page.

### 4.1.15.5 Education in the Protection of Human Research Participants

Before funds are awarded for competing applications involving human subjects, applicants must submit documentation that all senior/key personnel involved in human subjects research have received training in the protection of human subjects. Senior/key personnel include all individuals responsible for the design or conduct of the study, including senior/key personnel of all sites involved in research activities. This documentation should be included in the cover letter signed by the AOR that accompanies the description of other support, IRB and IACUC approval, and other information submitted prior to funding in accordance with Just-in-Time procedures. For non-competing continuation awards, the description of education for new senior/key personnel should be part of the progress report submitted as a prerequisite to award. Additional information about this education requirement is available on the Training & Resources – Human Subjects page of the NIH Grants & Funding website.

### 4.1.15.6 Data and Safety Monitoring

The NIH policy for data and safety monitoring requires oversight and monitoring of all NIH-conducted or -supported human biomedical and behavioral intervention studies (clinical trials) to ensure the safety of participants and the validity and integrity of the data. NIH policies on data and safety monitoring specify that the level and frequency of monitoring should be commensurate with the risks, nature, and complexity of the clinical trial, and are in addition to any monitoring requirements imposed by FDA. There are a number of options for monitoring clinical trials including, but not limited to, monitoring by a/an:

- PD/PI (required),
- IRB (required),
- Independent individual/safety officer,
- Designated medical/research monitor,
- Internal committee or board with explicit guidelines,
- DSMB (required for multi-site trials).

Applications that include clinical trials must include a general description of the data and safety monitoring plan. The description of the data and safety monitoring plan in competing applications will be reviewed by the SRG. A general description of a monitoring plan establishes the overall framework for data and safety monitoring. It must describe the entity that will be responsible for monitoring how adverse events will be reported to the IRB and NIH and, when appropriate, how NIH Guidelines and FDA regulations for INDs and IDEs will be satisfied.

A detailed monitoring plan must be included as part of the research protocol, be submitted to the IRB, and be reviewed and approved by the NIH awarding IC prior to the accrual of human subjects. The awarding IC may specify the reporting requirements for adverse events, which are in addition to the annual report to the IRB. The clinical trial monitoring function is above and beyond that traditionally provided by IRBs; however, the IRB must be cognizant of the procedures used by clinical trial monitoring entities and the monitor must provide periodic reports to investigators for transmittal to the IRB.

NIH specifically requires the establishment of DSMBs for multi-site clinical trials involving interventions that entail potential risk to the participants, and generally for Phase III clinical trials. Although Phase I and Phase II clinical trials also may use DSMBs, smaller clinical trials may not require this oversight format, and alternative monitoring plans may be appropriate.

For multi-site Phase I and II trials, investigators should organize a central reporting entity that will be responsible for preparing timely summary reports of adverse events for distribution among sites and the IRBs of participating sites. The frequency of summary reports will depend on the nature of the trial. Organizations with a large number of clinical trials may develop standard monitoring plans for Phase I and II clinical trials. However, such plans always should be evaluated for appropriateness for the particular investigation.

All multi-site trials with DSMBs are expected to forward summary reports of adverse events to each responsible IRB so they can address as appropriate to their responsibility reports related to the site. Recipients should address questions on this subject to the NIH PO.

Further information concerning these requirements is found on the NIH Human Subjects Research website and in the SF424 (R&R) application instructions, see section G.500 – PHS Human Subjects and Clinical Trials Information.

## 4.1.15.7 Inclusion of Individuals Across the Lifespan as Participants in Research Involving Human Subjects

For all competing grant applications, individuals of all ages, including children (i.e. individuals under the age of 18) and older adults, must be included in all human subjects research, conducted or supported by NIH, unless there are scientific or ethical reasons not to include them. The inclusion of individuals across the lifespan as subjects in research must be in compliance with all applicable subparts of 45 CFR Part 46 as well as with other pertinent federal laws and regulations.

Applications or proposals for research involving human subjects must address the age-appropriate inclusion or exclusion of individuals in the proposed research project. Applications must include a description

of plans for including individuals across the lifespan, including a rationale for selecting the specific age range justified in the context of the scientific question proposed. If individuals will be excluded from the research based on age, the recipient / offeror must provide an acceptable justification for the exclusion.

Scientific review groups at NIH will assess each application as being "acceptable" or "unacceptable" with regard to the age-appropriate inclusion or exclusion of individuals in the research project, in addition to evaluating the plans for conducting the research in accord with these provisions. NIH staff will monitor implementation of this policy during the development, review, award and conduct of research; and manage the NIH research portfolio to comply with the policy.

NIH recipients must submit data on participant age at enrollment in progress reports. Investigators planning to conduct research involving human subjects should design their studies in such a way that de-identified individual-level participant data on sex/gender, race, ethnicity, and age at enrollment may be provided to NIH in progress reports.

Ongoing, non-competing awards and competing applications submitted prior to January 25, 2019, will not be expected to comply with this policy until the recipient submits a competing renewal application. For these projects, the previous policy on the inclusion of children (NOT-98-024) continues to apply.

## 4.1.15.8 Inclusion of Women and Minorities as Subjects in Clinical Research and Reporting Sex/Gender, Racial, and Ethnic Participation

NIH-conducted and supported Clinical research must conform to the *NIH Policy and Guidelines on the Inclusion of Women and Minorities as Subjects in Clinical Research* in accord with Public Health Service Act sec. 492B, 42 U.S.C. sec 289a-2. The policy requires that women and members of minority groups and their subpopulations be included in NIH-conducted or supported clinical research, unless a clear and compelling rationale and justification establishes to the satisfaction of the NIH IC Director that inclusion is inappropriate with respect to the health of the subjects or the purpose of the research. Exclusion under other circumstances may be made by the Director, NIH, upon the recommendation of an IC Director based on a compelling rationale and justification.

Cost is not an acceptable reason for exclusion except when the research would duplicate existing data. Women of childbearing potential should not be routinely excluded from participation in clinical research. The policy applies to research subjects of all ages in NIH-supported clinical research studies (see definition of clinical research). The inclusion of individuals on the basis of sex/gender, race, and ethnicity must be addressed in developing a research design appropriate to the scientific objectives of the study. A proposed outreach program for recruiting should also be included. When an NIH-defined Phase III clinical trial is proposed, investigators must consider whether clinically important sex/gender, racial, and/or ethnic differences in the intervention effect are to be expected and plan the research accordingly. When registering in Clincialtrials.gov, applicable clinical trials as defined in 42 C.F.R. Part 11, that are also NIH-defined Phase III clinical trials must specify outcomes on sex/gender and race/ethnicity, as required based on prior evidence, and as explained in the NIH Policy and Guidelines on the Inclusion of Women and Minorities as Subjects in Clinical Research. For applicable clinical trials that are also NIH-defined Phase III clinical trials, submissions of results to Clinicaltrials.gov must include results of valid analyses by sex/gender and race/ethnicity, as required based on prior evidence.

Investigators must also collect and annually report information on sex/gender, race, and ethnicity in clinical research studies. The OMB minimum standards for maintaining, collecting, and presenting data on race and ethnicity for all grant projects are described in OMB Directive No. 15. The categories in this classification are social-political constructs and should not be interpreted as being scientific or anthropological in nature. The standards include five racial categories: American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White. There are two categories for ethnicity: "Hispanic or Latino," and "Not Hispanic or Latino."

For more information on policies and procedures related to inclusion: Inclusion Procedures

## 4.1.15.9 Good Clinical Practice Training for NIH Recipients Involved in NIH-funded Clinical Trials

NIH expects that all NIH-funded investigators and staff who are involved in the conduct, oversight, or management of clinical trials to be trained in Good Clinical Practice (GCP), consistent with principles of the International Conference on Harmonization (ICH) E6 (R2).

The principles of GCP help assure the safety, integrity, and quality of clinical trials. GCP provides a standard for ensuring clinical trial compliance, implementation, data collection, monitoring, and reporting (e.g., safety data, accrual reports, study status, protocol deviations, or final data), and outline the responsibilities of Institutional Review Boards (IRBs), investigators, sponsors and monitors. GCP addresses elements related to the design, conduct and reporting of clinical trials.

GCP principles constitute an international ethical and scientific quality standard for designing, conducting, recording, and reporting clinical trials. The principles were developed in 1996 by the ICH in collaboration with representatives from the European Union, Japan, and the United States. The U.S. Food and Drug Administration (FDA) requires GCP compliance for studies conducted under an investigational new drug application or investigational device exemption.

GCP describes the responsibilities of investigators, sponsors, monitors and IRBs in the conduct of clinical trials. Compliance with GCP provides assurance that the rights, safety and well-being of human subjects are protected, that clinical trials are conducted in accordance with approved plans with rigor and integrity, and that data derived from clinical trials are reliable.

GCP training complements other required training on protections for human research participants. Since June 2000, the NIH Extramural Research Program has required training on protections for human research participants for all NIH-funded investigators and individuals responsible for the design or conduct of NIH funded research involving human subjects.

The GCP policy applies to NIH-funded investigators and clinical trial site staff who are responsible for the conduct, management and oversight of NIH-funded clinical trials. GCP training includes the Principles of ICH GCP found in Section 2 of ICH E6. GCP training may be achieved through a class or course, academic training program, or certification from a recognized clinical research professional organization. Acceptable GCP courses include the NIAID GCP Learning Center website and National Drug Abuse Treatment Clinical Trials Network.. Completion of GCP training will demonstrate that individuals have attained the fundamental knowledge of clinical trial quality standards for designing, conducting, recording and reporting trials that involve human research participants. GCP training should be refreshed at least every three years in order remain current with regulations, standards and guidelines. Recipients of GCP training are expected to retain documentation of their training, and make it available to NIH upon request.

For purposes of Good Clinical Practice training the following definitions apply:

**_Investigator_**: The individual responsible for the conduct of the clinical trial at a trial site. If a clinical trial is conducted by a team of individuals at a trial site, the investigator is the responsible leader of the team and may be called the principal investigator.

**_Clinical trial staff_**: Individuals, identified by the investigator, who are responsible for study coordination, data collection and data management. The central focus of clinical trial staff is to manage participant recruitment and enrollment, to maintain consistent study implementation, data management, and to ensure integrity and compliance with regulatory and reporting requirements. These individuals may also seek informed consent from prospective participants, enroll and meet with research participants, and

collect and record information from research participants. Clinical trial staff may also be called the research coordinator, study coordinator, research nurse, study nurse or sub-investigator.

### 4.1.15.10 NIH Policy on the Use of a Single Institutional Review Board for Multi-Site Research

NIH requires sites located in the United States engaged in NIH-funded, multi-site research conducted at more than one domestic site to rely upon approval by a single Institutional Review Board (sIRB) as required by the Revised Common Rule (rCR) at 45 CFR Part 46.114 and NIH sIRB Policy, including projects supported by career development (K) awards and fellowship (F) awards with initial IRB approval on or after January 20, 2020. NIH expects the domestic sites in NIH-funded, multi-site studies to rely on a US sIRB (located in the United States). Foreign sites participating in NIH-funded, multi-site studies will not be expected to use a single IRB.

