# 12 RESEARCH CAREER DEVELOPMENT ("K") AWARDS

## 12.1 GENERAL

This chapter includes general information about research career development awards (CDAs), also known as "K" awards. It supplements the general information found in IIA that applies to all NIH awards.

The objective of NIH career development programs is to help ensure that a diverse pool of highly trained scientists are available in adequate numbers and in appropriate research areas to address the Nation's biomedical, behavioral, and clinical research needs. Among NIH ICs, a variety of programs are available for scientists who require additional mentored or independent experience in a productive scientific environment in order to further develop their careers in independent biomedical, behavioral and clinical research.

For mentored programs, support is provided to cover protected time for supervised career development experiences with a goal of leading to research independence. Independent (non-mentored) programs foster the development of outstanding scientists and enable them to expand their potential to make significant contributions to a field of research.

### 12.1.1 Background

The research CDA program was established in 1961 to enable investigators who have demonstrated research potential to develop further their research careers. The program is authorized by sections 301, 402 and 405 of the PHS Act, 42 U.S.C. 241, 282 and 284. In general, CDAs provide up to five years of salary support and guarantee substantial protected time to engage in research and related activities. The award is available to persons who have demonstrated independent research accomplishments but need additional experience to establish or sustain an independent research program.

## 12.2 TYPES OF CAREER DEVELOPMENT AWARDS

### 12.2.1 General

NIH offers a wide variety of CDAs: mentored awards to individuals, including unique career transition programs; non-mentored awards to individuals (mid-career and senior stages), and institutional programs that provide mentored experiences for multiple individuals who are selected by the institution. Some CDAs are linked to other types of NIH awards. Applicants are encouraged to review the NOFO for information about IC-specific utilization of the wide variety of CDAs. Specific questions may be directed to the appropriate NIH scientific/research staff or grants management staff named in the NOFO.

Further information about specific NIH CDAs is found at the K Kiosk.

### 12.2.2 Individual Mentored Career Development Awards

Individual mentored CDAs (e.g. K01, K07 (developmental), K08, K22, K23, K25, K99/R00) provide support for a sustained period of "protected time" (generally three, four, or five years) for intensive research career development under the guidance of an experienced mentor or sponsor in the biomedical, behavioral, or clinical sciences. Through the sustained period of research career development and training provided by mentored CDAs, recipients are expected to gain the skills and experience necessary for

independent and productive research careers. Mentored CDAs are not renewable, nor are they transferable from one individual to another. No-cost extensions in time are permitted; however, all terms and conditions, including appointment and minimum effort requirements, remain during the extension period.

Generally, mentored CDA programs are covered by NIH-wide Parent NOFOs. In addition, some ICs may issue IC-specific NOFOs for specialized programs. Specific program requirements for each mentored CDA program are found in the NOFOs. Some programmatic information is provided below for programs with unique policies.

### 12.2.2.1 Mentor

Individual mentored CDA applications require the candidate to identify a mentor (sometimes referred to as a sponsor) with extensive and appropriate research experience. The candidate must name a primary mentor/sponsor, who, together with the candidate is responsible for the planning, direction, and execution of the program. The mentor should be recognized as an accomplished investigator in the proposed research area; have a track record of success in training independent investigators; and should have sufficient independent research support to cover any costs of the proposed research project in excess of the allowable costs of the CDA award. Candidates may have co-mentors/sponsors as appropriate to the goals of the program. Whenever possible and appropriate, women, individuals from underrepresented racial and ethnic groups, and individuals with disabilities are encouraged to be involved as mentors to serve as role models.

## 12.2.3 Career Transition Awards

In general, the career transition award programs (K22 and K99/R00) provides protected time through salary and research support to facilitate the transition of postdoctoral individuals or junior faculty in mentored positions to research independence.

### 12.2.3.1 K22

In general, the K22 program supports two phases of research: 1) a mentored phase (2 years); and, 2) an independent phase (up to 3 years), for a total of up to 5 years of combined support. Some programs, however, support only the newly-independent phase of an investigator's research career development. Applicants for K22 programs need not be affiliated with an applicant institution, e.g., NIH intramural scientists. Planning, direction, and execution of the proposed K22 award are the responsibility of the candidate. Only a few ICs support K22 programs and each has specific eligibility criteria and award provisions. There is no parent NOFO.

When the applicant is an intramural scientist, NIH issues a provisional award letter and the actual NoA is issued after identifying a suitable position at an extramural research institution. The position may include continuation of a postdoctoral segment.

### 12.2.3.2 Pathway to Independence Award (K99/R00)

The objective of the Pathway to Independence Award (K99/R00) is to assist postdoctoral investigators in transitioning to a stable independent research position with independent research funding. The K99/R00 program offers a two-phase award, generally providing up to a total of 5 years of support. Phase I (K99) provides support for up to 2 years of intensive, mentored research career development; Phase II (R00) provides support for up to 3 years of independent research, contingent on securing an independent research position. Phase II is also contingent upon an administrative review and approval by the awarding IC of a transition application.

## 12.2.3.2.1 Eligibility

The K99/R00 program has several unique eligibility criteria that are not generally applicable to other CDA programs.

- U.S. citizens and non-U.S. citizens with the skills, knowledge and resources necessary to carry out the proposed research and career development activities are eligible to apply.

- K99/R00 applicants must not have more than 4 years of postdoctoral research training as of the relevant application due date regardless of whether it is a new or resubmission application. NIH will consider requests for extension of the K99 eligibility window for various reasons, including medical concerns, disability, family care, extended periods of clinical training, natural disasters, and active duty military service. Each of these requests is reviewed on a case by case basis. NIH will approve an extension of one year for childbirth within the 4 year K99 eligibility window. Applicants who will be PD/PIs on a K99 application must provide the child's date of birth in the extension request justification submitted to IC program officials and/or scientific/research contacts listed in the NOFO at least 12 weeks before submitting an application.

- NIH intramural scientists are eligible to apply. If selected for funding, the K99 phase is supported by the NIH IC intramural laboratory in which the candidate conducts research. The R00 phase is supported via an extramural award once an acceptable position at an extramural organization is secured.

- It is expected that K99 recipients will benefit from no less than 12 months of mentored research training and career development before transitioning to the R00 phase.

- If an applicant achieves independence prior to initiating the K99 phase, neither the K99 nor the R00 phase will be awarded.

## 12.2.3.2.2 K99 Phase

Generally, the K99 phase is for 2 years; however, award recipients may transition earlier than 2 years when the recipient has been offered an acceptable position. It is expected that K99 recipients will receive at least 12 months of career development support from the award before transitioning to the R00 phase. If an applicant achieves independence prior to initiating the K99 phase, neither the K99 nor the R00 phase will be awarded. Recipients are advised to contact the awarding IC if early transition is being considered. In all cases, early transition is considered a prior approval request and therefore subject to the approval of NIH in accordance with Requests for Prior Approval.

Since the K99 and R00 phases are awarded independently, a no-cost extension may be allowed should additional time be needed to complete the goals of the K99 phase. However, no-cost extensions for K99 awards are not automatic and require prior approval by NIH. All terms and conditions of the K99/R00 award (including minimum effort requirements) remain in effect when the grant is in a no-cost extension. In requesting a no-cost extension, K99 recipients wishing to continue to seek a tenure-track or equivalent position should submit a plan for continued career development and a timely transition to an independent position. If an application for the R00 Phase with a suitable position is not submitted within the one-year period of the no-cost extension, the R00 will not be awarded. Those not continuing to seek to transition to the R00 will be permitted to extend without additional funds, in order to permit an orderly phase-out of the project.

Carryover of Funds: Carryover from the K99 phase to the R00 phase may be allowed provided the K99 phase was funded by extramural support. The K99 recipient should consult with the awarding IC as to its practices regarding carryover.

### 12.2.3.2.3 Transition to the R00 Phase

The K99 award recipient is required to secure a tenure track, full-time assistant professor position or equivalent in order to transition to the R00 independent phase. Transition to the R00 phase is not guaranteed. The transition application for the R00 phase is administratively reviewed by NIH staff and is not peer reviewed by a study section. There should not be any delay between the K99 phase and the R00 phase. R00 award recipients will be expected to compete successfully for independent R01 support from NIH during the R00 phase of the award.

Additional information on the K99/R00 and the NOFO are found on the New Investigators Program web page under Pathway to Independence Award: http://grants.nih.gov/grants/new_investigators/#indaward.

## 12.2.4 Individual Non-mentored (Independent) Career Development Awards

Independent (non-mentored) CDAs (e.g. K02, K05, K07 leadership, K24) provide protected time for scientists who can demonstrate the need for a period of intensive research focus as a means of enhancing their research careers. Independent CDAs are intended to foster the development of outstanding scientists and to enable them to expand their potential to make significant contributions to their field of research. Some Independent CDAs also require the candidates to serve as research mentors for junior researchers.

Candidates for independent CDAs must have a doctoral degree and independent, peer-reviewed support at the time the award is made. Some of the participating NIH ICs require candidates to have an NIH research grant from their IC at the time of application. Other NIH ICs will accept candidates with peer-reviewed, independent research support from other sources.

Planning, direction, and execution of the proposed career development program and research project are the responsibility of the applicant and sponsoring institution. Independent CDAs are not transferable from one PD/PI to another. Non-mentored awards are sometimes renewable.

## 12.2.5 Institutional Scientist Development Programs

The institutional mentored research scientist development program (K12 and KL2) provides support to an institution for the development of independent basic or clinical scientists. The goal is to enhance research career development for individuals (known as 'scholars') selected by the institution who are training for careers in specified research areas. A specified number of scholar positions are awarded in a K12. The K12 is solicited only by IC-specific NOFOs. Although the K12 is subject to NIH Standard Terms of Award, the carryover of unobligated balances from one budget period to the next generally requires prior written approval. K12 awards are generally not transferable to another institution. When institutional mentored research development programs are incorporated as part of a Clinical and Translational Science Award Consortium the KL2 activity code is used.

The Clinical Research Curriculum Award (K30) is awarded to an institution to stimulate the inclusion of high-quality, multidisciplinary, didactic training as part of the career development of clinical investigators. It supports the development and/or improvement of core courses designed as in-depth instruction in the fundamental skills, methodologies, and theories necessary for the well-trained, independent, clinical researcher.

# 12.3 ELIGIBILITY

Eligibility can vary depending on the type of award and may even vary by NIH IC within a particular program. However, there are some eligibility criteria which are consistent across all CDA programs and

these criteria are discussed in this section. Candidates are always strongly encouraged to carefully review the eligibility criteria in a specific NOFO and to contact the scientific/research and/or grants management contacts in the relevant IC prior to preparing an application to discuss issues of eligibility. These contacts are listed in the individual NOFO for each CDA.

## 12.3.1 Eligible Institutions

Applications for CDAs may be submitted on behalf of the candidate by any domestic for-profit or non-profit public or private institution/organization such as universities, colleges, hospitals, and laboratories to support a research program in a specified area(s) of research. Foreign organizations are not eligible to apply for CDAs, but foreign components may apply.

## 12.3.2 Eligible Individuals

Any individual with the skills, knowledge, and resources necessary to carry out the proposed research as the candidate (called the PD/PI) is invited to work with their organization to develop an application for a CDA program. Individuals from underrepresented racial and ethnic groups, individuals with disabilities, and individuals from disadvantaged backgrounds are always encouraged to apply for NIH programs. Multiple PD/PI applications are not accepted for individual CDAs; institutional CDAs should check the NOFO for the allowability of Multiple PD/PIs.

For mentored CDA programs, candidates who are well-established in their fields are considered ineligible. Some indications of having achieved this status are tenure or the equivalent, a substantial publication record or considerable research support that already requires commitment of a major part of the candidate's time. Applicants who meet one or more of these criteria must provide justification in the application that they are not already established in their field.

## 12.3.3 Degree Requirements

Degree requirements for CDAs are outlined in the specific NOFO. Applicants are generally required to hold a research or health-professional doctoral degree or its equivalent; eligibility for some CDAs is limited to only applicants with health professional doctoral degrees.

## 12.3.4 Citizenship

For CDA programs other than the K99/R00 program, only U.S. citizens, non-citizen nationals or individuals lawfully admitted for permanent residence at the time an offer of an award is made, are eligible for this award. Individuals on temporary or student visas are not eligible to apply for a CDA unless they have begun the process for becoming a permanent resident and expect to be admitted as a permanent resident by the earliest possible award date. In an application package, on the PHS398 Career Development Award Supplemental Form, the option of selecting "Non-citizen with temporary visa" is applicable to K99/R00 candidates only.

Noncitizen nationals are individuals who, although not citizens of the United States, owe permanent allegiance to the United States. They generally are born in outlying possessions of the United States (e.g., American Samoa and Swains Island).

Individuals who have been lawfully admitted for permanent residence must have a currently valid Permanent Resident Card (USCIS Form I-551) or other legal verification of such status. For example, if an individual has the proper validation on their passport, a notarized photocopy of the passport could suffice. Because there is a 6-month limitation on this validation, it is the applicant organization's responsibility to follow up and ensure that the candidate receives the I-551 before the 6-month expiration date.

An individual expecting to be admitted as a permanent resident by the earliest possible award date listed in the career award NOFO may submit an application recognizing that no award will be made until legal verification of permanent resident status is provided to NIH. The submission of documentation concerning permanent residency is not required as part of the initial application.

Applicants who have been lawfully admitted for permanent residence, i.e., have a Permanent Resident Card or other legal verification of such status, should check the Permanent Resident of U.S. box in Section 3. Citizenship of the PHS398 Career Development Award Supplemental Form. Applicants who have applied for and have not yet been granted admission as a permanent resident or have been granted Conditional Permanent Residency Status should also check the same box.

If a candidate's citizenship status changes after submission of an application, the new status should be reported in the candidate's Personal Profile in the eRA Commons.

In all cases involving any type of Permanent Residency status, when an application is selected to receive an award, prior to any award being issued, a notarized statement will be required that documents that a licensed notary has seen the candidate's valid Permanent Resident Card or other valid verification from the U.S. Immigration and Naturalization Service of legal admission to the U.S. In all cases where Permanent Residency status is involved, it is the responsibility of the recipient institution to assure the individual remains eligible for the project period of the award.

## 12.3.5 Type of Appointment

By the time of award, all CDA recipients must have a full-time appointment at the applicant institution. With prior approval from NIH, award recipients may hold part-time appointments for limited periods during the course of their awards (see Temporary Adjustments to the Full-Time Institutional Appointment Requirement below). Full-time or part-time is as defined by applicant institutional policy.

Candidates who hold additional appointments with an independent clinical practice plan, the VA or other organizations should contact the scientific/research and/or grants management contact in the relevant IC prior to preparing an application to discuss their eligibility. Responsibilities outside of the applicant organization appointment are not restricted; however, these types of additional appointments cannot be used to meet the full-time appointment requirement nor the effort requirement discussed below. If a candidate has a dual appointment, they must also have a full-time appointment at the applicant institution to qualify for a CDA.

### 12.3.5.1 Temporary Adjustments to the Full-Time Institutional Appointment Requirement

Temporary adjustment of the full-time requirement for awarded CDAs is allowed under certain circumstances. At the time of the award, the candidate must meet the full-time appointment requirement (as well as any minimum effort requirement); however, recipients may request a temporary reduction in their appointment to less than full-time (but not less than three-quarter time) for a period not to exceed 12 continuous months during the CDA award project period. Circumstances requiring such a change in appointment status might include personal or family situations such as parental leave, childcare, elder care, medical conditions, or a disability. Permission to change appointment status will not be approved to accommodate job opportunities, clinical practice, clinical training, or joint appointments.

When requesting approval to change to a part-time appointment status, the recipient must continue to commit at least 75% effort (of the part-time appointment) to research and career development activities. The recipient is encouraged to consider increasing their percent effort to greater than 75% (e.g., 85%) to compensate for the anticipated effect of the part-time appointment on the recipient's career progress.

On behalf of the K recipient, the recipient institution must submit a request and documentation to the NIH awarding IC supporting the need for a reduced faculty appointment and assuring the institution's continuing commitment to the scientific and research career development of the recipient. The request should justify reducing the appointment to less than full-time status and must describe the anticipated impact of the requested change on their career progress during the remainder of the award period. In addition, the recipient must submit assurance of their intention to return to a full-time faculty appointment as soon as possible. The mentor must provide a revised mentoring plan and specifically describe updated milestones for the recipient's progression to independence. Lastly, a revised statement of institutional commitment to the recipient must ensure continued "protected time" and describe additional support that will assist the recipient to continue to make progress toward their goals during the requested period of the reduced appointment. During the period of reduced appointment, the salary and other costs supported by the award will be reduced accordingly. Requests must be submitted by the recipient institution to the awarding Institute or Center (IC) where they will be considered on a case-by-case basis.

For transition CDAs (K22 and K99/R00), because of the relatively short duration of the mentored phase of the award, a request for reduction in the appointment must address the impact of this action on the recipient's ability to make sufficient progress to meet the goals of the program. For example, a K99 recipient must describe how the request will affect the recipient's ability to transition to the R00 phase of the award.

This policy also allows recipients to temporarily reduce the level of effort devoted to the CDA award; that policy is described below in Level of Effort. While these 2 policies are similar in overall goals, a recipient may not simultaneously request a reduction in appointment status from full-time to part-time AND a reduction in percent effort to less than 75%.

## 12.3.6 Level of Effort

In addition to the full-time appointment requirement described above, mentored and non-mentored CDA recipients are required to devote and maintain a minimum level of effort to the award. During a no-cost extension, the recipient is required to maintain any effort minimum and can only reduce their effort with prior approval of the awarding IC.

CDA recipients who hold additional appointments with an independent clinical practice plan, the VA or other organizations may not use these additional appointments to meet the minimum effort requirement. Responsibilities outside of the applicant organization appointment are not restricted; however, they also cannot be used to meet any minimum effort requirement. If a CDA recipient has a dual appointment, they must also have a full-time appointment at the applicant institution and be able to meet the minimum effort requirement as part of that full-time appointment in order to qualify for a CDA. Candidates are strongly encouraged to contact the scientific/research and/or grants management contact in the relevant IC prior to preparing an application to discuss their eligibility.

### 12.3.6.1 Mentored CDAs

Mentored CDA recipients are required to devote a minimum commitment equivalent of 9 calendar person months (75% of their full-time appointment at the applicant institution) to the career development and research objectives of the program specified in each NOFO. The remaining 3 person months (25% effort), if applicable, can be divided among other research, clinical, and teaching activities only if these activities are consistent with the goals of the mentored CDA, i.e., the recipient's development into an independent investigator. Some NIH ICs allow less than 75% (but not lower than 50%) effort for certain clinical specialties (e.g., surgical and procedure-intensive specialties). Applicants must consult the NOFO and also IC Program staff for this exception.

Mentored K recipients are encouraged to apply for additional research grants during the tenure of their K award (see Concurrent Support below). Mentored CDA recipients are allowed to devote complementary effort without salary support on other research grants that include related research between the CDA and the research grant. In such cases where there is scientific overlap, the percent effort on the research grant is subsumed within the required effort of the CDA. However, there should not be significant duplication of the scope of the research supported by the CDA. Further, the related research must be consistent with the goals and objectives of the CDA.

## 12.3.6.2 Concurrent Support

Provided they remain in a mentored status, mentored CDA recipients in the final two years of their support period are permitted to reduce the level of effort required for the CDA when they have competed successfully for peer-reviewed research awards from NIH or any Federal agency, if programmatic policy of the other Federal agency allows such an arrangement, or non-Federal sources (e.g., foundations or professional societies) of at least $100,000 in direct costs. Recipients are encouraged to obtain funding from NIH or other Federal sources either as a PD/PI on a competing research grant award or cooperative agreement or as a project leader on a competing multi-project award.

Budgets for a competing research grant or a subproject on a multi-project grant should request appropriate amounts for the salary and associated costs for the CDA recipient's effort. At the time the research grant is awarded the effort required on the CDA may be reduced to no less than 6 person months (50% full-time professional effort at the recipient organization) and replaced by effort and corresponding salary from the research award so that the total level of research commitment remains at 9 person months (75% full-time professional effort) or more for the duration of the mentored CDA. This policy applies to the following mentored CDA activity codes: K01, K07 (developmental), K08, K22, K23, and K25, as well as individuals mentored through institutional K12 or KL2 awards. To be eligible for salary support from peer-reviewed research awards from any Federal agency:

- The CDA recipient must be one of the named PD/PIs on a competing NIH research grant application (R01, R03, R15, R21, R34, or equivalent application from another Federal agency) or a sub-project director on a competing multi-component research or center grant or cooperative agreement application (P01, P50, U01, etc. or an equivalent application from another Federal agency).

- The CDA must be active when the competing research grant application is submitted.

- The CDA must be in its final two years before the reduction in effort to 6 person months (50% full-time professional effort) is permitted.

For submissions to NIH, a letter must accompany the research grant application from the chair of the mentored award recipient's department or other responsible institutional official providing: (1) evidence that the recipient will continue to focus on the development of their research career; (2) will continue to have access to their mentor; and (3) that the recipient's total level of research effort will be maintained and protected at a minimum of 9 person months (75% full-time professional effort). For submissions to other Federal agencies, this type of institutional commitment letter is strongly encouraged; however, applicants should check with that agency for guidance on the allowability of such a letter.

When a mentored CDA recipient obtains independent support, as described above, the NIH awarding IC supporting the CDA will adjust the level of effort committed to the CDA to no less than 6 person months (50% effort) consistent with maintaining total research effort at 9 person months or 75% or more of the full-time appointment. NIH will adjust the total salary support committed to the K award consistent with the adjusted level of effort. However, NIH will continue to provide full research development support costs (i.e., Other Personnel, Equipment, Travel, Participant/Trainee Support, and Other Direct Costs

budget categories) as indicated on the original Notice of Award. If necessary, the K award may also be adjusted to avoid any additional budget overlap.

### 12.3.6.3 Non-mentored CDAs

Established investigators on independent (non-mentored) CDAs are generally required to devote a minimum of 3-6 person months (25-50% effort) conducting research and research career development related activities during the period of the award. Some independent CDAs allow and may require more than 6 person months (50% effort). For example, K02 recipients are required to devote 9 person months (75% effort) to research.

Generally, an independent or leadership recipient may receive additional salary support from other NIH/PHS grants for effort not committed to the CDA and there are no limitations to receiving other salary support. Where applicable, specific policies are noted in the NOFO. The candidate must be able to demonstrate that the requested period of salary support and protected time will foster their career and capacity to contribute to the specified field.

### 12.3.6.4 Temporary Adjustments to the Percent Effort Requirement

At the time of the CDA award, the candidate must still meet the applicable effort requirement (as well as the full-time appointment requirement); however, under certain circumstances, recipients may request a temporary reduction in their effort for a period not to exceed 12 continuous months during the award project period. For programs that require a 75% effort minimum (equivalent to 9 person months), a recipient can request a reduction to no less than 50%. Circumstances requiring such a change in effort might include personal or family situations such as parental leave, childcare, elder care, medical conditions, or a disability. Permission to temporarily reduce effort will not be approved to accommodate job opportunities, clinical practice, clinical training, or joint appointments.

On behalf of the K recipient, the recipient institution must submit a request and documentation to the NIH awarding IC supporting the need for reduced effort and assuring the institution's continuing commitment to the scientific and research career development of the recipient. The request should justify reducing effort and must describe the anticipated impact of the requested change on their career progress during the remainder of the award period. In addition, the recipient must submit assurance of their intention to return to 75% effort as soon as possible. The mentor must provide a revised mentoring plan and specifically describe updated milestones for the recipient's progression to independence. Lastly, a revised statement of institutional commitment to the recipient must ensure continued "protected time" and describe additional support that will assist the recipient to continue to make progress toward their goals during the requested period of the reduced appointment. During the period of reduced effort, NIH will adjust the total salary amount committed to the K award consistent with the adjusted level of effort. However, NIH will continue to provide full research costs in other budget categories as indicated on the original Notice of Award. In addition, the K recipient may request to extend the duration of the award to account for the reduced effort. Requests must be submitted by the recipient institution to the awarding Institute or Center (IC) where they will be considered on a case-by-case basis.

This option is not available for Independent CDAs that require only 25-50% effort; e.g., K07 leadership, K05, and K24.

While this temporary adjustment in effort policy is similar to the policy described above allowing a temporary adjustment in the full-time appointment requirement, recipient may not simultaneously request a reduction in appointment status from full-time to part-time AND a reduction in percent effort to less than 75%.

