UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>  Plaintiffs,<br><br> v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>  Defendants. | Civil Action No. 1:25-cv-10814-WGY<br><br>Leave to file combined brief granted June 12, 2025 (*See* Doc No. 131) |
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,<br><br>  Plaintiffs,<br><br> v.<br><br>NATIONAL INSTITUTES OF HEALTH, *et al.*,<br><br>  Defendants. | Civil Action No. 1:25-cv-10787-WGY<br><br>Leave to file combined brief granted June 12, 2025 (*See* Doc No. 131) |

**DEFENDANTS' RESPONSE BRIEF**

## Table of Contents

Introduction ................................................................................................................................ 1

Argument .................................................................................................................................. 1

I.     Plaintiffs ask for relief that the Court cannot order. ................................................. 1

    A.    Plaintiffs' proposed permanent injunction seeks an order directing specific performance of a contract. ...................................................................................... 1

    B.    This Court should not interpret the terms of the grant agreements ......................... 2

II.    NIH's research priorities are not subject to judicial review. ................................... 4

    A.    Plaintiffs may not substitute their judgment for that of the Agency. ..................... 4

    B.    Plaintiffs otherwise mount arguments relevant only to grant terminations. ........... 6

    C.    Plaintiffs' newly announced "Challenged Directive" suffers the same jurisdictional problems as the previous seven. ....................................................... 7

III.   NIH's research priorities did not violate a statute. .................................................... 8

    A.    The agency complied with the requirement to adopt a strategic plan ..................... 8

    B.    NIH did not violate any other statutes. .................................................................... 8

IV.   Even if reviewed under the APA standard, NIH's priorities survive review. ......... 11

V.    The Challenged Directives do not violate the Spending Clause. ........................... 14

VI.   Plaintiffs are not entitled to a permanent injunction. ............................................. 15

Conclusion .............................................................................................................................. 16

## INTRODUCTION

Plaintiffs' contentions in both cases suffer fatal infirmities on the merits, and they beseech the Court to fashion remedies that are beyond its lawful jurisdiction. Although Plaintiffs express concern over the various "Challenged Directives," those concerns lose relevance upon closer scrutiny. For one thing, several are no longer even in effect. Others bear no relationship at all to the decision to terminate a grant at issue. Instead, the Challenged Directives are little more than an artifice designed to mask Plaintiffs' challenges to NIH's decisions to terminate grant agreements. Moreover, injunctive relief is not the norm for an APA case—and relief, if any, should be limited to vacatur and remand to the agency. It is indisputable that Plaintiffs seek to compel specific performance of the grant agreements, a remedy beyond the Court's authority to order. In any event, these grants terminated in February, nearly four months ago. Plaintiffs previously averred that many of their research projects would be irretrievably lost if the Court did not grant them relief at that time and have since offered no proof that the underlying projects will suddenly spring back to life if funding were restarted.  Plaintiffs' claims fail.

## ARGUMENT

**I.    Plaintiffs ask for relief that the Court cannot order.**

    **A.    Plaintiffs' proposed permanent injunction seeks an order directing specific performance of a contract.**

The Court lacks jurisdiction to order the United States to specifically perform its obligations under the grant agreements that Plaintiffs seek to resurrect. "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations," because the United States has never waived its sovereign immunity as to that remedy. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989). Plaintiffs ignore this rule. Their proposed orders would vacate and set aside any "notices of termination

1

transmitted to Plaintiffs from January 20, 2025, to the present, that invoke [not implement] the Agency Priorities Regulation." States' Proposed Order, Doc. No. 127 at 3. *See also id.* at 4 (permanently enjoining defendants from "terminating, freezing, pausing, or otherwise suspending (whether or not by means of a formal communication) any NIH notices of award issued to Plaintiffs…"). An order that bars NIH from terminating grant agreements is a command that NIH specifically perform those agreements by paying the grants. As recently recognized by a district court in Utah, "this is well beyond the Court's power." *Imaginarium LLC v. U.S. Small Bus. Admin.*, 618 F. Supp. 3d 1225, 1232 (D. Utah 2022). Jurisdiction aside, the Court must decline Plaintiffs' impermissible remedy.

