**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | |
| *Plaintiffs,* | |
| v. | No. 1:25-cv-10814-WGY |
| ROBERT F. KENNEDY, JR., *et al.*, | |
| *Defendants.* | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
OPENING BRIEF ON FIRST-PHASE ISSUES**

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 1

    I.    The Challenged Directives are unlawful and should be set aside. ................................... 1

        A.  The legality of the Challenged Directives is properly before the Court..................... 1

            1.  Adoption of the directives constitutes "final agency action" under the APA. ......................................................................................................... 1

            2.  Defendants' decision to rescind NOFOs is justiciable. ........................................ 3

            3.  The Court should not ignore the Lauer Memoranda and Notice Pause Directive. ...................................................................................................... 4

        B.  The Challenged Directives violate the APA. ......................................................... 4

            1.  Defendants cannot account for the lack of reasoning in the record. .................... 4

            2.  Defendants fail to reconcile the directives with statutory commands.................. 6

            3.  Defendants misread and misapply 2 C.F.R. §200.340(a)(4). .............................. 7

        C.  The Challenged Directives are unconstitutional......................................................... 9

        D.  The Challenged Directives are *ultra vires*. .............................................................. 10

    II.  Defendants' *en masse* terminations are unlawful and should be set aside. .................... 10

    III.  Injunctive relief is warranted. ....................................................................................... 12

Conclusion ........................................................................................................................... 12

## TABLE OF AUTHORITIES

**Cases:**

*AAUP v. Rubio*,
No. 25-cv-10685, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ............................................. 2

*Aiken County, In re*,
725 F.3d 225, 261 n.1 (D.C. Cir. 2013) ............................................................................... 10

*Am. Med. Ass'n v. Reno*,
57 F.3d 1129 (D.C. Cir. 1995) ............................................................................................... 3

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ............................................................................................. 5

*APHA v. Nat'l Insts. of Health*,
No. 25-cv-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025) ................................... 9

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................................................................... 2

*Cal. Dep't of Water Res. v. FERC*,
361 F.3d 517 (9th Cir. 2004) ............................................................................................... 11

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................................................. 10

*Clifton Power Corp. v. FERC*,
294 F.3d 108 (D.C. Cir. 2002) ............................................................................................. 11

*Dep't of Homeland Security v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) ...................................................................................................... 5, 6

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................................... 5

*Leedom v. Kyne*,
358 U.S. 184 (1958) ............................................................................................................. 10

*Massachusetts v. Kennedy*,
No. 25-cv-10814-WGY, 2025 WL 1371785 (D. Mass. May 12, 2025) ................................... 2

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................................. 5

*Pol'y & Rsch., LLC v. HHS*,
313 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................................... 3, 8

*R.I. Dep't of Envtl. Mgmt. v. United States*,
304 F.3d 31 (1st Cir. 2002) .............................................................................................. 1, 10

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) ................................................................................................... 3

*United States v. Lahey Clinic Hosp.*,
 399 F.3d 1 (1st Cir. 2005) ................................................................ 9

*Vanda Pharms. Inc. v. FDA*,
 No. 23-cv-2812-CRC, 2024 WL 4133623 (D.D.C. Sept. 10, 2024)........................ 11

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
 586 U.S. 9 (2018) ................................................................ 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952) ................................................................ 10

**Statutes:**

Administrative Procedure Act,
 5 U.S.C.:

 §551(4) ................................................................ 2

 §551(13) ................................................................ 2

 §701(a)(2) ................................................................ 3

 §704 ................................................................ 2

Public Health Service Act,
 42 U.S.C.:

 §283d ................................................................ 6

 §283p ................................................................ 6

 §285f-5(a) ................................................................ 6

**Regulations:**

2 C.F.R.:

 §1.105(b) ................................................................ 8

 §200.211(c)(1)(v) ................................................................ 8

 §200.340 ................................................................ 7, 8, 12

 §200.340(a)(4) ................................................................ 7, 8

