```
 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                                   No. 1:25-cv-10814-WGY

 4
     COMMONWEALTH OF MASSACHUSETTS, et al,
 5              Plaintiffs
     vs.
 6
     ROBERT F. KENNEDY, JR., et al,
 7              Defendants

 8
                                     No. 1:25-cv-10787-WGY
 9
     AMERICAN PUBLIC HEALTH ASSOCIATION, et al,
10              Plaintiffs
     vs.
11
     NATIONAL INSTITUTES OF HEALTH, et al,
12              Defendants

13
                         * * * * * * * *
14
                     For Hearing Before:
15                  Judge William G. Young

16
                     Bench Trial, Phase 1
17                        (Closings)

18
                     United States District Court
19                   District of Massachusetts (Boston.)
                     One Courthouse Way
20                   Boston, Massachusetts 02210
                     Monday, June 16, 2025
21

22                       * * * * * * *

23            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
24                United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
25                      rhr3tubas@aol.com
```

```
 1                    A P P E A R A N C E S

 2

 3   GERARD J. CEDRONE, ESQ.
     KATHERINE B. DIRKS, ESQ.
 4   PHOEBE LOCKHART, ESQ.
        Massachusetts Attorney General's Office
 5      One Ashburton Place, 20th Floor
        Boston, MA 02108
 6      (617) 963-2282
        E-mail: Gerard.cedrone@mass.gov
 7      For the Commonwealth of Massachusetts plaintiffs
     and
 8   OLGA AKSELROD, ESQ.
     JESSIE J. ROSSMAN, ESQ.
 9   RACHEL ANNE MEEROPOL, ESQ.
        American Civil Liberties Union Foundation
10      125 Broad Street
        New York, NY 10004
11      (212) 549-2659
        Email: Oakselrod@aclu.org
12   and
     KENNETH PARRENO, ESQ.
13      Protect Democracy Project
        15 Main Street, Suite 312
14      Watertown, MA 02472
        Email: Kenneth.parreno@protectdemocracy.org
15      For the APHA plaintiffs

16

17   THOMAS PORTS, JR., ESQ.
        DOJ-Enrd
18      P.O. Box 875
        Ben Franklin Station
19      Washington, DC 20044
        (202) 307-1105
20      Email: Thomas.ports@usdoj.gov
     and
21   ANUJ K. KHETARPAL, ESQ.
        United States Attorney's Office
22      1 Courthouse Way, Suite 9200
        Boston, MA 02210
23      (617) 823-6325
        Email: Anuj.khetarpal@usdoj.gov
24      For all defendants

25
```

```
1              P R O C E E D I N G S
2          (Begins, 10:00 a.m.)
3          THE CLERK:  The Court will hear Civil Action
4     Number 25-10787, the American Public Health Association,
5     et al vs. the National Institutes of Health, et al and
6     25-10814, the Commonwealth of Massachusetts, et al vs.
7     Robert F. Kennedy, Jr., et al.
8          THE COURT:  Good morning.  These two cases I've
9     authorized internet access, so it's appropriate that I
10    say that if you are viewing these proceedings via the
11    internet, the rules of the court remain in full force
12    and effect, and that is to say there is no taping,
13    streaming, rebroadcast, screen shots, or other
14    transcription of these proceedings.
15         This is the final argument in Phase 1 of this
16    Administrative Procedure Act case.  I'm pushing the
17    administrative record out of the way.  (Moves pile of
18    documents.)  Counsel will understand that I am prepared
19    for final argument.  I do not claim to have read the
20    entire administrative record.
21         As we discussed, argument will proceed first with
22    the plaintiffs, dividing an hour, should they take that
23    long, and then with the defendants, dividing an hour.
24    That isn't an invitation to use all that time.  I am
25    prepared for the final argument.
```

1          Mr. Cedrone, I will hear you.  I assume it's you.

2     Go ahead.

3          MR. CEDRONE:  Good morning, your Honor, Gerard

4     Cedrone from the Massachusetts Attorney General's office

5     for the plaintiff states in the '814 case.  We plan to

6     divide our time roughly equally, so I will speak for no

7     more than a half an hour.

8          We're asking the Court to set aside the challenged

9     directives and the terminations that flow from those

10    directives.  With the time I have I'd like to address

11    first the defendants' threshold arguments, then explain

12    why the challenged directives violate the APA and the

13    Constitution, and finally say a few words about

14    remedies.

15         THE COURT:  Maybe -- I want you to -- your

16    argument organization makes sense, but you said "set

17    aside the challenged directives," and one of the things

18    I'll ask everyone, if I were to do that, if I were,

19    under the Administrative Procedure Act, to set aside the

20    challenged directives -- declare, for whatever imperfect

21    reason that some or all were of no force and effect, um,

22    life then, it seems to me, proceeds as though they did

23    not exist, and I'm not clear for the need for injunctive

24    relief as to the Administrative Procedure Act claim.

25    Get to that whenever it suits you.

1          Go ahead.

2          MR. CEDRONE:  Understood, your Honor, and, um, I

3    will be speaking to remedies and the injunctive relief

4    piece.

5          THE COURT:  Thank you.

6          MR. CEDRONE:  Maybe before jumping into sort of

7    the specifics, I also just wanted to take a step back.

8    We've been living with these facts for a while now, but

9    I'd like to reiterate how unusual they are.

10          In the past few months, defendants have taken

11    actions that are unprecedented in the history of the

12    NIH, they issued directives that summarily ban research

13    on 7 discrete topics, and they implemented those

14    directives by canceling over 800 grants to the plaintiff

15    states' institutions.  And I can't emphasize enough just

16    how extraordinary that is.  In a typical year NIH

17    cancels 1, maybe 2 grants, and here we have 800 and

18    counting just to the plaintiff states, just in our case

19    alone since January.  That's 800 terminations affecting

20    real people, including patients who lost critical

21    medical treatments, researchers who lost years of work,

22    and students who've seen their educational opportunities

23    disappear.

24          Given that dramatic change and that dramatic

25    departure from past-agency practice, you would expect to

 1   see a robust administrative record, one with careful

 2   explanation, one that weighs various pros and cons, one

 3   that gives serious consideration to the real harms that

 4   happen to people when hundreds of studies are cancelled

 5   with no prior notice.  Instead the record has none of

 6   that.  There are obviously hefty binders, but what you

 7   have throughout those binders, over and over and over

 8   again, is repetition of the same paragraphs.

 9       So with that said, let me speak first to the

10   defendants' threshold arguments.  The defendants'

11   principal argument is that the Court should not even

12   consider the legality of the directives because those

13   directives are not final agency actions.  That's

14   incorrect.  And the simplest way I can think to explain

15   it is that between January and the termination of our

16   grants, defendants clearly made a final policy decision

17   to blacklist 7 discrete topics, that's the policy

18   decision that we're challenging.

19       Now we think it's clear from the record that that

20   policy decision is memorialized in, is consummated by,

21   is distilled in these directives that we identified, but

22   we don't think defendants can dispute the basic point

23   that, before terminating our actual grants, they made a

24   policy decision to blacklist certain topics, and that's

25   what we're challenging.

1          And I would compare that action to the policy

2     decision that your Honor currently has in front of you

3     in the **American Association of University Professors v.**

4     **Rubio** case, where your Honor decided, as a preliminary

5     matter, but recognized that even an unwritten policy in

6     that case of targeting certain students for deportation

7     can be a final agency action.  Here we think we're in an

8     even stronger position.  It's not just that there's some

9     unwritten policy in the ether, the defendants have

10    actually reduced it to writing in the directives that we

11    put in front of you.

12         And that's consistent with our challenging these

13    policies as a final agency action.  It's consistent with

14    the statutory text, the Section 551 of the APA defines

15    an "agency action" to include rules, which means

16    "statements of general applicability with future

17    effects."  That's exactly what these directives are,

18    they're directives that ban research into certain topics

19    and direct agency personnel to act accordingly.

20         One final point on this final agency action

21    question.  We think it's clear that the challenged

22    directives are final agency actions themselves.  Even if

23    we were wrong about that, there is no dispute, and the

24    defendants concede at Page 12 of their principal brief,

25    that the termination decisions are final agency actions,

1    and under Section 704 of the APA, final agency

2    actions -- the review of a final agency action includes

3    the review of any antecedent, interlocutory, or other

4    decisions that merge into the final decision.

5        And so with all of that said, we think your Honor

6    has already ruled on this in our case as a preliminary

7    matter, we don't think defendants have given any reason

8    to disturb your preliminary ruling that these -- that

9    both the directives and the terminations that flow from

10   them are final agency action.

11       I do want to address, before getting to the merits

12   of the case, two more minor points on the defendants'

13   threshold arguments that I just want to be sure are

14   clear.  One is that the defendants argued in their reply

15   brief that a February 21st directive, that we've called

16   the "Memoli directive," and I know there's different

17   nomenclature floating around, but this is a February

18   21st directive at Page 2930 of the administrative

19   record.  The defendants argue in their reply brief that

20   that's not properly in this case because we didn't call

21   it out by name in our complaint, but that's wrong for

22   two reasons.

23       The first is that our complaint makes clear, at

24   Paragraphs 116 to 117, that the directives we're

25   challenging -- that the directives we are challenging

1    include the universe of directives, including the
2    directives that had been kept secret or that were not
3    public at that point, um, that had the effect of
4    blacklisting these certain topics.  The February 21st
5    directive falls squarely within that language.
6        And second, regardless of what we said in our
7    complaint, defendants put this February 21st directive
8    in the administrative record.  So by their actions
9    they've acknowledged that this February 21st memorandum
10   is something that defendants considered or relied upon
11   in reaching their decision.  So they can't put that
12   directive in the administrative record and then say it's
13   not part of the case, that's not what the administrative
14   record is.
15       The last minor point before pivoting to the merits
16   relates to their argument that we lack standing to
17   challenge the rescission of "NOFOs," which are "Notices
18   Of Funding Opportunities" that announce grant
19   opportunities.  So defendants, um, haven't challenged
20   the State's standing in general, um, but there's one
21   minor piece, this rescission of NOFOs.
22       THE COURT:  Well actually I have a question on
23   that.  What is it that you want with respect to those?
24       MR. CEDRONE:  So just as, um, setting aside the
25   challenged directive means, under the APA, you treat the

```
 1    directives as if it never existed, because these notices
 2    of funding opportunity were pulled down based solely on
 3    the directives, um, the notices of funding opportunity
 4    should be restored.
 5           THE COURT:  I'm a pedestrian thinker, so help me
 6    here.
 7           As I understand it -- and if I'm wrong, I want to
 8    corrected, the grants that are -- the grants that are at
 9    issue in this first phase are grants that had been
10    funded by Congressional appropriation and were
11    proceeding, but because of the challenged directives,
12    were "terminated," um, an appropriate word.
13           I've got that right?
14           MR. CEDRONE:  I think that's right, your Honor.
15           THE COURT:  All right.  And I think I understand
16    that.
17           But even if the -- what do you expect?  Should you
18    prevail on that, I can -- I think I understand what
19    should happen to -- if the challenges are gone, the
20    money is there for this fiscal year, and the
21    Congressional will is clear, they have provided the
22    funds which the NIH has allocated and implemented, as it
23    always has, so what about these NOFOs, um, what should
24    happen?
25           MR. CEDRONE:  Right, so I think there's two
```

1    things.  One, I think it's largely relevant to the

2    second phase of the case where we're talking about

3    delays, but I wanted to address it today, as it's in the

4    defendants' brief.  But I think it's largely more

5    relevant to the second phase of the case.

6         But the second point is that, um, the government,

7    and the federal government produced a supplement to the

8    administrative record on Friday, and at Page 6960, and

9    the two pages that follow, there's a spreadsheet that

10   lists NOFOs that have been "unpublished," in the

11   language that they've used, with grants corresponding to

12   them.  At least some of those grants -- and these, as I

13   understand it, are awarded grants, correspond to the

14   plaintiff states.  And we think we have standing, we

15   think this is largely an issue for the second phase.

