**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., *et al.*,<br><br>*Defendants.* | No. 1:25-cv-10814-WGY |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS UNREASONABLE-DELAY CLAIMS**

# TABLE OF CONTENTS

Introduction ............................................................................................................................. 1

Background ............................................................................................................................. 2

    I.    NIH's Process for Reviewing Grant Applications ........................................................ 2

    II.    NIH's Deviation from Its Once-Predictable Process ................................................... 4

Argument ............................................................................................................................... 6

    I.    Defendants have not shown that plaintiffs' delay claims are moot. ............................... 6

    II.    Plaintiffs have stated a claim under 5 U.S.C. §706(1). ................................................ 8

        A.    Plaintiffs' complaint plausibly alleges that defendants have delayed required agency actions. ............................................................................................................ 8

            1.    The activities of NIH's study sections and advisory councils are discrete and required agency actions. ............................................................................... 9

            2.    The issuance of a final decision on a grant application is a discrete and required agency action. .......................................................................................... 10

        B.    The challenged delays are not committed to agency discretion. .............................. 12

        C.    There is no valid basis to recast plaintiffs' §706(1) claims as §706(2) claims......... 13

    III.    Plaintiffs have stated claims for constitutional violations. ............................................ 15

    IV.    Plaintiffs have stated a claim that defendants' delays are *ultra vires*. ........................... 17

Conclusion ............................................................................................................................ 18

i

## TABLE OF AUTHORITIES

**Cases:**

*Ahadian v. Rubio*,
    No. 24-cv-12168-ADB, 2025 WL 1617224 (D. Mass. June 6, 2025) .................................. 15

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    No. 25-cv-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025)............................ 1, 16

*AT&T Co. v. United States*,
    124 F.3d 1471 (Fed. Cir. 1997) ...................................................................................... 16

*Biden v. Nebraska*,
    600 U.S. 477 (2023)........................................................................................................ 16

*Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC*,
    268 F. Supp. 3d 1029 (N.D. Cal. 2017) ........................................................................... 8

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024)........................................................................................................ 16

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ........................................................................................ 17

*Dosmetova v. USCIS*,
    No. 3:24-cv-7409-SAL-PJG, 2025 WL 1663661 (D.S.C. Feb. 7, 2025)........................... 13

*Fund for Animals Inc. v. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ......................................................................................... 10

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    593 F.3d 923 (9th Cir. 2010)........................................................................................... 15

*In re Aiken County*,
    725 F.3d 225 (D.C. Cir. 2013) ....................................................................................... 17

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    110 F.4th 295 (1st Cir. 2024) ........................................................................................... 2

*Leedom v. Kyne*,
    358 U.S. 184 (1958)........................................................................................................ 18

*Merlonghi v. United States*,
    620 F.3d 50 (1st Cir. 2010) .............................................................................................. 2

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
    No. 20-cv-3706, 2024 WL 1344450 (D.D.C. March 29, 2024)............................................ 14

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)........................................................................................................ 8, 9

*R.I. Dep't of Env't Mgmt. v United States*,
    304 F.3d 31 (1st Cir. 2002) ............................................................................................ 18

*Ramírez v. Sánchez Ramos*,
    438 F.3d 92 (1st Cir. 2006) .............................................................................................. 6

*Rezaii v. Kennedy*,
   No. 1:24-cv-10838, 2025 WL 750215 (D. Mass. Feb. 24, 2025) .................................... 11, 13

*Tang v. Chertoff*,
   493 F. Supp. 2d 148 (D. Mass. 2007) ........................................................................... 10, 11

*Touarsi v. Mueller*,
   538 F. Supp. 2d 447 (D. Mass. 2008) .................................................................................. 13

*United States v. Lahey Clinic Hosp., Inc.*,
   399 F.3d 1 (1st Cir. 2005) ................................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................................................ 17

**Statutes:**

2 U.S.C. §683 ................................................................................................................................ 17

5 U.S.C.:

   §551(10)(B) ............................................................................................................................ 10

   §551(11)(C) ............................................................................................................................ 10

   §555(b) ................................................................................................................................... 11

   §704 ....................................................................................................................................... 10

   §706(1) ......................................................................................... 8, 9, 10, 12, 13, 14, 15

   §706(2) .............................................................................................................................. 13, 15

   §1009(a)(2) .............................................................................................................................. 2

31 U.S.C. §1105(a)(7) ................................................................................................................... 16

42 U.S.C.:

   §284(b)(2) ............................................................................................................................. 3, 9

   §284(b)(2)(B) ........................................................................................................................ 3, 9

   §284(b)(3) ................................................................................................................................ 4

   §284a(a)(1) ............................................................................................................................... 9

   §284a(a)(3)(A)(ii) ................................................................................................................. 3, 9

   §284a(e) ................................................................................................................................. 2, 9

   §289a(a) ................................................................................................................................. 3, 9

Pub. L. 99-158, §2, 99 Stat. 820, 874 (1985) ............................................................................... 5

**Rules:**

Fed. R. Civ. P. 12(b)(1) ............................................................................................................. 2, 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 2, 6

**Regulations:**

41 C.F.R. §102-3.150 ........................................................................................................ 2

42 C.F.R.:

    §52.5(a) ..................................................................................................................... 9, 11

    §52.5(b) ......................................................................................................................... 11

    §52.5(b)(2) ..................................................................................................................... 11