NIH applicants whose research is subject to the sIRB requirements must provide the name of the sIRB during the Just-in-Time period, before the award is issued. If, in delayed-onset research, an sIRB has not yet been identified, the recipient will provide the name of the sIRB to the funding NIH Institute/Center (IC) prior to initiating the multi-site research study/project.

The applicant may request direct cost funding for the additional costs associated with the establishment and review of the multi-site study/project by the sIRB, with appropriate justification; all such costs must be reasonable and consistent with cost principles, as described in Chapter 7 (Cost Consideration) and in case of for-profit organizations the Federal Acquisition Regulation (FAR) 31.302 (Direct Costs) and FAR 31.203 (Indirect Costs).

Recipients are responsible for ensuring that authorization agreements are in place. Copies of authorization agreements and other necessary documentation should be maintained to document compliance, as needed. As appropriate, recipients are responsible for ensuring that a mechanism for communication between the sIRB and participating sites is established.

All sites participating in multi-site research studies/projects subject to the sIRB requirements are expected to rely on an sIRB to carry out the functions that are required for institutional compliance with IRB review set forth in the HHS regulations at 45 CFR Part 46. Participating sites are responsible for meeting all other regulatory obligations.

NIH sIRB policy does not prohibit participating sites from also reviewing the research under the applicable regulatory framework. This additional review, even if performed by the institution's IRB, is not the regulatory review of the research as that responsibility still remains with the sIRB. Iif this approach is taken, NIH funds may not be used to pay for the cost of the duplicate review

## 4.1.16 Investigational New Drug Applications/Investigational Device Exceptions

To be eligible for NIH funding, all clinical research involving investigational drugs and devices, or other products regulated by the FDA, must comply with all applicable FDA requirements, including those for INDs, IDEs, and human subjects protections. Among other provisions, FDA regulations for human subjects protections are published in 21 CFR Parts 50 and 56 with additional standards found in Parts 312 and 812.

When applicable, the sponsor of the IND/IDE, whether NIH, a recipient, or a third party, is legally responsible for meeting the FDA requirements for sponsors. If the sponsor is also the PI, then the sponsor will need to satisfy FDA's requirements for sponsor-investigators. If the IND/IDE sponsor is a third party, such as a pharmaceutical company or research organization under contract to a recipient or to a

pharmaceutical company, the legal responsibility for monitoring the clinical trial and reporting to FDA rests with the sponsor rather than the recipient. This generally will be the case for larger, multi-site clinical trials. If the recipient is the IND/IDE holder, commonly referred to as an "investigator-initiated IND/IDE," the recipient or the investigator serves as the sponsor and assumes the legal responsibility. In any case, the recipient is ultimately responsible to NIH for ensuring compliance with the applicable requirements for protection of human subjects, including compliance with FDA's requirements.

Following the filing of an IND, FDA has a 30-day period in which to review it. FDA may allow the IND to proceed or may defer approval of the IND until changes it deems acceptable are made. FDA also may order a clinical trial to be suspended or terminated, at any time, based on information it receives about that clinical trial.

When NIH funds any part of a clinical study involving an IND or an IDE, NIH must be knowledgeable about any significant communications with FDA concerning the study. The recipient organization must report certain types of FDA communications to the NIH awarding IC within 72 hours of receiving a copy of, or upon being informed of, the FDA communication (through the PD/PI or another person acting on behalf of the recipient), whichever occurs first. This notification requirement applies to any of the following communications from FDA with the sponsor of the IND or IDE:

- Warning letters (whether sent to the recipient or to the for-profit sponsor)
- Notices of Initiation of Disqualification Proceedings and Opportunity to Explain
- Notice of Opportunity for Hearing
- Notice of Disqualification
- Consent Agreements
- Clinical hold letters that pertain to breaches of good manufacturing practices, good clinical practices, or other major issue requiring significant changes in the protocol.

The notification should be made in writing, but also may be done by telephone if a written notice would delay the notification. It should include a statement of the action taken or contemplated and the assistance needed to resolve the situation. These requirements apply to the recipient even if the recipient or the NIH-funded PD/PI is the sponsor. Failure to comply with this requirement may result in NIH imposing a corrective and/or enforcement action (see Administrative Requirements—Enforcement Actions). FDA communications are considered grant-related records for purposes of retention and access (see Administrative Requirements—Monitoring—Record Retention and Access).

## 4.1.17 Lobbying Prohibition

Recipients of Federal grants, cooperative agreements, contracts, and loans are prohibited by 31 U.S.C. 1352, "Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions," from using appropriated Federal funds to pay any person for influencing or attempting to influence any officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress with respect to the award, continuation, renewal, amendment, or modification of any of these instruments. These requirements are implemented by HHS in 45 CFR Part 93, which also describes types of activities, such as legislative liaison activities and professional and technical services, which are not subject to this prohibition under certain circumstances.

Applicants for NIH awards are required to certify and disclose that they:

- have not made, and will not make, such a prohibited payment;
- used or will use non-appropriated funds if they have made or agreed to make such payment; and

- will include these requirements in consortium agreements and contracts under grants that will exceed $100,000 and obtain necessary certifications from those consortium participants and contractors.

Certifications and disclosures must be filed at the times prescribed in the regulations based on the expected total costs.

The signature of the AOR on the application serves as the required certification of compliance for the applicant organization. Disclosure reporting is addressed in Administrative Requirements—Monitoring—Reporting.

See also Appropriation Public Policy Requirements Mandates Lobbying—Appropriation Prohibition for additional restrictions.

## 4.1.18 Metric System

Consistent with EO 12770 (July 25, 1991), Metric Usage in Federal Government Programs, measurement values in applications and recipient-prepared reports, publications, and other grant-related documents should be in metric. See Construction Grants chapter in IIB for requirements for metric usage in construction activities.

## 4.1.19 Military Recruiting and Reserve Officer Training Corps Program Access to Institutions of Higher Education

Section 588 of the National Defense Authorization Act of 1995, amended (10 U.S.C. §983), precludes NIH grant awards to institutions of higher education that DoD determines have an anti-Reserve Officer Training Corps (ROTC) policy or practice (regardless of when implemented) that either prohibits or, in effect, prevents the Secretary of Defense from gaining entry to campuses or access to students or information for military recruiting. DoD publishes each determination of ineligibility in the Federal Register as well as publishing, once every 6 months, a list of all currently ineligible schools. If DoD determines that an institution is ineligible during an ongoing project period, NIH will suspend support of current and future grant awards as provided in Administrative Requirements—Enforcement Actions—Suspension, Termination, and Withholding of Support. Funding eligibility may be restored on the basis of new information provided by DoD.

## 4.1.20 National Environmental Policy Act

All NIH grants, whether or not they include construction or major A&R activities, are subject to the requirements of the National Environmental Policy Act (NEPA) of 1969, as amended. This Act requires Federal agencies to consider the reasonably foreseeable environmental consequences of all grant-supported activities. As part of NIH's implementation of this Act, recipients are required to promptly notify NIH of any reasonably foreseeable impacts on the environment from grant-supported activities, or certify that no such impacts will arise upon receipt of a grant award. In addition, NIH has determined that most NIH research grants are not expected to individually or cumulatively have a significant effect on the environment unless any part of the proposed research and/or project includes one or more of the following categorical exclusions listed below:

1. The potential environmental impacts of the proposed research may be of greater scope or size than other actions included within a category.

2. The proposed research threatens to violate a Federal, State, or local law established for the protection of the environment or for public health and safety.

3. Potential effects of the proposed research are unique or highly uncertain.

4. Use of especially hazardous substances or processes is proposed for which adequate and accepted controls and safeguards are unknown or not available.

5. The proposed research may overload existing waste treatment plants due to new loads (volume, chemicals, toxicity, additional hazardous wasted, etc.)

6. The proposed research may have a possible impact on endangered or threatened species.

7. The proposed research may introduce new sources of hazardous/toxic wastes or require storage of wastes pending new technology for safe disposal.

8. The proposed research may introduce new sources of radiation or radioactive materials.

9. Substantial and reasonable controversy exists about the environmental effects of the proposed research.

This requirement is in addition to other public policy requirements for grants for construction and alteration and renovation activities discussed more fully in the Construction chapter — Construction, Modernization, or Major Alteration and Renovation of Research Facilities—Public Policy Requirements.

## 4.1.21 Nondelinquency on Federal Debt

The Federal Debt Collection Procedures Act of 1990 (Act), 28 U.S.C. 3201(e), provides that an organization or individual that is indebted to the United States, and has a judgment lien filed against it, is ineligible to receive a Federal grant. NIH cannot award a grant unless the AOR of the applicant organization (or individual in the case of a Kirschstein-NRSA individual fellowship) certifies, by means of their signature on the application, that the organization (or individual) is not delinquent in repaying any Federal debt. If the applicant discloses delinquency on a debt owed to the Federal government, NIH may not award the grant until the debt is satisfied or satisfactory arrangements are made with the agency to which the debt is owed. In addition, once the debt is repaid or satisfactory arrangements made, NIH will take that delinquency into account when determining whether the applicant would be a responsible NIH grant recipient.

Anyone who has been judged to be in default on a Federal debt and who has had a judgment lien filed against them should not be listed as a participant in an application for an NIH grant until the judgment is paid in full or is otherwise satisfied. No funds may be used for or rebudgeted following an award to pay such an individual. NIH will disallow costs charged to awards that provide funds to individuals in violation of this Act.

These requirements apply to all types of organizations and awards, including foreign grants.

## 4.1.22 President's Emergency Plan for AIDS Relief (PEPFAR) Program

### 4.1.22.1 PEPFAR Agreements

Specific terms and conditions concerning prostitution and sex trafficking apply to all grants awarded under the U.S. President's Emergency Plan for AIDs Relief (PEPFAR) program. These are:

A.  The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

B.  The following definitions apply for purposes of this provision:
    1.  "Commercial sex act" means any sex act on account of which anything of value is given to or received by any person.

    2.  "Prostitution" means procuring or providing any commercial sex act and the "practice of prostitution" has the same meaning.

    3.  "Sex trafficking" means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

C.  The Recipient must insert this provision, which is a standard provision, in all subawards or subcontracts.

D.  This provision includes express terms and conditions of the award and any violation of it is grounds for unilateral termination of the award by NIH prior to the end of its term.

## 4.1.22.2 PEPFAR Agreements Between the U.S. Government and Foreign Non-Governmental Organizations (NGOs)

Additional requirements regarding the opposition to prostitution and sex trafficking may be applied to grants awarded under PEPFAR and issued to foreign Non-Governmental Organizations (NGOs) directly supported by or subrecipients of U.S. public or private NGOs. Subject to the United States Supreme Court's decision in Agency for International Development, et al., v. Alliance for Open Society International, Inc., et al., 133 S. Ct. 2321 (2013) and subsequent proceedings, the terms and conditions for such agreements with foreign NGOs may include the following:

A.  The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

B.   1.   Except as provided in (B)(2) and (B)(3), by accepting this award or any subaward, a non-governmental organization or public international organization recipient / sub-recipient agrees that it is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women, men, and children. Any enforcement of this clause is subject to *Agency for International Development, et al., v. Alliance for Open Society International, Inc., et al.*, 133 S. Ct. 2321 (2013) and subsequent proceedings.

2.   The following organizations are exempt from (B)(1): the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations agency.