## 12.3.7 Prior Research Support

For most mentored career development awards, individuals are eligible to apply if they have previously served as the PD/PI of an NIH Small Grant (R03), Exploratory/Developmental Grant (R21), Planning Grant (R34/U34), Dissertation Award (R36), SBIR/STTR Award, Transition Scholar Award (K38) or been appointed to an institutional career development program (K12, KL2). The K99/R00 program, however, has different eligibility requirements related to prior research support and those are detailed in the Notice of Funding Opportunity.

In general, for mentored CDAs, individuals are NOT eligible if they:

- Are current and former PDs/PIs on NIH research project (R01), program project (P01), center grants (P50), other major individual career development awards (e.g., DP5, K01, K07, K08, K22, K23, K25, K76, K99/R00), or

- Project Leads of program project (P01) or center grant (P50) sub-projects, or the equivalent.

Most independent (non-mentored) CDAs require that the applicant have independent, peer-reviewed support at the time the award is made. Some of the participating NIH ICs require the candidate to have an NIH research grant at the time of application and that the support be from their IC. Other NIH ICs will accept candidates with peer-reviewed, independent research support from other sources. Applicants must check the NOFO for specific eligibility requirements.

# 12.4 APPLICATION REQUIREMENTS AND DUE DATES

## 12.4.1 Application

Before applying for a CDA, applicants should carefully review the guidelines in the NOFO for the specific career award(s) of interest, noting especially the eligibility requirements, award provisions, requirements for a mentor, and review criteria. The participating ICs may have distinctive guidelines, requirements, and funding amounts for each NOFO in order to accommodate the career needs of researchers working in fields related to their specific research missions. Candidates are therefore strongly encouraged to contact the staff person in the relevant IC listed in the NOFO prior to preparing an application to discuss any specific provisions of the award.

The specific NOFO provides links to the application forms package as well as the appropriate application instruction guide. As with all NIH programs using electronic submission, a CDA application uses a combination of SF424(R&R) and PHS398 forms. A separate section (Section I.7) of the SF424(R&R) Application Guide is included that provides supplemental instructions for preparing a CDA application. Further information is available from the NIH Grants & Funding website.

Applications must contain Candidate Information, Statements of Support, Environment and Institutional Commitment to the Candidate, as well as a Research Plan. The Candidate Information section includes required information about the candidate and must justify the need for the requested period of support, be tailored to the prior research experience and career development needs of the candidate, and for mentored CDAs be designed to move the candidate from a mentored phase to an independent status. The research plan must have intrinsic research importance as well as serve as a suitable vehicle for learning the methodology, theories, and skills necessary for a well-trained independent researcher. For mentored award programs, the research plan must also include a description of the relationship between the mentor's research and the candidate's proposed research plan.

Other than the K22 application from an unaffiliated candidate, all applications require documents describing the Environmental and Institutional commitment to the candidate.

For mentored award programs the career development application also must include Statement by Mentor(s), Co-Mentor(s), Consultant(s) and Contributor(s) as well as a statement describing the institution's commitment to the candidate's development.

The requirement for ORCID identifiers will be enforced at the time of application for individual career development awards, including the following: K01, K02, K05, K07, K08, K18, K22, K23, K24, K25, K26, K38, K43, K76, and K99/R00.

eRA system validations will check whether applicants have ORCID iDs and applications will not be accepted unless an ORCID iD is linked to the PD/PI's eRA Commons Personal Profile.

To either link their eRA profiles to existing ORCID accounts or create ORCID profiles and link them back to the eRA Commons. Prospective applicants for individual career development awards may follow the ORCID link from their Personal Profiles in the eRA Commons.

## 12.4.1.1 Letters of Reference

At least three (but no more than five) letters of reference are required for all new and resubmission mentored CDA applications. The letters should be from individuals not directly involved in the application, but who are familiar with the candidate's qualifications, training, and interests and include advisory committee members (if applicable). However, the candidate's mentor(s) of the application must not submit a separate letter of reference because a mentor's statement is required as part of the application. The letters of reference should address the candidate's competence and potential to develop into an independent biomedical, behavioral, or clinical investigator.

Electronic submission of CDA applications requires electronic submission of reference letters as well. However, reference letters are submitted directly by the referee through the eRA Commons and not as part of the electronic application that goes through Grants.gov. Reference letters will be joined with the electronic application within the eRA system once an application completes the submission process. Applications that are missing the required letters may be delayed in the review process or not accepted at all. Complete instructions for candidates and referees are found in Part I, Section 7.3 of the SF424(R&R) Application Guide for Adobe Applications.

## 12.4.1.2 Concurrent Applications

NIH will not accept any application in response to an NOFO that is essentially the same as one currently pending initial review unless the applicant withdraws the pending application. NIH will not accept any application that is essentially the same as one already reviewed. This does not preclude the submission of a substantial resubmission of an application already reviewed, but such applications must include an Introduction addressing the previous critique.

## 12.4.1.3 Environment and Institutional Commitment to the Candidate

The applicant organization must define and document a strong, well-established research and career development program related to the candidate's area of interest, including a high-quality research environment with staff capable of productive collaboration with the candidate. The institution must provide a statement of commitment to the candidate's development into a productive, independent investigator and to meeting the requirements of the award. The institution should indicate how the necessary facilities and other resources will be made available for career enhancement as well as the research proposed in the application. The applicant should describe opportunities for intellectual interactions with other investigators, including courses offered, journal clubs, seminars, and presentations.

The institution should provide a document on institutional letterhead that describes its commitment to the candidate and the candidate's career development. The document should include the institution's

agreement to provide adequate time and support for the candidate to devote the proposed protected time to research and career development for the entire period of the proposed award. The institution should provide the equipment, facilities, and resources necessary for a structured research career development experience. It is essential to document the institution's commitment to the retention, development, and advancement of the candidate during the period of the award.

Because of the diverse types of CDAs, applicants should contact the appropriate awarding IC scientific/research contact named in the specific NOFO to determine the level of commitment required for the application. Institutional commitment to the candidate may not be contingent upon the receipt of the CDA.

***Off-Site Training Experience.*** A candidate may propose a career award experience that involves sites beyond the applicant organization, provided that the goals of the total experience are encompassed and supported under the appointment with the applicant organization.

## 12.4.1.4 Training in the Responsible Conduct of Research

All CDA applicants (mentored and non-mentored) must include a description of the formal and informal activities related to instruction in the responsible conduct of research planned for the proposed research program. Specifically, applicants must include a description of a plan for instruction in responsible conduct of research. This description should document prior instruction in or the nature of the applicant's participation in responsible conduct of research instruction (lecturer, discussion leader, etc.) during the applicant's current career stage (including the dates of last occurrence) and propose plans to receive or participate in instruction in responsible conduct of research. Such plans must address the five instructional components, format, subject matter, faculty participation, duration of instruction, and frequency of instruction, as outlined below. Applications lacking a plan for instruction or participation in responsible conduct of research will be considered incomplete and may be delayed in the review process. Plans and past record will be rated as **acceptable** or **unacceptable** and the summary statement will provide the consensus rating of the review committee. Applications with unacceptable plans will not be funded until the applicant provides an acceptable, revised plan. For additional information see the specific NOFO.

1. ***Format.*** Discussion-based instruction in the responsible conduct of research is expected to remain a key feature of RCR training and to include substantive face-to-face interaction among participants and faculty. However, recognizing that advances in video conferencing now allow for effective "face-to-face" discussions to occur electronically, institutions may wish to consider incorporating video conferencing options into their RCR instruction, provided that those options are utilized in a way that fosters discussion, active learning, engagement, and interaction among the participants. At the same time, video conferencing should not be the sole means for meeting the requirement for RCR instruction, and a plan that employs only video conferencing will not be considered acceptable, except in special instances of short-term training programs (see below), or unusual and well-justified circumstances.

2. ***Subject Matter.*** While there are no specific curricular requirements for instruction in responsible conduct of research, the following topics have been incorporated into most acceptable plans for such instruction:

    (a) conflict of interest – personal, professional, and financial – and conflict of commitment, in allocating time, effort, or other research resources

    (b) policies regarding human subjects, live vertebrate animal subjects in research, and safe laboratory practices

    (c) mentor/mentee responsibilities and relationships

(d) safe research environments (e.g., those that promote inclusion and are free of sexual, racial, ethnic, disability and other forms of discriminatory harassment)

(e) collaborative research including collaborations with industry and investigators and institutions in other countries

(f) peer review, including the responsibility for maintaining confidentiality and security in peer review

(g) data acquisition and analysis; laboratory tools (e.g., tools for analyzing data and creating or working with digital images); recordkeeping practices, including methods such as electronic laboratory notebooks;

(h) secure and ethical data use; data confidentiality, management, sharing and ownership

(i) research misconduct and policies for handling misconduct

(j) responsible authorship and publication

(k) the scientist as a responsible member of society, contemporary ethical issues in biomedical research, and the environmental and societal impacts of scientific research

While courses related to professional ethics, ethical issues in clinical research, or research involving vertebrate animals may form a part of instruction in responsible conduct of research, they generally are not sufficient to cover all aspects of responsible research conduct.

3. **_Faculty Participation._** Mentors and other appropriate faculty are highly encouraged to contribute both to formal and informal instruction in responsible conduct of research. Informal instruction occurs in the course of laboratory interactions and in other informal situations throughout the year. For institutional Career Awards, training faculty may contribute to formal instruction in responsible conduct of research as discussion leaders, speakers, lecturers, and/or course directors. Rotation of training faculty as course directors, instructors, and/or discussion leaders may be a useful way to achieve the ideal of full faculty participation in formal responsible conduct of research courses over a period of time.

4. **_Duration of Instruction._** Instruction should involve substantive contact hours between the career recipient/scholars, mentors and other appropriate faculty. Acceptable programs generally involve at least eight contact hours. A semester-long series of seminars/programs may be more effective than a single seminar or one-day workshop because it is expected that topics will then be considered in sufficient depth, learning will be better consolidated, and the subject matter will be synthesized within a broader conceptual framework.

5. **_Frequency of Instruction._** Existing policy and guidance call for RCR instruction to be undertaken at least once during each career stage, and at a frequency of no less than once every four years. As institutions consider how to optimize the timing and delivery of instruction in the responsible conduct of research, they are encouraged to bear in mind the value of ongoing and discipline-specific training as individuals progress in their research careers. For example, while broad-based instruction in the responsible conduct of research is often appropriate early in graduate school; a more tailored, discipline-specific approach may better fit the needs of advanced graduate students and those who have transitioned to postdoctoral status. If advanced students and postdoctorates have been exposed to the full range of topics traditionally included in RCR instruction early in their scientific training, it may make sense for their ongoing and/or subsequent RCR training to focus on subjects most relevant to their fields, and institutions may wish to consider this approach, where applicable.

## 12.4.1.5 Budget

CDAs provide limited costs, generally covering only applicable salary and fringe benefits for the candidates, as well as a fixed amount for research development support. Costs requested and awarded for

CDA programs must be consistent with applicable Federal cost principles. Salary amounts as well as the research development costs can vary by CDA program and then within a particular program even by each participating NIH IC. Applicants are advised to consult the relevant NOFO for guidelines on allowable costs and budget limitations.

The transition to electronic submission included a change in business process with respect to budget information. Detailed budget information is now required as part of the initial application; however it is limited to the senior/key person information for only the candidate and then the total amount of requested research development support in budget section F.1. Other Direct Costs/Materials and Supplies. A budget justification is also required and should be used to provide a detailed description for the specific research development support costs. Instructions are provided in the applicable Application Guide and specific NOFOs.

As with all NIH training programs, Facilities and Administrative costs for CDAs are provided at a rate of 8% of modified total direct costs.

### 12.4.1.6 Submission Dates

For all parent CDA NOFOs, NIH receives applications three times each year using standard submission dates. For a list of the standard submission dates and review cycle are posted on NIH's web site. IC-specific NOFOs may use special submission dates instead of the standards dates, but the NOFO will clearly indicate if standard or special submission dates are used.

## 12.5 REVIEW

All CDA applications will undergo peer review as noted in The Peer Review Process in Part I; however, the actual review criteria and other review considerations are different as described herein.

### 12.5.1 Overall Impact

Reviewers should provide their assessment of the likelihood for the candidate to develop and/or maintain a strong research program, taking into consideration the criteria below in determining the overall impact score.

### 12.5.2 Scored Review Criteria

For CDA applications, reviewers will consider each of the five review criteria below in the determination of the scientific and technical merit and give a separate score for each. An application does not need to be strong in all categories to be judged likely to have a major scientific impact. The scored criteria are:

- Candidate
- Career Development Plan/Career Goals & Objectives/Plan to Provide Mentoring
- Research Plan
- Mentor(s), Co-Mentor(s), Consultant(s), Collaborator(s); and for non-Mentors the Mentoring Plan
- Environment and Institutional Commitment to the Candidate

These criteria are listed in logical order and not in order of priority. Since the specifics for each of these criteria can vary for the various CDA programs, the review criteria are described in detail in the NOFO. Note that different ICs may employ additional review criteria.

### 12.5.3 Additional Review Criteria

As applicable for the project proposed, reviewers will evaluate the following additional items while determining scientific and technical merit, and in providing an overall impact score, but will not give separate scores for these items.

- Protection of Human Subjects
- Inclusion of Women, Minorities and Individuals Across the Lifespan
- Vertebrate Animals
- Biohazards
- Resubmission Applications
- Renewal Applications
- Revision Applications

The NOFO should be consulted for further information describing each of the relevant additional review criteria.

### 12.5.4 Additional Review Considerations

As applicable for the project proposed, reviewers will address each of the following items, but will not give scores for these items and should not consider them in providing an overall impact score.

- Training in the Responsible Conduct of Research
- Select Agents
- Authentication of Key Biological and/or Chemical Resources
- Resource Sharing Plans
- Budget and Period of Support

Candidates should carefully review the applicable NOFO for complete information associated with the peer review process including further information describing each of the relevant additional review considerations.

## 12.6 NOTIFICATION OF ACTION

Shortly after the initial peer review meeting, candidates receive an e-mail indicating that the SRG recommendation/impact score is available in the eRA Commons. The candidate is also notified via an e-mail when the summary statement (written critique) is available in the eRA Commons.

The PO may notify the applicant about the final review recommendation. The applicant should direct any questions about initial review recommendations and funding possibilities to the designated IC PO, not the SRO of the SRG. Name and contact information of the assigned PO is also available in the eRA Commons. If the application is under consideration for funding, NIH will request additional information. After all program and administrative issues have been resolved, the NoA will be issued for those applications selected for funding.

## 12.7 PERIOD OF SUPPORT

The NIH awarding IC will notify the individual of the intention to make an award and confirm the plans for the start of support. An award is for a period of 3 to 5 years and provides support for salary and

research-development support costs. Support beyond the first year shall be based on an assessment by NIH staff of the effectiveness of the development opportunity and continued opportunity for growth, as reflected in the recipient's annual progress report. Continuation of awards is contingent upon future Federal appropriations.

Mentored CDAs are not renewable. Non-mentored CDAs may be renewable; awards may be competitively renewed at the discretion of the participating NIH ICs. Only a few of NIH ICs permit competitive renewals.

Note the period of support for the K99/R00 program is awarded in 2 distinct phases. Phase I covers only the K99 period; phase II is the R00 portion and is contingent upon meeting certain criteria, including the submission and acceptance of a R00 application by the NIH IC.

Some K22 programs also have 2 distinct funding phases where specific criteria must be met before funding is provided for the second phase.

Note, the K99/R00 and some K22 programs allow NIH intramural scientist to apply. For those selected for funding, the period of support on any award issued will only reflect the period funded by NIH extramural funds. Any period of support supported by NIH intramural funds will not be evident in the NoA.

# 12.8 ALLOWABLE AND UNALLOWABLE COSTS

Policies included in the applicable cost principles in 2 CFR Part 200, Subpart E and the NIHGPS govern the expenditure of all CDA funds, unless otherwise indicated in the NoA.

## 12.8.1 Salaries and Fringe Benefits

Requested salary and fringe benefit amounts must be in accordance with institutional policies applied consistently to individuals in like circumstances and must be supported by acceptable accounting principles. If full-time, 12-month salaries are not currently paid to comparable staff members, the salary proposed must be appropriately related to the existing salary structure. Salary amounts requested on CDA grants must be based on the investigator's institutional base salary (IBS) prorated for their commitment on the project. While requested salary and fringe benefit information is provided in the initial application, confirmation of these costs may be required prior to the issuance of an award.

The amount funded as salary for a CDA is not uniform throughout the NIH participating ICs. Salary limits vary by IC and are noted in the NOFO. Note the limit is on salary only; applicable fringe benefits are provided in addition to the salary. The candidate is strongly advised to contact the relevant awarding IC for any distinct guidelines, requirements, and allowable funds. Salary costs charged cannot exceed the applicable legislative salary cap.

The recipient institution may supplement the NIH salary contribution on the CDA up to a level that is consistent with the institution's salary scale. For effort directly committed to the CDA, salary supplementation is allowable, but must be from non-Federal sources (including institutional sources). In no case may PHS funds be used for such salary supplementation. Non-federal or institutional supplementation of salary must not require extra duties or responsibilities that would interfere with the goals of the CDA. For effort not directly committed to the CDA, CDA recipients may devote effort, with compensation, on Federal or non-Federal grants as the Program Director/Principal Investigator (PD/PI) or in another role (e.g., co-Investigator), as long as the specific aims of the other supporting grant(s) differ from those of the CDA.

NIH IC limitations on awarded salary levels do not limit the recipient's rebudgeting authority. Institutions may rebudget the total costs awarded to cover additional salary charges, provided they are within

the approved scope of the project and consistent with the institution's salary scale as long as the cost charged is within the applicable legislative salary cap.

Salary support for ancillary personnel (e.g. administrative assistance or secretarial support) on CDAs is not allowable.

Salary support for mentors is not allowable on individual mentored CDAs.

Salary support for research technicians or study coordinators for clinical studies are generally allowable but are budgeted as part of the Research Development Support Costs described below.

## 12.8.2 Research Development Support Costs

CDAs may include a fixed amount for research development support costs. This amount may vary by IC and is commonly used for supplies, equipment, technical personnel, travel to research meetings or training, tuition/fees for courses and computational services.

## 12.8.3 Proposal Preparation Costs

Mentored CDA programs provide support with a goal of leading to research independence for an individual. Since research independence is achieved through applying for other research support, consistent with these objectives, it is allowable for effort devoted to proposal preparation costs for subsequent research support to be charged to a mentored CDA award. This can be considered part of the awarded effort commitment of the mentored CDA or an increase to that commitment with the allowable salary provided as applicable.

## 12.8.4 Facilities and Administrative Costs

For career awards other than the R00 phase of the K99/R00 and other than State, local, or Indian tribe (or "federally recognized Indian tribes"), recipients will receive F&A costs at 8 percent of modified total direct costs. State and local agencies, and Indian tribes (or "federally recognized Indian tribes") are eligible for full F&A cost reimbursement. For this policy, State universities or hospitals are not considered governmental agencies.

# 12.9 REBUDGETING OF FUNDS

Funds awarded on CDAs may typically be rebudgeted within direct cost categories without prior approval; however restrictions on rebudgeting may be noted in the NoA.

Rebudgeting of salary funds in an NIH-supported research grant for the salaries or fringe benefits of individuals which are freed as a result of a career award, may not be rebudgeted without the prior approval of the NIH awarding IC.

# 12.10 CARRYOVER AUTHORITY

Unless otherwise noted by a specific term of award, Individual CDAs have automatic carryover authority. However, for most Institutional CDAs, carryover requires prior approval. The NoA will specify whether or not the recipient must obtain prior approval to carry over funds.

For the two-phased K99/R00 program, carryover from the K99 phase to the R00 phase may be allowed provided the K99 phase was funded by extramural support. The K99 recipient should consult with the awarding IC as to its practices regarding carryover.

# 12.11 REPORTING REQUIREMENTS

Failure to comply with reporting requirements and to submit the required forms in a timely manner may result in an expenditure disallowance or a delay in any continuation funding.

## 12.11.1 Progress Reports

Most individual CDA awards (mentored and non-mentored) are awarded under SNAP authorities. Progress reports for SNAP awards must be submitted using the Research Performance Project Report (RPPR). The RPPR must be submitted electronically using the RPPR module in the eRA Commons. For progress reports submitted using the RPPR, the IDP requirement described in Non-Competing Continuation Progress Reports will apply. Progress reports for non-SNAP awards should be submitted in accordance with the PHS 2590 instructions, including Section 4, Additional Instructions for Preparing Continuation Career Development Award (CDA) Progress Reports. PHS 2590 progress report forms and instructions are available from the NIH Web site.

Following completion or termination of a project period, the recipient must submit a Final RPPR to the NIH awarding IC within 120 days after the end of grant support as part of the Closeout documents described below.

## 12.11.2 Federal Financial Report

For individual CDAs awarded under the SNAP authorities, an annual electronic FFR is not required. Only a final FFR is required at the end of the project period (see Administrative Requirements—Monitoring—Reporting—Financial Reports and Administrative Requirements—Closeout—Final Reports in IIA).

## 12.11.3 Closeout

The Closeout requirements included in IIA (see Administrative Requirements—Closeout—Final Reports) apply to all Individual CDAs (mentored and non-mentored). For Institutional Scientist Development Programs the closeout requirements apply with the exception of the Final Invention Statement; invention reporting is not applicable to K12s & KL2s thus a final invention statement is not required as part of the closeout process.

## 12.11.4 Post Closeout Evaluation

In carrying out its stewardship of human resource-related programs, NIH may request information essential to an assessment of the effectiveness of CDA programs. Accordingly, CDA recipients may be contacted after the completion of any CDA award for periodic updates on various aspects of their employment history, publications, support from research grants or contracts, honors and awards, professional activities, and other information helpful in evaluating the impact of the program.

# 12.12 CHANGES IN THE PROJECT

The approval of the NIH awarding IC is required for a transfer of the CDA to another institution, or a project change. Note, individual mentored and non-mentored CDAs may not be transferred to another PD/PI.

The Change of Recipient Organization policies described in IIA apply to Individual CDAs as long as the transfer is between domestic institutions. For mentored CDAs, the recipient must have a mentor at the new institution. If the transfer also involves a change in mentor, supporting documentation from the new

mentor will be required. Consultation with the applicable NIH program staff and/or grants management staff is strongly encouraged when a change of institution is being considered.

CDAs are awarded under the NIH Standard Terms of Award and as such recipients have the authority to extend the final budget period of a project period without additional funds for up to 12 months. Recipients are reminded that all terms and conditions and programmatic requirements apply during the extension period. For instance, the full-time appointment and minimum effort requirements must continue for the entire extension period. Recipients should be mindful of these requirements when deciding how much additional time is needed.

## 12.12.1 Temporary Off-Site Career Development Experience

A temporary career development experience at another institution, including a foreign laboratory, may be permitted if the proposed experience is directly related to the overall goals and purpose of the K award. Only local institutional approval is required if such an arrangement does not exceed 3 months. For longer periods (not to exceed 12 months), prior written approval from the NIH awarding IC is required. The written request must document the approval of the recipient organization and the adequacy of arrangements for off-site training. Support from the career award will continue during such an off-site experience. For some CDAs additional information is required as part of any prior approval request:

- For transition CDAs (K22 and K99/R00), because of the relatively short duration of the mentored phase of each of these awards, a request for approval of an off-site training experience lasting more than 3 months must address the impact of such action on the recipient's ability to make sufficient progress to meet the goals of the award. For example, for a K99 phase recipient, the request must describe how the off-site experience will affect the recipient's ability to transition to the R00 phase.

- For K05, K07 leadership, and K24 recipients, the request must include a letter assuring that arrangements have been made to continue to commit the appropriate effort to the research and to provide mentoring.

- For K12 and KL2 Scholar appointees, because of the short duration of the mentored phase of each of these awards, a request for approval of an off-site training experience lasting more than 3 months must address the impact of such action on the scholar's ability to make sufficient progress to meet the goals of the program.

## 12.13 OTHER TERMS AND CONDITIONS

Except as otherwise noted below, the provisions of IIA apply to all CDA programs. This includes all Public Policy Requirements, Objectives, and Other Appropriation Mandates such as civil rights; the protection of human subjects, including data and safety monitoring requirements; the humane care and use of live vertebrate animals; human embryonic stem cells; and/or research involving recombinant or synthetic nucleic acid molecules. See Subpart IIA for a complete list of applicable requirements.