      **B.**    **This Court should not interpret the terms of the grant agreements.**

Plaintiffs next request declaratory judgment on the meaning of various regulations that are only relevant because they have been incorporated into the contract terms of each grant. States' Proposed Order, Doc. No. 127 at 3. They ask the court to declare that 2 C.F.R. § 200.340(a)(2) (2020) and 2 C.F.R. § 200.340(a)(4) (2024) do not permit termination in certain circumstances. States' Proposed Order, Doc. No. 127 at 3. This requested relief is also beyond the Court's purview. Each grant's Notice of Award explains that the grant "is subject to the terms and conditions incorporated either directly or by reference in the" agreement. *See, e.g.*, NIH_GRANTS_000080. One of those terms and conditions of the grant is found in the Notice of Award's express incorporation of the NIH Grants Policy Statement. *Id.* The NIH Grants Policy Statement covers the grounds for terminating grants in Section 8.5.2, which explicitly states that "NIH may also terminate the grant in whole or in part as outlined in 2 CFR Part 200.340." NIH 2024 Grants Policy Statement, NIH_GRANTS_003924. NIH relied upon these contract terms when it terminated each grant. Absent this incorporation into the contract, 2 C.F.R. § 200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) would not apply to any assessment of the

propriety of a grant termination. As Plaintiffs themselves admit, HHS' general grant termination regulations are found in 45 C.F.R. §75.372, not 2 C.F.R. § 200.340. Thus, the terminations at issue are all rooted in the terms of agreement between NIH and each grantee, and this case does not present a matter for regulatory review. The meaning of 2 C.F.R. § 200.340(a)(2) and 2 C.F.R. § 200.340(a)(4) can be in dispute only as terms of contracts, incorporated into the Notices of Award *as contract terms.*

"The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes" with the federal government. *Wisconsin Elec. Power Co. v. U.S. Dept. of Energy*, 211 F.3d 646, 648 (D.C. Cir. 2000). This includes contract interpretation and construction. *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 14688 (Fed. Cir. 1998). The Court's retention of jurisdiction over this case does not give Plaintiffs license to seek or obtain remedies that only the Court of Federal Claims can adjudicate. Declaratory judgment on the meaning of contract terms is unavailable here.

Finally, even if the Court were inclined to interpret these contractual terms, Plaintiffs' proffered interpretation is wrong. Their strained reading on the termination language contends -- with no proof at all -- that the right of termination cannot be based on shifts in agency priorities or changes in policy. But that's precisely what the Office of Management and Budget contemplated when it crafted the provision. *See* 89 FR 30046, 30089 (noting that "OMB had proposed to remove language that allows a Federal agency or pass-through entity to terminate an award 'if an award no longer effectuates the program goals or agency priorities,'" but the change was "unnecessary" because § 200.340 "still allowed agencies to terminate a Federal award according to the terms and conditions of the award.") As OMB recently observed, "an agency could specify the conditions upon which an award could be terminated in the terms and

3

conditions of the award, including, for example, *when an award no longer effectuates the program goals or agency priorities." Id.* (emphasis added). That is exactly what NIH did here. Even though HHS did not adopt the language of 2 C.F.R. § 200.340 until 2024, NIH has been expressly incorporating that term into its grant awards. OMB expressly recognizes such a practice, and Plaintiffs' contrary arguments do not pass muster.

## II. NIH's research priorities are not subject to judicial review.

### A. Plaintiffs may not substitute their judgment for that of the Agency.

This Court correctly recognized that APA review does not allow it to "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Similarly, the Court may not "set aside an agency's policymaking decision solely because it might have been influenced by political consideration or prompted by an Administration's priorities." *APHA, et al. v. NIH, et al.*, No. 25-cv-10787, ECF No. 84 at 26 (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). Yet, Plaintiffs ask this Court to do precisely what they recognize it may not: Plaintiffs ask this Court to substitute *their* policy judgment concerning funding priorities for that of the agency.