 §200.340(b) ................................................................ 8

45 C.F.R. §75.210(b) ................................................................ 8

**Online Sources:**

*Research General Terms and Conditions* (Apr. 8, 2021),
 https://https://bit.ly/NIH-Terms ................................................................ 8

# GLOSSARY

APA....................................................Administrative Procedure Act

AR.....................................................Administrative Record

Award Revision Guidance ..................Email from M. Bulls to Chief GMOs re: Award Revision Guidance etc. (March 13, 2025) [AR 1957–1968]

Challenged Directives..........................Award Revision Guidance, Secretarial Directive, Lauer Memorandum, Supplemental Lauer Memorandum, Memoli Directive, Priorities Directive, and Revised Priorities Directives, collectively

DEI.....................................................diversity, equity, and inclusion

GPS ....................................................NIH Grants Policy Statement

HHS....................................................Department of Health and Human Services

Lauer Memorandum............................Mem. from M. Lauer to IC CGMOs re: NIH Review of Agency Priorities Based on the New Administration's Goals (Feb. 12, 2025) [AR 9]

Memoli Directive ................................Directive on NIH Priorities re: Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards (Feb. 21, 2025) [AR 1702–1703, 2930–2931, 3821–3822]

NIH ....................................................National Institutes of Health

NOFO.................................................notice of funding opportunity

OMB ..................................................Office of Management and Budget

PHSA .................................................Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944) (codified, as amended, at 42 U.S.C. §201 *et seq.*)

Priorities Directive .............................Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025 [AR 2135–2172, 3453–3461]

Revised Priorities Directives...............Revised versions of the Priorities Directive dated March 25 [AR 3216–3230, 3351–3379, 3685–3700], May 7 [AR 3547–3581], May 15 [AR 3516–3546], and undated [AR 3231–3350]

Secretarial Directive...........................Secretarial Directive on DEI-Related Funding (Feb. 10, 2025) [AR 4–5]

Strategic Plan .....................................NIH-Wide Strategic Plan, Fiscal Years 2021–2025 (2021), https://bit.ly/NIHSP2021

Supplemental Lauer Memorandum.....Mem. from M. Lauer to IC CGMOs re: Supplemental Guidance to Memo (Feb. 13, 2025) [AR 16]

iv

## INTRODUCTION

Defendants identify no reason why this Court should uphold their illegal blacklisting of certain research topics, or their mass termination of grants related to those topics. The certified administrative record belies defendants' various threshold arguments, because it leaves no doubt that defendants have conclusively banned research on seven discrete subjects and have terminated plaintiffs' grants pursuant to those bans. Defendants' merits arguments are likewise unavailing: the Challenged Directives and resulting terminations are not supported by reasoned decisionmaking, and they conflict with applicable regulations, statutes, and constitutional guarantees. The Court should set aside the Challenged Directives and vacate the decisions implementing them.

## ARGUMENT

**I.    The Challenged Directives are unlawful and should be set aside.**

**A.    The legality of the Challenged Directives is properly before the Court.**

To prevent the Court from reaching the merits, defendants argue (at 9–17) that some or all of the Challenged Directives are not justiciable. Defendants are incorrect.

**1.    Adoption of the directives constitutes "final agency action" under the APA.**

Defendants begin by arguing (at 9) that the directives are not "final agency actions," attempting to characterize them instead as "interlocutory" measures that "merely ordered a review." [1] That argument distorts both the directives and plaintiffs' claims. Plaintiffs are not challenging NIH's initiation of a review: they are challenging NIH's decision to categorically ban certain research topics. That decision originated in the directives, not in the subsequent

---

[1] Contrary to defendants' suggestion, this issue is not jurisdictional. *See R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002) (explaining that the alleged nonfinality of an agency action does not "implicate[] the subject-matter jurisdiction of the court").

terminations that carried them out.