16   But to the extent that the unpublishing of NOFOs has

17   been a mechanism for terminating grants or part of

18   terminating grants, we think that the Court can set it

19   aside.  But it is admittedly a very small part of this

20   first phase, if it's relevant at all.

21        So turning then to the merits.  The challenged

22   directives violate, as we've explained, the

23   Administrative Procedure Act and the Constitution.  Let

24   me start with the Administrative Procedure Act.

25        We obviously go through the various doctrinal

1    reasons in the brief why the directives are arbitrary

2    and capricious.  I think it's easiest to explain by

3    looking at a particular example.

4        So in the brief we talk about a particular grant

5    that was terminated, at Page 1364 of the record, it's a

6    grant to the University of California entitled "Genetic

7    and Social Determinants of Pharmacological Health

8    Outcomes in Ancestrally-Diverse Populations."  And

9    admittedly I'm not scientist, but my understanding of

10   this project is it's looking at how people of different

11   genetic backgrounds might respond differently to

12   pharmaceutical products, in the way it's absorbed by

13   your body, in the way your body processes it, and so on.

14   And that grant was cancelled.  The cancellation language

15   is at Page 1369 of the record.

16       Your Honor is very familiar with this paragraph by

17   now, it's the standard DEI paragraph that reads:  "It's

18   the policy of NIH not to prioritize research programs

19   related to DEI," and so on and so on.  And ending with,

20   you know, the assertion that "worse so-called 'Diversity

21   Equity and Inclusion studies' are often" --

22   (Interruption by zoom.) "are often used to support

23   unlawful discrimination on the basis of race and other

24   protected characteristics."  It's the same stock

25   paragraph that repeats itself throughout the directives

1    and throughout the terminations.  And what is stunning

2    from the record is the lack of any support beyond those

3    conclusory words.

4         So first, and perhaps most prominently, there is

5    no definition anywhere in the record, despite repeated

6    requests from this Court, for what the government even

7    considers "DEI" to mean.  I think -- I would have

8    thought we could all agree that that term can have

9    positive or, you know, laudable connotations.  So the

10   government never even defines what is so-called

11   "prohibited DEI."

12        But even beyond that, the agency doesn't explain

13   how that language, those conclusory statements, are

14   consistent with statutes that Congress has enacted, very

15   clearly expressing a preference and a priority for

16   advancing research into health disparities, for

17   understanding the health conditions of underrepresented

18   groups.  They haven't explained how that language in

19   those conclusory statements are consistent with a

20   strategic plan that NIH promulgated and that Congress

21   requires NIH to promulgate.

22        And perhaps most, I think remarkably, they -- you

23   know there's some, um, striking factual assertions in

24   there.  So that paragraph, as I mentioned, says --

25   asserts that DEI studies are, quote, "often used to

 1    support unlawful discrimination on the basis of race."

 2    That is a serious charge, and you would expect, with a

 3    charge of that magnitude, there would be some

 4    explanation somewhere in the record of how the agency

 5    came to that conclusion, what it relied on in reaching

 6    that conclusion, why it determined that one study, but

 7    not another runs afoul of that principle, and there is

 8    absolutely nothing like that.

 9        When you strip away the hundreds of termination

10    letters and the challenged directives from the binders

11    that your Honor has in front of you, there is nothing

12    left.  And it is hard to reconcile that complete absence

13    of explanation and evidence with the magnitude of the

14    policy changes that the agency has enacted here.  That's

15    not what the Administrative Procedure Act requires.

16        And I would like to linger for a moment, before

17    moving on to the other points on one particular aspect

18    of the arbitrary and capricious nature of the Agency's

19    decision, which is their failure to consider reliance

20    interests.

21        The Supreme Court has said, again and again, that

22    when an agency is changing its policies, particularly an

23    entrenched policy, it has to consider reliance

24    interests, it has to consider ways that the public and

25    regulated parties have come to rely on the agency's

1  steady position.  We cite numerous cases in our brief,

2  *The Department of Homeland Security against Regents of*

3  *the University of California, and Cena Motor Cars, SEC*

4  *vs. Fox*.  Actually just a few months ago, this term, the

5  Supreme Court reiterated the point in a case called

6  *Wages and White Lines --*

7      (Interruption via zoom.)

8      THE COURT:  Where does that come from?

9      THE CLERK:  It's the zoom, Judge.

10     (Pause.)

11     MR. CEDRONE:  Should I continue?

12     THE COURT:  No, you continue.

13     MR. CEDRONE:  Okay.

14     So the law is clear.  When an agency is changing

15  position, it has to at least consider and grapple with

16  reliance interests.  And we have gone through, in the

17  briefing, some of the significant reliance interests

18  that are at stake here.

19     So particularly close to home, Docket 7745,

20  "Walking through the Impacts on the University of

21  Massachusetts."  UMass Chan Medical School has laid off

22  209 employees, it's cut the 2025 graduate program from

23  70 students to 10.  It's frozen all hiring.  And a

24  similar thing for UMass Amherst, rescinding funding from

25  100 accepted applicants and reducing admissions by half

1  for its School of Public Health.

2       And that's not to mention the harm to patients.

3  We walk through in the briefing studies that support

4  patients who are receiving treatment for risk of suicide

5  whose programs have been closed down.  We walk through

6  in the briefing the lost data.  One example from Docket

7  7725 is a Rutgers' study, it's a longitudinal study of

8  alcohol abuse among youth and minors.  And the

9  declaration detailed how, when a study is interrupted,

10  your ability to recruit participants and track them over

11  time in a longitudinal study --

12       THE COURT:  Don't let me throw you off, but I'm

13  going to stick to the time, and you have about 10

14  minutes.  And I have expressed a concern about

15  straight-out discrimination here, racial discrimination,

16  discrimination on the basis of one's -- how one lives

17  out their sexuality, and possibly, and I'm much less

18  certain about this, possibly discrimination against

19  women's health issues.

20       Are you going to address any of those?  Do you

21  think they bear on this first, um, this first phase?

22       MR. CEDRONE:  We haven't raised an expressed claim

23  of racial or sexual discrimination.  I think it's, um --

24  I think it's hard to look at what the agency has done

25  here and, um, walk away with the view that it's

consistent with not only the values in the Public Health
Service Act, which requires, um, thoughtful
consideration and the promotion of minority health, um,
women's health, and the health of sexual and gender
minorities.  And so I think that's -- that's the way we
have seen it as being relevant to this case, is that not
only are there these overarching constitutional and
statutory principles and other statutes, but the Public
Health Service Act itself states a Congressional
priority for advancing the health of underrepresented
groups, for advancing women's health, for advancing the
health of sexual and gender minorities.  And so that
last statute in particular is Section 283(p), which we
cite in our briefing.

        I do not understand -- and that gets beyond the
arbitrary and capricious point to the contrary-to-
statute point, I don't understand how the agency can
adopt these policies that it's adopted in these
boilerplate paragraphs consistent with those
Congressional policies.  The defendants accuse us of
trying to substitute our policy judgment for that of the
agency?  No, what we're arguing is that the agency has
substituted its policy judgment for that of Congress.

        The agency might believe, and the defendants might
believe, as fervently as they like, that, um, that NIH

1   shouldn't be advancing the health of transgender

2   Americans, shouldn't be studying, um, you know

3   disparities in underrepresented communities, they might

4   believe that very fervently, but Congress chose a

5   different course in the statute and the agency is

6   required to carry it out.

7       And just on the reliance point, just to close out

8   that point.  It's important not only to walk through the

9   reliance interests at stake, but the complete absence of

10  any discussion of those interests in the record.

11      I would have thought that an agency that was

12  taking seriously canceling, um -- banning research into

13  certain topics and canceling projects that flowed from

14  those topics would at least have considered those

15  serious reliance interests and there is nothing to that

16  effect in the record.

17      The defendants can say, "Well you can look at the

18  termination letters and infer that the agency must have

19  considered reliance interests, because obviously when

20  you cancel a project, people had been relying on it, and

21  they chose to do so anyway."  But that is not how this

22  works, that is not what the APA requires.  The APA

23  requires the agency actually to grapple with those

24  issues in the record and explain why it's doing what

25  it's doing.  And it's a procedural requirement, but it's

not an empty formality.  The reason the APA required

that is because we think that agencies reach better

substantive decisions when they're required to confront

the things that they're doing, and they haven't done

that here.

In the interests of time, I know I've addressed

the contrary-to-statute point, we also argue in the

briefing that the agency's decision is contrary to

regulation.  Um, I'll say on that briefly that obviously

an argument that requires carefully parsing through the

regulations, the regulatory history, um, the two basic

points I would make on that argument is:  Number 1, the

defendants are arguing that we're trying to turn this

into a contract case.  It's been clear from the outset

that we're not raising contract claims, we're asking the

Court to construe a regulation that they invoke and

directives that they promulgate.  We're asking the Court

to decide that that regulation doesn't mean what the

defendants say it means.  That is the ordinary business

of a court hearing an APA claim.

And the second point on the contrary-to-regulation

argument that I would leave the Court is, that at the

end of the day, when you have all of these arguments

walking through the statutory provisions, the

regulation, um, cannot mean what the defendants say it

 1    means because it would not be structured and worded and

 2    located in that way.  They essentially read this

 3    regulation to say that an agency can cancel any project,

 4    at any time, with no prior notice.  And if the

 5    regulation meant that, this would be a surprising way to

 6    grant that power, to say the least.

 7            We also, as we've explained --

 8            THE COURT:  About 5 more minutes.

 9            Go ahead.

10            MR. CEDRONE:  Understood, your Honor.

11            We've also explained that the challenged

12    directives violate the Constitution and are ultra vires.

13    Our constitutional claim -- I'll just address briefly to

14    emphasize that --

15            THE COURT:  It's a disfavored claim in light of

16    the breathe of the Administrative Procedure Act, as I

17    understand it, but I'll hear you.

18            MR. CEDRONE:  I understand.  And even with that,

19    um -- even with that nature of, um -- even with that

20    said, the one piece that the constitutional claim

21    addresses that the APA claim doesn't is the failure to

22    spend appropriated money.  And I just would like to

23    emphasize the constitutional claim and ultra vires

24    claim, before moving on to remedies, that these claims

25    span both phases of the case, we think there's a --

1          THE COURT:  But that gets to the question I posed

2     at the outset.  So now, in the 4 minutes remaining, I

3     really want an answer to that question.

4          Were you to prevail, assume you prevail, at least

5     as to the grants, the NOFOs, we'll see, if that were to

6     happen, isn't it enough simply to vacate the, um,

7     challenged directives as arbitrary and capricious, say

8     they're of no force and effect, illegal, and then, one

9     would expect, that given the landscape, the undisputed

10    landscape here, the appropriated grant-specific money

11    would flow?  You'd expect that, wouldn't you?

12         MR. CEDRONE:  We would expect that.  Let me

13    explain I think one reason why I think an injunction is

14    still appropriate and one other APA remedy that we're

15    asking for.

16         So not only, in our view, should the Court set

17    aside the challenged directives under the APA, it should

18    also set aside the termination decisions that flow from

19    it.  As you see in the record, the termination decisions

20    use the same boilerplate language, so one should follow

21    from the other.

22         I agree with your Honor that that relief gets us

23    much of what we are asking for and I agree that one

24    would expect from that, um, would flow an appropriate

25    result.  The reason we think an injunction is still

1    appropriate is that the record, even though it

2    demonstrates an underlying policy, it's been a bit of a

3    game of Whac-a-mole, there are these different

4    directives and defendants -- you know you point to one

5    and defendants say, "That's not the directive that

6    actually encapsulates this policy," so you point to

7    another.  And so the injunction gets at the idea that

8    we're challenging these directives, but at its core

9    we're challenging the policy that underlies it.  And we

10   think the plaintiffs need, especially given the harms at

11   stake here, prospective relief, not just a set-aside of

12   the directives and of the terminations that have flowed

13   from them.

14        That's how we understand the defendants are

15   requesting to take cross-examination of the witnesses

16   that support our request for an injunction, so we don't

17   want that piece of the case to delay what we think is

18   appropriate relief that is currently ripe for decision,

19   which is relief under the APA, um, that sets aside the

20   challenged directives and the terminations.