    §52a.5 ............................................................................................................................... 3

    §52h.3 .............................................................................................................................. 2

    §52h.4 .............................................................................................................................. 3

    §52h.7 .............................................................................................................................. 9

    §52h.8 .............................................................................................................................. 3

    §52h.11 ............................................................................................................................ 3

89 Fed. Reg. 104,554 (Dec. 23, 2024) ............................................................................. 4

90 Fed. Reg. 2710 (Jan. 13, 2025) .................................................................................... 4

90 Fed. Reg. 5920 (Jan. 17, 2025) .................................................................................... 4

## INTRODUCTION

Plaintiffs' complaint details two related but distinct categories of illegal actions that defendants have undertaken in recent months. First, as the Court already found in Phase One, defendants adopted a series of unlawful directives and improperly terminated in-progress research grants based on those directives. *See* Am. Compl. ¶¶144–158 (ECF No. 75); Rule 54(b) Final Judgment 1–2 (ECF No. 151). Second, and in part as a result of those Challenged Directives, defendants have impeded the issuance of new research grants—including grants for projects that *already* have received "fundable" scores from NIH's relevant review committees. *See* Am. Compl. ¶¶118–143. Plaintiffs' complaint explains, in detail, why these undue delays violate the APA (Count 7), run afoul of the Constitution (Counts 4–5), and exceed defendants' legitimate executive authority (Count 6). Defendants now seek dismissal of those undue-delay claims, but their arguments are unavailing.

Indeed, the Court has already rejected defendants' current arguments in the co-pending lawsuit brought by private plaintiffs. There, defendants raised the exact challenges they now press in their motion to dismiss, including that (1) plaintiffs "have not shown the agency failed to . . . take a discrete and mandatory agency action," (2) "the 'delay' claims are moot as NIH is now expeditiously reviewing and deciding applications," and (3) "Congress committed grant administration to agency discretion." Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 2, 19, 32, *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-cv-10787-WGY (ECF No. 66). Construing defendants' arguments as a motion to dismiss, the Court rejected them in a thorough, reasoned opinion. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-cv-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025) (*APHA*). As the Court explained, the plaintiffs' complaint "raise[ed] a fact issue" about "whether NIH is processing affected applications" that "would be improper for this Court to decide at [the pleading] stage." *Id.* at *14.

1

Defendants identify no reason for the Court to reach a different conclusion here. Plaintiffs' amended complaint states viable, justiciable claims arising out of defendants' unlawful delay. Their motion should be denied.

## BACKGROUND

### I.    NIH's Process for Reviewing Grant Applications

Phase Two of this litigation involves defendants' delay in reviewing pending applications for NIH research grants. The application process generally begins with the publication of a "notice of funding opportunity" (NOFO), in which the agency declares its intention to fund a specific project and outlines the project's goals. Am. Compl. ¶¶54–55; *see also* AR 3892 (§2.3.5, at I-51).[1] Applications submitted in response to the NOFO then undergo two layers of evaluation: an initial layer of review by a "scientific review group" (also known as a "study section"), followed by "advisory council" review. Am. Compl. ¶57; *see* AR 3912–3917 (§2.4.1-3, at I-71–76). Both bodies carry out their work at regularly scheduled meetings that must be noticed in advance in the Federal Register. *See* 5 U.S.C. §1009(a)(2); 42 U.S.C. §284a(e); 41 C.F.R. §102-3.150; 42 C.F.R. §52h.3.

Study sections review applications for their scientific merit and likely impact on the field of research. Am. Compl. ¶¶58–64; *see* AR 3913 (§2.4.1.2, at I-72); ECF No. 77-37, ¶¶21–22.

---

[1] Defendants seek dismissal for failure to state a claim under Rule 12(b)(6) and dismissal on mootness grounds under Rule 12(b)(1). In ruling on the Rule 12(b)(6) component of defendants' motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 303 (1st Cir. 2024). In ruling on the Rule 12(b)(1) component of defendants' motion, the Court "*must* credit [plaintiffs'] well-pled factual allegations and draw all reasonable inferences in [plaintiffs'] favor" and "*may* also consider whatever evidence has been submitted, such as the depositions and exhibits submitted." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) (emphasis added) (quotation marks omitted). Because defendants have not submitted any evidence beyond the pleadings to support their mootness argument, *see* Defs.' Mem. 8–9 (ECF No. 150), the Court may dispose of that argument based on the allegations in the amended complaint, accepted as true. Nevertheless, plaintiffs are including parallel citations to pertinent extra-pleading evidence in the record, in case the Court deems it appropriate to look beyond the amended complaint.

2

NIH has hundreds of study sections, organized by specialty and consisting primarily of non-federal scientists with expertise in the relevant field. Am. Compl. ¶59; *see* 42 C.F.R. §52h.4. For each NOFO, the assigned study section reviews applications and issues each one a numerical "impact score" and a percentile rank comparing it to other applications reviewed by that study section. Am. Compl. ¶62; *see* 42 C.F.R. §§52a.5, 52h.8, 52h.11. A favorable study-section recommendation is a prerequisite to a final award. Am. Compl. ¶58; *see* 42 U.S.C. §§284(b)(2)(B), 289a(a).