3.   Contractors and subcontractors are exempt from (B)(1) if the contract or subcontract is for commercial items and services as defined in FAR 2.101, such as pharmaceuticals, medical supplies, logistics support, data management, and freight forwarding.

4.   Notwithstanding section (B)(3), not exempt from (B)(1) are recipients, subrecipients, contractors, and subcontractors that implement HIV/AIDS programs under this assistance award, any subaward, or procurement contract or subcontract by:

   i.   Providing supplies or services directly to the final populations receiving such supplies or services in host countries;

   ii.   Providing technical assistance and training directly to host country individuals or entities on the provision of supplies or services to the final populations receiving such supplies and services; or

   iii.   Providing the types of services listed in FAR 37.203(b)(1)-(6) that involve giving advice about substantive policies of a recipient, giving advice regarding the activities referenced in (i) and (ii), or making decisions or functioning in a recipient's chain of command (e.g., providing managerial or supervisory services approving financial transactions, personnel actions).

C.   The following definitions apply for purposes of this provision:

1.   "Commercial sex act" means any sex act on account of which anything of value is given to or received by any person.

2.   "Prostitution" means procuring or providing any commercial sex act and the "practice of prostitution" has the same meaning.

3.   "Sex trafficking" means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act. 22 U.S.C. 7102(9).

D.   The recipient shall insert this provision, which is a standard provision, in all subawards, procurement contracts or subcontracts.

E.   This provision includes express terms and conditions of the award and any violation of it shall be grounds for termination of the award by NIH prior to the end of its term.

## 4.1.23 Pro-Children Act of 1994

Public Law 103-227, Title X, Part C, Environmental Tobacco Smoke, also known as the Pro-Children Act of 1994, imposes restrictions on smoking in facilities where federally funded children's services are provided. NIH grants are subject to these requirements only if they meet the Act's specified coverage. The Act specifies that smoking is prohibited in any indoor facility (owned, leased, or contracted for) used for the routine or regular provision of kindergarten, elementary, or secondary education or library

services to children under the age of 18. In addition, smoking is prohibited in any indoor facility or portion of a facility (owned, leased, or contracted for) used for the routine or regular provision of federally funded health care, day care, or early childhood development (Head Start) services to children under the age of 18. The statutory prohibition also applies if such facilities are constructed, operated, or maintained with Federal funds. The statute does not apply to children's services provided in private residences, facilities funded solely by Medicare or Medicaid funds, portions of facilities used for inpatient substance or alcohol treatment, or facilities where Women, Infants and Children (WIC) coupons are redeemed. Failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1,000 per violation and/or the imposition of an administrative compliance order on the responsible entity.

Because of the nature of NIH programs and funding, individual transactions, rather than entire programs, may be subject to these requirements. The signature of the AOR will indicate the intent to comply. Any questions concerning the applicability of these provisions to an NIH grant should be directed to the GMO.

## 4.1.24 Public Health Security

### 4.1.24.1 Public Health Security and Bioterrorism Preparedness and Response Act (Select Agents)

The Public Health Security and Bioterrorism Preparedness and Response Act of 2002, 42 U.S.C. 201, is designed to provide protection against misuse of select agents and toxins whether inadvertent or the result of terrorist acts against the U.S. homeland or other criminal acts. The Act was implemented, in part, through regulations published by HHS and USDA at 42 CFR Part 73, 9 CFR Part 121 and 7 CFR Part 331 or commonly referred to as "Select Agent Regulations." Copies of these regulations are available here, or can be obtained from CDC, 1600 Clifton Road, MS A-46, Atlanta, GA 30333; telephone: 404-718-2000.

Research involving select agents and recombinant or synthetic nucleic acid molecules also is subject to *NIH Guidelines for Research Involving Recombinant or Synthetic Nucleic Acid Molecules (NIH Guidelines)*. *NIH Guidelines* apply to all research projects (NIH-funded and non-NIH-funded) that involve recombinant or synthetic nucleic acid molecules and are conducted at or sponsored by an organization that receives NIH support for recombinant or synthetic nucleic acid molecule research.

### 4.1.24.1.1 Select Agents

#### 4.1.24.1.1.1 Select Agent Awards to U.S. Institutions

Domestic recipients who conduct research involving select agents or toxins (see Section 3 and 4 of 42 CFR Part 73 and 9 CFR Part 121 and Section 3 of 7 CFR Part 331) must maintain a registration with CDC (or USDA, depending on the agent) before using NIH funds. No funds can be used for research involving select agents or toxins if the registration certificate maintained by CDC or USDA is suspended or revoked.

#### 4.1.24.1.1.2 Select Agent Awards to Foreign Organizations and International Organizations

Foreign Organizations and International Organizations who conduct research involving select agents (see 42 CFR Part 73 for the select agent list; and 7 CFR Part 331 and 9 CFR Part 121 for the relevant animal and plant pathogens) must provide information satisfactory to NIH that a process equivalent to that described in 42 CFR Part 73 for U.S. institutions is in place and will be administered on behalf of all

select agent work sponsored by NIH funds before using these funds for any work directly involving select agents. Recipients must be willing to address the following key elements appropriate for their institutions: safety, security, training, procedures for ensuring that only approved/appropriate individuals have access to the select agents, and any applicable laws, regulations and policies equivalent to 42 CFR Part 73. If this work will not, in fact, involve select agents (i.e. excluded strains), and you provide documentation satisfactory to NIH that your work does not now nor will it in the future (i.e. throughout the life of the award) involve select agents, no further action will be necessary.

### 4.1.24.1.1.3 Select Agent Awards to U.S. Institutions with Foreign Subcomponents

Recipients who conduct research involving select agents (see 42 CFR Part 73 for the select agent list; and 7 CFR Part 331 and 9 CFR Part 121 for the relevant animal and plant pathogens) must complete registration with CDC (or USDA, depending on the agent) before using NIH funds for any work directly involving the select agent at the U.S. institution. No funds can be used for research involving select agents if the final registration certificate is denied. Before using NIH funds for any work directly involving the select agents at a foreign subrecipient, the U.S. recipient must provide information from the foreign organization satisfactory to NIH that a process equivalent to that described in 42 CFR Part 73 for U.S. institutions is in place and will be administered on behalf of all select agent work sponsored by these funds. Recipients must be willing to address the following key elements appropriate for the foreign organization: safety, security, training, procedures for ensuring that only approved/appropriate individuals have access to the select agents, and any applicable laws, regulations and policies equivalent to 42 CFR Part 73 are followed. If this work will not, in fact, involve select agents (e.g. excluded strains), and you provide documentation satisfactory to NIH that your work does not now nor will it in the future (i.e. throughout the life of the award) involve select agents, no further action will be necessary.

### 4.1.24.2 Dual Use Research of Concern

On September 24, 2014, the Federal government issued a policy for the oversight of life sciences "Dual Use Research of Concern" (DURC). DURC is defined as life sciences research that, based on current understanding, can be reasonably anticipated to provide knowledge, information, products, or technologies that could be directly misapplied to pose a significant threat with broad potential consequences to public health and safety, agricultural crops and other plants, animals, the environment, materiel, or national security. Despite its value and benefits, some research may be misused for harmful purposes. The fundamental aim of this oversight policy is to preserve the benefits of life sciences research while minimizing the risk of misuse of the knowledge, information, products, or technologies provided by such research.

The DURC policy applies to recipient institutions and its investigators in the United States that receive Federal funding for life sciences research and that conduct or sponsor research involving one or more of the 15 agents or toxins listed in the policy and to foreign recipients that receive Federal funding to conduct or sponsor research involving one of these 15 agents or toxins. Institutions must establish an Institutional Review Entity (IRE) which must review research involving these agents or toxins to determine if it involves one or more of the listed experimental effects and if so, whether it meets the definition of DURC. Recipients also must establish an Institutional Contact for Dual Use Research (ICDUR), as required by the U.S. Government's DURC Policy, to serve as an internal resource for issues regarding compliance with and implementation of the requirements for the oversight of research that falls within the scope of the DURC policy role. The award recipient must maintain records of institutional DURC reviews and completed risk mitigation plans for the term of the research grant or contract plus three years after its completion, but no less than eight years, unless a shorter period is required by law or regulation.

For research that may be considered DURC, NIH will work collaboratively with the institution and investigators to develop a risk mitigation plan, which may be implemented through a term of award and that NIH must approve. For example, NIH may request that institutions periodically review a project for its DURC potential, propose any modifications to the risk mitigation plan, and share any resulting manuscripts with their Program Official prior to submitting the manuscript to a journal.

### 4.1.24.3 Agents Regulated Under the Chemical Weapons Convention

The United States is one of 175 States Parties to the Chemical Weapons Convention (CWC), which prohibits the development, production, stockpiling, and use of chemical weapons (CW). The CWC does not prohibit production, processing, consumption, or trade of related chemicals for peaceful purposes, but it does establish a verification regime to ensure such activities are consistent with the object and purpose of the treaty.

NIH researchers engaged in activities involving these chemicals, especially Schedule 1 chemicals, may be required to submit declarations and/or reports to the Bureau of Industry and Security (BIS) and may be subject to inspection by the Organization for the Prohibition of Chemical Weapons, which administers the CWC. In addition, trade in certain chemicals with States not Party to the CWC may be prohibited or subject to an export license and or end-use certificate.

Schedule 1 chemicals include, but are not limited to, the toxic chemicals sarin, soman, tabun, VX, sulfur mustards, Lewisites, saxitoxin, ricin, and nitrogen mustards. More information about the U.S. CWC, including complete lists of Schedule 1, 2, and 3 chemicals under the CWC may be found at on the U.S. Chemical Weapons Convention website. Federal regulations that apply to the CWC are 15 CFR CHAPTER VII, SUBCHAPTER B, PARTS 710-722, SUBCHAPTER C, PARTS 730-774; 22 CFR CHAPTER I, PART 103, PARTS 120-130. These CRFs and other applicable safety standards issued by the Department of Commerce and Department of State are available on the Chemical Weapons Conventions Regulations webpage.

## 4.1.25 Reporting and Assurance Requirements for Institutions Receiving Awards for Training of Graduate Students for Doctoral Degrees

As required by Section 403C of the Public Health Service Act, each institution receiving an NIH award for the training of graduate students for doctoral degrees must provide information on completion rates and time to degree to all applicants to doctoral programs supported by NIH training awards. Specifically, institutions must provide applicants with the following information for the programs to which they apply:

- The percentage of students admitted for study who successfully attain a doctoral degree, and
- The average time (not including any leaves of absence) between the beginning of graduate study and the receipt of a doctoral degree.

Institutions **affected** by this Assurance and information disclosure requirement are doctoral degree granting institutions that receive any of the following institutional training grant awards or cooperative agreements from NIH for the doctoral training of graduate students:

- D43, TU2, T15, T32, T37, T90, U2R, U90, and U54/TL1

Institutions are **not affected** by this requirement if they:

- Receive only individual NIH fellowship awards.
- Provide training only to undergraduate or master's level students supported through one of the activity codes listed above.
- Provide only short-term training to doctoral-level health professional students through one of the activity codes listed above.
- Receive an award for one or more of the activity codes for doctoral training of graduate students, but do not confer doctoral degrees themselves (e.g., teaching hospitals).
- Receive an institutional training grant award for doctoral training of graduate students from a Public Health Service Agency other than NIH.