In addition, all Administrative Requirements described in IIA also apply to CDA program unless an exception is noted below. These include requirements such as prior approvals; availability of research results, publications, NIH Public Access policy, invention reporting, and program income. See IIA for a complete list of applicable administrative requirements.

## 12.13.1 Leave

Since CDA recipients are employees of the institution, applicable institutional leave policies for leave such as vacation, sick, parental, etc. apply to individuals supported by NIH CDAs.

CDAs are expected to be for continuous support of an individual; however, in certain circumstances, candidates will be permitted to take a leave of absence. Circumstances include personal or family situations such as parental leave, childcare, elder care, medical conditions, or a disability. A leave of absence or sabbatical greater than three months must be requested and approved in writing by the NIH awarding IC. A leave of absence less than 3 months only requires institutional prior approval.

For some CDAs additional information is required as part of any prior approval request:

- For transition CDAs (K22 and K99/R00), because of the relatively short duration of the mentored phase of each of these awards, a request for approval of a leave of absence lasting more than 3 months must address the impact of such action on the recipient's ability to make sufficient progress to meet the goals of the award. For example, a K99 phase recipient must describe how the leave will affect the recipient's ability to transition to the R00 phase.

- For K05, K07 leadership, and K24 recipients, the request for a leave of absence lasting more than 3 months must include a letter assuring that arrangements have been made to continue to commit the appropriate effort to the research and to provide mentoring.

- For K12 and KL2 Scholar appointees, because of the short duration of the mentored phase of each of these awards, a request for a leave of absence lasting more than 3 months must address the impact of such action on the scholar's ability to make sufficient progress to meet the goals of the program.

### 12.13.1.1 Unpaid Leave

Leave without award support may not exceed 12 months. Such leave requires prior written approval of the awarding component and will be granted only with justification. When approved, the K award will be placed in a no-cost extension for the duration of the unpaid leave and no charges to the grant will be allowed during that period, although continued coverage of health insurance would be allowable if in accordance with institutional policy. Such leave does not reduce the total number of months of program support for which an individual is eligible.

## 12.13.2 Statement of Appointment—Institutional CDAs Only

At the time of the initial appointment of K12 or KL2 scholars, the Program Director may submit a Statement of Appointment (Form PHS 2271) for each scholar to the NIH awarding IC to document the appointment of scholars to institutional CDAs. This policy varies with ICs and is specified in the Notice of Funding Opportunity. When 2271s are required, this information must be submitted using the xTrain feature in the eRA Commons.

## 12.13.3 Early Termination

Consultation with the applicable NIH program staff and/or grants management staff is strongly encouraged when a termination is being considered before the scheduled project end date. When an institution plans to terminate an award, the awarding IC must be notified in writing at the earliest possible time, so that appropriate instructions can be given for termination. NIH will issue a revised NoA to specify the changed period of support.

NIH may terminate a CDA before its normal completion date if it determines that the recipient has materially failed to comply with the terms and conditions of the award or to carry out the purpose for which it was made. If an award is terminated, NIH will notify the recipient in writing of the determination, the reasons for the determination, the effective date, and the right to appeal the decision.

The NIH awarding IC should be notified immediately if a sponsoring institution wants to terminate a K12 scholar, or if the scholar decides to terminate the appointment before the scheduled completion date.

## 12.13.4 Other Income: Generation and Disposition of Professional Fees

CDA recipients may retain royalties and fees from activities such as scholarly writing, service on an advisory group, honoraria from other institutions for lectures or seminars, fees resulting from clinical practice, professional consultation, or other comparable activities, provided these activities remain incidental, are not required by the research and research-related activities of the CDA, and provided that the retention of such pay is consistent with the policies and practices of the recipient institution. No other income or fees may be retained by the CDA recipient and must be assigned to the recipient institution for disposition by any of the following methods:

- The funds may be expended by the recipient institution in accordance with NIH policy on supplementation of career award salaries and to provide fringe benefits in proportion to such supplementation. Such salary supplementation and fringe benefit payments must be within the established policies of the recipient institution.

- The funds may be used for health-related research purposes.

- The funds may be paid to miscellaneous receipts of the U.S. Treasury. Checks should be made payable to the Department of Health and Human Services and forwarded to the Director, Office of Financial Management, NIH, Bethesda, MD 20892. Checks must identify the relevant award account and reason for payment.

Adequate records regarding the source, receipt and disposition of fees and other income are to be maintained by the institution for the applicable retention time period(s) specified in 2 CFR Part 200.307.

# 13 MODULAR APPLICATIONS AND AWARDS

## 13.1 GENERAL

Modular applications and awards employ a simplified process for developing and reviewing application budgets, documenting approved budgets, and making post-award budgetary changes.

## 13.2 APPLICABILITY

Modular procedures are required to be used for new, renewal, and resubmission applications as well as for revisions for the following grants and their cooperative agreement equivalents that request up to a total of $250,000 of direct costs per year (excluding consortium F&A costs), regardless of whether the application is an investigator-initiated application or is one submitted in response to a PA/RFA: Research Project Grants Program (R01/U01), Small Grant Program (R03), Exploratory/Development Research Grant Award (R21/UH2), Clinical Trial Planning Grant Program (R34/U34) and Academic Research Enhancement Awards (R15/UA5). Modular procedures do not apply to SBIR and STTR Phase I grants (R43 and R41), and do not apply to foreign (non-U.S.) organizations.

Instructions for specific grant mechanisms other than the R01 and guidelines for IC programs may indicate a particular number or range of modules allowed.

Modular applications and awards may also be subject to other simplified procedures, specifically Just-in-Time requirements and SNAP.

## 13.3 APPLICATION REQUIREMENTS

Modular applications must be submitted on the SF424 (R&R) forms. Paper-based applications that include modular budgets will no longer be accepted.

### 13.3.1 Budget

Modular applications request direct cost funding in modules of $25,000, for up to $250,000 each year for covered activity codes. F&A costs for subcontracts are not included in determining the direct cost modular amount or the total cost amount requested. The modules should be a reasonable estimate of allowable, allocable, and reasonable costs for the proposed project. In addition, F&A costs at the negotiated rate for the applicant institution are also allowable.

Since only limited budget information is required for submission of a modular application, the PHS 398 Modular Budget Component, which is included as part of the electronic SF424 (R&R) form set, must be submitted to NIH through Grants.gov. Sample modular application budget pages are available at NIH's web site. The standard SF 424 Research and Related Budget Component is not used for application using modular budgets.

The PHS 398 Modular Budget Component includes information on direct costs modules as well as F&A costs; budget justifications for all personnel by position, role, and level of effort (measured in person months); consultants; and 'to be appointed' positions. No individual salary information should be provided. Applicants must use the current legislatively imposed salary limitation when determining the number of modules to request (see Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Salaries and Wages in IIA). Given the authority to rebudget and carry forward unobligated balances, funds generally should be available to cover modest increases in any statutorily imposed salary cap. NIH also limits the compensation for graduate students. Compensation includes salary or

wages, fringe benefits, and tuition remission. These limits should be used when estimating the number of modules. See Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Salaries and Wages in IIA for more information on compensation of graduate students.

When applicable, a separate budget justification must address consortium/contractual costs (including applicable F&A costs) rounded to the nearest $1,000. The narrative should list the individuals and organizations with whom consortium or contractual arrangements have been (or will be) made, the level of effort of senior/key personnel (measured in person months) and their role on the project, and indicate whether the collaborating organization is foreign or domestic.

A typical modular application will request the same number of modules for each year. However, well-justified modular increments (up to the $250,000 modular ceiling) or decrements in the total direct costs for any year of the project that reflect substantial changes in expected future activities may be requested at the outset. For example, a major equipment purchase in the first year may justify a higher overall budget in that year, but not necessarily in succeeding years. There is no provision for escalation in future years. NIH requires additional narrative budget justification if there is a variation in the number of modules requested from year to year. Further, when the pre-award review warrants such a request, NIH ICs may request a detailed budget as part of the Just-in-Time process.

# 13.4 APPLICATION REVIEW AND AWARD

SRGs evaluate the budget on the basis of a general, expert estimate of the total effort and resources required to carry out the proposed research. If the SRG recommends an adjustment in the project budget, the recommended adjustment will be in terms of an entire module.

Following peer review, for applications being considered for award, the IC will request information about "Other Support" and, as applicable, the use of human subjects or vertebrate animals, and education in the protection of human research participants. Additional budget information will be requested before award only under special circumstances.

NIH will attempt to make awards at or close to the level of total direct costs recommended by the SRG, taking other support into account. An IC may need to reduce the award amount to accommodate the IC's cost management plan.

The award budget will be a noncategorical budget specifying approved total direct costs and F&A costs, if applicable.

# 13.5 POST-AWARD ADMINISTRATION

Recipients have discretion in determining how to allocate and account for costs related to modular awards within their organizational accounting system. However, institutions are still required to ensure that all costs charged to modular awards are in accordance with applicable costs principles, the NIHGPS, and any legislatively imposed restrictions.

Modular awards are subject to the standard NIH Terms of Award and may be awarded under the SNAP authorities. However, since the award is issued without direct cost budget categories, the significant rebudgeting provision described as a potential change of scope indicator does not apply to modular grants.

Recipients may submit requests for administrative supplements to the CGMO of the NIH awarding IC, but must provide a detailed (non-modular) budget.

Competing Revisions should be submitted to NIH using the modular budget component.

# 14 SUPPORT OF SCIENTIFIC MEETINGS (CONFERENCE GRANTS)

## 14.1 GENERAL

NIH supports scientific meetings, conferences, and workshops (hereafter "conferences") that are relevant to its scientific mission and to public health under the R13 and U13 activity codes. NIH's support of conferences is contingent on the interests and priorities of the individual ICs. Most ICs provide conference support although their budget guidelines may vary. Prior approval (advance permission) is required before submission of an application for conference support. Advance permission to submit an application must be requested early in the process and no later than 6 weeks before the application submission date. Permission to submit a conference grant application does not assure funding or funding at the level requested. The letter from the NIH IC conference grant contact person documenting advance permission to submit an application must be included as part of the PHS 398 Cover Letter component of the application. Potential applicants must contact the funding IC before submission for specific information as well as to ensure compliance with submission requirements. Applications for conference support must be submitted based on the published receipt dates. In general, NIH will not issue a conference grant award unless the Federal award date can precede the conference start date. Awarding a conference grant after a conference has been held should only be done when an IC can determine or document that funding of post-conference activities is consistent with the approved application.

## 14.2 APPLICABILITY

This chapter applies to grants that support domestic and international conferences. If a policy is not addressed in this chapter, then IIA coverage applies.

Questions concerning the allowability of conference activity under research grants should be directed to the GMO.

## 14.3 DEFINITIONS

***Conference (in general).*** 2 CFR Part 200.432 defines a conference as a meeting, retreat, seminar, symposium, workshop or event whose primary purpose is the dissemination of technical information beyond the non-Federal entity and is necessary and reasonable for successful performance under the Federal award.

***Scientific Meeting (Conference).*** A gathering, symposium, seminar, workshop, or any other organized, formal event where people assemble to coordinate, exchange, and disseminate information or to explore or clarify a defined subject, problem, or area of knowledge.

***International Conference.*** A scientific meeting so designated by its sponsor or one to which open invitations are issued on an equal basis to potential participants in two or more countries other than the United States or Canada. The meeting may be held in the United States or any country, subject to U.S. Department of State travel restrictions.

***Domestic Conference.*** A scientific meeting held in the United States or Canada primarily for U.S. or U.S.-Canadian participation (even if foreign speakers are invited).

## 14.4 ELIGIBILITY

Domestic institutions or organizations, including established scientific or professional societies, are eligible to apply for conference support. Both domestic and international conferences may be supported; however, an international conference may be supported only through the U.S. representative organization of an established international scientific or professional society. An individual is not eligible to receive a grant in support of a conference.

## 14.5 APPLICATION REQUIREMENTS

Conference grant applications are electronically submitted using an application package that combines SF424 (R&R) and PHS398 components. Applications packages and instructions are provided with each NOFO. Applicants must complete and submit a detailed categorical budget using the Research & Related Budget component; however, no indirect (F&A) costs may be requested. The appropriate NIH IC Conference Grant Contact should be consulted for guidance regarding any IC-specific budget and project duration requirements. R13 and U13 applicants should describe in the Personal Statement of the Biographical Sketch senior/key persons' past experiences with enhancing diversity by increasing the participation of individuals from diverse backgrounds, including those from underrepresented groups, in biomedical sciences. Application requirements and further information on NIH support for conferences and scientific meetings (R13 and U13) may be found on the NIH Web site at http://grants.nih.gov/grants/funding/r13/ or in applicable NOFOs.

## 14.6 PUBLIC POLICY REQUIREMENTS AND OBJECTIVES

In addition to any applicable public policy requirements and objectives specified in Public Policy Requirements, Objectives, and Other Appropriation Mandates in IIA, the following apply to NIH Conference Grants.

### 14.6.1 The United States Hotel and Motel Fire Safety Act of 1990

The Hotel and Motel Fire Safety Act of 1990 (PL101-391) was passed into law by Congress to save lives and protect property by promoting fire and life safety in hotels, motels and other places of public accommodation. PL101-391 states that federally funded meetings and conferences cannot be held in properties that do not comply with the law. PL101-391 is applicable to all places of public accommodation, and requires that such properties are equipped with:

- hard-wired, single-station smoke detectors in each guestroom in accordance with the National Fire Protection Association (NFPA) standard 72;
- an automatic sprinkler system, with a sprinkler head in each guest room in compliance with NFPA standards 13 or 13R. Properties three stories or lower in height are exempt from the sprinkler requirement.

The United States Fire Administration (USFA) is charged with carrying out FEMA's responsibilities with respect to the Hotel and Motel Fire Safety Act of 1990. In addition to compiling, maintaining and publishing the National Master List, USFA is also responsible for taking steps to encourage states to promote the use of automatic sprinkler systems and automatic smoke detection systems.

### 14.6.2 Guideline on the Inclusion of Underrepresented Populations

Conference grant applicants must address efforts to enhance diversity by increasing the representation of individuals from underrepresented populations in the planning of, implementation of, and participation in

the proposed conference. Underrepresented populations include individuals from nationally under-represented racial and ethnic groups, individuals with disabilities, individuals from disadvantaged back-grounds, and women (see GPS 11.3.3.4). Plans to enhance diversity must be included in all aspects of the conference, including the selection of the organizing committees, speakers, other invited participants, such as session chairs and panel discussants, and attendees. If plans to enhance diversity are not adequate, NIH will not make an award until the applicant has submitted acceptable documentation of its compliance.

## 14.6.3 Plans to Promote Safe Environments at Conferences

Consistent with NIH Grants Policy Statement (Section 4.1.2 Civil Rights Protections) and Federal civil rights laws, it is expected that organizers of NIH-supported conferences and scientific meetings take steps to maintain a safe and respectful environment for all attendees by providing an environment free from discrimination and harassment. Conference grant applicants recommended for funding must provide to NIH as part of Just-In-Time materials the "safety plan" that will be communicated to all con-ference/meeting attendees.

"Safety plans" are required to include the following elements:

- Statement of commitment to provide a safe environment
- Expectations of behavior
    - Including list of behaviors considered harassing (specific emphasis on harassment, sexual, racial, ethnic, or otherwise)
- Instructions on how to confidentially report alleged violations of the expectations of behavior to conference organizers
- Description of how the organizers will assess allegations and the consequences for those who are found to violate the expectations of behavior
- Information explaining that individuals who have questions, concerns or complaints related to harassment are also encouraged to contact the conference organizer or the HHS Office for Civil Rights (OCR)
- Information about how to file a complaint with HHS OCR (see OCR's webpage, Filing a Civil Rights Complaint).
- Information explaining that filing a complaint with the conference organizer is not required before filing a complaint of discrimination with HHS OCR, and that seeking assistance from the conference organizer in no way prohibits filing complaints with HHS OCR.
- Information explaining how individuals can notify NIH about concerns of harassment, including sexual harassment, discrimination, and other forms of inappropriate conduct at NIH-supported conferences (see NIH's Find Help webpage).

R13/U13 applicants recommended for funding must also provide to NIH as part of Just-in-Time mater-ials:

- a description of the strategy that will be used to communicate the Safety Plan to conference attendees and a plan to document allegations and resulting actions.
- information on the steps the organizers will take to ensure a safe and respectful environment for all attendees, free from discrimination and harassment

NIH staff will review all plans and must approve them prior to award. Safety Plans that are deemed incomplete or unsatisfactory will need to be corrected by the applicant and approved by NIH prior to award.

## 14.7 APPLICATION REVIEW

Applications for conference grants will be reviewed for programmatic relevance and for merit as described in The Peer Review Process in Part I and applicable NOFO.

In addition, applications submitted to NIH for support of Scientific Conferences (R13 and U13) are required to include a Conference Grant Application Diversity Plan, as described in 14.6.2.

Reviewers will be asked to evaluate the Conference Grant Application Diversity Plan:

How well does the diversity plan demonstrate efforts to enhance diversity by increasing the participation of individuals from diverse backgrounds, including those from underrepresented groups, in the planning and implementation, and participation in the proposed conference? Underrepresented groups include individuals from nationally underrepresented racial and ethnic groups, individuals with disabilities, individuals from disadvantaged backgrounds, and women. For more information, see Notice of NIH's Interest in Diversity; Civil Rights Protections in NIH-Supported Research, Programs, Conferences and Other Activities; and Updated Guidelines on Enhancing Diversity and Creating Safe Environments in Conferences Supported by NIH Grants and Cooperative Agreements.

Reviewers will consider the Conference Grant Application Diversity Plan in determining the scientific and technical merit of the application, and in providing an overall impact score. The Diversity Plan will be evaluated as an additional review criterion and not receive a separate criterion score.

Reviewers will be asked to evaluate PD(s)/PI(s) Personal Statement of the Biographical Sketch:

Is(are) the PD(s)/PI(s) well suited for organizing and fulfilling the goals of this conference, including efforts to enhance diversity? Are the qualifications and past performance of the PD(s)/PI(s) appropriate, and are they well suited for their described roles in the conference? Are the key personnel and selected speakers appropriate and well suited for their described roles in the conference?

## 14.8 FUNDING

Grants or cooperative agreements may be used to provide conference support. A cooperative agreement may be awarded if the NIH awarding IC determines that it needs to have substantial involvement in the planning and conduct of a conference.

Grant funds may not be used to provide general support for international conferences held in the United States or Canada. Grant funds may be awarded to support only specific aspects of such conferences. An example would be a selected symposium, panel, or workshop, including the costs of planning and travel of U.S. participants.

Awards in support of a single conference will be made for a project period commensurate with the time involved in planning and conducting the conference and post-conference follow-up, usually 1 year. A conference grant made to a permanently sponsoring organization for conferences held annually or biennially on a recurring topic may be awarded for up to a total of 5 years and will be funded annually, based on the availability of funds. Continued funding beyond the first year will be contingent on a report of satisfactory progress submitted in accordance with SNAP instructions. A change in conference focus requires NIH awarding IC prior approval.

# 14.9 ACKNOWLEDGMENT OF FUNDING SOURCE AND DISCLAIMER

When a conference is funded by an NIH grant or cooperative agreement, recipients must include the following statement on conference materials (including promotional materials, agenda, and internet sites):

> *"Funding for this conference was made possible (in part) by (Insert Grant/Cooperative Agreement #) from (insert name of NIH IC). The views expressed in written conference materials or publications and by speakers and moderators do not necessarily reflect the official policies of NIH; nor does mention by trade names, commercial practices, or organizations imply endorsement by the U.S. Government."*

Appropriate use of the NIH or HHS logo on conference materials is of particular importance. Neither logo should be displayed if it would cause confusion as to the source of the conference or give the false appearance of government endorsement. Accordingly, unless specifically authorized by the award, any use of the HHS and/or NIH logo requires prior approval. Unauthorized use of the HHS or NIH name or logo may result in imposition of civil monetary penalties (as provided in 42 CFR Part 1003).

# 14.10 ALLOWABLE AND UNALLOWABLE COSTS

The following highlights allowable and unallowable costs under conference grants. No costs other than those specified in this subsection as allowable, including any qualifications on their allowability, are permitted under conference grants.

## 14.10.1 Allowable Costs

In general, consistent with 2 CFR Part 200.432, conference hosts/sponsors must exercise discretion and judgment in ensuring that conference costs are appropriate, necessary and managed in a manner that minimizes costs to the Federal award.

***Conference Services.*** Grant funds may be used for necessary recording of proceedings, simultaneous translation, and subsequent transcriptions.

***Consultant Services.*** Grant funds may be used to pay consultant fees, including travel and supporting costs (per diem or, where applicable, subsistence).

***Equipment Rental.*** Grant funds may be used for the rental of necessary equipment.

***Federal Employees.*** See Grants to Federal Institutions and Payments to Federal Employees under Grants chapter.

***Meals.*** When meals are justified by the applicant as an integral and necessary part of a conference (i.e., a working meal where business is transacted), grant funds may be used for such meals, provided that meal costs are not duplicated in participants' per diem or subsistence allowances. See Travel below.

***Publication Costs.*** When grant funds are awarded to pay for either the entire or partial cost of publication of proceedings or a book or pamphlet, allowable costs include special plates, charts, diagrams, printing, distribution, mailing, postage, and general handling, unless otherwise specified at the time the grant is awarded.

***Registration Fees.*** Grant funds may not be used for registration fees paid by the recipient to other organizations on behalf of attendees. Grant funds may be used to help defray registration costs for some select conference attendees

***Salaries.*** In accordance with the policy of the recipient organization, grant funds may be used for all or part of the salaries of professional personnel, clerical assistants, editorial assistants, and other non-professional staff in proportion to the time or effort directly related to the conference.

***Speakers Fees.*** Speakers' fees for services rendered are allowable.

***Supplies.*** Grant funds may be used for the purchase of supplies for the conference if the supplies are received and used during the budget period.

***Travel.*** Funds may be used for the travel of staff, speakers, participants, and attendees, if identified in the application and approved at the time of award. Travel expenses for employees of the recipient organization are governed by the recipient's travel policies, consistently applied regardless of the source of funds.

Any U.S. foreign travel restrictions that are in effect at the time of the award will be followed, such as

- limitations or restrictions on countries to which travel will be supported or
- budgetary or other limitations on availability of funds for foreign travel.

Proposed per diem or subsistence allowances must be reasonable and limited to the days of attendance at the conference plus the actual travel time to reach the conference location by the most direct route. Local mileage costs only may be paid for local participants. Where meals and/or lodgings are furnished without charge or at a nominal cost (e.g., as part of the registration fee), the proposed per diem or subsistence allowance must take this into consideration.

Transportation costs for attendees and participants at the conference may not exceed coach class fares. In all cases, U.S. flag carriers will be used where possible (see Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Travel in IIA).

In accordance with 2 CFR Part 200.475, temporary dependent care costs (as dependent is defined in 26 USC § 152) above and beyond regular dependent care that directly results from travel to conferences is allowable provided that:

1. The costs are a direct result of the individual's travel for the Federal award;
2. The costs are consistent with the non-Federal entity's documented travel policy for all entity travel; and
3. Are only temporary during the travel period.

Travel costs for dependents are unallowable, except for travel of duration of six months or more with prior approval of the HHS awarding agency. However, as indicated in 2 CFR Part 200.432, as needed, the costs of identifying, but not providing, locally available dependent-care resources are allowable.

## 14.10.2 Unallowable Costs

***A&R.*** Not allowable.

***Entertainment and Personal Expenses.*** Costs of amusement, diversion, social activities, ceremonials, and related incidental costs, such as bar charges, tips, personal telephone calls, and laundry charges of participants or guests, are unallowable. However, meals may be allowable as provided under Allowable Costs—Meals above.

***Equipment Purchase.*** Grant funds may not be used for the purchase of equipment.

***F&A Costs.*** Not allowable.

***Honoraria.*** Honoraria or other payments given for the purpose of conferring distinction or to symbolize respect, esteem, or admiration may not be paid from grant funds.

***Local Participants' Expenses.*** With the exception of local mileage as indicated under Allowable Costs—Travel above, grant funds may not be used to pay per diem or expenses for local participants in the conference.

***Membership Dues.*** Not allowable.

***Research Patient Care.*** Not allowable.

***Visas and Passports.*** Not Allowable.

# 14.11 ADMINISTRATIVE REQUIREMENTS

## 14.11.1 Intellectual Property: Publications, Copyright, and Public Disclosure

If the recipient publishes material developed in whole or in part with NIH funds, the material may be distributed free of charge. If the recipient organization charges for the material, the sales proceeds are considered program income, and must be accounted for as specified in the NoA and reported on the FFR (see Administrative Requirements—Reporting and Record Retention in this chapter).