Plaintiffs' characterization of the agency's priorities as "pure *ipse dixit*," "conclusory," and "'*post hoc* rationalizations' from counsel" misstate the facts and the minimal obligations imposed on the agency in the context of a grant termination. 25-cv-10814, States Brief, Doc. No. 126 at 19, 20; 25-cv-10787, APHA Brief, Doc. No. 103, at 20-21. The change in democratically accountable leadership with different priorities is not a *post hoc* rationalization; it is historical fact. With a new administration comes an appropriate opportunity to assess and reassess the agency's activities. No one can reasonably quarrel with that as part of representative, democratic government. Fundamentally, Plaintiffs take issue with the shift in agency priorities, not because they are unlawful or improper, but because Plaintiffs disagree with the agency's view. Despite

4

Plaintiffs' complaints, setting funding priorities is an "administrative decision traditionally regarded as committed to agency discretion," and are thus not properly in the purview of the Court. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *see also Marinoff v. Dep't of Health, Ed. & Welfare*, 456 F. Supp. 120, 1122 (S.D.N.Y. 1978), *aff'd*, 595 F.2d 1208 (1979) ("Agency determinations as to whether scientific research into a matter within the agency's area of expertise should be undertaken or funded have previously been found within the permissible scope of agency discretion."); *Grassetti v. Weinberger*, 408 F. Supp. 142, 155 (N.D. Cal. 1976) ("These are matters for the judgment of medical experts, not courts."). This Court should reject Plaintiffs' attempts to substitute their policy preferences for the agency's decision-making.

The grant terminations about which Plaintiffs complain were made by Dr. Memoli, Acting NIH Director, to align NIH's grant funding with its agency priorities. *See* APHA Brief, Doc. No. 103 at 7-10; States Brief, Doc. No. 126 at 13-14 (describing Dr. Memoli's identification of grants to be terminated). Dr. Memoli's decision to terminate any of Plaintiffs' grants was a statutorily authorized exercise of his authority as NIH Director to "conduct[] priority-setting reviews." *See* 42 U.S.C. § 283(b)(3). Plaintiffs acknowledge that, in each instance, Dr. Memoli reviewed the grants and determined that they no longer aligned with agency priorities, and Plaintiffs all but admit that the Challenged Directives are wholly disconnected from most of the grant terminations that they challenge. APHA Brief, Doc No. 103 at 7-10; States Brief, Doc No. 126 at 13-14. Therefore, the injuries Plaintiffs allege in their respective complaints are not the direct or indirect result of any of the Challenged Directives.

The only Challenged Directive that preceded many of Plaintiffs' claims—Dr. Memoli's Directive announcing NIH's shift in priorities—is not subject to review because no statute or regulation provides a meaningful standard by which to judge what research NIH chooses to

prioritize. See NIH_GRANTS_002930-31. "[T]he APA's 'arbitrary and capricious' standard, *see* 5 U.S.C. § 706(2)(a), cannot be sufficient by itself to provide the requisite 'meaningful standard' for courts to apply in evaluating the legality of agency action." *Lumney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003) (citing *Heckler v. Chaney*, 470 U.S. 821, 829-30 (1985). Even if the Court determines that grant terminations or other documents were final agency actions subject to review, announcements of agency priorities, like Dr. Memoli's announcement, are not reviewable.