The directives themselves make that clear: on their face, the directives represent the consummation of the agency's decision to place seven discrete topics off-limits. *See* Pls.' Mem. 5–15. The Memoli Directive, for example, declares that "it is the policy of NIH not to prioritize [certain] research programs" and "directs[] NIH personnel" to act accordingly. AR 1702–1703. That is a textbook "agency action." *See* 5 U.S.C. §551(13) (an "agency action" includes a "rule"); *id.* §551(4) (a "rule" includes "statement[s] of general . . . applicability and future effect" that "implement, interpret, or prescribe law or policy"). In this way, the Challenged Directives are like the unwritten policy in *AAUP v. Rubio*, No. 25-cv-10685-WGY, 2025 WL 1235084, at *21 (D. Mass. Apr. 29, 2025), or the memorandum in *Biden v. Texas*, 597 U.S. 785, 793, 808–810 (2022); both were reviewable "final" actions even though, like the Challenged Directives, they announced general policies to be applied later in specific cases.[2]

In the end, defendants' own conduct forecloses their finality argument. As plaintiffs have explained, defendants would not be canceling grants *en masse* if their directives were nonfinal. The Court previously found that reasoning "persuasive[]," *Massachusetts v. Kennedy*, No. 25-cv-10814-WGY, 2025 WL 1371785, at *10 (D. Mass. May 12, 2025), and defendants offer no rebuttal. Defendants also concede (at 12) that the grant terminations *themselves* are final agency actions. That, too, dooms their finality argument: as part of its review of the terminations, the Court clearly has the authority to review the overarching agency policies that compelled them. *See* 5 U.S.C. §704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

---

[2] Defendants ignore *AAUP* entirely, and they offer no material basis to distinguish *Texas*. Instead, they cite cases about the initiation of agency reviews, *see* Defs.' Br. 9–12, but those cases are inapposite for the reasons discussed above.

### 2.    Defendants' decision to rescind NOFOs is justiciable.

Defendants next argue (at 12–13) that their decision to rescind various notices of funding opportunity (NOFOs) is not a reviewable final agency action. As the record makes clear, however, defendants' decision to "unpublish" these NOFOs is merely an outgrowth of the Challenged Directives[3]—and so is reviewable as part of the Court's review of the directives.

Defendants' related contention (at 13–14) that 5 U.S.C. §701(a)(2) makes rescission of NOFOs unreviewable because funding issues are "committed to agency discretion" fails for largely the same reasons: plaintiffs seek review not of discretionary funding decisions, but of the unlawful agency directives that preceded any funding determinations. Statutes and regulations offer "meaningful standard[s] against which to judge" those directives, so this is not one of the "rare circumstances" where §701(a)(2) bars review. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 n. 5 (1st Cir. 2020) (noting that although individual hiring decisions were arguably discretionary, an "agency-wide policy" governing those decisions was not); *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134–1135 (D.C. Cir. 1995) (explaining that discretion over resource allocation does not bar review of whether an agency gave a reasoned explanation and complied with statutory requirements); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (discussing HHS regulations that "circumscribe [the] agency['s] discretion to allocate resources").

Defendants also claim (at 14–15) that plaintiffs have not identified any harm they suffered from the rescission of NOFOs. But defendants fail to look beyond the allegations in the complaint, inexplicably ignoring the substantial evidence that documents plaintiffs' injuries from NOFO

---

[3] The record repeatedly refers to "NOFO[s] that ha[ve] been unpublished due to [their] focus on activities that are no longer an NIH/HHS priority/authority," AR 3216, 3231, 3261, 3291, 3321, 3351, 3517, 3548, 3686, along with numerous other references to "unpublished" NOFOs, AR 2136, 2143, 2152, 2159, 2166, 3255, 3258, 3285, 3288, 3315, 3345, 3348, 3454, 3516, 3541, 3544, 3547, 3572, 3575.

rescissions.  *See, e.g.*, ECF No. 77-12, ¶56; ECF No. 77-19, ¶44; ECF No. 77-27, ¶45.[4]

> ### 3.    The Court should not ignore the Lauer Memoranda and Notice Pause Directive.