21        And unless your Honor has further questions, I'm

22   happy to yield the Court to my APHA colleagues.  Thank

23   you.

24        THE COURT:  Thank you.  And I appreciate it.

25        Counsel?

1          MR. PARRENO:  Good morning, your Honor, Kenneth

2     Parreno on behalf of the APHA plaintiffs.

3          THE COURT:  Yes, Mr. Parreno, I'll hear you.

4          MR. PARRENO:  It's good to see you again, your

5     Honor.  I'll be splitting argument today with

6     Ms. Meeropol, um, and transition accordingly.

7          I want to start by, just very briefly, talking

8     about who our clients are.  Our clients are researchers

9     and organizations of researchers who are dedicated to

10    their work.

11         THE COURT:  Well let me ask this question, which

12    may be a little aside the point.

13         You have supplied, at the Court's direction, a

14    finite list of the grants that we're talking about, very

15    similar to that, um, put forward by the various states,

16    and I've just been hearing about them.  Whatever happens

17    in this case -- well were anything to happen favorable

18    to your clients, Rule 52 of the Rules of Civil Procedure

19    require a written opinion.  And so this is not -- it

20    doesn't require a written opinion, but eventually in

21    this case there's going to be a full written opinion.

22         I don't understand why those grants, should you

23    prevail, ought not be listed in an appendix to that

24    opinion?  I don't understand why not?

25         MR. PARRENO:  Your Honor, if I may?  Ms. Meeropol

 1   will address the remedy, the question of the --

 2        THE COURT:  Fine.  Go ahead.

 3        MR. PARRENO:  But we'll address that as well.  I

 4   thank your Honor for that opportunity.

 5        THE COURT:  Yes, go ahead.

 6        (Knocks over microphone.)

 7        MR. PARRENO:  Sorry about that.

 8        Is that better?

 9        THE COURT:  Yes, go ahead.

10        MR. PARRENO:  So these researchers comprise

11   hundreds of individuals who are working on thousands of

12   projects, some of which are at issue here, benefiting

13   millions of Americans with their work on public health

14   and advancing the scientific effort.  That's what was

15   disrupted by the defendants' actions.  And I will focus

16   first on the arbitrary and capricious nature of their

17   actions.

18        Defendants' actions, the directives, both through

19   their development and through their implementation, are

20   arbitrary and capricious for three reasons.  First, they

21   do not represent the reasoned decision-making that is

22   required of the Administrative Procedure Act.  Second,

23   they are unexplained, about-faced in policy.  And third,

24   they do not properly address the reliance interests that

25   are at stake.  They don't even consider them, much less

1    weigh them.  I'll start with the reasoned decision-
2    making.
3          My colleague, Mr. Cedrone, already emphasized the
4    sheer stunning lack of analysis data, evidence
5    underlying the directives themselves.  No working
6    definitions.  No evidence establishing, for example,
7    so-called "DEI studies" ultimately do not enhance
8    health, lengthen life, or decrease illness.  I won't
9    belabor that point, um, for the sake of efficiency,
10   we've argued that in our brief and Mr. Cedrone covered
11   that point.  But what I would like to do at this time,
12   as to the reasoned decision-making, is to highlight what
13   actually was in the record and how that further
14   emphasizes the arbitrary and capricious decision-making
15   that occurred here.
16         First, what is in the record shows a slap-dash
17   decision-making process.  What was revealed from a
18   series of e-mails is that often NIH officials would take
19   just minutes to make decisions that affected hundreds of
20   researchers and millions of lives.
21         For example, and I know that your Honor is
22   familiar -- is familiar with the record, but I do want
23   to highlight a couple of examples to highlight this.
24         On March 11th, 2025, that's AR 3820, it took Matt
25   Memoli 6 minutes to review 6 grants and to conclude that

```
 1    all of them aren't aligned with agency priorities.

 2         On May 9th, it took him just 2 minutes to review,

 3    quote, "several grants."

 4         THE COURT:  "Him" is who?

 5         MR. PARRENO:  I'm sorry?

 6         THE COURT:  "Him" is who?

 7         MR. PARRENO:  I'm sorry, your Honor, that's Matt

 8    Memoli, again, at AR 3452.  These are just a couple of

 9    illustrative examples that reflect the slap-dash nature

10    of how this review is occurring.

11         And as defendants acknowledge in their own

12    certification in this case, in ECF Number 86-1, these

13    grant files, for each of these grants, are hundreds if

14    not thousands of pages long.  It just strains credulity

15    that any meaningful review can occur in a matter of

16    minutes, much less 2 minutes.

17         Second, what also is in the record reflects that

18    that slap-dash decision-making was in fact encouraged

19    from the top down.

20         On June 13th, the defendants produced, um, in

21    response with this Court's order on a motion to complete

22    what is at AR 6963.  That is a document that was

23    provided to program officers to assess pending grant

24    awards or actions for the purpose of alignment with the

25    directives.
```

1          That document, like the rest of the record,

2     reflects no working definitions of these forbidden

3     topics, no guidance on how they actually analyze grants

4     for these topics, and in fact includes the line, which

5     is very telling, where when asked to provide or

6     elaborate on the analysis, the document says explicitly,

7     "No details are necessary."  That's what the agency was

8     saying from the top down.

9          Third, and still in the reasoned decision-making

10    province, is that officials outside of NIH were calling

11    the shots here.  What's clear from the record is that

12    the directives themselves are explicitly spelling out a

13    process where HHS is directing and identifying these

14    terminations, so that NIH officials are in turn just

15    rubber-stamping them, not providing any review, and in

16    fact are required to issue termination letters.

17         For example, on March 25th, the revised priorities

18    directive at AR 3220, highlights that point, as does the

19    May 7th directive at AR 3554.

20         In addition to that, the drafting and

21    implementation of the directives also reflect this same

22    sort of outside influence.  Individuals outside of NIH

23    were charged with identifying these grants, um, and that

24    included individuals at HHS, for example, Rachel Riley,

25    um, and in the record as well some individuals from the

1    so-called "Department of Government Efficiency," and

2    that includes an individual named Brad Smith, and that's

3    at AR 3752.

4         The point here is this isn't the sort of reasoned

5    decision-making that we would expect and is required

6    under the APA, what this is is a slap-dash harried

7    effort to rubber stamp an ideological purge.  That is

8    not what the APA requires.

9         THE COURT:  Well when you say an "ideological

10   purge," what do you mean?

11        MR. PARRENO:  What I mean here, your Honor, is

12   that there had been statements in their directives that

13   had been put out in a conclusory and boilerplate manner

14   with no evidence and no data backing them up.  What's

15   missing here is that sort of reasoned analysis that is

16   required of the agency.

17        Second, and I'll briefly discuss, um, the

18   about-face nature, because I believe Mr. Cedrone

19   addressed, in great detail, the reliance interests at

20   stake.

21        So this is an improper about-face in agency

22   policy.  The issue here isn't that an agency can't

23   change its policy, it's that the APA imposes specific

24   requirements for such a change, especially where, as

25   here, there are underlying facts that, um, contradict

1   the new priorities or policies.

2       So when defendants, in their briefing, are talking

3   about this just boiling down to a policy-interest

4   disagreement, that's just plain disingenuous, the issue

5   here is that there's no explanation for why there was

6   this about-face.  Defendants are right, there needs to

7   be an assessment and a reassessment, but there is

8   neither here.

9       And in the interests of time, I will just turn

10   very quickly to one question of jurisdiction, before

11   turning this over to Ms. Meeropol.  My, um --

12   Mr. Cedrone has made a number of points in the

13   jurisdictional issue that we join as well, and it's

14   highlighted in our brief, but I would like to emphasize

15   that we still maintain that appeals of grant

16   terminations do not strip this Court of its

17   jurisdiction.

18       The terminations that were made pursuant to those

19   directives and the directives themselves are final

20   agency actions that are the consummation of

21   decision-making and have legal consequences.  And

22   importantly, what the record shows repeatedly from these

23   termination letters is the sheer utility of these

24   terminations -- of, sorry, the appeal process of these

25   terminations.

1          THE COURT:  And in fact the letters themselves

2     frequently say "No correction is possible," as I read

3     it.

4          Is that correct?

5          MR. PARRENO:  "No correction is possible," your

6     Honor, and "The premise of this grant is incompatible

7     with agency priorities," and "No modification of the

8     project could align it with agency priorities."  If

9     that's not futility, your Honor, I don't know what is.

10         So I'll go ahead and -- and if there's no more

11    questions about these two issues, your Honor, I will go

12    ahead and turn it over to Ms. Meeropol, who will address

13    the remedy issues.

14         THE COURT:  Thank you.

15         Ms. Meeropol.

16         MS. MEEROPOL:  Thank you, your Honor, Rachel

17    Meeropol from the ACLU.

18         I want to cover the APA plaintiffs'

19    contrary-to-law claims, the withdrawal of funding

20    opportunities, and the scope of vacatur.  Based on your

21    Honor's questions so far this morning, I'd like to

22    actually start at the end and talk about vacatur first.

23         THE COURT:  So would I.

24         Go ahead.

25         MS. MEEROPOL:  Perfect.

1          So I agree with the way my colleagues from the

2     states have largely framed the issue, I'd like to take a

3     minute to talk about exactly what the scope of vacatur

4     looks like, um, should your Honor choose to set aside

5     agency action.

6          Setting aside agency action is an indivisible

7     remedy, and that means it necessarily benefits

8     nonparties.  If the Court finds that the directives --

9          THE COURT:  Wait a minute.  Wait a minute.  It may

10    have implications, but I've been clear from the

11    beginning, that's why I wanted this list of grants.

12    Suppose that's right -- I misspoke.  Forgive me.

13         At best -- at best you're here, you've listed

14    these grants.  If I accept these various arguments --

15    and we're just talking Phase 1 now, and I declare all of

16    these directives, um, arbitrary and capricious, void and

17    of no effect, this is -- I -- this is the United States

18    District Court, that has an effect on these litigants

19    who have standing who have challenged these grants.

20         Now once judgment enters under the -- the

21    judgment -- again assuming that you're winning here --

22    and don't take anything from that, but assume that.  If

23    you win here, that's the judgment, because I -- either

24    way I propose to enter a judgment on Phase 1 just as

25    soon as I can to allow an appeal.  So that -- well, um,

1    others who haven't sued, who haven't challenged their

2    grants, may well have to deal with the defendants in

3    other cases.

4        Is that legally incorrect?

5        MS. MEEROPOL:  Your Honor has discretion to scope

6    -- to design the scope of relief in this case just as

7    you put forward.

8        THE COURT:  All right.

9        MS. MEEROPOL:  But give me 5 minutes for me to

10   attempt to convince you --

11       THE COURT:  Go ahead.

12       MS. MEEROPOL:  -- that you may issue an order that

13   is larger in scope.  And here is why.

14       THE COURT:  Go ahead.

15       MS. MEEROPOL:  So first I would direct your Honor

16   to Justice Kavanaugh's concurrence in **Corner Post** where

17   he lays out the history of how the Supreme Court has,

18   um, looked at what it means to vacate or set aside an

19   agency action, and the degree to which even when

20   individuals who are not before the --

21       (Interruption zoom.)

22       MS. MEEROPOL:  -- even when individuals are not

23   before the Court, they sometimes reap the benefit of

24   setting aside that agency action, and that is because

25   7062 is authorization by Congress to set aside the

1    agency's action that is far broader in scope than what

2    we think of as an injunction or sort of the concerns

3    that we've heard from courts recently about possible

4    nation-wide injunctions.

5         So if we look at the precedents that we've cited

6    in our cases.  Um --

7         THE COURT:  I want to follow your argument,

8    because I'm interested in it.

9         You're saying this is not a nation-wide injunction

10   issue, this flows from the Congressional intent -- and

11   you've cited a Supreme Court case, in passing the APA,

12   the statute which governs here?

13        MS. MEEROPOL:  That's correct, your Honor.

14        THE COURT:  And that's the basis of your argument?

15        MS. MEEROPOL:  Yes, we can look at the language of

16   7062 itself, which says to set aside agency actions that

17   are arbitrary and capricious or contrary to law.