Each fiscal year, NIH's institutes and centers publish guidance called "paylines" to help applicants interpret their study-section scores. Am. Compl. ¶63; *see* ECF No. 77-12, ¶24. These paylines reflect a sort of cutoff: for each category of grants, the payline shows the impact score or percentile above which a project is highly likely to be funded. Am. Compl. ¶63; *see* ECF No. 77-12, ¶24. In Fiscal Year 2025, for example, published guidance from the National Institute of Allergy and Infectious Diseases (NIAID) established a 12th-percentile payline for the category of "R01" awards with junior principal investigators. Am. Compl. ¶63. In other words, an applicant in that category who received a score from the relevant study section within the 12th percentile—called a "fundable" score—could anticipate that NIAID would likely fund his or her project. *Id.*; *see* ECF No. 77-12, ¶24.

Applications recommended by study sections then proceed to the advisory-council stage. Am. Compl. ¶65. While study sections focus on scientific merit, the advisory councils—one for each NIH component that funds grants—weigh programmatic issues, such as how an application aligns with the institute or center's priorities and overall funding availability. *Id.* ¶66; *see* AR 3916–3917 (§2.4.3, at I-75–76); ECF No.77-37, ¶23. A favorable recommendation from the relevant advisory council is a prerequisite to a final award of any grant over $50,000. Am. Compl. ¶67; *see* 42 U.S.C. §§284(b)(2), 284a(a)(3)(A)(ii). The advisory council's recommendations go to

the director of the relevant institute or center, who makes the ultimate funding decision and issues a final "Notice of Award" to successful applicants.  Am. Compl. ¶¶68–69; *see* 42 U.S.C. §284(b)(3); AR 3982 (§5, at IIA-59).

## II.    NIH's Deviation from Its Once-Predictable Process

Before the events giving rise to this lawsuit, NIH's application process followed a predictable timetable with three yearly application cycles published in advance.  Per the agency's website, the current triannual schedule is as follows:

### Review and Award Cycles

| | Cycle I | Cycle II | Cycle III |
|---|---|---|---|
| Application Due Dates | January 25 - May 7 | May 25 - September 7 | September 25 - January 7 |
| Scientific Merit Review | June - July | October - November | February - March |
| Advisory Council Round | August or October * | January | May |
| Earliest Project Start Date | September or December * | April | July |

Am. Compl. ¶72.  Since January, however, defendants have upended that once-predictable schedule.  *See id.* ¶¶118–134.  These delays have manifested themselves in two concrete ways.

*First*, defendants have impeded the study-section and advisory-council meetings that, as just described, are necessary to the review of grant applications under governing law.  According to the published calendar above, "Cycle II" grant applications—which were reviewed by study sections in fall 2024—should have undergone advisory-council review in January 2025.  Am. Compl. ¶118.  And indeed, meetings for the advisory councils had been duly noticed for January and February 2025 in the Federal Register.  *Id.* ¶119; *see, e.g.*, 90 Fed. Reg. 5920 (NHLBI) (Jan. 17, 2025); 90 Fed. Reg. 2710 (NHGRI) (Jan. 13, 2025); 89 Fed. Reg. 104,554 (NIDA) (Dec. 23, 2024).  But after Inauguration Day, any meetings that had not yet been held were abruptly canceled.

Am. Compl. ¶119; *see* ECF No. 77-12, ¶32.  Throughout February and March, various NIH institute websites stated: "At the present time, all Federal advisory committee meetings have been canceled until further notice.  Additional information will be forthcoming as it becomes available. We apologize for any inconvenience."  Am. Compl. ¶122; *see* ECF No. 77-43.  Study sections saw similar cancellations.  Applications submitted to NIH last fall in "Cycle III" should have undergone study-section review in February and March of this year, but meetings that had been noticed for January and February were cancelled after Inauguration Day without warning.  Am. Compl. ¶118; *see* ECF No. 77-44, at 1.  And between January 22 and March 3, defendants suspended the scheduling of future advisory-council or study-section meetings: no meeting notices appeared in the Federal Register during that time.  Am. Compl. ¶121; *see* ECF No. 77-40, ¶9.

This is unprecedented.  Congress has required the current peer review of grant applications for scientific and technical merit since 1985, *see* Pub. L. 99-158, §2, 99 Stat. 820, 874; in that time, broad cancellations or changes to noticed meetings have been rare, *see* Am. Compl. ¶120; ECF No. 77-12, ¶¶30–33; ECF No. 77-37, ¶25.  According to an analysis of Federal Register notices, an average of four cancellations were issued each year between Fiscal Years 2010 and 2024, and even amendments—which typically provide a new date immediately—were uncommon, with an average of around 100 per year.  Am. Compl. ¶120; *see* ECF No. 77-40, ¶8.  While defendants have resumed scheduling some future meetings, they have not done so at a pace that will allow them to meet the timelines that NIH has published and consistently met in the past.  *See* Am. Compl. ¶125.  The number of meetings scheduled for this fiscal year remains far below the number of such meetings in every fiscal year since 2010, and even further below a level that would make up for the meetings not held in January and February.  *Id.*; *see* ECF No. 77-40, ¶13 & fig. 1; Ex. A (Supp. Hutchings Decl., attached hereto) figs. 1–2.  The consequences of these delays for plaintiffs

have been significant.  For example, as of the filing of the amended complaint, the five health centers of the University of California system were awaiting action on applications submitted in 2024 worth approximately $563 million.  Am. Compl. ¶77.