In complying with this Assurance and information disclosure requirement, institutions may decide how best to present the required information to applicants and may wish to consider consolidating data by department or broad program to which candidates apply, or providing additional information in order to provide context.

Recipients with awards for any of the activity codes listed above are also required to provide corresponding information on trainees supported by each of their awards when submitting a renewal application or RPPR.

# 4.1.26 Research Involving Recombinant or Synthetic Nucleic Acid Molecules

## 4.1.26.1 Scope and Availability

*The NIH Guidelines for Research Involving Recombinant or Synthetic Nucleic Acid Molecules (NIH Guidelines)* (April 2019 or latest revision) apply to all research projects (NIH-funded and non-NIH-funded) that involve recombinant or synthetic nucleic acid molecules and are conducted at or sponsored by an organization that receives NIH support for recombinant or synthetic nucleic acid molecules.

According to *NIH Guidelines*, recombinant and synthetic nucleic acid molecules are defined as (1) molecules that a) are constructed by joining nucleic acid molecules and b) can replicate in a living cell, i.e. recombinant nucleic acids, or (2) nucleic acid molecules that are chemically or by other means synthesized or amplified, including those that are chemically or otherwise modified but can base pair with naturally occurring nucleic acid molecules, i.e. synthetic nucleic acids, or (3)molecules that result from the replication of those described in (1) or (2). *NIH Guidelines* apply to both basic and clinical research studies.

Failure to comply with these requirements may result in suspension or termination of an award for recombinant or synthetic nucleic acid molecule research at the organization, or a requirement for NIH prior approval of any or all recombinant or synthetic nucleic acid molecule projects at the organization. The recipient should carefully review *NIH Guidelines* in its entirety to ensure compliance with all of the requirements for projects involving recombinant or synthetic nucleic acid molecules.

Research involving recombinant or synthetic nucleic acid molecules and select agents also is subject to pertinent CDC and USDA regulations, 42 CFR Part 73, Select Agents and Toxins; and 7 CFR Part 331 and 9 CFR Part 121, Possession, Use, and Transfer of Biological Agents and Toxins.

## 4.1.26.2 Institutional Biosafety Committee

Each organization that conducts research involving recombinant or synthetic nucleic acid molecules, including contractors under grants, must have policies and procedures to ensure compliance with NIH

Guidelines and must establish a standing IBC. The IBC is required to review experiments involving recombinant or synthetic nucleic acid molecules to ensure that the procedures, project, personnel, and facilities are adequate and in compliance with NIH Guidelines. Section IV of NIH Guidelines specifies the composition of IBCs. A roster of the IBC members and biosketches for each member must be submitted to NIH. At a minimum, the roster should indicate the name of each IBC member, as well as which IBC members are serving as the chairperson, contact person, and, as applicable, experts in biosafety or plant, animal, or human experimentation. Biosketches should include a description of the occupation and professional qualifications of each member. Organizations can register their IBC with NIH on-line by utilizing the IBC Registration Management System (RMS).

### 4.1.26.3 Investigators and Institutional Staff

Section IV of *NIH Guidelines* also specifies the roles and responsibilities of PIs, biological safety officers (BSOs) and recipient institutions with respect to the safe conduct and oversight of recombinant or synthetic nucleic acid molecules. Investigators, laboratory staff, BSOs, and institutional officials should read and be aware of their duties and expected biosafety practices, as described by *NIH Guidelines*.

## 4.1.27 Research Misconduct

Title 42 CFR Part 93, PHS Policies on Research Misconduct (the "PHS regulation"), Subpart C, "Responsibilities of Institutions" specifies recipient responsibilities to have written policies and procedures for addressing allegations of research misconduct, to file an Assurance of Compliance with the HHS Office of Research Integrity (ORI), and take all reasonable and practical steps to foster research integrity. Research misconduct is defined by Subpart A of 42 CFR Part 93 as fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results. Subpart D, "Responsibilities of the U.S. Department of Health and Human Services," specifies that ORI has responsibility for addressing research integrity and misconduct, monitors institutional investigations of research misconduct and facilitates the responsible conduct of research through education, preventive, and regulatory activities.

To be eligible for PHS funding, domestic and foreign institutions must have approved assurances and required renewals on file with ORI. The responsible institutional official must assure on behalf of the institution that the institution (1) has written policies and procedures in compliance with 42 CFR Part 93 for inquiring into and investigating allegations of research misconduct in PHS-supported research and (2) complies with its own policies and procedures and the requirements of 42 CFR Part 93. In addition, recipient institutions must foster a research environment that promotes the responsible conduct of research. Domestic and foreign subrecipient institutions must also maintain an assurance by submitting form PHS-6315 to ORI. An institution establishes an assurance when an official signs the face-page (SF 424 (R&R) or PHS 398) of the grant application form or when the institution files a separate assurance form. Once established, institutions maintain their assurance by filing the Annual Report on Possible Research Misconduct (between January 1 and April 30 each year), submitting their policy for responding to allegations of research misconduct for review when requested by ORI, revising their policy when requested by ORI to bring the policy into compliance with the PHS regulation, and complying with the PHS regulation.

As stated throughout the NIHGPS, the recipient has primary responsibility for ensuring that it is conducting its NIH-funded project in accordance with the approved application and budget and the terms and conditions of the award. The recipient must carry out its responsibilities with extra care where research misconduct has been found or where a research misconduct investigation has been initiated, as specified in 42 CFR Part 93, Subpart C. The recipient must report promptly to ORI any decision to initiate an investigation of research misconduct.

The regulations specify the timing of an institutional investigation, related reporting to ORI, notice to the respondent, custody of records, documentation, opportunity for respondent to comment on the report, and the components on a final institutional investigative report.

If a misconduct investigation is initiated, the recipient must take any necessary steps, in addition to its normal and ongoing responsibilities under the grant, to protect the scientific integrity of the project, protect human subjects and live vertebrate animals, provide reports to ORI, and ensure the proper expenditure of funds and continuation of the project during the investigation, if appropriate. ORI staff members are available to provide technical assistance to any institution that is responding to an allegation of research misconduct involving PHS funds. NIH IC staff members are available to provide guidance and to work with recipient institutions to protect funded projects from the adverse effects of research misconduct.

The recipient institution's engagement with ORI as provided in 42 CFR Part 93 does not substitute for its engagement with NIH to ensure ongoing compliance with the terms and conditions of award. When the recipient institution finds, learns of, or suspects research misconduct that impacts or might impact the conduct or performance of an NIH-supported project(s), whether at the recipient organization or at a third-party subrecipient organization, the recipient must work with NIH to assess the effect on the ability to continue the project, as originally approved by NIH. If the recipient institution determines that a change of scope or a change of PD/PI or other senior/key personnel is required, the institution must promptly obtain approval from the NIH funding Institute or Center Grants Management Officer. When a recipient institution finds, learns, or suspects that falsified, fabricated, or plagiarized information has affected the integrity of NIH-supported research, including but not limited to, applications for funding and progress reports, or published research or research products supported by NIH funds, NIH has a need to know this information, and the institution must immediately provide information on the affected research to the NIH Office of Extramural Research – Research Integrity (OER-RI), in a manner consistent with the ORI confidentiality provision at, 42 CFR Part 93.108. The final institutional investigation report must be submitted to ORI, as outlined in Subpart C of 42 CFR Part 93.

NIH retains the authority to provide oversight regarding the management of grants and cooperative agreements. Accordingly, NIH may take action(s) to protect the health and safety of the public, including research participants, to promote the integrity of the PHS supported research and research process, and to conserve public funds. When a recipient fails to comply with the terms and conditions of award, NIH may take one or more enforcement actions including disallowance of costs, withholding of further support, or suspension or termination of the grant. These actions are described in Administrative Requirements—Enforcement Actions.

Where research misconduct has affected data validity or reliability, ORI or NIH may request that the recipient and its employee/collaborator authors submit a correction or retraction of the data to a journal, publish the corrected data, or both. If the recipient does not comply, NIH may invoke its rights, under 2 CFR Part 200.315, to access the data (including copyrightable material developed under the award), and may then have the data reviewed, and notify the journal.

## 4.1.28 Seat Belt Use

Pursuant to EO 13043 (April 16, 1997), Increasing the Use of Seat Belts in the United States, NIH encourages recipients to adopt and enforce on-the-job seat belt policies and programs for their employees when operating vehicles, whether organizationally owned or rented or personally owned.

## 4.1.29 Smoke-Free Workplace

NIH strongly encourages recipients to provide smoke-free workplaces and to promote the nonuse of tobacco products. NIH defines the term "workplace" to mean office space (including private offices and other workspace), conference or meeting rooms, corridors, stairways, lobbies, rest rooms, cafeterias, and other public spaces.

## 4.1.30 Standards of Conduct

NIH requires recipients to establish safeguards to prevent employees, consultants, members of governing bodies, and others who may be involved in grant-supported activities from using their positions for purposes that are, or give the appearance of being, motivated by a desire for private financial gain for themselves or others, such as those with whom they have family, business, or other ties. These safeguards must be reflected in written standards of conduct. Except as provided below, NIH does not require a recipient to establish separate standards of conduct if it maintains such standards for its non-grant-supported activities, as long as those standards are consistent with State and local laws and cover, at a minimum, expected conduct in regard to financial interests, gifts, gratuities and favors, nepotism, and such other areas as political participation and bribery. The standards also must do the following:

- Address the conditions under which outside activities, relationships, or financial interests are proper or improper.

- Provide for advance notification of outside activities, relationships, or financial interests to a responsible organizational official.

- Include a process for notification and review by the responsible official of potential or actual violations of the standards.

- Specify the nature of penalties that the recipient may impose. These penalties would be in addition to any penalties that NIH or a cognizant Federal agency may impose for infractions that also violate the terms or conditions of award.

The recipient is not required to submit its general standards of conduct to NIH for review or approval. However, a copy must be made available to each of its officers, each employee and consultant working on the grant-supported project or activity, each member of the governing board, if applicable, and, upon request, to NIH. The recipient is responsible for enforcing its standards of conduct, taking appropriate action on individual infractions, and, in the case of financial conflict of interest, the recipient is required to notify the NIH of an identified financial conflict of interest (FCOI) by submitting the FCOI report to NIH via the eRA Commons FCOI Module (see 4.1.10, Financial Conflict of Interest). If a suspension or separation action is taken by a recipient against a PD/PI or other senior/key personnel under an NIH grant, the recipient must request prior approval of the proposed replacement as specified in Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements.

The recipient must promptly report issues involving potential criminal violations, such as misappropriation of Federal funds, to the HHS OIG .

## 4.1.31 Text Messaging While Driving

Executive Order 13513 (E.O. 13513) requires each Federal agency to encourage contractors, subcontractors, and grant and cooperative agreement recipients and subrecipients to adopt and enforce policies that ban text messaging while driving company-owned or -rented vehicles or Government Owned Vehicles, or while driving Personally Owned Vehicles when on official Government business or when performing any work for or on behalf of the Government.

To further the requirement of encouraging such policies, NIH encourages recipients to consider new rules and programs, reevaluate existing programs to prohibit text messaging while driving, and conduct education, awareness, and other outreach for employees about the risks associated with texting while driving. These initiatives should encourage voluntary compliance with the recipient agency's text messaging policy while off duty.