Unless otherwise provided in the terms and conditions of the award, the recipient is free to arrange for copyright of any publication resulting from an NIH-supported conference. However, any such copyrighted publication shall be subject to a nonexclusive, irrevocable, royalty-free license to the Federal government to reproduce, translate, publish, and dispose of the material and to authorize others to use the work for government purposes. Copyright does not extend to any materials prepared by Federal employees as part of their official duties.

The recipient is cautioned to remind conference participants that any presentation or discussion constitutes public disclosure of information. Any such public disclosure could seriously impact the degree to which any intellectual property rights could be protected.

## 14.11.2 Reporting and Record Retention

Upon completion or termination of a grant in support of a conference, recipients are responsible for submitting the final RPPR and the final FFR in accordance with the Closeout provisions described in Administrative Requirements—Closeout in IIA. Submission details of the final FFR and Final Progress Report are described in respective subsections of Closeout.

### 14.11.2.1 Progress/Final Report

For single conferences, a final report of the conference must be submitted electronically through the eRA Commons, or by paper submission to the NIH DCGP within 120 days after the end of the project period. The report must include the following:

- Grant number
- Title, date, and place of the conference
- Name(s) of the person(s) shown on the application as the conference director or PD/PI(s)
- Name of the organization that conducted the conference

- A list of the individuals, and their organizational affiliations, who participated as speakers or discussants in the formally planned sessions of the meeting

- A summary of topics discussed/conclusions.

- Summary of outcomes of plans to enhance diversity.

Under multiple-year awards, i.e., ones that support more than one conference, NIH requires an annual progress report that contains a description of specific plans for the next budget period, in similar detail and format as for a single conference. The annual progress report must be submitted at least 6 months before the next scheduled conference. The final progress report should be submitted within 120 days after the end of the project period.

With the approval of the NIH awarding IC, copies of proceedings or publications resulting from the conference(s) may be substituted for the final report, provided that they contain the information specified for inclusion in the final report.

## 14.11.2.2 Federal Financial Report

Electronic submission of the final FFR through PMS is required from the recipient within 120 days after the end of the project period. Records of expenditures and any program income generated must be maintained in accordance with the provisions of 2 CFR Part 200.328 (see Administrative Requirements—Monitoring—Record Retention and Access in IIA).

# 15 CONSORTIUM AGREEMENTS

## 15.1 GENERAL

This chapter includes the requirements for an applicant/recipient under consortium agreements in which the recipient collaborates with one or more other organizations in carrying out the grant-supported research. The recipient, as the direct and primary recipient of NIH grant funds, is accountable to NIH for the performance of the project, the appropriate expenditure of grant funds by all parties, applicable reporting requirements, and all other obligations of the recipient, as specified in the NIHGPS. In addition, the terms and conditions flow down to subrecipients in accordance with 2 CFR Part 200.101(b)(2) — the requirements that apply to the recipient, including the intellectual property requirements in IIA and the program income requirements of the award, also apply to consortium participant(s). Exceptions are noted in this chapter. The recipient is responsible for including the applicable requirements of the NIHGPS in its agreements with collaborating organizations (see Written Agreement in this chapter).

Under grants that include consortium agreements:

- The award will be made to a single recipient with a single PD/PI even though one or more organizations other than the recipient will carry out portions of the planned programmatic activity. When the multiple PD/PI model is used, all PD/PIs are listed on the award regardless of organization affiliation, with the Contact PD/PI so noted.
- The pass-through entity must perform a substantive role in the conduct of the planned research and not merely serve as a conduit of funds to another party or parties. This includes being able to provide appropriate oversight of all scientific, programmatic, financial, and administrative matters related to the grant.

Applicants are expected to detail their proposed collaborations as part of the grant application. If the application is approved as submitted, no further approval is required unless, during performance, the recipient plans to undertake additional or alternative collaborations that would constitute a change in the scope of the approved project (see Administrative Requirements—Changes in Project and Budget in IIA). Applicants for STTR grants should follow the specific requirements for research collaboration established for that program (see Grants to For-Profit Organizations chapter).

The following information must be provided to NIH as part of a competing application that proposes consortium arrangements:

- Include all proposed performance sites; those of the applicant organization and the consortium participant(s); and
- Non-modular grant applications must include complete detailed budgets for each consortium participant. Modular grant applications must include an estimate of consortium total costs (direct costs plus F&A costs) each year as part of the budget narrative justification (see Modular Applications and Awards chapter).

For the consortium site, it is appropriate and expected that someone will be designated as the consortium lead investigator responsible for ensuring proper conduct of the project or program at the consortium site. However, this individual must only be assigned the PD/PI role when a multiple PD/PI application is being submitted. Otherwise, this individual should be assigned some other project role in the Senior/Key Personnel section of the application.

The signature (or electronic equivalent) of the AOR/SO on the application signifies that the applicant organization and all proposed consortium participants understand and agree with the following statement:

> "The appropriate programmatic and administrative personnel of each organization involved in this grant application are aware of the NIH consortium agreement policy and are prepared to establish the necessary inter-organizational agreement(s) consistent with that policy."

NIH may request additional information before award and may place a specific award condition(s) on the award.

# 15.2 ADMINISTRATIVE AND OTHER REQUIREMENTS

The following highlights several areas within the consortium relationship that the recipient needs to address with consortium organizations receiving subawards under a grant to ensure compliance with NIH requirements. The requirement for a written agreement addressing these and other areas is specified in this section. NIH will not support any agreement that does not meet the minimum requirements outlined in the written agreement section below (15.2.1). NIH reserves the right to request copies of the written agreement and relevant supporting documentation as needed, as part of its oversight responsibilities. Failure to provide requested documentation may lead to remedies for noncompliance and potential enforcement actions (see 8.5, Specific award conditions and remedies for noncompliance).

NIH expects recipients to ask potential subrecipients, at the application stage, to submit language in their letters of support indicating their awareness of these requirements and the subrecipient's willingness to abide by all requirements should an award be issued.

Note that most of these requirements only apply to a recipient's consortium relationships with subrecipients. When the relationship is with a vendor that is providing routine goods and services within normal business operations that are ancillary to the operation of the research program, the public policy requirements listed below do not apply. The vendor must also be providing similar goods and services to many different purchasers and provide them in a competitive environment.

## 15.2.1 Written Agreement

The recipient must enter into a formal written agreement, signed and agreed to by both parties, with each consortium participant/subrecipient that addresses the negotiated arrangements for meeting the scientific, administrative, financial, and reporting requirements of the grant, including those necessary to ensure compliance with all applicable Federal regulations and policies and facilitate an efficient collaborative venture. If a subrecipient is unwilling to sign the written agreement outlining the requirements below, then a subaward cannot be issued. At a minimum, this agreement must include the following:

- Identification of the individual who will serve as the consortium lead investigator and other individuals responsible for the research activity at each consortium participant along with their roles and responsibilities.

- When multiple PD/PIs are involved at different organizations, only the Contact PD/PI is required to have the official relationship with the applicant organization. PD/PIs in the leadership team at other organizations must have a documented relationship with a consortium organization, but need not be employees. Any consortium agreement must address the unique aspects to these individuals holding the PD/PI role including the requirement for the pass-through entity to secure and retain all PD/PI signatures for all applications, progress reports, and post-award prior approval requests. Further, such signatures must be made available to NIH or other authorized DHHS or Federal officials upon request. See Multiple Program Director/Principal Investigator Applications and Awards for additional information.

- Procedures for directing and monitoring the research effort.

- Procedures to be followed in reimbursing each consortium participant for its effort, including dollar ceiling, method and schedule of reimbursement, type of supporting documentation required, procedures for review and approval of expenditures of grant funds at each organization and timing of applicable reporting requirements. This includes provisions on access to core facilities and resources and whether access will be provided as a fee-for-service.

- If different from those of the recipient, a determination of policies to be followed in such areas as travel reimbursement and salaries and fringe benefits (the policies of the consortium participant may be used as long as they meet NIH requirements).

- Terms that establish whether the Financial Conflict of Interest policy of the pass-through entity or that of the subrecipient will apply to the subrecipient's Investigators.

- If the subrecipient's Investigators must comply with the pass-through entity's Financial Conflict of Interest policy, the subrecipient shall certify as part of the written agreement that its policy complies with the 2011 revised FCOI regulation (42 CFR Part 50 Subpart F). If the subrecipient cannot provide such certification, the agreement shall state that subrecipient Investigators are subject to the Financial Conflict of Interest policy of the pass-through entity for disclosing Significant Financial Interests that are directly related to the subrecipient's work for the pass-through entity.

- If the subrecipient's Investigators must comply with the subrecipient's Financial Conflict of Interest policy, the written agreement shall specify time period(s) for the subrecipient to report all identified Financial Conflicts of Interest to the pass-through entity. Such time period(s) shall be sufficient to enable the pass-through entity to provide timely FCOI reports, as necessary, to the PHS as required by the regulation.

- Alternatively, if the subrecipient's Investigators must comply with the pass-through entity's Financial Conflict of Interest policy, the written agreement shall specify time period(s) for the subrecipient to submit all Investigator disclosures of Significant Financial Interests to the pass-through entity. Such time period(s) shall be sufficient to enable the pass-through entity to comply timely with its review, management, and reporting obligations under the 2011 revised FCOI regulation.

- A provision addressing ownership and disposition of data produced under the consortium agreement. This includes whether cell lines, samples or other resources will be freely available to other investigators in the scientific community or will be provided to particular investigators only.

- A provision making NIH data sharing and inventions and patent policy, including a requirement to report inventions to the recipient (see Administrative Requirements—Availability of Research Results: Publications, Intellectual Property Rights, and Sharing Research Resources in IIA), applicable to each consortium participant and its employees in order to ensure that the rights of the parties to the consortium agreement are protected and that the recipient can fulfill its responsibilities to NIH.

- Expectations for authorship and co-authorship on publications.

- Provisions regarding property (other than intellectual property), program income, publications, reporting, and audit necessary for the recipient to fulfill its obligations to NIH.

- Provisions regarding compliance with requirements for a UEI and subrecipient reporting under FFATA (see Recipient Reporting of Subrecipient Data and Executive Compensation Information for FFATA). Note, the recipient must provide the FAIN to all subrecipients to aid in this requirement.

- Incorporation of applicable public policy requirements and provisions indicating the intent of each consortium participant to comply, including submission of applicable assurances and certifications (see Public Policy Requirements, Objectives, and Other Appropriation Mandates in IIA).

- For foreign subrecipients, a provision requiring the foreign subrecipient to provide access to copies of all lab notebooks, all data and documentation that supports the research outcomes as described in the progress report, to the primary recipient with a frequency of no less than annually, in alignment with the reporting requirements for the RPPR. Such access may be entirely electronic.

## 15.2.2 Public Policy Requirements and Objectives

The recipient is responsible for determining whether a consortium participant, including foreign consortium participants under domestic or foreign grants, has filed assurances with NIH that would cover its activities within the consortium and, if not, for ensuring that any required assurances or certifications are submitted to NIH. See Public Policy Requirements, Objectives, and Other Appropriation Mandates in IIA for the full statement of these requirements and their applicability to consortium participants.

The recipient is responsible for ensuring that all sites engaged in human subjects research have an appropriate OHRP-approved assurance and IRB approval of the research consistent with 45 CFR Part 46 (see *Guidance on Engagement of Institutions in Human Subjects Research* and for complying with NIH prior approval requirements related to the addition of sites not included in the approved application (see Administrative Requirements—Changes in Project and Budget in IIA). The list of organizations with approved assurances is available at the OHRP Web site.

The animal welfare requirements that apply to recipients also apply to consortium participants and subprojects. The primary recipient is responsible for including these requirements in its agreements with collaborating organizations, and for ensuring that all sites engaged in research involving the use of live vertebrate animals have an approved Animal Welfare Assurance and that the activity has valid IACUC approval. The approval of more than one IACUC is not required if the recipient and performance site(s) have Assurances; the institutions may exercise discretion in determining which IACUC reviews research protocols and under which institutional program the research will be conducted. If the pass-through entity does not have an approved domestic or foreign Assurance and the animal work will be conducted at an institution with an Assurance, the recipient must obtain an Inter-institutional Assurance from OLAW. Under the Inter-institutional Assurance, the recipient and performance site agree that the research will be conducted under the auspices and program of animal care and use of the performance

site's Assurance. The recipient is further responsible for complying with NIH prior approval require-ments related to the addition of sites not included in the approved application (see Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements in IIA). See the OLAW web site for a list of domestic organizations and foreign organizations with approved assurances.

## 15.2.3 Allowable and Unallowable Costs

The recipient must include in consortium agreements the applicable government-wide cost principles and NIH cost policies described in the Cost Considerations chapter in IIA and, as appropriate, requirements related to allowable and unallowable costs in other sections of IIB. For example, a university recipient must flow down the cost principles of 2 CFR Part 200, Appendix IX to a consortium participant that is a hospital. This includes the application of F&A rates in determining consortium budgets and the reim-bursement of costs.

Recipients must use an approved federally recognized indirect cost rate negotiated between the sub-recipient and the Federal Government. If no such rate exists, the recipient must use either a rate it has negotiated with the subrecipient, including for-profit organizations (except for the SBIR/STTR program, as described in 18.5.4.3,or a de minimis indirect cost rate of 10 percent of modified total direct costs (MTDC) if the subrecipient has never received a negotiated indirect cost rate from the Federal Govern-ment. Recipients are reminded that F&A reimbursement rates are restricted for certain classes of awards. If the consortium participant is a Federal organization, direct costs will be limited and no F&A will be provided. (See Reimbursement of Facilities and Administrative Costs.) For more information on allow-able costs to Federal organizations, see Grants to Federal Institutions and Payments to Federal Employ-ees Under Grants.

## 15.2.4 Approval Authorities

The recipient is responsible for obtaining NIH awarding IC approval for any actions to be undertaken by consortium participants that require prior approval. Recipients may establish requirements for review of consortium participants' activities consistent with those requirements and with any authorities provided to the recipient; however, a recipient may not provide any authority to a consortium participant that the recipient has not been provided under its NIH award.

Regardless of whether there is a change in scope, in all cases, if a recipient (or consortium participant) proposes the transfer of work to a foreign site, awarding IC prior approval is required.

## 15.2.5 Tangible Personal Property

### 15.2.5.1 Exempt Property

If the recipient provides exempt property to a consortium participant or authorizes a consortium par-ticipant to purchase property that would be considered exempt if acquired by the recipient, the recipient may vest title in the consortium participant upon transfer or purchase or may reserve the right to do so at a later time. The recipient also may establish its own use, disposition, and accountability requirements, provided they are consistent with the NIH right to transfer title (see Administrative Requirements—Man-agement Systems and Procedures—Property Management System Standards—Equipment and Supplies in IIA).

### 15.2.5.2 Nonexempt Property

If the recipient provides nonexempt property to a consortium participant or authorizes a consortium par-ticipant to purchase property that would be considered nonexempt if purchased by the recipient, title to

such property must remain with the recipient or be vested in the recipient upon acquisition of the property. The recipient may establish use, accountability, and disposition requirements for the property, provided they are consistent with, and do not impair, the recipient's ability to comply with the requirements of 2 CFR Part 200.311, as appropriate.

## 15.2.6 Audit

The recipient must require consortium participants to comply with the requirements of 2 CFR Part 200, Subpart F or 2 CFR Part 200.501, as applicable, for audit of NIH grant funds expended by consortium participants. A consortium participant also may be a direct NIH recipient or contractor or may be receiving funds only under the consortium agreement. Regardless, if a non-profit consortium participant meets the 2 CFR Part 200.501 threshold criterion of aggregate annual expenditures of $750,000 or more under applicable Federal awards, the recipient must receive a copy of that organization's 2 CFR Part 200.501 audit and take appropriate action to resolve any findings that relate to the consortium agreement. The recipient is not responsible for resolving crosscutting findings. If a consortium participant will not reach that expenditure threshold, the recipient is responsible for monitoring the organization's activities to ensure compliance with NIH requirements. The recipient may not require a consortium participant to have an audit and charge the audit costs to NIH grant funds unless required or authorized by 2 CFR Part 200.501.

# 16 GRANTS TO FOREIGN ORGANIZATIONS, INTERNATIONAL ORGANIZATIONS, AND DOMESTIC GRANTS WITH FOREIGN COMPONENTS

## 16.1 GENERAL

Most of the policies contained in IIA apply to NIH grants made to foreign organizations and international organizations (hereafter "foreign grants"), including the requirements of 2 CFR Part 200 and the cost principles incorporated by reference in those regulations. If an applicant/recipient would be unable to comply with these requirements, the AOR should contact the GMO. Specific exceptions and modifications of IIA requirements for foreign grants, and highlights of other policies, are set forth in this chapter. This chapter also includes policies that apply to domestic grants with a foreign component.

## 16.2 ELIGIBILITY

In general, foreign organizations and international organizations, including public or private non-profit or for-profit organizations, are eligible to apply for research project grants, but are not eligible to submit a modular grant application. International organizations are treated as foreign organizations for the purpose of eligibility. If the Notice of Funding Opportunity (NOFO) allows foreign organizations to apply, international organizations may apply. If the NOFO does not allow foreign organizations to apply, international organizations may not apply. Foreign organizations and international organizations are not eligible to apply for Kirschstein-NRSA institutional research training grants, program project grants, center grants, resource grants, SBIR/STTR grants, or construction grants. However, some activity codes, such as program project grants (P01), may support projects awarded to a domestic institution with a foreign component. For purposes of this policy, a foreign component is defined as performance of any significant element or segment of the project outside the United States either by the recipient or by a researcher employed by a foreign organization, whether or not grant funds are expended. Activities that would meet this definition include the following:

- The involvement of human subjects or vertebrate animals at a foreign site.
- Extensive foreign travel by recipient project staff for the purpose of data collection, surveying, sampling, and similar activities.
- Any activity of the recipient that may have an impact on U.S. foreign policy through involvement in the affairs or environment of a foreign country.

Examples of other grant-related activities that may be significant are:

- collaborations with investigators at a foreign site anticipated to result in co-authorship;
- use of facilities or instrumentation at a foreign site; or
- receipt of financial support or resources from a foreign entity.

Foreign travel exclusively for consultation is not considered a foreign component.

See Support of Scientific Meetings (Conference Grants) chapter for NIH policy on support of international conferences.

Grants may not be made to individuals in a foreign location (i.e., outside of the United States and its territorial possessions). Occasionally, a Kirschstein-NRSA individual fellowship award is made to a U.S. citizen or a non-citizen national to study in a foreign organization. (A "non-citizen national" is a person

who although not a citizen of the United States owes permanent allegiance to the United States, such as a resident of American Samoa.) See Ruth L. Kirschstein National Research Service Awards—Individual Fellowships for additional information.

# 16.3 APPLICATION REVIEW

Applications from foreign organizations or international organizations will be evaluated and scored during the initial review process using the standard review criteria. In addition, the following will be assessed as part of the review process and award decision:

- Whether the project presents special opportunities for furthering research programs through the use of unusual talent, resources, populations, or environmental conditions in other countries that are not readily available in the United States or that augment existing U.S. resources.

- Whether the proposed project has specific relevance to the mission and objectives of the IC and has the potential for significantly advancing the health sciences in the United States.

Note, these additional criteria are not applied to applications from domestic organizations with foreign components or applications in response to a NOFO requesting applications from foreign organizations only.

Research grant applications from foreign organizations or international organizations may not be funded unless approved by the IC National Advisory Council or Board.

# 16.4 PUBLIC POLICY REQUIREMENTS AND OBJECTIVES

A complete listing of public policy requirements and objectives and their applicability to foreign grants is included in Public Policy Requirements, Objectives, and Other Appropriation Mandates in IIA. Several of the public policy requirements and objectives are highlighted below:

- ***Research Misconduct.*** The research misconduct requirements included in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Research Misconduct apply to foreign grants.

- ***Animal Welfare.*** The animal welfare requirements contained in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Animal Welfare apply to foreign grants, regardless of the requirements of the home country.

- ***Human Subjects.*** The human subjects requirements contained in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Human Subjects Protections, including the requirement for an assurance pursuant to 45 CFR Part 46, apply to foreign grants and foreign consortium participants under domestic or foreign grants.

- ***Financial Conflict of Interest.*** The financial conflict of interest requirements contained in Public Policy Requirements, Objectives, and Other Appropriation Mandates— Financial Conflict of Interest apply to foreign grants.

- ***Inclusiveness in Research Design.*** Foreign grants are subject to the requirements for inclusion of women, minorities, and individuals across the lifespan in research design as specified in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Inclusion of Children as Subjects in Clinical Research and Inclusion of Women and Minorities as Subjects in Clinical Research and Reporting Sex/Gender and Racial and Ethnic Participation.

- ***Civil Rights.*** The civil rights requirements specified in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Civil Rights do not apply to foreign grants.

- **_Lobbying._** The requirements of Public Policy Requirements, Objectives, and Other Appropriation Mandates—Lobbying Prohibition, including disclosure reporting, apply to foreign grants.

- **_Debt._** Foreign applicants are required to provide a certification of nondelinquency on debts owed to the United States as specified in Public Policy Requirements, Objectives, and Other Appropriation Mandates—Nondelinquency on Federal Debt.

- **_Debarment and Suspension._** Applicants/recipients that are foreign governments or governmental entities, public international organizations, or foreign-government-owned or -controlled (in whole or in part) entities are not subject to the debarment or suspension certification requirement or to debarment or suspension under 2 CFR Part 376. All other foreign organizations and international organizations are subject to these requirements. See Public Policy Requirements, Objectives, and Other Appropriation Mandates—Debarment and Suspension for additional information on this requirement.

- **_Drug-Free Workplace._** Foreign applicants and recipients may be exempted from the drug-free workplace requirements of 2 CFR Part 182 based on a documented finding by the NIH awarding IC that application of those requirements is inconsistent with U.S. international obligations or the laws and regulations of a foreign government. See Public Policy Requirements, Objectives, and Other Appropriation Mandates—Drug-Free Workplace for additional information on this requirement.

## 16.5 FUNDING AND PAYMENT

The application budget, requests for funds, and financial reports (see Reporting and Record Retention in this chapter) must be stated in U.S. dollars. Cost increases for fluctuations in exchange rates are allowable costs subject to the availability of funding, as determined by the awarding IC. Prior approval of exchange rate fluctuations is required only when the charge results in the need of additional Federal funding, or the increased costs result in the need to significantly reduce the scope of the project. The non-Federal entity is required to make reviews of local currency gains to determine the need for additional federal funding before the expiration date of the Federal award. Subsequent adjustments for currency increases may be allowable only when the non-Federal entity provides the awarding IC with adequate source documentation from a commonly used source in effect at the time the expense was made, and to the extent that sufficient Federal funds are available.

Awards to foreign and international organizations are paid through PMS. PMS is operated by the PSC in accordance with Department of the Treasury and OMB requirements as implemented by 2 CFR Part 200.305. These requirements are intended to minimize the time elapsing between the transfer of funds from the U.S. Federal government and disbursed by the recipient. Therefore, although the grant may be financed by advance payments, the intent is that recipients draw funds on an as-needed basis – specifically, no more than 3 days before the funds are needed.

Operational guidance for recipients is provided through a training from PSC. Inquiries regarding drawdown requests, cash management rules, and the disbursement of funds should be directed to PSC/PMS (see Part III).

The funding and payment information outlined in this subsection applies when the foreign organization is the recipient organization. When a foreign component participates in a consortium arrangement, the funding and payment information should be reflected in the formal written agreement. Recipients are required to maintain grant funds in an interest bearing account; however, interest earned in excess of $500 per year in the aggregate on advances of Federal funds must be returned in U.S. dollars by reimbursement check to OFM, and reflected on the annual FFR.

For more information on payment, see Payment Chapter.

Any questions regarding payments to foreign recipients may be addressed to the Grants Management Specialist noted on the NoA or PSC (see Part III for address and telephone and fax numbers).

# 16.6 ALLOWABLE AND UNALLOWABLE COSTS

The cost principles that apply to foreign organizations depend on the type of organization, i.e., for a university 2 CFR Part 200, Subpart E—Cost Principles would apply, with the following exceptions:

- **_Major A&R._** Unallowable under foreign grants and domestic grants with foreign components.