### B. Plaintiffs otherwise mount arguments relevant only to grant terminations.

As further evidence of the disconnect between the Challenged Directives and NIH's final action (grant terminations), Plaintiffs focus a significant part of their briefs on the process that Dr. Memoli and NIH followed when making individual grant termination decisions. For example, APHA Plaintiffs' focus on the amount of time Dr. Memoli spent on each list of grants prior to exercising his discretion to terminate those grants that no longer aligned with agency priority. *See* APHA Opening Br. at 7, 11, 18-19. Although Plaintiffs characterize their focus as on the "time and manner in which the Defendants implemented the [Directives]," Plaintiffs have not shown and cannot show that Dr. Memoli relied on any "Directive" when he identified individual grants to be terminated. Instead, Dr. Memoli reviewed the list and used his expertise to assess whether any of those grants no longer aligned with NIH's agency priorities. Plaintiffs' focus on the process *for terminating the grants*, separate and apart from the Challenged Directives, and particularly on the amount of time it took Dr. Memoli to review the lists to identify the grants to terminate, illustrates that Plaintiffs' claims are truly about grant terminations untethered from the so-called "Challenged Directives."[1]

---

[1] The fact that most of the grant terminations took place *before* NIH's Chief Grants Management Officer issued any of the staff guidance documents that Plaintiffs challenge as "Challenged

### C. Plaintiffs' newly announced "Challenged Directive" suffers the same jurisdictional problems as the previous seven.

Without seeking leave to amend, Plaintiffs now attempt to shoehorn a February 21, 2025 "Directive on NIH Priorities" memorandum signed by Dr. Memoli as an additional "Challenged Directive"—despite being aware of its existence for nearly a month, if not more.[2] This Court should reject this eleventh hour addition to Plaintiffs' Complaint.

Consideration of this tardy addition to Plaintiffs' case, however, does not improve their claim for relief. Their challenge to the February 21 Directive on NIH Priorities suffers from the same jurisdictional problem as several other Challenged Directives: the February 21 Directive is not a final agency action subject to judicial review. The February 21 Directive is an announcement of NIH's Priorities and directs NIH personnel to conduct an internal review of grants for consistency with agency priorities. *See* NIH_GRANTS_002930-31. Initiating an agency review does not determine a grantees' rights and obligations, and did not itself have any legal impact on Plaintiffs' grants. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) ("[I]nvestigatory measures are not final agency action," because such measures are "tentative or interlocutory in nature."). The opening of a review or investigation is a preliminary step, "leading toward the possibility of a final action in the form of an enforcement or other action." *Id.* (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003)). The only final agency action that Plaintiffs do challenge, albeit indirectly using the artifice of Challenged Directives, is the decision to terminate their grants.

---

Directives" provides further evidence that Plaintiffs' claims are about grant terminations, not regulatory directives.

[2] Notably, the February 21 "Memoli Directive" was attached as Exhibit 44 to the APHA Declaration, filed on May 19, 2025. Doc. No. 72 ¶ 6.

7

### III.    NIH's research priorities did not violate a statute.

####    A.    The agency complied with the requirement to adopt a strategic plan.

Plaintiffs concede that NIH complied with its statutory obligation to adopt a strategic plan and concede that the strategic plan does not bind the agency to any priorities expressed in it. States Mot. for Prelim. Inj., Doc No. 78 at 34 ("[N]ew administrations are certainly permitted to shift priorities in NIH research."). Plaintiffs incorrectly insist that changing any priorities stated in that plan, however, somehow violates the APA. Not so.

As State Plaintiffs acknowledge, the requirement to update an NIH strategic plan every six years does not prevent NIH from shifting priorities in the interim. The statute requires only that NIH adopt a plan ultimately "to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42 U.S.C. § 282(m)(1). The statute does not purport to impose any binding obligation on NIH's activities. *See id.* It does not require NIH to limit its research to priorities identified in the plan, nor does it prohibit NIH from changing priorities once adopted. *See id.* And the statute does not require NIH to update the strategic plan when priorities shift. *See id.* If Congress wanted the strategic plan to bind NIH and its priorities, it could have said so. Plaintiffs' contention thus finds no support. Shifting individual priorities while a strategic plan is in place does not negate the value of the plan, nor does it invalidate a change in priority. Plaintiffs' suggestion to the contrary lacks merit.[3]

####    B.    NIH did not violate any other statutes.

APHA Plaintiffs admit that there is a difference between health disparity research and Diversity, Equity, and Inclusion programs, thus the Challenged Directives do not prohibit

---

[3] Plaintiffs make a third statutory argument related to appropriations, which is addressed in section VI, *infra*. In short, NIH has continued to issue awards and intends to repurpose appropriated funds to grants that align with the agency's priorities.