Defendants also argue (at 15–17) that the court should ignore three specific directives on the theory that they caused no harm or have since been rescinded.  But whatever their *current* status, the two Lauer Memoranda remained in full force when plaintiffs' first grants were canceled on February 28, and they are part and parcel of the raft of directives that defendants have issued since January.  AR 9, 16, 2469; Pls.' Mem. 5–15.  All three of these directives, moreover, are relevant to the delay claims that the Court will consider in the second phase of the litigation.  *See* Pls.' Mem. 6 n. 2 (explaining that plaintiffs will address the Notice Pause Directive in phase two).

> ### B.    The Challenged Directives violate the APA.

For the reasons above, the Court should proceed to the merits of the Challenged Directives' legality.  On the merits, defendants fail to overcome the directives' many infirmities.

> ### 1.    Defendants cannot account for the lack of reasoning in the record.

Plaintiffs identified four distinct ways in which the adoption of the Challenged Directives was arbitrary and capricious: they rest on conclusory statements; they fail to address changes in the NIH's position; they ignore NIH's congressionally mandated Strategic Plan; and they disregard grantees' reliance interests.  Pls.' Mem. 18–24.  Defendants' brief fails to show otherwise.

On the first issue, defendants repeatedly assert (at 23–27) that their decisions were "reasoned."  But to support that assertion, defendants just point back to the same scripted language that permeates the directives.  *See* Defs.' Br. 23 (block-quoting the now-familiar "DEI" script).  The problem is that there is nothing *behind* that rote language—no explanations, findings, analysis of evidence, or other indicia of reasoned decisionmaking.  Indeed, after months of litigation, and

---

[4] The delisting of NOFOs is also relevant to second-phase delay issues.

despite repeated requests from the Court, defendants have not even defined the term "DEI."  As defendants admit (at 23), a court cannot affirm an agency's decision unless "the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–514 (2009). Here, however, it is anyone's guess how defendants got from A to B.  The APA requires more.  *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning.*" (quotation marks omitted)).

With respect to the second issue, defendants contend (at 24) that a presidential transition is "a perfectly reasonable basis" for an agency to change its policies.  But even if that is sometimes true,[5] an agency's rationale must still appear *in the record*: the agency must acknowledge that it is changing positions, identify the transition as the reason for the change, and grapple with the implications of its new stance.  *Fox Television*, 556 U.S. at 515.  Defendants did none of that here, and their attorneys' "*post hoc* rationalizations" cannot fill the gap in the record.  *Dep't of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (*DHS*).

On the third issue, defendants argue (at 26) that NIH's congressionally mandated Strategic Plan is merely "guidance" and not a "straight jacket."  But they do not dispute that the agency failed to even *consider* the Plan in adopting its new policies (which conflict with the Plan).  *See* Pls.' Mem. 22.  That complete failure to consider an "important aspect of the problem" is a quintessential APA error.  Pls.' Mem. 18 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As for the fourth issue—plaintiffs' reliance interests—defendants insist (at 24) that "NIH necessarily understood that it was terminating funding on which the grantee relied" and decided

---

[5] As plaintiffs previously noted, defendants' only support for this view comes from a portion of an opinion in which Chief Justice Rehnquist *dissented* from the Supreme Court's holding in *State Farm*.  *See* ECF No. 101, at 12 n. 12.

those interests "were outweighed." But defendants offer no citation to the record to support that claim, because the record is devoid of any discussion of reliance. Again, the APA does not allow defendants to justify the agency's decision through attorney argument alone—the agency's reasoning must appear in the record. *DHS*, 140 S. Ct. at 1909. Here, the record supports only one conclusion: defendants flouted the rule that, in changing course, agencies must consider legitimate reliance interests. *See id.* at 1913 ("It would be arbitrary and capricious to ignore such matters.").

### 2. Defendants fail to reconcile the directives with statutory commands.

As plaintiffs explained, the Challenged Directives are also contrary to statute (and therefore violate the APA) because they purport to restrict research on subjects that Congress has instructed NIH to support, and because they circumvent NIH's statutory strategic-planning process.