18        Looking at the leading D.C. Circuit case, um,

19   ***Allied Video v. U.S. Nuclear Regulatory Commission*** on

20   the question of whether a remand about vacatur is

21   appropriate, which is not an issue presented in this

22   case.  When the D.C. Circuit actually looked to create

23   the, um, the various factors that courts should consider

24   about whether to remand about vacatur, one of the

25   factors was how disruptive is this decision going to be?

1    And the Court, in deciding in that case that vacatur

2    would be too disruptive, said that's because vacating

3    this rule would require the agency to refund all the

4    fees it had collected in that case, not just the fees of

5    individuals who were before the Court, but all of the

6    fees.

7         The APA allows agency action -- allows the Court

8    to set aside agency action that is unlawful and stops,

9    and the Court is empowered through that, not just to set

10   aside all of the unlawful terminations that our clients

11   and a number of our client organizations have put before

12   the Court, but that -- but if you look at how the Ninth

13   Circuit has put it, "Agency action that" --

14        THE COURT:  I'm not sure that -- wait a second.  I

15   just want you to use your time effectively, because I'm

16   responsive to this argument.

17        MS. MEEROPOL:  Yes.

18        THE COURT:  Assume you win, as to these grants, et

19   cetera, and you win in the manner that Mr. Cedrone, um,

20   framed it, that the directives are declared arbitrary

21   and capricious, have no force an effect, in essence are

22   illegal, as are the terminations to these contracts --

23   to these grants, not contracts.  All right, suppose

24   that.  Now -- and that's as far as we go.

25        I'm sensitive to the fact that this is an equity

1    case, that's why there's no jury sitting there, and

2    whatever I do in a written opinion, or conceivably

3    however I express myself today, or in the near future --

4    and I say this with respect, you people aren't going

5    away, we're going to be back here.  Isn't that an issue

6    that I need not reach today?  But you're not giving it

7    away if you answer "Yes."  So as I would say, if it was

8    a trial, "Your rights are saved."  Well it is a trial,

9    but if it was a jury trial.

10        Do you hear what I'm saying?

11        MS. MEEROPOL:  I do.  I do, your Honor.  You need

12   not reach it.  My point is that you are empowered to

13   reach it.  And that is because agency action that is

14   taken in violation of the law is void, it has no legal

15   impact, and this Court can set aside all the actions

16   that flowed from the directives.

17        And that's a good segue, if I may, because I see

18   that I'm already short of time and I do want to make

19   sure to talk a little bit about the withdrawal of

20   funding opportunities.  Unless your Honor wants to talk

21   more about vacatur?

22        THE COURT:  No, no, only on the part that I pushed

23   back on him, on Mr. Cedrone.  He says, "Look we live in

24   the real world," he says "Now, if you're going to enter

25   judgment on this part -- win or lose, if you're going to

1    enter judgment, if it goes our way, we want an

2    injunction in the real world."  And I'm saying, "Well

3    wait a second, once I've explained the law, you know one

4    can presume" -- I always did back when I was a Superior

5    Court Justice and the executive was the Commonwealth of

6    Massachusetts, I rarely entered an injunction -- and

7    Mr. Cedrone, coming from that office, can go back and

8    check, because once you've told them what to do, they'd

9    appeal of course, and I welcomed it.  But they do it.

10   And he says, "Well, real world, Judge, that's not going

11   to happen today, we need an injunction."

12         But what I'm asking you.  If I were to stop short

13   of an injunction, but, well, you win otherwise -- maybe

14   not as far as I'm listing here, but for today, if that

15   were to happen -- or when I get myself together, um, if

16   that were to happen, um, don't you think they'll follow

17   a reasoned opinion?

18         MS. MEEROPOL:  I would hope so, your Honor.

19         THE COURT:  Well more than that, you'd expect it.

20         MS. MEEROPOL:  I would expect it last year, I

21   don't know if I would expect it this year.

22         THE COURT:  Well let's be clear, I do expect it.

23   Well enough on this, I do expect it.  If that were to

24   happen, I expect it.  And again, nobody's going

25   anywhere.

1          MS. MEEROPOL:  We certainly aren't, your Honor.

2          THE COURT:  Suppose it doesn't, we'll all be in

3     this courtroom again and then I'll have that record

4     before me.  But that's not for today.

5          Go ahead as to what you want to cover.

6          MS. MEEROPOL:  Um, before I move off vacatur, I

7     would just ask your Honor to look at one of the cases

8     we've cited in our briefs, um, **Montana Wildlife**

9     **Federation vs. Holland**, which is a case where the Court

10    vacated a Bureau of Land Management policy around oil

11    and gas leases, and then vacated all of the leases under

12    that policy, not just the ones belonging to the parties

13    that were before the Court.  In fact the lease owners

14    weren't before the Court at all, it was individuals

15    challenging those leases who were before the Court.

16         And now I'll move on to the withdrawal-of-funding

17    opportunities.  I want to be clear on what we're

18    challenging here and what we're not, um, because our

19    perspective on this is slightly different than what I

20    think we've heard so far this morning.  And that's

21    because the withdrawal-of-funding opportunities had

22    several different legal consequences here.

23         First, the withdrawal-of-funding opportunities

24    require -- the directives themselves require

25    unpublishing these massive numbers of funding

1    opportunities, and they also require terminating multi-

2    year grants by prohibiting noncompetitive renewals under

3    the unpublished notices of funding opportunities.  And

4    we cited cases in our briefing, um, most notably *Policy*

5    *and Research LLC*, which explains that a failure to

6    provide a noncompetitive renewal is tantamount to a

7    termination and must be reviewed by the Court in the

8    same way.  And finally, because of the unpublishing, the

9    directives prohibit the award of new grants under

10   unpublished notices.

11        THE COURT:  But that leads me to this.  What is it

12   you want me to do beyond declaring the directives and

13   these non -- to take down these opportunities, void and

14   of no effect, what more?  Yeah, that's my question.

15        MS. MEEROPOL:  Unwind all of the implementation of

16   the directives.  Require that NIH republish the funding

17   opportunities that were unpublished in an arbitrary and

18   capricious manner.  Require that NIH vacate the

19   terminations that occurred under those unpublished

20   notices-of-funding opportunities through the failure to

21   award competitive renewals.  And order NIH to act on the

22   applications that were pending before it when it

23   unpublished the notices-of-funding opportunities.

24        THE COURT:  Well if the bar to action is removed,

25   isn't that what we've been talking about, one expects

1  they'll go on and do what they're supposed to do, which

2  is act.

3       MS. MEEROPOL:  Well certainly the regulations

4  require them to do so.  The regulations require that

5  they evaluate every application that has been submitted

6  taking into account scientific merit and through the

7  peer-review process.  But they have not done that for

8  each of these unpublished, um, notices-of-funding

9  opportunities.  They haven't denied the application.

10 They haven't delayed the application.

11      THE COURT:  It's undisputed.  It's undisputed, the

12 record, of what's happened.  Yes.

13      So again, suppose the directives are void and of

14 no effect, suppose that, and, um, I agree with you,

15 suppose these, um -- the effect of requiring competitive

16 review year by year stifles multi-year grants, I

17 understand that, so suppose I knock that out, um -- just

18 suppose it, then things will go on, won't they?

19      MS. MEEROPOL:  Yes, but in the interest of

20 absolute clarity and to ensure NIH takes the steps it is

21 regulatorily required to take -- and it is not doing so

22 right now, despite the regulations require it, we think

23 in the interest of ensuring that --

24      THE COURT:  Well it's not doing it now because

25 it's following the directives that, as we stand here

1    today, are in effect.

2         MS. MEEROPOL:  Yes, that's certainly correct, your

3    Honor, and certainly vacating the directives is the most

4    essential component of the relief that we are seeking

5    under the APA here.  But the agency may need to be

6    explicitly told that vacating the directives means

7    unwinding all ways in which the directives have been

8    implemented, and that includes their unpublishing of

9    funding opportunities and their refusal, in violation of

10   the regulations, to act on those applications through

11   the peer-review process, through an evaluation of their

12   scientific merit.

13        Now if I may, your Honor, I'd like to turn to our

14   contrary-to-statute arguments briefly.  And here, um, I

15   would just start by saying that, you know, it is clear

16   that Congress has mandated that NIH increase diversity

17   in the biomedical research field, and that excludes

18   through NRSA training grants and early-career

19   investigator opportunities.  So I want to highlight, um,

20   a stark take away from the briefs and the record.

21        THE COURT:  And the statute is the PSHA?

22        MS. MEEROPOL:  The PSHA, but also, if you look at

23   288(a)(4), that sets forth, um, NRSA training

24   requirements, and 283(O)(b)(2) talks about recruitment,

25   um, in the context of early-career investigators.

1          THE COURT:  These are statutory requirements?

2          MS. MEEROPOL:  Statutory requirements, yes, your

3    Honor.

4          THE COURT:  Thank you.

5          MS. MEEROPOL:  As we explained in our opening

6    brief, every single program created by NIH specifically

7    geared to increasing the diversity of the biomedical

8    research field has been terminated.

9          THE COURT:  5 more minutes.

10         MS. MEEROPOL:  Thank you, your Honor.

11         Because I have 5 minutes, I want to make sure I

12   say one thing and then I'm going to come back to the

13   statute, if you'll bear with me here.

14         THE COURT:  Sure.

15         MS. MEEROPOL:  I do want to say that defendants

16   have challenged standing only with respect to the

17   withdrawal of the notice-of-funding opportunities.  And,

18   um, on the other hand, they have never challenged the

19   standing of our individual plaintiffs.  But we have an

20   individual plaintiff, Ms. Dee Mathis, who has explained

21   that she applied for a mosaic grant, which is one of

22   these unpublished opportunities, and she explains how --

23   because the opportunity was unpublished, even though she

24   knows her application was reviewed, she never got the

25   benefit of that review, and she's had no action on her

1     application.

2          So I just want to be clear that, to the extent

3     their complaint about standing is about the failure to

4     provide an individual who has, um, applied for one of

5     these opportunities, we very clearly have one of those

6     individuals.

7          Moving back to contrary-to-statute.  We explained,

8     in our opening brief, that every single program created

9     by NIH specifically geared at increasing diversity has

10    been cancelled, while the training programs that don't

11    focus on increasing diversity have been retained.  And

12    the administrative record your Honor has just received

13    bears this out.

14         I could read the record cites right now of a case

15    that would be helpful to your Honor, because we weren't

16    able to put that into our briefing, um, but I'm

17    conscious of time, so I'm going to base that on -- your

18    Honor told me not to, so I won't do it.

19         So, for example, the mosaic grant cancelled at AR

20    4309.  The Mark program cancelled at AR 3741.

21         THE COURT:  Just so you know, I'm not saying don't

22    do it.

23         MS. MEEROPOL:  Okay.

24         THE COURT:  No one's going anywhere, no one has

25    precluded post-hearing submissions.

```
1           MS. MEEROPOL:  Should your Honor --
2           THE COURT:  We talked about our procedure.  You
3    say -- the point you're making is the conclusory point,
4    every single program designed to address or increase
5    diversity is cancelled.  That's what you're saying?
6           MS. MEEROPOL:  That's what I said, and they have
7    not disputed it, and the record bears it out.  But we
8    would also appreciate the opportunity, if it would aid
9    your Honor, to provide a list of the citations for the
10   new record.
11          THE COURT:  I have not told you not to.
12          MS. MEEROPOL:  Okay.
13          Finally, NIH also must prioritize research into
14   health disparities and minority health issues.
15   Defendants insist that they're only prohibiting DEI,
16   that they still fund health-disparities research.  But
17   the record shows that a grant about cervical cancer
18   screening and follow-up delays among Latinos was
19   terminated as being --
20          THE COURT:  But Mr. Cedrone made the point that at
21   least at the time of this action, DEI was nowhere
22   defined, isn't that right?
23          MS. MEEROPOL:  That's correct.  And we know from
24   the way they're implementing the directives, that NIH
25   understands DEI to include medical research into who
```

1    bears the burden of disease in this country, which is

2    precisely what Congress has mandated for research.  They

3    are targeting here exactly what Congress has required

4    them to research.