*Second*, defendants have also systematically delayed and withheld final decisions on applications favorably reviewed by study sections and advisory councils.  Am. Compl. ¶¶128–134.  Again, the consequences for plaintiffs and their institutions are significant.  For example, as of March 31, the University of Massachusetts had 18 applications pending that received fundable scores and had been reviewed by an advisory council but had not been notified of a final determination on funding.  *Id.* ¶161.

## ARGUMENT

Defendants ask the Court to dismiss plaintiffs' unreasonable-delay claims on mootness grounds under Rule 12(b)(1), and they seek dismissal of the relevant counts for failure to state a claim under Rule 12(b)(6).  The Court should deny both requests.

## I.    Defendants have not shown that plaintiffs' delay claims are moot.

Defendants begin by asserting (Mem. 8–9) that plaintiffs' claims are moot because defendants have supposedly resumed business as usual at NIH.  To secure dismissal on these grounds, however, defendants have a "heavy burden": they "must show that, after the case's commencement, intervening events have blotted out the alleged injury and established that the conduct complained of cannot reasonably be expected to recur."  *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 100 (1st Cir. 2006).  Defendants fail to make that showing.

The amended complaint alleges, in detail, how defendants have canceled required meetings and delayed required review of pending applications.  Am. Compl. ¶¶118–143.  In particular, the complaint alleges that, although defendants resumed scheduling some meetings in early March, "the number of meetings scheduled for this fiscal year remains at a level far below the number of

such meetings in every fiscal year since 2010, and even further below the number that would be required to make up for the meetings not held in January and February." *Id.* ¶123.  The complaint also alleges that defendants are "delaying final decisions on applications in order to implement the Challenged Directives by conducting a review of applications for their relation to subjects and topics disfavored by the Administration." *Id.* ¶130.  Although these allegations suffice at the pleading stage, plaintiffs went further and provided a thorough analysis of the underlying numbers, which demonstrate that "defendants are not picking up the pace." *Id.* ¶125.

In the face of these allegations and this analysis, defendants insist (Mem. 9) that, "although NIH briefly paused certain processes upon the change in administrations, NIH has been conducting all necessary steps in the review and disposition of grant applications."  But defendants offer no actual evidence to support that bald assertion.  Citing the online calendar of NIH's Center for Scientific Review (CSR), defendants assert (Mem. 5 n. 4, 8 n. 5) that NIH scheduled or held 837 peer review meetings between March 24 and June 30.  But plaintiffs have reviewed the same CSR calendar and identified only 533 meetings for that period.  Defendants do not explain the source or scope of their larger number.  More fundamentally, defendants' reliance on a March 24 start date is misleading: in prior years, NIH held hundreds of meetings between January 21 and March 23— a period where no meetings occurred in 2025.  A more apt comparison of the period of January 21 to June 30 shows that defendants continue to lag the number of meetings scheduled by the CSR in 2024 and 2023.[2]

Moreover, to the extent the Court looks beyond the pleadings (*but see supra*, n. 1), the evidence refutes defendants' assertion that NIH has resumed business as usual.  Plaintiffs have

---

[2] Defendants also cite the Federal Register to show that some study-section and/or advisory-council meetings have occurred or are now scheduled to occur. *See* Mem. 8–9 & nn. 5–6.  Again, that does not address the problem, which is that defendants have failed to resume meetings at a pace that will allow them to meet the timelines that NIH has published and consistently met in the past.

previously submitted evidence demonstrating that unreasonable delays persist, with significant consequences for plaintiffs and their institutions. *See* ECF No. 101-2, ¶¶3–10; ECF No. 101-3, ¶¶5–10; ECF No. 101-5, ¶¶9–16. And an updated analysis shows that the same pattern is continuing. Through June 30, NIH has scheduled only 1,644 grant-related meetings for Fiscal Year 2025, just 79% of the historical average by that date (2,112) and below the historical range from 2010 to 2024 (1,969–2,314). *See* Ex. A (Supp. Hutchings Decl.) ¶4 & fig. 1. The number of noticed meetings by June 20 was similarly still at 76% of the historical average. *Id.* ¶6 & fig. 2. As a result of these delays, the amount of funds committed to new and competitive renewal grants is approximately $800 million lower than expected based on results over the same time period in Fiscal Years 2023 and 2024. *See* Ex. B (Supp. Berg Decl., attached hereto) ¶9. This gap in obligated funds has continued to grow, making it highly unlikely that—absent relief from this Court—NIH will close the gap and obligate its full budget by the fast-approaching end of the fiscal year in September. *Compare* Am. Compl. ¶¶209–211, *with* Ex. B. (Supp. Berg Decl.) ¶¶8–11.

"Given the existence of key disputed facts at this early stage in the case," defendants have "not met their heavy burden of showing that [plaintiffs'] claims . . . are moot." *Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1043 (N.D. Cal. 2017). The Court should reject their cursory mootness arguments.

## II.    Plaintiffs have stated a claim under 5 U.S.C. §706(1).

### A.    Plaintiffs' complaint plausibly alleges that defendants have delayed required agency actions.

To state a claim under §706(1), a plaintiff must allege that an agency failed to take—or unreasonably delayed in taking—"a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). Plaintiffs' complaint does exactly that. The complaint alleges that defendants have cancelled and declined to schedule study-

section and advisory-council meetings and have refused to issue final decisions on pending grant applications. *See* Am. Compl. ¶¶118–143. These are all "discrete agency action[s]" that NIH is "required to take." *S. Utah*, 542 U.S. at 64 (emphasis omitted).