For the purposes of this policy and pursuant to E.O. 13513, the following definitions apply:

a. ''Texting'' or ''Text Messaging'' means reading from or entering data into any handheld or other electronic device, including for the purpose of SMS texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication.

b. ''Driving'' means operating a motor vehicle on an active roadway with the motor running, including while temporarily stationary because of traffic, a traffic light or stop sign, or otherwise. It does not include operating a motor vehicle with or without the motor running when one has pulled over to the side of, or off, an active roadway and has halted in a location where one can safely remain stationary.

## 4.1.32 Trafficking in Persons

This government-wide award term implements Section 106 (g) of the Trafficking Victims Protection Act (TVPA) of 2000, as amended (22 U.S.C. 7104), located at 2 CFR Part 175.A Final Notice is expected to be issued in the future; however, HHS agencies have implemented this award term based on the Interim Final Guidance. A Final Notice is expected to be issued in the future; however, HHS agencies have implemented this award term based on the Interim Final Guidance.

In accordance with the statutory requirement, in each agency award under which funding is provided to a private entity, section 106(g) of the TVPA, as amended, requires the agency to include a condition that authorizes the agency to terminate the award, without penalty, if the recipient or a subrecipient —

a. Engages in severe forms of trafficking in persons during the period of time that the award is in effect;

b. Procures a commercial sex act during the period of time that the award is in effect; or

c. Uses forced labor in the performance of the award or subawards under the award.

## 4.1.33 USA Patriot Act

The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) (P.L. 107-56) amends 18 U.S.C. 10 and provides criminal penalties for possession of any biological agent, toxin, or delivery system of a type or in a quantity that is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose. The Act also establishes restrictions on access to specified materials. "Restricted persons," as defined by the Act, may not possess, ship, transport, or receive any biological agent or toxin that is listed as a select agent (see Public Health Security and Bioterrorism Preparedness and Response Act in this section).

## 4.1.34 Responsibility/Qualification Information in SAM.gov

NIH award recipients are subject to the reporting requirements established by Public Law 112-239, National Defense Authorization Act for Fiscal Year 2013 and provided in Appendix XII to 2 CFR Part 200, NIH recipients that have currently active Federal grants, cooperative agreements, and procurement contracts from all Federal awarding agencies with a cumulative total value greater than $10,000,000

must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semi-annual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system. Full reporting requirements and procedures are found in Appendix XII to 2 CFR Part 200.

## 4.1.35 Mandatory Disclosures

Consistent with 2 CFR Part 200.113, NIH applicants and recipients must disclose, in a timely manner, in writing to the NIH awarding IC and the HHS Office of Inspector General (OIG) all information related to violations of federal criminal law involving fraud, bribery, or gratuity violations potentially impacting the federal award. Subrecipients must disclose, in a timely manner, in writing to the pass-through entity and the HHS OIG all information related to violations of federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the federal award. Disclosures must be sent in writing to the NIH awarding IC and to the HHS OIG at the following address:

NIH CGMO listed on the NoA for the IC that funded the grant (See Part III: Points of Contact 20 INSTITUTES AND CENTERS)

AND

U.S. Department of Health and Human Services

Office of Inspector General

ATTN: Mandatory Grant Disclosures, Intake Coordinator

330 Independence Avenue, SW, Cohen Building

Room 5527

Washington, DC 20201

URL: https://oig.hhs.gov/fraud/report-fraud/index.asp

(Include "Mandatory Grant Disclosures" in the subject line")

Fax: (202) 205-0604 (Include "Mandatory Grant Disclosures" in subject line) or

Email: MandatoryGranteeDisclosures@oig.hhs.gov

Failure to make required disclosures can result in any of the remedies described in 2 CFR Part 200.339. Remedies for noncompliance and Administrative Requirements – Enforcement Actions, including suspension or debarment (See 2 CFR Part 180 and 376, 31 U.S.C.3321 and Public Policy Requirements and Objectives— Debarment and Suspension), as necessary and appropriate.

## 4.1.36 Never Contract with the Enemy

Federal awarding agencies and recipients are subject to the regulations implementing Never Contract with the Enemy in 2 CFR Part 183. The regulations in 2 CFR Part 183 affect covered contracts, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are

performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

## 4.1.37 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment

Recipients and subrecipients are prohibited from expending loan or grant funds to: (1) Procure or obtain; (2) Extend or renew a contract to procure or obtain; or (3) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

COVERED FOREIGN COUNTRY means the People's Republic of China.

In implementing the prohibition under section 889 of the NDAA, subsection (f), paragraph (1), heads of executive agencies administering loan, grant, or subsidy programs shall prioritize available funding and technical support to assist affected businesses, institutions, and organizations as is reasonably necessary for those affected entities to transition from covered communications equipment and services, to procure replacement equipment and services, and to ensure that communications service to users and customers is sustained.

## 4.2 APPROPRIATION MANDATES

The following statutory provisions limit the use of funds on NIH grants, cooperative agreements, and contract awards. These are provided separately in this section since they are subject to change annually based on specific appropriation language that restricts the use of grant funds. References to "Act" in these sections refer to the governing HHS annual appropriation Act. A list of Appropriation Mandates applicable to each fiscal year can be found on the OER web site.

## 4.2.1 Acknowledgment of Federal Funding

In accordance with Public Law 101-166, Section 511, known as the Steven's Amendment, all HHS recipients must acknowledge Federal funding when issuing statements, press releases, requests for proposals, bid invitations, and other documents describing projects or programs funded in whole or in part with Federal money. Recipients are required to state (1) the percentage and dollar amounts of the total program or project costs financed with Federal money and (2) the dollar amount of the total costs financed by nongovernmental sources, only for NIH programs that require cost-sharing.

## 4.2.2 Dissemination of False or Deliberately Misleading Information

None of the funds made available in the governing appropriations Act may be used to disseminate information that is deliberately false or misleading.

## 4.2.3 Gun Control

NIH funds may not be used, in whole or in part, to advocate or promote gun control.

## 4.2.4 Human Embryo Research and Cloning Ban

NIH funds may not be used for (1) the creation of a human embryo or embryos for research purposes; or (2) for research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR Part 46.204(b) and subsection 498(b) of the PHS Act (42 U.S.C. 289g(b)). The term "human embryo or embryos" includes any organism not protected as a human subject under 45 CFR Part 46, as of the date of enactment of the governing appropriations act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells. Furthermore, per the NIH Director's Statement of April 28, 2015, NIH will not fund any use of gene-editing technologies in human embryos.

In addition to the statutory restrictions on human fetal research under subsection 498((b) of the PHS Act, by Presidential memorandum of March 4, 1997, NIH is prohibited from using Federal funds for cloning of human beings.

## 4.2.5 Lobbying—Appropriation Prohibition

NIH appropriated funds may not be used, other than for normal and recognized executive-legislative relationships for publicity or propaganda purposes, for the preparation, distribution, or use of a kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any State legislature or local legislature itself or designed to support or defeat any proposed or pending regulation administrative action, or order issued by the executive branch of any State or local government, except in presentation to the executive branch of any State or local government itself. No part of any governing appropriation shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive Order proposed or pending before the Congress or any State government, State legislature or local legislature or legislative body other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a State, local or tribal government in policymaking and administrative processes within the executive branch of that government. No part of any governing appropriation Act shall be used for any activity to advocate or promote any proposed, pending or future Federal, State or local tax increase, or any proposed, pending, or future requirement or restriction on any legal consumer product, including its sale or marketing, including but not limited to the advocacy or promotion of gun control, except as described above. Also see Public Policy Requirements and Objectives—Lobbying Prohibition, Appropriation Mandates—Gun Control and Cost Considerations—Allowability of Costs and Activities.

## 4.2.6 Promotion or Legalization of Controlled Substances

Recipients are prohibited from knowingly using appropriated funds to support activities that promote the legalization of any drug or other substance included in Schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act, 21 U.S.C. 812 except for normal and recognized executive-congressional communications. This limitation does not apply if the recipient notifies the GMO that there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage (see also 4.1.5 Controlled Substances).

## 4.2.7 Restriction on Abortion Funding

NIH appropriated funds and funds in any trust fund to which funds are appropriated in the governing appropriation Act may not be spent for any abortion. None of the funds appropriated in the governing appropriation Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion. The term ''health benefits coverage'' means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

### 4.2.8.1 Exceptions to Restrictions on Abortions

A. The limitations established in the preceding section shall not apply to an abortion —
   1. If the pregnancy is the result of an act of rape or incest; or

   2. In the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

B. Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

C. Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

D.  1. None of the funds appropriated to NIH may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

    2. In this subsection, the term ''health care entity'' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

## 4.2.9 Restriction on Distribution of Sterile Needles

NIH appropriated funds may not be used to carry out any program of distributing sterile needles or syringes for the hypodermic injection of any illegal drug. However, this limitation does not apply to the use of funds for elements of a program other than making such purchases if the relevant State or local health

department, in consultation with the Centers for Disease Control and Prevention, determines that the State or local jurisdiction, as applicable, is experiencing, or is at risk for, a significant increase in hepatitis infections or an HIV outbreak due to injection drug use, and such program is operating in accordance with State and local law

## 4.2.10 Salary Cap/Salary Limitation

None of the funds appropriated in the governing appropriation Act for NIH (the Act), shall be used to pay the salary of an individual through a grant or other extramural mechanism at a rate in excess of that prescribed in the Act. Applications and proposals with categorical direct cost budgets reflecting direct salaries of individuals in excess of the rate prescribed in the Act will be adjusted in accordance with the legislative salary limitation. Current and historical information on the applicable salary cap for each fiscal year is on the Salary Cap Summary page of the NIH Grants & Funding website.

## 4.2.10 Restriction of Pornography on Computer Networks

"(a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities."

## 4.2.11 Restriction on Disclosure of Political Affiliation for Federal Scientific Advisory Committee Candidates

Section 515 of the FY2014 Consolidated Appropriations Act included an additional legislative mandate regarding this requirement:

"None of the funds made available in this Act may be used to request that a candidate for appointment to a Federal scientific advisory committee disclose the political affiliation or voting history of the candidate or the position that the candidate holds with respect to political issues not directly related to and necessary for the work of the committee involved."

# 5 THE NOTICE OF AWARD

The Notice of Award (NoA) is the legal document issued to notify the recipient that an award has been made and that funds may be requested from the designated HHS payment system or office. The NoA is issued for the initial budget period and each subsequent budget period in the approved project period. The NoA reflects any future-year commitments. A revised NoA may be issued during a budget period to affect an action resulting in a change in the period or amount of support or other change in the terms and conditions of award. NIH will not issue a revised NoA to reflect a recipient's post-award rebudgeting. Until an IC has issued the NoA for the initial award, any costs incurred by the applicant for the project are incurred at its own risk (see Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Pre-Award (Pre-Agreement) Costs for NIH policy on the allowability of pre-award costs).