- **_Minor A&R._** Generally allowable on grants made to foreign organizations or to the foreign component of a domestic grant, unless prohibited by the governing statute or implementing program regulations. Minor A&R costs may be included and justified in any detailed budget of a competing application. Further, rebudgeting of active grants to accommodate minor A&R is also allowable; however, this does require NIH prior approval of the GMO. Additional information may be required (see Administrative Requirements—Alteration and Renovation Projects under Non-construction Grants in IIB).

- **_F&A Costs._** With the exception of the American University of Beirut and the World Health Organization, which are eligible for full F&A cost reimbursement, F&A costs under grants to foreign and international organizations will be funded at a fixed rate of 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. Some examples of NIH compliance requirements are the protection of human subjects (including the required education in the protection of human research participants), animal welfare, invention reporting, other post-award reporting requirements, financial conflict of interest and research misconduct. Note, these are just a few representative examples of compliance requirement; this list is not all inclusive. Awards to domestic organizations with a foreign or international consortium participant may include 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. NIH will not support the acquisition of or provide for depreciation on any capital expenses (facilities) or the normal general operations of foreign and international organizations. Therefore, these expenses may not be requested as a direct cost; however, equipment is an allowable direct cost. _Other items normally treated as F&A costs (e.g., rent) may be requested as direct costs and will be evaluated by NIH for allowability._

- **_Patient Care Costs._** Patient care costs are provided only in exceptional circumstances.

- Travel Visas (including short-term). Generally, allowable direct cost as part of recruiting costs on an NIH grant, as long as the institution has an employee/employer relationship with the individual. Visa costs may also be allowable when identified in specific NOFOs or when within the scope of an approved research project. See 7.9.1 Recruiting Costs and  Travel Visas.

# 16.7 ADMINISTRATIVE REQUIREMENTS

For SNAP awards to foreign organizations recipients are required to submit FFR expenditure data at the end of the competitive segment only. NIH staff now monitors financial aspects of these grants through subaccounts in PMS. For all non-SNAP awards to foreign organizations recipients are required to submit FFR expenditure data annually.

### 16.7.1 Changes in Project and Budget

Foreign grants are subject to NIH Standard Terms of award, see Administrative Requirements—NIH Standard Terms of Award in IIA. Inclusion in SNAP is at the discretion of the NIH awarding IC and will be specified in the NoA.

### 16.7.2 Change in Scope

A change in the performance site within a foreign country or the addition of a performance site in a country other than that specified in the approved application requires NIH awarding IC prior approval. The transfer of work by a domestic recipient to a foreign component also requires awarding IC prior approval.

### 16.7.3 Change of Recipient Organization

A change of recipient organization that involves the transfer of a grant to or between foreign organizations or international organizations requires approval of the NIH awarding IC and its National Advisory Council or Board. NIH awarding IC approval also is required for the transfer of a grant from a foreign organization to a domestic organization. Recipients adding or changing a foreign performance site within a funded grant award must obtain approval from the GMO before work can be performed at the added or changed foreign site.

### 16.7.4 Audit

Foreign recipients are subject to the same audit requirements as for-profit organizations (specified 2 CFR Part 200.501 and in the in the Grants to For-Profit Organizations chapter).

### 16.7.5 Reporting and Record Retention

For SNAP awards, foreign recipients submit FFR expenditure data at the end of the competitive segment only. Awards are administered in PMS using subaccounts and payments will be specific to each grant at the time the recipient draws funds.

The FFR expenditure data must be submitted electronically through PMS and must be submitted in U.S. dollars and in English. The currency rate in effect at the time the funds are drawn down from PMS should be used in preparing the FFR. For the final FFR, NIH requires recipients to reimburse the U.S. government for funds not spent. Repayment instruction can be found on the HHS Returning Funds website.

All foreign recipients, contractors, consortium participants, and/or subcontractors must comply with Bayh-Dole invention reporting requirements. Regarding intellectual property, foreign recipients have the same rights and obligations regarding invention ownership as U.S. recipients. (See Interagency Edison for more information.)

Record retention requirements are the same as those for domestic recipients.

# 17 GRANTS TO FEDERAL INSTITUTIONS AND PAYMENTS TO FEDERAL EMPLOYEES UNDER GRANTS

## 17.1 GENERAL

NIH may award grants to Federal entities. Although the activity under these grants will take place in a research environment, certain terms and conditions vary from those included in IIA due to the recipient's status as a Federal institution. This chapter specifies those differences as well as differences in treatment among different Federal institutions. This chapter does not apply to Federally Funded Research and Development Centers (also known as Government Owned Contract Operated facilities) since the recipient institution is the institution operating the facility. In addition, this chapter addresses the policies that apply to payments to (or on behalf of) Federal employees under grants, including grants awarded to organizations other than Federal institutions.

## 17.2 ELIGIBILITY

In general, Federal institutions are eligible to apply for NIH grants, including research project grants. Specific eligibility will be stated in each NOFO. Federal institutions also must meet the eligibility requirements of the grant program from which support is sought. PHS organizational segments, other than IHS hospitals, may receive NIH grant support under exceptional circumstances only. Such circumstances may include situations where a project cannot be supported within the mission of the applicant PHS agency or organizational segment, the activity cannot be performed elsewhere, or its nonpursuit would have an adverse impact or potentially important effect on the NIH mission, and NIH determines a grant is the appropriate means of carrying out the activity. However, NIH may not award a grant to an NIH component.

Although the performance site may be at a level lower than the agency or department level of the Federal institution, when an award is made to an eligible Federal institution, the Federal agency or department will be the recipient of record and must assume responsibility for the project. A Federal institution also must ensure that its own authorizing legislation will allow it to receive NIH grants and to be able to comply with the award terms and conditions.

A document that assures both the assumption of responsibility and authority to receive a grant must accompany each new and competing continuation application. The assurance must be signed by the head of the responsible Federal department or independent agency or a designee who reports directly to the department or agency head. (In the case of the DoD, the Departments of the Army, Navy, and Air Force are considered the Federal department, and their Secretaries the responsible Department head.) This assurance is in addition to those made by the AOR's signature on the face page of the application. The assurance requirement does not apply to VAMCs, Bureau of Prisons' (Department of Justice) hospitals, IHS hospitals, or other PHS organizational segments.

## 17.3 VA-UNIVERSITY AFFILIATIONS

Investigators with joint appointments at a VAMC (VA hospital) and an affiliated university must have a valid MOU that specifies (at both the university and the VAMC) the title of the investigator's appointment, distribution of compensation, the responsibilities of the proposed investigator, and the percentage of effort available for research at each institution. The MOU must be signed by the appropriate officials of the recipient and the VAMC, and must be updated with each significant change of the investigator's

responsibilities or distribution of effort and, without a significant change, not less than annually. The joint VA/university appointment of the investigator constitutes 100 percent of their total professional responsibilities. However, NIH will recognize such a joint appointment only when a university and an affiliated VA hospital are the parties involved.

A grant application from a university may request the university's share of an investigator's salary in proportion to the effort devoted to the research project. The institutional base salary as contained in the individual's university appointment determines the base for computing that request.

The signature of the AOR of the submitting university on an application to NIH that includes such an arrangement certifies that

- the individual whose salary is included in the application serves under a joint appointment documented in a formal MOU between the university and the VA, and
- there is no possibility of dual compensation for the same work or of an actual or apparent conflict of interest.

Under the above-described arrangement, there is no involvement of a VA-affiliated non-profit research corporation, which is eligible to apply for and receive NIH grants in its own right as a non-profit organization. The limitations on the payment of Federal salaries apply (see Allowable and Unallowable Costs in this chapter).

## 17.4 PUBLIC POLICY REQUIREMENTS AND OBJECTIVES

The requirements concerning disclosure of financial conflicts of interest (see Public Policy Requirements, Objectives, and Other Appropriation Mandates—Financial Conflict of Interest in IIA) do not apply to Federal employees and/or Federal agencies. All other Public Policy Requirements described in IIA apply to Federal recipients.

## 17.5 PAYMENT

The NIH Office of Financial Management (OFM) will pay grants and cooperative agreements to Federal departments and agencies through the Interagency Payment and Collection method (IPAC). Upon receipt of an NIH award, in order to be reimbursed, Federal recipient institutions may send IPACs to NIH Agency Location Code (ALC) 75080031 for payment.

## 17.6 ALLOWABLE AND UNALLOWABLE COSTS

Allowable and unallowable costs under grants to Federal institutions will be determined by the established policies of the institution, consistently applied to both its own activities and to grant-supported activities, and the requirements of this subsection. In the absence of a governing organizational policy, the cost principles in 2 CFR Part 200, Subpart E, will apply.

***Salaries.*** See Federal (U.S. Government) Employees below.

***Institutional Allowances Under Kirschstein-NRSA Individual Fellowships.*** Institutional allowances may be requested by Federal institutions sponsoring a predoctoral or postdoctoral fellow.

***F&A Costs.*** F&A costs will not be provided to Federal institutions.

***Federal (U.S. Government) Employees.*** Whether or not costs will be charged to the grant, when a Federal employee will be involved in an NIH grant-supported activity in any capacity other than as an employee working on a grant to a Federal institution, or a study subject, specified conditions apply as provided in this subsection. The limitations in this subsection do not apply to individuals that are

classified as special government employees because of service on advisory groups or as a result of a formal consulting arrangement with a Federal agency. (See the HHS Standards of Conduct at 45 CFR Part 73, Subpart J for additional guidance.) The Federal employee should consult with their agency ethics officials to determine whether outside activity approval is required by their employing agency.

Only four types of costs—consultant fees, subject costs, salary or fringe benefits, and travel costs—can be charged to NIH grants on behalf of Federal employees, whether by a recipient or a consortium participant, and under the conditions specified only. Applicants/recipients should advise any Federal employee with whom these types of arrangements may be made to consult with their employing agency concerning their ability to participate and to meet the required conditions for payment. The applicant organization must submit, as part of the grant application, any letters or documentation specified below, and that documentation must be deemed acceptable by the GMO before the Federal employee's involvement in the project.

***Consultant Fees.*** Consultant fees are allowable only for medical personnel of the Uniformed Services of the United States (excluding PHS Commissioned Officers) and when all of the following conditions are present:

- The employees are providing the kind and extent of medical services approved in the grant award.

- Adequate numbers of qualified civilian personnel are not available to provide these services, and eligible Federal medical personnel are hired only in addition to those qualified civilian medical personnel, if any, who are available.

- The applicant organization provides prior written authorization from the proposed consultant's commanding officer that they are authorized to work on the grant-supported activity during non-duty hours or while on authorized leave, and can be paid for their efforts.

***Outpatient or Subject Costs.*** These costs are allowable when the federal employee is an outpatient or subject under study in connection with grant-supported activities.

***Salary or Fringe Benefits.*** In most circumstances no salary or fringe benefit payments may be made from NIH grant funds to support Federal employees. While the level of effort required for the research project must be allowed by the employing agency as part of the individuals' official duties, salary and fringe benefit costs associated with an individual participating in an official capacity as a career, career-conditional, or other Federal employees (civilian or uniformed services) are not allowable. Salary and fringe benefits payments may only be made when prior approval is obtained from an authorized official of the employee's agency and the employee is one of the following:

- A temporary employee specifically hired to assist in the performance of an NIH grant.

- A PHS Commissioned Officer or a civil service employee carrying out duties for which specific statutory authorization exists permitting direct Federal assistance in lieu of cash under the grant, or where the government is reimbursed for services rendered subject to restrictions applicable to such personnel, including the applicable Federal standards of conduct (for HHS, 45 CFR Part 73).

- A PHS Commissioned Officer on LWOP if the
  ◦ recipient has obtained written prior approval from the NIH awarding IC;

  ◦ total amount of salary paid from NIH grant funds is proportional to the time devoted to the project and does not exceed the total annual amount of pay and allowances the individual would have received if not in LWOP status; and

  ◦ parties concerned have made a prior determination that there is no possibility of dual compensation and there is no actual or apparent conflict of interest or other violation of the applicable standards of conduct.

- A civil service employee participating in a grant to a non-Federal organization and all of the following conditions are met:
  ◦ The individual is participating as part of an approved IPA assignment in a role other than as PD/PI. IPA assignments generally do not exceed 2 years and may not exceed 4 years of continuous duration (5 U.S.C. 3372). Based on this statutory time restriction, the involvement of the civil service employee should be limited in scope. Therefore, the proposed PD/PI for an NIH grant may not be participating through an IPA. On a case-by-case basis, the NIH awarding IC may determine that certain other senior/key personnel on the project are sufficiently critical to its long-term success that participation through an IPA is not appropriate. Note, a Federal agency may not send or receive on assignment an employee who has served under the mobility authority for 4 continuous years without at least a 12-month return to duty with the organization from which originally assigned (5 CFR Part 334).

  ◦ Before making any payment from NIH grant funds to such an employee, the recipient must certify that the employee is on an IPA assignment and must provide adequate documentation, as determined by NIH, of the IPA assignment and information about its nature and duration.

  ◦ The level of effort required for the research project must be allowed by the employing agency as part of the individual's official duties. Salary payments from NIH grant funds must be proportional to the time an individual devotes to the grant-supported project. The total salary support may not exceed the normal level of compensation from Federal salary if the individual were not participating in the grant.

  ◦ The parties concerned have made a prior determination that there is no possibility of dual compensation and there is no actual or apparent conflict of interest or other violation of the applicable standards of conduct.

- A part-time VA employee at VANPCs for which NIH grant funds are used to pay the differential between the individual's VA part-time salary and the salary level for a full-time VANPC commitment in proportion to the level of effort devoted to the project. Compensation must be in accordance with the established policies and salary structure of the VANPC and the total number of VA and VANPC hours should not exceed a full time position. Therefore, if the PD/PI has a part-time appointment with the VANPC, an appropriate portion of the individual's salary that would otherwise be supported by the non-profit VANPC may be charged to the NIH grant. The work paid for by the VANPC must not be for the same project paid for by VA time for VA salary in accordance with the VA policy set forth in the VHA Handbook 1200.17.

**_Travel Costs._** Travel costs are allowable if the employee is

- working under a grant to a Federal institution;
- performing allowable reimbursable services as specified under Salary or Fringe Benefits immediately above; or
- attending an NIH grant-supported conference
  - during non-duty hours,
  - while in a preexisting LWOP status or one that continues beyond the conference, or
  - while on detail to a State or local government, Institution of Higher Education (IHE), or other non-profit organization.

Such payments must be made in accordance with established organizational policy and consistently applied regardless of the source of funds, and the parties concerned must take reasonable steps to ensure that there is no actual or apparent conflict of interest.

# 17.7 ADMINISTRATIVE REQUIREMENTS

## 17.7.1 Equipment Accountability

NIH will consider all nonexpendable personal property acquired under a grant awarded to a Federal institution as exempt (see 2 CFR Part 200.312) for purposes of determining the accountability requirements of 2 CFR Part 200.313. However, NIH has the right to require transfer of equipment, including title, to NIH or an eligible third party named by the NIH awarding IC under the conditions specified in 2 CFR Part 200.313.

## 17.7.2 Procurement Requirements

Procurement under grants to Federal institutions is governed by the FAR and the recipient agency's FAR supplement.

## 17.7.3 Intellectual Property

Inventions resulting from grants supporting the activities of Federal employees under grants to Federal institutions must be reported simultaneously to NIH and to the employing agency under the terms of EO 10096, as amended, and are subject to the government assignment of rights in invention of government employee requirements of 37 CFR Part 401. (See http://iEdison.gov for reporting requirements.) Any resulting patent applications and patents must identify the NIH award, consistent with the language of 37 CFR Part 401.14(f)(4). In cases where the VA is involved with the invention but is not the grant recipient, and the recipient institution chooses not to elect title or pursue practical application of an invention, the recipient must note VA's involvement on its notice to NIH and provide a courtesy copy of the NIH notification to the appropriate VA office. NIH will notify the recipient and the VA whether NIH has an interest in taking title and/or continuing the pursuit of practical application of the invention.

## 17.7.4 Reporting Requirements

Federal institutions must electronically submit annual expenditure FFRs regardless of whether the award is subject to SNAP.

# 18 GRANTS TO FOR-PROFIT ORGANIZATIONS

## 18.1 GENERAL

Some of the terms and conditions for grants to for-profit organizations vary from the standard terms and conditions included in IIA. In addition, the terms and conditions of the SBIR and STTR programs vary from those otherwise applicable to for-profit organizations. This chapter addresses separately the policies applicable to for-profit organizations generally, and those that apply to SBIR and STTR awards specifically. It also highlights several policies in IIA that apply equally to for-profit and non-profit recipients. If an exception is not stated below or in the NoA, the terms and conditions specified in IIA apply, including requirements for the protection of human subjects and animal welfare.

## 18.2 ELIGIBILITY

For-profit organizations are eligible to apply under all NIH programs and support mechanisms unless specifically excluded by statute.

## 18.3 ALLOWABLE AND UNALLOWABLE COSTS

### 18.3.1 Cost Principles

There are no cost principles specifically applicable to grants to for-profit organizations. Therefore, the cost principles for commercial organizations set forth in the FAR (48 CFR Part 31.2) generally are used to determine allowable costs under NIH grants to for-profit organizations. As provided in those costs principles, allowable travel costs may not exceed those established by the FTR. The cost principles in 2 CFR Part 200, Appendix IX, Hospital Cost Principles, are used to determine allowable costs under NIH grants to proprietary hospitals.

### 18.3.2 Facilities and Administrative Costs (Indirect Costs)

F&A costs, including de minimis costs when appropriate, are allowable under awards to for-profit organizations. See "Reimbursement of Facilities and Administrative Costs" on page IIA-68.

### 18.3.3 Profit or Fee

Except for grants awarded under the SBIR/STTR programs, under an NIH grant, no profit or fee will be provided to a for-profit organization, whether as a recipient or as a consortium participant. A profit or fee under a grant is not a cost, but is an amount in excess of actual allowable direct and F&A costs. In accordance with normal commercial practice, a profit/fee may be paid to a contractor under an NIH grant providing routine goods or services to the recipient.

## 18.4 ADMINISTRATIVE REQUIREMENTS

For-profit organizations generally are subject to the same administrative requirements as non-profit organizations, including those relating to personal property title and management. Exceptions to or elaboration of those requirements for for-profit organizations are indicated below.

## 18.4.1 Equipment Accountability

For-profit recipients of NIH grants are nonexempt and subject to the requirements in 2 CFR Part 200.313, as well as the conditions set forth in Administrative Requirements—Management Systems and Procedures—Property Management System Standards and Administrative Requirements—Management Systems and Procedures—Procurement Systems Standards and Requirements in IIA. Under the conditions specified in 2 CFR Part 200.313, for-profit recipients are permitted to retain title to equipment purchased under a research grant though NIH reserves the right to order the transfer of equipment, including title, to NIH or an eligible third party named by the NIH awarding office when such third party is otherwise eligible under existing statutes. In addition, for-profit recipients must not use equipment acquired with NIH funds to provide services to non-Federal organizations for a fee to compete unfairly with private companies that provide equivalent services, unless the terms and conditions of the award provide otherwise, and any user charges shall be treated as program income and must be reported on the FFR. Conditions for the sale of equipment are specified at Administrative Requirements—Management Systems and Procedures—Sale of Real Property, Equipment, and Supplies in IIA.

## 18.4.2 Intellectual Property

Intellectual property requirements set forth in 37 CFR 401 apply to for-profit organizations, whether small businesses or large businesses. However, invention reporting requirements for for-profit organizations differ somewhat from those for non-profit organizations. When the recipient is a for-profit organization, assignment of invention rights to a third party does not require NIH approval, but ongoing reporting remains a requirement for each invention. (See Administrative Requirements—Availability of Research Results: Publications, Intellectual Property Rights, and Sharing Research Resources in IIA.) Additional information about the requirements of 37 CFR 401 may be obtained from the Division of Extramural Inventions and Technology Resources, OPERA, NIH (see Part III for address and telephone number).

To the extent authorized by law, the Federal government will not make public any information disclosing a Federal government-supported invention.

## 18.4.3 Program Income

Consistent with NIH Standard Terms of Award, for-profit recipients, including those under the SBIR/STTR programs, are subject to the additive alternative for the use of program income described in Administrative Requirements—Management Systems and Procedures—Program Income in IIA.

## 18.4.4 Operating Authorities

Awards to for-profit organizations are subject to NIH Standard Terms of Award; however, some mechanisms do not allow automatic carryover of unobligated balances of funds. Under those mechanisms, the NIH awarding IC will specify the disposition of the reported unobligated balance in the NoA. (See Administrative Requirements—Changes in Project and Budget in IIA).

## 18.4.5 Audit

The requirements for non-Federal audits of for-profit organizations are specified in 2 CFR Part 200.501. For-profit organizations are subject to requirements for non-Federal audits. A for-profit organization is required to have a non-Federal audit if, during its fiscal year, it expended a total of $750,000 or more under one or more HHS award (as a direct recipient or consortium participant). Audits must be completed and submitted to the Department of Health and Human Services, Audit Resolution Division within

30 days after receipt of the auditor's report(s), or 9 months after the end of the audit period, i.e., the end of the organization's fiscal year, whichever is earlier. The address is found in Part III.

For-profit organizations expending less than $750,000 a year are not required to have an annual audit for that year but must make their grant-related records available to NIH or other designated officials for review or audit.

## 18.4.6 Labor Distribution Requirements for For-Profit Organizations

Salary and wage amounts charged to grant-supported projects for personal services must be based on an adequate labor distribution system that distributes payroll costs in accordance with generally accepted practices of like organizations. Standards for labor distribution systems are contained in the applicable cost principles (other than those for for-profit organizations).

NIH requires for-profit organizations to conform with industry standards to support salary and wage charges to NIH grants. Therefore, unless an alternate system is approved by the GMO, the recipient must maintain a time and-effort reporting system for both professional and other-than-professional staff reflecting daily after-the-fact reporting of hours expended on individual projects or indirect activities. The system must record both hours worked and hours absent. This information must be certified by an AOR no less frequently than every pay period.

# 18.5 SMALL BUSINESS INNOVATION RESEARCH AND SMALL BUSINESS TECHNOLOGY TRANSFER PROGRAMS

NIH is required by statute to reserve a portion of its annual extramural budget for projects under the SBIR and STTR programs. These programs primarily are intended to encourage private-sector commercialization of technology and to increase small business participation in federally funded R&D.

The SBIR and STTR programs were reauthorized and modified by Congress under P.L. 114-328, Section 1834, and P.L. 115-232. These authorities modified several aspects of the programs, including small business eligibility requirements. Updates on reauthorization implementation will be posted on NIH's SBIR web page. NIH will issue Guide Notice/s to advise the community about the impact on NIH's SBIR and STTR programs.

The SBIR and STTR programs are phased programs:

_**Phase I.**_ The objective of this phase is to establish the technical merit and feasibility of proposed research or R&D efforts and to determine the quality of performance of the applicant (small business concern or SBC) before providing further Federal support in Phase II.

_**Phase II.**_ The objective of this phase is to continue the research or R&D efforts initiated in Phase I. Funding will be based on the results of Phase I and the scientific and technical merit and commercial potential of the Phase II application. Unless submitted as a Fast-Track application (see here), Phase II STTR applications may be submitted only after the Phase I award is made.

For small businesses that have already demonstrated scientific and technical merit and feasibility but have not received a Phase I SBIR or STTR for that project, NIH can issue a SBIR Direct to Phase II award. The NIH SBIR Direct to Phase II will accept SBIR Phase II applications regardless of the funding source for the proof of principle work on which the proposed Phase II research is based.

Small business concerns (SBCs) eligible to submit Phase II applications for projects that were supported with a Phase I SBIR or STTR award from NIH or any other agency are expected to submit Phase II application through SBIR/STTR solicitations as "Renewal" applications based on the awarded Phase I SBIR or STTR project. Only one Phase II award may be made for a specific project supported by a

Phase I award. NIH policies regarding overlapping applications (Sec. 2.3.7.4) still apply. A Phase II recipient may receive one additional, sequential Phase II award (called NIH Phase IIB) to continue the work of an initial Phase II award.

For small businesses that have received a Phase I SBIR or STTR, NIH expects non Fast-Track Phase II applications to be submitted within the first six receipt dates following expiration of the Phase I budget period, i.e., normally 2 years beyond the completion date of the Phase I award.