8

research into health disparities. Specifically, they admit that research into health disparities must be "*recast*" to be "verboten 'studies based on diversity, equity, and inclusion.'" APHA Brief, Doc No. 103 at 25 (emphasis added). More accurately, Plaintiffs are recasting the Challenged Directives to make it appear that that the Challenged Directives violate statutes. As explained in Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Defendants' Opening Brief, the Challenged Directives cannot mean that research into health disparities is prohibited because NIH continues to fund research into health disparities. Opp. to States' Mot. for Prelim Inj., Doc. No. 95 at 26-27[4]; Def. Brief, States Doc. No. 125 at 32. Plaintiffs do not dispute that this funding continues. *See* States Reply re Prelim. Inj., Doc. No. 101 at 16.

Similarly, the Challenged Directives do not violate any statutes that APHA Plaintiffs say "mandat[e] that NIH increase diversity within the biomedical field." APHA Brief, Doc No. 103 at 24. The Challenged Directives do not prevent NIH from "issu[ing] grants 'in a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities," nor from providing for an "increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research." *Id.* (citing 42 U.S.C. 288(a)(4), 282(h)). They are not policies about workforce diversity, although the statute that APHA Plaintiffs cite gives the NIH Director explicit authority to modify such policies. *Id.* (citing 283*o*(2)).

---

[4] In opposing Plaintiffs' Motions for Preliminary Injunctions, Defendants cited 26 then-active grants as examples that showed Plaintiffs were incorrect in contending that the Challenged Directives violated statutes. Since that time, only two of those grants have been terminated. For many more, NIH affirmatively *renewed* funding *after* the Challenged Directives issued. On June 16, 2025, Defendants will move into evidence the Notices of Award for the currently active grants.

NIH also continues to fund institutions to support programs of excellence in biomedical and behavioral research training for members of minority health disparity populations or other health disparity populations, thus disproving Plaintiffs contention that the Challenged Directives violate 285t-1(a), (b). APHA Brief, Doc No. 103 at 24. For example, after the Challenged Directives issued, on April 21, 2025, NIH renewed funding for a program "designed to reduce health disparities associated with chronic health conditions such as obesity, hypertension, diabetes, cardiovascular disease, and cancer, by supporting delivery of evidence-based health promotion programs in churches serving African American communities."[5] The project is funded through the National Institute on Minority Health and Health Disparities, and requires that one of the research members be a member of the community (that is, a member of the minority health disparity population). *Id.* Clearly, the Challenged Directives do not prohibit or prevent NIH from furthering certain research that Plaintiffs falsely contend is "forbidden."

Plaintiffs may fear that the Challenged Directives violate certain penumbras emanating from various statutes, but the Challenged Directives violate no statute. *See Marinoff v. Dep't of Health, Ed. & Welfare*, 456 F. Supp. 1120, 1121 (S.D.N.Y. 1978) ("Though HEW has a general duty, imposed by 42 U.S.C. § 282(a)(1) (Supp.1975), to undertake cancer research, the agency has not been specifically directed to investigate the possible cancer-curing properties of particular substances."), *aff'd sub nom. Marinoff v. Dep't of Health, Educ. & Welfare*, 595 F.2d 1208 (2d Cir. 1979). Nor has Congress mandated that its broad directives must take any particular form, such as self-described Diversity, Equity, and Inclusion initiatives.

---

[5] Defendants will move the notice of award for this research project, along with other notices of award, into evidence on June 16, 2025. In the meantime, the relevant information is available at <https://reporter.nih.gov/search/bsWFTCHH8Umk_PmVap974A/project-details/11085268>.