Defendants do not address provisions in the PHSA that prioritize the health of sexual and gender minority populations, research on viral pandemics,[6] and vaccine development. *Compare* Pls.' Mem. 26 (citing 42 U.S.C. §§283d, 283p, 285f-5(a)), *with* Defs.' Br. 23, 27–28. As for the many statutes that conflict with defendants' blacklisting of "DEI" research, *see* Pls.' Mem. 25 (collecting statutes), defendants argue (at 25–26) that they have adhered to congressional directives because they have not terminated every single grant pertaining to minority health.[7] But the fact that defendants have not engaged in *more* unlawful conduct does not justify the unlawful actions they *have* taken. For the reasons discussed, *see* Pls.' Mem. 25, defendants' decision to blacklist

---

[6] Defendants assert (at 23) that none of plaintiffs' grants were terminated on the ground that the studies involved COVID research. The administrative record shows otherwise. *See* AR 747, 1299, 4256.

[7] To support this claim, defendants rely (at 25) on Exhibit A to their opposition to plaintiffs' preliminary-injunction motion, ECF No. 95-1. But at least some projects on that supposed list of "minority-related health projects that were not terminated," *id.* at 1 (title case omitted), *have*, in fact, been terminated. *Compare id.* (listing 5R01MD018459 and 5R44MD017106 as non-terminated projects), *with* AR 2400, 2404 (terminating the first project, entitled "Elucidating the High and Heterogeneous Risk of Gestational Diabetes Among Asian Americans," effective May 5), *and* NIH RePORTER, *Project Details*, https://reporter.nih.gov/search/3OVGMdgTBkymsFKH0ti8eg/project-details/11124192 (identifying the second project, entitled "Reducing Hypertension Among African American Men," as terminated effective May 5).

virtually all research with perceived equity aims is inconsistent with Congress's judgment.  That is true even if defendants have not canceled *every last grant* with a "DEI" dimension.

Turning to the Strategic Plan, defendants argue (at 26) that, in requiring NIH to formulate such a plan every six years, the PHSA does not "forbid[] NIH from changing its priorities" outside of that process.  But defendants are attacking a strawman.  Even if NIH has some discretion to modify the plan from time to time, it cannot toss entire portions of the plan out the window on a whim.  Yet that is what defendants have done—effectively nullifying Congress's carefully crafted strategic-planning statute.

### 3.    Defendants misread and misapply 2 C.F.R. §200.340(a)(4).

The Challenged Directives—and the terminations that flow from them—also violate the APA because of their erroneous invocation of 2 C.F.R. §200.340(a)(4) (or its predecessor, §200.340(a)(2), as the case may be, *see* Pls.' Mem. 27 n. 11).  As plaintiffs have explained, that nonbinding provision does not allow terminations based on *sua sponte* changes in agency priorities: the most natural reading of the provision, in light of the provision's history and context, is that an agency can terminate a grant if the recipient can no longer effectuate priorities in existence at the time the agency awarded the grant.  *See* Pls.' Mem. 29–30.  Defendants respond (at 21) that the text of the provision does not *expressly preclude* the agency from terminating grants based on unilateral changes in its priorities.  But defendants are advancing a decidedly implausible interpretation—one that turns §200.340 into the classic elephant in a mousehole.  *See* Pls.' Mem. 29.  If OMB had wanted to give agencies unchecked authority to cancel any grant at any time with no prior notice—based solely on the agency's amorphous identification of new "priorities"—it surely would not have hidden that sweeping power in the fourth subclause of an obscure provision in a chapter full of nonbinding "guidance."

Regardless, the precise meaning of §200.340(a)(4) is irrelevant because that provision does

not govern NIH grants.  Defendants do not dispute that §200.340(a)(4), by its terms, is "guidance, not regulation."  2 C.F.R. §1.105(b); *see* Pls.' Mem. 27–28.  Nor do they dispute that HHS adopted its own, HHS-specific regulation that rejected §200.340's "priorities" clause.  *Id.*  Still, defendants argue (at 19–21) that §200.340 applies because NIH incorporated it into grant agreements by way of the NIH Grants Policy Statement (GPS).  *See* AR 3825–4251.  But plaintiffs are not bringing contract claims; the question is whether the Challenged Directives comply with the agency's controlling regulation.  And the answer to that question does not turn—nor could it turn—on the terms and conditions of grant awards.  *Pol'y & Rsch.*, 313 F. Supp. 3d at 82 (holding that the GPS "does not, and cannot, trump the agency's formal regulations").