5         And your Honor asked about the degree to which

6    there's discrimination happening here.  And I do think

7    it is through the contrary-to-statute claim argument

8    that your Honor can get at the way research that, um, is

9    essential to ensure minority health -- not just majority

10   health in this country, is being terminated.

11        If your Honor has no further questions, I'll sit

12   down.

13        THE COURT:  Thank you.

14        Mr. Ports.

15        MR. PORTS:  Thank you, your Honor.  Tom Ports from

16   the United States Department of Justice.

17        Your Honor has asked some very practical questions

18   and, um, defendants would like to walk through the case

19   in a practical manner, and we believe that doing so

20   leads to the conclusion that we should win.  And so I'll

21   walk through in five steps along the lines of what I

22   think the Court will want to address and what it has

23   shown interest in.

24        So the first thing that needs to be determined is

25   what is the final agency action?  We say it's the grant

1    terminations, they say it's something else, and that

2    could be a couple of things, and we'll talk about that

3    first.

4         Second, what was the agency's reasons for the

5    terminations?  Everyone agrees these are laid out.

6    There are a finite number of them.  We've walked through

7    them in our briefs.  We say they're sufficient.  They

8    say they are not.  And we can talk about that.

9         The question is -- or third, do those reasons

10   analyze, examine the pertinent evidence, consider the

11   relevant factors, and articulate a satisfactory

12   explanation, including a rational connection between the

13   facts found and the choice made?  We believe it does.

14        Moving on to four.  Assuming we survive those

15   reviews, have plaintiffs proved that it's, for some

16   other reason, in violation of the statute or regulation?

17        And then the last, if the Court nonetheless

18   determines the defendants lose, what exactly should the

19   order do here?  And address remedy.

20        Starting at the top, which we believe is very very

21   important and underlies the Court's questions and what

22   the Court was driving at, um, if your Honor doesn't

23   mind, we have printed each of the 8 so-called

24   "challenged directives," we have them in a binder, and

25   for convenient reference we think it's helpful to look

1    at each of them, um, because that's -- well it goes back

2    and forth.  There are, I guess, three ways to look at

3    the terminations here -- or four really.

4         One thing as, um, I think the state plaintiffs are

5    most explicit in saying, is the challenge here is to the

6    agencies selecting a policy, setting a priority, a

7    research priority.  So that's Number 1, is just they

8    challenge the agencies setting up research priorities

9    that they don't agree with, and they think that it --

10         THE COURT:  Well that's not how they frame it.

11         MR. PORTS:  Your Honor, it's been a few different

12   things.  I believe Mr. Cedrone said that they're not

13   necessarily challenging these 8 challenged directives,

14   they are challenging, quote, "the underlying policy,"

15   "the underlying research priority decision," and that is

16   exactly what Mr. Cedrone said, and that's one way to

17   look at it.  So we can look at these 8 documents or we

18   can look at the challenge to the research priority.  We

19   think both of those would be inappropriate and we'll

20   explain why.

21         Other options?  I guess there's two more.  We can

22   look at the e-mails directing terminations that have a

23   -- that collect a series of grants.  Now those are

24   directives to terminate.  And then we have what we

25   believe is the true final agency action, the

1    terminations themselves.  This meets Stephanie Spears'

2    two-prong test that represents the final decision of the

3    agency, is the consummation of the decision-making

4    process, and it has legal effect to terminate the

5    grants.  So that is what defendants believe you're

6    ultimately looking at and these are listed on the

7    spreadsheets the plaintiffs have presented here.

8         So starting at the top.  These so-called

9    "challenged directives" do not meet -- unlike the

10   terminations don't meet the Stephanie Spears' test.

11        (Interruption zoom.)

12        If we look at Tab Number 1, the first tab, this is

13   a policy directive.  It says "Stop sending out

14   miscommunications until the presidential appointee or

15   some political appointee has reviewed a new

16   publication."  This is standard.  It happens when a new

17   administration comes in.  It ended before the lawsuit.

18        We don't think this is a challenged directive that

19   they care about so much here.  Now it did lead to

20   delays, we acknowledge that, and because meetings were

21   cancelled for a time, meetings have since restarted.

22        Defendants mentioned in the status conference that

23   we would ask the Court to take judicial notice of the

24   Federal Register notices that we have cited that, um,

25   say so.  We have physical copies of those for all the

 1    parties, if the Court would like them, otherwise they

 2    are cited in our brief, and they're simply Federal

 3    Register notices saying that NIH has scheduled meetings.

 4    So if the Court would like these --

 5            THE COURT:  So the record is clear, I'm prepared

 6    to take judicial notice of the Federal Register --

 7            MR. PORTS:  Thank you, your Honor.

 8            THE COURT:  -- that the Federal Register says what

 9    it says.

10            MR. PORTS:  Yes, your Honor, thank you.

11            Moving on to the second so-called "challenged

12    directive."  This is the February 10th Secretarial

13    Directive on DEI-related funding.  It expresses a policy

14    preference and it implements a review.  It says "grants

15    may be terminated."

16            So here we do know that NIH is setting a research

17    priority preference and it's conducting a review.  It

18    hasn't made any decision to terminate -- well this

19    document does not terminate or direct any terminations,

20    that is not in here, it's conducting a review, we don't

21    believe that to be final.

22            Next is the February 12th directive.  This is the

23    first so-called "Lauer memo."  This directive says,

24    based on various injunctions and Court orders, you know

25    "Follow those directives, follow those orders, resume

1    issuing grants, and just make sure everything proceeds

2    without -- without respect to, um, research priorities."

3    There's no harm from this directive to plaintiffs, this

4    is not something that they, um, that we've been saying

5    they could challenge and try to set aside.

6         The next document, Number 4, Challenge Directive

7    4, February 13th, it's a supplemental Lauer memo.  This

8    says they're, um, "restricting funding where a program

9    takes part in DEI, which is to remain in place until the

10   review's complete."  So again, this doesn't terminate

11   any grants, it places a temporary restriction.  It was

12   subsequently terminated.  This directive here was

13   superseded, this is no longer in effect.  Instead, um,

14   it's been replaced and rescinded.  So that is no more.

15   It didn't direct terminations in the first instance and

16   it has been rescinded regardless.

17        Number 5, we reach the February 21st, Dr. Memoli

18   memo.  This one expresses a need to ensure that NIH is

19   not supporting low-value and off-mission projects.  It

20   does express a research priority.

21        THE COURT:  It does not define "DEI"?

22        MR. PORTS:  No, your Honor, it does not.  And I'll

23   touch on that in a moment.

24        It ultimately says that programs that do not meet

25   priorities may be terminated.  Similarly this directive

1    does not direct anyone to enter any terminations.

2          Moving on to Number 6.  Importantly, before we

3    move on to Number 6, it's important to note here that

4    terminations occurred.  Dr. Memoli directed the

5    terminations after Number 6 -- or after Number 5, I

6    apologize, and before Number 6.  So after his memo,

7    before any of the Bulls guidances started.  So there are

8    three guidances on -- signed by Michelle Gould and the

9    terminations occurred before that.

10          So to the extent that any of these three are the

11    challenged directives, terminations that preceded them

12    cannot be affected by these.  And we'll note that

13    nothing before this had said "You must terminate

14    anything," they just expressed priorities sadly to

15    terminate and the termination occurs by an e-mail

16    directive attaching a list of grants.

17          Looking at the Bull's directives.

18          THE COURT:  Well where are we now?  We're at 6?

19          MR. PORTS:  Yes, your Honor, we're on Number 6.

20    This is labeled March 20, 2025.  It's the first Bulls

21    guidance.  And it walks through not issuing a solely --

22    a grant solely based on a deprioritized filing and how

23    -- well, first of all, it rescinded the February 13th

24    memo.  But it walks through priorities on what to do to

25    adapt to make sure that research products that have

1  scientific value, in the judgment of NIH and its

2  priorities, should be able to continue, while removing

3  parts that, um, that NIH does not want to fund.  And it

4  is not directing any terminations, this is an entirely

5  prospective guidance about future grants.

6      Number 7, the second Bulls guidance.  This one

7  here refers to essentially the language and other things

8  and they refer to -- essentially Dr. Memoli made a

9  decision, sent terminations, and this talks about the

10  language to use when implementing the terminations,

11  which are a separate directive from Number 7.  So again

12  this isn't telling anyone to terminate things, it's just

13  saying "Where we have a decision, this is what to do."

14      And, um, the third of those Bulls guidances,

15  Number 8, um, this is -- it suffers the same problems as

16  the first two.  So this one isn't helpful.

17      If we turn to the most --

18      THE COURT:  I don't understand what you just said

19  about 8?

20      MR. PORTS:  I apologize, your Honor.

21      This is similarly not final, it does not direct

22  any terminations, it's involved in a review, it's

23  involved in like the agency's management of its process,

24  so the terminations are --

25      THE COURT:  So where do these thousands of the

1    terminations come from?

2        MR. PORTS:  These terminations actually were made

3    by Dr. Memoli, your Honor.  I get there's two -- the

4    termination decisions are made by Dr. Memoli attaching

5    --

6        THE COURT:  All of the ones we're concerned with

7    here?

8        MR. PORTS:  Any termination, yes.

9        THE COURT:  All right.

10       MR. PORTS:  So that if the challenge is to not

11   issuing a grant, issuing a future grant --

12       THE COURT:  And he did that over a short period of

13   time, didn't he?

14       MR. PORTS:  Your Honor, the plaintiffs do

15   challenge the amount of time that he took to actually

16   review these spreadsheets after receiving them and argue

17   that that is arbitrary and capricious.  And that is, we

18   would say, your Honor, a question, a challenge to the

19   termination, the e-mail termination, whether that was

20   arbitrary and capricious, which is separate from the

21   research priority.  And that is a more narrow ruling and

22   is appropriate -- is more appropriate to review than a

23   broader policy statement of what NIH will prioritize or

24   will not prioritize.

25       THE COURT:  Wait a minute.  Okay, now I'm

1     appreciating your argument, and I want to appreciate it.

2     Here's what I heard you just say.

3         If this Court were to vacate certain terminations

4     or all of the terminations based on the conduct of

5     Dr. Memoli, that result, from your point of view, is

6     preferable to an opinion that takes issue with these

7     challenged directives on the ground, as I hear your

8     argument, that they either don't direct the terminations

9     or state policies of HHS and NIH, which are beyond the

10    purview of this Court, they have the right to their

11    policies.

12        Do I understand?

13        MR. PORTS:  Yes, your Honor.  We're moving down a

14    funnel essentially from a very broad statement of "These

15    are policies" and then you have the e-mails directing

16    terminations, and then we have the actual final agency

17    action that represents the consummation and the agency's

18    reasons, which are the termination letters which are

19    sent pursuant to that e-mail.  And so we believe that

20    it's the letter that is the termination and it's the

21    notices of awards that are amended that represent the

22    final agency action.

23        THE COURT:  So this Dr. Memoli, when he scurries

24    around and does whatever he does, he does that, I take

25    it -- but I have to review the record more thoroughly,

1    he does that pursuant to e-mails, right?

2         MR. PORTS:  Um --

3         THE COURT:  I mean where does he get his

4    direction?

5         MR. PORTS:  The decisions to terminate grants were

6    Dr. Memoli's decisions, is that what you're asking, your

7    Honor?  He's making the decisions based on --

8         THE COURT:  I'm asking how it works, as a

9    practical matter, as an existential matter?

10        MR. PORTS:  The record here shows that Dr. Memoli

11   received these lists of grants --

12        THE COURT:  That's a careful answer, but I'm

13   asking you -- to the extent that you know, and you're an

14   Officer of the Court, as a practical matter, how did we

15   get from these challenged directives to these -- and

16   I'll focus just on the terminations that are before this

17   Court, and if it's Dr. Memoli who did it, what was he

18   looking at when he made those determinations?  Beyond

19   the grants themselves, what instructions was he looking

20   at?  I'll ask that.