> **1.    The activities of NIH's study sections and advisory councils are discrete and required agency actions.**

By both statute and regulation, the activities of NIH's study sections and advisory councils—including the holding of meetings, the review of pending grant applications by those bodies, and the making of a final recommendation on each application—are discrete agency actions that NIH is required to take. Under the PHSA, applications for NIH research grants *must* undergo "technical and scientific peer review"—*i.e.*, review by a study section. 42 U.S.C. §§284(b)(2)(B), 289a(a). Regulations, in turn, provide for the creation of study groups and reiterate that "no awarding official shall award a grant . . . unless the application has been reviewed by a peer review group . . . and the group has made recommendations concerning the scientific merit of that application." 42 C.F.R. §52h.7. Similarly, the PHSA states that each NIH institute's advisory council "*shall* meet . . . at least three times each fiscal year," 42 U.S.C. §284a(e) (emphasis added), and that it "*shall* advise, assist, consult with, and make recommendations to the Secretary and the Director of such institute" on areas within the council's jurisdiction, *id.* §284a(a)(1) (emphasis added). The PHSA also makes sign-off from an advisory council a prerequisite to a final award of any grant in excess of $50,000. *Id.* §284(b)(2); *see id.* §284a(a)(3)(A)(ii); 42 C.F.R. §52.5(a) (providing that "[a]ll applications" for NIH grants "shall be evaluated," "including review by an appropriate National Advisory Council").

Defendants do not dispute that the PHSA and its implementing regulations require study sections and advisory councils to hold meetings, review applications, and make recommendations. Nevertheless, defendants maintain (Mem. 12) that §706(1) does not allow a court to compel

9

"meetings—even meetings established by statute." But nothing in the provisions they cite supports such a categorical rule. As defendants acknowledge, §706(1) allows a court to compel an "agency action." And under 5 U.S.C. §551(13), an agency action includes "the whole or a part of an agency . . . sanction [or] relief." A "relief," in turn, includes the "taking of other action on the application or petition of, and beneficial to, a person," while a "sanction" includes the "withholding of relief." 5 U.S.C. §§551(10)(B), (11)(C). Study-section and advisory-council meetings fall within those capacious definitions: they are formal meetings at which an arm of the agency evaluates, grades, and votes on each application.

The single case defendants cite, *Fund for Animals, Inc. v. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), is wholly inapposite. There, the court held that an agency's budget request to Congress was not an "'agency action'" at all, "much less 'final agency action' within the meaning of §704." *Id.* at 19. But there is no similarity between that disputed budget request or any of the other examples of agency non-"actions" that the D.C. Circuit cited—*e.g.*, "prepar[ing] proposals, conduct[ing] studies, meet[ing] with members of Congress and interested groups, and engag[ing] in a wide variety of activities that comprise the common business of managing government programs," *id.* at 20—and the formal, legally required business of study sections and advisory councils at issue here. Defendants ultimately offer no explanation how the facts of *Fund for Animals* are analogous—because they are not.

## 2. The issuance of a final decision on a grant application is a discrete and required agency action.

Even if the activities of NIH's study sections and advisory councils were not discrete and required, the issuance of a timely, up-or-down decision on each grant application clearly is. *See Tang v. Chertoff*, 493 F. Supp. 2d 148, 156, 158 (D. Mass. 2007) (compelling adjudication of pending application for immigration relief). Under NIH regulations, "[a]ll applications" for grants

10

"*shall* be evaluated by the [HHS] Secretary [or his designee] through [qualified] officers and employees." 42 C.F.R. §52.5(a) (emphasis added). "[S]ubject to approvals, recommendations or consultations by the appropriate National Advisory Council or other body as may be required by law," those regulations state, "the Secretary *will* (1) approve, (2) defer because of either lack of funds or a need for further evaluation, or (3) disapprove support of the proposed project in whole or in part." *Id.* §52.5(b) (emphasis added).

Defendants respond (Mem. 13) that 42 C.F.R. §52.5(b)(2) allows the agency to "defer [a decision on an application] because of either lack of funds or a need for further evaluation." But defendants have not purported to defer any applications for lack of funding or further evaluation— and they certainly have not presented evidence of any formal deferrals. Defendants' argument also ignores 5 U.S.C. §555(b), which, again, requires the agency to "proceed to conclude a matter presented to it" "within a reasonable time." *See Tang*, 493 F. Supp. 2d at 155–156 (citing §555(b) in denying motion to dismiss); *Rezaii v. Kennedy*, No. 1:24-cv-10838, 2025 WL 750215, at *5 (D. Mass. Feb. 24, 2025) (same). In short, NIH does not have unbridled discretion to sit on an application forever, as defendants seem to suggest.[3]

In the end, to reject defendants' motion, the Court need only reiterate what it already decided in the related *APHA* case. There, as here, the plaintiffs alleged that "the Public Officials have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them." 2025 WL 1548611, at *14. As the Court held, these allegations "raise[] a