Notice of Award Page One

Effective October 1, 2020, HHS implemented a standardized page one of the NoA that serves as the first page of every HHS NoA for all discretionary awards. The standardized page one incorporates the following data elements:

- ◦ HHS Operating Division
- ◦ Federal Award Identification Number
- ◦ Federal Award Date
- Recipient Information
  - Recipient Name
  - Congressional District of Recipient
  - Payment System Identifier (also known as Entity Identification Number)
  - Employer Identification Number
  - Data Universal Numbering System
  - Recipient's Unique Entity Identifier
  - Project Director or Principal Investigator
  - Authorized Official
- Federal Agency Information
  - Awarding Agency Contact Information
  - Program Official Contact Information
- Federal Award Information
  - Award Number
  - Unique Federal Award Identification Number
  - Statutory Authority
  - Federal Award Project Title
  - Assistance Listing Number (formerly / also known as CFDA Number)

- Assistance Listing Program Title (formerly / also known as CFDA program title)Name
- Award Action Type
- Is this Award R&D?
- Summary Federal Award Financial Information
    - Budget Period Start and End Date
    - Total Amount of Federal Funds Obligated by this Action
        - Direct Cost Amount
        - Indirect Cost Amount
    - Authorized Carryover
    - Offset
    - Total Amount of Federal Funds Obligated this Budget Period
    - Total Approved Cost Sharing or Matching, where applicable
    - Total Federal and Non-Federal Approved this Budget Period
    - Project Period Start and End Date
    - Total Amount of the Federal Award, including Approved Cost Sharing or Matching, this Project Period
- Authorized Treatment of Program Income
- Grants Management Officer Signature
- Remarks

Remainder of the NIH NoA

Additionally, the remainder of the NIH NoA sets forth pertinent information about the grant in Section I (Award Data), Section II (Payment Information), and Sections III and IV (Applicable Terms and Conditions of Award). This additional information, includes, but not limited to, the following:

- Cumulative budget approved by the NIH awarding IC
- Amount of anticipated future-year commitments (if applicable)
- Names of the cognizant IC PO, GMO, and GMS
- Indirect cost rate for the Federal award (including if the de minimis rate is charged per 2 CFR Part 200.414)
- Applicable terms and conditions of award, either by reference or inclusion
- Federal award performance goals (as required by the periodic report in the RPPR or in the final RPPR when applicable)
- Any restriction on the use of funds

Note: If applicable, section III of the NoA will also reference an institution's participation in the current phase of the Federal Demonstration Partnership (FDP).

As specified in the NoA, all awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 2 CFR Part 200. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

A recipient indicates acceptance of an NIH award and its associated terms and conditions by drawing or requesting funds from the designated HHS payment system or office. If the recipient cannot accept the award, including the legal obligation to perform in accordance with its provisions, it should notify the GMO immediately upon receipt of the NoA. If resolution cannot be reached, the GMO will void the grant. NIH's determination of applicable terms and conditions of award or a GMO's denial of a request to change the terms and conditions is discretionary and not subject to appeal (post-award appeal rights are discussed in Administrative Requirements—Grant Appeals Procedures). Once the award is accepted by the recipient, the contents of the NoA are binding on the recipient unless and until modified by a revised NoA signed by the GMO.

## 5.1 NOTICE OF AWARD NOTIFICATION

NIH notifies the recipient organization via e-mail when an award has been issued-i.e., on the Federal award date. In order to allow for the e-mail notification of the NoA, recipient organizations must register a valid e-mail address in the NoA E-mail field in the eRA Commons Institutional Profile once the initial eRA Commons registration process is complete. Organizations are encouraged to use a unique e-mail address that is not specific to an individual in order to avoid communication problems when personnel change. It is the responsibility of the recipient organization to maintain a current and accurate e-mail address for NoAs. NIH will not distribute NoAs other than through this system-generated e-mail notification process. Recipients that do not maintain a current NoA notification e-mail address will be responsible for accessing NoAs via the eRA Common.

On the Federal award date, the NoA is made available to recipient officials and corresponding PD/PIs in the eRA Commons through the Status module. The eRA Commons is the official repository for the NoA document.

In addition to e-mail notifications, there is a public query Quick Query – Search for an Issued NoA) available on the eRA web site to generate a list of awards issued to an organization over a selected period. The organization's Institution Profile File (IPF) Number is required in order to use the query.

## 5.2 ASSOCIATED APPLICATIONS AND/OR AWARDS

For some special initiatives a project or program may be funded by multiple awards that are associated with the others through specific terms and conditions. These terms include any reporting requirements that would need to be coordinated in future years. When multiple awards are issued for a particular project/program at different institutions, the coordination required among the recipient institutions administering the awards will be documented in the specific terms and conditions.

## 5.3 FUNDING

For most grants, NIH uses the project period system of funding. Under this system, projects are programmatically approved for support in their entirety but are funded in annual increments called budget

periods. The length of an initial project period (competitive segment) or of any subsequent competitive segment is determined by the NIH awarding IC based on:

- any statutory or regulatory requirements,
- the length of time requested by the applicant to complete the project,
- limitation on the length of the project period recommended by the peer reviewers,
- the awarding IC's programmatic determination of the frequency of competitive review desirable for managing the project, and
- NIH funding principles.

The total project period consists of the initial competitive segment, any additional competitive segments authorized by approval of a competing continuation application, and any non-competing extensions. NIH policy limits each competitive segment to a maximum of 5 years (exclusive of non-competing extensions). A single award covering the entire period of support generally is used only if the project is solely for construction or modernization of real property, if the total planned period of support will be less than 18 months, or if the project is awarded under a special support mechanism.

The initial NoA provides funds for the project during the first budget period. Budget periods usually are 12 months long; however, shorter or longer budget periods may be established for compelling programmatic or administrative reasons. The NoA that documents approval of a project period that extends beyond the budget period for which funds are provided (including anticipated levels of future support) expresses NIH's intention to provide continued financial support for the project. The amounts shown for subsequent years represent projections of future funding levels based on the information available at the time of the initial award. Such projected levels of future support are contingent on satisfactory progress, the availability of funds, and the continued best interests of the Federal government. They are not guarantees by NIH that the project will be funded or will be funded at those levels and create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the NoA.

Recipients are required to submit an annual progress report as a prerequisite to NIH approval and funding of each subsequent budget period (non-competing continuation award) within an approved project period (see Administrative Requirements—Monitoring—Reporting—Non-Competing Continuation Progress Report). A decision to fund the next budget period will be formalized by the issuance of the NoA indicating the new budget period and the amount of new funding. The NoA also will reflect any remaining future-year commitments. NIH may decide to withhold support for one or more of the reasons cited in Administrative Requirements—Enforcement Actions—Suspension, Termination, and Withholding of Support. A recipient may appeal this decision only if the withholding was for the recipient's failure to comply with the terms and conditions of a previous award (see Administrative Requirements—Grant Appeals Procedures).

All Federal agencies are required by 31 U.S.C. §1552(a) to close fixed year appropriation accounts and cancel any remaining balances by September 30 of the fifth fiscal year after the year of availability unless otherwise authorized by Congress. In order for NIH to meet its obligation to close these accounts and cancel any remaining balances by September 30, recipients must report disbursements on the FFR no later than August 31 of the fifth fiscal year after the year of availability. This provision may limit the availability of funds for carryover. It may also limit or eliminate the authority to extend the final budget period when an entire project period is funded by a single award (e.g., multiyear funded awards).

## 5.4 BUDGET

Each NoA sets forth the amount of funds awarded. The amount may be shown either as a categorical (line item) budget or as an amount for total direct costs (not broken down by category) and an amount

for F&A costs, if applicable. Modular awards represent a type of award made without a categorical budget (see Modular Applications and Awards chapter in IIB). The recipient has certain rebudgeting flexibility within the overall amount awarded (see Administrative Requirements—Changes in Project and Budget). The recipient may be required to provide matching funds under construction awards as specified in Construction Grants—Matching in IIB as well as under other NIH programs or awards if specified in the Notice of Funding Opportunity.

## 5.5 ADDITIONAL TERMS AND CONDITIONS

In addition to, or in lieu of, the standard terms and conditions of award specified in the NIHGPS, NIH may use terms and conditions for program-specific or award-specific reasons. For example, if, on the basis of a recipient's application or other available information, the GMO finds—at the time of award or at any time subsequent to award—that the recipient's management systems and practices are not adequate to ensure the appropriate stewardship of NIH funds or to achieve the objectives of the award, the GMO may impose special, more restrictive terms and conditions on the award in accordance with applicable regulations including 42 CFR Part 52.9 and 2 CFR Part 200.339 and 45 CFR Part 75.371. For example, NIH could require a recipient to obtain prior approval for expenditures that ordinarily do not require such approval or to provide more frequent reports. In addition to closer monitoring, NIH may assist the recipient in taking any necessary corrective action.

# 6 PAYMENT

The PMS is a centralized grants payment and cash management system, operated by HHS PSC, PMS. HHS grant payments may be made by one of several advance payment methods, including SMARTLINK II/ACH, cash request, or by cash request on a reimbursement basis, as specified in the NoA and as described in this chapter. Payments under NIH grants generally are made as advance payments. NIH grant payments are made by PMS, operated by PSC, in accordance with Department of the Treasury and OMB requirements, as implemented by 2 CFR Part 200.305. These requirements are intended to minimize the time elapsing between the transfer of funds from the Federal government and disbursement by a recipient. Therefore, although the grant may be financed by advance payments, the intent is that recipients draw funds on an as-needed basis—specifically, no more than 3 business days before the funds are needed.

All Federal funds deposited by PMS in a recipient's bank account as an unrestricted advance payment should be fully disbursed (checks written, signed, and issued to the payees) by the close of business the next workday after receipt of the funds. The potential for excessive Federal cash on hand exists each time a recipient does not disburse Federal funds in this manner. The recipient is responsible for determining when the Federal funds have been deposited into its bank account for each drawdown, ensuring that the funds are fully disbursed by the close of business the next workday after they are received, and immediately returning all undisbursed Federal funds to PMS.

The Treasury and OMB policies also establish accountability for interest earned on advances of grant funds and provide for use of the reimbursement method if cash management requirements are not met. Advances made by recipients to consortium participants and contractors under grants must conform to substantially the same standards of timing and amount that govern advances to the recipient.

Operational guidance for recipients is provided through a training CD from PSC. Inquiries regarding drawdown requests, cash management rules, and the disbursement of funds through the Federal Financial Report (SF 425) should be directed to PSC/PMS (see Part III).

## 6.1 SMARTLINK II/ACH

The SMARTLINK II/ACH method of advance payment makes direct deposit of funds to a recipient's bank account and requires recipients to have Internet access to submit a request for funds to PMS. SMARTLINK II/ACH provides funds the day following the request with direct deposit using the Federal Reserve Bank's (Richmond, Virginia) ACH process.

## 6.2 CASH REQUEST

Recipients not eligible for an unrestricted advance of funds by SMARTLINK II/ACH must submit a cash request, usually monthly. The cash request may be on either an advance or reimbursement basis, as specified by the NIH awarding IC. Cash requests are used when a recipient's cash management must be closely monitored (for example, recipients whose financial management systems do not meet the standards specified in 2 CFR Part 200.302) or under programs where reimbursement financing is appropriate. A recipient also may be converted from an unrestricted advance payment method to a cash request basis if, during post-award administration, the GMO determines that a recipient is not complying with the cash management requirements or other requirements of the award, including the submission of complete and timely reports (see Administrative Requirements—Monitoring—Reporting and Administrative Requirements—Enforcement Actions—Modification of the Terms of Award).