Some NIH ICs offer Phase II SBIR / STTR recipients the opportunity to apply for Phase IIB Competing Renewal awards. These are available for those projects that require extraordinary time and effort, including those requiring regulatory approval or developing complex instrumentation, clinical research tools, and behavioral interventions. NIH ICs accept phase IIB applications through the Omnibus SBIR/STTR Grant Solicitation or other specific Notices of Funding Opportunity. Only those small business concerns who have been awarded a Phase II are eligible to apply for a Phase IIB Competing Renewal award. Prospective applicants are strongly encouraged to contact NIH staff prior to submission. Additional requirements and instructions (e.g., submission of a letter of intent) are available in the specific IC research topics section and in the specific IC Program Notices of Funding Opportunity.

Some NIH ICs offer Phase II SBIR/STTR recipients the opportunity to apply for Commercialization Readiness Pilot (CRP) Program. The goal of the CRP is to facilitate the transition of previously funded SBIR/STTR Phase I/IIB projects to the commercialization stage by providing additional support for later stage research and development (R&D) and product development not typically supported through Phase II or Phase IIB grants or contracts.

There are two major differences between the SBIR and STTR programs:

- Primary Employment: Under the SBIR Program, the Project Director/Principal Investigator (PD/PI) must have their primary employment with the small business concern at the time of award and for the duration of the project period. However, under the STTR Program the PD/PI may have their primary employment with either the small business concern or the collaborating research institution. On an STTR project, the PD/PI must devote at least 10 percent of their time to the STTR project. For purposes of the SBIR and STTR Programs, personnel obtained through a Professional Employer Organization or other similar personnel leasing company may be considered employees of the recipient.

- Partnering Research Institution: The STTR program *requires* for both phases I and II that the SBC formally partner with a single, non-profit research institution. At least 40 percent of the STTR research project is to be conducted by the SBC and at least 30 percent of the work is to be conducted by the single, "partnering" research institution through a formal, cooperative arrangement. Such organizations include universities, non-profit hospitals, and other non-profit research organizations as well as Federally Funded Research and Development Centers. STTR grants are awarded to the SBC, which will receive all of the funding for the project and disburse the appropriate funding to the research institution. The SBIR program allows subcontracting, it does not require it so the SBC may conduct the entire SBIR project without outside collaboration.

SBIR/STTR program policy allows the following:

- Phase I STTR Recipients may apply for NIH SBIR or STTR Phase II.
- Phase I SBIR Recipients may apply for NIH SBIR or STTR Phase II.
- Phase II STTR Recipients may apply for NIH SBIR Phase IIB or STTR Phase IIB or CRP.
- Phase II SBIR Recipients may apply for NIH SBIR Phase IIB or STTR Phase IIB or CRP.

- Phase IIB STTR Recipients may apply for the CRP Program.
- Phase IIB SBIR Recipients may apply for the CRP Program.

Applicants may 'switch' programs to any active and open NIH SBIR or STTR solicitation, including the Omnibus and any targeted funding opportunity.

Note: There are distinct policies for each program—SBIR and STTR—and each phase within these programs. Applicants that 'switch' programs must comply with the policies for the program and NOFO to which they submit the application. See 18.5.5.4 SBIR Life Cycle Certification and Sec. 18.5.5.5 STTR Life Cycle Certification for further information.

## 18.5.1 NIH Fast-Track Application Process

The NIH Fast-Track application process expedites award decisions and funding of SBIR and STTR Phase II applications for scientifically meritorious projects that have a high potential for commercialization. The Fast-Track process allows Phase I and Phase II grant applications to be submitted and reviewed together. Fast-Track applications receive a single rating. Before submitting applications for Fast-Track review, applicants are strongly encouraged to consult with cognizant NIH program staff to assure Fast-Track is appropriate. For additional information on the submission of Fast-Track applications, see the SF424 (R&R) SBIR/STTR Application Guide.

## 18.5.2 Eligibility

Only United States small business concerns (SBCs) are eligible to submit SBIR and STTR applications. A small business concern is one that, at the time of award for both Phase I and Phase II SBIR awards, meets all the following criteria. If it appears that an applicant organization does not meet the eligibility requirements, NIH will request a size determination by the SBA. If eligibility is unclear, NIH will not make an SBIR or STTR award until the SBA provides a determination.

**1. SBIR Eligibility Requirements**

a. Organized for profit, with a place of business located in the United States, which operates primarily within the United States or which makes a significant contribution to the United States economy through payment of taxes or use of American products, materials;

b. In the legal form of an individual proprietorship, partnership, limited liability company, corporation, joint venture, association, trust or cooperative, except that where the form is a joint venture, there must be less than 50 percent participation by foreign business entities in the joint venture;

c.

  i. Be a concern which is more than 50% directly owned and controlled by one or more individuals (who are citizens or permanent resident aliens of the United States), other business concerns (each of which is more than 50% directly owned and controlled by individuals who are citizens or permanent resident aliens of the United States), an Indian tribe, ANC (Alaska Native Corporation) or NHO (Native Hawaiian Organization) (or a wholly owned business entity of such tribe, ANC or NHO), or any combination of these; OR

  ii. Be a concern which is more than 50% owned by multiple venture capital operating companies, hedge funds, private equity firms, or any combination of these. No single venture capital operating company, hedge fund, or private equity firm may own more than 50% of the concern; OR

  iii. Be a joint venture in which each entity to the joint venture must meet the requirements set forth in paragraph c(i) or c(ii) of this section. A joint venture that includes one or more concerns that meet the requirements of paragraph (ii) of this section must comply with § 121.705(b) concerning registration and application requirements.

d. Has, including its affiliates, not more than 500 employees and meets the other regulatory requirements found in 13 CFR Part 121. Business concerns, other than investment companies licensed, or state development companies qualifying under the Small Business Investment Act of 1958, 15 U.S.C. 661, et seq., are affiliates of one another when either directly or indirectly, (a) one concern controls or has the power to control the other; or (b) a third-party/parties controls or has the power to control both.

## 2. STTR Eligibility Requirements

a. Organized for profit, with a place of business located in the United States, which operates primarily within the United States or which makes a significant contribution to the United States economy through payment of taxes or use of American products, materials;

b. In the legal form of an individual proprietorship, partnership, limited liability company, corporation, joint venture, association, trust or cooperative, except that where the form is a joint venture, there must be less than 50 percent participation by foreign business entities in the joint venture;

c.

  i. Be a concern which is more than 50% directly owned and controlled by one or more individuals (who are citizens or permanent resident aliens of the United States), other business concerns (each of which is more than 50% directly owned and controlled by individuals who are citizens or permanent resident aliens of the United States), an Indian tribe, ANC (Alaska Native Corporation) or NHO (Native Hawaiian Organization) (or a wholly owned business entity of such tribe, ANC or NHO), or any combination of these; OR

  ii. Be a joint venture in which each entity to the joint venture must meet the requirements set forth in paragraph c(i) of this section.

d. Has, including its affiliates, not more than 500 employees and meets the other regulatory requirements found in 13 CFR Part 121. Business concerns, other than investment companies licensed, or state development companies qualifying under the Small Business Investment Act of 1958, 15 U.S.C. 661, et seq., are affiliates of one another when either directly or indirectly, (a) one concern controls or has the power to control the other; or (b) a third-party/parties controls or has the power to control both.

Control can be exercised through common ownership, common management, and contractual relationships. The term "affiliates" is defined in greater detail in 13 CFR Part 121.3-2(a). The term "number of employees" is defined in 13 CFR Part 121.3-2(t).

Business concerns include, but are not limited to, any individual (sole proprietorship), partnership, corporation, joint venture, association, or cooperative. Further information may be obtained by contacting the Small Business Administration Size District Office.

## 18.5.2.1 Place of Performance

For both Phase I and Phase II SBIR/STTR awards, the research or R&D project activity must be performed in its entirety in the United States. (The United States is defined as the 50 States, the territories and possessions of the United States, the Commonwealth of Puerto Rico, the Federated States of Micronesia, the Republic of Palau, the Republic of the Marshall Islands, and the District of Columbia.)

In those rare instances where the study design requires use of a foreign site (e.g., to conduct testing of specific patient populations or if a supply or material is not available in the United States), the investigator must provide compelling scientific justification in the application that it is not possible to perform the R&D project activity in the United States and for the need / use of a foreign site. NIH will consider these instances on a case-by-case basis, and they should be discussed with cognizant NIH staff before submitting an application. Approval will not be considered unless the application is being considered for an award and applicants may be required to provide additional justification. IC GMOs have the authority to approve these waiver requests. Whether the request is approved or disapproved, it will be explicitly addressed in the NoA if an award is made. Whenever possible, work outside the United States, which is necessary to the completion of the project, should be supported by funding other than SBIR / STTR.

## 18.5.2.2 Change in Organization Size & Change of Recipient Institution Actions

Applicant organization eligibility is determined at the time of the initial SBIR / STTR award. In the case where an organization grows to be other than small, NIH may exercise its ability to perform a review to determine whether the SBIR / STTR award will continue. At the time of continuation award, the size and eligibility status of the small business organization for the SBIR/STTR program will be reassessed and no new or continuation awards will be issued to ineligible organizations.

In alignment with NIH GPS Section 8.1.2.8 Change in Recipient Organizational Status and NIH GPS Section 8.1.3 Requests for Prior Approval, recipients must give NIH advance notice for legal actions such as merger, acquisition, and successor-in-interest as soon as possible, but no later than 30 days before the proposed change, so that NIH can determine if the organization will continue to meet the SBIR /STTR program eligibility requirements.

In the case of a legal action such as a merger, acquisition, or successor-in-interest action for a small business organization, the transferee organization must recertify its small business status in order for NIH to revise currently active SBIR / STTR awards to reflect the transferee as the recipient of record. However, if the legal action changes the organization size so that they cannot recertify its small business status, rendering it ineligible for the SBIR / STTR programs, existing SBIR / STTR awards cannot be awarded additional funds, including noncompeting continuation awards and supplements to awards. NIH will not issue change in organization status award to the transferee organization for any SBIR/STTR awards, as the organization is ineligible for the SBIR/STTR program. Additionally, all existing SBIR/STTR awards issued to the original recipient will be terminated.

When there is a desire to transfer an SBIR/STTR grant to a different organization, the new organization must continue to meet the SBIR / STTR program eligibility requirements. Recipients should contact the NIH awarding office to discuss options when considering a move to a new organization.

### 18.5.2.3 Minimum Level of Effort

Generally, under SBIR Phase I awards, a minimum of two-thirds or 67 percent of the research or analytical effort must be carried out by the SBC. Payments, in the aggregate, to consultants, consortium participants and contractors for portions of the scientific/technical effort generally may not exceed 33 percent of the total requested amount.

Generally, under SBIR Phase II awards a minimum of one-half or 50 percent of the research or analytical effort must be carried out by the SBC. In addition, payments, in the aggregate, to consultants, consortium participants, and contractors for portions of the scientific/technical effort generally may not exceed 50 percent of the total requested amount.

Deviations from these requirements may be considered on a case-by-case basis for SBIR only and must be approved in writing by the awarding IC

For STTR awards (both Phase I and Phase II), at least 40 percent of the work must be performed by the SBC and at least 30 percent of the work must be performed by the single, non-profit research institution. These percentages are Congressionally mandated and waivers are not permitted. The basis for determining the percentage of work to be performed by each of the cooperating parties is the total cost (direct and F&A costs, and fee) attributable to each party, unless otherwise described and justified in the "Consortium/Contractual Arrangements" portion of the of the grant application.

### 18.5.2.4 Multiple Program Director/Principal Investigator Applications and Awards

The Multiple Program Director/Principal Investigator (multiple PD/PI) option is available for NIH SBIR / STTR applicants for team science efforts. All of the policy and requirements described in Multi PD/PI apply to SBIR/STTR projects, with the exception of sections that are not relevant to the SBIR/STTR program (e.g., new investigators, multi-project applications). In addition, the following criteria apply to multiple PD/PI SBC applicants and awards:

- The small business concern (SBC) is *always* the applicant/awardee organization. Organizations other than the SBC with PD/PIs participating in the multiple PD/PI project, including the STTR non-profit research institution partner, are subcontractors to the SBC.

- For Phase I SBIR projects, the Contact PD / PI must meet the primary employment requirement; other PD / PIs are not required to meet the requirement. Primary employment means that more than one half of the PD/PI's time is spent in the employ of the SBC at the time of award and during the conduct of the proposed project. However, deviations from this requirement are allowable under exceptional circumstances (such as unexpected loss of a PD/PI or to mitigate negative effects on employment benefits) and must be approved in writing by the awarding IC. To receive a deviation a small business must show:
  - Significant PI employment at the company;
  - Significant commitment of the PI to the project;
  - Commitment to transition the PI to 51% or more employment in the Phase II.

- For Phase II SBIR projects, the Contact PD/PI must meet the primary employment requirement; other PD/PIs are not required to meet the requirement. Deviations from this requirement in Phase II are extremely rare (e.g., the unexpected passing of a PD/PI) and must be approved in writing by the awarding IC.

- For Phase I and Phase II STTR projects, the PD/PI is not required to be employed by the SBC. However, the Contact PD/PI, the first PD/PI listed, must have a formal appointment with, or commitment to, the SBC, which must be in the form of an official relationship between the parties, but need not include a salary or other form of remuneration. Each PD/PI on a multiple PD/PI award must commit a minimum of 1.2 calendar months (10% effort) to the project.

- An STTR applicant organization must officially affiliate a PD/PI with the SBC in the eRA Commons if the PD/PI is not an employee of the SBC.

- A Phase IIB Competing Renewal submitted as a multiple PD/PI application requesting support for a project previously supported through a single PD/PI award should state the changes in the Project's direct and management that led to the proposed multiple PD/PI model.

## 18.5.3 Public Policy Requirements and Objectives

For-profit organizations receiving SBIR/STTR awards generally are subject to the same public policy requirements as non-profit organizations. However, the requirements concerning reporting of financial conflicts of interest (see Public Policy Requirements, Objectives, and Other Appropriation Mandates— Financial Conflict of Interest in IIA) do not apply to applications or awards under Phase I of the SBIR/STTR programs. The requirements do, however, apply to Phase II applications and awards.

Consistent with SBA program policy directives and NIH's omnibus NOFOs for SBIR and STTR, when purchasing equipment or a product under the SBIR/STTR award, the small business concern should purchase only American-made items whenever possible.

## 18.5.4 Allowable Costs and Fee

### 18.5.4.1 Program Levels (Total Costs)

The SBA SBIR and STTR Policy Directive provides program levels for SBIR and STTR programs based on statutory guidelines. Agencies have the discretion to issue awards up to the SBA guideline when the proposed budget and requested period of support are fully justified and scientifically appropriate in relation to the proposed research. The Small Business Administration may adjust award guidelines annually. The current SBA budget levels can be found on NIH's SBIR web page.

As written in the statute and under appropriate circumstances, NIH has received waivers from SBA to issue an award exceeding the SBA budget levels for Phase I or for Phase II if this cap will interfere with NIH's ability to meet its mission. See NIH's SBIR web page for a current list of waiver topics.

Applicants must request an appropriate level in the competing application; applications will not be adjusted after submission.

### 18.5.4.2 Profit or Fee

A reasonable profit or fee may be paid to an SBC receiving an award under Phase I or Phase II of the SBIR and STTR programs. However, this profit or fee must be included in the budget request at the time of application. The profit or fee is not considered a "cost" for purposes of determining allowable use, program income accountability, or audit thresholds. The profit or fee may be used by the SBC for any purpose, including additional effort under the SBIR/STTR award. It is intended to provide a reasonable profit consistent with normal profit margins for for-profit organizations for R&D work; however, the amount of the profit or fee normally will not exceed seven (7) percent of total costs (direct and F&A) for each phase of the project. The profit or fee should be drawn from PMS in increments proportional to the drawdown of funds for direct and F&A costs. The profit or fee applies solely to the SBC receiving the SBIR/STTR award and not to any other participant; however, in accordance with normal commercial

practice, the SBC may pay a profit or fee to a contractor providing routine goods or services to the SBC under the grant.

### 18.5.4.3 Facilities and Administrative Costs (Indirect Costs)

### 18.5.4.3.1 Phase I

If the applicant SBC has a currently effective F&A cost rate(s) with a Federal agency, such rate(s) should be used when calculating proposed F&A costs for an NIH application. NIH ICs use the term F&A costs for all types of applicants and recipients; however, for-profit organizations will find that DFAS and organizations external to NIH refer to these costs as indirect costs. (However, the rates(s) must be adjusted for IR&D expenses, which are not allowable under HHS awards.) If the applicant SBC does not have a currently effective negotiated indirect cost rate with a Federal agency, the applicant should propose estimated F&A costs at a rate not to exceed 40 percent of the total direct costs. However, SBCs are reminded that only actual F&A costs are to be charged to projects. (If awarded at a rate of 40 percent or less, the rate used to charge actual F&A costs to projects cannot exceed the awarded rate unless the SBC negotiates an indirect cost rate(s) with a Federal agency.) NIH will not negotiate indirect cost rates for Phase I awards.

### 18.5.4.3.2 Phase II

If the applicant SBC has a currently effective negotiated indirect cost rate(s) with a Federal agency, such rate(s) should be used when calculating proposed F&A costs for an NIH application. (However, the rates(s) must be adjusted for IR&D expenses, which are not allowable under HHS awards.) If the applicant SBC does not have a currently effective negotiated indirect cost rate with a Federal agency, the applicant should propose an estimated F&A rate in the application. If the requested F&A cost rate is 40 percent of total direct costs or less, no further justification is required at the time of award, and F&A costs will be awarded at the requested rate. However, SBCs are reminded that only actual F&A costs may be charged to projects. If awarded at a rate of 40 percent or less of total direct costs, the rate used to charge actual F&A costs to projects cannot exceed the awarded rate unless the SBC negotiates an indirect cost rate(s) with DFAS. DFAS—the office authorized to negotiate indirect cost rates with SBC's receiving NIH SBIR/STTR awards—will negotiate indirect cost rates for SBCs receiving Phase II awards that requested a rate greater than 40 percent of total direct costs.

Upon request, the applicant SBC should provide DFAS with an indirect cost proposal and supporting financial data for its most recently completed fiscal year. If financial data is not available for the most recently completed fiscal year, the applicant should submit a proposal showing estimated rates with supporting documentation. Further information about DFAS is available at its web site or by telephone (see Part III).

## 18.5.5 Administrative Requirements

For-profit organizations that receive SBIR/STTR awards generally are subject to the same administrative requirements as non-profit organizations. (See 2 CFR Part 200.)

### 18.5.5.1 Market Research

NIH will not support market research, including studies of the literature that lead to a new or expanded statement of work, under the grant except for the Technical and Business Assistance (TABA) funds or with the Commercialization Readiness Pilot. No SBIR/STTR funds (direct or indirect costs) can be used to support commercialization. For purposes of the SBIR/STTR programs, "market research" is the systematic gathering, editing, recording, computing, and analyzing of data about problems relating to the

sale and distribution of the subject of the proposed research. It includes various types of research, such as the size of potential markets and potential sales volume, the identification of consumers most apt to purchase the products, and the advertising media most likely to stimulate their purchases. However, "market research" does not include activities under a research plan or protocol that include a survey of the public as part of the objectives of the project to determine the impact of the subject of the research on the behavior of individuals.

## 18.5.5.2 Intellectual Property

Rights to data, including software developed under the terms of any funding agreement resulting from an NIH award, shall remain with the recipient except that any such copyrighted material shall be subject to a royalty-free, nonexclusive and irrevocable license to the Federal government to reproduce, publish or otherwise use the material, and to authorize others to do so for Federal purposes. In addition, under the SBIR/STTR programs, in contrast to awards to for-profit organizations under other support mechanisms, such data shall not be released outside the Federal government without the recipient's permission for a period of 20 years from completion of the project.

***Rights in Data Developed Under SBIR Funding Agreement.*** Section 9 of the Small Business Act, as amended (15 U.S.C. 638) provides for "retention by a small business concern of the rights to data generated by the concern in the performance of an [SBIR/STTR] award for a period of not less than 4 years."

1. The Act provides for retention by a small business concern (SBC) award recipient of the rights to data generated by the concern in the performance of an SBIR/STTR award. These data rights provide an incentive for SBCs to participate in Federally-funded research projects and contribute to the ability of small business recipients to commercialize the technology developed under the program. The central purpose of SBIR/STTR data rights is to provide the Federal Government with the degree of access to a recipient's SBIR/STTR data needed to evaluate the work and effectively utilize the results and at the same time ensure that the Federal Government or other concerns cannot use SBIR/STTR data in ways (e.g., for commercial purposes or to produce future technical procurement specifications) that would inappropriately diminish the rights or associated economic opportunities of the small business that developed the data. The SBIR/STTR data rights provisions and definitions are designed to ensure that, for properly marked SBIR/STTR data, during the SBIR/STTR protection period, the Federal Government provides effective protection of the data that is comparable to and at least as strong as the protection the Federal Government gives to delivered proprietary data that is developed exclusively at private expense.

2.  SBIR/STTR participating agencies must ensure that recipients of an SBIR/STTR funding agreement retain appropriate proprietary rights for all SBIR/STTR data generated in the performance of the award. In general, this results in the Government receiving SBIR/STTR data rights in all SBIR/STTR data during the SBIR/STTR protection period, except for certain types of data that are not subject to such data rights restrictions due to the nature of the data (e.g., Form, Fit, and Function Data or OMIT Data). SBIR/STTR data rights apply to all SBIR/STTR awards, including subcontracts or subgrants to such awards, that fall within the statutory definition of Phase I, II, or III of the SBIR/STTR programs, as described in § 4 of the SBA Policy Directive effective May 2, 2019. The scope and extent of the SBIR/STTR data rights applicable to Federally-funded Phase III awards are identical to the SBIR/STTR data rights applicable to Phases I and II SBIR/STTR awards. SBIR/STTR data rights provide license rights to the Federal Government. SBIR/STTR data rights restrict the Federal Government's use and release of properly marked SBIR/STTR data only during the SBIR/STTR protection period; after the protection period, the Federal Government has a royalty-free license to use, and to authorize others to use on its behalf, these data for government purposes, and is relieved of disclosure prohibitions related to such government purposes, and assumes no liability for unauthorized use of these data by third parties. The Federal Government receives unlimited rights in Form, Fit, and Function Data, OMIT Data, and all unmarked SBIR/STTR data.

3.  3. SBIR/STTR Data Rights – Main Elements:

    a.  An SBC retains title and ownership of all SBIR/STTR data it develops or generates in the performance of an SBIR/STTR award. The SBC retains all rights in SBIR/STTR data that are not granted to the Government in accordance with the SBA Policy Directive. These rights of the SBC do not expire.

    b.  The Government receives SBIR/STTR data rights during the SBIR/STTR protection period on all appropriately marked SBIR/STTR data. These rights enable the Federal Government to use SBIR/STTR data in limited ways within the Government, such as for project evaluation purposes, but are intended to prohibit uses and disclosures of the SBIR/STTR data that may undermine the SBC's future commercialization of the associated technology. The Government receives unlimited rights in Form, Fit, and Function Data, OMIT Data, and all unmarked SBIR/STTR data.

    c.  After the SBIR/STTR protection period has expired, the Federal Government may use, and authorize others to use on its behalf, for government purposes, SBIR/STTR data that was subject to SBIR/STTR data rights during the SBIR/STTR protection period.

4.  The SBIR/STTR protection period begins with award of an SBIR/STTR funding agreement and ends twenty years, or longer at the discretion of the participating agency, from the date of award of an SBIR/STTR funding agreement (either Phase I, Phase II, or Federally-funded SBIR/STTR Phase III) unless subsequent to the award, the agency and the SBC negotiate for some other protection period for the SBIR/STTR data.

5. To receive the protections accorded to SBIR/STTR data pursuant to SBIR/STTR data rights, any SBIR/STTR data that is delivered must be marked with the appropriate SBIR/STTR data rights legend or notice, in accordance with agency procedures. The Government assumes no liability for the access, use, modification, reproduction, release, performance, display, disclosure, or distribution of SBIR/STTR data without markings. If SBIR/STTR data is delivered without the required legend or notice, the SBIR/STTR recipient may, within 6 months of such delivery (or a longer period approved by the agency for good cause shown), request to have an omitted SBIR/STTR data legend or notice, as applicable, placed on qualifying data. If SBIR/STTR data is delivered with an incorrect or nonconforming legend or notice, the agency may correct or permit correction at the recipient's expense of such incorrect or nonconforming notice(s).