The State Plaintiffs are also incorrect when they assert that NIH violated a statute when it chose to de-prioritize research into Covid-19. States Brief, Doc No. 126 at 26. Plaintiffs accurately point out that 42 USC § 285f-5(a) encourages the Secretary to "advance the discovery and preclinical development of medical products for priority virus families and other viral pathogens with a significant potential to cause a pandemic." States Brief, Doc No. 126 at 26 (citing 42 USC 285f-5(a)). But the Secretary chose to de-prioritize Covid-19 research because the pandemic caused by that virus had ended. NIH_GRANTS_003567. The statute does not require NIH to research past pandemics, and Plaintiffs have presented no evidence that Covid-19 is likely to cause another pandemic. More important, NIH's decision about what to research is committed to agency discretion. "Agency determinations as to whether scientific research into a matter within the agency's area of expertise should be undertaken or funded have previously been found within the permissible scope of agency discretion." *Marinoff*, 456 F. Supp. at 1122 (citing *Grassetti v. Weinberger*, 408 F. Supp. 142 (N.D. Cal. 1976)).

## IV.    Even if reviewed under the APA standard, NIH's priorities survive review.

NIH provided a reasoned explanation for its decision to terminate grants related to DEI programs.[6] Plaintiffs argue that NIH's explanation was conclusory. Not so. NIH did not merely assert in a conclusory fashion that DEI-related grants no longer effectuated agency priorities. To the contrary, NIH elaborated at length and supplied multiple reasons why such grants no longer effectuated agency priorities: such grants are "based on artificial and non-scientific categories, including amorphous equity objectives"; they "are antithetical to the scientific inquiry"; they "do

---

[6] State Plaintiffs focus their arguments on the termination of DEI-related grants. The analysis for grants related to gender identity and vaccine hesitancy is largely the same. *See* Defs. Brief, Staes Doc. 125 at 33–34. As explained in Defendants' Opening Brief, Plaintiffs do not have standing to challenge the termination of grants related to China, Covid-19, or climate change. *Id.* at 30.

11

nothing to expand our knowledge of living systems"; they "provide low returns on investment"; they "do not enhance health, lengthen life, or reduce illness"; and they "are often used to support unlawful discrimination . . . which harms the health of Americans." NIH_GRANTS_000035. The fact that these reasons applied to multiple grants does not make them any less salient.

Plaintiffs argue that NIH's reasons are unsubstantiated. But NIH's positions—that DEI programs are artificial and unscientific, are antithetical to scientific inquiry, and support unlawful discrimination, for example—reflect subjective policy judgments. Though Plaintiffs may disagree with these judgments, the new administration is entitled to enact its own political and policy preferences. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."); *see also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (noting that decisionmakers may weigh political considerations when making an agency action and that "[s]uch decisions are routinely informed by unstated considerations of politics").[7] Neither Plaintiffs nor courts may "substitute [their] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Plaintiffs also argue that NIH's explanation is required to acknowledge the change in policy and failed to do so. As an initial matter, where internal procedures or rules were never intended to bind an agency or limit its discretion, an agency has no obligation to explain a

---

[7] Contrary to Plaintiffs' suggestion, noting the change in administrations is not an improper post-hoc rationalization. The Challenged Directives themselves referenced the new administration to explain the changes. NIH_GRANTS_003821 (noting the decision to deprioritize DEI grants "is consistent with" though independent of "recent Executive Orders issued by the President"); *see also* NIH_GRANTS_000001 ("As the new Administration considers its plan for managing the federal policy and public communications processes, it is important the President's appointees and designees have the opportunity to review and approve . . . guidance documents.").

12

"departure" from its rules. *See Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 539 (D.C. Cir. 1988). The award of grants is discretionary, and the guidance reflected in the Strategic Plan was never intended to bind the agency. Regardless, NIH did clearly acknowledge the change in policy. *See, e.g.* NIH_GRANTS_003821 ("Therefore, it is the policy of NIH not to prioritize such research programs."). Moreover, an agency is not required to justify its policy change by reasons more substantial than those required to adopt a policy in the first instance. *F.C.C. v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 514 (2009) ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review.").