Even if the Court were to indulge defendants' efforts to wade into the terms and conditions of plaintiffs' grant awards, their arguments still fail.  Defendants observe (at 20) that the notices of award that they issued to plaintiffs cross-reference the GPS, which in turn cross-references §200.340.  But a federal agency must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. §200.340(b); *see id.* §200.211(c)(1)(v).  The lone cross-reference to §200.340 in the GPS is embedded in a section on "Remedies for *Noncompliance*," about halfway through the 400-page tome.  AR 4078 (title style omitted, italics added).  That hardly provides unambiguous notice that NIH can terminate grants at will for "changed priorities."[8]  Indeed, a different section of the GPS suggests the exact opposite, incorporating by reference an NIH policy that says "NIH *does not* adopt 2 CFR § 200.240(a)(2)."  *Research General Terms and Conditions* at 2 (Apr. 8, 2021) (emphasis added), https://bit.ly/NIH-Terms; *see* AR 3925 (cross-referencing the April 2021 document).  Defendants argue (at 22–23)

---

[8] Defendants argue (at 22) that 45 C.F.R. §75.210(b) allows incorporation of certain terms and conditions by reference. But that provision does not trump the more specific requirement of clear and unambiguous notice of termination rules.

that the 2024 GPS "supersede[s] the statement from the 2021 document."  That makes no sense: the GPS *cross-references* the 2021 document.  A GPS that points in two different directions does not provide clear and unambiguous notice.

### C.    The Challenged Directives are unconstitutional.

In addition to violating the APA, the Challenged Directives also unconstitutionally usurp two of Congress's core powers: the power to legislate and the power to appropriate.  *See* Pls.' Mem. 30–31.  Defendants ask the Court (at 28) to reject plaintiffs' constitutional claims "for the same reasons" it dismissed separation-of-powers arguments in the *APHA* case, but the plaintiff states' claims are not the same as those of the *APHA* plaintiffs.  There, the Court held that the plaintiffs' separation-of-powers claim was "the stuff of APA litigation" because it involved, at its core, defendants' compliance "with statutory and regulatory requirements."  *APHA v. Nat'l Insts. of Health*, No. 25-cv-10787-WGY, 2025 WL 1548611, at *15 (D. Mass. May 30, 2025).  Here, by contrast, plaintiffs challenge defendants' "pattern and policy of systemic delays and terminations," which effectively impound appropriated funds in violation of appropriations statutes, the Impoundment Control Act of 1974, and, ultimately, the Constitution.  *See United States v. Lahey Clinic Hosp.*, 399 F.3d 1, 14 (1st Cir. 2005) (recognizing the separation-of-powers problems that arise when an agency, "by its actions," effectively "repeal[s] an act of Congress").  Plaintiffs' APA claims cannot fully redress that de facto impoundment of duly appropriated funds.

Defendants' observation (at 29) that the HHS Secretary and NIH Director have "overall" responsibility for their departments—and that the Executive "has implicit authority" to terminate grants in some circumstances—misses the point.  Defendants have not shown that they intend to put the funds that they have clawed back from terminated projects to permissible use before the end of the fiscal year.  That is a constitutional problem: the Executive does not possess the "unilateral authority to refuse to spend" vast swaths of funding.  *City & County of San Francisco*

*v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (citing *In re Aiken County*, 725 F.3d 225, 261 n.1 (D.C. Cir. 2013)).  Nor does any statute supply that authority, *see id.* at 1235, meaning the Executive's power here is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–638 (1952) (Jackson, J., concurring).  On this ground, too, the Court should award relief.