21        What was he looking at?

22        MR. PORTS:  Sure, your Honor.

23        So to -- to answer the question as to the

24   challenged directives, how do we get from the challenged

25   directives to Dr. Memoli's directive to terminate grants

```
 1    that are attached to the e-mails?  I will say, first of
 2    all, that the last three challenged directives, 6, 7, 8,
 3    the Bulls directives, they have nothing to do with
 4    Dr. Memoli's directive to terminate, these are sort of
 5    instructions to ICs about their reviews and about any
 6    future grants to --
 7              THE COURT:  "ICs" are who?
 8              MR. PORTS:  "Institutes and Centers."  NIH is
 9    divided into --
10              THE COURT:  Understood, they're the various
11    defendants here.
12              MR. PORTS:  So these last three have nothing to do
13    with that.
14              The February 21st Memoli memo states his
15    priorities.  And now as far as the -- the details of --
16              THE COURT:  Well that's an order, isn't it?
17              MR. PORTS:  It is a statement of his priorities
18    and a statement of things that may be terminated
19    pursuant to them, but it doesn't terminate anything,
20    it's a statement of research priorities, your Honor.
21              THE COURT:  Which goes out to the various
22    subinstitutes, the ICs?
23              MR. PORTS:  Yes, your Honor, it informs them of
24    Dr. Memoli's priorities and states that they may be
25    terminated and --
```

1          THE COURT:  And he's the man, I mean he's the --

2     in a bureaucracy, he's the one who's giving the

3     directives?

4          MR. PORTS:  He is the Acting Director of NIH, your

5     Honor, yes, he has that authority.

6          THE COURT:  I see.

7          MR. PORTS:  And then the directives are sent --

8     the determinations directed to terminate are sent by

9     him, they are his decisions, um, and that is my -- that

10    is my understanding, as an Officer of the Court, of the

11    statements.  And otherwise the details of his review and

12    what he did, I can't speak beyond the record.

13         THE COURT:  And I'm not asking you to.  The record

14    is what it is, the timing and the like.  And I thank

15    you.

16         Go ahead.

17         MR. PORTS:  Um, thank you, your Honor.

18         So that was the -- what is the program.  But what

19    is the challenged -- if the Court is setting something

20    aside, holding something to be arbitrary and capricious,

21    that is, getting towards "What could be that be?"

22    Again, the defendants submit it is the ultimate

23    terminations of, um, grants, not anything earlier,

24    because all of the earlier things are --

25         THE COURT:  I understand.  You've made that point.

1          MR. PORTS:  Thank you, your Honor.

2          Next we address what are the agency's reasons in

3     any given termination?

4          As the parties recognize, there are a handful of

5     reasons why Dr. Memoli directed the termination of

6     grants.  The language is provided, that is provided in

7     each grant termination decision.  And, um, we in our

8     briefs walk through why we believe it doesn't meet the

9     arbitrary and capricious standard.

10          And we will start by saying the standard of

11     arbitrary and capricious, there is a presumption that it

12     is valid.  It need only be reasoned.  A Court will

13     uphold a decision of less-than-ideal clarity if the

14     agency's path is discernable.  And in our -- in our

15     brief, um, we --

16          THE COURT:  Looking at these letters, and I've

17     looked at many of them, they're ipse dixit, there's no

18     support.  The action must be both reasoned, as I

19     understand the controlling law, reasoned and reasonable.

20     And in an earlier hearing I asked -- I looked at some of

21     this conclusory language and I said, "Well I didn't

22     understand that."

23          Is that so, that they are not, um, leading to

24     valid results, they're not expending the money

25     correctly?  How do I know that?  I know they say that.

1    But just saying it is not sufficient.

2          And I'm not suggesting a pretext here, I'm

3    suggesting they're so conclusory that it doesn't provide

4    me a basis for a rational review to make the

5    determination, um, whether it's arbitrary and

6    capricious.  There's nothing more than these, um, just

7    conclusory statements.

8          You say that's enough.  "DEI" is never defined.

9    The language in one of them, it says "Worse still" and

10   then it comes a litany of things that might be of

11   concern, and there's no explanation of how they're of

12   concern or, um, the like, they're just there, um, and

13   over a very short period of time.

14         MR. PORTS:  Thank you, your Honor.

15         So starting with your point that "DEI" is never

16   defined.  I'm looking at Tab 8 of the binder I just gave

17   you, it's the page -- the 10th page, this has the

18   various lists for terminations, um, the list of reasons

19   for terminations.

20         And I'll note that this one, Number 2, says "DEI:"

21   And this is the justification language where a grant is

22   directed to be terminated, this is the agency's reason

23   for termination.  And I will note that --

24         THE COURT:  Wait a minute, I'm not clear where you

25   are.  You're on Tab 8 --

1              MR. PORTS:  10.

2              THE COURT:  And on Page --

3              MR. PORTS:  10, which is 3226.

4              THE COURT:  Thank you very much.  I'm on Page 10.

5              MR. PORTS:  And just looking at the second bullet

6       point, your Honor.

7              Now it does not say "Terminate DEI grants," and

8       leave it without definition, the agency's stated reason

9       is, quote:  "Research programs based primarily on

10      artificial and nonscientific categories" --

11             THE COURT:  No, it doesn't say that, it starts

12      saying, "DEI," and then your point is there's a colon?

13             MR. PORTS:  Correct, your Honor.

14             THE COURT:  All right, I follow.  I'm reading it.

15             MR. PORTS:  "Research programs based primarily on

16      artificial and nonscientific categories, including the"

17      --

18             THE COURT:  Yes, and it has the language which so

19      many of these -- go down to the sentence, "Worse,

20      so-called 'Diversity Equity and Inclusion,'" and then

21      comes the dread quote:  "DEI are often used to support

22      unlawful discrimination."  Where's the support for that,

23      any support, any rational explanation?

24             You see I do understand.  Believe me, I understand

25      that the extirpation of affirmative action is a -- is

 1    today a valid government position.  I understand that.

 2    Affirmative action had various invidious, um, calculus

 3    based upon race.  I understand that.  But that's not a

 4    license to discriminate.

 5         So I'm asking you, just explain to me, um, "often

 6    used to support unlawful discrimination," I see no

 7    evidence of that?  I mean in this record, point me to

 8    anywhere in this record where it's pointed out that any

 9    particular grant or group of grants is being used to

10    support unlawful discrimination on the basis of race.

11    From what I can see, it's the reverse.  But, um, point

12    it out to me.

13         MR. PORTS:  Thank you, your Honor.  Beyond the

14    statement here, I -- there's nothing that I can point

15    the Court to as far as --

16         THE COURT:  I understand.  All right.  So that's

17    as close to a definition as we've got?

18         MR. PORTS:  That is the agency's reasoning.

19         THE COURT:  I do understand, that that's what's

20    proffered.

21         Go ahead.

22         (Pause.)

23         MR. PORTS:  Thank you, your Honor.

24         Now moving on to the fourth topic then, the

25    terminations do not violate laws or regulations.  Here

 1    the plaintiffs -- first of all, if the Court determines

 2    that these are arbitrary or capricious, or an abuse of

 3    discretion, there's no need to reach this question.  But

 4    if the Court were to reach the question, um, we find the

 5    regulation does not violate -- the terminations don't

 6    violate the regulations because the, um, the relevant

 7    regulation, 45 CFR 75 at 372 is --

 8         THE COURT:  I'm more concerned -- actually forgive

 9    me for interrupting, but just to be transparent.

10         With respect to the interpretation of the

11    regulations, I've got to reflect on the particular

12    challenged regulation and the like.  But how much is the

13    statutory language that Congress has used?  Don't --

14    don't these directives, and isn't the practical effect

15    of these terminations flat-out violate what Congress,

16    the people's representative, has, um -- who have enacted

17    it into law, don't they violate it?

18         MR. PORTS:  Respectfully, your Honor, no, they do

19    not.  And we'll start with, um, here plaintiffs have --

20    at least the APHA plaintiffs, as we say in our response

21    brief, admit that in order to construe these

22    terminations as prohibiting research into health

23    disparities, they need to be "recast," that is the word

24    they use.  And research into health disparities?  NIH

25    has renewed research into health disparities, including

```
 1   research that requires that the researchers themselves
 2   be members of the health disparity communities.
 3          And so we would submit, and I state it as well in
 4   the hearing, that the defendants intended to offer, um,
 5   examples of 13 grants that NIH has not terminated, that
 6   many of them have been renewed after the challenged
 7   directives that authorized research into health
 8   disparities, minority-related health, and topics along
 9   those lines.  That, we would submit, clearly cannot be
10   what the intent is here and that none of these laws --
11          THE COURT:  What cannot be what the intent is?
12          MR. PORTS:  To unlawfully discriminate, in some
13   sort of way, um, is the -- is the question that was the
14   concern.
15          THE COURT:  The fact that you have allowed and
16   reinstated 13?
17          MR. PORTS:  I apologize, your Honor?
18          THE COURT:  Is that what you -- is that your
19   argument?  I'm trying to understand.  The fact that
20   you've reinstated 13?
21          MR. PORTS:  Well, your Honor, these are examples
22   of other grants that have been renewed after the
23   challenged directives that authorized research into
24   health disparities and required that members of the
25   health disparity community be researchers.  And so the
```

1    assertion that this is a prohibition on that type of

2    research, which is favored by certain statutes, is

3    factually incorrect.

4         THE COURT:  But you agree that it's favored by

5    certain statutes.  It's favored?  It's required.  It's

6    not "favored"?

7         MR. PORTS:  Well respectfully, your Honor, we

8    would look at the statutes and I would argue that the

9    language and the terminations do not violate the

10   statutes.

11        So to take an example, um -- looking at the

12   statutory language.  So -- but before I do that, your

13   Honor, I would like to move into evidence, um, certified

14   records of the notices of award.

15        THE COURT:  Well could you answer that question?

16   You were about to and I'm very interested in the answer.

17        MR. PORTS:  Yes, your Honor, I just didn't want to

18   forget to --

19        THE COURT:  The statutory language.

20        MR. PORTS:  Yes, your Honor.

21        So I'm looking at Page 26 of the States' brief,

22   that's 126, it uses the language here:

23        "Challenged directives prohibiting research

24   related to gender identity runs headlong into a

25   provision instructing the NIH Director to, quote,

 1    'encourage efforts to improve research related to the

 2    health of sexual and gender minority populations,' 42

 3    USC, Section 283(p)."

 4         And I'll note that that is the section that -- my

 5    example is the section that the States called out in its

 6    opening remarks.

 7         If we look at the -- if we turn back to the

 8    document that we were looking at before, Tab 8, Page 10,

 9    3226, "Transgender Issues:"

10         "Research programs based on gender identity are

11    often unscientific, have little identifiable return on

12    investment, and do nothing to enhance the health of many

13    Americans.  Many such studies ignore, rather than

14    seriously examine biological realities.  It's the policy

15    of NIH not to prioritize these research programs."

16         Your Honor, this statement here about the

17    terminations is, in the judgment of NIH, "Improving

18    research related to the health of sexual and gender

19    minority populations."  It is the judgment that this

20    research is not -- is not scientifically valuable, and

21    it is --

22         THE COURT:  Wait.  Wait a minute, please.  And I'm

23    truly trying to understand.

24         You just quoted to me, and I believe accurately,

25    the statute, where you started, quote, "Encourage

1    efforts," and then you jumped from there to this

2    language in your Tab 8, Page 10, which I'm looking at.

3          MR. PORTS:  Yes, your Honor.

4          THE COURT:  And you say somehow the language in

5    Tab 8 encourages these efforts that Congress has

6    required?

7          MR. PORTS:  Your Honor, the key language is "to

8    improve research."  And this is a judgment that this

9    research, although arguably related to sexual and gender

10   minorities, is not good research to pursue.

11         THE COURT:  Despite what Congress has said?

12         MR. PORTS:  Your Honor, respectfully Congress has

13   not said that research programs based on gender

14   identity, it's not what this says, it says "improve

15   research related to the health of sexual and gender

16   minorities."  And this -- the Secretary or the Director

17   of NIH can make a judgment on what is an improvement of

18   research and what is research that is not worth

19   pursuing.  And by not pursuing research that --

20         THE COURT:  So Congress has -- in other words, I

21   recognize that legislation is difficult, and it is, it's

22   a difficult government endeavor, and so because of the

23   language they have used -- of course the Congress has

24   never dealt with an administration that has taken the

25   positions that this administration has.  So, um, they're

1    writing in a different milieu, I suggest to you.