---

[3] Defendants elsewhere argue (Mem. 14) that plaintiffs' complaint does not "identify[] all the specific applications that have allegedly been delayed." But there is no such pleading requirement. *Compare* Fed. R. Civ. P. 8(a)(2) (requiring only "a short and plain statement of the claim"), *with* Fed. R. Civ. P. 9(b)–(c) (requiring "particularity" with respect to certain claims not at issue here). Plaintiffs' amended complaint describes the nature of the applications that have been delayed and provides a number of representative examples. *See* Am. Compl. ¶¶118–143, 159–211. No more is required at this stage.

fact issue—whether NIH is processing affected applications at all, as opposed to something else—that would be improper for this Court to decide at this stage." *Id.*[4]

### B.    The challenged delays are not committed to agency discretion.

Defendants also argue that plaintiffs cannot pursue their §706(1) claim because "NIH's management of its grant review process is . . . 'committed to agency discretion by law.'"  Defs.' Mem. 16 (quoting 5 U.S.C. §701(a)(2)).  As already explained, however, defendants are *required* to hold study-section and advisory-council meetings and to issue final decisions on award applications.  *See supra*, pp. 9–12.  Thus, even if defendants may exercise discretion in deciding whether to ultimately grant or deny a particular application, they may not categorically refuse to issue a decision on that application.  *See Tang*, 493 F. Supp. 2d at 154 (holding, in the context of a §706(1) claim, that even if "the substance of the Attorney General's decision is discretionary, he does not have discretion to decide not to adjudicate at all").

Defendants suggest (Mem. 16) that a §706(1) claim can proceed only if a statute expressly imposes "timing requirements on [the] agency," but there is no support for such a rule.  By its terms, §706(1) allows a court to "compel agency action unlawfully withheld *or unreasonably delayed*" (emphasis added).  The emphasized language is important.  As a session of this Court explained in *Tang*:

> Congress did not say "agency action unlawfully withheld or delayed," as it could have if it meant to allow judicial review only where agency delay violated a fixed deadline set out in a separate statute or regulation.  The deliberate insertion of the word "unreasonably" contemplates that reviewing courts will delve into the

---

[4] Defendants argue (Mem. 13) that plaintiffs cannot challenge the withdrawal of NOFOs because "maintaining a NOFO is neither discrete nor mandatory."  That misunderstands how defendants' withdrawal of NOFOs features in plaintiffs' claims.  First, to the extent defendants withdrew any NOFOs based on the policies in the Challenged Directives, those withdrawals are now unlawful as a direct consequence of the Court's determination, in Phase One, that the directives are "void, illegal, and of no force and effect."  Rule 54(b) Final Judgment 2.  Second, to the extent the withdrawal of a NOFO has caused defendants to hold an application in perpetual limbo, that state of limbo is a basis for relief under §706(1).  In this regard, the discrete and required agency action is not the maintenance of the NOFO—it is, as described above, a final yes-or-no decision on the pending grant application.

question of what is "reasonable" in the pacing of adjudication.

493 F. Supp. 2d at 155. Defendants' attempt to narrow §706(1) to cases involving fixed statutory deadlines also ignores the plain text of 5 U.S.C. §555(b), which states, in relevant part, that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time." *See Rezaii*, 2025 WL 750215, at *5 (holding that §706(1) claim survived motion to dismiss where federal officials failed to process application "within a reasonable time" as required under §555(b)).

The two cases that defendants cite do not support their efforts to limit the scope of §706(1) . In both cases, the court concluded that various immigration statutes gave public officials discretion over all aspects of the disputed application process, "including its pace." *Dosmetova v. USCIS*, No. 3:24-cv-7409-SAL-PJG, 2025 WL 1663661 (D.S.C. Feb. 7, 2025);[5] *see Touarsi v. Mueller*, 538 F. Supp. 2d 447 (D. Mass. 2008).[6] For the reasons discussed, however, that conclusion does not apply to NIH's review of grant applications: defendants do not have unfettered discretion over the pace of review, but instead must review and decide applications "within a reasonable time." 5 U.S.C. §555(b).

For all these reasons, plaintiffs have stated a viable §706(1) claim.

**C.      There is no valid basis to recast plaintiffs' §706(1) claims as §706(2) claims.**

Defendants also contend (Mem. 10) that the Court should not consider plaintiffs' §706(1) claim because it is really a §706(2) claim in "disguis[e]." But the central premise of defendants' argument—that plaintiffs' §706(1) claim is "based on the same legal theory" as their §706(2) claim

---

[5] The decision in *Domestova* is of limited persuasive force; it consists of a magistrate's report and recommendation that did not receive further review because the plaintiff voluntarily dismissed her claims before the court acted on her objections. *See* Notice of Voluntary Dismissal, *Domestova v. USCIS*, No. 3:24-cv-7409-SAL-PJG (D.S.C. April 18, 2025) (ECF No. 10).

[6] Even as to the specific immigration statutes at issue in *Touarsi*, other courts—including other sessions of this Court— have concluded that the federal government does *not* have unreviewable discretion to delay review of applications. *See Touarsi*, 538 F. Supp. 2d at 449 (collecting cases, including the *Tang* case discussed above).

(Mem. 10)—is incorrect.

Plaintiffs' unreasonable-delay claim vindicates different legal rights—and seeks different relief—than their other APA claims. That is clear not only from the amended complaint, but also from the course of proceedings so far. The §706(2) claims at issue in Phase One challenged certain discrete final agency actions (*i.e.*, the adoption of several directives and the termination of grants based on those directives) and asked the Court to set those actions aside. *See* Am. Compl. ¶¶94–117, 144–158; *see also* Rule 54(b) Final Judgment 1–2. Now, in Phase Two, plaintiffs' §706(1) claims seek relief for ongoing *inaction* that plaintiffs' §706(2) claims did not address—and that this Court has yet to redress. *See* Am. Compl. ¶¶118–143.