If the cash request is for an advance payment, the recipient may request grant funds from PMS monthly on the basis of expected disbursements during the succeeding month and the amount of Federal funds already on hand. A request for reimbursement may be submitted more often, if authorized. For timely receipt of cash, a recipient must submit the request through the awarding IC early enough for it to be forwarded to PMS at least 2 weeks before the cash is needed. PMS makes payment to the recipient electronically through the ACH process upon receipt of the approved payment request from the awarding IC.

## 6.3 INTEREST EARNED ON ADVANCES OF GRANT FUNDS

Except as provided in 2 CFR Part 200.305(b)(8), any NIH recipient subject to the requirements of 2 CFR Part 200 that receives advance payments must maintain those advances in an interest-bearing account.

Recipients are expected to promptly return any funds not spent within three business days. As provided in 2 CFR Part 200.305(b)(9) subject to the requirements of 2 CFR Part 200 and to the extent required by law, interest earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services, Payment Management System, Rockville, MD 20852. Interest amounts up to $500 per year may be retained by the non-Federal entity for administrative expense.

## 6.4 IMPROPER PAYMENTS ELIMINATION AND RECOVERY IMPROVEMENT ACT

The Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA) (PL 112-248), signed into law on January 10, 2013, established the Do Not Pay Initiative to reduce improper payments or awards. Improper payments occur when funds go to the wrong recipient, the recipient receives the incorrect amount of funds (including overpayments and underpayments), documentation is not available to support a payment, or the recipient uses funds in an improper manner. Incorrect amounts are overpayments or underpayments that are made to eligible recipients (including inappropriate denials of payment or service, any payment that does not account for credit for applicable discounts, payments that are for an incorrect amount, and duplicate payments). When an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment should also be considered an improper payment. When establishing documentation requirements for payments, agencies should ensure that all documentation requirements are necessary and should refrain from imposing additional burdensome documentation requirements. Interest or other fees that may result from an underpayment by an agency are not considered an improper payment if the interest was paid correctly. These payments are generally separate transactions and may be necessary under certain statutory, contractual, administrative, or other legally applicable requirements.

HHS has implemented provisions of IPERIA through integrating use of the Do Not Pay system into the current payment processes managed by the PMS, HHS.

# 7 COST CONSIDERATION

## 7.1 GENERAL

Cost considerations are critical throughout the life cycle of a grant. An applicant's budget request is reviewed for compliance with the governing cost principles and other requirements and policies applicable to the type of recipient and the type of award. Any resulting award will include a budget that is consistent with these requirements.

NIH anticipates that, because of the nature of research, the recipient may need to modify its award budget during performance to accomplish the award's programmatic objectives. Therefore, NIH provides some flexibility for recipients to deviate from the award budget, depending on the deviation's significance to the project or activity. More significant post-award changes require NIH prior approval. Prior approval requirements and authorities are discussed in Administrative Requirements—Changes in Project and Budget.

During post-award administration, the GMO, or a GMO designee, monitors expenditures for conformance with cost policies. The GMO's monitoring includes, among other things, responding to prior approval requests and reviewing progress reports, audit reports, and other periodic reports. The GMO also may use audit findings as the basis for final cost adjustments (see Administrative Requirements—Closeout).

This chapter addresses the general principles underlying the allowability of costs, differentiates direct costs from F&A costs, and highlights a number of specific costs and categories of cost for NIH applicants and recipients. It is not intended to be all-inclusive and should be used as a supplement to the applicable cost principles.

## 7.2 THE COST PRINCIPLES

In general, NIH grant awards provide for reimbursement of actual, allowable costs incurred and are subject to Federal cost principles. The cost principles establish standards for the allowability of costs, provide detailed guidance on the cost accounting treatment of costs as direct or F&A costs, and set forth allowability and allocability principles for selected items of cost. Applicability of a particular set of cost principles depends on the type of organization (regardless whether domestic or foreign) making the expenditure. For example, a for-profit organization collaborating with a university recipient would be subject to the cost principles for for-profit organizations, while the university would be subject to the cost principles for Institutions of Higher Educations (IHEs).

The cost principles are set forth in HHS regulations at 2 CFR Part 200, Subpart E. For-profit organizations are subject to the cost principles located at 48 CFR Part 31.2 Federal Acquisition Regulation.

The cost principles apply to all NIH award instruments, award mechanisms, and special programs and authorities, including modular awards and awards under SNAP with one exception: they do not apply to Kirschstein-NRSA individual fellowship awards. The allowable use of funds under those awards is included in Ruth L. Kirschstein National Research Service Awards in IIB.

Recipients may use their own accounting systems, policies, and procedures to implement the cost principle requirements as long as they meet the standards prescribed in 2 CFR Part 200.302 for financial management systems.

The cost principles address four tests to determine the allowability of costs. The tests are as follows:

- **_Reasonableness (Including Necessity)._** A cost may be considered reasonable if the nature of the goods or services acquired or applied and the associated dollar amount reflect the action that a prudent person would have taken under the circumstances prevailing when the decision to incur the cost was made. The cost principles elaborate on this concept and address considerations such as whether the cost is of a type generally necessary for the organization's operations or the grant's performance, whether the recipient complied with its established organizational policies in incurring the cost or charge, and whether the individuals responsible for the expenditure acted with due prudence in carrying out their responsibilities to the Federal government and the public at large as well as to the organization.

- **_Allocability._** A cost is allocable to a specific grant, function, department, or other component, known as a cost objective, if the goods or services involved are chargeable or assignable to that cost objective in accordance with the relative benefits received or other equitable relationship. A cost is allocable to a grant if it is incurred solely in order to advance work under the grant; it benefits both the grant and other work of the institution, including other grant-supported projects; or it is necessary to the overall operation of the organization and is deemed to be assignable, at least in part, to the grant. A cost is allocable as a direct cost to a grant if it is incurred solely in order to advance work under the grant or meets the criteria for closely related projects determination (see Cost Considerations—Allocation of Costs and Closely Related Work).

- **_Consistency._** Recipients must be consistent in assigning costs to cost objectives. Costs may be charged as either direct costs or F&A costs, depending on their identifiable benefit to a particular project or program, but all costs must be treated consistently for all work of the organization under similar circumstances, regardless of the source of funding.

- **_Conformance._** This test of allowability—conformance with limitations and exclusions as contained in the terms and conditions of award, including those in the cost principles—varies by the type of activity, the type of recipient, and other characteristics of individual awards. Cost Considerations—Allowability of Costs/Activities provides information common to most NIH grants and, where appropriate, specifies some of the distinctions if there is a different treatment based on the type of grant or recipient. IIB contains additional information on allowability of costs for particular types of grants, recipients, and activities.

These four tests apply regardless of whether the particular category of costs is one specified in the cost principles or one governed by other terms and conditions of an award. These tests also apply regardless of treatment as a direct cost or an F&A cost. The fact that a proposed cost is awarded as requested by an applicant does not indicate a determination of allowability.

## 7.3 DIRECT COSTS AND FACILITIES AND ADMINISTRATIVE COSTS

Direct costs are any cost that can be identified specifically with a particular sponsored project, an instructional activity, or any other institutional activity, or that can be directly assigned (allocated) to such activities relatively easily with a high degree of accuracy. Direct costs may include, but are not limited to, salaries, travel, equipment, and supplies directly supporting or benefiting the grant-supported project or activity. If directly related to a specific award, certain costs that otherwise would be treated as indirect costs may also be considered direct costs.

Most organizations also incur costs for common or joint objectives that cannot be readily identified with an individual project or program. These are referred to as indirect costs, also called Facilities and Administrative costs (F&A). Facilities operation and maintenance costs, depreciation, and administrative

expenses are examples of costs that usually are treated as F&A costs. The organization is responsible for the management and accounting of costs consistently and must not include costs associated with its F&A rate as direct costs. Note, the term facilities and administrative costs and the term indirect costs may be used interchangeably to determine applicable policies. For NIH purposes, including the NIHGPS, these costs will be referred to as F&A costs; however, other documents or non-NIH entities may refer to them as indirect costs.

Project costs consist of the allowable direct costs directly related to the performance of the grant plus the allocable portion of the allowable F&A costs of the organization, less applicable credits (as described below and in the cost principles).

The amount NIH awards for each budget period will reflect the total approved budget for the grant, including direct costs and, if applicable, F&A costs. (SBIR and STTR awards also may include a fee as specified in Grants to For-Profit Organizations—Small Business Innovation Research and Small Business Technology Transfer Programs in IIB.) If a recipient waives reimbursement of full F&A costs, NIH will either not award F&A costs or will award only partial F&A costs, as appropriate. The NIH award amount shown in the NoA constitutes NIH's maximum financial obligation to the recipient under that award.

# 7.4 REIMBURSEMENT OF FACILITIES AND ADMINISTRATIVE COSTS

For grant programs that can provide F&A cost reimbursement, NIH will generally not provide F&A costs unless the recipient has established an F&A cost rate covering the applicable activities and period of time, except for awards under which F&A costs are reimbursed at a fixed rate.

In addition, NIH will not require a recipient to establish an F&A rate if the organization's total operations consist of a single grant-supported project or if the organization appropriately and consistently treats all costs as direct costs to projects and accounts for them as such. In the latter case, the GMO must be satisfied that the organization's accounting system can adequately identify and support all costs as direct costs to the project. This includes being able to identify and segregate costs on the basis of a process that assigns costs commensurate with the benefits provided to individual projects (see Administrative Requirements—Management Systems and Procedures—Financial Management System Standards).

F&A rates are negotiated by CAS, DFAS in the Office of Acquisition Management and Policy, NIH (responsible for negotiating F&A cost rates for for-profit entities receiving awards from HHS), or other agency with cognizance for F&A/indirect cost rate (and other special rate) negotiation. If an applicant is advised by the GMO of the need to establish a rate, the GMO will indicate the responsible office to be contacted.

F&A cost proposals must be prepared in accordance with the applicable cost principles and guidance provided by the cognizant office or agency for indirect costs and must conform to cost policies in the NIHGPS. Further information concerning the establishment of F&A rates and the reimbursement of F&A costs may be obtained from DCA or DFAS (see Part III). CAS should be consulted to determine the need to submit a Disclosure Statement (DS-2) pursuant to the requirements of 2 CFR Part 200, Subpart E-Cost Principles.

Consistent with 2 CFR Part 200.414(f), any non-Federal entity, including for-profit organizations, that does not have a current negotiated (including provisional) F&A rate, except for those non-Federal entities described in 2 CFR Part 200, Appendix VII, Section D(1)(b) and 45 CFR Part 75, Appendix VII may elect to charge a de minimis rate of 10% of modified total direct costs (MTDC) which may be used indefinitely. No documentation is required to justify the 10% de minimis indirect cost rate. As described in 2

CFR Part 200.403 and 45 CFR Part 75.403, costs must be consistently charged as either indirect or direct costs but may not be double charged or inconsistently charged as both. If chosen, this methodology once elected must be used consistently for all Federal awards until such time as a non-Federal entity chooses to negotiate for a rate, which the non-Federal entity may apply to do at any time.