6. Negotiated Rights:
   a. An agency must not, in any way, make issuance of an SBIR/STTR award conditional upon the recipient negotiating or consenting to negotiate a specially negotiated license or other agreement regarding SBIR/STTR data. The negotiation of any such specially negotiated license agreements shall be permitted only after award.

   b. Following issuance of an SBIR/STTR award, the recipient may enter into a written agreement with the awarding agency to modify the license rights that would otherwise be granted to the agency during the SBIR/STTR protection period. However, any such agreement must be entered into voluntarily and by mutual agreement of the SBIR/STTR recipient and agency, and not a condition for additional work under the funding agreement or the exercise of options. Such a bilateral data rights agreement must be entered into only after the subject SBIR/STTR award (which award must include an appropriate SBIR/STTR data rights clause) has been signed. Any such specially negotiated license must be in writing under a separate agreement after the SBIR/STTR funding agreement is signed. A decision by the recipient to relinquish, transfer, or modify in any way its rights in SBIR/STTR data must be made without pressure or coercion by the agency or any other party. Any provision in a competitive non-SBIR or SBIR solicitation that would have the effect of diminishing SBIR/STTR data rights shall have no effect on the provision of SBIR/STTR data rights in a resulting Phase I, Phase II, or Phase III award.

7. To ensure that SBIR/STTR recipients receive the applicable data rights, all SBIR and STTR solicitations and resulting funding agreements must fully implement all of the policies, procedures, and requirements set forth in the SBA Policy Directive in appropriate provisions and clauses incorporated into the SBIR/STTR solicitations and awards. Paragraph (5)(d)(3) of Appendix I: Instructions for Preparation of SBIR/STTR Program Solicitations in the SBA Policy Directive provides a sample SBIR/STTR data rights clause containing the key elements that must be reflected in the clause used in Federal Agency solicitations. SBA will report to the Congress any attempt or action by an agency, that it is aware of, to condition an SBIR or STTR award on the negotiation of lesser data rights or to exclude the appropriate data rights clause from the award.

The STTR program requires that the small business recipient and the single, non-profit research institution execute an agreement allocating between the parties intellectual property rights and rights, if any, to carry out follow-on research, development, or commercialization of the subject research. By signing the face page of the grant application, the SBC's AOR certifies that the agreement with the research institution is satisfactory to the SBC and will be effective at the time the grant award is made. Prior to award a copy of the agreement must be furnished to the NIH awarding IC.

SBIR/STTR recipients are covered by 35 U.S.C. 200-212 and 37 CFR Part 401 with respect to inventions and patents (see Grants to For-Profit Organizations—Administrative Requirements—Intellectual Property in this chapter).

### 18.5.5.3 Data Sharing

Applicants for SBIR Phase II funding of $500,000 or more of direct costs in any single year must comply with NIH DMS policy as modified by the Small Business Act. If the final data would not be amenable to sharing, e.g., proprietary data, the SBC should explain that in the application. In addition, as indicated under Intellectual Property in this chapter, whether or not the award meets the threshold for data sharing, NIH will not release data outside the Federal government without the recipient's permission for a period of 20 years from completion of the project.

### 18.5.5.4 SBIR Life Cycle Certification

All SBIR Phase I and Phase II recipients must complete a Life Cycle Certification at all times set forth in the Notice of Award (see §8(j) of the SBIR Policy Directive). This includes checking all of the boxes and having an authorized officer of the recipient sign and date the certification each time it is required.

A certification is required at the following times:

- For SBIR Phase I Recipients: At the time of receiving final payment or disbursement from the Payment Management System.

- For SBIR Phase II Recipients: prior to receiving more than 50% of the total award amount and prior to final payment or disbursement from the Payment Management System.

SBIR grant recipients are required to submit the Life Cycle Certifications within the I-RPPR and the F-RPPR under Section G.1: Special Notice of Award and Notice of Funding Opportunity Reporting Requirements. SBIR recipients should not select the "Nothing to Report" box in this section. The F-RPPR and I-RPPR must be submitted via eRA Commons no later than 120 calendar days from the period of performance end date. I-RPPR or F-RPPR will not be accepted unless all completed Life Cycle Certification(s) are received. Failure to provide all required completed certification(s) may cause NIH to take one or more actions that may include, but are not limited to, corrective actions, withholding of further awards, suspension or termination.

This does not impact the SBIR Funding Agreement Certification required by all SBIR applicants for new or renewal grants that is required prior to award of a new award or a competing renewal award.

In addition, SBIR recipients indicate compliance with these certification requirements by drawing or requesting funds from the Payment Management System. If the recipient cannot complete the certification or cannot ensure compliance with the certification process, it should notify the GMO immediately. If resolution cannot be reached, the GMO will void or terminate the grant, as appropriate.

The certification form is available in fillable format. However, the requirements are outlined below.

***Overview Certification Information.*** The Federal government relies on this information ensure compliance with specific program requirements during the life of the award. The definitions for the terms used in the certification are set forth in the Small Business Act, the SBIR Policy Directive and also any statutory and regulatory provisions referenced in those authorities.

If the Grants Management Officer believes, after award, that the business is not meeting certain funding agreement requirements, the agency may request further clarification and supporting documentation in order to assist in the verification of any of the information provided.

Even if correct information has been included in other materials submitted to the Federal government, any action taken with respect to the certification does not affect the Government's right to pursue criminal, civil, or administrative remedies for incorrect or incomplete information given in the certification. Each person signing a certification may be prosecuted if they have provided false information.

Recipients will verify and certify the following provisions:

1. The principal investigator spent more than half of their time (based on a 40-hour work week) as an employee of the recipient or has requested and received a written deviation from this requirement from the Grants Management Officer. When a deviation has been approved by NIH, the certification will also document the adjusted percentage of time approved.

2. All, essentially equivalent work, or a portion of the work performed under this project:
   a. Has not been submitted for funding to NIH or another Federal agency.

   b. Has been submitted for funding to NIH or another Federal agency but has not been funded under any other grant, contract, subcontract, or other transaction.

   c. A portion has been funded by another grant, contract, or subcontract as described in detail in the proposal and approved in writing by the Grants Management Officer.

3. Upon completion of the award the recipient will have performed the applicable percentage of work, unless a deviation from this requirement is approved in writing by the Grants Management Officer. Options on the certification document will include:
   a. SBIR Phase I: at least two-thirds (66 2/3%) of the research

   b. SBIR Phase II: at least half (50%) of the research

   c. Percent deviation approved in writing by the Grants Management Officer

4. The work is completed and the small business recipient has performed the applicable percentage of work, unless a deviation from this requirement is approved in writing by the Grants Management Officer. Options on the certification document will include:
   a. SBIR Phase I: at least two-thirds (66 2/3%) of the research

   b. SBIR Phase II: at least half (50%) of the research

   c. Percent deviation approved in writing by the Grants Management Officer

   d. N/A because work is not completed

5. The research / research and development is performed in the United States unless a deviation is approved in writing by the Grants Management Officer.

6. The research / research and development is performed at recipient's facilities with the recipient's employees, except as otherwise indicated in the SBIR application and approved in the Notice of Award.

The recipient will notify the Federal agency immediately if all or a portion of the work authorized and funded under the award is subsequently funded by another Federal agency.

The recipient will further certify that they understand that the information submitted may be given to Federal, State and local agencies for determining violations of law and other purposes.

Finally, the individual certifying on behalf of the recipient will certify they are:

1. An officer of the business concern authorized to represent it and sign the certification on its behalf.

2. Representing on their own behalf, and on behalf of the business concern, that the information provided in the certification, the application, and all other information submitted in connection with the award, is true and correct as of the date of submission.

3. Acknowledging that any intentional or negligent misrepresentation of the information contained in the certification may result in criminal, civil or administrative sanctions, including but not limited to: (1) fines, restitution and/or imprisonment under 18 U.S.C. § 1001; (2) treble damages and civil penalties under the False Claims Act (31 U.S.C. § 3729 et seq.); (3) double damages and civil penalties under the Program Fraud Civil Remedies Act (31 U.S.C. §3801 et seq.); (4) civil recovery of award funds; (5) suspension and/or debarment from all Federal procurement and nonprocurement transactions (FAR Subpart 9.4 or 2 C.F.R. part 180); and (6) other administrative penalties including termination of SBIR/STTR awards.

## 18.5.5.5 STTR Life Cycle Certification

All STTR Phase I and Phase II recipients must complete a Life Cycle Certification at all times set forth in the Notice of Award (see §8(j) of the SBIR Policy Directive). This includes checking all the boxes on the actual certification document and having an authorized officer of the recipient sign and date the certification each time it is required.

A certification is required at the following times:

- For STTR Phase I Recipients: At the time of receiving final payment or disbursement from the Payment Management System.

- For STTR Phase II Recipients: prior to receiving more than 50% of the total award amount and prior to final payment or disbursement from the Payment Management System.

STTR grant recipients are required to submit the Life Cycle Certifications within the I-RPPR and the F-RPPR under Section G.1: Special Notice of Award and Notice of Funding Opportunity Reporting Requirements. STTR recipients should not select the "Nothing to Report" box in this section. The F-RPPR and I-RPPR must be submitted via eRA Commons no later than 120 calendar days from the period of performance end date. I-RPPR or F-RPPR will not be accepted unless all completed Life Cycle Certification(s) are received. Failure to provide all required completed certification(s) may cause NIH to take one or more actions that may include, but are not limited to, corrective actions, withholding of further awards, suspension or termination.

This does not impact the STTR Funding Agreement Certification required by all STTR applicants for new or renewal grants that is required prior to award of a new award or a competing renewal award.

In addition, STTR recipients indicate compliance with these certification requirements by drawing or requesting funds from the Payment Management System. If the recipient cannot complete the certification or cannot ensure compliance with the certification process, it should notify the GMO immediately. If resolution cannot be reached, the GMO will void or terminate the grant, as appropriate.

The certification is available in fillable format, however, the requirements are outlined below.

***Overview Certification Information.*** Please read carefully the following certification statements. The Federal government relies on this information to determine whether the business is eligible for a Small Business Technology Transfer Research (STTR) Program award. The definitions for the terms used in the certification are set forth in the Small Business Act, SBA regulations (13 C.F.R. Part 121), the STTR Policy Directive and also any statutory and regulatory provisions references in those authorities.

If the Grants Management Officer believes, after award, that the business is not meeting certain funding agreement requirements, the agency may request further clarification and supporting documentation in order to assist in the verification of any of the information provided.

Even if correct information has been included in other materials submitted to the Federal government, any action taken with respect to the certification does not affect the Government's right to pursue

criminal, civil, or administrative remedies for incorrect or incomplete information given in the certification. Each person signing a certification may be prosecuted if they have provided false information.

Recipients will verify and certify the following provisions:

1. The principal investigator spent more than half of their time as an employee of the recipient or the research institution, or the recipient has requested and received a written deviation from this requirement from the Grants Management Officer. When a deviation has been approved by NIH, the certification will also document the adjusted percentage of time approved.

2. All, essentially equivalent work, or a portion of the work performed under this project:
   a. Has not been submitted for funding by another Federal agency
   b. Has been submitted for funding by another Federal agency but has not been funded under any other Federal grant, contract, subcontract, or other transaction.
   c. A portion has been funded by another grant, contract, or subcontract as described in detail in the proposal and approved in writing by the Grants Management Officer.

3. Upon completion of the award it will have performed the applicable percentage of work, unless a deviation from this requirement is approved in writing by the Grants Management Officer. Options on the certification document will include:
   a. STTR Phase I: at least forty (40%) of the research
   b. STTR Phase II: at least forty (40%) of the research
   c. Percent deviation approved in writing by the Grants Management Officer

4. The small business concern, and not the single, partnering Research Institution, is exercising management direction and control of the performance of the STTR funding agreement.

5. The work is completed and it has performed the applicable percentage of work, unless a deviation from this requirement is approved in writing by the Grants Management Officer. Options on the certification document will include:
   a. STTR Phase I: at least forty (40%) of the research
   b. STTR Phase II: at least forty (40%) of the research
   c. Percent deviation approved in writing by the Grants Management Officer
   d. N/A because work is not completed

6. The research / research and development is performed in the United States unless a deviation is approved in writing by the Grants Management Officer.

7. The research / research and development is performed at Recipient's facilities with Recipient's employees, except as otherwise indicated in the STTR application and approved in the Notice of Award.

The recipient will notify the Federal agency immediately if all or a portion of the work proposed is subsequently funded by another Federal agency.

The recipient will further certify that they understand that the information submitted may be given to Federal, State and local agencies for determining violations of law and other purposes.

Finally, the individual certifying on behalf of the recipient will certify they are:

1. An officer of the business concern authorized to represent it and sign the certification on its behalf.

2. Representing on their own behalf, and on behalf of the business concern, that the information provided in the certification, the application, and all other information submitted in connection with the award, is true and correct as of the date of submission.

3. Acknowledging that any intentional or negligent misrepresentation of the information contained in the certification may result in criminal, civil or administrative sanctions, including but not limited to: (1) fines, restitution and/or imprisonment under 18 U.S.C. § 1001; (2) treble damages and civil penalties under the False Claims Act (31 U.S.C. § 3729 et seq.); (3) double damages and civil penalties under the Program Fraud Civil Remedies Act (31 U.S.C. §3801 et seq.); (4) civil recovery of award funds; (5) suspension and/or debarment from all Federal procurement and nonprocurement transactions (FAR Subpart 9.4 or 2 C.F.R. part 180); and (6) other administrative penalties including termination of SBIR/STTR awards.

## 18.5.5.6 Final RPPR

***Phase I Final RPPR:*** If a Phase I recipient does not intend to submit a Phase II application within four months of the Phase I project period end date, then Phase I Final RPPR must be submitted to the Grants Management Office of the Awarding Component *within 120* days of the completion date of the Phase I grant period. An Interim-RPPR is required if an application for a Phase II or Phase IIB, respectively, is submitted before a final report for the Phase I award would otherwise be due. In the event that the Type 2/Phase II/Phase IIB application is funded, NIH will treat the Interim –RPPR as the annual performance report for the final year of the previous competitive segment. If the Type 2 is not funded, the Interim-RPPR will be treated by NIH staff as the institution's Final-RPPR.

**Final RPPR Phase I, Phase II, Phase IIB, CRP**: Instructions for the Final RPPR are found on NIH's web site. See in particular, Chapter 7.3, SBIR/STTR RPPRs.

## 18.5.5.7 Phase II Data Collection Requirement for Government SBIR Reporting Database

***Phase II Data Collection Requirement for Government SBIR Reporting Database:*** The SBA maintains a Database System on SBIR.gov to track and report on statistics regarding the SBIR and the STTR programs. Each small business concern applying for a Phase II award is required to update the appropriate information in the reporting database on SBIR.gov for any of its prior Phase II awards.

In meeting this requirement, the small business concern may apportion sales or additional investment information relating to more than one Phase II award among those awards, if it notes the apportionment for each award. Each Phase II recipient is required to update the appropriate information in the SBIR.gov database on that award upon completion of the last deliverable (e.g., Final RPPR, Final Financial Report, Final Invention Statement) under the funding agreement. In addition, the recipient is requested to voluntarily update the appropriate information on that award in the SBIR.gov database annually thereafter for a minimum period of 5 years.

*Questions about this requirement may be submitted to SBA directly through the Contact Us/Send Feedback link on SBIR.gov.* To register on and use the database system, visit SBIR.gov. Online help is available. SBA will minimize the data reporting requirements of small business concerns, make updating available electronically, and provide standardized procedures.

Project commercialization and sales data can only be viewed by Congress, General Accounting Office (GAO), agencies participating in the SBIR/STTR programs, Office of Management and Budget (OMB), Office of Science and Technology Policy (OSTP), Office of Federal Procurement Policy (OFPP), and other authorized persons (for example, authorized contractors) who are subject to a use and nondisclosure agreement with the Federal Government covering the use of the database. Pursuant to 15 U.S.C. 638(k)(4), information provided to the SBIR.gov database is privileged and confidential and not subject

to disclosure pursuant to 5 U.S.C. 552 (Government Organization and Employees); nor must it be considered to be publication for purposes of 35 U.S.C. 102 (a) or (b).

Examples of the data to be entered by applicants into SBIR.gov include revenue from the sale of new products or services resulting from the research conducted under each Phase II award or additional investment from any source, other than Phase I or Phase II awards, to further the research and development conducted under each Phase II award.

# 19 RESEARCH PATIENT CARE COSTS

## 19.1 GENERAL

This chapter provides NIH policy on the determination and reimbursement of research patient care costs under grants. This general policy is intended to be applied in conjunction with the requirements of 2 CFR Part 200, Appendix IX, Hospital Cost Principles. In addition, specific NIH programs may have additional or alternative requirements with which an applicant or recipient must comply.

## 19.2 DEFINITIONS

*Research Patient Care Costs.* The costs of routine and ancillary services provided by hospitals to individuals participating in research programs. The costs of these services normally are assigned to specific research projects through the development and application of research patient care rates or amounts (hereafter "rates"). Research patient care costs do not include: (1) the otherwise allowable items of personal expense reimbursement, such as patient travel or subsistence, consulting physician fees, or any other direct payments related to all classes of individuals, including inpatients, outpatients, subjects, volunteers, and donors, (2) costs of ancillary tests performed in facilities outside the hospital on a fee-for-service basis (e.g., in an independent, privately owned laboratory) or laboratory tests performed at a medical school/university not associated with a hospital routine or ancillary service , (3) recruitment or retention fees or (4) the data management or statistical analysis of clinical research results.

*Hospital.* Includes all types of medical, psychiatric, and dental facilities, such as clinics, infirmaries, and sanatoria.

*Research Patients.* Inpatient and outpatient subjects, volunteers, or donors participating in a research protocol.

*Routine Services.* Regular room services, minor medical and surgical supplies, and the use of equipment and facilities, for which a separate charge is not customarily made.

*Ancillary Services.* Those special services for which charges are customarily made in addition to routine services, e.g., x-ray, operating room, laboratory, pharmacy, blood bank, and pathology.

*Outpatient Services.* Services rendered to subjects/volunteers/donors who are not hospitalized.

*Usual Patient Care.* Items and services (routine and ancillary) ordinarily furnished in the treatment of patients by providers of patient care under the supervision of the physician or other responsible health professional. Such items or services may be diagnostic, therapeutic, rehabilitative, medical, psychiatric, or any other related professional health services. These expenses are for care that would have been incurred even if the research study did not exist. The patient and/or third-party insurance generally will provide for reimbursement of charges for "usual patient care" as opposed to not reimbursing those charges generated solely because of participation in a research protocol.

*Discrete Centers.* Groups of beds that have been set aside for occupancy by research patients and are physically separated from other hospital beds in an environment that normally permits an ascertainable allocation of costs associated with the space they occupy and the service needs they generate.

*Scatter Beds.* Beds assigned to research patients based on availability. These beds are not physically separate from nonresearch beds. Scatter beds are geographically dispersed among all the beds available for use in the hospital and are not usually distinguishable in terms of services or costs from other general service beds within the hospital.

***Cost-Finding Process.*** The technique of apportioning or allocating the costs of the non-revenue-producing cost centers to each other and to the revenue-producing centers on the basis of the statistical data that measure the amount of service rendered by each center to other centers.

## 19.3 POLICY

NIH provides funds for research patient care costs under grants and cooperative agreements. Research patients may receive routine services as inpatients or ancillary services as either inpatient or outpatient subjects/volunteers/donors. In order to receive reimbursement for research patient care costs, any hospital that, as a direct recipient of NIH funds, expects to incur more than $100,000 in patient care costs in any single budget period on a single NIH grant must either have in place or take steps to negotiate a research patient care rate agreement with the cognizant CAS office. These rates must be shown in all requests and/or claims for reimbursement of research patient care costs. Hospital recipients that expect to incur $100,000 or less in research patient care costs per budget period on a single NIH grant and patient care for all consortium participants/contractors under grants no matter the dollar figure are subject to the requirements specified in the subsection on Special Procedures for Certain Hospitals below. Failure to negotiate a research patient care rate with CAS when required may result in the disallowance of all research patient care costs charged to a grant.

## 19.4 ALLOWABLE COSTS

The type of patient and services received are the determining factors for allowing research patient care costs as charges to NIH grants. If the patient is receiving service or care that neither differs from usual patient care nor results in expenses greater than those that would have been incurred if the study had not existed, then the patient is considered to be hospitalized for usual care purposes and the grant will generally not support the costs. When the research extends the period of hospitalization beyond that ordinarily required for usual care, or imposes procedures, tests or services beyond usual care, whether in an inpatient or outpatient setting, the grant may pay the additional costs. The recipient must decide whether, in fact, the hospitalization period, the tests, or the services have been extended beyond or added to what would ordinarily have been expected, and to what extent. Patient care costs for individuals who are receiving accepted treatment according to standard regimens would not ordinarily be acceptable charges to an NIH grant. Similarly, in certain kinds of clinical trials where accepted treatments are compared against new therapies, research patient care costs generally may be charged to a grant only insofar as they are measurements or services above and beyond those that constitute usual patient care and are specified by the study protocol. Acceptable exceptions are listed below.

NIH funds may be used to pay all costs (whether usual care costs or research care costs) for the entire period of hospitalization or research tests or services for individuals who would not have been hospitalized or received such tests or services except for their participation in the research study. Any such exceptions should be documented in the recipient's records. These individuals may include the following:

- Volunteers to whom no health advantages may be expected to accrue as a result of the hospitalization. Examples would be normal controls for metabolic or other studies; people with genetic or certain abnormalities of interest to the investigator; healthy individuals participating in a clinical trial, for example a vaccine trial; and sick people brought to the hospital solely for studies when they otherwise would not require hospitalization.

- Volunteers who are sick and of research importance to the protocol but economically unable or without funds available to them through a responsible third party to pay hospitalization expenses. This includes patients for whom some third-party payer, such as a city, county, or State government, might pay hospitalization expenses in some other hospital but has no responsibility to pay in the hospital in which the approved clinical research is being conducted.

- Volunteers of research importance who are unwilling to spend their own money or use their hospital plan coverage at that particular time. (Fear of more urgent need in the future for both personal funds and health insurance might be one reason for the patient's reluctance to participate in the study.) The investigator has a special responsibility in making the decision to include patients in this group with full charges to the grant, since NIH expects the patient and/or third party to pay the total costs of usual care. However, in exceptional circumstances, the investigator may decide to pay the total expenses for hospitalization, research services, or tests from the grant if this is required to secure timely cooperation of a valuable study patient not otherwise available.

## 19.4.1 Computing Research Patient Care Costs

Research patient care costs, whether expressed as a rate or an amount, shall be computed in an amount consistent with the principles and procedures used by the Medicare program for determining the portion of Medicare reimbursement based on reasonable costs. Separate cost centers must be established for each discrete bed unit for purposes of allocating or distributing allowable routine costs to the discrete unit.

When provisional rates are used as the basis for award of research patient care costs, the amount awarded shall constitute the maximum amount that the NIH awarding IC is obligated to reimburse the recipient for such costs. Provisional rates must be adjusted if a lower final rate is negotiated.

## 19.4.2 Facilities and Administrative Costs

F&A costs should not be paid on any cost component representing the cost of research patient care activities. Research patient care rates (routine and ancillary) include F&A costs related to "hospital-type" employees (nurses, medical technicians, and similar personnel) supported as a direct cost under a grant. Therefore, to preclude over-recoveries of costs similar to these F&A costs, salaries and wages of all "hospital-type" employees working on the grant must be excluded from the salary and wage (S&W) base used to claim F&A costs. Related fringe benefits also should be excluded if such costs are part of the S&W base. If a "total-direct-costs" base is used to compute and claim F&A costs, the above-mentioned "hospital-type" salaries also must be excluded from the base as well as any other base costs chargeable to the grant through the application of a research patient care rate.

If the grant or a consortium agreement/contract under a grant provides funding exclusively for research patient care activities, no F&A costs normally will be allowed as a separate cost element since all allocable F&A costs will be accounted for in the routine or ancillary activity costs contained in research patient care rates.

Although foreign organizations are not prohibited from requesting research patient care costs, all F&A expenses must be excluded from the charges to the grant.

## 19.4.3 Special Procedures for Certain Hospitals

### 19.4.3.1 Recipients

If a recipient does not meet the threshold for negotiation of a research patient care rate agreement with CAS in a given budget period, as specified under Policy in this chapter, but has a currently negotiated

research patient care rate, that rate will be used in awarding and reimbursing research patient care costs, regardless of the amount that the recipient expects to incur. In all other cases, the recipient will be reimbursed at a rate not to exceed the lesser of actual research patient care costs or the rate included in its Medicare cost report.

### 19.4.3.2 Consortium Participants/Contractors under Grants

If a hospital incurring research patient care costs is not the recipient, the recipient will be responsible for establishing the rate or amount that will be reimbursed for such costs unless the hospital also is a direct recipient of other HHS awards and in that capacity has established a research patient care rate with CAS.