Finally, Plaintiffs' argument that NIH failed to consider reliance interests is incorrect. The Revised Notice of Award for terminated grants explicitly notes that funding is being withdrawn. *See, e.g.*, NIH_GRANTS_000106 ("[N]o additional funding will be awarded for this project, and all future years have been removed."). The Revised Notice of Award also notes that funds may be available "to support patient safety and animal welfare to support an orderly phaseout of the project," which is an accommodation that shows consideration of reliance interests. *Id.* Further reflecting consideration of reliance interests, the notice of termination explains that NIH considered whether corrective action was possible short of termination—which would salvage or at least mitigate the recipient's reliance interests—but that unfortunately "no corrective action is possible here." NIH_GRANTS_000068. NIH plainly considered and understood, as is obvious, that terminating the grants and denying the expected funds would have negative consequences for the grant recipients.

## V.      The Challenged Directives do not violate the Spending Clause.

No separation of powers issue arises here.[8] Plaintiffs are correct that the Executive Branch cannot unilaterally refuse to spend funds. *In re Aiken County*, 725 F.3d 255, 261 n. 1 (D.C. Cir. 2013), but NIH's actions do not contravene that rule. Plaintiffs, who bear the burden of proof on this point, cannot carry their burden because NIH is scheduling the meetings necessary to obligate all funds appropriated to it by Congress.[9] Since March 4, NIH has published over 150 notices of scheduled meetings in the Federal Register. *See id.* And it scheduled 201 more meetings from March 24 to May 31 than it did in the previous year. *See id.* Far from subverting Congress' intent by holding back appropriated funding, NIH is working overtime to review grant applications.

Finally, federal agencies routinely fail to spend all the funding appropriated to them by Congress. When this occurs, the funds are deemed "cancelled" and, after five years, they revert to the Treasury.[10] Indeed, "about 1.6 percent of total available budget authority government-wide was cancelled from fiscal year 2009 through fiscal year 2019, averaging $23.9 billion per

---

[8] State Plaintiffs' brief apparently raises both a separation-of-powers claim and a freestanding Spending Clause argument. States Brief, Doc. No. 126 at 39-40. But, besides the heading of that section, they make no distinct arguments as to each claim. *Id.*

[9] This is confirmed by searching the relevant date range through NIH's public calendar of peer review meetings: https://www.csr.nih.gov/RevPanelsAndDates/RevDates.aspx; *see also, e.g.*, 90 Fed. Reg. 11175; 90 Fed. Reg. 11324; 90 Fed. Reg. 11323; 90 Fed. Reg. 11422; 90 Fed. Reg. 12333; 90 Fed. Reg. 12325; 90 Fed. Reg. 13187; 90 Fed. Reg. 13182. 4; 90 Fed. Reg. 14267; 90 Fed. Reg. 13755; 90 Fed. Reg. 13175; 90 Fed. Reg. 14454; 90 Fed. Reg. 13376; 90 Fed. Reg. 15009; 90 Fed. Reg. 14143; 90 Fed. Reg. 13379; 90 Fed. Reg. 13604.

[10] GOVERNMENT ACCOUNTABILITY OFFICE, FEDERAL BUDGET: A FEW AGENCIES AND PROGRAM-SPECIFIC FACTORS EXPLAIN MOST UNUSED FUNDS 4 (2021) (https://www.gao.gov/assets/gao-21-432.pdf).

14

year."[11] These cancellations arise in the normal course of government operations from such factors as unpredictable program costs and overestimating actual program needs.[12] Just so here. As discussed in Defendants' Opening Brief, NIH has the authority to administer its grant programs, including the authority to terminate grants when they no longer align with agency policy. Defs. Brief, States Doc. No. 125 at 28-29. When, in the normal course of government operations, NIH is unable to obligate available funds to appropriate research projects, that could possibly result in a reversion of funds to the Treasury, despite the agency's good faith efforts. But every time some surplus funds are left unspent does not spur a constitutional violation. If the opposite were true, government would cease to function.