> **D.    The Challenged Directives are *ultra vires*.**

Plaintiffs' *ultra vires* claims are not precluded by their APA claims, as defendants suggest (at 29–30).  Even after the APA's passage, "some residuum of power remains with the district court to review agency action that is *ultra vires*." *R.I. Dep't of Env't Mgmt. v United States*, 304 F.3d 31, 42 (1st Cir. 2002).  So, for example, even if the Court were to agree with defendants that some challenged actions were nonfinal, *but see supra*, pp. 1–2, it would still have the authority to set aside defendants' *ultra vires* actions.  *See R.I. Dep't of Env't Mgmt.*, 304 F.3d at 42–43 (explaining that *ultra vires* review of nonfinal actions is permissible where a plaintiff lacks "a meaningful and adequate means of vindicating its rights" and there is no clear evidence that Congress "intended to preclude review of the agency's particular determination").  Because plaintiffs' claim is not precluded by the APA, *see id.*, and because it provides a distinct avenue for injunctive relief, *see Leedom v. Kyne*, 358 U.S. 184, 188–189, 191 (1958), the Court should entertain it.

> **II.    Defendants' *en masse* terminations are unlawful and should be set aside.**

Defendants have terminated[9] hundreds of grants to plaintiffs' institutions based solely on the projects' perceived association with one of the seven blacklisted topics identified in the Challenged Directives.  Because these directives are illegal, so are the terminations they prompted.

---

[9] In this context, "termination" includes failure to issue an annual renewal for a multi-year project that, but for its perceived association with a blacklisted topic, met the preconditions for renewal.  *See* Am. Compl. (ECF No. 75) ¶71 (explaining "non-competing" renewals); AR 1703 (Memoli Directive describing grants being "terminated, paused, and/or *not continued or renewed*" based on their association with a blacklisted topic (emphasis added)); ECF No. 118-1, ¶3 (certifying that defendants produced the complete record for the "non-renewals that plaintiffs challenge in this case").

Focusing on a subset of terminations that plaintiffs identified in their May 13 spreadsheet,[10] defendants argue (at 18) that 44 of these entries are not properly before the Court because they are currently the subject of an administrative appeal. As just discussed, however, plaintiffs are challenging grant terminations as an outgrowth of the Challenged Directives. The directives are properly before the Court, and appropriate relief includes vacatur of all actions that effectuate the directives, regardless of whether a subset of those actions have been administratively appealed. A contrary result—*i.e.*, parceling out a minority of grants for which an administrative appeal was filed—does nothing to advance the purpose behind the non-finality rule that defendants invoke, which is that "a favorable decision from the agency might yet obviate the need for review by the court." *Clifton Power Corp. v. FERC*, 294 F.3d 108, 111–112 (D.C. Cir. 2002). The appealed grant terminations will not involve the legality of the Challenged Directives that are currently before the Court, such that there is no possibility of any "waste [of] judicial resources." Defs.' Br. 18; *see Cal. Dep't of Water Res. v. FERC*, 361 F.3d 517, 520 (9th Cir. 2004) ("[T]he fact that one part of an agency order remains pending before the agency does not deprive this court of jurisdiction to review a discrete issue that has been definitively resolved by the agency."); *Vanda Pharms. Inc. v. FDA*, No. 23-cv-2812-CRC, 2024 WL 4133623, at *7 (D.D.C. Sept. 10, 2024) ("[C]ourts have often looked beyond labels and focused on whether the ongoing agency action raises the same issues that are currently before the court.").[11]

Defendants also argue (at 17–19) that certain previously identified grants either (1) were

---

[10] At the Court's request, plaintiffs submitted a demonstrative identifying, to the best of their ability, grants that had been terminated pursuant to the Challenged Directives. As discussed at the June 12 pretrial conference, plaintiffs will be providing the Court with an updated version of that spreadsheet today.