2         But "encouraged efforts," you think that mandate

3    -- I read that as a mandate of the people's

4    representatives assembled in Congress, and they have now

5    made that law.  The Director has decided that, um, in

6    his judgment, um, that this is not, um -- I want to be

7    fair to the specific language, he says, it's his

8    judgment that "Such, um, research, um, does not," I take

9    it, Dr. Memoli, in his judgment, um, "is not valid

10   research."

11        Is that correct?

12        MR. PORTS:  The key language, your Honor, in the

13   statute is to "improve research," and that leaves a --

14   that leaves a great deal of discretion to HHS and NIH to

15   say what is "improving research."  And this is not

16   valuable and it's a --

17        THE COURT:  Thank you.  Thank you, that answers my

18   question, it's that language -- Congress's mandate, you

19   point out, is to "improve research."  And he decides

20   this doesn't improve research?

21        MR. PORTS:  Yes.

22        THE COURT:  But it's not explained anywhere, um,

23   how that's so, um, beyond the edict here?  Correct me.

24   It isn't explained?  It's a judgment, but it's not

25   explained?

1           MR. PORTS:  Your Honor, I have nothing beyond the
2      agency's stated reasoning for the termination.
3           THE COURT:  Thank you.  Understood.
4           Go ahead.
5           MR. PORTS:  Moving on to other topics, um,
6      immediately following that.  This is the next line from
7      the States' brief:
8           "The aspects of the challenged directives, the
9      States' characterization of blacklisting research
10     related to covid, cannot be squared with the statute
11     mandating the NIH Director to advance the discovery and
12     preclinical development of medical products for priority
13     virus families and other viral pathogens with the
14     significant potential to cause a pandemic."
15          First of all, your Honor, I'll note that, um,
16     although I have not reviewed all of the recently-filed
17     list of grants, at the time that we were writing a
18     response brief, based on the initial list of grants, we
19     didn't have any terminations for covid research.  APHA
20     said in their reply that they did.  I would respectfully
21     say that's mistaken, although a couple of them said
22     "covid" in the name of the grant.  The reason given by
23     NIH for termination was "vaccine hesitancy."
24          But putting that aside, um, the reason for
25     terminating these grants was:

1          "The end of the pandemic provides cause for

2     terminating covid-related grant funds.  These grant

3     funds were issued for a limited purpose, to ameliorate

4     the effects of the pandemic.  But now that the pandemic

5     is over, the grant funding is no longer necessary."

6          Again this is not inconsistent with the statutory

7     language.

8          THE COURT:  I heard -- and this is an expert

9     record and it's not evidence, but I heard recently that

10    300 people die a week in the United States from covid.

11    Of course probably an equal number die from the flu.  I

12    don't know.

13         Go ahead.

14         MR. PORTS:  So the language for termination is not

15    inconsistent with the statute here.  Again, this is

16    NIH's judgment about what is a priority virus family.

17    Is covid still likely to cause a pandemic?  And it says

18    that the pandemic is over.  And so this is a judgment

19    call and it doesn't contradict the statute.

20         Again, with vaccines, just because a statute says

21    the word "vaccine" doesn't mean that the NIH must

22    prioritize research into vaccine hesitancy.  The

23    language of the statute quoted by the state is to,

24    quote, "Support efforts" -- "Support efforts to," quote,

25    "develop affordable new and improved vaccines."  There's

1    nothing in any of these directives about prohibiting the

2    development of affordable new and improved vaccines.

3    And that is so with each of these actions.  They mention

4    some of the same words, but the actions are -- they do

5    not violate them.

6        The ultimate challenge is that the plaintiffs

7    disagree with NIH's conclusions or that, cited in the

8    conclusion, that NIH did this thing arbitrary and

9    capricious.  But there's no violation of statutes here,

10   um, if we actually look at the statutes and look at the

11   language that NIH provided.

12       And that moves us on to the fifth point, which I

13   believe is the most, um, the one the Court just asked

14   about, and, um, that is that if the Court rules against

15   the defendants, what is the appropriate remedy here?

16   And, um, the ultimate question about what is the result

17   of the Court's order turns a lot on what the Court

18   determines to be the final agency action that it is

19   vacating and remanding.

20       And so the 8 challenged directives that we went

21   through have said -- none of them direct a termination,

22   require a termination, they set priorities.  And so, um,

23   it's difficult to -- vacating them similarly doesn't

24   reverse the termination, those are separate decisions,

25   separate actions.

1          THE COURT:  And that may be right.  I mean

2     Mr. Cedrone made it clear that he was seeking, if that

3     was where the Court went, not to stop with any one or

4     more of these challenged records, but to vacate the

5     termination orders.

6          MR. PORTS:  Yes, your Honor.

7          THE COURT:  And your position?

8          Go ahead.

9          MR. PORTS:  And our position is that if the Court

10    vacates the termination orders, then that reinstates the

11    grants.  There's no need for a preliminary injunction.

12    If that's what the Court said it would do is what it

13    would do, then the defendants would comply.

14         THE COURT:  It is my duty to ask you, and I do so

15    both with respect and the utmost seriousness, were I to

16    do that, are you going to -- is the agency -- I'm not

17    talking about you.  Are the defendants here, starting

18    with the Cabinet Secretary and other high officials, the

19    now Director of the NIH and the individual ICs, are they

20    going to -- preserving all their rights to appeal, if I

21    were to do that, are they going to obey promptly?

22         MR. PORTS:  Yes, your Honor, I would expect the

23    defendants to comply.

24         THE COURT:  You expect them to comply?

25         MR. PORTS:  Your Honor, there is a presumption

1      that the defendants will comply.

2            THE COURT:  There is a presumption they will

3      comply.  And you're telling me, as an Officer of the

4      Court, you expect them to comply?

5            MR. PORTS:  Yes, your Honor.

6            THE COURT:  Thank you.  All right.

7            MR. PORTS:  I began moving in the certified

8      records that show the notices of awards that have been

9      not terminated that deal with the various topics that

10     plaintiffs say are prohibited.  If I may move them into

11     evidence?  They have a certification, a record of

12     regularly-conducted activity attesting to their

13     authenticity.

14           THE COURT:  No objection to my receiving these?

15           (Silence.)

16           THE COURT:  I hear none.  They may be received and

17     they will be part of the record.

18           MR. PORTS:  Yes, your Honor.

19           I will say that APHA had asked that -- so this is

20     a subset of the 16 initial grants that were listed as,

21     um, active at the time of the opposition to the PI.  So

22     this is 13 that continue to be active.  And they asked

23     to be moved in -- or they requested 26.  This is 13 of

24     26.  They requested the opportunity to move in the rest

25     as different documents.  We do not object if they were

1    going to move for that, just to put that on the record.

2         THE COURT:  So I'll take all 26.

3         All right.

4         MR. CEDRONE:  No objection to them being received

5    into evidence preserving all arguments to the weight

6    they should be given, if any.

7         THE COURT:  I understand that.

8         MS. MEEROPOL:  And the same for the APHA

9    plaintiffs, your Honor.

10        THE COURT:  In a multi party case the objection or

11   statement of one is the statement of the others, on that

12   side of the "versus," unless you want to take a

13   different position.  They are received and part of the

14   record.

15        Thank you very much.

16        All right, now as we discussed, here's what's

17   going to happen.  I'm taking this matter under

18   advisement.

19        At 2:00, Ms. Belmont is going to ask you whether

20   you want me to stay my hand, because you're talking.  If

21   you both agree, you can be sure that the Court will

22   agree.

23        I've said, and I reiterate, that this case

24   warrants a thorough written opinion.  I recognize that

25   we've only talked about Phase 1 and indeed we've talked

1    about the contours of Phase 1, and when I say a

2    "thorough written opinion," it's focused on Phase 1.

3    And at an appropriate time, however it comes out, I

4    would enter an order that the interests of justice are

5    that there be a separate judgment so it can be

6    immediately appealed by whoever wants to appeal.

7          If you say you want to -- if you tell her you want

8    me to stay my hand, the Court will honor it.  If any of

9    you want to hear if I have anything to say, she'll tell

10   me that.  I don't need to know who.  It's up to me

11   whether I see my way clear to say anything at all today.

12         It goes without saying that I am very grateful

13   both for the briefing and the extraordinarily fine oral

14   arguments made by counsel.  We'll take the matter under

15   advisement.

16         We'll recess.

17         (Recess, 12:50 a.m.)

18         (Resumed, 2:00 p.m.)

19         THE COURT:  This case warrants and will receive a

20   full written opinion.  At the same time, this case

21   commenced with a request for a preliminary injunction,

22   and the Court takes that very seriously.  And the

23   parties, and I include all the parties, have stepped up

24   to afford the Court the chance to make findings and

25   rulings upon an adequate record.

1          I have worked on the case really since the day it

2     was filed.  I still must further reflect upon the

3     extensive record, the extensive administrative record

4     before the Court, and I intend to do so.

5          But there are some findings and rulings that the

6     Court's efforts, aided by you all, and aided by the

7     Court's law clerks, that I'm able to make today, and in

8     the interests of justice, I'm going to do it, right now.

9          These are -- well let me start really by saying

10    what I'm not going to address, and nothing I say now

11    should, um, implicate or suggest any finding yet to be

12    made, though the Court reserves its right to make such

13    findings upon a more thorough review of the record or,

14    as we will see, as the record comes to be more fully

15    developed.

16         So I am not -- well I have limited today's

17    remarks, at least the first phrase, because I'm going to

18    stop and let you ask questions, and then I have

19    something else to say.  But the first-phase remarks this

20    afternoon are limited entirely to the claims under the

21    Administrative Procedure Act, and nothing else.

22         Even as to the claims under the Administrative

23    Procedure Act, the Court makes no rulings.  I have the

24    data on which I could make them, but I do not today make

25    any ruling on conflicts with the challenged directives

1   or terminations and the governing statutes and

2   regulations save -- that is the Administrative Procedure

3   Act itself is a governing statute.  Likewise, um, I am

4   not today going to endeavor to interpret any of the

5   governing regulations.

6       There is evidence here that, um -- that these

7   directives are at least a part of the process that led

8   us to the terminations that, um, we are dealing with in

9   this case, there was some input of some sort by some

10  representative of DOGE.  The Court makes no finding

11  either way -- either way as to that, but reserves its

12  right further to consider that matter.

13      The Court has expressed a concern, a very real

14  concern about discrimination here.  I'll have more to

15  say about that after our break.

16      One of the things that concerns the Court is that

17  there is more than a little evidence here of, um,

18  discrimination on issues of women's health.  I make no

19  such finding.  I reserve the right to make that finding

20  should I come to be satisfied, by a fair preponderance

21  of the evidence, that such discrimination exists.  So

22  those are the things I'm not making any findings on.

23      As to my remarks today, they are necessarily

24  conclusory.  I've challenged the defendants for making

25  conclusory statements, and perhaps I'm going to make

1    some, but I do so only in the interests of justice and
2    for expedition, I am satisfied that everything I say now
3    is fully supported by the evidentiary record, and, um,
4    in the full written opinion I will, um, have ample
5    recourse to that record.  And I reserve my right to make
6    further subsidiary, um, factual determinations, and draw
7    further legal conclusions.  But what I say now decides
8    the points to which I speak, having in mind there's
9    going to be a full written opinion that will follow.  So
10   let me address the first part of what I want to say.
11        The Court, on the administrative record, rules
12   that the parties before it have standing.  The Court,
13   having carefully considered the briefs and the oral
14   arguments, treats the challenged directives as a whole,
15   as a process, does not break them down into discrete
16   paragraphs, and rules that when treated as a whole,
17   these directives constitute final agency action under
18   the Administrative Procedure Act, Sections 551 and 704.
19        When you look at these directives, 7 different
20   explanations are offered for agency action.  The law, as
21   to the adequacy of such explanations, I -- I would take
22   it, though there are many cases, but the one I want to
23   refer to specifically is Judge Gorsuch's opinion for the
24   Court in *Ohio vs. Environmental Protection Agency*, found
25   at 603 United States at 279, um -- well the PIN cite

1    will be 144 Supreme Court 2040 at 2024.  And there,

2    speaking for the Court, Justice Gorsuch says:

3         "An agency" -- and I'm omitting citations.  "An

4    agency action qualifies as, quote, 'arbitrary' or,

5    quote, 'capricious' if it is not, quote, 'reasonable'

6    and 'reasonably explained.'  In reviewing an agency's

7    action under that standard, a Court is not, quote, 'to

8    substitute its judgment for that of the agency,' closed

9    quote, but it must ensure, among other things, that the

10   agency has offered a satisfactory explanation for its

11   action, including a rational connection between the

12   facts found and the choice made.  Accordingly, an agency

13   cannot simply ignore an important aspect of the

14   problem."