To be sure, there are some issues common to both sets of claims: plaintiffs alleged, for example, that the continuing delays stemmed in part from defendants' efforts to implement the Challenged Directives' blacklisting policy. *See id.* ¶¶264–265. Those directives have now been set aside, and defendants may no longer carry them out—including by holding up applications based on the directives. *See* Rule 54(b) Final Judgment 1–2. But that is not the end of the story. To the extent the challenged delays persist—and plaintiffs maintain that they do—plaintiffs are entitled to prove that those delays are unreasonable and to seek redress for the harms they are causing. At bottom, defendants are not asking the Court to strike a duplicative claim; they are seeking a windfall by asking the Court to leave unaddressed an entire category of injuries the Court has yet to consider.

The very cases that defendants cite confirm that their arguments are misplaced. For example, in *National Parks Conservation Ass'n v. U.S. Department of the Interior*, No. 20-cv-3706, 2024 WL 1344450 (D.D.C. March 29, 2024), the court did not decline to consider the plaintiff's §706(1) claim, as defendants here suggest. Instead, the court simply decided that it

14

should address the plaintiff's §706(2) claims *before* addressing any §706(1) claims—exactly as this Court is doing. *See id.* at *9; *see id.* at *14–23 (considering the §706(1) claim and finding that the defendants committed unreasonable delay). Meanwhile, in *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923 (9th Cir. 2010), the Ninth Circuit declined to consider a §706(1) claim because the supposed agency *inaction* that the plaintiffs sought to challenge under §706(1) (namely, the agency's alleged failure to close a particular forest trail to motorized vehicles) was really just a recasting of an agency *action* that the plaintiffs were time-barred from challenging under §706(2) (namely, the agency's drawing of a boundary line that placed the trail outside of a no-vehicle zone). *See id.* at 933–934; *accord Ahadian v. Rubio*, No. 24-cv-12168-ADB, 2025 WL 1617224, at *4 (D. Mass. June 6, 2025) (declining to "separately consider" a §706(2) claim that "rel[ied] on the same theory" as a co-pending §706(1) claim). Here, by contrast, defendants' unreasonable delay in reviewing plaintiffs' applications is not merely the flip side of some affirmative action that the agency has taken.

Plaintiffs' §706(1) claim is not "another volley" in an "assault on the Challenged Directives." Defs.' Mem. 10. It is a freestanding claim that the Court should proceed to try on the merits.[7]

## III.    Plaintiffs have stated claims for constitutional violations.

In addition to violating the APA, the Challenged Directives also unconstitutionally usurp two of Congress's core powers: the power to legislate and the power to appropriate. Defendants

---

[7] Defendants elsewhere argue (Mem. 14–15) that plaintiffs have failed to state a claim for unreasonable delay under §706(2). That argument is a non sequitur. Again, plaintiffs' APA claim for unreasonable delay arises under §706(1), not §706(2). As the parties previously explained in a joint filing, Phase Two of this case involves "Count 7 [*i.e.*, plaintiffs' §706(1) claim] and that portion of Counts 4–6 [*i.e.*, plaintiffs' constitutional and *ultra vires* claims] that plaintiffs contend concern unreasonable delay." ECF No. 113, at 1 n. 1. For that reason, defendants' contention (Mem. 15) that "an application remaining under review is not a final agency action" misses the point. Plaintiffs are bringing a §706(1) claim precisely *because* defendants have withheld a required final action by keeping applications "under review" indefinitely.

ask the Court to reject plaintiffs' constitutional claims "for the same reasons" it dismissed separation-of-powers arguments in the *APHA* case (Mem. 17), but the plaintiff states' claims are not the same as those of the *APHA* plaintiffs.  There, the Court held that the plaintiffs' separation-of-powers claim was "the stuff of APA litigation" because it involved, at its core, defendants' compliance "with statutory and regulatory requirements."  *APHA*, 2025 WL 1548611, at *15.

By contrast, plaintiffs here challenge defendants' "pattern and policy of systematic delays," Am. Compl. ¶¶241, 247–248, which effectively impound appropriated funds in violation of appropriations statutes, the Impoundment Control Act of 1974, and, ultimately, the Constitution, *see United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 14 (1st Cir. 2005) (recognizing the separation-of-powers problems that arise when an agency, "by its actions," effectively "repeal[s] an act of Congress").  Congress' "legislative supremacy over fiscal matters" has been axiomatic since the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 431 (2024), and "control of the purse" is "[a]mong Congress's most important authorities," *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).  Plaintiffs' APA claims cannot fully redress defendants' attempt to run out the clock on grant spending with the unconstitutional result of de facto impoundment of duly appropriated funds.