If a subrecipient already has a negotiated indirect cost rate established with their cognizant agency for indirect cost, the negotiated rate must be used. If no approved rate exists, the pass-through entity must determine the appropriate rate in collaboration with the subrecipient, which is either: the negotiated indirect cost rate between the pass-through entity and the subrecipient; which can be based on a prior negotiated rate between a different PTE and the same subrecipient. If basing the rate on a previously negotiated rate, the pass-through entity is not required to collect information justifying this rate but may elect to do so; or the de minimis indirect cost rate. The pass-through entity must not require use of a de minimis indirect cost rate if the subrecipient has a Federally approved rate. Subrecipients can elect to use the cost allocation method to account for indirect costs. The cost principles are designed to provide that Federal awards bear their fair share of costs recognized under these principles.(See 2 CFR 200.100(c) and 45 CFR Part 75.100). Pass-through entities may, but are not required, to negotiate a rate with a proposed subrecipient that asks to do so. If the consortium is a for-profit entity, such as a small business, the organization must have an established F&A cost rate before they can charge F&A costs. The default small business rate of 40 percent is only applicable to SBIR and STTR applications.

Regardless of the type of recipient, the rate(s) in effect at the beginning of the competitive segment will be used to determine the amount budgeted for F&A costs for each year of the competitive segment. If the rate agreement does not extend to the end of the project period, the last rate in effect will be used to establish the total cost commitment for any remaining future years. NIH generally will not award additional F&A costs beyond those calculated in the approved budget.

F&A costs awarded may be subject to upward or downward adjustment, depending on the type of rate negotiated and recipient type. Generally, recipients may rebudget between direct and F&A costs (in either direction) without NIH prior approval, provided there is no change in the scope of the approved project. F&A cost reimbursement on grants to IHEs is based on the rates used in the award, which are not subject to adjustment in reimbursement except for the establishment of permanent rates when a provisional rate was used for funding (See 2 CFR 200 Appendix III Section C(7)(b)). Therefore per 2 CFR 200 Appendix IIIIHEs may not rebudget from direct costs to accommodate a rate increase if the F&A costs provided for a period were based on negotiated (final, fixed or predetermined) rates rather than provisional rates (See 2 CFR 200 Appendix III Section C(7)(a)).For recipients other than IHEs, F&A cost reimbursement is based on the negotiated F&A rate agreement consistent with the time period when the cost is incurred, except if F&A costs were limited or not provided. F&A costs are subject to downward adjustment if the proposal that served as the basis for the negotiation included unallowable costs.

Some grants require negotiation of project costs annually, e.g., clinical trials. For these awards, the policies pertain to each year of support rather than to a multiyear competitive segment.

Once NIH awards a grant, it is not obligated to make any supplemental or other award for additional F&A costs or for any other purpose. There are limited circumstances under which the GMO may award F&A costs where none were previously awarded or may increase the amount previously awarded. If an award does not include an amount for F&A costs because the applicant or recipient did not submit a timely F&A cost proposal and the recipient subsequently establishes a rate, the GMO may amend the award to provide an appropriate amount for F&A costs if the amendment can be made using funds from the same Federal fiscal year in which the award was made. However, the amount will be limited to the F&A costs applicable to the period after the date of the recipient's F&A cost proposal submission. This provision does not affect local governmental agencies that are not required to submit their F&A (indir-

ect) cost proposals to the Federal government. They may charge F&A costs to NIH grants based on the rate computations they prepare and keep on file for subsequent Federal review.

If funds are available, a GMO may amend an award to provide additional funds for F&A costs, but only under the following circumstances:

- NIH made an error in computing the award. This includes situations in which a higher rate than the rate used in the grant award is negotiated and the date of the rate agreement for the higher rate is before 1 calendar month prior to the beginning date of the grant budget period.
- NIH restores funds previously recaptured as part of a recipient's unobligated balance.
- The recipient is eligible for additional F&A costs associated with additional direct costs awarded for the supplementation or extension of a project.

NIH does not reimburse indirect costs under the following classes of awards:

- **_Fellowships._** F&A costs will not be provided on Kirschstein-NRSA individual fellowships or similar awards for which NIH funding is in the form of fixed amounts or is determined by the normal published tuition rates of an institution and for which the recipient is not required to account on an actual cost basis.
- **_Construction and Modernization._** F&A costs will not be provided on construction or modernization grants.
- **_Grants to Individuals._** F&A costs will not be provided on awards to individuals.
- **_Grants to Federal Institutions._** F&A costs will not be provided on grants to Federal institutions.
- **_Grants in Support of Scientific Meetings (Conference Grants)._** F&A costs will not be provided under grants in support of scientific meetings.
- **_Endowment Grants._** F&A costs will not be provided for endowment grants.

NIH limits the amounts included in the F&A base for the following type of costs:

- **_Genomic Arrays (GA)_** are a high-throughput genetic analysis technology which enables the study of genetic variation and gene expression at high resolution. Approaches such as genome-wide association and gene expression profiling often depend upon manufactured products known as microarrays or bead arrays. These tools are exceptional among laboratory supplies in that they are almost always procured from a commercial source; have a relatively high unit cost and are often utilized in large numbers. The treatment of the costs for purchase of GA as "supplies" in these specialized award budgets at high levels of usage would result in the application of F&A cost recovery that is disproportionate to the actual administrative burden associated with the relatively high cost of the procurement of these GA. Accordingly, for purposes of budgeting for and award of high volume purchases of GA in excess of $50,000 per year, the standard treatment of these resources as supplies in determining the F&A base of an award will be non-applicable. Instead, the requested and reimbursed costs for GA will utilize as a surrogate the concept of sub-contracts (consortium/contractual cost). Therefore, for each budget year, the first $50,000 of GA will be treated as "supplies", and any GA in excess of $50,000 (for high volume requirements) will use as a surrogate the budgeting and reimbursement concept utilized for subcontracts (consortium/contractual cost), providing consistent budgeting, accounting and reimbursement of these costs.

NIH provides F&A costs without the need for a negotiated rate under the following classes of awards:

- ***Research Training and Education Grants (e.g., R25), and K Awards.*** F&A costs under Kirschstein-NRSA institutional research training grants, educational and K awards will be budgeted and reimbursed at a rate of 8 percent of modified total direct costs, exclusive of tuition and fees, expenditures for equipment, and consortiums in excess of $25,000. State, local, and Indian tribes (or "federally recognized Indian tribes") may receive full F&A cost reimbursement under NIH Kirschstein-NRSA institutional research training grants and K awards. For this policy, State universities or hospitals are not considered governmental agencies.

- ***Grants to Foreign Organizations and International Organizations.*** With the exception of the American University of Beirut and the World Health Organization, which are eligible for full F&A cost reimbursement, F&A costs under grants to foreign and international organizations will be funded at a fixed rate of 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. Some examples of NIH compliance requirements are the protection of human subjects (including the required education in the protection of human research participants), animal welfare, invention reporting, other post-award reporting requirements, financial conflict of interest and research misconduct. Note, these are just a few representative examples of compliance requirement; this list is not all inclusive. Awards to domestic organizations with a foreign or international consortium participant may include 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. NIH will not support the acquisition of or provide for depreciation on any capital expenses (facilities) or the normal general operations of foreign and international organizations. Therefore, these expenses may not be requested as a direct cost; however, equipment is an allowable direct cost. *Other items normally treated as F&A costs (e.g., rent) may be requested as direct costs and will be evaluated by NIH for allowability.*

# 7.5 COST TRANSFERS, OVERRUNS, AND ACCELERATED AND DELAYED EXPENDITURES

Cost transfers to NIH grants by recipients, consortium participants, or contractors under grants that represent corrections of clerical or bookkeeping errors should be accomplished within 90 days of when the error was discovered. The transfers must be supported by documentation that fully explains how the error occurred and a certification of the correctness of the new charge by a responsible organizational official of the recipient, consortium participant, or contractor. An explanation merely stating that the transfer was made "to correct error" or "to transfer to correct project" is not sufficient. Transfers of costs from one project to another or from one competitive segment to the next solely to cover cost overruns are not allowable.

Recipients must maintain documentation of cost transfers, pursuant to 2 CFR Part 200.337, and must make it available for audit or other review (see Administrative Requirements—Monitoring—Record Retention and Access). The recipient should have systems in place to detect such errors within a reasonable time frame; untimely discovery of errors could be an indication of poor internal controls. Frequent errors in recording costs may indicate the need for accounting system improvements, enhanced internal controls, or both. If such errors occur, recipients are encouraged to evaluate the need for improvements and to make whatever improvements are deemed necessary to prevent reoccurrence. NIH also may require a recipient to take corrective action by imposing additional terms and conditions on an award(s).

The GMO monitors recipient expenditure rates under individual grants within each budget period and within the overall project period. The funding that NIH provides for each budget period is based on an assessment of the effort to be performed during that period and the recipient's associated budget, including the availability of unobligated balances. Although NIH allows recipients certain flexibilities with respect to rebudgeting (see Administrative Requirements—Changes in Project and Budget), NIH expects the rate and types of expenditures to be consistent with the approved project and budget and may question or restrict expenditures that appear inconsistent with these expectations.

The GMO may review recipient cash drawdowns to determine whether they indicate any pattern of accelerated or delayed expenditures. Expenditure patterns are of particular concern because they may indicate a deficiency in the recipient's financial management system or internal controls. Accelerated or delayed expenditures may result in a recipient's inability to complete the approved project within the approved budget and period of performance. In these situations, the GMO may seek additional information from the recipient and may make any necessary and appropriate adjustments.

## 7.6 ALLOCATION OF COSTS AND CLOSELY RELATED WORK

When salaries or other activities are supported by two or more sources, issues arise as to how the direct costs should be allocated among the sources of support. In general, a cost that benefits two or more projects or activities in proportions that can be determined without undue effort or cost should be allocated to the projects on the basis of the proportional benefit. A cost that benefits two or more projects or activities in proportions that cannot be determined because of the interrelationship of the work involved may be allocated or transferred to the benefiting projects on any reasonable basis as long as the costs charged are allowable, allocable, and reasonable under the applicable cost principles and the recipient's financial management system includes adequate internal controls (for example, no one person has complete control over all aspects of a financial transaction).

## 7.7 APPLICABLE CREDITS

The term applicable credits refers to those receipt or negative expenditure types of transactions that operate to offset or reduce direct or F&A cost items. Typical examples are purchase discounts, rebates or allowances, recoveries or indemnities on losses, and adjustments for overpayments or erroneous charges. Additional information concerning applicable credits is included in the cost principles.

Applicable credits to direct charges made to NIH grants must be treated as an adjustment on the recipient's FFR, whether those credits accrue during or after the period of grant support. (See Administrative Requirements—Monitoring—Reporting and Administrative Requirements—Closeout—Final Federal Financial Reports.) The NIH awarding IC will notify the recipient of any additional actions that may be necessary.

## 7.8 SERVICES PROVIDED BY AFFILIATED ORGANIZATIONS

A number of universities and other organizations have established closely affiliated, but separately incorporated, organizations to facilitate the administration of research and other programs supported by Federal funds. Such legally independent entities are often referred to as "foundations," although this term does not necessarily appear in the name of the organization. Sometimes, the parent organization provides considerable support services, in the form of administration, facilities, equipment, accounting, and other services, to its foundation, and the latter, acting in its own right as an NIH recipient, includes the cost of these services in its F&A proposal.