If a participating hospital expects to incur more than $100,000 in research patient care costs as specified under Policy in this chapter, the recipient must negotiate a rate for that hospital unless the relationship between the recipient and the hospital is considered "less-than-arms-length." In this case, the recipient should contact the GMO to determine whether CAS should negotiate the rate.

If a participating hospital expects to incur $100,000 or less in research patient care costs (as provided under Policy in this chapter), the recipient will use the lesser of actual costs or the rate in the hospital's Medicare cost report as the basis for determining reimbursement. For purposes of this paragraph, the recipient will apply the thresholds to each hospital individually.

## 19.4.4 Financial Responsibilities

If the costs of patient care are funded by the grant, and whether those costs are classified as usual patient care or research patient care, the amount recovered from third parties must be credited to the grant. However, patient charges must be adjusted for both routine services and ancillaries prior to applying the third-party recoveries. The recipient is obligated to pursue recovery to the fullest extent possible and should be able to document those efforts. An example of such an adjustment follows:

If the standard fee schedule charge for a CT scan is $500, the negotiated research patient care agreement rate is 75 percent, and third-party insurance pays $300, the maximum amount that may be charged to the NIH grant is $75, based on the following calculation.

Standard Fee Schedule X (multiplied by) Negotiated Rate = Cost—(minus) Insurance = Maximum Charge to NIH Grant

  $500 x .75 = $375 - $300 = $75

In those instances when the recipient determines that the balance of the patient's bill may be charged to the grant (see Allowable Costs in this chapter), the total bill must be adjusted to cost before applying any third-party recoveries. The remaining balance of allowable costs may then be charged to the grant.

In certain circumstances, funds may be awarded that support tests specifically developed for research purposes that are subsequently billed to third parties. In such cases, funds recovered from third parties must be credited to the grant account.

# 19.5 PROGRAM REQUIREMENTS

An individual NIH IC/program may adopt special implementing procedures consistent with this section to meet its own specific needs.

## 19.6 POST-AWARD REQUIREMENTS

Post-award rebudgeting into or out of the patient care costs category is likely to be considered a change in scope and require prior approval of the NIH awarding IC (see Administrative Requirements — Prior Approval Requirements — Change in Scope in IIA).

# PART III: POINTS OF CONTACT

Various offices and officials are mentioned throughout the preceding parts of the NIHGPS as sources of information or as responsible for certain activities in the NIH grants process. Contact information for these and other offices and officials is provided in this part. These addresses should not be used for express mail or other types of hand-deliveries. The IC should be contacted to obtain the address to use for express mail.

For each IC that awards grants, a listing is provided for the CGMO as well as an extramural program official that may be contacted for general information. The web address for the IC's home page also is included. Requests related to particular applications submitted or grants awarded should be directed to the individual(s) specified in formal communications from NIH, e.g., in the NoA.

# 20 INSTITUTES AND CENTERS

| Institute/Center | Chief Grants Management Officer | Extramural Program Official |
|---|---|---|
| John E. Fogarty International Center (FIC) http://www.fic.nih.gov/ | Building 31C, Room B2C29, MSC-2220 Bethesda, MD 20892-2220 301-451-1670 | Building 31C, Room B2C29, MSC-2220 Bethesda, MD 20892-2220 301-496-1653 |
| National Cancer Institute (NCI) https://www.cancer.gov/ | 9609 Medical Center Dr., 2W344 MSC 9710 Bethesda, MD 20892-9710 (for U.S. Postal Service) Rockville, MD 20850 (for express delivery) 240-276-6277 | 9609 Medical Center Drive, Room 7W444 Bethesda, MD 20892-9750 (for U.S. Postal Service mail) Rockville, MD 20850 (for express delivery) 240-276-6340 |
| National Center for Advancing Translational Sciences (NCATS) https://ncats.nih.gov/ | One Democracy Plaza, 6701 Democracy Boulevard, Suite 1036, MSC-4874 Bethesda, MD 20892-4874 301-435-0844 | One Democracy Plaza, 6701 Democracy Boulevard, Room 904, MSC-4874 Bethesda, MD 20892-4874 301-827-9239 |
| National Center for Complementary and Integrative Health (NCCIH) https://nccih.nih.gov/ | Two Democracy Plaza, 6707 Democracy Boulevard, II Suite 415, MSC-5475 Bethesda, MD 20892-5475 301-594-3788 | Two Democracy Plaza, 6707 Democracy Boulevard, II Suite 401, MSC-5475 Bethesda, MD 20892-5475 301-594-2014 |
| National Eye Institute (NEI) http://www.nei.nih.gov | 5635 Fishers Lane, Suite 3400, MSC-6419 Bethesda, MD 20892-6419 301-451-2020 | 5635 Fishers Lane, Suite 3400, MSC-6419 Bethesda, MD 20892-6419 301-451-2020 |
| National Heart, Lung and Blood Institute (NHLBI) http://www.nhlbi.nih.gov | One Rockledge Center 6705 Rockledge Dr. Bethesda, MD 20892-7902 301-827-8024 | One Rockledge Center 6705 Rockledge Dr. Bethesda, MD 20892-7902 301-827-5517 |

Part III: Points of Contact

| Institute/Center | Chief Grants Management Officer | Extramural Program Official |
|---|---|---|
| National Human Genome Research Institute (NHGRI)<br>http://www.genome.gov | 6700B Rockledge Dr., Room 3182 Bethesda, MD 20892-6908<br>301-435-7858 | 6700B Rockledge Dr., Suite 3100 Bethesda, MD 20892-6908<br>301-496-7531 |
| National Institute on Aging (NIA)<br>http://www.nia.nih.gov | 7201 Wisconsin Avenue Gateway Bldg., Room 2N212, MSC-9205 Bethesda, MD 20892-9205<br>301-496-1472 | 7201 Wisconsin Avenue Gateway Bldg., Room 2C218F, MSC-9205 Bethesda, MD 20892-9205<br>301-402-7715 |
| National Institute on Alcohol Abuse and Alcoholism (NIAAA)<br>http://www.niaaa.nih.gov | 5635 Fishers Lane, Room 3023, MSC-9304 Bethesda, MD 20892-9304<br>301-443-4704 | 5635 Fishers Lane, Room 3039, MSC-9304 Bethesda, MD 20892-9304<br>301-443-9737 |
| National Institute of Allergy and Infectious Diseases (NIAID)<br>http://www.niaid.nih.gov | 5601 Fishers Lane, MSC-9833 Rockville, MD 20892-9833<br>301-496-7075 | 5601 Fishers Lane, MSC-9824 Rockville, MD 20892-9824<br>301-496-7291 |
| National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS)<br>http://www.niams.nih.gov | 6701 Democracy Boulevard One Democracy Plaza, Suite 800, MSC-4872 Bethesda, MD 20892-4872<br>301-594-5032 | 6701 Democracy Boulevard One Democracy Plaza, Suite 800, MSC-4872 Bethesda, MD 20892-4872<br>301-594-5055 |
| National Institute of Biomedical Imaging and Bioengineering (NIBIB)<br>http://www.nibib.nih.gov | 6707 Democracy Boulevard, Suite 900, MSC-5469 Bethesda, MD 20892-5469<br>301-451-4782 | 6707 Democracy Boulevard, Suite 200, MSC-5477 Bethesda, MD 20892-5477<br>301-496-9474 |
| Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD)<br>http://www.nichd.nih.gov | 6710B Rockledge Drive, Room 3302 Bethesda, MD 20817-1834<br>301-496-5001 | 6710B Rockledge Drive, Room 2216 Bethesda, MD 20817-1834<br>301-435-6856 |

| Institute/Center | Chief Grants Management Officer | Extramural Program Official |
|---|---|---|
| National Institute on Deafness and Other Communication Disorders (NIDCD)<br>http://www.nidcd.nih.gov | 6001 Executive Boulevard, Room 8335 MSC-9670 Bethesda, MD 20892-9670<br>301-402-0909 | 6001 Executive Boulevard, Room 8345 MSC-9670 Bethesda, MD 20892-9670<br>301-402-0909 |
| National Institute of Dental and Craniofacial Research (NIDCR)<br>http://www.nidcr.nih.gov | 6701 Democracy Boulevard, Room 658, MSC-4878 Bethesda, MD 20892-4878<br>301-594-4808 | 6701 Democracy Boulevard, Room 660, MSC-4878 Bethesda, MD 20892-4878<br>301-594-4805 |
| National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)<br>http://www.niddk.nih.gov | 6707 Democracy Boulevard 2 Democracy Plaza, Room 731, MSC-5450 Bethesda, MD 20892-5450<br>301-594-8854 | 6707 Democracy Boulevard 2 Democracy Plaza, Room 715, MSC-5453 Bethesda, MD 20892-5453<br>301-594-8834 |
| National Institute on Drug Abuse (NIDA)<br>http://www.nida.nih.gov | 6001 Executive Boulevard Neuroscience Center, Suite 4128, MSC-9560 Bethesda, MD 20892-9560<br>301-443-6710 | 6001 Executive Boulevard Neuroscience Center, Suite 200, MSC-8401 Bethesda, MD 20892-8401<br>301-443-2755 |
| National Institute of Environmental Health Sciences (NIEHS)<br>http://www.niehs.nih.gov | 530 Davis Drive, Room 3044, K3-11 Morrisville, NC 27560<br>984-287-3332 | 530 Davis Drive, Room 3112, K3-13 Morrisville, NC 27560<br>984-287-3249 |
| National Institute of General Medical Sciences (NIGMS)<br>http://www.nigms.nih.gov | 45 Center Drive Natcher Bldg., Room 2AN24J., MSC-6200 Bethesda, MD 20892-6200<br>301-594-5520 | 45 Center Drive Natcher Bldg., Room 2AN32B, MSC-6200 Bethesda, MD 20892-6200<br>301-594-4499 |
| National Institute of Mental Health (NIMH)<br>http://www.nimh.nih.gov | 6001 Executive Boulevard Neuroscience Center, Room 6122, MSC 9605 Bethesda, MD 20892-9605<br>301-443-2811 | 6001 Executive Boulevard Neuroscience Center, Room 6154, MSC-9609 Bethesda, MD 20892-9609<br>301-443-3367 |

| Institute/Center | Chief Grants Management Officer | Extramural Program Official |
|---|---|---|
| National Institute on Minority Health and Health Disparities (NIMHD)<br>http://www.nimhd.nih.gov/ | 6707 Democracy Boulevard, Suite 800, MSC 5465 Bethesda, MD 20892-5465<br>301-594-8412 | 6707 Democracy Boulevard, Suite 800, MSC 5465 Bethesda, MD 20892-5465<br>301-402-1366 |
| National Institute of Neurological Disorders and Stroke (NINDS)<br>http://www.ninds.nih.gov | 6001 Executive Boulevard Neuroscience Center, Room 3254, MSC-9537 Bethesda, MD 20892-9537<br>301-496-9231 | 6001 Executive Boulevard Neuroscience Center, Room 3307, MSC-9531 Bethesda, MD 20892-9531<br>301-496-9248 |
| National Institute of Nursing Research (NINR)<br>http://www.ninr.nih.gov | 6701 Democracy Boulevard One Democracy Plaza, Suite 710, MSC-4870 Bethesda, MD 20892-4870<br>301-594-6869 | 6701 Democracy Boulevard One Democracy Plaza, Suite 710, MSC-4870 Bethesda, MD 20892-4870<br>301-594-0544 |
| National Library of Medicine (NLM)<br>http://www.nlm.nih.gov | 6705 Rockledge Drive Rockledge I, Suite 500, MSC-7968 Bethesda, MD 20892-7968<br>301-496-4222 | 6705 Rockledge Drive Rockledge I, Suite 500, MSC-7968 Bethesda, MD 20892-7968<br>301-496-4621 |

# 20.1 OTHER NIH OFFICES

| NIH Office | Address |
|---|---|
| Closeout Center<br><br>Division of Grant Systems Integration<br><br>Office of Policy for Extramural Research Administration (OPERA)<br><br>Office of Extramural Research | NIH Closeout Center<br><br>Office of Policy for Extramural Research Administration (OPERA), OER<br><br>6705 Rockledge Drive, 8th Floor<br><br>Bethesda, MD 20892 (for regular or U.S. Postal Service Express mail)<br><br>Bethesda, MD 20817 (for other courier/express deliveries only)<br><br>E-mail: NIHCloseoutCenter@mail.nih.gov |
| Division of Foreign Interference, Research Misconduct and Harassment<br><br>Office of Policy for Extramural Research Administration (OPERA)<br><br>Office of Extramural Research | 6705 Rockledge Drive, 8th Floor<br><br>Bethesda, MD 20892 (for regular or U.S. Postal Service Express mail)<br><br>Bethesda, MD 20817 (for other courier/express deliveries only)<br><br>Financial Conflicts of Interest E-mail: FCOICompliance@mail.nih.gov<br><br>Inventions and Technology Resources (301) 435-1986 E-mail: edison@nih.gov |
| Division of Grants Policy<br>Office of Policy for Extramural Research Administration (OPERA)<br>Office of Extramural Research | 6705 Rockledge Drive, Rockledge I, 8th Floor<br>Bethesda, MD 20892-7974<br>301-435-0949<br>301-435-3059 (fax)<br>E-mail: GrantsPolicy@mail.nih.gov |
| Division of Grants Compliance and Oversight<br>Office of Policy for Extramural Research Administration (OPERA)<br>Office of Extramural Research | 6705 Rockledge Drive,<br>Rockledge I, 8th Floor<br>Bethesda, MD 20892-7974<br>301-435-0938<br>301-435-3059 (fax)<br>E-mail: GrantsCompliance@mail.nih.gov<br>Financial Conflicts of Interest |

| NIH Office | Address |
|---|---|
| Division of Grant Systems Integration<br>Office of Policy for Extramural Research Administration (OPERA)<br>Office of Extramural Research | Systems Policy Branch<br>6705 Rockledge Drive<br>Rockledge I, 8th Floor<br>Bethesda, MD 20892-7974<br>E-mail: operasystemspolicy@nih.gov |
| Division of Communications and Outreach<br>Office of Planning and Communication<br>Office of Extramural Research<br>Grants Information (general grants information)<br>https://grants.nih.gov/grants/oer.htm | 6705 Rockledge Drive, Suite 5040<br>301-435-0714<br>E-mail: GrantsInfo@nih.gov |
| Division of Central Grants Processing<br>Office of Extramural Research | Centralized Mailing Address for hard copy submission of documents:<br>NIH Closeout Center<br>Division of Central Grants Processing, OER<br>6705 Rockledge Drive, 8th Floor<br>Bethesda, MD 20892 (for regular or U.S. Postal Service Express mail)<br>Bethesda, MD 20817 (for other courier/express deliveries only)<br>E-mail: NIHCloseoutCenter@mail.nih.gov |

| NIH Office | Address |
|---|---|
| Office of Extramural Research<br>E-mail: oer@od.nih.gov<br>https://grants.nih.gov/aboutoer/intro2oer.htm | NRSA Payback Service Center<br><br>Division of Loan Repayment<br><br>OER/OD/National Institutes of Health<br><br>6700B., Rockledge, Drive, Suite 2300, MSC 6904<br><br>Bethesda, MD 20892-6904<br><br>Phone: (301) 594-1835 or (866) 298-9371<br><br>NRSApaybackcenter@mail.nih.gov<br><br><br>2. For issues regarding Human Subjects Protections, Clinical Trials, Inclusion, and Single IRB contact:<br>Division of Human Subjects Research<br>6705 Rockledge Drive, 8th Floor<br>Bethesda, MD 20892-7982<br>Human Subjects research protections: OER-HS@nih.gov<br>Clinical trials: Clinicaltrials.disseminatiopolicy@mail.nih.gov<br>Inclusion: inclusion@od.nih.gov<br>Single IRB: SingleIRBpolicy@mail.nih.gov<br><br>For issues regarding Peer Review contact:<br><br>Review Policy Officer<br><br>6705 Rockledge Drive, 8th Floor<br><br>Bethesda, MD 20892-7982<br><br>ReviewPolicyOfficer@nih.gov.<br><br>For issues regarding Research Training contact:<br><br>Division of Biomedical Research Workforce<br><br>6705 Rockledge Drive, 8th Floor<br><br>Bethesda, MD 20892-7982<br><br>NIHTrain@mail.nih.gov.<br><br><br>For issues regarding SBIR/STTR Programs and conference grants contact:<br>Office of Biomedical Entrepreneurship and Innovation |

Part III: Points of Contact

| NIH Office | Address |
|---|---|
| | 6705 Rockledge Drive, 8th Floor<br><br>Bethesda, MD 20892-7982<br><br>301-435-2688<br><br>301-480-0146 (fax)<br><br>Web sites for these topic areas can be found from the main OER Grants site:<br>http://grants.nih.gov/grants/oer.htm |
| Office of Laboratory Animal Welfare (OLAW)<br>Office of Extramural Research<br>https://olaw.nih.gov/ | 6700B Rockledge Drive, Suite 2500<br>MSC-6910<br>Bethesda, MD 20892<br>301-496-7163<br>301-480-3394 (fax)<br>E-mail: OLAW@mail.nih.gov |
| Center for Scientific Review (CSR)<br>https://public.csr.nih.gov/ | Division of Receipt and Referral<br>6701 Rockledge Drive<br>Rockledge II, MSC-7759<br>Bethesda, MD 20892-7759<br>301-435-0715<br>Email: csrdrr@mail.nih.gov |
| Center for Scientific Review (CSR)<br>https://public.csr.nih.gov/ | For submission of paper competing applications:<br>Center for Scientific Review<br>National Institutes of Health<br>Room 713-K<br>6701 Rockledge Drive, MSC-7759<br>Bethesda, MD 20892-7759 (zip code for applications sent by USPS regular or Express mail)<br>Bethesda, MD 20817 (zip code for applications sent using a courier service) |
| Office of Science Policy<br>https://osp.od.nih.gov/ | 6705 Rockledge Drive<br>Suite 630, MSC-7985<br>Bethesda, MD 20892-7985<br>301-496-9838<br>E-mail: SciencePolicy@od.nih.gov |

Part III: Points of Contact

| NIH Office | Address |
|---|---|
| Office of Intramural Research (OIR)<br>https://oir.nih.gov/ | 1 Center Drive<br>Building 1, Room 160<br>Bethesda, MD 20892-0151<br>301-496-1921<br>301-402-4273 (fax) |
| Office of Financial Management (OFM)<br>http://ofm.od.nih.gov | Office of Financial Management<br>6701 Rockledge Drive, 3rd Floor<br>Bethesda, MD 20892-7784<br>301-496-6088<br>301-402-4934 (fax) |
| Division of Financial Advisory Services (DFAS) Office of Acquisition Management and Policy (OAMP)<br>https://oamp.od.nih.gov/ | 6701 Rockledge Dr. 4th floor,<br>Bethesda, MD 20817<br>301-496-4401<br>301-402-0177 (fax) |
| Office of Management Assessment (OMA)<br>https://oma.od.nih.gov/DPI/Pages/Home.aspx | Report allegations of non-criminal misuse of grant funds to:<br>Division of Program Integrity<br>Office of Management Assessment<br>National Institutes of Health<br>6705 Rockledge Drive, RK1-RM 605-Q<br>301-496-5586<br>301-480-1204 (fax) |

## 20.2 OTHER HHS GOVERNMENT OFFICES

| Office | Address |
|---|---|
| Advisory Council on Historic Preservation<br>http://www.achp.gov | 401 F Street NW<br><br>Suite 308<br><br>Washington, DC 20001<br><br>202-517-0200<br><br>Email: achp@achp.gov |
| Office of the Inspector General (OIG) https://www.oig.hhs.gov | Report allegations of criminal offenses to:<br><br>U.S. Department of Health and Human Services<br><br>Office of Inspector General<br><br>ATTN: OIG HOTLINE OPERATIONS<br><br>P.O. Box 23489<br><br>Washington, DC 20026<br><br>1-800-HHS-TIPS (1-800-447-8477)<br>E-mail: HHSTips@oig.hhs.gov http://oig.hhs.gov/fraud/hotline<br>TTY: 1-800-377-4950<br>Fax: 1-800-223-8164 |
| HHS National External Audit Review Center<br>https://facweb.census.gov/ | Questions concerning audit requirements:<br><br>Office of Audit Services<br><br>1100 Walnut Street, Suite 850<br><br>Kansas City, Missouri 64106<br><br>1-800-732-0679 (voice)<br><br>Email: https://facweb.census.gov/<br><br>Receipt point for single audits for-profit organizations:<br><br>Department of Health & Human Services<br><br>Audit Resolution Division<br><br>HHH Building, Room 549D<br><br>200 Independence Avenue, SW<br><br>Washington, DC 20201<br><br>AuditResolution@hhs.gov |

Part III: Points of Contact

| Office | Address |
|---|---|
| Office for Human Research Protections (OHRP)<br>http://www.hhs.gov/ohrp/ | The Tower Building<br>1101 Wootton Parkway, Suite 200<br>Rockville, MD 20852<br>240-453-6900<br>Toll Free within the U.S. 1-866-447-4777<br>E-mail: OHRP@hhs.gov |
| Office of Research Integrity (ORI)<br>https://ori.hhs.gov | The Tower Building<br>1101 Wootton Parkway, Suite 240<br>Rockville, MD 20852<br>240-453-8400<br>E-mail: askori@hhs.gov |
| Departmental Appeals Board (DAB)<br>http://www.hhs.gov/dab/ | 330 Independence Avenue, SW<br>Cohen Building, Room G-644, MS 6127<br>Washington, DC 20201<br>202-565-0200 |
| Office for Civil Rights (OCR)<br>http://www.hhs.gov/ocr | Headquarters<br>200 Independence Avenue, SW<br>Hubert H. Humphrey Building Bldg., Room 509 F<br>Washington, DC 20201<br>1-800-368-1019 |
| Program Support Center (PSC), Payment Management Services (PMS)<br>http://pms.psc.gov | 1-877-614-5533 (PMS Help Desk)<br>301-443-8362 (fax)<br>E-mail: PMSSupport@psc.gov<br><br>Payment Management System: https://pms.psc.gov/ |

| Office | Address |
|---|---|
| Cost Allocation Services (CAS)<br>http://rates.psc.gov/ | Mid-Atlantic Field Office<br><br>(Services Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia)<br><br>7700 Wisconsin Ave.<br><br>Bethesda, MD 20857<br><br>Email: cas-bethesda@psc.hhs.gov<br><br>PHONE: (301)443-5625<br><br>Director Phone Number<br><br>Director # Darryl Mayes (301) 492-4852 |
| Cost Allocation Services (CAS) | Northeastern Field Office<br><br>(Services Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, Puerto Rico, the Virgin Islands, Canada and Europe)<br><br>26 Federal Plaza<br><br>New York New York10278<br><br>cas-ny@psc.hhs.gov<br><br>PHONE: (212) 264-2069<br><br>Director Phone Number<br><br>Darryl Mayes (301) 492-4852 |

Part III: Points of Contact

| Office | Address |
|---|---|
| Cost Allocation Services (CAS)<br>http://rates.psc.gov/ | Central States Field Office<br><br>(Services Arkansas, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Missouri, Nebraska, New Mexico, Ohio, Oklahoma, Texas and Wisconsin)<br><br>1301 Young St<br>Dallas Texas 75202<br>cas-dallas@psc.hhs.gov<br>PHONE: (214) 767-3261<br>FAX: (214) 767-3264<br>Director Phone Number<br>Arif Karim (214)767-3600 |
| Cost Allocation Services (CAS)<br>http://rates.psc.gov/ | Western Field Office<br><br>(Services Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, North Dakota, Oregon, South Dakota, Utah, Washington, Wyoming, Australia, and Asia)<br><br>90 7th Street<br>San Francisco, California 94103<br>United States<br>cas-sf@psc.hhs.gov<br>PHONE: (415) 437-7820<br>Director's Phone Number<br>Arif Karim (214)767-3600 |

NIH_GRANTS_004250

| Office | Address |
|--------|---------|
| Federal Audit Clearinghouse (Single Audit Reports) | 4700 Silver Hill Road<br>Suitland, MD 20746<br><br>Questions:<br>866-306-8779<br>govs.fac.ides@census.gov<br><br>Online submission: Form SF-SAC and Single Audit reporting package must be submitted on line using the Internet Data Entry System (IDES) found at https://facweb.census.gov/ |

NIH_GRANTS_004251