## VI. Plaintiffs are not entitled to a permanent injunction.

As demonstrated in Defendants' Opening Brief, vacatur and remand is the appropriate APA remedy. Moreover, Plaintiffs have not made a sufficient evidentiary showing to support their requested permanent injunction.[13] Among other requirements, a permanent injunction may only issue upon a showing that the movant will suffer "irreparable harm in the absence of relief."

---

[11] GOVERNMENT ACCOUNTABILITY OFFICE, FEDERAL BUDGET: A FEW AGENCIES AND PROGRAM-SPECIFIC FACTORS EXPLAIN MOST UNUSED FUNDS 5 (2021) (https://www.gao.gov/assets/gao-21-432.pdf).

[12] GOVERNMENT ACCOUNTABILITY OFFICE, FEDERAL BUDGET: A FEW AGENCIES AND PROGRAM-SPECIFIC FACTORS EXPLAIN MOST UNUSED FUNDS 11, 13 (2021) (https://www.gao.gov/assets/gao-21-432.pdf).

[13] Plaintiffs, without briefing the issue, also request an order enjoining NIH from "deeming, classifying, or otherwise characterizing any funding for awards subject to Priorities-Based Terminations as unused, expired, 'unobligated' or 'deobligated' funds such that they may revert to the U.S. Treasury at the end of the period of availability for those funds and/or the end of the fiscal year, as applicable." States' Proposed Order, Doc. No. 127 at 3-4. To the extent Plaintiffs are requesting that the Court order NIH to keep funds available for obligation to Plaintiffs beyond their appropriations period, such relief could run afoul of the Anti-Deficiency Act. Given the lack of briefing on this issue, the Court should not include this language in any order. 31 U.S. Code § 1341.

*Axia Net-Media Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 6 (1st Cir. 2018). Here, "[p]laintiffs have not proffered any admissible evidence tending to show injury caused by defendants' actions that could not be remedied monetarily in the future." *Chiara v. Dizoglio*, 59 F. Supp. 2d 193, 198 (D. Mass. 1999) (emphasis added); *Big Top USA, Inc. v. Wittern Grp.*, 998 F. Supp. 30, 54 (D. Mass. 1998). Plaintiffs point to various declarations submitted throughout these proceedings. *See, e.g.*, APHA Brief, Doc. No. 103-2. But on June 16, Plaintiffs do not intend to introduce the proffered declarations through testimony. Without evidence to sustain a permanent injunction, a permanent injunction cannot issue.[14]

Nor does the upcoming end of the fiscal year transmute Plaintiffs' monetary injury into an irreparable harm. "Upon expiration of a fixed appropriation, the obligated and unobligated balances retain their fiscal year identity in an 'expired account' for that appropriation for an additional five years. General Accounting Office, Principles of Federal Appropriations Law 5–72 (3d ed. 2004); 31 U.S.C. § 1553(a). The funds in this expired account "remain available for recording, adjusting, and liquidating obligations properly chargeable to that account." 31 U.S.C. § 1553(a). Such "obligations properly chargeable to that account" could include court-ordered disbursals. Availability of Expired Funds for Non-monetary Judicial Awards, 70 Comp. Gen 225, 229 (1991).

## CONCLUSION

Defendants respectfully request the Court deny Plaintiffs' requested relief.

Respectfully submitted,

BRETT A. SHUMATE

---

[14] The declarations offered are also not current, and the record is devoid of any information concerning the status of each underlying research project. It is unknown whether the grant projects are still running, paused but remain viable, or have been shuttered. Indeed, it is pure conjecture to assume that restoring their funding will revive any project.

<div style="margin-left: 40%;">

Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

</div>

Dated: June 13, 2025        */s/ Thomas W. Ports, Jr.*

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1105
Email: thomas.ports@usdoj.gov

*/s/ Anuj Khetarpal*
ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
Anuj.Khetarpal@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 13, 2025        */s/ Thomas W. Ports, Jr.*
Thomas W. Ports, Jr.

*/s/ Anuj Khetarpal*
Anuj Khetarpal