[11] The "Frequently Asked Questions" attached to the Priorities Directive seem to confirm that administrative appeals do not provide a vehicle for challenging the agency's newfound priorities. *See* AR 3573 ("When an [institute, center, or office] or the [Office of the NIH Director] determines that an award no longer aligns with agency priorities, the termination is made in accordance with 2 CFR 200.340(a)(4). This is not a termination for material failure to comply with the terms and conditions of award and is not appealable.").

not actually terminated or (2) are not grants at all.  By and large, defendants are incorrect.  For example, of the 90 grants that defendants say were not terminated (*see* ECF No. 131-3), most were in fact terminated through nonrenewal—*i.e.*, they were up for non-competing renewal on or before a date certain but were not renewed despite meeting all the preconditions.  Plaintiffs are submitting a table as Appendix A to this brief that provides an individualized response to each of the grants that defendants identify in ECF No. 131-3, -4, and -5.

Regardless, even if defendants' objections about the nonfinality of administratively-appealed grants were correct, and even if their quibbles with plaintiffs' spreadsheet were 100% accurate, that still leaves hundreds of terminations that, as all parties agree, are properly before the Court.  The Court should review those terminations—and the directives that prompted them.

## III.    Injunctive relief is warranted.

If the Court finds for plaintiffs on the merits, they are entitled to the full range of APA, injunctive, and declaratory remedies.  *See* Pls.' Mem. 33–35.  Defendants counter (at 30) that an injunction is an "extraordinary" remedy available only in "rare circumstances."  But these *are* rare circumstances: defendants' disruption of NIH grants over the past few months has no historical precedent or modern comparator.  Plaintiffs understand from the pretrial conference that the June 16 hearing will not consider issues relating to a permanent injunction, which will instead be deferred to a later stage.  Plaintiffs stand ready to prove their entitlement to that relief at the appropriate time.

## CONCLUSION

The Court should find for plaintiffs on the merits of all claims that are ripe for decision at the June 16 hearing and should promptly vacate the Challenged Directives and resulting project terminations and enter a declaration as to the meaning of §200.340.

June 12, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

 /s/ Gerard J. Cedrone
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Allyson Slater (BBO No. 704545)
  *Director, Reproductive Justice Unit*
Rachel M. Brown (BBO No. 667369)
Vanessa A. Arslanian (BBO No. 688099)
Phoebe M. Lockhart (BBO No. 709411)
Chris Pappavaselio (BBO No. 713519)
  *Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
  *Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

 /s/ James C. Luh
Michael Drezner*
James C. Luh*
  *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
  *Attorney General of California*

 /s/ Emilio Varanini
Neli Palma
  *Senior Assistant Attorney General*
Emilio Varanini*
Kathleen Boergers*
  *Supervising Deputy Attorneys General*
Nimrod Pitsker Elias*
Daniel D. Ambar*
Ketakee R. Kane*
Sophia TonNu*
Hilary Chan*
  *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for the State of California*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

 /s/ Andrew Hughes
Andrew Hughes*
Tyler Roberts*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for the State of Washington*

**KRISTIN K. MAYES**
  *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*


**KATHLEEN JENNINGS**
  *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**KEITH ELLISON**
  *Attorney General of Minnesota*

 /s/ *Pete Farrell*
Peter J. Farrell*
  *Deputy Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
peter.farrell@ag.state.mn.us

*Counsel for the State of Minnesota*

**PHILIP J. WEISER**
  *Attorney General of Colorado*

 /s/ *Lauren Peach*
Shannon Stevenson*
  *Solicitor General*
Lauren Peach*
  *First Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
lauren.peach@coag.gov

*Counsel for the State of Colorado*


**ANNE E. LOPEZ**
  *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON D. FORD**
  *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

14

**MATTHEW J. PLATKIN**
  *Attorney General of New Jersey*

 /s/ *Nancy Trasande*
Nancy Trasande*
Bryce Hurst*
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 954-2368
nancy.trasande@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
  *Attorney General of New York*

 /s/ *Rabia Muqaddam*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

* admitted *pro hac vice*

**RAÚL TORREZ**
  *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete*
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
  *Attorney General of Oregon*

 /s/ *Christina L. Beatty-Walters*
Christina L. Beatty-Walters*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
tina.beattywalters@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
  *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl*
  *Assistant Attorney General*
17 West Main Street
P.O. Box 7857
Madison, WI 53707
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

15