15        This Court finds and rules that the explanations

16   are bereft of reasoning virtually in their entirety.

17   These edicts are nothing more than conclusory,

18   unsupported by factual development.

19        Moreover, in -- as presented to this Court, there

20   is no reasoned argument as to the reliance interests of

21   the many parties affected.  It's well to have recourse

22   precisely to the statute under which this Court -- the

23   Act of Congress under which this Court draws its

24   authority for the conclusions and rulings that the Court

25   makes.

1          I quote paragraph -- not paragraph, Section 706,

2     "Scope of Review of the Administrative Procedure Act."

3     This -- this defines, in this aspect of the case, the

4     powers of this United States District Court in

5     circumstances.  This power is derived directly from the

6     statute enacted by the people's representatives in both

7     Houses of Congress.  It trumps any regulation.  It

8     trumps any order, directive, or edict.  Here is what it

9     says:

10          "To the extent necessary to decision and when

11     presented, the reviewing Court shall decide all relevant

12     questions of law, interpret constitutional and statutory

13     provisions, and determine the meaning or applicability

14     of an agency action."

15          Then, in Paragraph 2, it empowers the Court to

16     "Hold unlawful and set aside agency action, findings,

17     and conclusions, found to be" -- and I here have

18     reliance on Subparagraph A, "arbitrary and capricious."

19          This Court rules that the determinations -- that

20     the challenged directives, excuse me, taken as a whole

21     are -- and each of them are, when taken as a whole,

22     arbitrary and capricious, they are of no force and

23     effect, they are void and illegal.  And so are each of

24     the terminations before this Court declared arbitrary

25     and capricious, void, and of no effect, they are illegal

1    and they are vacated and set aside.

2            I looked up and spotted Ms. Meeropol and I should

3    be specific.

4            I am not now deciding anything beyond the ruling I

5    just made.  That does not mean that in further

6    consideration of the NOFO claims, I could not, or I

7    could not further analyze the argument that was made by

8    those plaintiffs.  All I'm saying is I am not now doing

9    that, I'm not ready, nor am I sufficiently confident to

10   do it.  I'm speaking only to those things about which I

11   -- a careful review satisfies me that on that ground --

12   on the grounds I have announced, I am confident in the

13   action that the Court takes.

14           Having done that, the Court, um, at least sitting

15   this afternoon, accepts the representation of the

16   government counsel, I'm sure made after careful

17   consideration, that he expects that the defendants

18   promptly will comply with the, um, decisions as to the

19   law made by this Court, and I'm relying on that.  The

20   Court -- because the case goes on, the Court has

21   continuing jurisdiction.  And if these -- this vacation

22   of these particular grant terminations, the vacation of

23   these directives, taken as a whole, um, does not result

24   in forthwith, um, disbursement of funds both

25   appropriated by the Congress of the United States and

1   allocated heretofore by the defendant agencies, if that

2   doesn't happen forthwith, the Court has ample

3   jurisdiction.

4       But as I stated earlier, I do come from a kindler,

5   gentler period of jurisprudence when, if a Court of

6   competent jurisdiction -- and this Court is such a

7   court, declares the law authoritatively, executive

8   agencies are presumed to put that declaration into

9   effect, that's the authorization of the Congress in the

10  Administrative Procedure Act.  And based on the

11  representation of counsel, I have every reason to

12  believe that will be done.

13      Now to give effect to the few conclusory findings

14  I have made and the rulings I have thus-far made, the

15  plaintiffs are charged with, forthwith, tomorrow will be

16  soon enough, um, preparing a partial but final judgment

17  as to these issues.  I will enter that final judgment,

18  um, under Federal Rule of Civil Procedure 54(d), in the

19  interests of justice so that there is a basis for an

20  immediate appeal, should anyone wish to appeal.

21      There is more to this case.  I very much

22  understand that.  I both welcome any such appeal, but it

23  is my duty to move as rapidly as careful and

24  conscientious analysis permits, and I believe I have

25  given it to so much of this action as I have just spoken

1   to.

2       I have more to say on another topic, but this is a

3   good time to stop and simply go around and see if there

4   are any questions.  This is not a time to argue or seek

5   to reargue, just are there any questions about what the

6   Court has found and ruled.  Questions.  And we'll go in

7   the order of the argument.

8       Mr. Cedrone?

9       (Pause.)

10      MR. CEDRONE:  No, your Honor, I think it's clear.

11      THE COURT:  Fine.

12      Mr. Parreno?

13      MR. PARRENO:  No, your Honor, no questions.

14      THE COURT:  And, Mr. Ports, any questions?

15      MS. PORTER:  I want to make sure that we're clear

16  that this -- the order applies to all grants listed by

17  the plaintiffs, that's both sets of plaintiffs, as most

18  recently updated, um, any orders to set them aside and

19  terminate them, to vacate them, and set them aside.

20      So everything on that list?

21      THE COURT:  That is the list to which I have

22  referenced.  Your question is perfectly appropriate.

23  That's what I'm speaking about.

24      MS. PORTER:  Okay, thank you, your Honor.

25      THE COURT:  All right.

```
 1          Any other questions?
 2          MS. PORTER:  Does this apply to, I guess, the
 3     status of, um, grants listed where there have been no
 4     action, no affirmative action by the agency other than
 5     maybe, um --
 6          THE COURT:  I think I've made myself clear.  I
 7     have a list and I've acted on it.
 8          MS. PORTER:  Okay, thank you, your Honor.
 9          THE COURT:  All right.
10          Now I have something else to say.
11          MR. PARRENO:  Your Honor, if I may?
12          THE COURT:  Yes.
13          MR. PARRENO:  What, um, just to make it clear,
14     what counsel on the other side has addressed has raised
15     another question for us, and perhaps if I may raise it
16     with the Court?
17          We wish to ask the Court for the opportunity to
18     provide one additional list of plaintiff members, grants
19     of plaintiff members that have not yet been provided to
20     the Court, and we're prepared to, um, provide that.
21          THE COURT:  Work it out with them.  If they
22     oppose, I will take that into account.  But work it out
23     with them.
24          MR. PARRENO:  Yes, thank you, your Honor.
25          THE COURT:  Now there's another aspect of this
```

1    case, a darker aspect, one that I take very seriously,

2    and it's this.

3         I could not -- I cannot, as a United States

4    District Judge, read this record without coming to the

5    conclusion, and I draw this conclusion -- I am hesitant

6    to draw this conclusion, but I have an unflinching

7    obligation to draw it, that this represents racial

8    discrimination and discrimination against America's

9    LGBTQ community, that's what this is.  I would be blind

10   not to call it out.  My duty is to call it out.  And I

11   do so.

12        Now clearly I have no hesitancy in enjoining

13   racial discrimination, I said during the course of the

14   argument, and it is the law and I must uphold it, and I

15   have no hesitancy in upholding it.  The extirpation of

16   affirmative action is a legitimate government policy.

17   It is not a license to discriminate on the basis of

18   color.  It simply is not.  That's what the Civil War

19   amendments are about.  Any discrimination, any

20   discrimination by our government is so wrong that it

21   requires the Court to enjoin it, and at an appropriate

22   time I'm going to do it.

23        Having said that, I welcome -- if the parties

24   wish, though I don't require any extension of the

25   record, evidence as to harm so that I may more carefully

1    and accurately frame such an injunction.  That's racial
2    discrimination.
3         It is palpably clear that these directives and
4    that the set of terminated, um, grants here also are
5    designed to, um, frustrate, to stop research that may
6    bear on the health -- we're talking about health here,
7    the health of Americans, of our LGBTQ community.  That's
8    appalling.  Having said it, I have very real questions
9    about whether this Court has the power to enjoin it.  I
10   do not assert such a power, though I find the record
11   will be clear to anyone that it has and is occurring
12   under this, um, under what's going on.
13        Now I'm speaking only of health care, I'm speaking
14   only of the parties before me, nothing else.  I don't
15   have a record as to that.  It's not the province of this
16   Court just to invade against discrimination.  But on
17   this record, these two aspects of discrimination are so
18   clear that I would fail in my duty if I did not note it.
19        And so the parties are invited, as to those two
20   aspects and -- though I make no finding with respect to
21   it, any harm to the issues involving women's health.
22   Gender differences are an appropriate area of research
23   and research and, um, trying to advance the frontiers of
24   science so that all Americans have the best health care
25   that we can afford.

1          You will meet and inform the Court as to when --

2     if any party wishes -- I am bound by case-in-

3     controversy, I say what I will receive evidence on, but

4     I do not require anything.  I've said everything that I

5     am able to say.  And while there's another phase to this

6     case, on this discrimination issue, I am prepared to

7     receive evidence, but I do not require it.

8          If the parties wish to present evidence, you'll

9     inform me as to when you're prepared to begin such

10    evidentiary -- because defense counsel is correct, they

11    have the right to cross-examine as to that, and at least

12    as to any discrimination as to LGBTQ people, they -- it

13    may very well be that while I can recognize it and call

14    it out, I have no power to enter injunctions with

15    respect to it.  But I'm certainly open to considering

16    that.

17         But let me say something about racial

18    discrimination here.  I've never seen a record where

19    racial discrimination was so palpable.  I've sat on this

20    bench now for 40 years, I've never seen government

21    racial discrimination like this.  And I confine my

22    remarks to this record, to health care.  And I ask

23    myself, how -- how can this be, because on this record

24    anyway, I don't see anyone pushing back against it?

25         I don't -- take a look at the people who have been

 1     named as defendants here, one of them is a cabinet-level

 2     officer.  The other one is, not the same individual, but

 3     is now the Director of the National Institutes of

 4     Health.  And though I needed help as to what an "IC" is,

 5     there are other distinguished, um, at the National

 6     Institutes of Health level and their subsidiary

 7     institutes, these are distinguished doctors, they are

 8     people whose profession has been devoted to the American

 9     people, to our society.  All our society.  They are all

10     American citizens.

11          Now I don't claim any high moral ground here.  I'm

12     a United States District Judge, I have the protections

13     that the Founders wrote into the Constitution, along

14     with imposing upon me a duty to speak the truth in every

15     case, and I try to do that.  And so I've asked myself,

16     what if I didn't have those protections?  What if my job

17     was on the line, my profession, all the career to which

18     I have devoted whatever poor skill I have, would I have

19     stood up against all of this?  Would I have said, "You

20     can't do this, you are bearing down on people of color

21     because of their color.  The Constitution will not

22     permit that."  I see nothing in this record.

23          And, you know, when I ask myself that question,

24     without the protections of --

25          (Phone rings.)

1          THE COURT:  I was going pretty well there.

2          (Laughter.)

3          THE COURT:  Okay.

4          -- without the protections of an independent

5     judiciary so necessary to our society, as I know my own

6     heart, I do not have an answer to that question, for

7     myself, and that makes me unutterably sad.

8          And so we're going to recess.  But is it true of

9     our society as a whole, have we fallen so low?  Have we

10    no shame?

11         We'll recess.

12         (Recess, 2:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

4     hereby certify that the forgoing transcript of the

5     record is a true and accurate transcription of my

6     stenographic notes, before Judge William G. Young, on

7     Monday, June 16, 2025, to the best of my skill and

8     ability.

9

10

11

12

    /s/ Richard H. Romanow 06-23-25
13  _____
    RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25