Defendants' observation (Mem. 18) that the Executive "has implicit authority" from Congress "to not enter grants" misses the point.[8]  As defendants acknowledge, "Congress knows how to write laws that constrain Executive Branch discretion," Defs.' Mem. 18 (quoting *AT&T Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997)), and *Congress did so here*.  In enacting

---

[8] It is notable that this new interpretation is essentially an about-face in NIH's traditional relationship with Congress. For at least the last two decades, across presidential administrations, NIH has made every effort to obligate every dollar of its congressionally appropriated funds within the given fiscal year.  Ex. B (Supp. Berg Decl.) ¶¶14–15.  NIH has in fact reported to Congress that it has obligated all or nearly all of its funds.  *Id.* ¶¶12, 17-15; *see also* 31 U.S.C. §1105(a)(7) (requiring reporting of appropriations, receipts, and expenditures from prior fiscal year to Congress).

the Impoundment Control Act, Congress made clear that the Executive does not have the power to shirk its spending duties—instead, the President is limited to informing Congress of the President's view that certain appropriations are no longer needed and awaiting a congressional response. 2 U.S.C. §683. And even if the Executive can make a reasonable and lawful argument for impoundment, those funds must still "be made available for obligation" unless and until Congress receives a special message from the President and approves rescission within the following 45 days. *Id.*

Defendants' unprecedented and systematic delay of grant review has set NIH on track to be unable to award its appropriated funds. *See* Am. Compl. ¶211 (explaining that defendants' delay caused a $260 million reduction in anticipatable new and competitive renewal awards in 2025). That gap has only continued to grow, creating an effective funding gap of $3.71 billion as of June 1, 2025. Ex. B (Supp. Berg Decl.) ¶7. To spend all or nearly all of its appropriated funds, NIH would need to commit approximately $23.3 billion in the remaining three months of the fiscal year—a pace without any modern precedent. *Id.* ¶11. Defendants have not shown any reasonable ability to recover the time lost, and their stagnant progress as the fiscal year winds down indicates the constitutional nature of the problem: the Executive does not possess the "unilateral authority to refuse to spend" vast swaths of funding. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (citing *In re Aiken County*, 725 F.3d 225, 261 n.1 (D.C. Cir. 2013)). The Executive's power here is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–638 (1952) (Jackson, J., concurring). On this ground, too, the Court should award relief.

## IV.    Plaintiffs have stated a claim that defendants' delays are *ultra vires*.

Plaintiffs' *ultra vires* claims are not precluded by their APA claims, as defendants suggest (Mem. 18–19.) Even after the APA's passage, "some residuum of power remains with the district

to review agency action that is *ultra vires*." *R.I. Dep't of Env't Mgmt. v United States*, 304 F.3d 31, 42 (1st Cir. 2002). So, for example, if the Court were to agree with defendants' arguments on plaintiffs' other claims, *but see supra* pp. 8–15, it would still have the authority to set aside defendants' *ultra vires* actions. *See R.I. Dep't of Env't Mgmt.*, 304 F.3d at 42–43 (explaining that *ultra vires* review of nonfinal actions is permissible where a plaintiff lacks "a meaningful and adequate means of vindicating its rights" and there is no clear evidence that Congress "intended to preclude review of the agency's particular determination"). Because plaintiffs' claim is not precluded by the APA, *see id.*, and because it provides a distinct avenue for injunctive relief, *see Leedom v. Kyne*, 358 U.S. 184, 188–189, 191 (1958), the Court should entertain it.

## CONCLUSION

The Court should deny defendants' motion to dismiss.

June 30, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

 /s/ *Gerard J. Cedrone*
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Allyson Slater (BBO No. 704545)
  *Director, Reproductive Justice Unit*
Rachel M. Brown (BBO No. 667369)
Vanessa A. Arslanian (BBO No. 688099)
Phoebe M. Lockhart (BBO No. 709411)
Chris Pappavaselio (BBO No. 713519)
  *Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
  *Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

 /s/ *James C. Luh*
Michael Drezner*
James C. Luh*
  *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
  *Attorney General of California*

 /s/ *Emilio Varanini*
Neli Palma
  *Senior Assistant Attorney General*
Emilio Varanini*
Kathleen Boergers*
  *Supervising Deputy Attorneys General*
Nimrod Pitsker Elias*
Daniel D. Ambar*
Ketakee R. Kane*
Sophia TonNu*
Hilary Chan*
  *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for the State of California*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

 /s/ *Andrew Hughes*
Andrew Hughes*
Tyler Roberts*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for the State of Washington*

19

**KRISTIN K. MAYES**
 *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
 *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*


**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**KEITH ELLISON**
 *Attorney General of Minnesota*

 /s/ *Pete Farrell*
Peter J. Farrell*
 *Deputy Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
peter.farrell@ag.state.mn.us

*Counsel for the State of Minnesota*

**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ *Lauren Peach*
Shannon Stevenson*
 *Solicitor General*
Lauren Peach*
 *First Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
lauren.peach@coag.gov

*Counsel for the State of Colorado*


**ANNE E. LOPEZ**
 *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
 *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON D. FORD**
 *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
 *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
  *Attorney General of New Jersey*

 /s/ *Nancy Trasande*
Nancy Trasande*
Bryce Hurst*
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 954-2368
nancy.trasande@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
  *Attorney General of New York*

 /s/ *Rabia Muqaddam*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

* admitted *pro hac vice*

**RAÚL TORREZ**
  *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete*
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
  *Attorney General of Oregon*

 /s/ *Christina L. Beatty-Walters*
Christina L. Beatty-Walters*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
tina.beattywalters@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
  *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl*
  *Assistant Attorney General*
17 West Main Street
P.O. Box 7857
Madison, WI 53707
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*